# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

BELLA HEALTH AND WELLNESS,
DENISE "DEDE" CHISM,
ABBY SINNETT, and
KATHLEEN SANDER, on behalf of them-
selves and their patients,

 *Plaintiffs*,

 v.

PHIL WEISER, in his official capacity as
Attorney General of Colorado;
ROLAND FLORES,
AMANDA MIXON,
JENNIFER BLAIR,
BECKETT CZARNECKI,
ROBERT M. MAULITZ,
SAUGHAR SAMALI,
ALAN E. SHACKELFORD,
KIELY M. SCHULTZ,
AMY E. COLEN,
ANITA KUMAR,
DONALD LEFKOWITS,
MAIDUL MEHMUD,
KIAN MODANLOU,
SCOTT C. STRAUSS,
CHRISTOPHER A. BATES,
JULIE ANN HARPER, and
HIEN H. LY, in their official capacity as
members of the Colorado Medical Board;
BERNARD JOSEPH FRANTA,
LORI RAE HAMILTON,
KARRIE TOMLIN,
LENNY ROTHERMUND,
HAYLEY HITCHCOCK,
ALISSA M. SHELTON,
PHYLLIS GRAHAM-DICKERSON,
BRANDY VALDEZ MURPHY,
DIANE REINHARD,

Case No.   <u>23-939</u>

**VERIFIED COMPLAINT**

**DEMAND FOR
JURY TRIAL**

NICHELE BRATTON, and
AECIAN PENDLETON, in their official capacity as members of the Colorado State Board of Nursing;
JOHN KELLNER, in his official capacity as District Attorney of the 18th Judicial District of Colorado;
MICHAEL DOUGHERTY, in his official capacity as District Attorney of the 20th Judicial District of Colorado; and
BETH McCANN, in her official capacity as District Attorney of the 2nd Judicial District of Colorado;

 *Defendants.*

## NATURE OF THE ACTION

1. A new Colorado law targets women who have changed their minds about abortion, forcing them to undergo abortions they seek to avoid.

2. Although Colorado claims to recognize the "fundamental right to continue a pregnancy," its new law, SB 23-190, actively thwarts women from making that choice, and makes it illegal for nurses and doctors to assist them or even *inform* them about their options.

3. That misguided approach both violates the Constitution and makes Colorado a national and international outlier.

4. Across the country and around the world, pregnant women facing threatened miscarriages are commonly treated with progesterone—a naturally occurring and safe hormone that supports pregnancy. Progesterone helps thicken the uterine lining

and suppresses uterine contractions, thereby helping a woman who makes the choice to stay pregnant carry out that choice.

5.   Plaintiffs are experienced, licensed health care providers who regularly provide progesterone to help women facing threatened miscarriages. Collectively, they have used progesterone this way for thousands of women, over several decades of practice.

6.   Plaintiffs, in fact, feel religiously compelled to offer this treatment to women facing threatened miscarriage. They cannot in good conscience turn their backs on either their pregnant patient or the pregnancy she seeks their medical help to continue.

7.   In 49 states, it remains perfectly legal for health care providers to provide such treatment to women who seek it. But a new Colorado law makes it illegal to give progesterone to one particular group: women who have changed their minds about having an abortion and instead choose to stay pregnant. If Plaintiffs persist in offering progesterone to help these patients carry out their choice, they will be "subject to discipline" by their respective licensing boards and will risk losing their licenses. And by publicizing their willingness to provide this treatment option, Plaintiffs are exposed to crushing financial penalties.

8.   Some women initially begin the abortion process by taking a drug called mife-pristone—which the FDA describes as "a drug that blocks a hormone called proges-terone that is needed for a pregnancy to continue." By blocking progesterone, mife-pristone eventually causes an abortion by triggering a miscarriage.

9.   But as the Supreme Court has long recognized, the decision to have an abortion is often a stressful one and fraught with consequences. Sometimes women change their minds about whether to follow through with an abortion. Sadly, some women are even tricked or pressured into taking mifepristone in the first place, including women who are victims of sex trafficking.

10.   While Colorado allows Plaintiffs and other health care providers to use pro-gesterone for all other women facing threatened miscarriage, SB 23-190 makes it il-legal for them to offer the same treatment for women facing threatened miscarriage because they initially took mifepristone (whether willingly or not) but now want to remain pregnant. Colorado law would force these women to abort pregnancies they wish to continue.

11.   No public health goal is served, and Plaintiffs and their patients will be irrep-arably harmed, by allowing SB 23-190 to take effect and depriving these women of a treatment available to all other Coloradans facing threatened miscarriage.

12. Indeed, mere hours before SB 23-190 took effect, a woman contacted Plain-tiffs, requesting their help in reversing an abortion after taking mifepristone. Under

Bella's care, she received an initial dose of progesterone to reverse the effects of mifepristone and is now under follow-up care.

13. SB 23-190 would deprive this woman of the ability to exercise her fundamental right to continue her pregnancy, leaving her at risk of being forced to undergo an abortion she no longer desires. It also forces Plaintiffs to imminently choose between exercising their sincerely held religious beliefs by offering this woman and her child life-affirming health care—or facing the loss of their licenses and severe financial penalties.

14. No public health goal is served by denying Colorado women a treatment available in every other state even to women who have changed their minds and choose to continue their pregnancy after taking one abortion pill.

15. Colorado's decision to single out for draconian penalties progesterone treatment to reverse an unwanted abortion violates Bella's free exercise rights. Bella and its providers sincerely believe that they are religiously obligated to assist any woman facing a threat of miscarriage who requests their help, whether that risk arises biologically, due to physical trauma, or because she willingly or unwillingly took the first abortion pill. Colorado, in no uncertain terms, now tells them that if they choose to follow their religious beliefs, they risk losing their licenses and face crushing financial penalties. This is precisely the type of targeting and coercion prohibited by the Free Exercise Clause.

16. SB 23-190 also constitutes an egregious form of viewpoint discrimination, leaving health care providers free to publicize any and all progesterone treatments save one—progesterone administered to reverse the effects of the first abortion pill. But the First Amendment roundly condemns any governmental attempt to play favorites in this fashion. And it likewise protects a patient's right to receive information. Colorado cannot decide that certain topics are off limits for health care providers and their patients just because Colorado does not like the message that women can choose to change their minds.

17. Finally, SB 23-190 will have tragic effects on any woman in Colorado who has taken mifepristone and wants help to maintain her pregnancy. The Fourteenth Amendment entitles those women to make medical decisions affecting their bodily integrity and to receive the equal protection of the laws—including laws regulating medical practices like progesterone treatment. But thanks to SB 23-190, women who have changed their mind after beginning the abortion-pill regimen—or those who were pressured or tricked into taking it in the first place—are now left out in the cold. While other women facing threatened pregnancy loss can still seek help, Colorado is now forcing abortion on women who desire to carry their pregnancies to term—and prohibiting any health care provider from helping them carry out that choice, or even telling them their options.

18. Without immediate relief, Plaintiffs are threatened with the loss of medical and nursing licenses for continuing to help women in need who choose to keep their

pregnancies, as well as severe financial penalties merely for publicizing their willingness to help. Without immediate relief, Plaintiffs' patients will be forced to undergo abortions they would choose not to have.

## JURISDICTION AND VENUE

19. This action arises under the Constitution and the laws of the United States. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

20. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

21. Venue lies in this district under 28 U.S.C. § 1391(b)(1) and (2).

## THE PARTIES

### *Plaintiffs*

22. Plaintiff Bella Health and Wellness is an independent, faith-based Catholic medical center offering life-affirming, dignified health care to men, women, and children. Bella is a Colorado nonprofit corporation and a de facto association of the Christian faithful under Code of Canon Law of the Catholic Church c.299, § 1. Bella maintains its primary medical campus in Englewood, Colorado, and additional medical centers in Denver and Lafayette, Colorado.

23. Plaintiff Denise "Dede" Chism, MSN, PNNP, is co-founder and chief executive officer of Bella. She earned her master's degree in nursing with a specialty as a perinatal nurse practitioner from Regis University in Denver. She has worked as a nurse practitioner specializing in high-risk pregnancies for over twenty-five years.

24. Plaintiff Abby Sinnett, MS, WHNP, is co-founder and chief operating officer of Bella. She earned her master's degree in science from the University of Colorado. She has ten years' experience as a women's health nurse practitioner. She also has ten years' experience as a women's clinical preceptor, educating nurse practitioner students, certified nurse midwife students, and physician assistant students in the clinical setting. She worked as a labor and delivery nurse for seven years before becoming a nurse practitioner.

25. Plaintiff Kathleen Sander, MD, OB-GYN, is a board-certified obstetrician and gynecologist at Bella, where she has worked for five years. She earned her medical degree from Florida State University. She completed the four-year OB-GYN Residency Training Program at Mercy Hospital St. Louis, as well as a year-long fellowship in medical and surgical NaPro Technology at the Pope Paul VI Institute.

