# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

BELLA HEALTH AND WELLNESS et al.,

 *Plaintiffs,*

 v.

PHIL WEISER, in his official capacity as Attorney General of Colorado, et al.,

 *Defendants.*

Case No.  1:23-cv-939

# PLAINTIFFS' EMERGENCY MOTION
# FOR A TEMPORARY RESTRAINING ORDER
# AND PRELIMINARY INJUNCTION

Mark L. Rienzi
Rebekah P. Ricketts*
Laura W. Slavis
Daniel M. Vitagliano**
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
mrienzi@becketlaw.org

*Admitted only in Texas. Practice limited to cases in federal court. Supervised by a member of the D.C. Bar.

**Admitted only in New York. Practice limited to cases in federal court. Supervised by a member of the D.C. Bar.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 3

LEGAL STANDARD ................................................................................................... 18

ARGUMENT ............................................................................................................... 19

I.  Plaintiffs are likely to succeed on the merits. ....................................................... 19

    A. SB 23-190 violates the Free Exercise Clause. .................................................... 19

    B. SB 23-190 violates the Free Speech Clause by discriminating
       based on content and viewpoint. ....................................................................... 24

    C. SB 23-190 violates the First Amendment right to receive information. ......... 27

    D. SB 23-190 violates the Fourteenth Amendment right of
       pregnant women not to be forced to undergo or continue an abortion. .......... 28

    E. The government cannot carry its burden under strict scrutiny. ..................... 29

II. The remaining preliminary injunction factors favor relief. ................................. 32

CONCLUSION ............................................................................................................ 33

CERTIFICATE OF SERVICE ..................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. FDA*,
    2023 WL 2825871 (N.D. Tex. Apr. 7, 2023) ........................................................... 6

*All. for Hippocratic Med. v. FDA*,
    No. 23-10362 (5th Cir. Apr. 12, 2023) .................................................................... 6

*Animal Legal Def. Fund v. Kelly*,
    9 F.4th 1219 (10th Cir. 2021) ................................................................................ 25

*Axson-Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004) ............................................................................. 29

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ......................................................................................... 29-30

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ............................................................................................... 18

*Chamber of Commerce of U.S. v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ............................................................................... 33

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ......................................................................................*passim*

*Citizens United v. Gessler*,
    773 F.3d 200 (10th Cir. 2014) ............................................................................... 32

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ............................................................................................... 29

*Colo. Christian Univ. v. Weaver*,
    534 F.3d 1245 (10th Cir. 2008) ............................................................................. 22

*Cruzan v. Director*,
    497 U.S. 261 (1990) ............................................................................................... 28

*Dobbs v. Jackson Women's Health Org.*,
    142 S.Ct. 2228 (2022) ...................................................................................... 28, 29

*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) ............................................................................. 27

*Eisenstadt v. Baird*,
  405 U.S. 438 (1972) ......................................................................................... 28-29

*FDA v. All. for Hippocratic Med.*,
  No. 22A902 (S.Ct. Apr. 14, 2023) ............................................................................ 6

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978) ............................................................................................ 27

*Fulton v. City of Philadelphia*,
  141 S.Ct. 1868 (2021) ......................................................................................... 19

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
  415 U.S. 423 (1974) ............................................................................................ 18

*Hicks v. Jones*,
  332 F. App'x 505 (10th Cir. 2009) ........................................................................ 18

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ............................................................. 18, 32, 33

*Kennedy v. Bremerton Sch. Dist.*,
  142 S.Ct. 2407 (2022) ................................................................................... 19, 24

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  138 S.Ct. 1719 (2018) ................................................................................... 21, 22

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ...................................................................................... 26, 32

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ............................................................................... 23

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*,
  138 S.Ct. 2361 (2018) ................................................................................... 24, 27

*New Hope Fam. Servs., Inc. v. Poole*,
  966 F.3d 145 (2d Cir. 2020) ................................................................................ 23

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................ 33

*Peck v. McCann*,
  43 F.4th 1116,1134-35 (10th Cir. 2022) ............................................................. 24

*Planned Parenthood Ass'n of Utah v. Herbert*,
  828 F.3d 1245 (10th Cir. 2016) ........................................................................... 32

*Planned Parenthood of Kan. v. Andersen,*
    882 F.3d 1205 (10th Cir. 2018) ............................................................ 18

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992) ...................................................................... 27-28

*Rochin v. California,*
    342 U.S. 165 (1952) ........................................................................ 28

*Reed v. Town of Gilbert,*
    576 U.S. 155, (2015) ........................................................... 24, 25, 26

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) .......................................................... 24-25, 26

*Sorrell v. IMS Health, Inc.,*
    564 U.S. 552 (2011) ........................................................................ 27

*Stanley v. Georgia,*
    394 U.S. 557 (1969) ........................................................................ 27

*Tandon v. Newsom,*
    141 S.Ct. 1294 (2021) ............................................................... 19, 20

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S.Ct. 2012 (2017) ..................................................................... 23

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ........................................................................ 25

*Washington v. FDA,*
    No. 1:23-CV-3026.............................................................................. 6

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ........................................................................ 28

*Whalen v. Roe,*
    429 U.S. 589 (1977) ........................................................................ 28

*Yellowbear v. Lampert,*
    741 F.3d 48 (10th Cir. 2014) ......................................................... 30

**Statutes**

Colo. Rev. Stat. §6-1-102 ............................................................... 12

Colo. Rev. Stat. §6-1-103 ........................................................... 13, 17

Colo. Rev. Stat. §6-1-105 ............................................... 12

Colo. Rev. Stat. §6-1-112 ............................................... 13

Colo. Rev. Stat. §6-1-113 ............................................... 13

Colo. Rev. Stat. §12-20-403 ........................................... 11

Colo. Rev. Stat. §12-20-404 ........................................... 12

Colo. Rev. Stat. §12-240-125 .......................................... 12

Colo. Rev. Stat. §12-255-119............................................ 12

Colo. Rev. Stat. §25-6-403 ........................................ 11, 29

Colo. Rev. Stat. §25-6-404 ........................................ 11, 29

## Other Authorities

Lauren Aratani, *Texas man faces charges for allegedly slipping abortion drug in wife's drink,* Guardian (Nov. 14, 2022)........................7

*Civil servant guilty of spiking drink with abortion drug*, BBC News (May 3, 2022) ............................................................7

Loulla-Mae Eleftheriou-Smith, *Man forced ex-girlfriend to miscarry after secretly feeding her abortion pills in a smoothie*, Independent (Mar. 13, 2015)..........................................................7

FDA Drug Bulletin, Apr. 1982 ...........................................5

H.B. 22-1279, 73rd Gen. Assemb., Reg. Sess. (Colo. 2022) ........................ 11

Lateef Mungin, *Man pleads guilty to tricking pregnant girlfriend into taking abortion pill*, CNN (Sept. 10, 2013)...............................7

Kevin Murphy, *Abortion-drug dealer pleads guilty, linked to Grand Rapids man accused of poisoning pregnant woman's drink*, Wis. Rapids Trib. (Mar. 5, 2020) ............................................7

Kristine Phillips, *A doctor laced his ex-girlfriend's tea with abortion pills and got three years in prison*, Wash. Post (May 19, 2018)............7

S.B. 23-190, 74th Gen. Assemb., Reg. Sess. (Colo. 2023)...................*passim*

Andy Wells, *NHS nurse struck off for supplying abortion pills to man who 'force-fed' them to pregnant partner*, Yahoo (Sept. 23, 2021) ........................7

**INTRODUCTION**

A new Colorado law targets women who have changed their minds about abortion, forcing them to undergo abortions they seek to avoid. In a flagrant constitutional violation that should be immediately enjoined, Colorado has forbidden doctors and nurses from helping these women. They cannot give them, or *even tell them about*, safe and effective treatment that is lawfully available across the country and around the world.

