IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00939-DDD-SKC

BELLA HEALTH AND WELLNESS, et al.,

Plaintiffs,

vs.

PHIL WEISER, in his official capacity as Attorney General of Colorado, et al.,

Defendants.

---

REPORTER'S TRANSCRIPT
HEARING ON MOTION FOR PRELIMINARY INJUNCTION

---

Proceedings before the HONORABLE DANIEL D. DOMENICO, Judge, United States District Court for the District of Colorado, commencing at 9:35 a.m. on the 24th day of April, 2023, in Courtroom A1002, Alfred A. Arraj United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:
MARK L. RIENZI, REBEKAH P. RICKETTS, LAURA W. SLAVIS, and DANIEL M. VITAGLIANO, THE BECKET FUND FOR RELIGIOUS LIBERTY, 1919 Pennsylvania Ave, N.W., Suite 400, Washington, D.C. 20006

For the Defendant Phil Weiser:
MICHAEL T. KOTLARCZYK, Senior Assistant Attorney General, ABIGAIL HINCHCLIFF, First Assistant Attorney General, OFFICE OF THE COLORADO ATTORNEY GENERAL, 1300 Broadway, Denver, CO 80203

JULIE H. THOMAS, RMR, CRR, Official Court Reporter,
901 19th Street, Room A256, Denver, CO 80294, (303)335-2111

Proceedings reported by mechanical stenography;
transcription produced via computer.

APPEARANCES: (Cont.)

For Defendant Members of the Colorado Medical Board:
BRIAN URANKAR, Assistant Attorney General, OFFICE OF THE COLORADO ATTORNEY GENERAL, 1300 Broadway, Denver, CO 80203

For Defendant Members of the Colorado State Board of Nursing:
ELIZABETH KENNY, Assistant Attorney General, OFFICE OF THE COLORADO ATTORNEY GENERAL, 1300 Broadway, Denver, CO 80203

For the Defendant Michael Dougherty:
CATHERINE "TRINA" RUHLAND and DAVID HUGHES, Deputy County Attorneys, BOULDER COUNTY ATTORNEY'S OFFICE, P.O. Box 471, Boulder, CO 80306

For the Defendant John Kellner:
ANN B. TOMSIC, Chief Deputy District Attorney, 18th JUDICIAL DISTRICT ATTORNEY'S OFFICE, 6450 S. Revere Parkway, Centennial, CO 80111

For the Defendant Beth McCann:
ANDREW DAVID RINGEL, HALL & EVANS LLC, 1001 Seventeenth Street, Suite 300, Denver, CO 80202

* * * * *

I N D E X

| OPENING STATEMENTS | PAGE |
|---|---|
| Ms. Ricketts | 8 |
| Mr. Kotlarczyk | 12 |

| PLAINTIFFS' WITNESS | PAGE |
|---|---|
| DENISE MARY CHISM | |
| Cross - Ms. Kenny | 14 |
| Redirect - Ms. Ricketts | 32 |

| DEFENDANTS' WITNESSES | PAGE |
|---|---|
| SAMUEL DELP | |

 | | |
|---|---|
| Cross - Mr. Rienzi | 40 |
| Redirect - Mr. Urankar | 56 |
| Cross - Ms. Tomsic | 59 |
| Recross - Mr. Rienzi | 64 |
| NATALIE HANLON LEH | |
| Cross - Mr. Rienzi | 65 |
| Redirect - Ms. Hinchcliff | 77 |

| CLOSING ARGUMENTS | PAGE |
|---|---|
| Mr. Rienzi | 80 |
| Mr. Kotlarczyk | 100 |
| Mr. Rienzi | 121 |

(Proceedings commenced 9:35 a.m., April 24, 2023.)

THE COURT: Good morning. Let's all take our seats, please.

We are here for a hearing on plaintiff Bella Health and Wellness's emergency motion for a temporary restraining order and preliminary injunction. This is Case No. 23-cv-939, Bella Health and Wellness, et al., versus Phil Weiser, et al.

Why don't I begin by getting counsel to enter their appearances for the record. For the plaintiffs?

MR. RIENZI: Good morning, Your Honor. Mark Rienzi for plaintiff Bella Health and individual plaintiffs as well.

THE COURT: Good morning. Thank you.

MS. RICKETTS: Rebekah Ricketts also for plaintiffs. Good morning, Your Honor.

THE COURT: Good morning.

MR. VITAGLIANO: Daniel Vitagliano also for plaintiffs. Good morning, Your Honor.

THE COURT: Good morning.

MS. SLAVIS: Laura Slavis also for plaintiffs, Your Honor.

THE COURT: All right. Welcome. Thank you all.

And for the defendants?

MR. KOTLARCZYK: Good morning, Your Honor. Mike Kotlarczyk on behalf of defendant Phil Weiser.

THE COURT: Good morning.

MS. KENNY: Good morning, Your Honor. Liz Kenny on behalf of the Nursing Board members. I can list them if the Court would like.

THE COURT: I think that's all right. I've got a list already. Thank you.

MR. URANKAR: Good morning, Your Honor. Brian Urankar on behalf of the members of the Colorado Medical Board.

THE COURT: Good morning.

MS. HINCHCLIFF: Good morning, Your Honor. Abigail Hinchcliff on behalf of Phil Weiser.

THE COURT: All right. Welcome. Thank you all for being here.

MR. RINGEL: Sorry, Your Honor. Andrew Ringel --

THE COURT: Oh, we've got more. Sorry.

MR. RINGEL: We're at the kids table, Your Honor. Andrew Ringel on behalf of District Attorney Beth McCann.

THE COURT: Good morning.

MR. HUGHES: David Hughes, Deputy County Attorney, on behalf of DA Dougherty.

MS. TOMSIC: Ann Tomsic on behalf of DA John Kellner.

THE COURT: All right. Thank you all, also, for being here. Sorry for skipping over you.

So let me just -- first I want to start by just

noting a few relationships I have in this case. I have thought about these. I don't believe they warrant a recusal, but I do want to disclose I've got some relationships with people involved in this case that I think I want to make sure everybody understands. If anybody thinks recusal is warranted or necessary, you can let me know today or, if you change your mind, later.

So I was Solicitor General for a long time. I worked with a number of people in the Attorney General's Office, including Beth McCann, who was a Deputy Attorney General while I was there, and Michael Dougherty, who was also a Deputy Attorney General while I was there. I consider them both, in addition to former colleagues, friends. And we worked fairly closely together for quite a while when I was in that office.

Grant Sullivan, who I believe signed the State's response to the TRO motion, I worked very closely with Grant on a number of things -- with Mr. Sullivan, I should say, on a number of things. He was -- he's still, I think, titled an Assistant Solicitor General. That was a position I created. He was one of the first people I put into that position in the Attorney General's Office. We worked together on quite a number of cases, including at least one time we went to the Supreme Court together.

And, of course, I've known Attorney General Weiser for quite a long time back when he was at CU. I consider him

a friend as well.

On the other side, I've worked at least once on an amicus brief with what was then known as The Becket Fund on a case in the Tenth Circuit. I believe I was briefly asked to serve on some sort of advisory board for The Becket Fund for a little while. I don't remember doing a lot of advice, advising of them, but I do think that I probably helped them discuss the role of attorneys general, state attorneys general around the country, and discuss various matters that they might have, again, while I was Solicitor General.

So, as I said, I don't think any of those require me to recuse, and I think probably recusal would be inappropriate, even though I do have a few hundred other cases on my docket that I would be interested in spending my time on if I were to recuse, but I did want to just get that out and make sure that everybody understands that I have had some relationship with people involved in this case over the years.

I don't believe I worked with any of the present counsel for Becket Fund or anybody present here over the years.

So with that out of the way, obviously if you think I need to recuse, feel free to speak up. Or, as I said, obviously if anyone decides I need to later, I'm not going to promise that I will, but I will certainly take anybody's position on that under advisement.

With that mentioned, why don't I just lay out how I think we should proceed this morning. As noted in our order granting the original temporary restraining order, we have asked that the, sort of, testimony in chief be presented in declarations, which I appreciate everyone has done. I have read those.

So what I think we will do is have each side, starting with the plaintiffs, present a short, maybe 10-minute, 5-to-10-minute opening statement summary of what's going on, and then turn to the evidence, allow the plaintiffs to introduce their witness, explain their declaration very briefly, then go directly to cross-examination and then redirect, and then sort of do the reverse with the defendants' witnesses.

So then we'll just sort of take the evidence first. Probably at that point we'll need a break, and then we'll come back and have an hour or so of closing slash oral arguments that I think we'll sort of structure like an appellate oral argument where the plaintiffs will go, I will ask questions, and then the defendants will have a chance to respond, and then some rebuttal. And that will mostly be a discussion between me and the attorneys.

So if that makes sense, why don't we begin with the plaintiffs' opening statement, if you would.

MS. RICKETTS: Good morning, Your Honor.

THE COURT: Good morning.

MS. RICKETTS: May it please the Court. Ten days ago the State of Colorado enacted a ban on providing progesterone to a pregnant woman in only one circumstance, where that woman takes the first abortion pill and then changes her mind and decides to continue a pregnancy. In every other state in the country, it is perfectly legal for medical providers like Dede Chism to agree to help that woman when she asks for help. In the state of Colorado today, it is legal to use progesterone to treat recurrent miscarriage, to support IVF, to treat a whole range of premenstrual to postmenopausal symptoms. All of that is in the record that's already before the Court.

Because of SB 190, Dede Chism and her colleagues face the loss of their license to practice medicine if they follow their religious convictions and agree to help a woman who takes the first abortion pill and faces a possible risk of miscarriage. They also face ruinous fines for publicizing those services.

The legislative record makes clear why, Your Honor. The record in this case is replete with evidence of targeting of religious actors. The law also regulates based on content and viewpoint, and it forces women to continue abortions they wish to stop.

The State disputes none of this. They say nothing about the merits in their brief. Their only defense is

 justiciability. And even then they cannot dispute that Bella's conduct was illegal on the day the law was signed. That's why plaintiffs filed this lawsuit hours later. That's why defendants spent last week scrambling to have emergency meetings to try to disavow the law. But for this Court's TRO, it is illegal today for Bella to treat two current abortion-pill-reversal patients or to advertise for that service. But the State says, Don't worry, we won't enforce the law against you for now. Well, what about later? We don't know. That temporary conditional revocable period of nonenforcement is not nearly enough to bar plaintiffs at the courthouse door. The State is not saying: We agree this law is unconstitutional; Bella cannot be penalized now or in the future. They are not saying that. What they are saying is: Your behavior is illegal now, your practice is unprofessional conduct now, but we'll tell you later if we want to prosecute you for it. Your Honor, that's not disavowal. That is a strategic pause, and it is not enough to deprive this Court of jurisdiction.

Colorado cannot force Dede Chism to live under the specter of losing her license based on a noncommittal promise from the State to get back to you later. The next time she picks up the phone from a current abortion-pill-reversal patient or from the next one, she has to decide whether to follow her religious convictions and agree to treat that

 woman.

Colorado also cannot subject Bella to special and targeted speech restrictions that were designed, in the words of the bill's sponsor to, quote, crack down on pro-life providers. Dede has to decide every day how to speak about her practice without risking massive fines.

Your Honor, any reasonable person who reads this law would be deterred from speaking. Plaintiffs here were deterred. They pulled down website content and social media posts and put them back up only because of the protection of this Court's TRO. That is not speculation, as the State alleges. That is actual chill, and it is more than enough to show standing here.

The State doesn't even try to defend this on the merits, so their only witnesses this morning are here in full retreat mode, hoping to promise their way out of defending a duly-enacted Colorado law that prohibits my clients' conduct right now.

Your Honor, there are real people, real lives at stake here. Dede Chism should not have to put her practice and her license at risk and guess at whatever the State plans to do next, and her patients should not have to risk being deprived of care in the middle of their pregnancies. We're here because our clients need real binding relief from this Court right now, and we believe the evidence this morning will

 show that a preliminary injunction should issue. Thank you.

THE COURT: Thank you very much.

Who is going to go for the defendants?

MR. KOTLARCZYK: Good morning, Your Honor. Mike Kotlarczyk. I will be speaking on behalf of the State defendants.

It's important to bear in mind this morning the posture that we're here on in this case, and we're here on a request for a preliminary injunction. The defendants have not filed a motion to dismiss. We have not sought any dismissal of these claims yet. All we're seeking today is the denial of the preliminary injunction.

And the plaintiffs have requested a preliminary injunction against the enforcement of Senate Bill 23-190, but the defendants have unequivocally stated that they will not enforce Senate Bill 23-190 pending the outcome of the rulemaking that will conclude later this year. So the bill itself contemplates that the rulemaking will take place. The defendants have, through formal resolutions of their boards, in the case of the Nursing Board and the Medical Board, have stated that they are not going to take any action to enforce SB 23-190 while those rulemakings are ongoing.

And as to the CCPA piece of the bill, the declaration makes clear -- the declaration from Miss Hanlon Leh makes clear that not only is the Attorney General not going to

enforce the bill, the Attorney General doesn't even think what plaintiffs say is illegal under the bill is illegal under the CCPA. So it doesn't get much more unequivocal when disclaiming an intent to enforce than that.

So because the defendants have disclaimed any enforcement of this bill, the plaintiffs cannot show the imminent and irreparable harm that would entitle them to an injunction under the preliminary injunction factors. The evidence that will be presented today, that has already been largely presented through the declarations, shows that the actions that have been taken by the boards and by the Attorney General are unequivocal disavowals of any intent to prosecute. The plaintiffs face no threat of irreparable harm and certainly do not face an imminent threat.

We look forward to presenting our evidence and speaking to you more in closing.

THE COURT: All right. Thank you, Mr. Kotlarczyk.

MR. KOTLARCZYK: Thank you.

THE COURT: Do any other defendants need to make an opening statement or -- I think that covered it. Right? Okay. Terrific.

Then why don't we go ahead and allow the plaintiffs to call their first witness or their only witness, I guess. Go ahead.

MS. RICKETTS: Thank you, Your Honor. Plaintiffs

call Denise Dede Chism, the cofounder and chief executive officer of Bella Health and Wellness, to the stand.

THE COURT: All right. She may step forward.

COURTROOM DEPUTY: Please raise your right hand.

(The witness was sworn.)

COURTROOM DEPUTY: Please be seated. Please state your name, and spell your first and last names for the record.

THE WITNESS: My name is Denise Mary Chism. I go by Dede. D-e-n-i-s-e, C-h-i-s-m.

THE COURT: All right. So we've already got your declaration, so unless there's anything we need to do, I would allow the defense to go straight to cross-examination. Is that all right?

MS. RICKETTS: We agree, Your Honor. Thank you.

THE COURT: All right. Thank you very much.

MS. KENNY: May I proceed, Your Honor?

THE COURT: Yes.

MS. KENNY: Thank you.

**DENISE MARY CHISM, A PLAINTIFF HEREIN, CROSS-EXAMINATION**

BY MS. KENNY:

Q. Good morning, Miss Chism.

A. Good morning.

Q. My name is Liz Kenny, and I represent the State defendants in my questioning this morning.

A. Okay. Thank you.

Q. Now, Miss Chism, Bella Health and Wellness provides a wide array of patient care across the lifespan; is that right?

A. Yes.

Q. And one of the guiding tenets of the care provided at Bella is to avoid manipulation, intimidation, or condescension; is that right?

A. I'm sorry?

Q. Would you like me to repeat the question?

A. Yes, please. Thank you.

Q. Sure. Can you hear me okay?

A. Just a little bit. I was having a little bit of a hard time. Thank you.

Q. Okay. I just don't want to blow your ears out.

A. That's okay. You're good. Thanks.

Q. Okay. So one of the guiding tenets of the care provided at Bella is that Bella avoids manipulation, intimidation, or condescension.

A. Um, I would say that our -- our pillars and our core values are life-affirming, dignified care, and I would say that in that we certainly would not want to manipulate anyone or, um -- what was the other word?

