1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3
    Civil Action No. 23-cv-00939-DDD-SKC
4

5      BELLA HEALTH AND WELLNESS, et al.,

6          Plaintiffs,

7          vs.

8      PHIL WEISER, in his official capacity as
       Attorney General of Colorado, et al.,
9
           Defendants.
10
    ----------------------------------------------------------------
11
                      REPORTER'S TRANSCRIPT
12          HEARING ON MOTION FOR PRELIMINARY INJUNCTION

13  ----------------------------------------------------------------

14          Proceedings before the HONORABLE DANIEL D. DOMENICO,
    Judge, United States District Court for the District of
15  Colorado, commencing at 9:35 a.m. on the 24th day of
    April, 2023, in Courtroom A1002, Alfred A. Arraj United States
16  Courthouse, Denver, Colorado.

17
                          APPEARANCES
18
    For the Plaintiffs:
19  MARK L. RIENZI, REBEKAH P. RICKETTS, LAURA W. SLAVIS, and
    DANIEL M. VITAGLIANO, THE BECKET FUND FOR RELIGIOUS LIBERTY,
20  1919 Pennsylvania Ave, N.W., Suite 400, Washington, D.C. 20006

21
    For the Defendant Phil Weiser:
22  MICHAEL T. KOTLARCZYK, Senior Assistant Attorney General,
    ABIGAIL HINCHCLIFF, First Assistant Attorney General, OFFICE
23  OF THE COLORADO ATTORNEY GENERAL, 1300 Broadway, Denver, CO
    80203
24
            JULIE H. THOMAS, RMR, CRR, Official Court Reporter,
25     901 19th Street, Room A256, Denver, CO 80294, (303)335-2111

          Proceedings reported by mechanical stenography;
              transcription produced via computer.

EXHIBIT
2

1    APPEARANCES:   (Cont.)

2    For Defendant Members of the Colorado Medical Board:
     BRIAN URANKAR, Assistant Attorney General, OFFICE OF THE
3    COLORADO ATTORNEY GENERAL, 1300 Broadway, Denver, CO 80203

4    For Defendant Members of the Colorado State Board of Nursing:
     ELIZABETH KENNY, Assistant Attorney General, OFFICE OF THE
5    COLORADO ATTORNEY GENERAL, 1300 Broadway, Denver, CO 80203

6    For the Defendant Michael Dougherty:
     CATHERINE "TRINA" RUHLAND and DAVID HUGHES, Deputy County
7    Attorneys, BOULDER COUNTY ATTORNEY'S OFFICE, P.O. Box 471,
     Boulder, CO 80306
8
     For the Defendant John Kellner:
9    ANN B. TOMSIC, Chief Deputy District Attorney, 18th JUDICIAL
     DISTRICT ATTORNEY'S OFFICE, 6450 S. Revere Parkway,
10   Centennial, CO 80111

11   For the Defendant Beth McCann:
     ANDREW DAVID RINGEL, HALL & EVANS LLC, 1001 Seventeenth
12   Street, Suite 300, Denver, CO 80202

13

14                  *      *      *      *      *

15
                              I N D E X
16

17   OPENING STATEMENTS                                    PAGE

18   Ms. Ricketts                                             8
     Mr. Kotlarczyk                                          12
19

20
     PLAINTIFFS' WITNESS                                   PAGE
21
     DENISE MARY CHISM
22      Cross - Ms. Kenny                                    14
        Redirect - Ms. Ricketts                             32
23

24
     DEFENDANTS' WITNESSES                                 PAGE
25
     SAMUEL DELP

| 1 | Cross - Mr. Rienzi | 40 |
|   | Redirect - Mr. Urankar | 56 |
| 2 | Cross - Ms. Tomsic | 59 |
|   | Recross - Mr. Rienzi | 64 |
| 3 | NATALIE HANLON LEH | |
|   | Cross - Mr. Rienzi | 65 |
| 4 | Redirect - Ms. Hinchcliff | 77 |

CLOSING ARGUMENTS                                     PAGE

Mr. Rienzi                                             80
Mr. Kotlarczyk                                        100
Mr. Rienzi                                            121

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   Q.   Now, Miss Chism, Bella Health and Wellness provides a wide

 2   array of patient care across the lifespan; is that right?

 3   A.   Yes.

 4   Q.   And one of the guiding tenets of the care provided at

 5   Bella is to avoid manipulation, intimidation, or

 6   condescension; is that right?

