# Exhibit L:

# Transcript of House Judiciary Hearing on SB 23- 190 (excerpts)



# Certificate of Accuracy

Transcription of **House Judiciary [Mar 28, 2023 - Upon Adjournment]_2023-03-28-09.38.32_52421_14431_36.3gp** in English

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **30 March 2023**

Signed: *MindCaplin*
Name: Mindaugas Caplinskas
Position: CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

1



# COLORADO HOUSE JUDICIARY COMMITTEE HEARING
# MARCH 28, 2023

**[06:47:43] Mr. Chair:** Judiciary committee, will come back to order. We've given the sponsors of our next bill, which is Senate Bill 190, a few moments to get their presentation ready. We have the witness, uh, order ready to go for after that. Just as a reminder, we'll begin with the opening presentation by the sponsors. There will be not more than 30 minutes of Q&A by the committee following that. As with the last bill, we'll have, uh, one extended, uh, discussion with witnesses, uh, for both sides. The issue total of present, uh, comments and-and questions of that panel not to exceed 30 minutes in either case.

And then we'll proceed with the rest of witnesses, the standard two minutes, as with the last bill. Um, with that, sponsors, whoever would like to begin with your opening presentation for Senate Bill 190, Rep. McCormick.

**[06:48:32] Rep. McCormick:** Thank you, Mr. Chair. And, um, hello committee. Happy to be here to present Senate Bill 23-190. And, um, thank you for your long hours already here today. We all know that, um, the series of bills working their way through the Capitol right now are in response to protections against safe abortion care being stripped away from many states after last summer's Supreme Court decision. And we have seen a significant rise in crisis pregnancy centers that are using advertisements that give consumers the impression that they offer full reproductive care.

Uh, they-- in this way, they're luring folks in with deceptive ads. They're not offering all options for reproductive care. They are targeting certain members of our communities that already face multiple barriers to reproductive healthcare. And many thousands of people, as you know, are coming to our state from other states and are mistakenly finding themselves at these centers. Uh, I see this as an example of bait and switch, honestly. It is harmful and it is wrong.

Comprehensive reproductive care includes access to contraception, emergency contraception, otherwise known as the morning-after pill testing and treatment for STIs. Pregnancy testing, ultrasound, prenatal advice, abortion or referral for abortion in a complete range of sound science-based medical advice by licensed medical professionals. When a person seeks a full range of services and is fooled, deceived, or outright lied to by what is stated in an advertisement that is not a form of free speech protected by the First Amendment, instead, it qualifies as deceptive trade practice and restricting this form of speech is regulated by consumer protection law.

Senate Bill 190 does two things. It's just a short bill. [chuckles] It states that if one of these centers advertises that they offer or implies that they offer abortion care or emergency contraception, and they know that they do not offer these services, then they have engaged in deceptive trade practice and the attorney general can step in to stop this form of false advertising. The second part of the bill addresses what is being



called abortion pill reversal. This so-called treatment has absolutely no basis in science, has not gone through safety studies, and is, in fact, been called out by the American Medical Association, the American College of Obstetricians and Gynecologists as unethical, unproven, and false.

In other words, abortion pill reversal is not an actual thing in medicine. To be clear, it is known that when the second drug in the two-drug protocol for a medic-medical abor-bortion is not taken, it is possible that upwards of 50% of patients may remain pregnant. It depends on your gestational, um, period of your pregnancy, um, and multiple other factors. It is the second drug of the protocol that increases the success rate of a medical abortion up to 98%. That means if you don't take the second drug, there is a higher chance that you will remain pregnant regardless of whether you're given a high dose of progesterone or a placebo.

Giving someone a high dose of injectable progesterone, which is what is happening when, um, abortion pill reversal, uh, is talked about when that happens after you've only taken the first drug in the protocol, this does not by any stretch of the imagination prove that progesterone worked as an abortion pill reversal. The claim that a high dose of progesterone reverses an abortion after taking the first drug of the protocol is completely false information. Giving pregnant people false information poses potential danger.