26. All four Plaintiffs assert claims on behalf of themselves and their current and prospective patients.

### Defendants

27. Defendant Phil Weiser is the Colorado Attorney General. Weiser "shall prosecute" complaints referred to him by the Colorado Medical Board, Colo. Rev. Stat. § 12-240-125(5)(d), and the Colorado State Board of Nursing, *id.* § 12-255-119(4)(d). Weiser has authority to investigate and enforce the Colorado Consumer Protection Act. *See id.* §§ 6-1-103, 6-1-107. Weiser is sued in his official capacity only.

28.  Defendants Roland Flores, Jr., Amanda Mixon, Jennifer Blair, Beckett Czarnecki, Robert M. Maulitz, Saughar Samali, Alan E. Shackelford, Kiely M. Schultz, Amy E. Colen, Anita Kumar, Donald J. Lefkowits, Maidul (May) Mehmud, Kian A. Modanlou, Scott C. Strauss, Christopher A. Bates, Julie Ann Harper, and Hien (Adam) H. Ly are members of the Colorado Medical Board. As members of the Colorado Medical Board, they exercise investigative, adjudicative, and disciplinary authority over licensees, certificants, and registrants with respect to Colorado Revised Statutes, title 12, article 240. *See id.* § 12-240-125. These Defendants are sued in their official capacity only.

29.  Defendants Bernard Joseph Franta, Lori Rae Hamilton, Karrie Tomlin, Lenny Rothermund, Hayley Hitchcock, Alissa M. Shelton, Phyllis Graham-Dickerson, Brandy Valdez Murphy, Diane Reinhard, Nichele Bratton, and Aecian Pendleton are members of the Colorado State Board of Nursing. As members of the Colorado State Board of Nursing, they exercise investigative, adjudicative, and disciplinary authority over licensees, certificants, and registrants with respect to Colorado Revised Statutes, title 12, article 255. *See id.* § 12-255-119. These Defendants are sued in their official capacity only.

30.  Defendant John Kellner is District Attorney of the 18th Judicial District of Colorado. The 18th Judicial District includes Arapahoe County, where Bella's primary medical campus is located. Kellner has authority to investigate and enforce the

Colorado Consumer Protection Act. *See id.* §§ 6-1-103, 6-1-107. Kellner is sued in his official capacity only.

31. Defendant Michael Dougherty is District Attorney of the 20th Judicial District of Colorado. The 20th Judicial District includes Boulder County, where Bella's Lafayette medical center is located. Dougherty has authority to investigate and enforce the Colorado Consumer Protection Act. *See id.* §§ 6-1-103, 6-1-107. Dougherty is sued in his official capacity only.

32. Defendant Beth McCann is District Attorney of the 2nd Judicial District of Colorado. The 2nd Judicial District includes Denver County, where Bella's Denver medical center is located. McCann has authority to investigate and enforce the Colorado Consumer Protection Act. *See id.* §§ 6-1-103, 6-1-107. McCann is sued in her official capacity only.

## FACTUAL ALLEGATIONS

### *Bella Health and Wellness*

33. Bella Health and Wellness is a nonprofit, faith-based medical clinic that offers life-affirming, dignified health care to men, women, and children from all backgrounds and faith traditions. Bella is one of Denver's leading multi-specialty medical practices, offering obstetrics-gynecology care as well as family medicine, pediatrics, and functional medicine.

34. The inspiration for Bella arose in 2012, when mother and daughter nurse practitioners, Dede Chism and Abby Sinnett, were on a medical mission in the Andes

Mountains of Peru. On that mission trip, Dede and Abby became convinced that everyone has a story, every life should be protected, and every person deserves to know they are made good. They ultimately discerned the Holy Spirit's call to open a Catholic medical clinic for women in the Denver metropolitan area.

35.   In December 2014, Dede and Abby opened Bella Natural Women's Care, the first comprehensive, life-affirming OB-GYN practice in Colorado. In 2018, Bella began also offering care to men and children. In 2020, Bella instituted full family medicine and primary care under a new mission name, Bella Health and Wellness.

36.   Today, Bella has 18 providers and over 20,000 patients, averaging approximately 200 new patients each month. A significant percentage of Bella's patients are financially vulnerable, with approximately one in three obstetrics patients receiving Medicaid, Emergency Medicaid, or free care.

37.   Bella currently practices out of three clinics, with the medical center in Englewood, Colorado as its primary campus. Bella also partners with Catholic Charities to provide medical services to women at Marisol Health Clinics in Denver and Lafayette, Colorado.

38.   Bella is organized as an association of the Christian faithful under Code of Canon Law of the Catholic Church c.299, § 1, for religious, public, charitable, or educational purposes, to promote health and the social welfare of the Catholic community (not to the exclusion of others). As an association of the Christian faithful under canon law, Bella "strive[s] in a common endeavor to foster a more perfect life, to promote

public worship or Christian doctrine, or to exercise other works of the apostolate such as initiatives of evangelization, works of piety or charity, and those which animate the temporal order with a Christian spirit." Code of Canon Law of the Catholic Church c.298, § 1.

39.  Bella is a nonprofit corporation organized in the state of Colorado under section 501(c)(3) of the Internal Revenue Code.

40.  Bella is included in the federal group tax exemption of the Roman Catholic Church. It is listed in the Official Catholic Directory—which lists all agencies, instrumentalities, and the educational, charitable, and religious institutions operated by the Roman Catholic Church in the United States—under the Archdiocese of Denver.

41.  Bella's Articles of Incorporation authorize it to promote, establish, conduct, and maintain activities:

> (a) To provide spiritual, emotional, educational, charitable, and financial support of human dignity in accordance with the social teachings of the Magisterium of the Catholic Church, the Ethical and Religious Directives of the United States Conference of Catholic Bishops;
>
> (b) To support the ministry of the local Archbishop in a way that is consistent with its mission and possibilities; to govern all efforts in accord with good stewardship, fidelity to Catholic teaching on matters of faith and morals; to conduct its work in conformity with Civil and Canon laws; and to cooperate with all relevant archdiocese policies and procedures;
>
> (c) To promote and protect life from natural conception to natural death;
>
> (d) To deliver, and support the delivery of, charitable health services consistent with the teachings of the Catholic Church;
>
> (e) To assist the poor in their basic health care needs;
>
> (f) To promote a Catholic culture, spiritual life and strong relationship with the Lord Jesus among members, volunteers, and workers of the

Corporation through spiritual retreats, religious services, liturgical rites and celebrations, lectures, talks, discussion groups and other similar activities;

(g) To develop religious formation programs concerning the teachings of the Catholic Church on human dignity, women's health, and the gift of sexuality; [and]

(h) To promote the religious freedom of all citizens and the protection of moral conscious for patients and physicians concerning health care[.]

42. Bella operates with the blessing of Archbishop Samuel Aquila of the Archdiocese of Denver.

43. Bella exists to make people whole—body, mind, and soul—by practicing medicine that honors the innate dignity of every person. Bella and its providers believe that they are entrusted to continue the healing ministry of Jesus Christ. They approach all health care with compassion and reverence, guided by the words of St. Pope John Paul II: "A person's rightful due is to be treated as an object of love, not as an object for use."

44. Consistent with its religious mission, Bella and its providers and staff follow the Ethical and Religious Directives for Catholic Health Care Services issued by the United States Conference of Catholic Bishops (available at https://perma.cc/KAS3-JXAK). Under the Directives, "The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care in-

stitution." *Id.* at 13. The "free exchange of information" that results from the relation-ship between the professional health care provider and the patient "must avoid ma-nipulation, intimidation, or condescension." *Id.*

45. All providers employed by Bella sign a "Provider Ethical Agreement." Ex. A. The Agreement explains that "[p]roviders and staff of Bella have agreed to follow the Ethical and Religious Directives for Catholic Health Care Services as issued by the United States Conference of Catholic Bishops." By signing the Agreement, Bella's providers "agree to identify treatment plans that work in cooperation with the body and that do not alter healthy natural processes."

46. Each patient of Bella signs a "Practice Agreement." Ex. B. The Agreement provides that Bella commits "to provide comprehensive, life-affirming health care with dignity and compassion" and "to offering you medical solutions that respect your dignity, preserve your integrity, and work in cooperation with your body." The Agree-ment explains, "This means that we do not offer contraception, sterilizations, or abor-tions but rather promote and provide natural fertility awareness that is scientifically validated."

47. Bella and its providers believe that pregnancy and childbirth are beautiful and natural processes. They are devoted to honoring the dignity of the women they serve and promoting respect for their unborn children.

48. Bella and its providers are committed to providing the best possible care to all pregnant women, including women who are experiencing threatened miscarriage, regardless of the cause of that threat.

49. Thus, Bella's commitment to respecting the dignity of its patients extends to women who decided to take the first drug in the abortion-pill regimen before concluding that they wish to continue their pregnancies.

50. Consistent with its commitment to honor the dignity of their patients and provide life-affirming health care, Bella offers progesterone therapy to all pregnant women experiencing threatened miscarriage—including women who have taken the first abortion pill and then choose to continue their pregnancies.