During a healthy pregnancy, a woman's body naturally produces a hormone called progesterone. Progesterone supports pregnancy by thickening the uterine lining and suppressing contractions. When a woman who wants to keep her baby faces threatened miscarriage, doctors often prescribe additional progesterone to help her maintain the pregnancy. By contrast, one way to cause an abortion is to block the body's natural supply of progesterone and induce miscarriage. In fact, the FDA describes the abortion-inducing drug mifepristone as "a drug that blocks a hormone called progesterone that is needed for a pregnancy to continue."

The decision to end a pregnancy is often stressful and complicated. Unsurprisingly, some women initially choose to take mifepristone, only to decide thereafter that they wish to remain pregnant. Other women seek medical help because they took mifepristone unwillingly or under duress and wish to remain pregnant. Because mifepristone takes time to work, these women sometimes seek medical help to stop the mifepristone-induced miscarriage and continue the pregnancy.

Plaintiffs are experienced Colorado health care providers who help women by prescribing progesterone to maintain pregnancy. When a woman faces threatened miscarriage for any reason—natural causes, physical trauma, or the willing or unwilling ingestion of mifepristone—Plaintiffs prescribe progesterone to help her maintain the desired pregnancy. To Plaintiffs, this help is a religious obligation—they cannot in good conscience turn their backs on a woman who seeks their help to keep her baby.

But Colorado has outlawed this practice entirely, forbidding Plaintiffs from helping even women who took mifepristone under duress. It also forbids Plaintiffs from even *telling* women that such treatments exist. Thus, while Colorado claims to respect a woman's "fundamental right to continue a pregnancy," its new law actually forces women to undergo abortions they do not want.

None of this is lawful. Colorado has violated the free exercise rights of the Plaintiff health care providers who have a religious obligation to offer women who have taken mifepristone the same help Colorado allows to thousands of other women facing threatened miscarriage. Colorado has violated the Free Speech Clause by censoring speech about progesterone and preventing women from even learning about their options. And it has violated the Fourteenth Amendment rights of Plaintiffs' patients to make their own medical choices.

And the situation could not be more urgent. Plaintiffs are *currently* providing ongoing medical treatment to a new patient who wishes to continue her pregnancy after taking mifepristone. Just this morning, hours before Governor Polis signed SB 23-

190 into law, Plaintiffs lawfully began providing this patient with progesterone to help her keep her baby. Yet SB 23-190 now purports to make the continuation of that requested treatment illegal. Absent immediate relief, this patient risks having her care interrupted, and Plaintiffs will be in an impossible position: either deny care in accordance with this new law and violate their sincerely held religious beliefs or continue to provide life-affirming care to their patients at the risk of losing their licenses. A temporary restraining order is desperately needed to maintain the status quo—namely that, just as in the rest of the country, and just as in Colorado until a few hours ago, women should be free to change their minds after taking mifepristone, and their doctors and nurses should be free to help them.

## BACKGROUND

*Bella Health and Wellness.* Plaintiff Bella Health and Wellness is a nonprofit, faith-based medical clinic that offers life-affirming, dignified health care to men, women, and children from all backgrounds and faith traditions. Compl. ¶¶22, 33. Founded in 2014 by mother and daughter nurse practitioners, Plaintiffs Dede Chism and Abby Sinnett, Bella offers obstetrics-gynecology care as well as family medicine, pediatrics, and functional medicine. *Id.* ¶¶33-34. Today, Bella's three locations and 18 providers serve 20,000 patients, many of whom are financially vulnerable. *Id.* ¶¶36-37. Bella is an association of the Christian faithful under the Code of Canon Law of the Catholic Church c.299, §1, and a Colorado nonprofit organization under section 501(c)(3) of the Internal Revenue Code. *Id.* ¶¶19, 37-38.

Bella manifests its commitment to honor the innate dignity of every person in a variety of ways. Consistent with its religious mission, it follows the Ethical and Religious Directives for Catholic Health Care Services issued by the United States Conference of Catholic Bishops. *Id.* ¶¶43-44. Under its Provider Ethical Agreement, Bella's providers "agree to identify treatment plans that work in cooperation with the body and that do not alter healthy natural processes." *Id.* ¶45. In the Practice Agreement signed by each patient, Bella commits "to provide comprehensive, life-affirming health care with dignity and compassion" and "to offer[] you medical solutions that respect your dignity, preserve your integrity, and work in cooperation with your body." *Id.* ¶46. As the Agreement explains, "we do not offer contraception, sterilizations, or abortions but rather promote and provide natural fertility awareness that is scientifically validated." *Id.* Bella's website states that "we take a mission approach to medicine and serve all people, no matter their life circumstances[,] with high-quality care that honors their dignity." *Id.* ¶109.

***Progesterone.*** Progesterone is a naturally occurring hormone that promotes gestation—hence its name. Compl. ¶52. It plays an essential role in regulating female reproductive function in the uterus, ovaries, mammary glands, and brain, and it is particularly critical to the achievement and maintenance of a healthy pregnancy. *Id.* ¶53. Among other things, it prepares the endometrium (the tissue lining the uterus) to allow implantation, stimulates glands in the endometrium to secrete nutrients for the embryo, and suppresses uterine contractions prior to delivery. *Id.* ¶¶55-56.

Progesterone has been used to support female fertility in a variety of ways for more than 50 years. *Id.* ¶57. It is commonly prescribed for a host of uses in obstetrics and gynecology, including treatment of recurring miscarriages, prevention of preterm birth, support of endometrial function during in vitro fertilization, treatment of absent menstrual periods (secondary amenorrhea), treatment of excessive blood loss during menstruation, treatment of premenstrual syndrome, and prevention of irregular thickening of the endometrium (endometrial hyperplasia) during menopause. *Id.* ¶61. All uses of supplemental progesterone except two—treatment of endometrial hyperplasia and secondary amenorrhea—are considered "off-label" uses. *Id.* ¶62.[1]

The FDA historically classified the drugs pregnant women might take into five risk categories (A, B, C, D, or X) to indicate the potential of a drug to cause adverse effects during pregnancy. *Id.* ¶59. Progesterone is classified as Category B—the same category as Tylenol, the most commonly used pain reliever during pregnancy. *Id.* ¶60.