Q. Sure. The other words were "intimidation" or "condescension."

A. Oh, we would never want to intimidate or treat anyone with disrespect.

Q. Right. And Bella incorporates the Directives for Catholic Health Care into the care that's provided; is that right?
A. Yes.
Q. And those directives specifically instruct that you are supposed to avoid any manipulation, intimidation, or condescension in your care.
A. Sure.
Q. Okay. Bella Health and Wellness does not perform abortions; is that right?
A. Correct.
Q. Okay. And Bella's current patients sign a practice agreement when they are going to receive care at Bella; right?
A. Yes, they do.
Q. And the very first agreement that the patients have to initial specifically and clearly states that Bella does not perform abortions; is that right?
A. Yes, that is correct.
Q. Okay. Now, Bella advertises and publicizes its services on a variety of media to potential patients; right?
A. Yes.
Q. And Bella does not abort -- offer abortion care in any of those media; right?
A. Are you saying do we advertise any kind of abortion care?
Q. That's my question, yes.
A. Okay. Yes. No, we do not advertise anything regarding

 abortion care.

Q. And one of the media where Bella provides information about services is through Bella's Facebook page?

A. Yes.

Q. Okay. And on Bella's Facebook page there's links to interviews that you have done describing care provided at Bella; is that right?

A. Yes.

Q. Okay. And in those interviews you never state that Bella provides abortions.

A. Correct.

Q. And a few years ago Bella Health and Wellness had a different name; is that right?

A. We opened as Bella Natural Women's Care. We opened initially as a women's health ob-gyn.

Q. And did you give interviews and speak on behalf of the practice in the original name?

A. Yes.

Q. Okay. And in those interviews and in those speeches you never said that your practice offered abortion care?

A. Correct.

Q. Okay. Now, you do describe in the Complaint and in your declaration that Bella does provide medication abortion reversal care.

A. Yes, that is correct.

Q. And you believe that medication abortion reversal treatment is safe for patients?

A. I do believe that, yes.

Q. Okay. And, to your knowledge, the other providers at Bella also believe that medication abortion reversal care is safe for patients?

A. Yes.

Q. And you believe that that treatment is supported by science?

A. Yes.

Q. And, to your knowledge, Bella's not the only practice in Colorado that believes that medication abortion reversal is safe for patients?

A. I don't actually know a whole lot about the other places in Colorado. There's not a lot of clinics or any clinics such as mine, so I'm not sure what kind of places you are talking about.

Q. Sure. Let's start by talking about patient number 2 in your declaration.

A. Oh, yes.

Q. And so patient 2, as I understand it, and let me know if this is accurate, patient 2 received medication abortion reversal care at a practice other than Bella. Is that right?

A. Yes, at a center.

Q. And then she was referred to Bella; correct?

A. Yes, that's true.

Q. So Bella is not the only one?

A. Correct.

Q. Now, we talked a moment ago about the interviews that you have provided describing Bella's services. This Complaint in this case is not the first time that you have spoken publicly about medication abortion reversal care; is that right?

A. Yes, that's correct.

Q. And we've talked about the Facebook page. On that Facebook page there's a post from May of 2015 where Bella refers specifically to a patient that received medication abortion reversal care at Bella; is that right?

A. Okay. I would have to -- that's a long time ago. I would need to review that.

Q. Sure. So let's look at Plaintiffs' Exhibit 3 or, I'm sorry, number 6.

A. Would that be in this book I'm seeing?

MS. KENNY: May I approach, Your Honor?

THE COURT: Yeah, actually --

BY MS. KENNY:

Q. Oh, you've got your own binder. I'm sorry, Miss Chism.

THE COURT: She's got one.

MS. KENNY: Thank you.

BY MS. KENNY:

Q. If you could open the plaintiffs' exhibit binder.

 COURTROOM DEPUTY: I think that's the right one. I think that's plaintiffs'.

THE WITNESS: Okay. And to what number?

BY MS. KENNY:

Q. Number 6, please. I'm looking at page 2, and the page numbers are in the bottom right corner.

A. Got it.

Q. Okay. And, Miss Chism, what do we have here on Plaintiffs' Exhibit 6, page 2?

A. Um, yes, on this page -- I do remember it now.

Q. Oh, great. Okay.

A. It is a -- it is a story about walking through our office and seeing the differences of all the different patients in our practice.

Q. And this was the practice before the shift into Bella Health and Wellness; is that right?

A. Yes. This was just months after we opened, actually.

Q. Okay. And did you draft that?

A. Yes.

Q. Okay. And in there one of the specific things that you talk about observing is a particular patient who received medication abortion reversal care; right?

A. Can I look through --

Q. Absolutely.

A. Thank you.

Q. Take your time.
A. Yes, I see that now. Thank you.
Q. Miss Chism, you did not receive any discipline from the board related to that Facebook post about medication abortion reversal care; correct?
A. Correct, I did not.
Q. And I want to make sure we're talking about the same thing when we're talking about discipline. You described discipline in your Complaint as the board issuing a letter of admonition, placing a licensee -- and you have a number of different licenses and certificates and permissions, but putting that category of things on probation, imposing an administrative fine, or denying a renewal, or suspending the license. Is that right?
A. Yes.
Q. And is that what you mean -- when I ask you about discipline, is that what you mean in your answer?
A. When it comes to the Nursing Board, yes.
Q. Yes, yes. Okay. Thank you.

Now, shifting back to that post, the May 2015 post, you also didn't have any Consumer Protection enforcement action related to that care; is that right?
A. As in I broke the law or somebody came and talked to me about that? Is that what you are saying?
Q. Yes.

A. No, I did not.

Q. Okay. I'm going to move to a 2017 Bella Facebook post where you talk about a different patient that received -- oh, go ahead.

A. Thank you. Sorry.

Q. No, that's okay.

A. My mouth is a little dry.

Sorry. Thank you.

Q. That's okay, absolutely.

On that 2017 Facebook post you speak about a different patient who received medication abortion reversal care.

A. Okay. Is that --

Q. Would you like to look at it? Okay. So we're looking at Exhibit 6, so that same section, and page 3.

A. And page what?

Q. 3, so the facing page.

A. Mm-hmm.

Q. So that's accurate that that post is about a different patient that received the care?

A. Yes.

Q. That patient's care was featured on the Channel 7 News here in Colorado; is that right?

A. Um, actually I don't -- I don't know that that patient's care was on Channel 7 News, but -- so I can't confirm that.

Q. That's fine. That patient's care was also, though, profiled on liveaction.org; correct?

A. Again, I'm not -- I'm not for sure on that, so I'm sorry.

Q. No, that's fine. So let's look at that exhibit you have open in front of you. That's page 3 of Exhibit 6. When you look at that exhibit, is that something that was solely drafted by you, or is it a post that includes an article from a different source?

A. Well, it does say at the bottom liveactionnews.org, so the bottom quote must be from Live Action News. And at the top, um, it's a -- it seems like it would be written by my staff. It talks about me. It doesn't seem like something that I would write.

Q. Gotcha.

Now, that Facebook post was a public statement; right?

A. Yes.

Q. And you didn't face any discipline related to the care of that patient?

A. No.

Q. And nobody at Bella faced any discipline related to the care of that patient?

A. No.

Q. And there was no Consumer Protection enforcement action related to that care of that patient?

A. Correct.

Q. Do you recall that you were interviewed by Live Action News in about 2016?

A. I'm sorry. I really, really don't.

Q. That's fine.

A. But it's very possible.

Q. That's fine. So let's move then to 2018. So in 2018 Bella posted on its Facebook page an article titled "Director of Women's Clinic: Abortion Pill Reversal is Safe and Effective." Do you recall that post?

A. I'm sorry. I do a lot of talking, so I actually don't remember some of these details.

Q. That's fine.

A. And I take care of patients. So actually I don't.

Q. Absolutely. So let's look at that same section of the Exhibit 6 that you are in, and it's page 1.

A. Page 1?

Q. Right.

A. Okay.

Q. Page 1.

Does that refresh your recollection?

A. It does.

Q. Okay. Now, that headline speaking about director of a women's clinic, that's you; correct?

A. Yes.

Q. Okay. And does that refresh your recollection about an interview that you did in 2018 about your work at Bella?
A. It does.
Q. Okay. Now, in that interview you spoke specifically about your experience providing abortion -- I'm sorry -- medication abortion reversal care; is that right?
A. Yes.
Q. All right. And you were quoted in that interview as saying, When it comes to saving the life of any human person, even when the chance is slim, isn't it worth the effort when the benefits outweigh the risk? Do you recall that?
A. I don't recall that specifically, but I would say that, yes.
Q. Okay. You didn't receive any discipline from the board related to your description of your medication abortion reversal care; correct?
A. Correct.
Q. And you didn't receive any Consumer Protection enforcement action related to your statements in that interview either?
A. Right.
Q. Okay. We have looked at a few of the Bella Facebook posts. There are other Bella Facebook posts about the medication abortion reversal care done at the clinic; is that right?
A. Yes.

Q. And Bella has never faced any discipline related to its posts about medication abortion reversal care; is that right?
A. Correct.
Q. Would it be fair to say that the posts fall into two categories: one, describing that the care exists; and, two, specifically stating that Bella provides that care?
A. Like all of my posts or --
Q. Just the posts -- we are just going to look at the medication abortion reversal posts.
A. Okay.
Q. And let me rephrase the question.

Those posts say two things, very generally. One thing is what is medication abortion reversal. Is that right?
A. Yes, educating, yes.
Q. And the other is that Bella specifically provides medication abortion reversal care. Is that right?
A. Yes. And maybe a third would be the testimonies of patients.
Q. That have received that care; is that right?
A. Yes.
Q. Okay. And there's been no discipline related to those posts?
A. No.
Q. And no Consumer Protection enforcement actions related to those posts?

A. Correct.

Q. Has -- in our definition of "discipline," we talked about license renewals and recertifications as being discipline. I want to confirm: There hasn't been any issues with license renewals or recertifications related to medication abortion reversal care; is that right?

A. Correct.

Q. And now there's 18 providers at Bella; is that right?

A. Yes.

Q. And are there nurses in addition to the provider staff?

A. Yes.

Q. And no discipline for any of those folks?

A. Correct.

Q. Okay. And are you aware of any cease and desist orders from any boards related to medication abortion reversal care at Bella?

A. No.

Q. And are you aware of any injunctive orders related to Bella's medication abortion reversal care?

A. Could you explain "injunctive orders"?

Q. So it would be an order from the Court saying you cannot do this particular thing.

A. No, I have not had that at all.

Q. Okay. Have you received any communication from a court about medication abortion reversal care before last week?

A. No.
Q. Okay. So I'd like to pivot to the enactment of SB 23-190.
A. Okay.
Q. You're aware of the general time when the bill was signed; is that right?
A. Yes.
Q. Okay. Around -- shortly before the bill was signed, you were providing medication abortion care to a particular patient?
A. Yes.
Q. And you described the care that you have provided there?
A. Yes.
Q. And you have also described the ongoing care that you have provided?
A. Yes.
Q. Now, you also described that at the time the bill was signed Bella removed all mention of abortion pill reversal care from its website and social media accounts; is that right?
A. Yes.
Q. Was there any need to remove -- or did Bella see the need to remove any references from print materials?
A. We actually felt like we needed to remove it from everything.
Q. And can you tell us what "everything" is?

A. Anything that we had in our, um, website. Um, anything -- even speaking in our office, our employees, um, speaking to one another, speaking outside, outside of Bella. Um, and we did not have -- we took away our handouts on anything about this.

Q. Okay. And arranging that took some advance planning; is that right?

A. Well, we actually had a lot of people working pretty darn quick, to be honest.

Q. Okay. But you were able to identify all of those locations?

A. We sure tried.

Q. Okay. And in that work of removing media in relation to the bill signing, you didn't have anyone reach out to the defendants in this case to talk about whether the bill would be enforced?

A. No. I had every reason to believe the bill would be enforced.

Q. Okay. Was there any effort to contact any of the boards involved in the bill about how they would potentially enforce SB 23-190?

A. On my part? Is that what you are saying?

Q. Right.

A. No.

Q. And, to your knowledge, did anyone at Bella make those

efforts?

A. No, I do not believe anyone contacted anyone at the State.

Q. You know that SB 23-190 requires that the Medical, Nursing, and Pharmacy Boards engage in rulemaking by October 1st of this year; right?

A. I do know that.

Q. Okay. You have provided in other contexts public testimony about medication abortion reversal in the legislative context; is that right?

A. Yes, that's true.

Q. Okay. So in 2017 you appeared and talked about your clinical experience and scientific beliefs in the care in front of the Colorado state legislature.

A. Yes, I did.

Q. Okay. And you didn't face any discipline for that testimony?

A. No.

Q. And no Consumer Protection enforcement actions related to that testimony?

A. Correct.

Q. Okay. Are you aware that anybody is able to participate in the board's rulemaking process?

A. No.

Q. Now that you know that anyone can participate in the board's rulemaking process, will you participate in the

board's rulemaking process about medication abortion reversal care?

MS. RICKETTS: Objection, Your Honor. I don't think that's an appropriate question for this witness at this time.

THE COURT: No, overruled.

You can answer.

BY MS. KENNY:

Q. Would you like me to repeat it, Miss Chism?

THE WITNESS: So I can answer?

THE COURT: You can answer, yes.

A. Yes, please repeat it.

BY MS. KENNY:

Q. So now that you know that anyone can participate in the board's rulemaking process, will you participate in the rulemaking process about medication abortion reversal care?

A. I don't know.

MS. KENNY: Thank you. May I consult with my colleagues?

THE COURT: Yes.

MS. KENNY: Thank you, Your Honor. Nothing further.

Thank you, Miss Chism.

THE WITNESS: Mm-hmm.

THE COURT: All right. Thank you, Miss Kenny.

Redirect?

MS. RICKETTS: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MS. RICKETTS:

Q. Good morning.

A. Good morning.

Q. Miss Chism, you were just asked some questions about how Bella describes its services. Do you recall those questions?

A. Yes.

Q. And you were specifically asked about a practice agreement document; is that right?

A. Yes.

Q. If you could turn in the binder in front of you to Exhibit 3. It should be the white binder.

A. Am I in the same binder?

COURTROOM DEPUTY: That's correct. It's the binder you were just in.

THE WITNESS: Okay. Thank you.

A. Yes.

BY MS. RICKETTS:

Q. And what is Exhibit 3?

A. Exhibit 3 is the 2022 practice agreements and financial policies for Bella Health and Wellness.

Q. And is that the document that you were just speaking about with counsel for the other side?

A. Yes.

MS. RICKETTS: Your Honor, if I may, just for the

record. All parties in advance of the hearing stipulated to the admission of all exhibits for purposes of this hearing.

THE COURT: Very good. Thank you.

MR. KOTLARCZYK: That's correct, Your Honor.

THE COURT: All right.

BY MS. RICKETTS:

Q. Miss Chism, you were asked some questions about the first agreement on page 1 of this document; is that right?

A. Yes.

Q. And, first of all, what is this document? What function does it perform in Bella's practice?

A. When all -- when all patients are coming in to Bella, we have them review basically what we do as a practice and have them understand everything from our commitment to care as well as our expectations in finances and how we take care of people financially. And so it's a -- it's a page where we can just be very transparent with our patients so that they can know what to expect from us.

Q. So is this a document that all Bella clients sign when they agree to be treated at Bella?

A. Yes.

Q. Okay. If you could read for me the first sentence in the paragraph that begins "Our commitment to you."

A. Yes. "Our commitment to you is to provide comprehensive life-affirming health care with dignity and compassion."

Q. Miss Chism, what does it mean that Bella provides health care with dignity and compassion, according to that sentence?

A. What that means is that all of us are broken people, and we recognize that, and that's why we seek services from other people. And Bella -- Bella's hope, our prayer, is that we can reach people in their brokenness and recognize that we want them to be whole body, mind, and soul. And when we're caring for someone with dignity and compassion, that means we are going to take the time to hear their story, to hear their needs, um, more time than your average office or insurance pays, but actually enter in with them, love them, hear them, see what their needs are, and work together to meet those needs.

Q. So the other half of that sentence says that you provide comprehensive life-affirming health care. What does that mean?