 7   A.   I'm sorry?

 8   Q.   Would you like me to repeat the question?

 9   A.   Yes, please.  Thank you.

10   Q.   Sure.  Can you hear me okay?

11   A.   Just a little bit.  I was having a little bit of a hard

12   time.  Thank you.

13   Q.   Okay.  I just don't want to blow your ears out.

14   A.   That's okay.  You're good.  Thanks.

15   Q.   Okay.  So one of the guiding tenets of the care provided

16   at Bella is that Bella avoids manipulation, intimidation, or

17   condescension.

18   A.   Um, I would say that our -- our pillars and our core

19   values are life-affirming, dignified care, and I would say

20   that in that we certainly would not want to manipulate anyone

21   or, um -- what was the other word?

22   Q.   Sure.  The other words were "intimidation" or

23   "condescension."

24   A.   Oh, we would never want to intimidate or treat anyone with

25   disrespect.

1    Q.  Right.  And Bella incorporates the Directives for Catholic

2    Health Care into the care that's provided; is that right?

3    A.  Yes.

4    Q.  And those directives specifically instruct that you are

5    supposed to avoid any manipulation, intimidation, or

6    condescension in your care.

7    A.  Sure.

8    Q.  Okay.  Bella Health and Wellness does not perform

9    abortions; is that right?

10   A.  Correct.

11   Q.  Okay.  And Bella's current patients sign a practice

12   agreement when they are going to receive care at Bella; right?

13   A.  Yes, they do.

14   Q.  And the very first agreement that the patients have to

15   initial specifically and clearly states that Bella does not

16   perform abortions; is that right?

17   A.  Yes, that is correct.

18   Q.  Okay.  Now, Bella advertises and publicizes its services

19   on a variety of media to potential patients; right?

20   A.  Yes.

21   Q.  And Bella does not abort -- offer abortion care in any of

22   those media; right?

23   A.  Are you saying do we advertise any kind of abortion care?

24   Q.  That's my question, yes.

25   A.  Okay.  Yes.  No, we do not advertise anything regarding

1   abortion care.

2   Q.   And one of the media where Bella provides information

3   about services is through Bella's Facebook page?

4   A.   Yes.

5   Q.   Okay.  And on Bella's Facebook page there's links to

6   interviews that you have done describing care provided at

7   Bella; is that right?

8   A.   Yes.

9   Q.   Okay.  And in those interviews you never state that Bella

10  provides abortions.

11  A.   Correct.

12  Q.   And a few years ago Bella Health and Wellness had a

13  different name; is that right?

14  A.   We opened as Bella Natural Women's Care.  We opened

15  initially as a women's health ob-gyn.

16  Q.   And did you give interviews and speak on behalf of the

17  practice in the original name?

18  A.   Yes.

19  Q.   Okay.  And in those interviews and in those speeches you

20  never said that your practice offered abortion care?

21  A.   Correct.

22  Q.   Okay.  Now, you do describe in the Complaint and in your

23  declaration that Bella does provide medication abortion

24  reversal care.

25  A.   Yes, that is correct.

1    Q.  Miss Chism, what does it mean that Bella provides health

2    care with dignity and compassion, according to that sentence?

3    A.  What that means is that all of us are broken people, and

4    we recognize that, and that's why we seek services from other

5    people.  And Bella -- Bella's hope, our prayer, is that we can

6    reach people in their brokenness and recognize that we want

7    them to be whole body, mind, and soul.  And when we're caring

8    for someone with dignity and compassion, that means we are

9    going to take the time to hear their story, to hear their

10   needs, um, more time than your average office or insurance

11   pays, but actually enter in with them, love them, hear them,

12   see what their needs are, and work together to meet those

13   needs.

14   Q.  So the other half of that sentence says that you provide

15   comprehensive life-affirming health care.  What does that

16   mean?

17   A.  I'll break it into two things.  Okay?  So comprehensive

18   is, um -- it's, again, caring for someone body, mind, and

19   soul, but it's through the lifespan.  We care for, um -- we

20   care for people from the moment of conception until natural

21   death.  And so in many cases, even fertilitywise, you know,

22   working to achieve that conception.  But that is a full scope

23   of care for women's health, for family medicine, pediatrics,

24   functional medicine, full women's gynecological care through

25   menopause.

1    Q.  So if you look two sentences down in the same paragraph,

2    Bella also discloses that we do not offer contraception,

3    sterilizations, or abortions.  Do you see that?