When this is done, it means that those folks are not receiving the legitimate information they need after making the personal choice to not take the second drug in the protocol. They do absolutely have that choice not to take the second drug. No one will make them take the second drug in the protocol. So people deserve honest, complete, standard-of-care medical information when they are making decisions about their healthcare, including healthcare decisions. Science must prove cause and effect. That does not exist for this so-called abortion pill reversal.

Science-based medical studies are critical to patient safety and are relied on by ethical providers. Saying the bill takes away a person's choice makes no sense. We should not allow these fake therapies to trick people into believing they are getting something that they are not. This is lying to people and must be viewed as unprofessional conduct. The bill is calling out this activity in law so that the medical board can specifically address when this activity occurs. That is what is done in Section 3 of the bill.

The bill does not shut down these pregnancy centers. Faith-based counseling is absolutely wonderful for people who are seeking that. Encouraging folks to continue their pregnancy without coercion is also completely fine. All we're asking is that they be transparent about what they provide and equally transparent about what they don't. This bill will help assure the public that these centers must say what they mean and mean what they say. Don't trick people. Be transparent, be honest, send people on their way,



decisions are making-- are made. And we use something called evidence-based medicine. Most of the medicine that we practice does not rely on randomized control trials. They're incredibly expensive. Uh, they take a lot of time. And so we use our personal experience, we use the opinions of the American College of OB-GYN.

Uh, we look at the randomized control trials, we look at case studies, we put it all together and look for what's true and counsel our patients appropriately. So I would hope you would consider that. Um, we've heard already today that women who don't want to complete their abortion can just not take the second medication, um, but we do know from evidence if they do that their risk of hemorrhage is considerably higher. Between 15 and 22% of them will actually hemorrhage, um, which is a life-threatening situation.

Uh, and it turns out that the board would-- so that was presented as a potential alternative for women who choose not to continue, but unfortunately, it places them at much higher risk. And we actually do have scientific evidence, case studies are scientific evidence, that if they take progesterone, the same natural hormone that is being blocked, it more than doubles their chance their baby will survive, and it lowers their chance for hemorrhage. So it's actually a safer alternative than not taking the second pill with a higher chance of her getting the option that she would like.

Um, as far as the American College of OB-GYN, um, it doesn't represent the 90% of OB-GYNs or more who do not do abortion. Um, and the American Medical Association doesn't represent at least 75% of doctors. So while they give opinions, and they do guidelines, they are just that, guidelines, they're not necessarily standards that we have to follow. Um, the next thing I'd like to address is Dr. Creinin's study which we heard in the Senate and we've also heard referenced today.

The only randomized control trial looking at adding progesterone. And so I'd ask you to carefully listen to the witnesses today, uh, including myself, hopefully, um, that the people who hemorrhaged with that were the people who did not receive the progesterone. Um, as far as the ones who needed a surgery to complete the abortion and one of them needing a transfusion. The one who did get the progesterone who hemorrhaged was the one who actually went on to abort. And so she completed her abortion and did not need surgery or a transfusion.

So I would ask you to listen to both sides on that and look for what's actually true. And, um, I would agree that people need all of the information, so I hope you'll also consider that. Thank you.

**[08:07:34] Madam Vice Chair:** Thank you. We'll go next to Dr. George Delgado. Is he online?

**[08:07:41] Dr. George Delgado:** Yes, I am.



**[08:07:42] Madam Vice Chair:** Oh, wonderful. Thank you.

**[08:07:44] Dr. Delgado:** You're welcome. Thank you very much for having me. My name is Dr. George Delgado. I'm representing myself as well as Steno Institute and I've been providing abortion pill reversal services since, uh, 2009, and I was one of the pioneers of abortion pill reversal. Abortion pill reversal is safe and women who are given the opportunity to reverse their chemical abortions are very-very grateful.