51. The use of progesterone to treat women who change their minds after taking the first abortion pill is commonly known as "abortion pill reversal."

### Progesterone

52. Progesterone is a naturally occurring hormone that is named for its promotion of gestation.[1]

53. Progesterone plays an essential role in regulating female reproductive function in the uterus, ovaries, mammary glands, and brain. It is particularly critical to the achievement and maintenance of a healthy pregnancy.[2]

---

[1]   *See* W. M. Allen et al., *Nomenclature of Corpus Luteum Hormone*, 136 Nature 303, 303 (1935) https://perma.cc/DV4P-W5BL (discussing identification of the "progestational hormone").

[2]   *See generally* Lucie Kolatorova et al., *Progesterone: A Steroid with Wide Range of Effects in Physiology as Well as Human Medicine*, 23 Int'l J. Molecular Scis., July 2022, https://perma.cc/V3JE-CGXF.

54. Progesterone is naturally secreted by the corpus luteum (*i.e.*, the remnants of the ovarian follicle that enclosed a developing ovum) during the first ten weeks of pregnancy, followed by the placenta during later pregnancy.[3]

55. Progesterone prepares the endometrium (the tissue lining the uterus) to allow implantation and stimulates glands in the endometrium to secrete nutrients for the embryo.[4]

56. Later in pregnancy, progesterone plays a role in the relaxation of smooth muscle cells, promoting uterine relaxation prior to delivery.[5]

57. Progesterone has been used in fertility care for pregnant women for more than 50 years.[6]

58. Progesterone received FDA approval in 1998 for use in treating irregular thickening of the endometrium (endometrial hyperplasia) in post-menopausal women.[7]

---

[3] Jessie K. Cable, *Physiology, Progesterone*, StatPearls Publishing (Michael H. Grider ed., 2022), https://perma.cc/VB6D-JY72.

[4] *See* Arri Coomarasamy et al., *PROMISE: first-trimester progesterone therapy in women with a history of unexplained recurrent miscarriages – a randomised, double-blind, placebo-controlled, international multicentre trial and economic evaluation*, Health Tech. Assessment, May 2016, at 1, https://perma.cc/4BZH-NUUN.

[5] *See* N.E. Simons et al., *The long-term effect of prenatal progesterone treatment on child development, behaviour and health: a systematic review*, 128 Brit. J. of Obstetrics & Gynaecology 964, May 2021, https://bit.ly/3Ky7SGD.

[6] *See* Gian Carlo Di Renzo et al., *Progesterone: History, facts, and artifacts*, 69 Best Practice & Rsch. Clinical Obstetrics & Gynaecology 2 (2020), https://bit.ly/3ZH1uAU.

[7] FDA, Approval Letter (Dec. 16, 1998), https://perma.cc/M7T7-VSDL.

59. The FDA historically classified the drugs pregnant women might take into five risk categories (A, B, C, D, or X) to indicate the potential of a drug to cause adverse effects during pregnancy.

60. Progesterone is classified as a "Category B" drug for pregnant women—in the same category as Tylenol, the most commonly used pain reliever during pregnancy.[8]

61. There are several well-known indications for progesterone administration in both obstetrics and gynecology. These include treatment of recurring miscarriages, prevention of preterm birth, support of endometrial structure and function during in vitro fertilization, treatment of absent menstrual periods (secondary amenorrhea), treatment of excessive blood loss during menstruation, treatment of premenstrual syndrome, and prevention of irregular thickening of the endometrium (endometrial hyperplasia) during menopause.[9]

62. All uses of supplemental progesterone except for two—treatment of endometrial hyperplasia and secondary amenorrhea—are considered "off-label" uses.

63. Health care professionals may lawfully prescribe or use a prescription drug both for uses suggested on the FDA-approved labeling, *i.e.*, "on-label uses," and for uses not prescribed, recommended, or suggested on the FDA-approved labeling, *i.e.*, "off-label uses."

---

[8]   FDA, Prometrium Label, at 19, https://perma.cc/CR46-2FTS; *Prometrium Prescribing Information,* Drugs.com, https://perma.cc/RDN3-WNQ8; *see also* Emily Oster, *Expecting Better* 169 (2016) ("Other than prenatal vitamins, probably the most common Category B drug is Tylenol," which is "the most commonly used pain reliever during pregnancy.").

[9]   *See* Kolatorova et al., *supra* note 2.

64. Off-label use of prescription drugs is a widespread and accepted practice in health care.[10]

65. The FDA has long recognized the freedom health care professionals enjoy to prescribe FDA-approved drugs off-label. It has stated: "[O]nce a [drug] product has been approved for marketing, a physician may prescribe it for uses or in treatment regimens of patient populations that are not included in approved labeling."[11]

66. Obstetricians frequently prescribe drugs for off-label uses during pregnancy.

67. Two recent studies evaluated progesterone as a potential treatment for women with vaginal bleeding in early pregnancy or unexplained recurrent miscarriages.

68. The first study, known as the Progesterone in Recurrent Miscarriages (PROMISE) study, evaluated more than 800 women with unexplained recurrent miscarriages in 45 hospitals in the United Kingdom and the Netherlands. It found a 2.5%

---

[10]   *See, e.g.*, Agata Bodie, Cong. Rsch. Serv., R45792, Off-Label Use of Prescription Drugs 10 (2021), https://perma.cc/T35U-H8KD (estimating that off-label prescriptions make up as much as 38% of doctor-office prescriptions in the United States (collecting sources)); *see also, e.g.*, *Wash. Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) ("[I]t is undisputed that the prescription of drugs for unapproved uses is commonplace in modern medical practice and ubiquitous in certain specialties.").

[11]   Citizen Petition Regarding the Food and Drug Administration's Policy on Promotion of Unapproved Uses of Approved Drugs and Devices; Request for Comments, 59 Fed. Reg. 59820, 59821 (Nov. 18, 1994) (quoting 12 FDA Drug Bulletin, Apr. 1982, at 5, https://perma.cc/A5UJ-C5YL); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (explaining that "'off-label' usage … is an accepted and necessary corollary of the FDA's mission to regulate … without directly interfering with the practice of medicine").

greater live birth rate among the women who received progesterone therapy, but concluded there was no "significant difference" in the rate of live births with the use of progesterone.[12] There was also no increased risk of birth defects.

69. The second study, known as the Progesterone in Spontaneous Miscarriage (PRISM) study, followed over 4,000 women at 48 hospitals in the United Kingdom and found a 3% greater live birth rate among the women who received progesterone therapy. The study found no "significantly higher incidence of live births" among all women who received progesterone therapy. But it did identify a differential benefit among women with prior miscarriages, showing a 15% greater live birth rate among women with early pregnancy bleeding and three or more prior miscarriages. It also found no increased risk of birth defects.[13]

70. In November 2021, the UK's National Institute of Health and Care Excellence (NICE) published new guidelines, based on review of recent studies (including the PRISM study), recommending progesterone therapy for women with early pregnancy bleeding and at least one previous miscarriage.[14]

---

[12]   Coomarasamy et al., *supra* note 4.

[13]   Arri Coomarasamy et al., *A Randomized Trial of Progesterone in Women with Bleeding in Early Pregnancy*, 380 New Eng. J. Med. 1815 (2019), https://bit.ly/3m0dXCl.

[14]   *Ectopic pregnancy and miscarriage: diagnosis and initial management*, National Institute for Health and Care Excellence (NICE) (updated Nov. 24, 2021), https://perma.cc/Y9TE-KCY5 (Guideline NG126, Recommendation 1.5.2).

71. The NICE committee specifically noted that "there was no evidence of harms for women or babies" from the use of progesterone, including "no increase in risk of stillbirth, ectopic pregnancy, congenital abnormalities or adverse drug reactions."[15]

***The Abortion Pill***

72. The abortion pill, also known as "medication abortion," "medical abortion," or "chemical abortion," refers to the use of prescribed drugs to terminate pregnancy, as opposed to surgical abortion.

73. Despite the common term "the abortion pill," the current abortion-pill regimen consists of two drugs: (1) mifepristone (marketed originally as "RU-486" and now as "Mifeprex"), and (2) misoprostol.

74. Mifepristone is a synthetic steroid developed in the 1980s by a research team led by Etienne-Emile Baulieu at the French pharmaceutical company Roussel-Uclaf.[16]

75. Mifepristone is a progesterone antagonist, meaning that it binds to—and blocks—the same intracellular receptors as progesterone.[17]

---

[15] *Ectopic pregnancy and miscarriage: diagnosis and initial management*, National Institute for Health and Care Excellence (NICE), 16 (November 2021), https://perma.cc/4W4X-Q95Y (Guideline NG126 Update).

[16] *See generally The Antiprogestin Steroid RU 486 and Human Fertility Control* (Etienne-Emile Baulieu & Sheldon J. Segal eds., 1985), https://bit.ly/3zyNvTs.

[17] *See id.* at 276 ("Our results confirm that RU 486 behaves as a progesterone antagonist at the receptor level.").