Two recent studies—the Progesterone in Recurrent Miscarriages (PROMISE) study and the Progesterone in Spontaneous Miscarriage (PRISM) study—documented the use of progesterone to treat unexplained recurrent miscarriage and early pregnancy bleeding. *Id.* ¶¶67-69. In November 2021, the United Kingdom's National Institute of Health and Care Excellence (NICE) published new guidelines, based on

---

[1]   The FDA has long recognized the freedom health care professionals enjoy to prescribe FDA-approved drugs off-label, stating that "[o]nce a [drug] product has been approved for marketing, a physician may prescribe it for uses or in treatment regimens of patient populations that are not included in approved labeling." 12 FDA Drug Bulletin, Apr. 1982, at 5, https://perma.cc/A5UJ-C5YL.

a research review (including the PRISM study), recommending progesterone therapy for women with early pregnancy bleeding and at least one previous miscarriage. *Id.* ¶70. NICE noted that "there was no evidence of harms for women or babies" from the use of progesterone, including "no increase in risk of stillbirth, ectopic pregnancy, congenital abnormalities or adverse drug reactions." *Id.* ¶71.

***The Abortion Pill.*** The abortion pill, also known as medication abortion, medical abortion, or chemical abortion, refers to the use of prescribed drugs to terminate pregnancy. *Id.* ¶72. The current FDA-approved abortion-pill regimen consists of two drugs: mifepristone and misoprostol.[2] *Id.* ¶73. Under the approved protocol, a woman takes mifepristone orally, followed up to 48 hours later by misoprostol. *Id.* ¶81.

Mifepristone is a progesterone antagonist, meaning it binds to (and blocks) the same intracellular receptors as progesterone. *Id.* ¶¶75-76. As the FDA explains, "Mifepristone is a drug that blocks a hormone called progesterone that is needed for a pregnancy to continue." *Id.* ¶76. By blocking the progesterone receptors, mifepristone causes the uterine lining to deteriorate, blocking oxygen and nutrition to the devel-

---

[2]   On April 7, 2023, a district judge in the Northern District of Texas stayed the FDA's 2000 approval of mifepristone and subsequent actions related to that approval. *All. for Hippocratic Med. v. FDA*, 2023 WL 2825871, at *32 (N.D. Tex. Apr. 7, 2023). The Fifth Circuit then stayed the portion of that decision staying the 2000 approval pending appeal. *All. for Hippocratic Med. v. FDA*, No. 23-10362 (5th Cir. Apr. 12, 2023). On April 14, Justice Alito entered an administrative stay of the district court's decision that expires at 11:59 PM on April 19, 2023. *FDA v. All. for Hippocratic Med.*, No. 22A902 (S.Ct. Apr. 14, 2023). A district judge in the Eastern District of Washington has separately enjoined the FDA from altering its risk evaluation and mitigation strategy (REMS) for mifepristone in 17 states, including Colorado. *Washington v. FDA*, No. 1:23-CV-3026 (E.D. Wash.), Dkt. 80, 91.

oping embryo and rendering the uterus vulnerable to contractions. *Id.* ¶78. Miso-prostol then binds to smooth muscle cells in the uterine lining, thereby causing con-tractions that mechanically expel the embryo from a woman's uterus, completing the abortion process. *Id.* ¶79.

**Abortion Pill Reversal.** Some women change their mind about terminating their pregnancies after taking mifepristone but before taking misoprostol. *Id.* ¶82. Other women did not want to take mifepristone in the first place, but rather took it under duress or because they were tricked.[3] *Id.* ¶83 & n.23.

When a woman has taken mifepristone and then wants to continue her pregnancy, providers may prescribe supplemental progesterone in an attempt to overcome the progesterone-blocking effects of the mifepristone. *Id.* ¶84. Administering progester-one in these circumstances is known as "abortion pill reversal." *Id.*

The basic biochemical premise of abortion pill reversal is that the function of a receptor antagonist (*i.e.*, mifepristone) can be inhibited by increasing the concentra-

---

[3] *See, e.g.*, Lauren Aratani, *Texas man faces charges for allegedly slipping abortion drug in wife's drink*, Guardian (Nov. 14, 2022), https://perma.cc/8NJD-3SSF; *Civil servant guilty of spiking drink with abortion drug*, BBC News (May 3, 2022), https://perma.cc/U43C-C2VU; Andy Wells, *NHS nurse struck off for supplying abortion pills to man who 'force-fed' them to pregnant partner*, Yahoo (Sept. 23, 2021), https://perma.cc/G88T-AXHX; Kevin Murphy, *Abortion-drug dealer pleads guilty, linked to Grand Rapids man accused of poisoning pregnant woman's drink*, Wis. Rapids Trib. (Mar. 5, 2020), https://perma.cc/4JSV-AJ64; Kristine Phillips, *A doctor laced his ex-girlfriend's tea with abortion pills and got three years in prison*, Wash. Post (May 19, 2018), https://perma.cc/W7QM-Q9VZ; Loulla-Mae Eleftheriou-Smith, *Man forced ex-girlfriend to miscarry after secretly feeding her abortion pills in a smoothie*, Independent (Mar. 13, 2015), https://perma.cc/KJF4-E9VX; Lateef Mungin, *Man pleads guilty to tricking pregnant girlfriend into taking abortion pill*, CNN (Sept. 10, 2013), https://perma.cc/RT4R-6LLL.

tion of the receptor agonist (*i.e.*, progesterone). *Id.* ¶85. Abortion pill reversal therefore involves administering an influx of progesterone to curb and outlast the effects of mifepristone. *Id.* Like most other uses of progesterone, its use in abortion pill reversal is off label. *Id.* ¶86.

An early animal study demonstrated progesterone's ability to counteract mifepristone. *Id.* ¶87. In 1989, researchers designed a study to investigate "the role of progesterone in the maintenance of pregnancy" by using groups of pregnant rats. *Id.* After four days, 66.7% of the rats who received mifepristone aborted their pups, but 100% who were given progesterone in addition to mifepristone remained pregnant. *Id.*

In 2018, Dr. George Delgado published an observational case series that followed 754 pregnant women who had taken mifepristone, but had not yet taken misoprostol, and were interested in reversing its effects. *Id.* ¶88. A total of 547 women met inclusion criteria and underwent progesterone therapy within 72 hours after taking mifepristone. *Id.* ¶89. The overall success rate—247 live births, plus four viable pregnancies lost after 20 weeks gestation—was 48%. *Id.* The 2018 study showed even higher success rates when the patients were divided into treatment subgroups. *Id.* ¶90. It showed fetal survival rates of 64% for the subgroup that received progesterone intramuscularly and 68% for the subgroup that received a high dose of oral progesterone

followed by daily oral progesterone until the end of the first trimester. *Id.* These com-
pare favorably with the baseline fetal survival rate of approximately 25% if no treat-
ment is attempted after mifepristone is administered. *Id.* ¶91.