A. I'll break it into two things. Okay? So comprehensive is, um -- it's, again, caring for someone body, mind, and soul, but it's through the lifespan. We care for, um -- we care for people from the moment of conception until natural death. And so in many cases, even fertilitywise, you know, working to achieve that conception. But that is a full scope of care for women's health, for family medicine, pediatrics, functional medicine, full women's gynecological care through menopause.

Q. So if you look two sentences down in the same paragraph, Bella also discloses that we do not offer contraception, sterilizations, or abortions. Do you see that?

A. Yes.

Q. Why do you make that disclosure in this document?

A. We feel like it's really important if we're trying to, um, establish health care with dignity and compassion that we start that, um, with honesty and transparency. And we want people to know what we are about and, honestly, what we feel like is best health care for an individual.

Q. Are there other places where Bella describes itself as providing dignified or life-affirming health care?

A. Beyond this piece of paper?

Q. Yes.

A. Everywhere. It's in our -- it's our social media. It's in our website. It's who we are.

Q. Are there other places where Bella describes itself as providing comprehensive health care?

A. Yes, that's everywhere as well.

Q. Do you use a big red box disclaimer "We do not provide abortions" every time you use the word "comprehensive"?

A. Oh, my gosh, no.

Q. Why not?

A. Um, sorry to be repetitive, but, um, it's important for us to establish a relationship with people who -- we know

everyone's broken. I'm broken. You're broken. We're all broken. And to have someone -- like, a big red box shouts at a person. That doesn't sound like, Come and let me take care of you and let me hear your story and -- and help you.

Q. So, Miss Chism, why are you concerned, if you are, about the advertising piece of the law if you're telling people that you don't provide abortions?

A. I listened in with a lot of testimony on the floor, with the House, with the Senate, with the legislators and their responses. Um, I feel very, very attacked just in the testimony. I felt that they were singling us out and -- and with words that they were coming after -- that they were coming after me, and, um, that -- I -- you need to understand. I have 68 employees. I care for over 6,000 people in more than 31,000 visits a year. There is a lot at stake here for a small number of patients. And I'm willing to sacrifice everything for a life, but, um, but this feels very, very threatening. This doesn't -- a promise is just a promise. I feel like I need something that is a little more concrete.

Q. Miss Chism, do you recall whether any of the language that Bella uses to describe its services, whether any of that language was specifically discussed in the legislative record in this case?

A. I'm sorry. Will you say that one more time?

Q. Do you recall whether any of the language that Bella uses

 to describe its services being discussed by legislators in the debate about SB 190?

MS. KENNY: Objection, Your Honor, just to limit the question to the testimony that Mrs. Chism heard. I'm not clear on whether she heard all of the testimony.

THE COURT: If you could clarify the question just a little bit, thank you.

MS. RICKETTS: Yes, Your Honor.

BY MS. RICKETTS:

Q. Miss Chism, you made reference to being aware of statements that were made by legislators about the law that's at issue in this case; is that right?

A. Yes.

Q. And do you recall whether any of the language that Bella uses to talk about itself came up in the course of that debate?

A. I don't recall if it was the exact language that we use as much as the faith-based clinics are -- it was a generalization of faith-based clinic, which I am. I mean, Bella is a faith-based clinic. And so the -- and I can't tell you who it was, I'm sorry, and I did not listen to the entire testimony, but I did hear the comments when the people summarized their comments, and they spoke about coming after the faith-based clinics who were deceiving the public, and that they would make it their mission to take us down. That felt -- and I

don't know if that's exact words, to be very honest. I mean, a lot of it went very, very late, and it felt threatening and very offensive.

Q. Just a couple more questions, Miss Chism.

You were also asked on cross-examination about a series of social media posts and other public statements that you have made about abortion pill reversal. Do you recall those questions?

A. Yes.

Q. Were all of the social media posts that were discussed made before this law was enacted?

A. Yes.

Q. In fact, were all the social media posts that were discussed made years before this law was enacted?

A. Yes.

Q. Is that also true of the public statements that were referred to?

A. Yes.

Q. So was all of that before the Colorado legislature declared abortion pill reversal to be unprofessional conduct?

A. Yes.

MS. RICKETTS: No further questions.

THE COURT: All right. Thank you, Miss Ricketts.

Miss Tomsic, I forgot that you had tried to reserve a little bit of time. Did you have anything you needed to ask

this witness?

MS. TOMSIC: Not of this witness. Thank you.

THE COURT: All right. Very good. Thank you.

Miss Chism, you may step down. Thank you very much.

THE WITNESS: Thank you.

THE COURT: All right. So that is the plaintiffs' only witness; right? There's nobody else?

MS. RICKETTS: That's correct, Your Honor.

THE COURT: Okay. So then why don't we go ahead and turn to the defendants' witnesses. And I'll just -- you can go ahead and call your witness, and while they're coming up I will just let you know something I have a bit of a question about.

MR. URANKAR: Good morning, Your Honor. The State defendants call Samuel Delp to the stand.

THE COURT: All right. Thank you.

So the thing I have a bit of a question about, it may be a bit lawyerly, but based on my reading of some of these declarations, the defendants have disclaimed any sort of enforcement action during this period, but it's not a hundred percent clear to me so far -- you can go ahead and swear him in here, Mr. Keech -- it's not entirely clear to me whether these actions, whether they have disclaimed taking any enforcement action for things that happened during this period later, if you understand what I'm saying. So it might be good

 if that sort of question can be brought out during this period, whether the defendants are clearly saying that they won't take any action based on things that happen here no matter what happens in September or October.

So with that, Mr. Keech, if you would swear in the witness.

COURTROOM DEPUTY: Please raise your right hand.

(The witness was sworn.)

COURTROOM DEPUTY: Please be seated. Please state your name, and spell your first and last names for the record.

THE WITNESS: My name is Samuel Delp. S-a-m-u-e-l, D-e-l-p.

THE COURT: Thank you. So unless there's anything the defense needs to begin with, I will allow the plaintiffs to cross-examine this witness.

MR. URANKAR: Thank you, Your Honor.

**SAMUEL DELP, DEFENDANTS' WITNESS, CROSS-EXAMINATION**

BY MR. RIENZI:

Q. Good morning, Mr. Delp.

A. Good morning.

Q. Mr. Delp, in your current job at the Department of Regulatory Agencies, you supervise the Colorado Medical Board and sometimes the Nursing Board; is that right?

A. That's correct.

Q. And previously, from 2016 to '18, you worked as a program

director at the Nursing Board and had responsibilities relating to rulemaking, discipline, licensing, and investigations; is that correct?
A. That's correct.
Q. So you know these boards and how they operate pretty well; is that fair?
A. Yes, I do.
Q. You have been authorized to testify for both boards today?
A. Yes, I have.
Q. How were you authorized?
A. Uh, both boards had meetings last week and authorized me, among others, to represent them in testimony on this issue.
Q. And did the board proceed by a majority vote?
A. Yes, unanimous vote.
Q. And is that typically how the board acts?
A. Through some mechanism of voting, yes.
Q. Could the board change your authority?
A. Yes.
Q. But that would require another vote; is that right?
A. It would require a public meeting, public notice, and another vote, yes.
Q. And you were authorized to testify as to the board's vote not to enforce SB 190 prior to rulemaking; is that correct?
A. Correct.
Q. And that nonenforcement decision was also made by board

vote; is that right?
A. Correct.
Q. And it could be changed by another board vote; is that right?
A. Yes.
Q. In your experience with the boards, can you tell me, are you aware of any prior complaints against a doctor or a nurse regarding their use of progesterone?
A. I'm not.
Q. Any prior complaints of women who said they had been injured by medication abortion reversal?
A. I'm not.
Q. And just to be clear, that's in all of your involvement over the years in all of these boards, you are not aware of any complaints related to medication abortion reversal; is that right?
A. That's correct, I'm not.
Q. Are you aware of any prior complaints against a doctor or nurse regarding use of the abortion pill?
A. No.
Q. When this case was filed, you understand that it was unprofessional conduct to engage in medication abortion reversal; correct?
A. My understanding is that the bill proclaimed that it was unprofessional conduct unless the boards determined that it

 was not.

Q. And on the day the case was filed, the boards had not determined that it was not; correct?

A. That's correct.

Q. And as of today it is still unprofessional conduct to engage in medication abortion reversal in Colorado; is that correct?

A. The boards have not determined that it's unprofessional conduct.

Q. I understand that. I'm not asking you what the boards have determined so far. I'm just asking you: Right now is it unprofessional conduct under Colorado law to engage in medication abortion reversal?

A. I'm not aware outside of the context of the board whether or not others would deem it would be unprofessional conduct. The boards don't currently deem it to be unprofessional conduct.

Q. You are aware that the legislature has deemed it to be unprofessional conduct --

A. Yes.

Q. -- to perform medication abortion reversal.

And as you sit here today, none of the three boards -- well, strike that.

The legislature said it's unprofessional conduct unless three boards, the Medical, Nursing, and Pharmacy

Boards, all agree that medication abortion reversal is a generally accepted standard practice; is that right?

A. Correct.

Q. And to date none of those three boards have made the finding that medication abortion reversal is a generally accepted standard practice; correct?

A. Correct.

Q. You said -- and you should have a black notebook there, and I think your declaration is at tab 102 of that notebook. And please feel free to take it out. I'm not trying to quiz or confuse you, but I'm going to ask you a couple of questions about your declaration.

A. Okay.

Q. If you could look at paragraph 7, please. You said in paragraph 7 at the end that the Medical Board is uniquely qualified to be the government agency that adopts rules which may impact its application of disciplinary violations to its licensees. Do you see that?

A. Yes.

Q. And by "uniquely qualified," you mean more qualified than the legislature, don't you?

A. I mean uniquely qualified as they have the statutory authority to provide discipline to licensees, yes, and engage in the rulemaking process.

Q. So the Medical Board's authority comes from the

legislature?

A. Correct.

Q. The same legislature that said this is unprofessional conduct?

A. Correct.

Q. You are not here for the Pharmacy Board this morning, are you, sir?

A. No.

Q. Do you know whether the Pharmacy Board has had a similar emergency meeting last week about this law?

A. I'm not aware whether or not the Pharmacy Board had a meeting.

Q. Do you have supervisory authority for the Pharmacy Board?

A. No, I don't.

Q. Do you know whether the Pharmacy Board has disavowed enforcement of this law?

A. I don't.

Q. If the Pharmacy Board doesn't say that medication abortion reversal is a generally accepted standard practice, then even if the Medical Board says that it is, it would remain unprofessional conduct for doctors; is that correct?

MR. URANKAR: Objection, Your Honor: calls for a legal conclusion.

THE COURT: I think that's probably true. I will let him give his answer, his understanding, but I know that it's a

 legal conclusion. But go ahead.

A. I'm not aware of what authority the Pharmacy Board would have in the Practice Act to provide discipline, if that's what you are asking.

BY MR. RIENZI:

Q. Let me back up. I'd like to focus you on the Medical Board that you are here to speak for. Okay?

The Medical Board itself cannot make this a generally accepted standard practice; is that correct?

MR. URANKAR: Objection, Your Honor: calls for a legal conclusion; also misstates SB 23 and misstates the law.

THE COURT: Well, I don't know that it misstates the law. I think it's a fair question to ask of the representative of the Medical Board what his understanding of the Medical Board's authority is. So you probably -- maybe you can clarify or --

BY MR. RIENZI:

Q. Sure. Let me back up, because I'm not trying to trick you. I'm not trying to make you do law.

A. Sure.

Q. I'm trying to get a fact out.

Normally when the Medical Board regulates medical licensees, the Medical Board decides on its own whether something is unprofessional conduct. Is that correct?

A. That's correct.

Q. The system for medication abortion reversal is different from that. Is that correct?
A. I don't know the answer to that question. Could you clarify it?
Q. Sure. SB 23-190 sets up a special system for figuring out what is unprofessional conduct in which three different boards must agree, and if they don't, then what the legislature said controls. Is that your understanding?
MR. URANKAR: Objection, Your Honor: misstates the law again. May I be heard on that?
THE COURT: No. Overruled.
Go ahead and answer.
A. I'm not sure that it sets up a unique situation. It's not uncommon for the boards to collaborate in rulemaking.
BY MR. RIENZI:
Q. Sir, is there any other treatment that you can name for which the Medical Board needs agreement from the Pharmacy Board to decide that something is a generally accepted standard practice?
A. No, there isn't anything that I can think of.
Q. The statute says that medication abortion reversal is unprofessional unless these boards say it's a generally accepted standard practice. Is that the way the board usually determines what counts as unprofessional conduct?
A. Uh, you mean -- could you clarify? I'm not sure that --

Q. Sure.
A. -- I understand what you are asking.
Q. Sure. The legislature has told you that something is unprofessional conduct --
A. Yes.
Q. -- unless three boards do something.
A. Correct.
Q. Is that the normal way the board figures out what counts as unprofessional conduct?
A. It's -- it's not uncommon for the legislature to pass legislation that then the medical boards must make a determination as to how to enforce, and --
Q. But is it -- is it common for the legislature to declare something is unprofessional conduct unless three boards make the generally accepted finding?
A. I don't know that I have seen that specifically before.
Q. Is there any published list of treatments that the boards have affirmatively found to be generally accepted standard practices?
A. I'm not aware. If there would be, it would be in board policy.
Q. Is it fair to say that most treatments that doctors use have not been affirmatively found to be generally accepted standard practice by board rulemaking?
A. I'm not a physician. I don't know the answer to that

question.

Q. And you don't know how the board works in that way?

A. I can't determine how the boards would make a determination as to whether something specific was unprofessional conduct or outside the scope of practice.

Q. Okay. The boards have not made a determination that the abortion pill is a generally accepted standard practice, have they?

A. Not that I'm aware of, no.

Q. Do you think giving the abortion pill is unprofessional conduct?

A. Again, I'm not -- I'm not a physician, and I don't presume to speak for the board on that particular piece, and I'm not aware that the board has made that determination.

Q. The legislature hasn't given the board a mandate like this about the abortion pill itself; is that true?

A. That's correct.

Q. So doctors can give the abortion pill without a board vote; is that right?

A. There's -- there is nothing on -- that the board has declared, that I'm aware of, that determines that physicians cannot prescribe that, no.

Q. Okay. You said in your declaration -- so this is paragraph 10. Again, I want to let you follow along. In paragraph 10 at the end of the paragraph you said, "It is

unlikely that either board could promulgate final rules prior to September 2023."

Can you tell me why that is?

A. There's a process that goes along with rulemaking that follows particular timelines. The boards would need to provide notice to the public. There would be opportunities for stakeholders to engage in that process. Rules would obviously need to be drafted. It's a process that takes quite a long period of time.

Q. Are you aware that the board has the ability, if it finds it necessary to do so, to act more quickly than that?

A. Yes.

Q. Okay. Do you think that -- well, I withdraw that.

Are you aware that the legislature found and determined and declared that this Act was necessary for the immediate preservation of public peace, health, and safety?

A. Yes.

Q. Do you agree with that statement?

A. It's not a determination that I make. It's -- that's what the legislature has declared.

Q. But the board does not see a need to act immediately?

A. The board has made the determination that they don't intend to act immediately.

Q. But they did need to act on an emergency basis to meet last week; correct?

A. That's correct.
Q. You said in paragraph 11 of your declaration that withholding enforcement will avoid the untenable scenario of dual enforcement tracks. Do you recall that?
A. Yes.
Q. What do you mean by "untenable scenario"?
A. The boards would want to avoid a situation where they were taking action against licensees prior to a rulemaking process and then potentially different action after a rulemaking process.
Q. Of course, if the board decided that abortion reversal was a generally accepted standard practice, you wouldn't have to deal with that untenable situation, is that right, because then it wouldn't be unprofessional conduct?
A. Correct.
Q. So the board could resolve the untenable situation if it wanted to; is that right?
A. The board could make that declaration if they wanted to, yes.
Q. Okay. And even if the board -- even if the Medical and Nursing Boards decide that it's a generally accepted practice, you might still end up in the untenable situation if the Pharmacy Board comes up with a different answer; is that right?
A. The collaboration among the three boards wouldn't likely

result in a situation where the boards were in disagreement.