4    A.  Yes.

5    Q.  Why do you make that disclosure in this document?

6    A.  We feel like it's really important if we're trying to, um,

7    establish health care with dignity and compassion that we

8    start that, um, with honesty and transparency.  And we want

9    people to know what we are about and, honestly, what we feel

10   like is best health care for an individual.

11   Q.  Are there other places where Bella describes itself as

12   providing dignified or life-affirming health care?

13   A.  Beyond this piece of paper?

14   Q.  Yes.

15   A.  Everywhere.  It's in our -- it's our social media.  It's

16   in our website.  It's who we are.

17   Q.  Are there other places where Bella describes itself as

18   providing comprehensive health care?

19   A.  Yes, that's everywhere as well.

20   Q.  Do you use a big red box disclaimer "We do not provide

21   abortions" every time you use the word "comprehensive"?

22   A.  Oh, my gosh, no.

23   Q.  Why not?

24   A.  Um, sorry to be repetitive, but, um, it's important for us

25   to establish a relationship with people who -- we know

1   everyone's broken.  I'm broken.  You're broken.  We're all

2   broken.  And to have someone -- like, a big red box shouts at

3   a person.  That doesn't sound like, Come and let me take care

4   of you and let me hear your story and -- and help you.

5   Q.  So, Miss Chism, why are you concerned, if you are, about

6   the advertising piece of the law if you're telling people that

7   you don't provide abortions?

8   A.  I listened in with a lot of testimony on the floor, with

9   the House, with the Senate, with the legislators and their

10   responses.  Um, I feel very, very attacked just in the

11   testimony.  I felt that they were singling us out and -- and

12   with words that they were coming after -- that they were

13   coming after me, and, um, that -- I -- you need to understand.

14   I have 68 employees.  I care for over 6,000 people in more

15   than 31,000 visits a year.  There is a lot at stake here for a

16   small number of patients.  And I'm willing to sacrifice

17   everything for a life, but, um, but this feels very, very

18   threatening.  This doesn't -- a promise is just a promise.  I

19   feel like I need something that is a little more concrete.

20   Q.  Miss Chism, do you recall whether any of the language that

21   Bella uses to describe its services, whether any of that

22   language was specifically discussed in the legislative record

23   in this case?

24   A.  I'm sorry.  Will you say that one more time?

25   Q.  Do you recall whether any of the language that Bella uses

1    your arguments at this point I think convince me about the

2    jurisdictional argument.  And, again, there's not a motion to

3    dismiss in front of me.  I'm not inclined to dismiss it even

4    if there were on that basis because, as you point out, it's

5    likely -- it's at least possible that this will spring back

6    into life.  But I think the point of those questions was, as I

7    said, between now and then they're not at risk of any

8    additional prosecution than they were before.  And so setting

9    aside sort of justiciability and jurisdiction, assuming I

10   still have those things based on the likelihood or the at

11   least strong possibility that enforcement could arise later

12   depending on the rulemaking, what is the immediate irreparable

13   harm between now and then if the State -- and I agree with

14   you, it's very unusual, but if the defendants have said, We

15   are not going to do any of the things that you claim to fear

16   at least for now, what is the justification for me saying,

17   Yes, don't do what you already said you are not going to do?

18          MR. RIENZI:  Well, one, I agree with you, you more

19   than have jurisdiction.  And once you have jurisdiction,

20   right, we've got a motion for preliminary injunction.  Their

21   claim is you have got nothing to worry about because I've made

22   nonbinding promises.  What on earth would the harm be of an

23   injunction that binds them to their nonbinding promises?

24   Right?  If you think about the balance of the harms that, of

25   course, is part of -- part of any injunction, right, if it's

1   true that nobody in the government is going to use this at all

2   and nobody is ever going to change their minds, which, of

3   course, they can't promise, they haven't promised, they can't

4   promise they are not going to change their minds, but if it

5   were all true, they'd suffer nothing from an injunction that

6   just binds them to that.  Right?  But they haven't offered to

7   stipulate to that injunction.  I doubt they are going to stand

8   up and do it.