The Abortion Pill Rescue Network reports that they have documented over 4,000 live births after successful reversals. I authored a study with, um, some other, uh, researchers in 2018, which looked at over 500 women who were attempting, uh, abortion pill reversal. With the best protocols, the abortion pill reversal success rate was 68%. This compares very favorably with the figure of survival of an embryo who's exposed to a Mifepristone and nothing else is done, which is only up to 25%.

Now, abortion pill reversal is also safe. In our study, we showed that, um, the birth defect rate was 2.7%, which is about equal to the birth defect rate in the general population in the US of about 3%. Additionally, the preterm birth rate was only 2.7% and that compares very favorably with a 10% preterm rate in the general population. The abortion pill rescue network is a-- has a hotline where women call in who are interested in abortion pill reversal. They-- if they want to go forth with reversal, they're connected to doctors who are competent and caring and are willing to help them and prescribe progesterone to reverse their chemical abortions.

Now they report-- they get about 150 new starts per month, and they report that in the last year there have been nine reports of adverse reactions and those were six cases of dizziness, one case of nausea, one case of heartburn, and one case of, uh, pain at an injection site in a patient who happened to be getting injected progesterone instead of oral progesterone.

Now, that's nine cases out of an estimated 1,800 patients, which is adverse reaction rate of 0.005%. That's right, that's two zeros before the five, also could be stated as five per 100,000. I've spoken to hundreds of women who have gone through abortion pill reversal, both those that I've treated myself as well as those treated by others, and they've expressed a profound heartfelt gratitude for the opportunity to second chance at choice.

Now, some of our critics have cited this study by Dr. Mitchell Creinin. It was-- uh, and others. It was published in Obstetrics and Gynecology first online in December of 2019, saying that it supports that abortion pill reversal is unsafe. I don't think anything could be further from the truth. Let's look at a couple of things in that study. First of all, the women who were in the progesterone group had continued pregnancies at a rate of 67% compared to the women who were in the placebo group who did not get abortion pill reversal. Their continuation of pregnancy rate was only 33%. Those effectiveness rates compare very favorably with the data that I reported to you just a minute ago.



Now, how about safety? Now, I want to quote the study itself that the authors themselves state that progesterone is safe. Quoting from the article, "First, patients who receive high dose oral progesterone treatment do not experience side effects that are noticeably different than placebo." Now, this study was stopped after three women, as you just heard, uh, called 911 and went to the emergency department. The first woman, she was in the progesterone group. She got abortion pill reversal treatment. When she got to the emergency department, again, I want to quote the study directly, "No intervention was needed." That is she really didn't need to be in the emergency department. She had brisk bleeding like many women do when they go through chemical abortions.

The other two patients were in the placebo group. They did not get progesterone, they did not get abortion pill reversal treatment. Both of them required emergency suction aspiration abortions. They needed secondary surgical abortions because they had retained products and because they were bleeding significantly, severely bleeding. One of them required a blood transfusion because her hemoglobin dropped significantly. So really what this study shows is it supports that abortion pill reversal is effective and it does not show that abortion pill reversal is unsafe

. If anything, it shows that giving Mifepristone and not doing anything else is potentially unsafe.

**[08:12:40] Madam Vice Chair:** Thank you. We will go next to, let's see, Tamara Axworthy. And there's about 10 minutes re-remaining in this panel.

**[08:12:53] Tamara Axworthy:** Okay, thank you. I'll try to be fast. Thank you Mr-- or Madam Chair and committee members. My name is Tamara Axworthy, and as a pregnancy center CEO in Colorado, I am testifying in opposition to SB 23190. This bill is in violation of RIA because these laws specifically add restrictions to reproductive healthcare. When amendments for health and safety were proposed during RIA amendments, they were thrown out by sponsors saying that they were against any and all restrictions regarding reproductive healthcare.