76. As the FDA explains, "Mifepristone is a drug that blocks a hormone called progesterone that is needed for a pregnancy to continue."[18]

77. As Baulieu put it, the progesterone receptors are like a keyhole, and mifepristone is the "false key" that fits the lock but cannot open it.[19]

78. By blocking the progesterone receptors, mifepristone causes the uterine lining to deteriorate, blocking oxygen and nutrition to the developing embryo and eventually resulting in detachment of the embryo from the endometrium. It also softens the cervix and renders the uterus vulnerable to contractions.[20]

79. The second drug in the abortion-pill regimen, misoprostol, binds to smooth muscle cells in the uterine lining, thereby causing contractions that mechanically expel the embryo from a woman's uterus.

80. Misoprostol is part of the protocol because mifepristone alone has an incomplete abortion rate of 20-40%, as determined by the end point of complete uterine expulsion.[21]

---

[18]   FDA, Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation, https://perma.cc/5XDY-Q4T3.

[19]   Cristine Russell, *Chemical Found by French Could Lead to Monthly Birth Control Pill*, Washington Post (Apr. 20, 1982), https://perma.cc/6VA5-5ZXJ.

[20]   Mary L. Davenport et al., *Embryo Survival After Mifepristone: A Systematic Review of the Literature*, 32 Issues L. & Med. 3 (2017), https://bit.ly/3ZBFfMN.

[21]   Mitchell D. Creinin et al., *Medical abortion in early pregnancy*, *in* Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care 112 (Blackwell Publishing Ltd. 2009), https://perma.cc/3YPB-DL4C.

81. The FDA approved the two-drug abortion-pill regimen in 2000. Under the approved protocol, a woman takes mifepristone orally, followed up to 48 hours later by misoprostol.[22]

### Abortion Pill Reversal

82. Some women change their mind about terminating their pregnancies after taking mifepristone but before taking misoprostol.

83. Other women did not want to take mifepristone in the first place, but rather took it under duress or because they were tricked[23]

84. When a woman has taken mifepristone (willingly or not) and then wants to keep her pregnancy, providers may prescribe progesterone in an attempt to overcome the progesterone-blocking effects of the mifepristone and maintain the pregnancy. Administering progesterone in these circumstances is known as "abortion pill reversal."

---

[22]   FDA, Summary Review for Regulatory Action (Mar. 29, 2016), https://perma.cc/F468-UFEJ.

[23]   *See, e.g.*, Lauren Aratani, *Texas man faces charges for allegedly slipping abortion drug in wife's drink*, Guardian (Nov. 14, 2022), https://perma.cc/8NJD-3SSF; *Civil servant guilty of spiking drink with abortion drug*, BBC News (May 3, 2022), https://perma.cc/U43C-C2VU; Andy Wells, *NHS nurse struck off for supplying abortion pills to man who 'force-fed' them to pregnant partner*, Yahoo (Sept. 23, 2021), https://perma.cc/G88T-AXHX; Kevin Murphy, *Abortion-drug dealer pleads guilty, linked to Grand Rapids man accused of poisoning pregnant woman's drink*, Wis. Rapids Trib. (Mar. 5, 2020), https://perma.cc/4JSV-AJ64; Kristine Phillips, *A doctor laced his ex-girlfriend's tea with abortion pills and got three years in prison*, Wash. Post (May 19, 2018), https://perma.cc/W7QM-Q9VZ; Loulla-Mae Eleftheriou-Smith, *Man forced ex-girlfriend to miscarry after secretly feeding her abortion pills in a smoothie*, Independent (Mar. 13, 2015), https://perma.cc/KJF4-E9VX; Lateef Mungin, *Man pleads guilty to tricking pregnant girlfriend into taking abortion pill*, CNN (Sept. 10, 2013), https://perma.cc/RT4R-6LLL.

85. The basic biochemical premise of abortion pill reversal is that the function of a receptor antagonist (*i.e.*, mifepristone) can be inhibited by increasing the concentration of the receptor agonist (*i.e.*, progesterone).[24] Abortion pill reversal therefore involves administering an influx of progesterone—the same hormone inhibited by mifepristone—to curb and outlast the effects of the mifepristone.

86. Like most other uses of supplemental progesterone, the use of progesterone in abortion pill reversal is an off-label use.

87. An early animal study on pregnant rats demonstrated the ability of progesterone to counteract mifepristone. In 1989, researchers designed a study to investigate "the role of progesterone in the maintenance of pregnancy" by using groups of pregnant rats.[25] After four days, 66.7% of the rats who received mifepristone aborted their pups. But 100% of the rats who were given progesterone in addition to mifepristone maintained their pregnancies.

88. In 2018, Dr. George Delgado published an observational case series that followed 754 pregnant women who had taken mifepristone, but had not yet taken misoprostol, and were interested in reversing its effects.

---

[24]   *See generally* Barbara J. Pleuvry, *Receptors, agonists and antagonists*, 5 Neurosurgical Anaesthesia and Intensive Care, Pharmacology 350 (2004), https://bit.ly/439IXR4.

[25]   Shingo Yamabe et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy*, 65 Folia Endocrinologica Japonica 497 (1989), https://perma.cc/FY3C-ADAD.

89. A total of 547 women met inclusion criteria and underwent progesterone therapy within 72 hours after taking mifepristone.[26] The overall success rate—247 live births, plus four viable pregnancies lost after 20 weeks gestation—was 48%.[27]

90. The 2018 study showed even higher success rates when the patients were divided into treatment subgroups. It showed fetal survival rates of 64% for the subgroup that received progesterone intramuscularly and 68% for the subgroup that received a high dose of oral progesterone followed by daily oral progesterone until the end of the first trimester.[28]

91. The survival rates in the 2018 study compare favorably with the baseline fetal survival rate of approximately 25% if no treatment is attempted after mifepristone is administered.[29]

92. Notably, the 2018 study found no increased risk of birth defects after progesterone therapy. And the rate of preterm delivery was 2.7%, compared with a 10% average in the general population in the United States.[30]

---

[26] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 Issues L. & Med. 21, 24-25 (2018), https://perma.cc/ZR33-UJWF. The 2018 study followed a 2012 case report, also published by Drs. Delgado and Davenport, that followed seven women who had taken mifepristone and then received progesterone therapy after "s[eeking] assistance to block the mifepristone effects." George Delgado et al., *Progesterone use to reverse the effects of mifepristone*, 46 Annals Pharmacotherapy 1723, 1723 (2012), https://perma.cc/3Z7Q-JBRT. Four of the six women who completed the study were able to carry their pregnancies to term.

[27] Delgado et al., *A Case Series*, *supra* note 26, at 25-26.

[28] *Id.* at 26.

[29] *Id.*; *see also* Davenport et al., *supra* note 20.

[30] Delgado et al., *A Case Series*, *supra* note 26, at 26.

93. In the case of a woman choosing to stop an abortion, the 2018 study recommended a protocol to reverse the effects of mifepristone by administering progesterone, either orally or by intramuscular injection, "as soon as possible" after taking mifepristone, followed by supplemental progesterone until the end of the first trimester (if taken orally) or for a series of additional intramuscular injections.[31]

### *Bella's Experience with Progesterone Therapy and Abortion Pill Reversal*

94. Because progesterone is used to treat so many conditions affecting the female reproductive system, it is one of the most common prescriptions written by Bella providers in its OB-GYN practice.

95. Bella's general practice is to check baseline progesterone levels where a pregnant woman has any of the following risk factors: previous spontaneous miscarriage, bleeding in the first trimester, previous pregnancy with premature labor or delivery, infertility, history of low luteal progesterone, and medications that block progesterone activity (*i.e.*, mifepristone).

96. If a woman with one or more risk factors presents with abnormal progesterone levels, Bella's practice is to offer progesterone therapy to reduce the risk of miscarriage and preterm birth.

97. Bella offers progesterone therapy to all women at risk of miscarriage, whether that risk arises biologically, due to physical trauma, or because the woman willingly or unwillingly ingested mifepristone.

---

[31]   *Id.* at 29.

98. As a matter of conscience, Bella and its providers cannot refuse to help a woman who desires to continue her pregnancy simply because she first took mifepristone. Consistent with their core religious beliefs in human dignity, Bella and its providers are religiously obligated to offer abortion pill reversal so long as they have the means and ability to do so.

99. When a woman contacts Bella seeking abortion pill reversal, Bella's practice is to prioritize her timely care. Bella's website explains that she should "please call our office immediately, INCLUDING PAGING OUR NIGHT / WEEKEND PROVIDER." It then provides a hotline number and a back-up phone number "if you can't reach our office."

100. After receiving a phone call from a woman seeking abortion pill reversal, a Bella provider will meet the woman at the clinic as soon as possible, including on nights, weekends, and holidays.

101. Bella informs each woman that the use of progesterone to attempt to reverse the effects of mifepristone is an off-label use and that success is not guaranteed.