In the case of a woman choosing to stop an abortion, the 2018 study recommended
a protocol to reverse the effects of mifepristone by administering progesterone, either
orally or by intramuscular injection, "as soon as possible" after taking mifepristone,
followed by supplemental progesterone until the end of the first trimester (if taken
orally) or for a series of additional intramuscular injections. *Id.* ¶93.

***Bella's Experience with Progesterone Therapy and Abortion Pill Reversal.***
Bella's general practice is to check baseline progesterone levels where a pregnant
woman has any of the following risk factors: prior miscarriage, bleeding in the first
trimester, prior pregnancy with premature labor, infertility, history of low luteal pro-
gesterone, and medications that block progesterone (*i.e.*, mifepristone). *Id.* ¶95. If a
woman with one or more risk factors has abnormal progesterone levels, Bella offers
progesterone therapy to reduce the risk of miscarriage and preterm birth. *Id.* ¶96.

Bella and its providers are devoted to honoring the dignity of the women they
serve and promoting respect for their unborn children. This religious commitment
extends to all women experiencing threatened miscarriage, whether that risk arises
biologically, due to physical trauma, or because the woman willingly or unwillingly
ingested mifepristone. *Id.* ¶97. As a matter of conscience, Bella and its providers can-
not refuse to help a woman who desires to continue her pregnancy simply because

9

she first took mifepristone. *Id.* ¶98. Consistent with their core religious beliefs, Bella and its providers are religiously obligated to offer abortion pill reversal. *Id.*

When a woman contacts Bella seeking abortion pill reversal, a Bella provider will meet her at the clinic as soon as possible, including on nights, weekends, and holidays. *Id.* ¶100. Bella informs each woman that the use of progesterone to attempt to reverse the effects of mifepristone is an off-label use and that success is not guaranteed. *Id.* ¶101. If the woman chooses to proceed, Bella offers progesterone therapy, just as in any other circumstance involving risk of miscarriage. *Id.* ¶102. Bella has treated dozens of abortion pill reversal patients who successfully maintained their pregnancies. *Id.* ¶103.

Prior to SB 23-190, Bella's website affirmed its commitment to "save mothers and babies through sound medical counseling and Abortion Pill Reversal." *Id.* ¶110. Bella's website previously contained the following FAQ: "I took the 'abortion pill.' But I've changed my mind. Is there anything you can do?" *Id.* ¶111. The answer explained: "If we act quickly, there is a possibility we can save your baby through a safe, painless therapy known as Abortion Pill Reversal (APR). We've helped dozens of women just like you. No judgment. No questions. Just excellent medical care and complete support. We are here for you." *Id.* The FAQ also made clear that Bella will "cover all costs associated with an Abortion Pill Reversal, should finances be an issue." *Id.* ¶112. Bella has also described and promoted the availability of abortion pill reversal on its social media accounts, including on Facebook and Instagram. *Id.* ¶114. Because of SB

23-190, Bella has been forced to strip its website and social media accounts of any information about abortion pill reversal. *Id.* ¶178.

**Reproductive Health Equity Act.** On April 4, 2022, Governor Jared Polis signed into law the Reproductive Health Equity Act (RHEA), which declares that "[a] pregnant individual has a fundamental right to continue a pregnancy and give birth or to have an abortion and to make decisions about how to exercise that right." Colo. Rev. Stat. §25-6-403(2). To secure that right, RHEA makes it unlawful for a "public entity" to "[d]eny, restrict, interfere with, or discriminate against an individual's fundamental right … to continue a pregnancy and give birth or to have an abortion in the regulation or provision of benefits, facilities, services, or information." *Id.* §25-6-404(1). RHEA further declares that "Colorado voters … trust individuals to make their own ethical decisions about abortion care based on what is best for their health and their families" and that "[p]olitically motivated, medically inappropriate restrictions on health care have no place in our statutes or our medical offices." H.B. 22-1279 §1(1)(f)-(g), 73rd Gen. Assemb., Reg. Sess. (Colo. 2022), https://perma.cc/9U3B-8UXR.

**Colorado Medical and Nursing Licensing Regimes.** As "regulators" of their respective professions, the Colorado Medical Board and the Colorado State Board of Nursing "may investigate, hold hearings, and gather evidence in all matters related to the exercise and performance of [their] powers and duties." Colo. Rev. Stat. §12-20-403(1). Each board also has general authority to impose disciplinary action if it

"determines" that a licensee "has committed an act or engaged in conduct that con-stitutes grounds for discipline or unprofessional conduct under a part or article of this title 12 governing the particular profession or occupation." *Id.* §12-20-404(1). The medical board may impose as disciplinary action for statutory violations, *inter alia*, a suspension or revocation of license to practice medicine and a fine of up to $5,000 per violation. *Id.* §12-240-125(5)(c)(III). The Colorado State Board of Nursing may impose disciplinary action for statutory violations, *inter alia*, suspension, revocation, or non-renewal of a license to practice nursing and a fine between $250 and $1,000 per vio-lation. *Id.* §12-255-119(4)(c)(III). Each board can "refer[] to the attorney general for preparation and filing of a formal complaint" any facts "that warrant further proceed-ings by formal complaint." *Id.* §§12-240-125(4)(c)(V), 12-255-119(3)(c)(V).

***Colorado Consumer Protection Act.*** The Colorado Consumer Protection Act (CCPA) makes it a "deceptive trade practice" to "knowingly or recklessly make[] a false representation as to the characteristics, … uses, [or] benefits … of goods, [or] services," Colo. Rev. Stat. §6-1-105(1)(e), or to "knowingly or recklessly engage[] in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice," *id.* §6-1-105(1)(rrr), including in advertisements. The CCPA defines "[a]dvertisement" as "the attempt by publication, dissemination, solicitation, or cir-culation, visual, oral, or written, to induce directly or indirectly any person to enter into any obligation or to acquire any title or interest in any property." *Id.* §6-1-102(1).

The CCPA is enforceable by the Colorado Attorney General, the state's district attorneys, and private parties. *Id.* §§6-1-103, 6-1-113(1)(a). For each violation, the government may seek a civil penalty of not more than $20,000, *id.* §6-1-112(1)(a), while private parties may seek the greater of $500, the "amount of actual damages sustained," or three times that amount if bad-faith conduct is established by clear and convincing evidence, plus attorney fees' and costs, *id.* §6-1-113(2).

***Colorado Senate Bill 23-190.*** On April 14, 2023, Governor Jared Polis signed into law Senate Bill 23-190, which took effect immediately.

SB 23-190 begins by declaring that "[i]n Colorado, a pregnant individual has a fundamental right to continue a pregnancy or to terminate a pregnancy by abortion." §1(1)(a). It then states that "[a]nti-abortion centers," which "are the ground-level presence of a well-coordinated anti-choice movement," §1(1)(d), interfere with that fundamental right through "deceptive advertising tactics to target and acquire clients from historically marginalized groups," §1(1)(e). SB 23-190 further accuses "[a]nti-abortion centers" of "go[ing] so far as to advertise medication abortion reversal, a dangerous and deceptive practice that is not supported by science or clinical standards." §1(1)(f). Because "[n]o one should be deceived, manipulated, or face unnecessary delays when seeking support or health care during pregnancy," §1(1)(h)-(i), the Legislature found it "imperative" to "stop deceptive trade practices and unprofessional conduct with respect to the provision of abortion services and medication abortion reversal." §1(1)(h)-(i), (2).