Q. Okay. But if all three don't agree, it remains unprofessional conduct; correct?

A. It would remain unprofessional conduct, yes.

Q. Even for doctors?

A. Uh, I don't know. It depend -- it would depend upon what the Medical Board determined. The Medical Board would be the board that would discipline physicians if they violated the Practice Act.

Q. Do you think the Medical Board has the authority to disagree with the legislature about what counts as unprofessional conduct?

A. I think relative to this bill the legislature has provided the Medical Board the opportunity to disagree.

Q. But the Medical Board can only disagree in unison with two other boards; correct?

A. I don't know that that's true.

Q. Okay. Argue about what the law means later. I apologize. I'll switch.

The board has only made a commitment about the timing of enforcement; is that right?

A. The board's commitment is not to enforce SB 23-190 until after the rulemaking process at whatever point that occurs.

Q. Okay. And that's the only board resolution that was made about the enforcement of this law; correct?

A. From each board.
Q. Yes.
A. The Medical Board and the Board of Nursing, yes.
Q. Thank you. So each board made one and only one resolution about the enforcement of this law, and they are as described in your declaration; is that fair?
A. Correct.
Q. So the board did not make any additional decisions about how any enforcement would occur in the future if it happens; is that right?
A. Correct.
Q. The board didn't make any resolution about whether there would be a safe harbor if a doctor or a nurse got informed consent; is that correct?
A. I don't understand the question. Could you --
Q. Well, you didn't make any other resolutions; correct?
A. Correct.
Q. So you didn't make any resolution about whether there would be a safe harbor if you got informed consent; correct?
A. Correct.
Q. And you didn't make any resolutions about how far back in time the board might reach if it determines this is unprofessional conduct; is that correct?
A. I don't -- the board is -- could not reach back in time from the moment they declared something unprofessional conduct

and declare it unprofessional conduct retroactively. I've never seen the board do that.

Q. You have never seen the board look back at someone's conduct and say, That thing you did a year ago, that was unprofessional conduct? Doesn't the board do that all the time, sir?

A. Not during a period of time where it was not unprofessional conduct.

Q. Is it your view that right now medication abortion reversal is not unprofessional conduct?

A. The Medical Board and the Nursing Board have not declared it to be unprofessional conduct.

Q. Right, but somebody --

A. I understand the --

Q. I'm sorry. I didn't mean to cut you off, sir.

A. I understand the bill says provided unless they determine it not to be unprofessional conduct, yes.

Q. So my client has been doing this for the past several years. Are you telling me that the boards just have no authority to prosecute her for her past actions and say that they were unprofessional? I mean, I'd be delighted to hear it, but I just --

A. I've never seen the board declare something unprofessional conduct today and then go back in time and discipline somebody for doing it.

Q. But haven't you frequently seen the board look at somebody's past behavior and say, Oh, yeah, that was unprofessional? Isn't that what the board does all the time?
A. Only when it has already been unprofessional conduct.
Q. The board never analyzes something as a matter of first impression based on the behavior of a doctor or a nurse?
A. I have never seen the board determine that something is unprofessional conduct at a point in time and then go back in time and discipline people for that conduct.
Q. Mr. Delp, as you sit here today, do you have any idea whether the boards will end up enforcing SB 23-190 or not?
A. No.
Q. You just don't know what's going to happen in a few months?
A. I don't know what the rulemaking will ultimately be.
Q. And it could go either way.
A. Yes, the board could make varying determinations.

MR. RIENZI: Your Honor, could I just consult with my colleagues for a moment?

THE COURT: Yes.

MR. RIENZI: Nothing further, Your Honor.

Thank you, Mr. Delp.

THE WITNESS: Thank you.

THE COURT: All right. Thank you, Mr. Rienzi.

Redirect?

MR. URANKAR: Yes, Your Honor.

THE COURT: And, Mr. Urankar, I didn't mean to be short with you before. I just want to take this time to get our evidence out. We will have plenty of time to talk about disagreements about the law later.

MR. URANKAR: Understood, Your Honor.

THE COURT: All right. Go ahead.

**REDIRECT EXAMINATION**

BY MR. URANKAR:

Q. Mr. Delp, earlier you just received some questions about if the board decides to change their vote they could do that. I want to dive into that a little bit.

Can the board change their vote in secret?

A. No.

Q. What would the boards have to do if they wanted to change their vote to not enforce SB 23-190?

A. We would have to provide a meeting notice to the public. The board would have to establish a quorum to have the meeting, and then the board would have to convene and then make whatever vote or, um, motion that they intended to make.

Q. Would the meetings be public?

A. Yes.

Q. Would the boards -- would the board be subject to CORA?

A. Yes.

Q. Is the board subject to open meeting laws when it meets in

those public meetings?

A. Yes.

Q. I want to talk a little bit about this concept of unprofessional conduct.

Once the board completes its investigation into alleged unprofessional conduct, what are the various findings that a board can make?

A. So the board could determine that the complaint is without merit. They could dismiss the complaint. They could find that they have some concern that does not rise to a violation of the Practice Act or one that could be proven, so they could issue a confidential letter. They could take a public disciplinary action in the form of a letter of admonition. They could engage in stipulations with the respondents. They could table cases for additional information or for a future action.

Q. Violation of a valid board rule, that's a form of unprofessional conduct; correct?

A. Yes.

Q. Now, the board has a rule -- at least the Medical Board has a rule that requires you to update your contact information with the board within 30 days of change. Are you familiar with that rule?

A. Yes.

Q. Is that considered unprofessional conduct if a physician

fails to update their contact information within 30 days?

A. Yes.

Q. Now, in a case like that, is it possible that that unprofessional conduct would result in no discipline?

A. Yes.

Q. Does every instance of unprofessional conduct result in public discipline?

A. No.

Q. Is it possible to predict what the board will decide about any one case if it's not before the board?

A. No.

Q. Now, the statute SB 23-190 directs the boards to act in consultation with each other when promulgating rules. Have you ever -- are you aware of any other circumstance where boards are required to act in consultation with each other prior to taking an action?

A. Not a disciplinary action. I'm familiar with situations where the boards act in consultation with one another in the rulemaking process.

Q. How common is that?

A. It's very common.

MR. URANKAR: Could I have a moment, Your Honor?

THE COURT: Sure.

BY MR. URANKAR:

Q. Do actions taken in consultation -- or when boards take --

or when boards consult with each other, is it possible that after that consultation the boards might come to different conclusions?

A. Yes.

Q. Does the actions of the Board of Nursing, does that bind the Colorado Medical Board?

A. No.

Q. Do the actions of the Pharmacy Board, do those bind the Colorado Medical Board?

A. No.

MR. URANKAR: No further questions, Your Honor.

THE COURT: All right. Thank you.

So, Miss Tomsic, I think this was your other witness that you wanted to reserve the option for asking questions. Is that right?

MS. TOMSIC: That's correct, Judge.

THE COURT: Do you have anything?

MS. TOMSIC: Just a very few questions.

THE COURT: Okay.

**CROSS-EXAMINATION**

BY MS. TOMSIC:

Q. Good morning, Mr. Delp.

A. Good morning.

Q. My name is Ann Tomsic. I'm with the 18th Judicial District Attorney's Office. I just had a few questions here.

Your declaration indicated that you generally work on a case-by-case basis --

A. That's correct.

Q. -- in making determinations.

Would it be fair to say that generally your process is you receive a complaint from a patient or a family member of a patient? Is that how your process usually starts?

A. The complaint could come from anyone, but yes, the process typically starts when we receive a complaint.

Q. Okay. And then the board members in that particular field might be called upon to review that initially for whether it warrants further investigation?

A. The board members would review the complaint and the information that we received to determine whether it warrants any further investigation, yes.

Q. And what types of investigation do you generally conduct?

A. The boards would -- if they chose to engage in an investigation, formal investigation of the complaint, um, we would send it to our office of investigations. They would -- the board would provide direction to that office. So it could involve consulting with experts. It could involve interviewing witnesses, collecting documents, medical records, those sorts of things.

Q. Okay. And at that early stage, that complaint and investigation stage, is the, in the case of the Medical Board,

the physician whose practice is being questioned aware of this situation?

A. Yes. The initiation of the complaint would, um, result in a letter, we call it a 30-day letter, being issued to the respondent where they would have the opportunity to respond to any allegations that were made against them in any complaint.

Q. Okay. And so typically a doctor who is accused of unprofessional conduct, they are able to provide the Medical Board with medical treatises about the efficacy of the course of treatment?

A. Yes.

Q. They would be able to provide perhaps statements from professional colleagues who engage in the same treatment?

A. Yes.

Q. Or expert testimonies about that treatment?

A. Correct.

Q. Now, in a situation where it is the legislature rather than a patient complaint, the legislature declaring conduct as unprofessional, do all medical professionals have the opportunity to defend this behavior or defend this treatment?

A. Yes. Anyone who's been accused of unprofessional conduct in that way would have an opportunity to provide any information relative to the complaint.

Q. Okay. And do you take SB 23-190 as a complaint?

A. Uh, I don't know the answer to that question. I don't

 know that it's a -- that the board views it as a formal complaint. Um, I'm sorry, I don't -- I don't quite understand the question.

Q. Okay. And part of the reason is this is not the way you ordinarily do business; right?

A. Correct.

Q. This is not the way you usually determine whether a medical practitioner has engaged in unprofessional conduct.

A. That's correct.

Q. And it is unusual for you to have the legislature declare to you what is unprofessional conduct.

A. That's correct.

Q. And, as noted, the legislature is what gives you your authority.

A. Yes.

Q. The legislature gives you your budget.

A. Correct.

Q. What weight, if any, does this legislative declaration that this procedure is unprofessional conduct, what weight does that carry with the board?

A. I'm not sure that, in this particular instance, that it carries a lot of weight with the board such that it provides the board the opportunity to determine whether or not it's unprofessional conduct.

Q. Okay. So you're taking it as a question asked and not as

an edict.

A. That's correct.

Q. Okay. Now, if in your review of this -- we'll call it a question asked by the legislature. If you were to review medical treatises and statements of practitioners that this practice of medication abortion reversal has been disapproved of for years, do you believe that you would not be able to enforce anything that happened prior to the signage of this bill?

A. Again, I don't -- I don't know that I've ever seen the Medical Board reach back in time. I don't know whether they have the legal authority to do that, but I've never seen them do that.

Q. And you have also never seen a complaint from a patient complaining about medication abortion reversal.

A. I'm not aware of one, no.

Q. So you are not aware that the -- of whether or not the board has ever examined this circumstance in the past.

A. I'm not.

Q. To the best of your knowledge, did the Medical Board provide any guidance to the state legislature?

A. Not that I'm aware of.

Q. Are you aware of the state legislature asking about the board's opinion prior to acting?

A. I'm not.

 MS. TOMSIC: That's all I have. Thank you, Judge.

THE COURT: Thank you, Miss Tomsic.

Mr. Rienzi, I think we're done with this witness, unless you have any follow-up.

MR. RIENZI: May I ask one question, Your Honor, please?

**RECROSS-EXAMINATION**

BY MR. RIENZI:

Q. Mr. Delp, can you bind the Medical Board and the Nursing Board, as you sit here today, to not enforce any unprofessional conduct sanctions against anybody who's done medication abortion reversal? Do you have that authority?

A. No.

MR. RIENZI: No further questions, Your Honor.

THE COURT: Thank you.

All right. You may step down. Thank you, sir.

THE WITNESS: Thank you, Your Honor.

THE COURT: All right. And the defense can call their next witness, please.

MS. HINCHCLIFF: Thank you, Your Honor. The state defendants call Chief Deputy Natalie Hanlon Leh to the stand.

THE COURT: All right.

COURTROOM DEPUTY: Please raise your right hand.

(The witness was sworn.)

COURTROOM DEPUTY: Please be seated. Please state

your name, and spell your first and last names for the record.

THE WITNESS: Natalie Hanlon Leh. N-a-t-a-l-i-e, H-a-n-l-o-n, and L-e-h.

THE COURT: All right. So we'll go ahead with cross-examination. Thank you.

MR. RIENZI: Thank you, Your Honor.

**NATALIE HANLON LEH, DEFENDANTS' WITNESS, CROSS-EXAMINATION**

BY MR. RIENZI:

Q. Good morning, Miss Leh.

A. Good morning.

Q. You should have a black binder in front of you, and I believe your declaration is at tab 103, and I'm going to ask you a few questions about it.

A. Great. Thank you.

Q. Ms. Leh, your job at the Attorney General's Office is limited to Consumer Protection; is that correct?

A. That is not correct. I oversee the entire legal function of the Department of Law, which one of the sections is Consumer Protection. So the deputy for Consumer Protection reports to me.

Q. Your declaration in this case is only about your role related to Consumer Protection; is that correct?

A. That's correct.

Q. Okay. Thank you.

You don't have responsibility for enforcement of the

Medical or Nursing Acts?
A. Not directly, but the section that does also reports to me, but again, other -- another section. I oversee all of it.
Q. Okay. And there's nothing in your declaration about that work in the Attorney General's Office; is that correct?
A. Correct.
Q. And, actually, in paragraph 3 of your declaration it says that the Attorney General has granted you authority to testify on his behalf regarding the lawsuit's challenge to the constitutionality of the amendments to the CCPA; is that correct?
A. Correct, yes.
Q. You're not here to disclaim the Attorney General's authority to enforce the Medical and Nursing Acts?
A. I don't know what you mean by -- yeah, I am not here to disclaim on his behalf the Medical and Nursing Acts.
Q. Okay. You think Section 1 of the statute is only a legislative declaration. Is that your testimony?
A. Yes, it is.
Q. You agree that Section 2 of the Act does amend the CCPA; correct?
A. I don't believe it amends the CCPA. There -- Section 2 has a provision that is part of a statute, but it doesn't -- I don't believe it's codified in the CCPA, but . . .
Q. In paragraph 7 of your declaration you refer to the only

amendment the bill makes to the CCPA.

A. Okay.

Q. Can you tell me what you had in mind when you say that?

A. Yeah. I think it's just clarifying that the CCPA, um, includes deception involving folks that advertise abortion or emergency contraceptive services. So I don't see that as amending but really clarifying. Again, we believe that authority was already there.

Q. It amends the statutory text, does it not?

A. Well, it doesn't amend the statutory text of 6-1-105(1)(e) or 6-1-105(1)(rrr), which are the two provisions about false representations.

Q. But it does provide for language to be added to the Colorado Revised Statutes; correct?

A. Yes.

Q. In Section 2; correct?

A. Yes.

Q. And you have not disavowed enforcement of Section 2, have you?

A. Uh, no, we enforce the law.

Q. Including Section 2 of this statute; correct?

A. Yeah, again, I don't believe that it changes anything. We really see that what Section 2 is just a clarification of the existing Consumer Protection law that is in 6-105-1 [sic].

Q. So you don't think there's an important interest in adding

Section 2 because it doesn't do anything? Is that true?

A. I think we believe that Section -- that the law as it is written in 6-1-105(1)(e) has long prohibited false representations about services, and this is just a clarification from the legislature.

Q. Do you think Section 2 adds anything?

A. I don't believe Section 2 adds anything that was not already a part of the statute and within the -- within the four corners of what 6-1-105(1)(e) provides.

Q. Are you aware that when passing the statute, members of the legislature said it was misleading to say you provide, quote, comprehensive care unless you provide abortions?

A. I'm not aware of what the legislators said.

Q. Do you agree that it's misleading to say you provide comprehensive care if you don't provide abortions?

A. You know, it's hard to say that sort of hypothetically without looking at a specific issue. When we enforce the Consumer Protection Act, you have to look at exactly what is being represented and whether it is misleading as to the services that are being provided.

Q. And you can't tell me whether you think it's misleading or deceptive to say that you provide comprehensive ob-gyn services without providing abortion? You don't have an opinion?

A. I can't say, like, hypothetically how I would address --

how that would be enforced. Again, we would look particularly at what the actual statements are that are being made and whether they are misleading, deceptive, and trying to deceive consumers, and that's -- if they were, and if the statements that were being made were misleading to consumers, then that potentially could be a violation of the Colorado Consumer Protection Act.