9           But we want a binding resolution at least during this

10  case that we don't have to worry about this law.  We don't

11  have to stare at four different government entities and hope

12  that they don't change their minds.  We don't have to worry

13  about how do we figure out, when do we learn, what counts as

14  per se, and when will they use the legislative finding that

15  this is deceptive against us or not, and we don't have to run

16  the ads.  I mean, we run ads all the time.  Right?  We have

17  ads on social media.  We have ads online.  We run ads all the

18  time.  We'd like protection that we are not running those ads

19  at the risk of $20,000-a-pop fines.  We have got very good

20  reason to fear it because of what they said in the law.  Their

21  attempt to walk it back is partial and time limited and not

22  enough to take away the threat.

23          They don't disclaim Section 2 of the law at all.  You

24  know, Section 2 is a part that is targeted only at people who

25  don't offer abortion, contraception, and sterilization.  And

```
 1   in the legislative history they said they were concerned about

 2   faith-based clinics, which Bella is, who say they offer

 3   comprehensive services.  Right?  And in the legislative

 4   history they say comprehensive services, that means abortion

 5   and contraception and sterilization.  So the people who passed

 6   the law said that faith-based clinics who offer comprehensive

 7   services are liars because when you say "comprehensive" or

 8   "full service" you are telling people you provide abortions.

 9   Right?  That's Section 2 of the law.  That is a law that

10   applies only to people like my clients.  It doesn't apply to

11   anybody else in the state.  It doesn't apply to Planned

12   Parenthood, doesn't apply to anybody who offers abortions.  It

13   only applies to one side of the debate.  They don't disclaim

14   it.  Right?  We filed the brief.  We explained how that's

15   content and viewpoint based and how that's illegal and they

16   can't pass strict scrutiny.  Their answer is nothing.  They

17   don't disclaim it.

18         So all those things are there.  What you have is a

19   very carefully cabined attempted temporary disavowal.  Right?

20   You have a pause.  It's a strategic litigation pause.  Why

21   didn't they disclaim Section 2?  I think it's because they

22   misread -- they didn't catch in the brief that we were

23   challenging Section 2, so they said, Okay, I don't have to

24   disclaim that.  I can leave that there.

25         You know, Section 1 they are trying to carve up.
```

1      Section 3, why didn't the Pharmacy Board disavow

2  enforcement, too, so that when we write a prescription the

3  pharmacist isn't facing unprofessional conduct?  I don't know,

4  but I suspect it's because the Pharmacy Board wasn't sued, and

5  then they felt like, Well, we don't need to disavow.

6      I think this is a litigation move to try to avoid an

7  obvious injunction from an unconstitutional law.

8      THE COURT:  Well, the Pharmacy Board doesn't have

9  authority over any of these plaintiffs.  Right?

10      MR. RIENZI:  No, but they have authority over the

11  people -- when we write a prescription and someone brings it

12  to them, they have authority over those people.  And under

13  this statute, unless they go along, the Medical Board itself

14  and the Nursing Board can't make this not unprofessional

15  conduct.  Right?  The legislature tied them together.

16      THE COURT:  Right, I understand that.  I just was

17  trying to make sure I understand the posture.

18      Let me talk to you a bit about Section 2 because --

19      MR. RIENZI:  Yes.

20      THE COURT:  -- it mostly, as I understand it, works

21  with the -- with Section 3, but it would be a curious

22  situation.  And I'll ask the State to explain how this would

23  work.  In the hypothetical where the boards do agree that this

24  procedure or this treatment is okay, what then happens to

25  Section 2?  Would it still be illegal under Section 2 to

1    advertise that you provide it even though the boards have said

2    it's okay?  I'm unclear on that.

3              MR. RIENZI:  Yeah, so I think you are talking about

4    Section 1, to be honest, Your Honor.

5              THE COURT:  Well --

6              MR. RIENZI:  Section 1 is the prohibition on

7    advertising abortion pill reversal.

8              THE COURT:  No, Section 1 is the legislative

9    declaration, but are you talking about --

10             MR. RIENZI:  So even if I had my citations wrong,

11   Your Honor, basically I agree with you, that's a good

12   question.  The statute just says that's illegal.  And an

13   injunction against such a statute would be certainly --

14             THE COURT:  I'm talking about in the bill, Section 2

15   of the bill.

16             MR. RIENZI:  Okay.

17             THE COURT:  So I agree, but -- so my question is is

18   the -- if the provision -- if the advertising provision is

19   tied necessarily to the action of the boards or not, in your

20   view.  If the --

21             MR. RIENZI:  No.

22             THE COURT:  -- boards were to say this is okay, would

23   the advertising provision still prohibit Bella from telling

24   people they do this?