How now are we talking about adding restrictions to choice less than a year later? It is important to consider the potential costs associated with passing redundant bills, such as the time and resources required for enforcement, compliance, the lawsuits, and other challenges, which are in additional concern to this bill as it doesn't account for any. Due process is a fundamental right enshrined in our constitution. It is the bedrock of our legal system and provides a safeguard against the abuse of power.

Without due process, individuals are left vulnerable to arbitrary, unfair, and purely subjective treatment by those in positions of authority. This bill, by not providing for due process, risks undermining the various fabric of our democracy. It gives the government unchecked power to act against its citizens without any oversight or accountability. It's a



**[08:23:11] Madam Vice Chair:** Mr. Nussbaum.

**[08:23:14] Mr. Nussbaum:** Yeah. That-that was actually the law that was essentially challenged in the fourth circuit decision I, um, spoke about briefly recently. Um, the issue there is that would certainly be compelled speech if what you required a crisis pregnancy centers to do is to say, we provide these services and we don't provide these other ones. Um, and that would, uh, run afoul of the First Amendment.

**[08:23:37] Madam Vice Chair:** Do you have a follow-up?

**[08:23:38] Rep. Marshall:** Uh, even if it applied to every reproductive health center.

**[08:23:43] Madam Vice Chair:** Mr. Nussbaum.

**[08:23:46] Mr. Nussbaum:** Uh, you know, I'd have to look at the specific hypothetical or the-the bill language that you're talking about to perhaps give a-a more informed answer. But I still think the problem of compelled speech would be present there.

**[08:23:59] Madam Vice Chair:** Great. Thank you, Representative Bradley.

**[08:24:02] Rep. Bradley:** Thank you, Madam Chair. Um, gosh, sometimes being a healthcare worker, I get really perplexed when we see big money behind certain things. 50 million spent on midterm elections by Planned Parenthood, $400,000 given to them through Federal Grants, FDA, and Planned Parenthood making quotes together about abortion access. And then we have this pill that can give a woman a choice. And we're all about choice. I hear it from all of you guys. Even if we don't agree on things, we agree on choice.

And I'm just wondering, um, maybe Dr. Delgado, why do you think the FDA hasn't approved abortion pill reversal when the only significant risk to the mom that-that you've seen as drowsiness or other things like that? Why-why-why are they dragging their feet? Thank you.

**[08:24:52] Madam Vice Chair:** Dr. Delgado.

**[08:24:54] Dr. Delgado:** Yes. Well, the FDA approval process first requires a, um, either a researcher or a drug company to submit an investigational new drug, um, application. And so that has not happened yet because as you probably know, uh, or you may not know, but 20% or so of all prescriptions in the United States are prescribed what's called an off-label fashion. For example, um, Terbutaline is not produ, uh, approved-- it's approved for asthma. It's not approved to stop preterm labor. But it's used mostly to stop preterm labor, not for asthma. That's an off-label u-use that's been used for a long time. So off-label use is-is very common.

32

**7**



And so using off-label use, uh, progesterone in abortion pill-pill reversal, um, is-is perfectly fine. Now, in the future, probably we will get an FDA indication, but that-that's a process that has to be started.

**[08:25:47] Madam Vice Chair:** Um, are there-- I have a question. Do you have a question as well? I am curious, um, for the physicians, I, you know, the AMA says that there isn't any credible scientific e-evidence that a medicated or a medication abortion can be reversed. Can you tell us why, Dr. Delgado? Sorry, go ahead.

**[08:26:09] Dr. Delgado:** Yes, I think, um, the AMA has definitely become an agenda-driven organization. Like, uh, a previous speaker said they probably only re-represented about 25% of their, um, of physicians. Um, they and ACOG have never told their constituents as to what they feel about abortion. But, uh, the leadership has become very much in support of abortion. And, uh, I think because of that, they-they're very agenda-driven.