102. If the woman chooses to maintain her pregnancy and wants to proceed with abortion pill reversal, then Bella offers progesterone therapy, just as in any other circumstance involving risk of miscarriage.

103. Bella has treated dozens of abortion pill reversal patients who successfully maintained their pregnancies.

104.   Hours before SB 23-190 took effect, Bella received a call from a woman seeking assistance in reversing her decision to take the first drug in the abortion-pill regime. That woman has now received an initial dose of progesterone and is currently under Bella's follow-up care.

105.   Bella and its providers are intimately involved with their patients' health care and thus share an inherently close relationship with their patients.

106.   Bella's patients have a strong interest in keeping their personal reproductive health care decisions private.

107.   In addition, Bella's prospective abortion pill reversal patients do not know sufficiently far in advance that they will seek that service and therefore cannot identify themselves and sue ex ante. Once those patients can identify themselves, they are in a race against time to access this care before the unwanted abortion takes place.

### *Bella's Speech About Its Services*

108.   Bella publicizes its services in a variety of media.

109.   The homepage of Bella's website states, "At Bella Health + Wellness, we take a mission approach to medicine and serve all people, no matter their life circumstances[,] with high-quality care that honors their dignity. We believe that patients should be heard, providers should demonstrate medical conscience, and all people can be made whole." The homepage goes on to state that "[w]e are proud to be one of

27

Denver's leading multi-specialty practice[s] offering full OB-GYN care with a specialization in NaPRO Technologies, Family Primary Care including Pediatrics, and Functional Medicine." Bella Health + Wellness, https://bellawellness.org/.

110.   Prior to SB 23-190, Bella's website also affirmed its commitment to "save mothers and babies through sound medical counseling and Abortion Pill Reversal." Ex. C.

111.   Bella's website previously contained the following FAQ: "I took the 'abortion pill.' But I've changed my mind. Is there anything you can do?" The answer explained: "If we act quickly, there is a possibility we can save your baby through a safe, painless therapy known as Abortion Pill Reversal (APR). We've helped dozens of women just like you. No judgment. No questions. Just excellent medical care and complete support. We are here for you." Ex. D.

112.   The FAQ also made clear that Bella will "cover all costs associated with an Abortion Pill Reversal, should finances be an issue." *Id.*

113.   Bella recently publicly described its experience with abortion pill reversal in the *Denver Catholic. See WATCH: One woman's abortion pill reversal story from Bella Health and Wellness*, Denver Catholic (Mar. 10, 2023), https://bit.ly/3U67kec.

114.   Bella has also described and promoted the availability of abortion pill reversal on its social media accounts, including on Facebook and Instagram. Ex. E.

*Reproductive Health Equity Act*

115.   On April 4, 2022, Governor Jared Polis signed into law the Reproductive Health Equity Act (RHEA). *See* H.B. 22-1279, 73rd Gen. Assemb., Reg. Sess. (Co. 2022), https://perma.cc/9U3B-8UXR.

116.   RHEA declares that "[a] pregnant individual has a fundamental right to continue a pregnancy and give birth or to have an abortion and to make decisions about how to exercise that right." Colo. Rev. Stat. § 25-6-403(2).

117.   To secure that right, RHEA makes it unlawful for a "public entity" to "[d]eny, restrict, interfere with, or discriminate against an individual's fundamental right … to continue a pregnancy and give birth or to have an abortion in the regulation or provision of benefits, facilities, services, or information," or to "[d]eprive, through prosecution, punishment, or other means, an individual of the individual's right to act or refrain from acting during the individual's own pregnancy based on the potential, actual, or perceived impact on the pregnancy, the pregnancy's outcomes, or on the pregnant individual's health." *Id.* § 25-6-404.

118.   RHEA defines "[p]ublic entity" as

> the state, the judicial department of the state, any county, city and county, municipality, school district, special improvement district, and every other kind of district, agency, instrumentality, or political subdivision thereof organized pursuant to law and any separate entity created by intergovernmental contract or cooperation only between or among the state, county, city and county, municipality, school district, special improvement district, and every other kind of district, agency, instrumentality, or political subdivision thereof.

*Id.* § 24-10-103(5); *see id.* § 25-6-402(3).

119.   RHEA's substantive provisions are based on a series of legislative declarations, including that "Colorado voters have demonstrated that they trust individuals to make their own ethical decisions about abortion care based on what is best for their health and their families," HB 22-1279 § 1(1)(f), and that "[p]olitically motivated, medically inappropriate restrictions on health care have no place in our statutes or our medical offices," *id.* § 1(1)(g).

### *Colorado Medical and Nursing Licensing Regimes*

120.   The Colorado Medical Board and the Colorado Board of Nursing are "type 1 entit[ies], as defined in section 24-1-105." Colo. Rev. Stat. § 12-240-105(1)(a) (Medical); *id.* § 12-255-105(1)(a) (Nursing). Thus, each board "exercises its prescribed statutory powers and performs its prescribed duties and functions, including rule-making, regulation, licensing, and registration … and the rendering of findings, orders, and adjudications, independently of the head of the principal department" under which it is administered. *Id.* § 24-1-105(1)(b).

121.   The common provisions of title 12, article 20 apply to article 240 governing medical practice, Colo. Rev. Stat. § 12-240-103, and article 255 governing nursing, *id.* § 12-255-103.

122.   Each board is a "regulator" under Colo. Rev. Stat. § 12-20-102(14). As regulators, each board "may investigate, hold hearings, and gather evidence in all matters related to the exercise and performance of [its] powers and duties" over their respective "particular profession or occupation." *Id.* § 12-20-403(1).

123.  As regulators, each board has general authority to impose disciplinary action if it "determines that an applicant, licensee, certificate holder, or registrant has committed an act or engaged in conduct that constitutes grounds for discipline or unprofessional conduct under a part or article of this title 12 governing the particular profession or occupation." *Id.* § 12-20-404(1). Such disciplinary actions can include, save certain statutory exemptions, issuing a letter of admonition; placing a licensee, certificant, or registrant on probation; imposing an administrative fine; or denying, refusing to renew, revoking, or suspending the license, certification, or registration of an applicant, licensee, certificant, or registrant. *Id.*

124.  Each board may issue cease-and-desist orders if it believes "based upon credible evidence as presented in a written complaint by any person, that a licensee, certificate holder, or registrant is acting in a manner that is an imminent threat to the health and safety of the public." *Id.* § 12-20-405(1)(a).

125.  And, "in the name of the people of the state of Colorado and through the attorney general of the state of Colorado," each board "may apply for an injunction in any court of competent jurisdiction to enjoin any person from committing any act prohibited by a part or article of this title 12." *Id.* § 12-20-406(1).

126.  The Colorado Medical Board has authority to investigate, conduct hearings, and impose disciplinary action for statutory violations, including, *inter alia*, a suspension or revocation of license to practice medicine and a fine of up to $5,000 per violation. *Id.* § 12-240-125(5)(c)(III). The Colorado Medical Board "shall … refer[] to

the attorney general for preparation and filing of a formal complaint" any "facts that warrant further proceedings by formal complaint." *Id.* § 12-240-125(4)(c)(V).

127.   The Colorado State Board of Nursing has authority to investigate, conduct hearings, and impose disciplinary action for statutory violations, including, *inter alia*, suspension, revocation, or nonrenewal of a license to practice nursing and a fine between $250 and $1,000 per violation. *Id.* § 12-255-119(4)(c)(III). The Colorado State Board of Nursing "should … refer[] to the attorney general for preparation and filing of a formal complaint" any "[f]acts … that warrant further proceedings by formal complaint." *Id.* § 12-255-119(3)(c)(V).

128.   The Colorado Medical Board rules provide that "the relationship between a provider and a patient is fundamental and is not to be constrained or adversely affected by any considerations other than what is best for the patient." Colorado Medical Board Policy 40-03, Policy Statement Regarding the Provider/Patient Relationship (rev. Aug. 20, 2015).

129.   Where "[p]revailing models of medical practice" result in "an inappropriate restriction of the provider's ability to practice quality medicine" and "creat[e] negative consequences for the patient," "[i]t is the expectation of the Board that providers take those actions they consider necessary to assure that the procedures in question do not adversely affect the care that they render to their patients." *Id.*

### Colorado Consumer Protection Act

130.  Section 6-1-105 of the Colorado Consumer Protection Act "provides a non-exhaustive list of deceptive trade practices that are actionable." *Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1301 (10th Cir. 2022) (citing *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54 (Colo. 2001)).

131.  Under section 6-1-105, "[a] person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person," *inter alia*, "[e]ither knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith," Colo. Rev. Stat. § 6-1-105(1)(e), or "[e]ither knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice," *id.* § 6-1-105(1)(rrr).

132.  As to section 6-1-105(1)(e), "'a deceptive trade practice' under the CCPA 're-quires a *false statement of fact* that either induces the recipient to act or has the ca-pacity to deceive the recipient.'" *Renfro*, 25 F.4th at 1301-02 (quoting *Rhino Linings USA, Inc. v. Rocky Mt. Rhino Lining, Inc.*, 62 P.3d 142, 144 (Colo. 2003)). Conversely, "[m]ere statements of opinion" are "not actionable." *Id.* at 1302.