Based on these findings, SB 23-190 prohibits publicizing abortion pill reversal by extending the "prohibition on deceptive trade practices" in the CCPA to "disseminating or causing to be disseminated false advertising relating to the provision of abortion or emergency contraceptive services, or referrals for those services, and *advertising for or providing or offering to provide or make available medication abortion reversal*." §1(3) (emphasis added). SB 23-190 also declares it to be a "deceptive trade practice" to "make[] or disseminate[] to the public … any advertisement that indicates that the person provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives, when the person knows or reasonably should have known … that the person does not provide those specific services." §2(2).

Finally, SB 23-190 bans abortion pill reversal treatment, declaring it to be "unprofessional conduct" for a "licensee, registrant, or certificant" to "provide[], prescribe[], administer[], or attempt[] medication abortion reversal in this state." §3(2); *see* §3(1)(b) (defining "[m]edication abortion"); §3(1)(c) (defining "[m]edication abortion reversal"). The only way for this declaration to be undone is if the Colorado Medical Board, State Board of Pharmacy, and the State Board of Nursing "in consultation with each other, each have in effect rules finding that it is a generally accepted standard of practice to engage in medication abortion reversal" by October 1, 2023. §3(2)(a)-(b). At the time of this filing, none of these boards has such a rule in place.

14

*Legislative Record.* The debate surrounding SB 23-190 shows that the law is specifically designed to target religious organizations in Colorado that offer alternatives to abortion, including abortion pill reversal. Compl. ¶151. The bill's sponsors stated explicitly that "anti-abortion centers" meant "faith-based organizations" or "religiously affiliated" organizations. *Id.* ¶¶152, 159; *see also id.* ¶153 (describing prevalence of religious organizations offering alternatives to abortion in Colorado). These organizations were described as "ideologically driven" and were repeatedly disparaged as "fake clinics." *Id.* ¶¶153-54, 156.

The bill's sponsors levied a variety of accusations about the motivations of such organizations, claiming among other things that they "trade on the goodwill of legitimate medicine to defraud patients," *id.* ¶153, "tak[e] advantage of vulnerable populations," *id.* ¶155, tell "outright lie[s]," *id.* ¶159, and engage in "intimidation," "delay tactics," "disinformation," and "shame," *id.* ¶153, 156, 159. Finally, the bill's sponsors accused religious organizations, which were described as "the only ones to prescribe abortion pill reversal," *id.* ¶154, as causing "harm" to pregnant women through a "life-threatening" and "dangerous" procedure, *id.* ¶¶154, 157.

The repeated claim that abortion pill reversal is "dangerous" rested largely on the testimony of Dr. Mitchell Creinin, an OB-GYN who has served as a paid consultant for the distributor of mifepristone. *Id.* ¶163. Creinin claimed that abortion pill reversal is a "medical fraud," a conclusion he based on a failed randomized trial he conducted in 2019 to test the "efficacy and safety" of abortion pill reversal. *Id.* ¶164.

Creinin's study was intended to enroll 40 pregnant women divided into two control groups: one receiving mifepristone followed by progesterone and the other receiving mifepristone followed by a placebo. *Id.* ¶165. But only 12 women were enrolled in the study, and only 10 women ultimately completed it. *Id.* Creinin testified that "[w]e had to stop the study after 12 women were enrolled because three of the women had such significant bleeding that had to be rushed to the emergency room or they called in an ambulance," which he described as "incredibly rare[,] more than rare." *Id.* ¶166. He then immediately had to clarify that of those three women, "two of the people had received placebo and one had received progesterone." *Id.*

But Creinin failed to disclose that "no intervention was needed" for the one woman who had received progesterone and went to the emergency department. *Id.* ¶167. By contrast, the two women in the placebo group who went to the emergency room both "required emergency suction aspiration abortions" because "they had retained products and … they were bleeding significantly, severely bleeding. One of them required a blood transfusion because her hemoglobin dropped significantly." *Id.* ¶168.

Creinin ultimately testified that "my study was inconclusive as far as showing whether or not the [progesterone] treatment might work" and conceded that "it's always possible" that abortion pill reversal could be effective. *Id.* ¶¶166, 170. He also admitted that no U.S. jurisdiction has ever made a finding of professional misconduct based on abortion pill reversal. *Id.* ¶171. Creinin further opined that progesterone

should not be used to treat miscarriage, since in his view progesterone "does nothing to increase the likelihood of them having another continuing pregnancy." *Id.* ¶172.

***Harm to Bella.*** Because of SB 23-190, Bella is unable to help pregnant women who seek abortion pill reversal without putting its providers' medical licenses at risk. *Id.* ¶174. If a woman calls Bella today seeking abortion pill reversal, Bella and its providers will be forced to choose between complying with SB 23-190 and following their conscience and core religious commitments to help that woman maintain her pregnancy by offering abortion pill reversal. *Id.* This harm is no speculation; it is occurring right now. Hours before SB 23-190 took effect, Bella received a call from a patient seeking urgent assistance in reversing the effects of mifepristone. Bella administered supplemental progesterone, and the patient's treatment is ongoing. If Bella follows its religious obligations and continues treatment, its providers risk losing their licenses. If they comply, they will have been coerced by the state to abandon their deep convictions, and their patients will irreparably lose the opportunity to continue their pregnancies.

Because of SB 23-190, Bella is also unable to publicize abortion pill reversal without risking ruinous financial penalties—up to $20,000 per violation. *Id.* ¶177; *see* Colo. Rev. Stat. §6-1-103. Bella has already been chilled from speaking about abortion pill reversal—and has been forced to remove information about abortion pill reversal from its website and social media accounts—because of SB 23-190's draconian penalties. Compl. ¶178.

More troubling still, Bella's current and prospective patients who take mifepristone and then decide to continue their pregnancies will be deprived of access to information and progesterone therapy—for the sole reason that they took mifepristone, willingly or unwillingly, before seeking medical help to preserve their pregnancies. *Id.* ¶179. That flatly contradicts SB 23-190's own declaration—also enshrined in RHEA—that women have the "fundamental right to continue a pregnancy." §1(1)(a).