Q. And you are not disavowing your authority to do any of that right now, are you?

A. I would say no, we will maintain our authority. Where there are false and misleading statements about the services of any business, as provided in the Act, our enforcement authority continues.

Q. Are you familiar with Section 2 of this law?

A. Um, Section -- the Section 2 that was just passed?

Q. Yes.

A. Yes.

Q. That only applies to health care providers who don't provide abortions, contraception, or sterilization; is that correct?

A. You know, I -- I don't know if it is or isn't.

Q. Can you turn -- tab 101 of your binder there is the statute that --

A. Yeah.

Q. -- your declaration is about. And Section 2 -- well, it's

page 4, if you are looking at the ECF header on top.

A. Thank you.

Q. And I'm really looking at that sub (2) part, so the first new section there on page 4. And my question, again, is: This law only provides -- only applies to health care providers who do not provide abortions, contraception, or sterilization; is that correct?

A. You know, again, the text says what it says. It doesn't actually say "health care providers." It says, uh, it is a deceptive trade practice when a person makes or disseminates to the public or causes to be made any advertisement that the person provides abortions or emergency contraceptives, and it continues on. So it just describes statements that are made by people.

Q. Okay. But on behalf of the Attorney General, can you tell me, does this law apply to people who offer abortion, contraception -- strike the question.

On behalf of the Attorney General, can you tell me, could this law be violated by somebody who provides abortion, contraception, sterilization?

A. I don't know.

Q. You don't know either way?

A. I would just say, again, what this statute is focused on is a person who is making misleading statements about the services that they are providing. And, again, it's hard to

answer it hypothetically as to who it could apply to. Again, right now it could apply to any person that would make, again, false, misleading, unconscionable, willful misrepresentations that are intended to deceive consumers. And that's, again, when the office exercises its enforcement discretion.

Q. Do you have any view as to whether advertising for abortion pill reversal is false or misleading?

A. Yeah, at this point I think it is our position that it is not a per se violation of the Consumer Protection Act to say that medication abortion pills or medication abortion treatment is misleading. And . . .

Q. Can you explain to me what you mean by the words "per se" in that limitation? I saw that in your declaration and in other people's declarations a fair bit.

A. Yeah. The core of the Colorado Consumer Protection Act is to protect consumers from false, misleading, unconscionable, deceptive trade practices. And I could read it specifically, but you capture it. The notion is to protect them from fraud. And so when we talk about the goal of what we believe this law does it's to prevent consumers from being misled, defrauded, or treated unconscionably.

Q. And is it your testimony that it does not mislead people or deceive people to say that you can provide abortion pill reversal?

A. Again, I can't say with that statement on its own as to

 whether it would be. That statement by itself does not necessarily mislead consumers.

Q. But it might?

A. Again, you would have to look at the particular statements that were being made, and then you would have to see what the conduct was.

So let me give you an example. If someone said they were going to be treating the common cold and giving people -- but they actually gave people cyanide pills, that would be misleading someone that they thought they were getting a cold remedy and they were getting cyanide pills. That's a misleading use.

Again, the goal here is if it is a misleading statement and not that it's per se a statement about medication abortion reversal.

Q. Can you take a look at paragraphs 14 and 15 of your declaration, please. Because I want to be clear about what the Attorney General's commitment is about enforcing the CCPA.

So paragraph 14, I think I read it to be you're not saying anything about whether you think it's true or not. You're just saying about Bella Health's statements. Is that your understanding of what you are saying in paragraph 14?

A. Correct.

Q. And in paragraph 15 you are making -- what would you -- is it a conditional statement? If the assertions are true, then

you wouldn't bring something? Is that --

A. That's correct.

Q. So could Bella Health rely on paragraphs 14 and 15 and go ahead and run its ads right now?

A. As long as its ads are truthful.

Q. And, again, is it the Attorney General's position that it is truthful to tell people you can reverse the abortion pill?

A. Again, I can't say that it is truthful to reverse the abortion pill. What I am saying as to right now, before the Medical Board has made any determination as to the medical efficacy or whether it is an unfair or an improper practice, that that might have bearing on it in the future. While they haven't done that, it's the Attorney General's position, I think, that we would not be enforcing, again, assuming statements that are being made are truthful. If Bella Health makes statements that -- I'll give a good -- an example. If Bella Health makes statements that you will never have to pay a fee, and then they make people pay fees, those are untruthful statements that would be false statements under the Consumer Protection Act. So that's why I can't say categorically any statement Bella Health is going to make would not be a violation of the Colorado Consumer Protection Act, but if their statements are true, then it would not be a violation of the Colorado Consumer Protection Act.

Q. Can I ask you to turn in the other exhibit binder, so I

think it's the white binder, to Exhibit 10, please, Plaintiffs' Exhibit 10. And don't worry, it's got a bunch of social media things, but I'm only going to direct you to one, if you would let me know when you've got it.

I'd like to direct you to the second page of that, and it's a social media post with a big picture that says "The Truth About Abortion Pill Reversal." Do you have that?

A. Yes, I see that.

Q. Can you read that page and let me know if it's the Attorney General's view that this advertisement is true and, therefore, not subject to enforcement under the CCPA?

A. I do not have an opinion on behalf of the -- as to whether this is true or not true.

Q. So this might be a violation of Section 2?

A. I don't know if it would be a violation of Section 2. Again, I'm not in a position to be able to make medical determinations about whether the statements that are made on this page are true or not. As we've said, per se, we are not saying that if you make a statement about abortion pill reversal that it is a per se violation. Again, it would verify if they are misleading consumers, and we are deferring to the Medical and the Nursing Boards as to the statements they are making about medical providers.

Q. Maybe I should ask it this way. You are not saying it's a per se violation, but you are also not saying it's per se not

a violation. Is that fair?

A. Well, again, I don't think I can make statements as to -- I have no personal knowledge here about the truth of the statements that are here --

Q. Understood.

A. -- and I can't --

Q. Yeah.

A. -- make any statements about the truth --

Q. Right.

A. -- or the falsity of what's on -- reflected on the exhibit that you have shown me.

Q. Yeah, and let me just do it as directly as I can. You are testifying about the Attorney General's disavowal, and I am trying to just understand the scope of that disavowal and what my client could do in reliance on the disavowal.

And I just want to make sure I have your testimony right that this ad that we have looked at together, you don't know whether it's subject to prosecution or not, and neither does my client. If they run it, they might run into liability, they might not, and we don't know. Is that correct?

A. I think what we have said is while the Medical Board and the Nursing Board are considering whether this is an accepted medical practice in Colorado, that we will not enforce a per se mention or advertisement to provide abortion pill

 services. I can't say that that wouldn't change in the future depending upon the work that happens at the Medical Board, but that would be -- my sense is that just by advertising abortion pill reversal that would not be -- unless, again, there could be other falsity that could be there, but that itself would not be something we would be enforcing against while this rulemaking is going on.

Q. Can she run this ad tomorrow as far as your enforcement authority is concerned or not? Is that a violation or not?

A. I think at this point, unless there's something -- here again, I can't verify whether this ad is true, it's the first time I've seen this ad, as to what's true or is not true that is here. But, again, it would not -- it would be our position right now that we would not be enforcing just because she is mentioning the abortion pill reversal.

Q. In your job at the Attorney General's Office, have you ever heard any complaints from women who say they have been harmed by abortion pill reversal?

A. I am not aware of any.

MR. RIENZI: Thank you.

THE COURT: Thank you.

Redirect?

MS. HINCHCLIFF: A short one, Your Honor.

THE COURT: Thank you.

///

**REDIRECT EXAMINATION**

BY MS. HINCHCLIFF:

Q. Miss Hanlon Leh, talk to us a little bit about how a CCPA investigation gets opened at the Attorney General's Office.

A. Yeah, the -- typically an investigation is going to open after we get complaints. And usually it's more than one complaint, because we get, frankly, hundreds of thousands of complaints, and so we have to prioritize those. And so when we see patterns or various kinds of complaints, we will decide that we want to follow up. And we will start by assigning an investigator who will take a look and try to find out more information about the complaints. And, again, it is a long process before we would actually enforce to make sure there's an important reason for us to take enforcement action.

Q. Does the Attorney General's Office ever investigate medical providers for violations of the CCPA?

A. Very rarely. Usually that happens in front of the Medical Board, which is not to say -- obviously there are medical businesses. I gave you the example, for example, of fees that we have had, and medical billing is something we have dealt a lot with, but typically it is the Medical Board that is investigating and responsible for the discipline of physicians. We don't have that authority. We really focus on the deceptive trade practices and advertising.

Q. Is Bella Health differently situated from any other

business in Colorado that the Attorney General might investigate for a CCPA violation?

A. No. Again, it's not any different. Again, with other -- other medical practices, if someone were advertising -- you know, any other deceptive types of things that a health care business could be offering is no different than Bella Health. We think of them the same.

Q. So even setting aside the fees issue and looking at a practice that might hurt someone, is Bella Health differently situated from any other medical provider in the state of Colorado in terms of the threat of enforcement from the Attorney General's Office?

A. No, they are not.

Q. Is it your view that SB 23-190 changes what is covered by subsection (e) or subsection (r) of 6-1-105 of the CCPA?

A. No, it doesn't change anything. That's the law as it existed.

Q. Will you make all investigation and enforcement decisions in light of that understanding?

A. Yes.

Q. Do plaintiffs face any present threat of investigation or enforcement from your office on the basis that advertising or offering abortion pill reversal treatment by itself violates the CCPA?

A. No.

 MS. HINCHCLIFF: That's all, Your Honor. Thank you.

THE COURT: All right. Thank you very much.

All right. You may step down. Thank you.

Mr. Rienzi.

MR. RIENZI: Your Honor, the plaintiffs at this point don't feel a need to call further witnesses for cross-examination. We are not stopping anybody else who wants to put them on, but just want to be clear about our needs. We don't feel a need to --

THE COURT: Okay. Very good. Thank you.

And from the defense perspective? As I mentioned, I have read the declarations. Given that, can we take a break?

MR. KOTLARCZYK: I think a break is in good order, Your Honor. The decs are in evidence, as counsel on the other side stipulated.

THE COURT: All right. I appreciate that. So, as I mentioned, I think -- and I should say I appreciate everyone's time so far. I appreciate the witnesses' efforts. I know we have been on a quick timeline, a quick timeline here.

Given that it's about 11:15, what if we -- why don't we take a 45-minute recess. Maybe we can get an early snack in and come back at noon and have our legal discussion. So we will take a recess until 12 o'clock. Thank you.

(Proceedings recessed 11:16 a.m.to 12:09 p.m.)

THE COURT: Okay. Let's take our seats, please.

All right. Welcome back. So, as I indicated at the outset, what I would plan to do now is allow each side to make sort of a closing argument or just sort of an oral argument.

Are more than one attorney planning to speak for each side? From the plaintiffs, just one?

MR. RIENZI: Just one.

THE COURT: And from the State?

MR. KOTLARCZYK: Just one from the State, Your Honor.

THE COURT: All right. Then you can go ahead and -- I was going to have you stay at your tables if it was going to be multiple, but if you do one, then go ahead. So why don't we start with the plaintiff. Go ahead.

MR. RIENZI: Yes, Your Honor.

May it please the Court. Your Honor, we're here because the Colorado legislature decided to shoot first and ask questions later. And without continued protection from this Court, real people are going to get hurt, and they're going to be hurt in ways that can't ever be fixed later.

When it enacted this law, Colorado may have thought that it was being progressive, that it was demonstrating its commitment to choice, that it was embracing freedom, but the truth is this law makes Colorado the most repressive and least free jurisdiction in the country for the women it targets, those who change their minds and want medical help in staving off the miscarriage brought on by the first abortion pill.

The government lawyers on the other side offer you no substantive defense of that law at all. Four different offices with an awful lot of smart lawyers, and not a one offers the first word in defense of the constitutionality of this law. Instead, they put all their eggs in the basket of justiciability, hoping to deprive this Court of jurisdiction and let some other part of Colorado's government fix the mess.

THE COURT: Let me just stop you, and I do apologize, but -- and I don't necessarily disagree with your general picture of the State's or the defendants' position, but we are here right now just, as Mr. Kotlarczyk mentioned, just on the motion for preliminary relief. And so what would, in particular, the preliminary relief I could offer do? Setting aside what might happen after September or October, say between now and September or October what would -- what can I do to prevent the types of harms that you suggest might arise that the defendants haven't already said they're going to prevent themselves?

MR. RIENZI: Great. So I agree with you, that's the question, and I'm happy to address it.

Mr. Kotlarczyk began by saying that the State had given an unequivocal -- an unequivocal disavowal, and I would say I think the testimony you heard this morning -- and I'd like to walk you through the law -- just makes clear it's just not so. It's not unequivocal. So what we are asking Your

Honor for and what I think you can give that the State has not yet given is a clear order that says none of these defendants can enforce any part of SB 23-190 during the pendency of this case. That's what we asked for.

I'd like to just go through the three sections of the law, if that's okay with Your Honor, and just talk about the different ways in which they are not giving us that. They are giving us something very carefully calibrated, in some cases cagily discussed in the affidavits, to give only exactly what they think they need to and with some different limits on it, but it's not complete relief, and it doesn't give my client the sort of complete protection that she and her patients need.

Let me start with -- let me start with the boards and with Mr. Delp and with Section 3 of the law, right, the prohibition, the finding that it is unprofessional conduct to provide medication abortion reversal. I have to say, a lot of the times this morning when the government and its witnesses were describing the law, I think they were, frankly, running away from the actual text of the law. The text says that it is unprofessional conduct today, right now, to engage in medication abortion reversal, not that it might be at some later date if some board agrees with us, but that it is right now. That's the current state of Colorado law.

I have to be honest, it's kind of surprising to hear

multiple government witnesses say: Yeah, I don't really care what the legislature said. Tell me what the board says in the fall.

The law says it's unprofessional conduct right now. You heard Mr. Delp testify, and Mr. Delp was clear that he really doesn't know what's going to happen in the end. Right? So he doesn't know if this is a temporary pause on enforcement or a permanent disavowal. He doesn't know. He can't predict what's going to happen. He said it's impossible to predict the outcome. He equivocated a little bit, but he ultimately said that he doesn't know if the board can reach back in time and, to put it very particularly, get my clients for their abortion pill reversal right now. Right?

If we have an order from the Court that says we have a constitutional right to go forward, I think we are much better protected than if we have, honestly, what is not the board's promise. Right? The board's promise is in its minutes, and the board's promise is about the timing of when they will enforce. It is not about the evidence they will consider, and they didn't make that resolution.

THE COURT: I get what you are saying, but at a preliminary injunction stage I'm not declaring it unconstitutional either. I am just enjoining the enforcement. And if they have already agreed not to enforce it, aren't we doing the same thing as a belt and suspenders?

MR. RIENZI: Well, if it is, Your Honor, the suspenders are worth a lot more than the belt. Right? If my client gets brought up on charges later and the first answer is, A federal judge told me that they couldn't do that to me so I went forward, right, that is a very strong argument. I take the point that theoretically somebody might later say, I don't care what the federal judge said. To be clear, we don't only want the preliminary injunction. We want to go forward and eventually win the case and get permanent relief. We think we are entitled to it. But simply the promise that today I won't prosecute you, but I can't quite promise you about whether your behavior today will lose you your license, that's not good enough.

And there's a reason they are fighting not to get to your order. Right? They know there's a delta too, which is why they don't want you to enter the order. Like, really, why would they have done what they did? Why would they write these declarations, get the Nursing Board and the Pharmacy Board to have their emergency meetings and coordinate the different parts of the AG's office with the different parts of the DA's offices and all come together and present this if it's really just the same as conceding to the injunction? They know it's different. They know they have more power if you don't enter an order that says they can't do this. Your protection right now is worth an awful lot.