25             MR. RIENZI:  Yeah, by the terms of what the

1  legislature of Colorado did, they are not tied.  I agree with

2  you.  Logically, again, the legislature -- it's very clear

3  from the government's reaction in this case.  Right?  The

4  government doesn't really love what the legislature did.  They

5  are trying to figure out how to fix it.  The legislature fired

6  something off here, right, but no, they didn't connect those

7  dots.  They made it false and deceptive and impermissible to

8  say it, whether or not later on somebody says it's not

9  unprofessional conduct.  So that's the way they wrote their

10 law.  That's an unconstitutional law.  They are not allowed to

11 say that unless they can pass strict scrutiny, unless they can

12 carry their burdens.  They don't come anywhere close.  In

13 fact, they don't try because this law is very

14 unconstitutional.

15         So I can imagine a law that was much better written.

16 You could write a better law that connects those dots and

17 says, And if it's not unprofessional conduct, then you can

18 talk about it.  That's not the law they wrote.  The law they

19 wrote punishes our speech based on its content, and it

20 subjects us to speech rules that other people aren't subjected

21 to.  It's content and viewpoint based.  They are not allowed

22 to have a law like that.

23         We don't have to -- to put it a different way, Your

24 Honor, so Section 2 -- again, nobody from the government I

25 heard disclaim Section 2.  Section 2 says there's a special --

1    a special false and misleading advertising provision that's

2    only going to apply to people who don't offer abortions.  It's

3    only going to apply to the pro-lifers, not to the

4    pro-choicers.  And in that special law it says if anything

5    indicates you provide those things, then you are in trouble,

6    then you have violated the law.  And the people who passed the

7    law said that if you say you do comprehensive services, that

8    that indicates you provide abortion and contraception and so

9    forth.

10           So my client has got to make decisions about a part

11   of the law the defendants haven't disclaimed.  Maybe in five

12   minutes they will decide that they want to, but they haven't

13   disclaimed yet.  My client has got to make decisions about her

14   advertising.  Can she keep talking about her services as

15   comprehensive and full service?  Under the way the people who

16   passed this law understood it, that's false and misleading.

17           Now, Planned Parenthood doesn't have to worry about

18   that because Planned Parenthood isn't subject to a separate

19   section like this.  This is part of what the people who passed

20   the law called, quote, a crackdown on anti-abortion centers.

21   There's no mincing words, no pretending we're doing something

22   else.  This was a crackdown on anti-abortion centers.

23           So they write a law that my client has to figure out,

24   How do I abide by that?  What do I do with my ads tomorrow?

25   Should I change that form that I give people?  Should I change

1   what I say on the website?  I am doing this all at my peril

2   because the government passed an illegal law that doesn't pass

3   strict scrutiny and that they don't disclaim.

4        THE COURT:  So let me ask you, what is it about

5   that -- what actual language in there do you think either is

6   violative or potentially violates or makes illegal the things

7   that we see that Bella has said or would likely say?

8        MR. RIENZI:  Sure.  In the third line, Your Honor,

9   it's any advertisement that indicates that the person provides

10  abortion or emergency contraception, or referrals for abortion

11  or emergency contraception, when the person knows or

12  reasonably should know that they don't.

13       THE COURT:  So I take it your fear, at least, or your

14  client's fear is that when Bella says they offer comprehensive

15  services, that would be viewed as indicating or potentially

16  indicating that they provide abortion or referrals for

17  abortions.  Is that right?

18       MR. RIENZI:  Yes, because the legislature said so,

19  Your Honor.

20       THE COURT:  Okay.

21       MR. RIENZI:  So, in other words, that's not -- that's

22  not our made-up fear.  Just two examples.  If you wanted to

23  look at Exhibit H of the Complaint, on page -- I believe it's

24  page 4, they talk about comprehensive care and saying you are

25  going to offer all options, and they say that's

1    offering these services a deceptive trade practice was

2    specifically to target that kind of a statement.  Why is that

3    an unreasonable position?

4            MR. KOTLARCZYK:  I think for two reasons, Your Honor.

5    One, I don't think that's what Section 2 says.  I think the

6    language of Section 2 is unambiguous.  And in addition to what

7    Your Honor pointed out about it was a statement of one

8    legislator and not a statement, you know, in legislative

9    declaration, it's not a statement that appears anywhere in the

10   statute.  Section 2 says that a person engages in a deceptive

11   trade practice when the person makes or disseminates to the

12   public, or causes to be made, any advertisement that indicates

13   that the person provides abortions or emergency

14   contraceptives, or referrals, when the person knows or

15   reasonably should have known that the person doesn't provide

16   those specific services.