But I've-I've briefly laid out the science and the science is there. Um, I have an analogy I like to use, which is, uh, CPR, cardiopulmonary resuscitation. When CPR, uh, was first, uh, described to be effective in animals, it was tried in humans. And once we saw that it-that it worked, we didn't do any randomized, uh, placebo-controlled trials with CPR and allow some people just to die on the sidewalk. No, that would be unethical.

So now we have enough evidence with, um, with abortion pill reversal, both in rat studies and a large number in human studies. We have over 4,000 documented births after, um, successful abortion pill reversal. We have documented safety. Even a study that I think was actually designed to disprove APR, according to Dr. Creinin's own comments in an, um, in a magazine article, it actually shows that, uh, it supports us. So there is scientific backing there.

It's not the highest level of scientific evidence, but we don't require that for CPR. This is essentially CPR for the pre-born baby. This is something that does not have an alternative. This is something that women desperately seek when they change their minds. There-there's a percentage of women in there who want a second chance of choice, and I think it would be very tragic if you deny them that second chance of choice.

**[08:27:50] Madam Vice Chair:** Thank you. And-and just a quick follow-up. I'll-I'll get there. I'm sorry. And part of the ethical concerns are about how you actually, uh, conduct any sort of, I don't even want to call it experiment, but how you would conduct a study, um, around this pill. Is that correct? In the reversal of it?

**[08:28:10] Dr. Delgado:** That's correct. And, you know, our feeling is that it would be unethical to have a placebo group where you allow the, uh- the preborn baby to die. Instead, uh, in our future randomized control trials, we will study different treatment arms and compare different progesterone treatments to see which one is more



effective. And that would be a very legitimate way to, uh, get good, uh, efficacy or effectiveness data, as well as get more of the, uh, safety data.

**[08:28:39] Madam Vice Chair:** Okay. Thank you. Uh, a-apologies. We'll go to Rep. Luck and then Representative Armagost, go ahead.

**[08:28:43] Rep. Luck:** Thank you, Madam Chair. So my question is for you, Dr. Wheeler, we-- I guess there's two parts. My understanding is that the-the pill, the abortion reversal pill is really just natural progesterone. It's just a natural hormone that is prescribed for other purposes. If that's- if that's incorrect, please let me know, um, in your answer. But off of that, my question actually relates to another witness's testimony about the fact that OBs may be put in a situation under this law where they actually are limited in their ability to treat women with miscarriages for fear that they might end up treating someone who has actually taken the first abortion pill. Do you think that that is a legitimate concern in terms of your practice experience?

**[08:29:30] Madam Vice Chair:** Dr. Wheeler?

**[08:29:32] Dr. Wheeler:** Thank you for those questions. Um, first of all, it is a bioidentical hormone, which means it's-it's the exact same chemical. It comes from plant, but it's the exact same chemical that the woman's ovary makes. Uh, we use it all the time through my practice. Uh, I practiced for 24 years and, uh, we used it for people with recurrent miscarriage, which by the way, it took almost 30 years to prove in studies that it worked. Um, but it did work for people's recurrent miscarriage. We used it for in-vitro fertilization.

It's now used from second trimester on for women with preterm birth is category B by the FDA for safety, for use in pregnancy. Which means, uh, that while there are not, uh, it was not directly studied in pregnant women, there has been no harm evident from it. And it's studied while in animal studies. So category B is the most common drug that we use during pregnancy and call it safe. The second question was about miscarriage. And I have heard concerns, uh, in fact, uh, a real story of a woman coming in with mis-- uh, what looked like maybe a miscarriage. And the woman admitted to the doctor, she had taken the medication abortion. And in that situation, you know, what is she to do if she cannot offer--

The woman desperately wanted a change, um, in her approach. She wanted to maintain her pregnancy. She said, "You know, I just-- I was frightened, so I did what I thought I had to do, and I wish I could save my baby." And so now you've got a woman bleeding and ultrasound showing a live heartbeat. And now this law saying, "Well, I'm sorry. We know that it's effective. Um, here are the studies, but I can't give it to you because the legislators said no." Even though we have a lot of scientific evidence that shows, you know, your biggest harm might be some bloating and headache. So--

**[08:31:21] Madam Vice Chair:** Thank you. Representative Armagost.



cause infertility and sepsis and is seen as an urgent medical concern. The AAC had performed sexually transmitted infection testing for which she had never received the results, and they performed a bi-manual exam on her.