133.   The Colorado Consumer Protection Act defines "[a]dvertisement" as "the attempt by publication, dissemination, solicitation, or circulation, visual, oral, or written, to induce directly or indirectly any person to enter into any obligation or to acquire any title or interest in any property." Colo. Rev. Stat. § 6-1-102(1).

134.   "The attorney general and the district attorneys of the several judicial districts of this state are concurrently responsible for the enforcement of [the Colorado Consumer Protection Act]." Colo. Rev. Stat. § 6-1-103.

135.   The attorney general and the district attorneys may bring against any person who violates the Act a civil action seeking imposition of a civil penalty of not more than $20,000 per violation. *Id.* § 6-1-112(1)(a). "[A] violation of any provision shall constitute a separate violation with respect to each consumer or transaction involved." *Id.*

136.   Furthermore, a civil action under the Act "shall be available to any person" who is "an actual or potential consumer of the defendant's goods, services, or property and is injured as a result of such deceptive trade practice," among others. *Id.* § 6-1-113(1)(a).

137.   In a private civil action, any person who "is found to have engaged in or caused another to engage in any deceptive trade practice" is liable for the greater of $500, the "amount of actual damages sustained," or three times that amount "if it is established by clear and convincing evidence that such person engaged in bad faith conduct," in addition to the claimant's attorney fees and costs. *Id.* § 6-1-113(2).

### *Colorado Senate Bill 23-190*

138.   On April 14, 2023, Governor Jared Polis signed into law Senate Bill 23-190, a bill for an act "[c]oncerning policies to make punishable deceptive actions regarding pregnancy-related services." SB 23-190 was one of three bills in the so-called "Safe Access to Protected Health Care" legislative package. The full text of SB 23-190 is attached as Ex. F.

139.   SB 23-190 took effect immediately upon signature.

140.   SB 23-190 begins with a series of findings. Like RHEA, SB 23-190 declares that "[i]n Colorado, a pregnant individual has a fundamental right to continue a pregnancy or to terminate a pregnancy by abortion." § 1(1)(a). SB 23-190 then states that "[p]regnant individuals need timely and accurate information from qualified medical professionals to make informed decisions about their health and well-being." § 1(1)(b). It declares that "[a]nti-abortion centers" stand in the way of that fundamental right.

141.   According to the legislative findings, "[a]nti-abortion centers are the ground-level presence of a well-coordinated anti-choice movement," § 1(1)(d), and such centers use "deceptive advertising tactics to target and acquire clients from historically marginalized groups," § 1(1)(e).

142.   SB 23-190 also makes specific findings with respect to abortion pill reversal and "anti-abortion centers." The law finds that "[s]ome anti-abortion centers go so far as to advertise medication abortion reversal, a dangerous and deceptive practice that is not supported by science or clinical standards, according to the American College

of Obstetricians and Gynecologists, or by the [FDA]." § 1(1)(f). It quotes the American Medical Association that "[physicians] do not and cannot, without misleading them, tell their patients that it may be possible to reverse a medication abortion." § 1(1)(g).

143.   SB 23-190 goes on: "[t]ime is a critical factor for individuals seeking abortion care," and "[n]o one should be deceived, manipulated, or face unnecessary delays when seeking support or health care during pregnancy." § 1(1)(h)-(i).

144.   Based on these conclusions, the Legislature found it "imperative" to "stop deceptive trade practices and unprofessional conduct with respect to the provision of abortion services and medication abortion reversal." § 1(1)(h)-(i), (2).

145.   SB 23-190, section 1 prohibits publicizing abortion pill reversal. Specifically, it extends the "prohibition on deceptive trade practices" under sections 6-1-105(1)(e) and (1)(rrr) of the Colorado Consumer Protection Act to "disseminating or causing to be disseminated false advertising relating to the provision of abortion or emergency contraceptive services, or referrals for those services, and *advertising for or providing or offering to provide or make available medication abortion reversal.*" § 1(3) (emphasis added).

146.   SB 23-190, section 2 provides:

> A person engages in a deceptive trade practice when the person makes or disseminates to the public or causes to be made or disseminated to the public any advertisement that indicates that the person provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives, when the person knows or reasonably should have known, at the time of publication or dissemination to the public of the advertisement, that the person does not provide those specific services.

§ 2(2). Section 2 defines "[e]mergency contraceptive" as "a drug or device approved by the [FDA] to significantly reduce the risk of pregnancy if taken or administered within a specified period of time after sexual intercourse, including emergency contraceptive pills and intrauterine devices." § 2(1)(b).

147.  SB 23-190, section 3 bans abortion pill reversal treatment. Section 3 provides, "A licensee, registrant, or certificant engages in unprofessional conduct or is subject to discipline pursuant to this Title 12 if the licensee, registrant, or certificant provides, prescribes, administers, or attempts medication abortion reversal in this state." § 3(2).

148.  The only way the SB 23-190's prohibitions can be undone is if the Colorado Medical Board, the State Board of Pharmacy, and the State Board of Nursing, "in consultation with each other, each have in effect rules finding that it is a generally accepted standard of practice to engage in medication abortion reversal" by October 1, 2023. § 3(2)(a)-(b). At the time of this filing, none of these boards has such a rule in place.

149.  SB 23-190 defines "[m]edication abortion" as "an abortion conducted solely through the use of one or more prescription drugs." § 3(1)(b).

150.  The statute separately defines "[m]edication abortion reversal" as "administering, dispensing, distributing, or delivering a drug with the intent to interfere with, reverse, or halt a medication abortion." § 3(1)(c).

***Legislative Record***[32]

151.   The debate surrounding SB 23-190 shows that it targets religious organizations in Colorado that offer alternatives to abortion.

152.   Senator Janice Marchman, one of the bill's sponsors, stated that the bill's reference to "anti-abortion centers" referred to "faith-based organizations" that offer alternatives to abortion in Colorado. Ex. H at 1 (Senate Judiciary Hearing, Mar. 15, 2023). She labeled these organizations "fake clinics." Ex. G at 6 (Press Conference, Mar. 9, 2023); Ex. H at 1.

153.   Marchman lamented that "Colorado has more than 50 religious-based" organizations "that encourage women to keep their babies or link them with adoption agencies," Ex. H at 3, and she accused these "ideologically-driven" religious organizations of "trad[ing] on the goodwill of legitimate medicine to defraud patients" by "us[ing] disinformation, intimidation, shame, and delay tactics to withhold essential and time-sensitive reproductive healthcare" and by "lur[ing] people in and steer[ing] them away from abortion," Ex. G at 6; Ex. H at 1-2.

154.   Marchman also stated that these "fake clinics" were the "only ones that can prescribe abortion pill reversal." Ex. I at 1 (Senate Second and Third Reading, Mar. 20, 2023). And she argued that these "fake clinics" must be stopped from offering this "life threatening" procedure. Ex. G at 6.

---

[32]   Citations to legislative sessions in this section are to unofficial transcripts that have been transcribed by a third party. Recordings of the sessions can be found at https://leg.colorado.gov/watch-listen.

155.  Senator Faith Winter, the bill's other Senate sponsor, accused faith-based organizations of "taking advantage of vulnerable populations" by "purposely target[ing] young people, low-income communities, rural communities, and communities of color." Ex. H at 4.

156.  Representative Elisabeth Epps, one of the bill's House sponsors, levied similar charges, accusing "fake clinics" of us[ing] "free pregnancy tests," ultrasounds, and prenatal care as "disinformation, intimidation and delay tactics" and faulting "fake clinics" for "advertis[ing] in languages other than English specifically to target immigrant communities." Ex. G at 8-9.

157.  Epps stated that such organizations employ "rhetoric" telling women that "you are less or incomplete or broken because of the status of your uterus." Ex. K at 14 (House Third Reading, Mar. 30, 2023). And she called abortion pill reversal "dangerous," claiming that it causes "harm" to pregnant women, Ex. G at 10, and that taking progesterone to reverse an abortion is as effective as taking "a Tylenol or a Viagra or a juju bean" to achieve the same effect. Ex. K at 15.

158.  According to Epps, when it comes to abortion pill reversal and other services provided by religious organizations, "there's not room for nuance." Ex. K at 5.

159.  Representative Karen McCormick, the bill's other House sponsor, accused these religious organizations of engaging in a "bait and switch," Ex. K at 1, by "fool[ing] or deceiv[ing] or outright [lying] to" their patients. *Id.* at 2. According to

McCormick, "religiously affiliated" organizations offer information that is "riddled with … guilt-inducing anti-abortion … messages." *Id.* at 12.

160.   Representative Stephanie Vigil lamented how "explicitly religious" organizations are "deeply integrated" in the "a massive, well-funded, and very intentional movement" known as the "anti-choice movement." Ex. K at 11.