## LEGAL STANDARD

A TRO "preserv[es] the status quo and prevent[s] irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing." *Granny Goose Foods, Inc. v. Bhd. of Teamsters,* 415 U.S. 423, 439 (1974). A TRO or preliminary injunction is warranted when an applicant shows (1) a likelihood of success on the merits, (2) irreparable harm absent relief, (3) the balance of equities weighs in its favor, and (4) the injunction is in the public interest. *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018); *see Hicks v. Jones*, 332 F. App'x 505, 508 (10th Cir. 2009) (applying same standard for TRO and preliminary injunction). "[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc), *aff'd sub nom.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

## ARGUMENT

### I.  Plaintiffs are likely to succeed on the merits.

Plaintiffs are highly likely to succeed on the merits because SB 23-190 violates the Free Exercise Clause, the Free Speech Clause, and the Fourteenth Amendment, and Colorado cannot come close to satisfying its burdens under strict scrutiny.

### A.   SB 23-190 violates the Free Exercise Clause.

A law is subject to strict scrutiny under the Free Exercise Clause when it "is not neutral or generally applicable." *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421-22 (2022) (cleaned up). SB 23-190 fails both requirements.

***Not generally applicable.*** "[L]aws burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993). A law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) (per curiam), or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1877 (2021). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S.Ct. at 1296. Importantly, the comparability analysis "is concerned with the *risks* various activities pose," not the "reasons why" people engage in them. *Id.* (emphasis added).

There is no question that SB 23-190 is a "law[] burdening religious practice" when it comes to Plaintiffs. *Lukumi*, 508 U.S. at 542. Consistent with their commitment to the dignity of human life, Plaintiffs must provide life-affirming medical care to women at risk of miscarriage—whether that risk arises biologically, due to physical trauma, or because she has ingested the first abortion pill. As a matter of conscience, Plaintiffs cannot refuse to administer progesterone to a woman who desires to continue her pregnancy simply because she took mifepristone. Plaintiffs are therefore religiously obligated to offer the abortion pill reversal that Colorado now outlaws.

Under *Tandon*, a single exemption for a "comparable secular activity" is enough to defeat general applicability. 141 S.Ct. at 1296. Here, SB 23-190 makes no attempt to regulate a laundry list of off-label uses of progesterone, much less outright prohibit them. Colorado's purported interest in prohibiting that religious exercise is in protecting women from "a dangerous and deceptive practice that is not supported by science or clinical standards." §1(1)(f). But abortion pill reversal is simply supplemental progesterone. And there are many off-label uses of progesterone—including treatment of recurring miscarriages, prevention of preterm birth, and support of endometrial function during IVF treatment—all of which remain legal in Colorado.

Nor can Colorado point to the "reasons why" the progesterone is administered to bolster its alleged interest. *See Tandon*, 141 S.Ct. at 1296. What matters is the "risk[]." *Id.* And the risk of administering progesterone—the naturally occurring hor-

mone that regulates female reproductive function and maintains pregnancy—is min-imal (if any). The FDA has said as much, placing progesterone in the same risk cate-gory as Tylenol—the most commonly used pain reliever during pregnancy.

This lack of general applicability is compounded by SB 23-190's quite specific and non-general focus on "anti-abortion centers," §1(1)(c)-(f), and its imposition of tar-geted deceptive practices rules (only related to one side of the abortion issue), §2(2), and information bans (only related to one use of progesterone), §§1(3), 3(2). Colorado cannot plausibly claim to be regulating generally. For all these reasons, SB 23-190 is not a generally applicable law. It is therefore subject to strict scrutiny, which it fails. *Infra* Section I.E.

***Not neutral.*** The government is "obliged under the Free Exercise Clause to pro-ceed in a manner neutral toward and tolerant of [religious actors'] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S.Ct. 1719, 1731 (2018). Even "slight suspicion[s]" of religious intolerance or "subtle departures from neutrality" violate the Free Exercise Clause. *Id.*; *Lukumi*, 508 U.S. at 534. SB 23-190 fails the bedrock principle of neutrality because it is the product of overt animus toward reli-gious adherents, *see Masterpiece*, 138 S.Ct. at 1731, and thereby creates a "religious gerrymander," *see Lukumi*, 508 U.S. at 535.

The Supreme Court has also long recognized that government hostility to religion can be "masked, as well as overt." *Id.* at 534. Thus, to determine whether a law vio-lates the neutrality requirement of the Free Exercise Clause, courts must "survey

meticulously," *id.*, all evidence of a law's purpose for religious animus, such as "the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece*, 138 S.Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 540); *see also Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008) ("[W]here governmental bodies discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional."). Such animus can demonstrate that a law was "enacted 'because of', not merely 'in spite of,' [its] suppression of … religious practice." *Lukumi*, 506 U.S. at 540.

The legislative record here raises far more than a "slight suspicion" of animosity, *Masterpiece*, 138 S.Ct. at 1731, instead making clear that SB 23-190 was enacted "because of" religious conduct, *Lukumi*, 508 U.S. at 540. The bill's sponsors expressly stated that their intent was to target "faith-based" and "religiously affiliated" organizations offering and advertising abortion pill reversal. *Supra* at p.15. Their disdain for such organizations manifests itself time and again in the legislative record, where the bill's sponsors and proponents refer to such organizations as "fake clinics" and accuse them of "sham[ing] women"; engaging in "delay tactics," "disinformation," and "intimidation"; and "harm[ing]" women by offering them the "life-threatening" procedure of abortion pill reversal, despite the data saying otherwise. *Supra* at p.15.

Taken together and separately, these statements demonstrate that the legislators intended to send a clear and unequivocal message to those motivated by their religion to offer life-affirming care in Colorado: compromise your beliefs or close your doors.

*See New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 168 (2d Cir. 2020) (finding similar statements sufficient to state a free exercise claim). Moreover, repeatedly impugning the motivations of religious adherents as intentionally employing deceitful disinformation campaigns and delay tactics amounts neither to "tolerance" nor "neutral objectivity." *Meriwether v. Hartop*, 992 F.3d 492, 512-13 (6th Cir. 2021) (finding statements about religion being "oppress[ive]" and "primarily motivated out of fear" sufficient to state a free exercise claim).

Unsurprisingly, the government's focus on religious providers means that "the burden of the [law], in practical terms, falls on [religious] adherents but almost no others." *Lukumi*, 508 U.S. at 535-36. "[S]trong evidence" of a religious gerrymander occurs when "the effect of [the] law in its real operation" makes it "evident" that the law "target[s]" religion. *Id.* at 535. That's because "[t]he principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2019 (2017) (government may not "target the religious for special disabilities based on their religious status" (cleaned up)).

Here, the exceedingly specific scope of SB 23-190's prohibition on advertising or offering abortion pill reversal makes clear that "almost the only conduct subject to the [law] is the religious exercise" of those faith-based providers offering life-affirm-

ing care through this service. *Lukumi*, 508 U.S. at 535. Colorado has chosen to regulate one and only one progesterone treatment—abortion pill reversal—which, according to the bill's sponsors, is used "only" by "faith-based organizations." *See supra* at p.15. Meanwhile, all other uses of progesterone are left unregulated. Thus, once SB 23-190's "operation is considered," it is clear that it "achieve[s] [the] result" of prohibiting religious conduct while leaving comparable conduct untouched. *Lukumi*, 508 U.S. at 535. This is precisely the type of "religious gerrymander" condemned by *Lukumi. See id.* at 536 (striking down a law that permits "almost all killings of animals except for religious sacrifice").