Mr. Delp also talked, and this was on the examination from DA Kellner's attorney, but also talked about private party complaints. And I take the point that, you know, we are not suing private parties, so in some sense your relief wouldn't reach them, but the Supreme Court has been quite clear -- and I pointed to the *Susan B. Anthony List* case -- the Supreme Court has been quite clear that where there is a public complaint function to begin enforcement, that that counts in favor of the credible threat of enforcement because people are exposed to private party complaints. And you heard Mr. Delp describe the system that happens, that there's a letter that goes out and there's a process. Well, they didn't foreswear any of that in the board resolution, and my clients would be subject to that.

If we get an order from the Court that says they can't do that to us, that is powerful protection. Right? That's happened in numerous cases. It happened in the Hobby Lobby case. Hobby Lobby has 35,000 employees. None of the private parties were in that case, but you get an injunction against the government, and the problem goes away. The government is the source of the problem. You get an injunction against the government, and it can help take away the chill on your behavior.

My client wants to be able to keep helping these women. The legislature said right now it's unprofessional

conduct. The description of the statute was also, frankly, in conflict with the text of the statute on the role of the Pharmacy Board. Right? The statute says quite clearly that this is unprofessional conduct unless all three boards say it's not, but that's not the way they talked about the statute. They acted as if, well, the Medical Board can decide for all the doctors, and the Nursing Board can decide for all the nurses. That's not what the legislature said. So when we hear the representative of the boards and we hear the representative of the Attorney General's Office on the CCPA claims say we don't put much stock in what the legislature says, that's facially absurd. Right? The legislature actually said that today it is unprofessional conduct.

So I take the point if Mr. Delp says, Well, I haven't seen them go back in time when something wasn't unprofessional conduct, but the fact of the matter is it is unprofessional conduct in Colorado under this law today, and we're asking for an injunction to stop that. We are asking for an injunction against the statute which imposes that illegal rule.

Section 1 of the law, Your Honor, the one that quite clearly talks about the prohibition on advertising or providing or offering to provide or make available medication abortion reversal, you know, the government says, Well, this is in the legislative declaration, so who cares. Right? Don't worry about it. Doesn't bind anybody. Several problems

with that. One, the legislature itself which passed the statute talks about a prohibition. They don't just talk about, We're giving our viewpoint. They wrote it, and they used the words "prohibition," "this prohibition." Right?

The legislators who are passing the law, and this is -- it's in our briefs, but Exhibit H to the Complaint, page 1, "What would SB 23-190 do to regulate anti-abortion centers? Prohibit the use of deceptive advertising by anti-abortion centers, prohibit advertising for abortion pill reversal and define it as a deceptive trade practice." That's from the sponsor of the law.

So the people who wrote the law said it was a prohibition. The people who passed the law understood that it was a prohibition. Surely at least that is an arguable proscription on my client's conduct.

And you heard when Assistant Attorney General Leh was on the stand and I was trying to get clarity about, well, can we go ahead and advertise this way, and the best I could get is, You can as long as it's not misleading. Well, like that's the $64,000 question is: Are the defendants going to take the ads that we put back up after the TRO and say that's misleading? Or not just the defendants. Are private parties going to use this law that the government put in place to bring us up on charges for misleading and deceptive advertising? The Attorney General says, Don't worry, it's

only about per se claims. It seems like a made-for-litigation dodge, to be perfectly honest, Your Honor. I'm not sure exactly what it means to say it's only for per se claims but not other claims we think are misleading. There wasn't a direct answer as to whether that pretty simple ad is okay or not. Like, we walk out of this courtroom with just their promises. Do we run the ad?

THE COURT: Well, tell me if you think this would be -- again, setting aside what might happen after the rulemaking, but tell me if you think this would be a fair or unfair summary of the defendants' position. Because I think -- and I agree some of the specifics were not explicitly answered, but would it be a fair summary of the defendants' position that for now they are treating this law as if it didn't change anything? So to the extent that the ad is illegal, it's because it was already illegal. To the extent it's not illegal, it's not anything about this bill that makes it illegal, if you get what I'm saying, that the bill didn't change anything in their -- in their view. So they might enforce it, but only because of preexisting prohibitions on misleading trade practices.

MR. RIENZI: So I think they are sort of trying to go there, they are indicating they might want to go there, but I don't think they did go there, and I don't think they can. I don't think they can just disclaim a statute like that,

especially where it's time limited. Right? All of the cases they cite are complete, complete disavowals of future enforcement. They are giving us at best a pause, and that's just not enough to deprive the Court of jurisdiction.

Ms. Leh said she didn't know about the ad. She said, Well, not as a per se violation. Well, okay, so are they -- you know, if they bring us up on charges or if a private party brings us up on charges, are they saying they are not going to cite to us the finding by the legislature that this is deceptive advertising? Right? So they wouldn't use it as per se. They will just use it as, you know, something sort of per se. Right? All they have disclaimed about Section 1 was the per se claim. So theoretically the per se claims, they are paused until the fall. The non-per se claims, whatever those are, right, whatever the non-per se use of the law is, those are live right now. They don't disclaim them. Right? They don't say, We won't ever cite that. How could they say, We won't ever cite that? How could they say private parties wouldn't ever rely on that? They can't. Right? Like, it's in the law.

The legislature found that the stuff we do every day and is protected by the First Amendment, they found that it's false and deceptive, and they hung a target on our back. And we had to take it down instantly because some of the fines for these things are $20,000 an occurrence. So we had to take it

down instantly. We put it back when we got the temporary restraining order.

There's real people out in the world who need to see those ads, who want to see those ads, and who respond to those ads and then who get the health care that they want and need for those ads. Now, maybe if the State had come in and said, Let me tell you why this is dangerous, let me tell you why this is unsafe, let me tell you why this doesn't work and it's fraud, maybe you would have something on the other side of the ledger to balance against that, but they gave you nothing. Right? They don't make the argument. They don't claim that anyone is getting hurt. Right? The whole cross-examination of Dede Chism, or at least a big chunk of it, was, Look, you have been advertising this for a long time, and we haven't come after you. Like, that's true, and that's good, and I'm glad, and that shows that the legislature was completely wrong when it pretends there's some big, dangerous problem with this because all the medical regulators never batted an eye at it. Right? So fine. It doesn't tell me anything about what the world looks like after the legislature announces present tense that this is unprofessional conduct. Right? It doesn't change the fact that they have done that, and they have made our ads, which are protected by the First Amendment, in jeopardy, and they shouldn't be allowed to do that.

THE COURT: Well, again, so I think your reply and

your arguments at this point I think convince me about the jurisdictional argument. And, again, there's not a motion to dismiss in front of me. I'm not inclined to dismiss it even if there were on that basis because, as you point out, it's likely -- it's at least possible that this will spring back into life. But I think the point of those questions was, as I said, between now and then they're not at risk of any additional prosecution than they were before. And so setting aside sort of justiciability and jurisdiction, assuming I still have those things based on the likelihood or the at least strong possibility that enforcement could arise later depending on the rulemaking, what is the immediate irreparable harm between now and then if the State -- and I agree with you, it's very unusual, but if the defendants have said, We are not going to do any of the things that you claim to fear at least for now, what is the justification for me saying, Yes, don't do what you already said you are not going to do?

MR. RIENZI: Well, one, I agree with you, you more than have jurisdiction. And once you have jurisdiction, right, we've got a motion for preliminary injunction. Their claim is you have got nothing to worry about because I've made nonbinding promises. What on earth would the harm be of an injunction that binds them to their nonbinding promises? Right? If you think about the balance of the harms that, of course, is part of -- part of any injunction, right, if it's

true that nobody in the government is going to use this at all and nobody is ever going to change their minds, which, of course, they can't promise, they haven't promised, they can't promise they are not going to change their minds, but if it were all true, they'd suffer nothing from an injunction that just binds them to that. Right? But they haven't offered to stipulate to that injunction. I doubt they are going to stand up and do it.

But we want a binding resolution at least during this case that we don't have to worry about this law. We don't have to stare at four different government entities and hope that they don't change their minds. We don't have to worry about how do we figure out, when do we learn, what counts as per se, and when will they use the legislative finding that this is deceptive against us or not, and we don't have to run the ads. I mean, we run ads all the time. Right? We have ads on social media. We have ads online. We run ads all the time. We'd like protection that we are not running those ads at the risk of $20,000-a-pop fines. We have got very good reason to fear it because of what they said in the law. Their attempt to walk it back is partial and time limited and not enough to take away the threat.

They don't disclaim Section 2 of the law at all. You know, Section 2 is a part that is targeted only at people who don't offer abortion, contraception, and sterilization. And

in the legislative history they said they were concerned about faith-based clinics, which Bella is, who say they offer comprehensive services. Right? And in the legislative history they say comprehensive services, that means abortion and contraception and sterilization. So the people who passed the law said that faith-based clinics who offer comprehensive services are liars because when you say "comprehensive" or "full service" you are telling people you provide abortions. Right? That's Section 2 of the law. That is a law that applies only to people like my clients. It doesn't apply to anybody else in the state. It doesn't apply to Planned Parenthood, doesn't apply to anybody who offers abortions. It only applies to one side of the debate. They don't disclaim it. Right? We filed the brief. We explained how that's content and viewpoint based and how that's illegal and they can't pass strict scrutiny. Their answer is nothing. They don't disclaim it.

So all those things are there. What you have is a very carefully cabined attempted temporary disavowal. Right? You have a pause. It's a strategic litigation pause. Why didn't they disclaim Section 2? I think it's because they misread -- they didn't catch in the brief that we were challenging Section 2, so they said, Okay, I don't have to disclaim that. I can leave that there.

You know, Section 1 they are trying to carve up.

Section 3, why didn't the Pharmacy Board disavow enforcement, too, so that when we write a prescription the pharmacist isn't facing unprofessional conduct? I don't know, but I suspect it's because the Pharmacy Board wasn't sued, and then they felt like, Well, we don't need to disavow.

I think this is a litigation move to try to avoid an obvious injunction from an unconstitutional law.

THE COURT: Well, the Pharmacy Board doesn't have authority over any of these plaintiffs. Right?

MR. RIENZI: No, but they have authority over the people -- when we write a prescription and someone brings it to them, they have authority over those people. And under this statute, unless they go along, the Medical Board itself and the Nursing Board can't make this not unprofessional conduct. Right? The legislature tied them together.

THE COURT: Right, I understand that. I just was trying to make sure I understand the posture.

Let me talk to you a bit about Section 2 because --

MR. RIENZI: Yes.

THE COURT: -- it mostly, as I understand it, works with the -- with Section 3, but it would be a curious situation. And I'll ask the State to explain how this would work. In the hypothetical where the boards do agree that this procedure or this treatment is okay, what then happens to Section 2? Would it still be illegal under Section 2 to

advertise that you provide it even though the boards have said it's okay? I'm unclear on that.

MR. RIENZI: Yeah, so I think you are talking about Section 1, to be honest, Your Honor.

THE COURT: Well --

MR. RIENZI: Section 1 is the prohibition on advertising abortion pill reversal.

THE COURT: No, Section 1 is the legislative declaration, but are you talking about --

MR. RIENZI: So even if I had my citations wrong, Your Honor, basically I agree with you, that's a good question. The statute just says that's illegal. And an injunction against such a statute would be certainly --

THE COURT: I'm talking about in the bill, Section 2 of the bill.

MR. RIENZI: Okay.

THE COURT: So I agree, but -- so my question is is the -- if the provision -- if the advertising provision is tied necessarily to the action of the boards or not, in your view. If the --

MR. RIENZI: No.

THE COURT: -- boards were to say this is okay, would the advertising provision still prohibit Bella from telling people they do this?

MR. RIENZI: Yeah, by the terms of what the

 legislature of Colorado did, they are not tied. I agree with you. Logically, again, the legislature -- it's very clear from the government's reaction in this case. Right? The government doesn't really love what the legislature did. They are trying to figure out how to fix it. The legislature fired something off here, right, but no, they didn't connect those dots. They made it false and deceptive and impermissible to say it, whether or not later on somebody says it's not unprofessional conduct. So that's the way they wrote their law. That's an unconstitutional law. They are not allowed to say that unless they can pass strict scrutiny, unless they can carry their burdens. They don't come anywhere close. In fact, they don't try because this law is very unconstitutional.

So I can imagine a law that was much better written. You could write a better law that connects those dots and says, And if it's not unprofessional conduct, then you can talk about it. That's not the law they wrote. The law they wrote punishes our speech based on its content, and it subjects us to speech rules that other people aren't subjected to. It's content and viewpoint based. They are not allowed to have a law like that.

We don't have to -- to put it a different way, Your Honor, so Section 2 -- again, nobody from the government I heard disclaim Section 2. Section 2 says there's a special --

a special false and misleading advertising provision that's only going to apply to people who don't offer abortions. It's only going to apply to the pro-lifers, not to the pro-choicers. And in that special law it says if anything indicates you provide those things, then you are in trouble, then you have violated the law. And the people who passed the law said that if you say you do comprehensive services, that that indicates you provide abortion and contraception and so forth.

So my client has got to make decisions about a part of the law the defendants haven't disclaimed. Maybe in five minutes they will decide that they want to, but they haven't disclaimed yet. My client has got to make decisions about her advertising. Can she keep talking about her services as comprehensive and full service? Under the way the people who passed this law understood it, that's false and misleading.

Now, Planned Parenthood doesn't have to worry about that because Planned Parenthood isn't subject to a separate section like this. This is part of what the people who passed the law called, quote, a crackdown on anti-abortion centers. There's no mincing words, no pretending we're doing something else. This was a crackdown on anti-abortion centers.

So they write a law that my client has to figure out, How do I abide by that? What do I do with my ads tomorrow? Should I change that form that I give people? Should I change

what I say on the website? I am doing this all at my peril because the government passed an illegal law that doesn't pass strict scrutiny and that they don't disclaim.

THE COURT: So let me ask you, what is it about that -- what actual language in there do you think either is violative or potentially violates or makes illegal the things that we see that Bella has said or would likely say?

MR. RIENZI: Sure. In the third line, Your Honor, it's any advertisement that indicates that the person provides abortion or emergency contraception, or referrals for abortion or emergency contraception, when the person knows or reasonably should know that they don't.

THE COURT: So I take it your fear, at least, or your client's fear is that when Bella says they offer comprehensive services, that would be viewed as indicating or potentially indicating that they provide abortion or referrals for abortions. Is that right?

MR. RIENZI: Yes, because the legislature said so, Your Honor.

THE COURT: Okay.

MR. RIENZI: So, in other words, that's not -- that's not our made-up fear. Just two examples. If you wanted to look at Exhibit H of the Complaint, on page -- I believe it's page 4, they talk about comprehensive care and saying you are going to offer all options, and they say that's

 misinformation.

And if you look at Exhibit J of the Complaint, Representative McCormick: Comprehensive reproductive care includes access to contraception, emergency contraception, abortion, and so forth. Right? Their understanding is that when you say "comprehensive," you'd better mean abortion too. That's not my client's understanding, but that's the government's. And we didn't make it up. We read it. We heard it when they passed their law.

THE COURT: Okay. That's not the legislature. That's a member of the legislature, not to be pedantic.

MR. RIENZI: Sure, understood, but in terms of why would we have an arguable fear that our conduct is arguably proscribed, I think it's enough. And to be perfectly honest, we feel the fear. It's real.

THE COURT: Fair enough.

MR. RIENZI: Yeah, I don't want to take more of Your Honor's time than you want. I'm happy to discuss the standing cases if you think there's anything that was unclear after the reply brief. I'm happy to talk about the merits of the constitutional arguments, but I want to stick with what you need.

THE COURT: I don't think that's necessary at this point. I will give you a chance to come back up after I hear from the defendants.

MR. RIENZI: Okay. Thank you, Your Honor.

MR. KOTLARCZYK: Thank you, Your Honor, and may it please the Court. The purpose of a preliminary injunction is to preserve the status quo, and the status quo we are looking at here is the status quo that prevailed before the passage of SB 23-190 when there was obviously no defendant who was able to enforce SB 23-190 since it didn't exist. That status quo exists now as a matter of practical reality because the defendants who have enforcement authority over SB 23-190 have disclaimed any intent to enforce it prior to the rulemaking that that bill instructs being completed.