17           THE COURT:  Right.  And so Miss Chism and Bella

18   clearly know they don't provide those services.  They say they

19   provide comprehensive services.  Is it the State's position

20   that that is not an indication -- and I take it to be, given

21   the declaration and the testimony -- that it's the State's

22   position that that advertisement that's saying we provide

23   comprehensive care does not violate either existing law

24   against misleading trade practices nor is it an -- nor does it

25   indicate that Bella provides those services?  Is that the

1   State's position?

2          MR. KOTLARCZYK:  Absent any other contextual

3   indication that something makes it misleading, absolutely,

4   that's the State's position.

5          THE COURT:  Okay.

6          MR. KOTLARCZYK:  And if you look at Exhibits 106 and

7   3 -- they are actually the same exhibit; both sides designated

8   it -- that's Bella Health's statement that it provides the

9   patients.  And it says very clearly in the very first

10  paragraph, We do not provide abortions.  In light of their

11  clear statement that they are telling their patients, I don't

12  see any credible threat -- I don't see any threat, period, I

13  certainly don't see a credible threat to the plaintiffs under

14  Section 2.

15         THE COURT:  But as was pointed out, their Facebook

16  posts and advertisements don't include that clear statement.

17  Are those problematic because they don't?

18         MR. KOTLARCZYK:  No.  No, Your Honor, I don't think

19  they are, not -- again, not absent there being some sort of

20  other indicia, and I can't even think of what that could be

21  standing here today, as to something that would make it

22  untruthful.  But that statement in and of itself is not going

23  to be the basis for any sort of action under here.

24         And the focus on Section 2 is another area I think

25  where the plaintiffs' argument has shifted this morning.  He

1   suggested we might have missed it in their briefs, and if

2   that's the case, then I confess we did miss in their briefs

3   where they were arguing that Section 2 was going to be

4   unconstitutionally applied to them.  Their briefs focused on

5   the legislative declaration in Section 1 and then the board

6   action in Section 3.  There's a couple cites to Section 2, but

7   their argument -- I know there's a claim in their verified

8   petition for void for vagueness under Section 2, but that was

9   not the focus of either their motion for preliminary

10  injunction or their reply brief.

11          And I think, you know, the reason for the shift here

12  is because they've achieved much of what they sought out to do

13  through the TRO.  They wanted an assurance that they are not

14  going to be prosecuted under Section 1, Section 3.  We have

15  given that assurance.  The State defendants have accomplished

16  much of what the Court expressed its concern as in issuing the

17  TRO by disclaiming any enforcement of the statute while the

18  rulemaking conducted by the boards goes forward.

19          The State defendants have done what they can to

20  address these concerns, including, you know, the patient

21  treatment won't be interrupted.  Well, you've heard from

22  Mr. Delp that there's going to be no enforcement of the 23-190

23  by the Medical or Nursing Boards.  There's no harm to First

24  Amendment interests because you have heard from Miss Hanlon

25  Leh that there's going to be no enforcement against Bella

1      THE COURT:  All right.  Well, I appreciate

2  everybody's efforts.  I know we are all working under some

3  time pressure for obvious reasons in this case.  I'm going to

4  take this question under advisement.  As you know, the

5  temporary restraining order that we entered expires by its own

6  terms and under the rules, I guess, either just after midnight

7  on Saturday or sometime on Saturday.  So I will for sure get

8  something out that resolves the present motion for a

9  preliminary injunction and the status well before then,

10  hopefully a couple of days before then, and then we will go

11  from there.

12      So I'll take the motion under advisement, and if

13  there's nothing further, the Court will be in recess.  Thank

14  you all.

15      (Proceedings concluded 1:23 p.m.,

16      April 24, 2023.)

17
                        REPORTER'S CERTIFICATE
18
        I, JULIE H. THOMAS, Official Court Reporter for the
19  United States District Court for the District of Colorado, a
    Registered Merit Reporter and Certified Realtime Reporter, do
20  hereby certify that I reported by machine shorthand the
    proceedings contained herein at the time and place
21  aforementioned and that the foregoing pages constitute a full,
    true and correct transcript.
22      Dated this 2nd day of May, 2023.

23
                          _____/s/ Julie H. Thomas_____
24                          Official Court Reporter

25