For those who do not know, a bi-manual exam is when a medical provider places two fingers in a person's vagina and presses on their cervix to determine if there's uterine inflammation. This exam is incredibly invasive and not indicated for most people who have simple vaginal concerns such as irritation. When this patient was seen in my clinic, it turned out she had not needed a bi-manual exam because she had a yeast infection. An infection this AAC claimed could be able-- that it was able to diagnose and treat not pelvic inflammatory disease.

She had undergone this invasive exam that was not indicated for her symptoms and was diagnosed with the wrong condition, which caused an immense amount of emotional distress. I contacted CDPHE about this case to report the AAC for poor quality and gross negligence of care and was informed that because they are not a health center licensed through the state, they had no authority to investigate. This is just one example of an AAC preying on a vulnerable patient who subsequently received improper negligent care and why I ask you to vote yes, on SB-190. Thank you.

**[10:11:23] Mr. Chair:** Okay, thank you. All right. Um, Ms. Shot, um, I'm gonna come to you in a moment. Uh, we're trying to sort of alternate panels, uh, by prospective for and against. I-I have, uh, a log here showing you're signed up against. So will this make you part of the next panel. For now, we'll go to questions of the four witnesses who have just testified in a support position. All right. Madam Vice Chair, then Rep. Bradley.

**[10:11:49] Madam Vice Chair:** Thank you. This-this question, it might be a little bit of a series is for Dr. Creinin. I'm curious if you can tell us about, um, in these situations, how I think it's Mifepristone works and why progesterone doesn't work in these situations. And then if you could share a little bit about the two drug protocols for medical abortion.

**[10:12:12] Dr. Creinin:** Sure. Well, thank you for your question. So first let me start out by saying that the basis of the concept of abortion pill reversal is with the idea that there's claims that doctors give high-dose progesterone to women who are at risk of miscarriage. And one of the former, um, uh, panelists for the opposition actually stated that when there are multiple large randomized trials showing that-that high-dose progesterone does nothing to prevent miscarriage except in a very, very minutiae of patients. Those who have had three or more losses and are actively bleeding are the only group where it makes a minimal difference.

I mean, truly minimal difference. So, the whole idea that this does something is already based- and that doctors use it is already based on the idea that it doesn't do anything, right? So then when you look at how Mifepristone works, Mifepristone binds to the progesterone receptor incredibly strongly. And progesterone, the hormone, means progestation so, a woman who is in early pregnancy has a lot of progesterone around.



Mifepristone binds more strongly to the progesterone receptor than progesterone itself and sticks to it, kind of like a-a bear hug. And it sticks to it for a long time.

So, the idea that I can then give more progesterone, and that somehow is gonna stop this bear hug makes no clinical sense. We also know from a lot of evidence with hormones that animal models do not translate to human models. So, anything in an animal just doesn't matter when it comes to hormones. It's for hypothesis generating only, and you need human studies to show that there really is any evidence. We've seen this with estrogen, with progesterone, um, in the uterus, uh, in other organs within the reproductive tract. So, you can't make that translation. And that's just basic science. Uh, your final question was how does the drug- how does the drug regimen work? Um, is that correct?