161.   These and other accusations caused Sen. James Smallwood, Jr. to describe the bill as "as close to pure vitriolic dribble that I've ever seen" in seven years as a legislator, and to comment that "the sheer lack of even thinly veiled neutrality is just appalling." Ex. I at 3.

162.   Legislators opposed to SB 23-190 repeatedly noted that its proponents offered no testimony that any woman in Colorado had been harmed by progesterone treatment of any kind—including abortion pill reversal—nor that any medical licensing board has ever taken action against a health care professional for offering abortion pill reversal. *See* Ex. L at 2 (House Third Reading, Apr. 1, 2023) (statement of Rep. Gabe Evans); *id.* at 4 (statement of Rep. Stephanie Luck); *id.* at 7 (statement of Rep. Bob Marshall).

163.   To support their statements about abortion pill reversal, the bill's proponents offered testimony from Dr. Mitchell Creinin, an OB-GYN who has served as a

paid consultant of Danco Laboratories, the distributor of mifepristone in the United States. Ex. H at 5-14.[33]

164.   Creinin described abortion pill reversal as "medical fraud." Ex. H at 6. He based this conclusion on a failed randomized trial he conducted in 2019 to test the "efficacy and safety" of abortion pill reversal.[34]

165.   Creinin's study was intended to enroll 40 pregnant women to be divided into two control groups: one group receiving mifepristone followed by progesterone, and the other group receiving mifepristone followed by a placebo. But only 12 women were enrolled in the study, and only 10 women ultimately completed it.

166.   Creinin testified that "[w]e had to stop the study after 12 women were enrolled because three of the women had such significant bleeding that had to be rushed to the emergency room or they called in an ambulance," which he described as "incredibly rare[,] more than rare." Ex. H at 9. He then immediately had to clarify that of those three women, "two of the people had received placebo and one had received progesterone." *Id.* He ultimately testified that "my study was inconclusive as far as showing whether or not the [progesterone] treatment might work." Ex. H at 11.

---

[33]   *See, e.g.*, Kelly Cleland & Mitchell D. Creinin et al., *Significant Adverse Events and Outcomes After Medical Abortion*, 121 Obstetrics & Gynecology 166, 171 (2013), https://perma.cc/DNJ2-L7VJ (disclosing that Creinin receives compensation from the company that sells Mifeprex as its sole product).

[34]   Mitchell D. Creinin et al., *Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135 Obstetrics & Gynecology 158 (2020), https://perma.cc/8LPN-NSKK.

167.   What Creinin's testimony failed to disclose, however, was that "no interven-tion was needed" for the one woman who had received progesterone and went to the emergency department. Ex. J at 5.

168.   By contrast, the two women receiving placebo in Creinin's study "required emergency suction aspiration abortions. They needed secondary surgical abortions because they had retained products and because they were bleeding significantly, se-verely bleeding. One of them required a blood transfusion because her hemoglobin dropped significantly." Ex. J at 5.

169.   These clarifications about the outcomes of the three affected women in Creinin's study came to light through the testimony of Dr. George Delgado. Delgado also testified about the results of his 2018 study that documented fetal survival rates up to 64-68% for women who received progesterone within 72 hours of taking mife-pristone. *See* Ex. J at 3-8; *see supra* ¶¶88-93.

170.   Creinin admitted that, even under his view, "it's always possible" that abor-tion pill reversal could become effective, Ex. H at 12, and that "the FDA does not require randomized control trials for drug approval." Ex. J at 11.

171.   Creinin also admitted that no jurisdiction in the United States has ever made a finding that a medical health care provider engaged in professional miscon-duct for administering abortion pill reversal. Ex. H at 11-12.

172.  Creinin opined that progesterone should not be used to treat miscarriage, since in his view progesterone "does nothing to increase the likelihood of them having another continuing pregnancy." Ex. H at 9-10; Ex. J at 9.

***Harm to Bella***

173.  The harm inflicted by SB 23-190 on Bella, its providers, and the women they serve is massive and immediate.

174.  Because of SB 23-190, Bella is unable to help pregnant women who seek abortion pill reversal without putting its providers' medical licenses at risk. If a woman calls Bella today seeking abortion pill reversal, Bella and its providers will be forced to choose between complying with SB 23-190 and following their conscience and core religious commitments to help that woman and her unborn child by offering abortion pill reversal.

175.  This harm is far from speculative; it is ongoing right now. Hours before Governor Polis signed SB 23-190, Bella received a call from a woman seeking assistance in reversing the effects of mifepristone to maintain her pregnancy. Yesterday, Bella could have freely exercised its religious obligations to provide life-affirming care to this patient and the child she wishes to carry to term. And that patient could have freely received medication that may allow her to exercise her "fundamental right" to maintain her pregnancy.

176.  Now, because of SB 23-190, Bella's providers stand on the brink of losing their licenses and facing ruinous fines if they follow their sincerely held beliefs by

continuing to offer life-affirming care to this patient and her child. And if they bow under the weight of the state's pressure, this patient will forever lose her ability to attempt to undo a deeply significant decision that is fraught with personal consequences.

177.  Bella's inability to assist patients in imminent need of medical care is not the only harm it faces. Because of SB 23-190, Bella is also unable to publicize abortion pill reversal without risking ruinous financial penalties.

178.  Because of SB 23-190, Bella has been forced to remove information about abortion pill reversal from its website and social media accounts. Bella desires to continue publicizing abortion pill reversal, but has been chilled from doing so because of SB 23-190. Bella would immediately resume publicizing abortion pill reversal if SB 23-190 were enjoined.

179.  Every day that Bella is forced to remain silent about abortion pill reversal, women in Colorado are deprived of information about highly qualified and local doctors and nurses who would help them if they have willingly or unwillingly taken mifepristone. Absent an injunction, these women may miss the critical window needed to effectuate their choice to continue their pregnancies, and Bella will miss the opportunity to help them.

## CLAIMS FOR RELIEF

### Count I

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Generally Applicable

180. All preceding paragraphs are incorporated by reference.

181. "[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

182. A law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam).

183. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* The comparability analysis "is concerned with the *risks* various activities pose," not the "reasons why" people engage in those activities. *Id.* (emphasis added).

184. Consistent with their underlying commitment to the dignity of every human life, Plaintiffs must provide life-affirming medical care to every woman at risk of miscarriage—whether that risk arises biologically, due to physical trauma, or because she has willingly or unwillingly ingested the first abortion pill. As a matter of conscience, Plaintiffs cannot refuse to administer progesterone to a woman who desires

to continue her pregnancy simply because she first took mifepristone. Plaintiffs are therefore religiously obligated to offer abortion pill reversal.

185.   Colorado's asserted interest in prohibiting abortion pill reversal is to protect women from "a dangerous and deceptive practice that is not supported by science or clinical standards." § 1(1)(f).

186.   But abortion pill reversal is nothing more than supplemental progesterone. And there are a multitude of off-label uses of progesterone, which has been widely prescribed to women—including pregnant women—for more than 50 years.

187.   Yet SB 23-190 makes no attempt to regulate—much less outright prohibit—the off-label use of progesterone in any other circumstance. That omission renders SB 23-190 not generally applicable.

188.   SB 23-190 thus triggers strict scrutiny.

189.   Colorado has no compelling interest in prohibiting the off-label use of progesterone for abortion pill reversal.

190.   Colorado has not selected the least restrictive means to further any governmental interest.

191.   Bella, its providers, and the women they serve have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

## Count II

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Exercise Clause
### Not Neutral

192.  All preceding paragraphs are incorporated by reference.

193.  The government is "obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [religious actors'] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018).

194.  "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

195.  Laws are not neutral when they accomplish a "religious gerrymander." *Lukumi*, 508 U.S. at 535.

196.  A religious gerrymander occurs when "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Id.* at 536.

197.  A law is also not neutral when "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body" demonstrate animus toward religion. *Masterpiece*, 138 S. Ct. at 1731.

198.  When "'official expressions of hostility' to religion accompany laws or policies burdening religious exercise," courts must "'set aside' such policies without further inquiry." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 n.1 (2022) (quoting *Masterpiece*, 138 S. Ct. at 1732).

199.  SB 23-190 is not neutral with regard to religion.

200.  SB 23-190's legislative history and narrow application demonstrate that defendants have proceeded in a manner intolerant of religious beliefs.

201.  SB 23-190 lacks a religious exemption, despite the legislature's awareness of health care providers who feel a religious obligation to provide abortion pill reversal.

202.  SB 23-190 creates a religious gerrymander by targeting a subset of religiously motivated actors while failing to pursue the same alleged state interest against those who provide, prescribe, and administer progesterone off-label for uses other than abortion pill reversal.

203.  SB 23-190 thus "violate[s] the State's duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece*, 138 S. Ct. at 1731.

204.  A strict scrutiny defense is not even available for a non-neutral law, and Defendants could not satisfy strict scrutiny in any event because they lack a compelling interest and the law is not narrowly tailored.