Colorado's blatant religious targeting ends the analysis. Courts must "set aside such policies without further inquiry." *Kennedy*, 142 S.Ct. at 2422 n.1 (cleaned up). SB 23-190 is therefore invalid for non-neutrality, even without strict scrutiny.

## B. SB 23-190 violates the Free Speech Clause by discriminating based on content and viewpoint.

SB 23-190 is also subject to strict scrutiny—and "presumptively unconstitutional"—because it regulates speech based on its content and viewpoint. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 138 S.Ct. 2361, 2371 (2018); *Peck v. McCann*, 43 F.4th 1116, 1134-35 (10th Cir. 2022). A law is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed" or if it was "adopted by the government because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (cleaned up). A law is viewpoint based "when the specific motivating ideology or the opinion or

perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). SB 23-190 is both.

SB 23-190 is facially content based because it applies only to speakers who discuss certain topics. Section 1's targeted prohibition on deceptive trade practices applies only to speakers who advertise abortion pill reversal. §1(3)(b). A speaker who advertises the abortion pill itself is not subject to the law. Because section 1 "singles out specific subject matter for differential treatment," it is content based. *Reed*, 576 U.S. at 169. And section 2 applies only to speakers whose advertisements "indicate" that they provide or refer for abortion or emergency contraceptives. §2(2). Because this provision "requires enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred," it is content based. *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (cleaned up).

Even if SB 23-190 were facially content neutral—it is not—it is content based because Colorado enacted it out of disagreement with the message conveyed by "anti-abortion centers." §1(1)(c)-(f); *see Reed*, 576 U.S. at 164; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The government's purpose is the controlling consideration."). SB 23-190 claims that "anti-abortion centers"—health care providers and pregnancy centers that do not provide or refer for abortion or emergency contraceptive services—"use deceptive advertising tactics" and "go so far as to advertise medication abortion reversal, a dangerous and deceptive practice that is not supported by science or clinical standards." §1(1)(e)-(f). And its sponsors decried them as

25

"fake clinics," accusing them of "shaming women" and spreading "disinformation." *Supra* at p.15. Because SB 23-190 is "targeted at specific subject matter" and was enacted due to "'disagreement' with its message," it is "content based even if it does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 167, 169.

But SB 23-190 *does* discriminate among viewpoints, making the First Amendment violation here "all the more blatant." *Rosenberger*, 515 U.S. at 829. Viewpoint discrimination is "an egregious form of content discrimination," in which "the government targets not subject matter, but particular views taken by speakers on a subject." *Id*. The government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*.

SB 23-190 explicitly targets the views of "[a]nti-abortion centers" for their role in the "anti-choice movement." §1(1)(d). SB 23-190 prohibits advertising of, and counseling patients in connection with, abortion pill reversal. §1(3)(b). It thus discriminates against the viewpoint that progesterone treatment can reverse the effects of the first abortion pill. Health care providers are free to advertise and discuss with patients any and every progesterone treatment except progesterone treatment to reverse the effects of the first abortion pill. Because SB 23-190 "facilitate[s] speech on only one side of the abortion debate," it is "a clear form of viewpoint discrimination." *McCullen v. Coakley*, 573 U.S. 464, 485 (2014).

The Supreme Court "has stressed the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'" *NIFLA*, 138 S.Ct. at 2374. Colorado may not like that women change their mind about abortion or may not believe that progesterone can reverse the effect of the first abortion pill. But it "may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578-79 (2011); *see First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785-86 (1978). As a content- and viewpoint-based restriction of speech, SB 23-190 is "presumptively unconstitutional" and subject to strict scrutiny, *NIFLA*, 138 S.Ct. at 2371, which it fails, *infra* Section I.E.

## C.   SB 23-190 violates the First Amendment right to receive information.

SB 23-190 is also invalid because it deprives Bella's current and prospective patients of their constitutional right to receive information. In particular, the law violates the First Amendment—and robs these women of their ability to make an informed choice—by stopping them from viewing advertisements and speaking with their health care providers about using progesterone to reverse the effects of the first abortion pill.

It is "well established" that the First Amendment "protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *accord Doe v. City of Albuquerque*, 667 F.3d 1111, 1118-20 (10th Cir. 2012) (compiling cases). That right is particularly important in the abortion context, where the Supreme Court has

long recognized the potential for under-informed decision-making to cause "devastating psychological consequences." *Planned Parenthood v. Casey*, 505 U.S. 833, 882 (1992), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022). Absent the ability to receive information about progesterone therapy to reverse the effects of the first abortion pill, women who want to choose to remain pregnant will instead be forced to undergo an abortion they have not chosen.

The restriction here is entirely content and viewpoint based. Women are permitted to see advertisements for drugs to help them choose abortion. And they are permitted to see advertisements for all manner of uses of progesterone. But they are forbidden from receiving only one message: that progesterone might help them if they choose to continue their pregnancy after taking an abortion pill. That is content and viewpoint discrimination, and it fails strict scrutiny. *Infra* Section I.E.

### D.   SB 23-190 violates the Fourteenth Amendment right of pregnant women not to be forced to undergo or continue an abortion.

The Constitution protects the right to refuse "unwanted medical treatment," *Cruzan v. Director*, 497 U.S. 261, 278 (1990), and the right "to bodily integrity," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. California*, 342 U.S. 165 (1952)). That includes the "right to decide independently, with the advice of [her] physician, to acquire and to use needed medication." *Whalen v. Roe*, 429 U.S. 589, 603 (1977). And it specifically includes the right to procreate—to decide "whether to bear

or beget a child" and to do so "free from unwarranted governmental intrusion." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *see also Dobbs*, 142 S.Ct. at 2280 ("It is hard to see how we could be clearer" that *Dobbs* does not "cast doubt" on *Eisenstadt*).

Colorado purports to respect these rights—recognizing a "fundamental right to continue a pregnancy" with which state public entities are forbidden to "interfere," Colo. Rev. Stat. §§25-6-403(2), 25-6-404(1)—but SB 23-190 does the opposite. By making it illegal to help women who either willingly or unwillingly ingested mifepristone and choose to keep their babies, Colorado is actively thwarting women's decisions about "whether to bear or beget" a child and making it illegal for them to access safe FDA-approved medications to try to prevent an abortion they do not wish to have. In so doing, Colorado has violated the Fourteenth Amendment's Due Process Clause.

**E.    The government cannot carry its burden under strict scrutiny.**

Because SB 23-190 infringes free exercise and free speech rights, and because it violates the Fourteenth Amendment, it must survive strict scrutiny—"the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The government bears the burden, and therefore "face[s] the daunting task of establishing that the requirement was narrowly tailored to advance a compelling governmental interest." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004).