The plaintiffs are asking this Court to rush to judgment and to enjoin a state law before the rulemaking that's directed by that state law has even taken place. And they're doing that even though they face no prospect of enforcement now and even though they may never face any prospect of enforcement pending the outcome of that rulemaking. When, as here, defendants have disclaimed enforcement of a law, the plaintiffs can't show the necessary irreparable injury or imminent harm that they would need to to justify the extraordinary remedy of a preliminary injunction.

The plaintiffs' argument today has shifted in a couple of ways I'd like to point out. Although their motion for preliminary injunction focused at first on asking for an injunction as to enforcement of SB 23-190, their questioning

today and the argument I understand plaintiffs' counsel to be making is really a lot broader than just, We don't want 190 enforced against us. It's: We want assurances from the state government that no state law is going to be enforced against us, no other provision of the CCPA is going to be enforced against us, and that we can engage in this business practice with complete immunity.

We have a disagreement about whether there was equivocation from the State's witnesses. They weren't equivocal. What they were saying very clearly was that while 23-190 is not going to be enforced against the defendant -- excuse me -- against the plaintiffs pending the outcome of the rulemaking, that we can't, in the context-specific world of what constitutes a CCPA violation, say for sure -- give you an absolute assurance now that nothing you are doing constitutes a deceptive or unfair trade practice.

THE COURT: Let me ask you about sort of the specific there that I think the evidence and the argument has raised most clearly. It's this question of the plaintiffs stating that they provide comprehensive care. And I think that they have significant evidence that those sorts of statements at least some members of the legislature viewed as misleading, and that part of the point, at least a large part of the reason for -- I don't know if we are calling it Section 3 or Section 2 -- the revision calling that a deceptive -- calling

offering these services a deceptive trade practice was specifically to target that kind of a statement. Why is that an unreasonable position?

MR. KOTLARCZYK: I think for two reasons, Your Honor. One, I don't think that's what Section 2 says. I think the language of Section 2 is unambiguous. And in addition to what Your Honor pointed out about it was a statement of one legislator and not a statement, you know, in legislative declaration, it's not a statement that appears anywhere in the statute. Section 2 says that a person engages in a deceptive trade practice when the person makes or disseminates to the public, or causes to be made, any advertisement that indicates that the person provides abortions or emergency contraceptives, or referrals, when the person knows or reasonably should have known that the person doesn't provide those specific services.

THE COURT: Right. And so Miss Chism and Bella clearly know they don't provide those services. They say they provide comprehensive services. Is it the State's position that that is not an indication -- and I take it to be, given the declaration and the testimony -- that it's the State's position that that advertisement that's saying we provide comprehensive care does not violate either existing law against misleading trade practices nor is it an -- nor does it indicate that Bella provides those services? Is that the

State's position?

MR. KOTLARCZYK: Absent any other contextual indication that something makes it misleading, absolutely, that's the State's position.

THE COURT: Okay.

MR. KOTLARCZYK: And if you look at Exhibits 106 and 3 -- they are actually the same exhibit; both sides designated it -- that's Bella Health's statement that it provides the patients. And it says very clearly in the very first paragraph, We do not provide abortions. In light of their clear statement that they are telling their patients, I don't see any credible threat -- I don't see any threat, period, I certainly don't see a credible threat to the plaintiffs under Section 2.

THE COURT: But as was pointed out, their Facebook posts and advertisements don't include that clear statement. Are those problematic because they don't?

MR. KOTLARCZYK: No. No, Your Honor, I don't think they are, not -- again, not absent there being some sort of other indicia, and I can't even think of what that could be standing here today, as to something that would make it untruthful. But that statement in and of itself is not going to be the basis for any sort of action under here.

And the focus on Section 2 is another area I think where the plaintiffs' argument has shifted this morning. He

suggested we might have missed it in their briefs, and if that's the case, then I confess we did miss in their briefs where they were arguing that Section 2 was going to be unconstitutionally applied to them. Their briefs focused on the legislative declaration in Section 1 and then the board action in Section 3. There's a couple cites to Section 2, but their argument -- I know there's a claim in their verified petition for void for vagueness under Section 2, but that was not the focus of either their motion for preliminary injunction or their reply brief.

And I think, you know, the reason for the shift here is because they've achieved much of what they sought out to do through the TRO. They wanted an assurance that they are not going to be prosecuted under Section 1, Section 3. We have given that assurance. The State defendants have accomplished much of what the Court expressed its concern as in issuing the TRO by disclaiming any enforcement of the statute while the rulemaking conducted by the boards goes forward.

The State defendants have done what they can to address these concerns, including, you know, the patient treatment won't be interrupted. Well, you've heard from Mr. Delp that there's going to be no enforcement of the 23-190 by the Medical or Nursing Boards. There's no harm to First Amendment interests because you have heard from Miss Hanlon Leh that there's going to be no enforcement against Bella

Health of 23-190 for the statements it's made.

So they are not entitled to and this Court -- they haven't asked this Court for and I don't think this Court can grant immunity of everything you do, everything you say related to the service is going to be okay. All they can ask the Court for is injunction to enforcement of 23-190, and that's not going to be enforced.

THE COURT: Well, let me ask you then sort of, I guess, kind of mirror-image questions.

In your view, what would be the difference between the status quo now after these declarations and these statements and if I entered the injunction they asked for? What would be the difference?

MR. KOTLARCZYK: As a practical matter, Your Honor, I don't think there is, in the day-to-day operations of either Bella Health or the boards, I don't think there is a difference because the boards have said -- and the Attorney General and the DAs, they have said they are not going to enforce. But the question in preliminary injunction isn't is this an appropriate suspender to the belts that's already been provided. The question for preliminary injunction is can the plaintiffs demonstrate -- it's the plaintiffs' burden to demonstrate irreparable harm. And, you know, we cited the *Winsness* case, we have cited other cases, the *D.L.S.* case, that talk about when a state has disclaimed enforcement, they

can't make that showing of irreparable harm that they would need to do to be entitled to injunction here.

THE COURT: So is it your position that that's just an issue for the preliminary injunction? I mean, you pointed out there's no motion to dismiss right now. Is it the State's position that -- given the possibility at least that after the rulemaking some or all of this bill comes back, and you've only disclaimed enforcement until then, is it the State's position that the case is still overall justiciable, but there's just not the need for an injunction because, as you have just told me, it wouldn't change anything from your view? Nobody in the AG's office or, as far as you know, any of the other defendants would do anything differently under the injunction that's being sought and what you have already agreed to do; is that right?

MR. KOTLARCZYK: That's right, Your Honor. As to the justiciability questions, I'd say we have a narrow position and a broader position. And the broader position, frankly, isn't entirely before the Court for the reasons we have discussed, that we haven't brought forth a motion to dismiss. And pending any number of ways, either facts on the ground or rulings from this Court come out in the next 60 days, you know, I can't guarantee that a motion to dismiss would be filed, but that would be our expectation at this time. But as to the narrow -- our narrow position that we are taking here

today that I think is clearly established by the evidence that the Court has heard is that because there is no pending enforcement of 23-190, there's no imminent harm that would justify -- imminent irreparable harm that would justify preliminary injunction.

THE COURT: All right. Let me ask you then -- sort of see if I can nail this down. Say I agree with you on that last point, that there doesn't seem to be any change in the legal relationship between the parties next week, given what you have told me, but what about we get to September, and there's a rulemaking process going on. It's not clear what the results of that will be. Where does that leave me, you, Bella? Would it become then imminent enough that we would have to come back and discuss this again, or where would that leave us?

MR. KOTLARCZYK: So I think a couple answers to that, Your Honor. One, not to give the overly lawyerly response, but it does, it depends on exactly what would happen. Right? If the boards, as Mr. Delp indicated today, follow their ordinary process and don't adopt emergency rules, a process I know the Court is very familiar with, then there would be an adoption date and an effective data, and there would be a lag between when rules are adopted, when they are effective. If the rules -- first of all, the rules could approve this as a generally accepted practice, in which case there's no harm to

Bella Health. If they don't, if they say, No, this violates generally accepted standards of practice, then there would be -- there's built into the State APA some time period for them to be able to come to court. And if they have standing at that time to bring this claim, then this Court could hear them.

Another answer to that question I think, Your Honor, is one of the jurisdictional arguments we raised in our opposition paper was ripeness. And when a Court finds a matter is unripe, it has a couple options. One, it can dismiss the case saying, Look, this is unripe, it may never be ripe, dismissed. That happened in the *Hardre* case that we cited in our papers.

The other thing the Court can do is: Yeah, this doesn't seem ripe yet, but it seems like it might become ripe, so I'm going to hold it in abeyance. I'm not going to rule on it right now, but I'm going to keep it so there's no need to refile, no need to open a new matter assigned to a new judge.

So I do think, in terms of what could happen down the road, I do think there's various ramps available to the Court in terms of how the Court views the likelihood of those.

THE COURT: Okay. Fair enough. So one question that I have about that, though, is -- and I agree with you, the typical rulemaking process would be as you describe: go through the process, you adopt a rule, you say this rule will

go into effect 60 days from whatever it is. The disclaimers or whatever -- the declarations and the statements I have currently from the defendants, the State defendants at least, are tied, though, to the conclusion of the rulemaking process. Would that include that lag period between effectiveness and -- between adoption and effectiveness? You may not know, but, you know, if they adopt rules, one reading of these declarations is then the disclaimer of enforcement has ended then, even if the rules aren't in effect for a little while. And I guess -- so that's one question.

Assuming that the result of the rulemaking process is that at least one board does not find this to be an appropriate medical procedure, then what difference -- doesn't that, sort of by operation of the statute, mean we're back to it being enforced immediately, the law, the statute itself being in force the moment that one of them says that? Right?

MR. KOTLARCZYK: Well, let me answer that second question first, Your Honor, if I could. So I think if you look at Section 3 of the law where it talks about those three different boards, it requires them to consult with each other, which we heard from Mr. Delp is something that these boards do routinely. And it says that a licensee engages in unprofessional conduct or is subject to discipline pursuant to Title 12 unless these three boards each have in effect rules finding it's a generally accepted standard of practice. Well,

what Mr. Delp said when he was asked about that on cross-examination, I think he was -- I think there was a disconnect between the lawyer and the witness on that, because if the Medical Board or the Board of Nursing finds it doesn't violate their professional standards to -- to do medication abortion reversals or to provide that treatment, they can't be compelled to discipline someone for violating something that they think is consistent with their law -- or with their generally accepted standards of practice. So the subject of discipline -- and Mr. Delp's declaration talks about the discretion the board has to consider complaints that come before it and to determine what the appropriate discipline should be. If they determine it's generally accepted, even if the Pharmacy Board says, Yeah, you shouldn't be prescribing medicine, or, We shouldn't be issuing medicine for this, whatever the Pharmacy Board would say -- I confess I'm not intimately familiar with the Pharmacy Board's practices -- if they were to do that, they may be subject to discipline, but there's still going to be no injury to the plaintiffs because they would not actually be disciplined by their body that said this is consistent with generally accepted --

THE COURT: So let me --

MR. KOTLARCZYK: -- standards of practice.

THE COURT: Sorry to interrupt. Let me make sure I understand your position, which I think I agree with what

Mr. Delp was saying. It's that under the statute the effect of the boards disagreeing would be that statutorily this is a -- this is -- they would be engaging in unprofessional conduct and subject under the statute to discipline, but that his understanding is that the Medical Board, if it was the one or one of the ones that thought it was okay, would not actually discipline anyone on that basis. Is that right?

MR. KOTLARCZYK: Yes, I think that's exactly what Mr. Delp testified to.

THE COURT: Okay. So they would be engaging in something the legislature decreed to be unprofessional but not subject to actual disciplinary action on --

MR. KOTLARCZYK: Right.

THE COURT: -- on that basis.

MR. KOTLARCZYK: And by analogy when Mr. Delp testified on redirect about if you fail to timely update your contact information, you have committed unprofessional conduct, people who do that aren't typically subjected to any form of discipline. So the consequence of unprofessional conduct is does it subject you to discipline? And if the board has said this is consistent with generally accepted standards of practice, then there's not going to be any discipline.

THE COURT: Take a minute to respond to the point that, under cases like *Susan B. Anthony List*, that the mere

 fact that people can submit or file complaints, as he testified the usual process is some sort of investigation, isn't the investigation and the complaint process itself a consequence that might be enough to chill or otherwise be the sort of harm that can give rise to the sort of injuries that we talk about in court?

MR. KOTLARCZYK: Yeah, I'm happy to answer that, Your Honor. So *Susan B. Anthony List* it's important to note is a standing case, not a preliminary injunction case. So it talks about three factors, which the Tenth Circuit has cited these three factors at all -- as well when considering whether there's a credible threat of enforcement. One of the factors is, as the plaintiffs point out, are there other parties that are able to enforce the statute? And as to standing, I'd agree, that's a factor that is probably going to weigh in their favor if and when we get to the point of briefing whether this case should be dismissed for plaintiffs' lack of standing. But the other two factors are: Is there any past history of enforcement, and has there been a disavowal of future enforcement? And those two factors, particularly as to the preliminary injunction phase but even as to the broader standing inquiry, weigh decisively in the State's favor here because we have disclaimed our future -- any future enforcement of this pending the rulemaking, and there is no -- plaintiffs have presented no evidence that there's been any

enforcement of any existing law against anybody engaged in medication abortion reversal in Colorado.

THE COURT: Okay. Thank you. Let me ask you to address a question I indicated during the testimony was one that I had, which is a technical reading of these declarations and the actions at least taken by the two boards is that they have said we are not going to do any enforcement during this time period, but does that mean we are not going to enforce -- we are not going to take action for anything done during this period even if later it turns out that the boards all agree this should not be permitted? Or are the defendants saying that -- and I think this is part -- this is sort of a subpart, I guess, of my original question to you about what difference would an injunction make. Are you saying that this is essentially -- you're not going to enforce any -- you are not going to discipline anyone for anything done during this period just as if I had entered an injunction against it?

MR. KOTLARCZYK: Yeah, I think it's the latter, Your Honor, if I could caveat a little bit, which is not going to enforce anyone under 23-190.

THE COURT: Right.

MR. KOTLARCZYK: Right? We can't give the broader assurances about nothing they are doing is violating any state law, but as to 23-190 I think that's correct. And Mr. Delp testified that the board cannot declare something

 unprofessional conduct and retroactively enforce it as unprofessional conduct. He's never seen that, and he doesn't think the board can do it.

So I think that's the answer to Your Honor's question about what about this May-to-October period.

THE COURT: So I think I found that a little bit confusing. Tell me if I'm right about what Mr. Delp was saying. I mean, I think Mr. Rienzi was trying to get at people often are disciplined for something that's never been explicitly said is unprofessional conduct before. Right? If I open up a medical practice and say providing Tylenol will help you lose weight, or something like that, right, I could be disciplined for that by the Medical Board even though it's something I have already done and they have never come out and said Tylenol -- advertising -- providing Tylenol for weight loss is unprofessional conduct. Right? But I would still be subject to discipline for that, right, under the kind of general rules?

MR. KOTLARCZYK: I think that's right, Your Honor. And I think what that means for purposes of the injunction sought by plaintiffs is if something was a violation of another provision of Colorado law the day before 23-190 was enacted, it's still a violation of Colorado law the day after it's enacted, and no injunction the Court can enter or no injunction the Court has been asked to enter, I should say,

 would make it not a violation of some other provision of Colorado law.

The relief that the plaintiffs have requested is an injunction as to this law. And as to this law the declarations and I think what Mr. -- I think what the witness said on cross-examination is that there will be no enforcement of this law. If it violates another law, that's a different question, but that's not the question I think that was posed or that this Court is in a position to be able to answer.

THE COURT: Okay. All right. Thank you.

MR. KOTLARCZYK: You're welcome.

Your Honor, I'm happy to -- I mean, most of the remaining parts of my argument are covered in the briefs, and I'm happy to -- we haven't talked much about Section 1, the legislative declaration. I'm happy to explain why we don't think that applies here if the Court has any questions about it.