**[10:14:02] Madam Vice Chair:** Yes.

**[10:14:03] Dr. Creinin:** Okay. So, Mifepristone is, uh, usually the first drug administered. It weakens the attachment of the pregnancy to the uterus, as I said, by binding to the progesterone receptor and not activating the receptor. So, it's a dud hormone. So, by blocking the receptor, progesterone itself no longer can get to the receptor. The- uh, that will weaken the attachment of the pregnancy to the uterus. And at some point later, anywhere from a few hours to a few days, depending on the patient's preference and how she uses the second drug so, you use Misoprostol. Now, Misoprostol is a prostaglandin analog.

Um, prostaglandins are hormones released by the uterus. Um, for any woman who's ever had cramps, that's from prostaglandins. So, we are giving, uh, an analog over prostaglandin to cause the uterus to cramp and contract. We know if we give the prostaglandin analog by itself, it doesn't cause the pregnancy to come out as well as if the preg- as if it's been weakened. The attachments weaken first, and that's what Mifepristone does.

**[10:15:04] Madam Vice Chair:** Thank you.

**[10:15:05] Mr. Chair:** All right.

**[10:15:05] Dr. Creinin:** I apologize.

**[10:15:09] Mr. Chair:** Okay, Rep. Bradley, I think we had you next.

**[10:15:12] Rep. Bradley:** Yes, thank you, Mr. Chair. I wanna explain, 'cause there's a lot of lawyers in this group and there's not a lot of health care workers. And I think, Rep. Bacon you're asking a lot of really good questions. Random control trials, you can't have those in situations like this, because you can't have a woman decide if she's not gonna have her baby and then get put into a group where she does have her baby, and vice versa. Does that make sense? You can't really have random control trials. And



Mifepristone, I think, was approved by the FDA, not based on random control trials. So, I'll let the doctor answer that question.

Um, his study involved 10 whole people and had to stop early and didn't prove-prove that progesterone was not effective. So, according to—there's-there's cases, 754 patients, so high dose progesterone more than doubled the chances of a continued pregnancy. 68% of women who had high doses of progesterone ended up having a successful pregnancy. The birth def-defects didn't even go up. We have 150 abortion pill reversals per month. 1,800 patients this year with a 0.005% chance of adverse reactions. We're not giving someone a crazy drug, everyone. This is a naturally occurring drug that you make in your body.

I was put on progesterone after I had in-vitro to support my twins. So, I'd like to be very clear when we're talking about random control trials, when it's not-- you ca-- there's no efficacy to do it. Because if I am a woman that chooses a-and gets chosen to be in a placebo group, but I'm- I want to have the progesterone and keep my baby, then that's not ethical. And I hope that that makes sense. Thank you.

**[10:16:46] Mr. Chair:** Um, Rep. Bradley, was that--

**[10:16:48] Dr. Creinin:** Is there a question in there? Am I able to respond?

**[10:16:49] Mr. Chair:** Yeah. I was gonna ask if that's a question.

**[10:16:51] Rep. Bradley:** Yes. Explain if Mife-- I can't even pronounce the word-- was approved by the FDA with random control trials.

**[10:16:58] Mr. Chair:** Doctor?

**[10:17:00] Dr. Creinin:** So, the FDA does not require randomized control trials for drug approval, but there is a process that a drug goes through multiple phases of testing. So, one of the important concepts in drug approval is the first phase of testing, the first in human studies are in patients who are not at risk. So, you take people where the outcome doesn't matter, and you provide them with the drug in different doses to get an idea of the safety and the potential efficacy. And you have to establish a lowest minimally effective dose, which means you also are establishing do-- you're using doses that don't work, in a sense, you will get a no effect treatment. So, the first rule in FDA approval of something is prove safety first. Now, safety has nothing to do with whether there are adverse effects- adverse effects of the drug. Does somebody get a headache, nausea, or something like that? Safety is for the purpose that's being used, does a bad outcome potentially occur? So, safety in this case would be in somebody who's used Mifepristone, do bad events occur if you provide this treatment, if they don't take Misoprostol? And the reason to understand this is so that we can provide appropriate counseling for patients.