205.  Bella, its providers, and the women they serve have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

## Count III

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. I: Free Speech Clause
### Content and Viewpoint Discrimination

206.   All preceding paragraphs are incorporated by reference.

207.   Under the First Amendment, "governments have 'no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2371 (2018) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

208.   A law is content based if it "on its face draws distinctions based on the message a speaker conveys" or if it "cannot be justified without reference to the content of the regulated speech, or [was] adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 163-64 (cleaned up); *see also City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) ("A regulation of speech is facially content based under the First Amendment if it targets speech based on its communicative content—that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." (cleaned up)).

209.   Viewpoint discrimination is "an egregious form of content discrimination," in which "the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). A law is viewpoint based "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

210.   Content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

211.   Even within a proscribed category of speech, the government may not engage in content or viewpoint discrimination within that proscribed category. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992) ("[T]he government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.").

212.   SB 23-190 turns on the content and viewpoint of speech by, among other things, targeting its speech restrictions at "anti-abortion centers," § 1(1), punishing advertising for abortion pill reversal, and prohibiting Plaintiffs and others from counseling patients in connection with abortion pill reversal.

213.   Because SB 23-190 turns on the content and viewpoint of a person's speech, it is content and viewpoint based and presumptively unconstitutional.

214.   Colorado has no compelling interest in targeting the speech of life-affirming OB-GYN medical providers and pro-life pregnancy centers.

215.   Colorado has no compelling interest in prohibiting Plaintiffs from publicizing the availability of abortion pill reversal.

216.   Colorado has no compelling interest in prohibiting Plaintiffs from counseling women in connection with abortion pill reversal.

217.   Colorado has not selected the least restrictive means to further any government interest.

218.   SB 23-190 has chilled Bella's speech by forcing Bella to remove information about abortion pill reversal from its website and social media accounts under threat of severe financial penalties.

219.   Bella, its providers, and the women they serve have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

**Count IV**

**42 U.S.C. § 1983**
**Violation of U.S. Const. Amend. I: Free Speech Clause**
**Patients' Right to Receive Information**

220.   All proceeding paragraphs are incorporated by reference.

221.   The First Amendment protects not only the right to disseminate information but also the "reciprocal right to receive" information. *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976); *see also Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) ("the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own right[] of speech").

222.   A patient's right to engage freely in conversations with her doctor is a corollary to the constitutional right to refuse "unwanted medical treatment," *Cruzan v. Director*, 497 U.S. 261, 278 (1990), as well as the right "to bodily integrity," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. California*, 342 U.S. 165

(1952)), which underlies the doctrine of informed consent, *see Schloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 92 (N.Y. 1914) (Cardozo, J.).

223.   By banning providing, administering, or attempting abortion pill reversal, SB 23-190 forces women to undergo abortions that they want to avoid by depriving pregnant women who have taken mifepristone the right to receive from Plaintiffs information on the full range of treatment options available, including the use of progesterone as abortion pill reversal.

224.   SB 23-190 is a content- and viewpoint-based restriction on speech.

225.   Colorado has no compelling interest in forcing women to undergo abortions that they want to avoid.

226.   Colorado has no compelling interest in targeting life-affirming OB-GYN medical providers and pro-life pregnancy centers that attempt abortion pill reversal by administering progesterone.

227.   Colorado has not selected the least restrictive means to further any government interest.

228.   Plaintiffs' current and prospective patients have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

## Count V

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. XIV: Due Process Clause
### Patients' Right to Medical Treatment

229.   All proceeding paragraphs are incorporated by reference.

230.   The Constitution protects one's right to refuse "unwanted medical treatment," *Cruzan*, 497 U.S. at 278, and one's right "to bodily integrity," *Glucksberg*, 521 U.S. at 720 (citing *Rochin*, 342 U.S. 165).

231.   The Constitution further protects one's "right to decide independently, with the advice of his physician, to acquire and to use needed medication." *Whalen v. Roe*, 429 U.S. 589, 603 (1977).

232.   These rights include a woman's fundamental right not to be forced to undergo or continue an abortion against her will.

233.   By depriving women who have taken mifepristone of the same treatments available to other women facing threatened miscarriage, SB 23-190 violates these rights.

234.   By prohibiting progesterone as abortion pill reversal, SB 23-190 fosters in current and prospective patients an incomplete understanding of medical alternatives, thereby distorting their assessment of the relative risks and benefits of available therapies and their medical decision-making process as a whole.

235.   SB 23-190's prohibition on progesterone as abortion pill reversal necessarily subverts patient autonomy and destroys the possibility of authentic patient consent.

236.   Colorado has no compelling interest in banning progesterone as abortion pill reversal.

237.   Colorado has not selected the least restrictive means to further any government interest.

238.  Colorado's prohibition on providing progesterone to women who change their minds about abortion fails rational basis review.

239.  Plaintiffs' current and prospective patients have suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

### Count VI

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. XIV: Equal Protection Clause
### Patients' Right to Medical Treatment

240.  All preceding paragraphs are incorporated by reference.

241.  Under the Equal Protection Clause of the Fourteenth Amendment, a State may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

242.  SB 23-190 denies women who have changed their minds about proceeding with an abortion the equal protection of the laws because, unlike all other women who face threatened miscarriage, SB 23-190 denies them the ability to receive progesterone.

243.  Colorado lacks any compelling interest in denying these women the progesterone treatment that is available to other women facing threatened miscarriage.

244.  Colorado has not chosen a narrowly tailored approach to pursuing its goals.

245.  Colorado's law fails even rational basis review.

246.  Plaintiffs' current and prospective patients have suffered and will suffer irreparable harm absent injunctive relief and declaratory relief against Defendants.

## Count VII

### 42 U.S.C. § 1983
### Violation of U.S. Const. Amend. XIV: Due Process Clause
### Void for Vagueness

247. All preceding paragraphs are incorporated by reference.

248. Under the Due Process Clause of the Fourteenth Amendment, a state statute "is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

249. The void-for-vagueness doctrine requires that a statute define the prohibition "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (collecting cases).

250. The vagueness of speech regulations "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997).

251. SB 23-190, section 2 is unconstitutionally vague.

252. SB 23-190, section 2 offers no standards or guidelines on what sort of advertisement "indicates" that a person "provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives."

253. SB 23-190, section 2 does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited.

254.    A person of ordinary intelligence does not know whether a medical practice's advertising of full OB-GYN care "indicates" that the practice "provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives" or whether pro-life descriptors like "life-affirming" negate any such potential indication.

255.    SB 23-190, section 2 fails to provide adequate standards or guidelines to govern the actions of those authorized to enforce the Colorado Consumer Protection Act and thus encourages arbitrary and discriminatory enforcement.

256.    The lack of adequate standards or guidelines leaves those authorized to bring enforcement actions free to do so based on their personal predilections or for discriminatory purposes, including disapproval of the beliefs, viewpoint, or messages of a particular speaker.

257.    The vagueness of section 2 has an actual chilling effect on Bella's speech.

258.    Bella has suffered and will suffer irreparable harm absent injunctive and declaratory relief against Defendants.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.    Declare that SB 23-190 violates the Free Exercise Clause of the First Amendment to the United States Constitution because it is not neutral or generally applicable;

b. Declare that SB 23-190 violates the Free Speech Clause of the First Amendment to the United States Constitution by discriminating against Plaintiffs based on the content and viewpoint of their speech;

c. Declare that SB 23-190 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by denying Plaintiffs' patients their right to medical treatment and their right not to undergo an abortion against their will;

d. Declare that SB 23-190 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating against women who have changed their minds about going through with an abortion;

e. Declare that SB 23-190 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by being impermissibly vague;

f. Declare SB 23-190 unconstitutional both on its face and as applied to Plaintiffs and their current and prospective patients;

g. Issue a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants, their agents and employees, and all those acting in concert with them, from enforcing SB 23-190 against Plaintiffs and all those acting in concert with them.

h. Award nominal damages in the amount of $1.00 against Defendants.

i. Award Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

j.   Award such other relief as the Court may deem equitable, just, and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 14, 2023                    Respectfully submitted,

                                         /s/ Mark L. Rienzi
                                         Mark L. Rienzi
                                         Rebekah P. Ricketts*
                                         Laura Wolk Slavis
                                         Daniel M. Vitagliano**
                                         The Becket Fund for Religious Liberty
                                            1919 Pennsylvania Ave, N.W.
                                         Suite 400
                                         Washington, D.C. 20006
                                         (202) 955-0095
                                         mrienzi@becketlaw.org

                                         *Admitted only in Texas. Practice limited to
                                         cases in federal court. Supervised by a mem-
                                         ber of the D.C. Bar.

                                         **Admitted only in New York. Practice lim-
                                         ited to cases in federal court. Supervised by a
                                         member of the D.C. Bar.

## VERIFICATION

I am over the age of 18 and am a Plaintiff in this action. I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that I have read the foregoing VERIFIED COMPLAINT, and the factual allegations thereof, and that to the best of my knowledge the facts alleged therein are true and correct.


Executed on April 14, 2023


_____

Denise Chism