***No compelling interest.*** There is no prospect that the government can demonstrate a compelling government interest. First, given that no other state forbids abortion pill reversal, and that Colorado has never used any of its existing tools to punish

anyone for using it, Defendants have not shown an "actual problem in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). Second, SB 23-190 is vastly underinclusive, in that it does not reach the majority of situations in which pregnant women take progesterone to ward off threatened miscarriage. A government fails to show a compelling interest "when [a law] leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547; *see also Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.) ("A law's underinclusiveness … can raise with it the inference that the government's claimed interest isn't actually so compelling after all.").

SB 23-190 was purportedly enacted to protect women from the "dangerous" and "deceptive" practice of abortion pill reversal. §1(1)(f). But if Colorado were truly concerned about patient safety, it would prohibit *all* off-label uses of the hormone, rather than singling out abortion pill reversal for disfavored treatment. Instead, it has left every other use completely untouched. It is hard to imagine a clearer example of a law that "leaves appreciable damage to [a] supposedly vital interest unprohibited" by failing to regulate conduct "that endangers [the government's] interest[] in a similar or greater degree." *Lukumi*, 508 U.S. at 543-44, 547.

Nor can Defendants hide behind the single failed randomized trial conducted by Dr. Creinin discussed in the legislative history. Dr. Creinin, who has served as a paid consultant for the distributor of mifepristone, has admitted his test was "inconclusive" and that progesterone treatment "might work." *See supra* at 16. Although

Creinin stopped his inconclusive study early because three women were sent to the emergency room with significant bleeding—which Creinin called "incredibly rare"—two of the three women had not received progesterone at all (they were in the placebo group), and the one who had received progesterone required "no intervention." If anything, Creinin's study shows harm from the one pill he gave women that is designed to cause bleeding—mifepristone (which of course Colorado does *not* seek to regulate)—rather than the progesterone offered to counteract it.

Tellingly, the legislative history reveals no evidence of a single Colorado woman harmed by taking progesterone at all, much less one harmed by taking progesterone to counteract mifepristone. Compl. ¶162. Nor does it reveal even one instance in which either the Medical Board or the Nursing Board has so much as admonished a single provider for providing progesterone for this purpose. *Id.* Nor does the record show *any other jurisdiction* having punished a provider for abortion pill reversal. *Id.* ¶171. When all other jurisdictions allow the practice, and where Colorado itself has not used any of its regulatory tools whatsoever, even once, it is difficult to imagine how Defendants could expect this Court to suddenly deem that interest *compelling*.

***Not Narrowly Tailored.*** Nor can Defendants plausibly carry their burden of showing that SB 23-190 is narrowly tailored to any valid interest, much less a compelling one. First, the same underinclusivity that dooms the compelling interest argument also forecloses narrow tailoring, because a law that is "underinclusive in sub-

31

stantial respects" demonstrates an "absence of narrow tailoring" that "suffices to establish [its] invalidity." *Lukumi*, 508 U.S. at 546. Moreover, Defendants would need to demonstrate—with evidence—that their myriad other existing laws to protect patients, regulate medical practice, and prevent false advertising have somehow been ineffective. *See, e.g.*, *McCullen*, 573 U.S. at 490-96 (law failed even intermediate scrutiny where "the Commonwealth has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it"). They have not even attempted to do so.

## II.    The remaining preliminary injunction factors favor relief.

As Plaintiffs have shown that SB 23-190 violates the First Amendment, the remaining TRO factors "present little difficulty." *Citizens United v. Gessler*, 773 F.3d 200, 218 (10th Cir. 2014).

***Irreparable harm.*** By establishing a likelihood of success on the merits of their First and Fourteenth Amendment claims, Plaintiffs have also shown that they and their patients will suffer irreparable harm absent an immediate TRO and preliminary injunction. *See, e.g., Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016) (concluding that "the likelihood that [plaintiff] will suffer a violation of its First Amendment rights … , standing alone, gives rise to an irreparable injury"). That's because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Hobby Lobby*, 723 F.3d at 1145. And women who would otherwise seek and receive this medical help

will be forced to undergo or continue abortions that they would choose not to have—a harm than can never be remedied.

**Balance of Equities and Public Interest.** The balance of the equities and public interest also favor Plaintiffs. In a suit against the government, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both are satisfied here. "When a law is likely unconstitutional, the interests of those the government represents, such as [consumers,] do not outweigh a plaintiff's interest in having its constitutional rights protected." *Hobby Lobby*, 723 F.3d at 1145 (cleaned up). Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* And Colorado simply "does not have an interest in enforcing a law that is likely constitutionally infirm." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). Nor could Colorado have an interest in violating its own law declaring a fundamental right to continue a pregnancy—with which no public entity can interfere.

## CONCLUSION

This Court should grant a temporary restraining order and preliminary injunction barring Defendants from enforcing SB 23-190.

Dated: April 14, 2023                    Respectfully submitted,

                                         /s/ Mark L. Rienzi
                                         Mark L. Rienzi
                                         Rebekah P. Ricketts*
                                         Laura W. Slavis
                                         Daniel M. Vitagliano**
                                         The Becket Fund for Religious Liberty
                                            1919 Pennsylvania Ave, N.W.
                                         Suite 400
                                         Washington, D.C. 20006
                                         (202) 955-0095
                                         mrienzi@becketlaw.org

                                         *Admitted only in Texas. Practice limited to
                                         cases in federal court. Supervised by a member
                                         of the D.C. Bar.

                                         **Admitted only in New York. Practice limited
                                         to cases in federal court. Supervised by a mem-
                                         ber of the D.C. Bar.

## CERTIFICATE OF SERVICE

I hereby certify that I have delivered a copy of the foregoing document via electronic mail to the following attorneys: Natalie Hanlon Leh (Chief Deputy Counsel, Colorado Attorney General's Office), John Kellner (District Attorney of the 18th Judicial District of Colorado), Michael Dougherty (District Attorney of the 20th Judicial District of Colorado), and Beth McCann (District Attorney of the 2nd Judicial District of Colorado). I further certify that I will serve the foregoing document or paper on the following non-CM/ECF participants by mail:

PHIL WEISER
ROLAND FLORES
AMANDA MIXON
JENNIFER BLAIR
BECKETT CZARNECKI
ROBERT M. MAULITZ
SAUGHAR SAMALI
ALAN E. SHACKELFORD
KIELY M. SCHULTZ
AMY E. COLEN
ANITA KUMAR
DONALD LEFKOWITS
MAIDUL MEHMUD
KIAN MODANLOU
SCOTT C. STRAUSS
CHRISTOPHER A. BATES
JULIE ANN HARPER
HIEN H. LY
JOSEPH FRANTA
LORI RAE HAMILTON
KARRIE TOMLIN
LENNY ROTHERMUND
HAYLEY HITCHCOCK
ALISSA M. SHELTON
PHYLLIS GRAHAM-DICKERSON

BRANDY VALDEZ MURPHY
DIANE REINHARD
NICHELE BRATTON
AECIAN PENDLETON
JOHN KELLNER
MICHAEL DOUGHERTY
BETH McCANN

s/ Mark L. Rienzi
Mark L. Rienzi