THE COURT: No. I'll give you a chance, I guess, just to mention it. My reading of the Act is that Section 1, the declaration, I agree with Mr. Rienzi that that may come into play at some point, I could certainly see that, but there's nothing to enforce directly in that section. Is that right? So an injunction against enforcing Section 1 wouldn't do anything.

MR. KOTLARCZYK: That's exactly right, Your Honor.

You can't enter an injunction against legislative history, which is effectively what a legislative declaration is. It only comes into effect if there's an ambiguity found.

"Deceptive trade practices" is not a term that's ever been found to be ambiguous in Colorado law, so there's no reason to think that would come into play, and there's especially no reason to think that would come into play here because what Section 1 is talking about is Section 105 of the CCPA, and the bill doesn't even amend Section 105. So it's unclear when that would even be -- how that would even come up in a hypothetical situation where a Court first found "deceptive trade practice" was ambiguous or vague.

THE COURT: Okay. I guess some of us would like to be able to enjoin legislative history, but only some nerdy lawyers probably.

Okay. I think I understand, but -- why don't you address the question that I mentioned to Mr. Rienzi, which is whether, whatever we are calling it, Section 2, the deceptive trade practices provision, even if the boards do agree that this is a permissible practice, say they all under whatever we are calling it, the provision allowing them to say it's permissible, that doesn't change the prohibition on the deceptive trade practices prohibition. Right?

MR. KOTLARCZYK: I think that's right, Your Honor. And I think Section 2 and Section 3 are really accomplishing

different things in the statute. So Section 3 is talking about what we've been spending most of our time today talking about, the boards establishing what a generally accepted standard of practice is for doctors and nurses and whether medication abortion reversal qualifies.

Section 2 is focused on: Do you say you offer abortion when you don't offer abortion? And if you look in the legislative declaration, there are statements in there about concern that people are being brought into abortion centers under false pretenses. And because so much of the abortion decision could be time -- where time is of the essence, that's posing a harm that even though, as Ms. Hanlon Leh testified, that was probably already covered by the CCPA, the legislature here wanted to make it explicit.

So I don't think there would be an inconsistency with Section 2 if the boards in Section 3 come out and say medication abortion reversal treatments are a generally accepted standard of practice. It would still be a deceptive trade practice for a business to say we offer abortion and emergency contraceptives when, in fact, they don't. If they do that knowingly or recklessly, that would still be a violation of the CCPA under Section 2.

THE COURT: But saying we offer comprehensive care to pregnant women does not indicate that, is your position?

MR. KOTLARCZYK: Again, absent any other indication

that would make that misleading, that's our position, correct.

THE COURT: Okay. Let me just ask you -- back to kind of a process thing so I don't make you come back up. You mentioned potentially holding a case in abeyance until when it looks like it could become ripe. What sorts of things would potentially be indicia, what should I be looking for that would maybe tell us all that we have reached that point, if I were to agree with you about where we are now?

MR. KOTLARCZYK: Do you mean what would -- I'm sorry. I don't quite understand the question.

THE COURT: Say I agreed with basically what you have argued as to the TRO and PI, but I agreed with the plaintiffs as to the general justiciability and the fact that this is not a complete disclaimer of prosecution forever. And so we get to the summer or the fall, what would you think would make it where we wouldn't get the same sorts of arguments from the defendants, we would actually reach the sort of merits of the --

MR. KOTLARCZYK: I see.

THE COURT: -- constitutional questions?

MR. KOTLARCZYK: Yeah, I think at a minimum what we would need, Your Honor, is rules. And if they're not effective yet, at least adopted rules from the boards so we're not shooting at, you know, several different moving targets in terms of trying to understand what is the legal issue, what

are the legal merits? You know, we've been -- the plaintiffs have pointed out that we haven't contested the merits here. We don't have merits to defend yet because there's not rules in place saying whether this is or is not generally accepted standards of practice. So once there are adopted rules that the boards have adopted, plaintiffs might end up liking those rules, and we all go on our merry ways. They may think that it still is violative of some of their constitutional rights, maybe the ones they have named here, maybe they think there was procedural irregularities that need to be addressed in the rulemaking process in the state APA and the state court system. We will know a whole lot more when we are there than we know sitting here now.

THE COURT: All right. Fair enough. I'll just say, given the way that the current declarations are explained, I have a little bit of trouble thinking we have to wait until the rules are in place. If, as Mr. Delp explained, that's not likely to happen until September, and the bill says October 1st, we're going to be pretty tight. And so, you know, if the State is going to start enforcing these or not, explicitly not enforcing them, waiting until sometime in September will -- I mean, I don't mind addressing motions that are filed at 8 o'clock on Fridays, but it's not my favorite thing, and so I would hope that we could all sort of work things out and figure out a way to either extend the, sort of,

 lack of the disclaimer of prosecution until the rules go into effect or something like that.

MR. KOTLARCZYK: Yeah, I understand what Your Honor is saying. And, you know, from the State's position, we are not trying to trick anybody. We are not trying to pull the rug out from anybody and say, Aha, we gotcha. We are really -- you know, we have put this defense together in the matter of nine days. So we are really trying our best to meet the plaintiffs halfway and explain, Look, you don't have to worry about this bill while the rulemaking is going on.

And, you know, we haven't dealt with that specific question Your Honor just posed, which I think is a very fair one, so I'm not in a position to take any position on behalf of the boards, but I think we are more than amenable to, you know, reasonable, you know, direction of consultation and the like. And it's worth pointing out that the rulemaking process itself is all very public. There are draft rules published before rulemaking hearings and things like that, so --

THE COURT: Fair enough. And I've been in your shoes before, and so I understand. And the legislature in a lot of ways just procedurally didn't do you a lot of favors the way they structured this bill, setting aside the merits of it. So I understand kind of the difficult position you are in. I also understand the position that it puts the plaintiffs in too. But I don't think anybody is acting in bad faith either

way. So I appreciate that answer. Thank you.

MR. KOTLARCZYK: Thank you, Your Honor. If the Court doesn't have any further questions for me, again, we really think that the simplest, most straightforward way to resolve this case now is really on the question of irreparable and imminent harm. And in light of the positions taken by the State defendants, we don't think the plaintiffs come close to satisfying that.

THE COURT: All right. Thank you very much.

MR. KOTLARCZYK: Thank you.

THE COURT: Mr. Rienzi, would you like to have a bit of rebuttal time?

MR. RIENZI: Thank you, Your Honor. I can be brief.

THE COURT: Thank you.

MR. RIENZI: The government started by saying, you know, status quo, let's make it like SB 23-190 didn't exist. Um, we've got agreement there. Right? That's what my clients want. We want it like SB 23-190 didn't exist. We think a preliminary injunction is actually the only and the right way to get there.

You know, on the question of will the board go back and get my client's conduct in this interim period, the board didn't resolve that. Right? You have their resolutions. They didn't make that commitment. Mr. Delp didn't make that commitment. So we don't have that certainty. And if we are

left to just rest on the promises that could be changed and we'll see what they think later, they may well come back to us in September or October and say, Well, what you did in April was unprofessional conduct, and the legislature has said so. They could do that to us. We should not need to practice at that peril.

They still have not disclaimed enforcement of Section 2. I urge you to take a look at the declarations they filed. They don't disclaim Section 2. We do challenge Section 2; it's on page 25 of our brief. We explain why it's content and viewpoint based. We should not have to operate under Section 2. It's an illegal restriction of our speech. They have not disclaimed it. An injunction from Your Honor can protect us from that. Their nondisclaimer of it does not protect us from that.

You know, they said that they want to go through the process and have their rules, and I agree this is not a typical process, right, because the legislature went first, but right now my clients are bearing the burden of the legislature went first. Right? This law exists. This law declares their actions unprofessional conduct. And I take the point that sometimes something is unprofessional conduct and the board definitely won't enforce it, although again Mr. Delp didn't say that and neither did the defendants. You could have unprofessional conduct that definitely no one enforces.

It's possible. You could can also have unprofessional conduct that leads to complaints against you and open complaints that you have to disclose to your insurer or if you move. It's not as if the legislature saying what you do is unprofessional conduct is meaningless. It's not meaningless. It has a meaning. It was intended to have a meaning. And they are not wiping it all away. I don't think they can wipe it all away.

Your Honor has broad equitable powers. The parties are in front of you. You can make it like SB 23-190 didn't exist. They can't, or at the very least they haven't offered that.

THE COURT: Well, they have told me that, from their view, in practice they -- and this in particular I think addresses or at least is meant to address your Section 2 argument -- that in their view the bill doesn't, as they are treating it now, doesn't change anything. Now, it exists, but in their view, from the State's view, from the perspective of the actual people who have the authority to do anything to your clients, they are going to treat this as if it doesn't exist at least pending resolution of the rulemaking.

MR. RIENZI: One, Your Honor, it's just doubtful that they'd bother to pass a law that doesn't do anything, but if they did, then there's one and only one purpose for passing this law as part of your crackdown on the anti-abortion centers, and it's to subject them to some additional

restriction that Planned Parenthood and other providers don't have to face. So I will be delighted if at the end of the day they say let's just cross it out, right, because everything else is just as good, but then honestly I'd feel much better if Your Honor just crossed it out, at least as best as you can, by preliminary injunction. Their statement now that, well, I don't think it means anything, and every single time the statement was said, Your Honor, and if you want to go back and review the transcript, every single time it comes with absent other factors, absent the circumstances --

THE COURT: Well, but --

MR. RIENZI: -- absent the indicia.

THE COURT: I'm sorry to interrupt. Mostly I'm sorry to Miss Thomas, but I'm also sorry to you.

But I take what they are saying there as that it isn't that this bill changes anything. It's that certain statements could, in this area, could violate preexisting laws, and so unless there's some indicia of violation of the other laws, that this doesn't change that. And I think I understand why they are making those sort of --

MR. RIENZI: And I understand, and to be clear we are not asking that we get a get-out-of, you know, false-advertising-law-free card. We are not asking for that. Before they passed SB 190 we never came to court. We tell the truth. We are not liars. We give people good care that they

need. Right? So it's not as if we are running around in need of special protection against the else absent SB 23-190. It's SB 23-190 was the elephant in the room that's placed there and that influences how they are looking at everything.

And, you know, I take the point that we didn't have a separate challenge to the CCPA, but the whole point of our Complaint is that -- like, why did we sue all the DAs? Well, look at the complaint. Because they have CCPA enforcement authority, and the legislature said under the CCPA this is deceptive and false and impermissible. Right? That was the prohibition, to use the legislature's term, on advertising abortion pill reversal.

So, you know, I agree, we didn't seek a separate injunction against all enforcement of the CCPA, but we are seeking an injunction against the use of 23-190, right, the use of the legislature's rule which says it prohibits it against us.

And, again, the fine shades of the limits of the other indicia and the, you know, the per se, we don't do it per se, but maybe we will do a non-per se prosecution, you know, those are not easy things for regular people to go conduct a business in front of. Right? Like, they've got to go run their business. They have got to advertise. They have got to help people. That's their religious commitment. That's why they do what they do, and they are very serious

about it. And, frankly, they are very good at it. Right? There's a lot of actual living babies because they do what they do. They need to do that stuff. And to tell them, Well, we are just going to walk out of court, and you've got these nonbinding -- right, because it's not binding -- you've got these nonbinding partial promises -- right, the board didn't say, We won't look back. Mr. Delp said, I've never seen them do that before, but then he said, Yeah, but I can't really bind us. Right? We don't have binding. Your Honor can give us binding, and we need binding.

Happy to address any other -- oh, one other point on the standing cases. The government's standing cases they say, Well, it's about disavowing enforcement. They haven't given a complete disavowal of enforcement. They haven't given a disavowal of enforcement for our present behavior right now. They still say we could get hit by that. They haven't given a disavowal of Section 2 at all. You can read their declarations. They didn't do it. They didn't give a disavowal of future enforcement at all. That's very clear. They don't know what's going to happen. Those cases are not like this case. This is a litigation strategy to kick it down the road. That's what it is. It's obvious that's what it is. My clients shouldn't have to suffer under that, Your Honor.

THE COURT: Let me ask you, I guess, a little about that. It does seem to me, you're right, they haven't

 disavowed Section 2, but what they have said is that it doesn't change, in their view, it doesn't change the preexisting law. It just maybe adds a specific example. And they have said -- as I understand it, part of the whole point of the cross-examination was here's how you present yourself, advertise yourself, and their position seems to be that's never been a problem before, it's not a problem now. So isn't that -- doesn't that give the same sort of statement that you just made? Isn't that a disavowal of alleging that what's going on now and previously -- don't they disavow trying to say 190 now makes that illegal?

MR. RIENZI: So I guess I didn't hear a complete disavowal, but if there is a disavowal, I'd love to see it at least memorialized in an order from the Court or in some written thing other than declarations that carefully say, Under Section 1 we disavow the per se, but we might still go there, and under Section 3 we'll tell you about the timing, but we won't tell you about which behavior we are getting. It's all very carefully calibrated. Right? Like, look at paragraphs 14 and 15 of every one of the -- of Leh, of Dougherty, of McCann declarations. They are all very carefully calibrated.

So, in the end, if you want to take the best spin on what they've got, the best light interpretation of what they've got and write it in an actual order that says the

government is committed to act like SB 23-190 didn't exist -- I mean, that's what I heard from the government. If you want to do something that binds them to act like SB 23-190 doesn't exist and won't exist until the board issues its rules, I think now we're at something that's like a preliminary injunction, but everything that's being offered short of that, Your Honor, would require us in a future case to come back and parse what was the sort of claim and to take the pieces of paper and figure it out, and that's not fair.

They passed an unconstitutional law. You know, the argument that we don't have anything to defend yet pretends the statute doesn't say what the statute says. The statute says what it says. It's applicable now. It's unprofessional conduct now. To say we don't have to defend that now because we might pass rules later, like, well, that's one way to look at the world, but it doesn't give my client a lot of comfort.

So, in the end, what they have given us here is soft. If you want to make it harder, if you want to lock it in for us, that may well be the functional equivalent of a preliminary injunction, but I'd love it in an order from the Court that memorializes all of the government defendants agree to act as if 23-190 did not exist until they issue new rules. I'm not positive they have made that promise, but if we get it in a binding way, that would give us the kind of relief we are looking for. Because what my client doesn't want to do is get

to September or October and get penalized for saving some baby's life in April. That's not fair. This is an unconstitutional law. She should not have to bare that risk. If the government wants to dodge and wait -- and "dodge" is not fair. If the government wants to find a way to kick it down the road to fight at a better time when the government has got its ducks in a row, at the very least we ought to have certainty in the interim, and we ought not to be in this unprofessional conduct but maybe we'll tell you later it's not, we'll let you know in the fall. That's not a fair position for us, Your Honor.

THE COURT: All right. Thank you, Mr. Rienzi.

MR. RIENZI: Thank you, Your Honor.

THE COURT: I feel like I should give Mr. Kotlarczyk an opportunity if he has anything to add or clarify.

MR. KOTLARCZYK: Your Honor, it goes against every lawyer instinct in my body to say I have nothing further to add, but I think, you know, between the positions we have taken in our briefs and the declarations we have submitted, I think our -- I think the question is fairly presented to the Court. I don't -- I don't have anything further to add unless the Court has any questions for me.

THE COURT: No, I don't think I do. I think I asked you plenty of questions. Thank you.

MR. KOTLARCZYK: Thank you, Your Honor.

THE COURT: All right. Well, I appreciate everybody's efforts. I know we are all working under some time pressure for obvious reasons in this case. I'm going to take this question under advisement. As you know, the temporary restraining order that we entered expires by its own terms and under the rules, I guess, either just after midnight on Saturday or sometime on Saturday. So I will for sure get something out that resolves the present motion for a preliminary injunction and the status well before then, hopefully a couple of days before then, and then we will go from there.

So I'll take the motion under advisement, and if there's nothing further, the Court will be in recess. Thank you all.

(Proceedings concluded 1:23 p.m., April 24, 2023.)

REPORTER'S CERTIFICATE

I, JULIE H. THOMAS, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true and correct transcript.

Dated this 2nd day of May, 2023.

/s/ Julie H. Thomas
Official Court Reporter