# Exhibit O:

# Transcript of June 5, 2023 Joint Shareholder Meeting



# Certificate of Accuracy

## Transcription of **Stakeholder Meeting 06 05 2023.mp4** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **07 August 2023**

Signed _MindCaplin_

Name Mindaugas Caplinskas

Position CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

1



**STAKEHOLDER MEETING**
**SB23-190**
**JUNE 5, 2023**

**[00:00:05] Darcie Magnuson:** Hello? Welcome and thank you for attending this joint stakeholder meeting via webinar today. The date is June 5th, 2023, and the time is 2:01 PM. Before we begin, we would like to introduce the staff members from the Division of Professions and Occupations that are present. My name is Darcie Magnuson and I'm a regulatory analyst within the Division of Professions and Occupations. Also attending is Paula Martinez, Program Director of the Colorado Medical Board, Roberta Hills, Program Director of the Colorado Board of Nursing, Dmitri Kunin, Senior Program Director and Dire-- uh, Program Director of the Board of Pharmacy, and Sam Delp, Senior Program Director.

To give you a quick overview of what we will be discussing today during this joint stakeholder meeting, um, so why we are here, we are here on behalf of the Board of Pharmacy, the Colorado Medical Board, and the Board of Nursing to get stakeholder feedback regarding the implementation of Con-- Colorado Senate Bill 23-190, and we'll talk about the rulemaking procedure and the stakeholder engagement process, and then we will ask for targeted feedback from stakeholders. And finally, we will go over the next steps, um, for this legislative implementation process. So, why we are here today?

So, um, you are likely here because you received the notice or heard from someone else about this stakeholder meeting regarding the implementation of Senate Bill 23-190 specifically in the law, um, it does say that the boards specified in Subsection (2)(a), which are Pharmacy, Nursing, and Medical, shall promulgate applic-- applicable rules no later than October 1st, 2023 in consultation with each other concerning whether engaging in medication abortion reversal is a generally accepted standard of practice.

So, that is what we will be focusing our stakeholder engagement on today, and what we are requesting from you is specific input regarding what those rules should look like, and that information then will be taken to each of the respective boards, the Medical, Nursing, and Pharmacy boards, um, as they determine what rules should be a-adopted to implement this new law. Um, we can also answer questions and then discuss next steps at the end. So, the rulemaking procedure, just a general overview, um, the rulemaking process for all state agencies within the executive bra-- executive branch is detailed in the Co-Colorado Administrative Procedure Act in Title 24 of the Colorado Revised Statutes.

So, there are four stages of the rulemaking process. We are at the beginning of the rulemaking process, which is the early stakeholder engagement. Um, and then from there we will file the notice of proposed rulemaking with the Colorado Secretary of State, and throughout this can-- this ongoing timeline, we are continuing to re-- uh, request and receive stakeholder feedback. All of that will be taken to the boards, um,



and then there will be a permanent-- um, an emergency rulemaking hearing, um, and at that hearing, stakeholders have a final opportunity to address the boards before the boards decide whether to adopt, um, their proposed rules.

And then at that hearing, the boards will determine what rules to adopt. So, we are at the beginning, um, and like I said, if you want more information about the rulemaking process, all of that can be found in the Colorado Administrative Procedure Act in Title 24. So, with respect to today's meeting, um, how to participate, so, we are, um, asking for feedback. This is 100% virtual and we appreciate your flexibility with that. We do wanna reiterate the importance of your comments. Um, DORA makes decisions every day that affect your life and your business, and so your input is vital in this rulemaking process.

Throughout this process, our goal is to have the boards create regulations that clarify and explain legislation and implement and comply with the directives of Senate Bill 23-190. So, like I mentioned, your input will be part of the information that goes to the Medical Board, the Board of Nursing, and the Board of Pharmacy, as those boards determine what rules and regulations should be adopted to in compliance with Senate Bill 23-190. This meeting, um, is being recorded and we will post the recording on each of those boards' websites, um, by the close of business tomorrow.

That information can be found under the public notices tab, um, on the board websites, and that's the same place where you can find, um, once draft rules are drafted, you can find those under the public notices tab as well as all written stakeholder comments, um, that have been received. We do update those, um, daily as we received-- receive new comments. We have received a lot of comments regarding this imple-implementation, and so sometimes it's hard to navigate through those. There are bookmarks on the side, if you download them and use, um, the-the PDF, you can navigate through them more easily.

Um, and then as far as today's meeting, you can participate by raising your hand and we will unmute your line, um, so you can be heard by everyone, or you can type into the Q&A feature of the Zoom webinar and we will read your comments out loud for the recording. Um, and then we do ask that when you are making comments, um, that you state your name and the name of the organization that you represent, if any, and you can provide general comments.

Um, we do have the targeted questions that were sent out in the notice, and we will get to that a few slides down, um, or if you have specific language that you think the board should co-consider in the draft rules, you can give us that information as well. And we do ask, um, in the interest of time and because of the number of attendees that you, uh, limit your comments to two minutes and, um, try not to repeat something that someone said, but if you agree with something that someone else said, you can let us know that and it will be noted.



Um, if you're using audio through your computer, please put any phones on vibrate or turn them off, and if you're using computer or phone audio, try to keep, um, background noises to a minimum. So, with that, we will move on to the targeted feedback, um, and call on people who would like to, um, provide comments. So, I show Angela Mojica, I show your hand is raised, so I'm gonna unmute you, and we should be able to hear you. It looks like you unmuted.

**[00:07:22] Angela Mojica:** I appreciate that. I actually only raised my hand to let you know that the audio was working.

**[00:07:26] Darcie:** Great. Thank you. All right. Richard **[unintelligible 00:07:36]**, I unmuted you.

**[00:07:42] Richard:** Hi. Yes, hi. Thank you so much. Um, can you hear me okay?

**[00:07:45] Darcie:** Yes, thank you.

**[00:07:46] Richard:** All right. Um, well, thank you so much for this opportunity. My name is Dr. Richard **[unintelligible 00:07:51]**. I'm a board-certified obstetrician and gynecologist as well as a fellow in maternal-fetal medicine. I'm licensed to practice medicine in the state of Colorado. I represent myself. Um, so I've had a chance to review the literature on, um, uh, progesterone reversal, and there was a-a prospective article in 2018 in the New England Journal, uh, that expressed concern for, uh, when legislatures in-in-intruded into the relationship between physicians and their patients.

And I- and I realize that, you know, this is, uh, uh, you know, not a legislature setting, but, uh, I hope to maybe, uh, uh, maybe offer, uh, some examples, uh, in how I-- um, we might go about, uh, you know, minimizing, um, you know, any kind of, uh, intrusion between physicians-- uh, between the legislature and-and the relationship that patients have with their physicians. So, um, many voices have suggested that there is no evidence for medical reversal in a patient who changes their mind, uh, after mifepristone administration, uh, but I feel that banning medication abortion reversal prevents the very research that, uh, critics are calling for.

For example, there is no carve out or exception made for re-researchers conducting an IRB monitor trial. Um, also of note, um, some may claim that progesterone is ineffective, uh, but the-the vague wording of the legislation would also prevent the investigation of, uh, additional efficacious agents. So, um, you know, I just wanna make sure that we're-we're doing-- all doing evidence-based medicine and-and that we're free to research progesterone and alternatives-- alternative agents. So, and lastly, progesterone is a safe medication. There are 134 studies, uh, at clinicaltrials.gov that are actively recruiting patients or awaiting results. So, I encourage using the most permissive language possible in any recommendations. Thank you.

3

<span style="color:red">4</span>



**[00:09:53] Darcie:** Thank you very much. I'm gonna go ahead and lower your hand. Um, next I have, um, Marcus Button, I have unmuted you. Marcus Button? You should--

**[00:10:13] Marcus Button:** This is Marcus Button. Thank you. I-

**[00:10:15] Darcie:** Yes, ah.

**[00:10:16] Marcus:** -appreciate the opportunity. Uh, yes. I'm a family physician and, uh, I'm practicing in Cañon City, Colorado. I, um, I'm board-certified and licensed in Colorado, and, um, I am one of the physicians that actually prescribes progesterone for women who have chosen reversal. Uh, I did obstetrical care for many years and used progesterone successfully to support pregnancies before. So, when I read Delgado's studies, especially 2018 series, which was convincing, I felt very strongly that, as Dr. **[unintelligible 00:10:47]** said, and I agree with his, uh, assertions, that, uh, we need to be careful about interfering with physicians and patients, uh, that, uh, progesterone was effective.

So, I've used it, oh, many times for patients, and we've seen some successful pregnancies result after mifepristone was administered in, uh, many of my patients. So, now, naturally, um, [clears throat] you know, the questions that have come up is whether or not this is a acc-- you know, generally accepted standard of care. I would ask the board what is the standard of care for reversal if Delgado and other researchers' information is incorrect about progesterone? I think it is correct, and I think it leads us to, uh, one conclusion, that that's the only remedy that women who don't wanna have a-- uh, abortion go through after they've taken mis-- mifepristone.

That's the only remedy that they have right now, and there-there is data to support it and, uh, I think it should be something that, uh, is lightly regulated, if at all. And, uh, certainly being called unprofessional for prescribing it is, uh, inappropriate in my opinion. I think it's, uh, an overreach by the state legislature to do that. So, I'm happy to take questions, uh, about that opinion, um, but, uh, again, I-I also agree with, uh, Dr. **[unintelligible 00:12:00]**. Thank you.

**[00:12:04] Darcie:** Thank you, Dr. Button. I'm gonna go ahead and lower your hand. Next, I show Catherine Wheeler. I have unmuted you. Catherine Wheeler?

**[00:12:18] Catherine Wheeler:** Yes. Thank you for this opportunity. Can you hear me?

**[00:12:22] Darcie:** Yes. Thank you.

**[00:12:23] Catherine:** Thank you. I am a board-certified OBGYN doctor. I do not practice anymore. I practiced for 24 years and I represent myself. Uh, my practice did include abortions. My comments I submitted online, um, so I'll be brief. Um, the first is on progesterone use in our practice as OBGYN. I had-- uh, we've had experience for well over 50 years. Uh, first, it is a safe medication. It's been reviewed by the FDA in

4



1999 as safe without increase in any specific or general numbers of birth defects. It's listed as category B for pregnancy, which is really about the best we can do. Uh, I believe Tylenol is in the same category.

The American Society of Reproductive Medicine, uh, has considered it safe for luteal phase support and for in vitro fertilization. For my own patients, in that 24 years, I had quite a few patients with unknown etiologies for recurrent miscarriage, and that was well before we had any studies that really showed that there was significant benefit. They were-- uh, some confirmed, some denied that there was any benefit, but I could counsel my patients.

Um, and this is a very similar situation to what we're talking about, trying to save the life of an unborn child, and I could counsel them, "This is what we know about safety, it's category B. Um, I don't have data to say this is for sure going to help, however, it's a very low-risk medication and it's the only thing I can offer." And I had great success, I never saw a hemorrhage. Um, and about, uh, three or four years ago, two studies came out confirming that there was a 3% improvement. That was the PROMISE study and the PRISM study. So I-I would encourage, um, the board to look at this apolitical and really look at evidence-based medicine. Thank you.

**[00:14:26] Darcie:** Thank you, Dr. Wheeler. I have, um, Stacy Swagger next. I have unmuted you. Stacy Swagger?

**[00:14:41] Stacy Swagger:** Yes, I'm here. Can you hear me?

**[00:14:44] Darcie:** Yes.

**[00:14:45] Stacy:** Hi, my name is Stacy Swagger. I'm an RN-BSN. Um, I am representing myself. I have worked OB all the way through to the other side and done hospice care. Um, I believe that I'm just gonna do these questions right in a row. Engaging in medication abortion reversal should be a generally accepted standard of practice, and, um, the reason being is that medical practice is that way for a reason. There's a relationship between the doctors and their patients. And, um, I know that they always try to let the patient guide their own care.

They make recommendations, they do the best that one-one doctor may choose one medication to treat the same condition that a different doctor would choose a different medication for, and that is why that they go to school. That's why they do all of the things that they need to do to become well-versed with the medical practice and what medications are good. So, the boards, I don't think there need to be any other adoption of rules or regulations because rules and regulations are already very strict around what doctors can and cannot do, and, um, like these doctors have spoken before, they've all done-- they've used this in their practice.



They've used medical, um, abortion pill reversal, um, in their own practices. They've used it for pregnancies for years, and many other doctors have as well, and I've seen that in my OB experience as well. So, I feel like the rules and regulations that are in place need to be there, but we don't need to add anything else because doctors are already under a lot of scrutiny. Um, so I just feel like this is a-- why would we take away somebody's choice? We're not gonna take away their choice to choose abortion. Why would we take away their choice to choose not to continue that abortion? Thank you very much.

**[00:16:42] Darcie:** Thank you. Um, next I show Emily Heckman. You are unmuted on our end. Emily Heckman?

**[00:16:53] Emily Heckman:** Hi. Yes, can you hear me?

**[00:16:55] Darcie:** Yes.

**[00:16:56] Emily:** Perfect. Hi, my name is Emily Heckman. I'm a board-certified **[unintelligible 00:17:00]** clinical pharmacist. Um, I have six years of practice experience. I held a doctorate of pharmacy from the University of Georgia, um, and currently practice here in Denver, Colorado. I should also add that I'm a mom, um, and I got a babysitter for this meeting, but if you hear anything, I apologize. Um, so in regards to the first question, um, you know, the evidence for both sides is weak.

I feel that, um, you know, Creinin and colleagues out of UC Davis had his study, um, [clears throat] and, you know, Delgado had his, as others have mentioned. Um, and there's not a lot of evidence either way. However, this is a toxicology treatment, and that's very common in the toxicology world not to have great evidence. So, I feel that calling for a huge swath of evidence, um, for abortion pill reversal is kind of unheard of and unusual.

Um, however, the Creinin and colleague study, I feel, really highlights what could happen if we remove progesterone, um, because in those patients they had a lot of bleeding out, um, and specifically in the patients that only got the-the mifepristone and not the mispa-- mi-misoprostol. Um, so I'm afraid of what might happen, um, if we remove the progesterone option and patients decide, "Hey, I took the first pill, I changed my mind, I'm just gonna stop." Um, there's a lot of risk with that. Additionally, um, taking mifepristone alone has a 77% rate of abortion, um, so they likely won't save their child.

In regards to rules and regulations, um, Heartbeat International is the main organization that helps with abortion pill reversal, and they have a large list of, um, rules that they make the patient sign off on, [clears throat] but just to summarize, I'm running out of time, um, basically ensure the patient doesn't have an ectopic pregnancy, ensure that it's not an incomplete abortion, um, and if they do start to show signs of abortion to go ahead and offer that care, but I believe we should allow abortion pill reversal in the state. Thank you.



[00:19:00] **Darcie:** Thank you. Um, next I show Scott Sundheim. I'm trying to get to the unmute. Uh, Scott Sundheim, you are unmuted.

[00:19:14] **Scott Sundheim:** Great. Thank you for the chance to speak. Uh, I am completing my 22nd year as a medical doctor, the 17th in Colorado. I'm a board-certified emergency physician. I use those same skills that I use in the ER, treating early pregnancy patients. Also, as the Medical Director of Life Choices Pregnancy Center in Loveland and in Longmont. So, clearly, I- I do not think that, uh, prescribing progesterone is unprofessional conduct. On the other hand, it's a-a good use of my skills.

So, this is a question of how modern medical practice operates with imperfect data. So, I submitted a two-page summary of all the human data, which is modest, uh, that talks about progesterone after mifepristone, and it can't be reviewed in two minutes, but it's incumbent upon the board as part of their due diligence to have that orally discussed during their-their meetings later on. And so whether that's with me or with a, uh, a panel of people, then-then I think that's a must do. Uh, I'd like to focus in the last minute here on two illustrations of modern medical practice and how it uses evidence.

Uh, as our pharmacist, uh, uh, just so clearly stated that overdoses, which are also part of my specialty, uh, often have weak data, and so let me give this specific example of calcium channel blocker overdoses that is listed as the most frequent fatal cardiovascular drug overdose, and often, uh, the first-line therapy is said to be high-dose insulin, but it turns out that the, uh, evidence for that, even in 2023, is only very low level, grade D on the grading scale, which is animal studies and low-quality observational studies. So, the board can't say that for progesterone as a overdose treatment after the anti-progesterone mifepristone, uh, just because that has modest evidence, uh, it cannot be said that that's outside the standard of care because that is just the standard of care for overdoses. Uh, thank you very much.

[00:21:20] **Darcie:** Thank you. Um, next is Lloyd Benes, I apologize if I mispronounced your name. Lloyd Benes?

[00:21:33] **Lloyd Benes:** Are you able to hear me?

[00:21:34] **Darcie:** Yes.

[00:21:36] **Lloyd:** Okay. Uh, my name is Lloyd Benes. I'm a, uh, a mechanical engineer BS and MS, and I represent myself. Scientific evidence favoring medication abortion reversal is found in preclinical studies. First, a study showing progesterone reverses mifepristone abortions in rats. Secondly, retrospective case studies of 547 women showing 68% baby-saving results with progesterone. Thirdly, over 4,000 women have safely achieved medical abortion reversals, and I submitted a paper with the, uh, sources for those earlier. People who receive financial gain from abortions may exhibit a compromised ability to make impartial decisions or to present unbiased information.



Legally speaking, members of the Colorado Medical, Nursing, and pharmaceutical boards who perform abortions or participate in abortion procedures, including prescribing or selling medical abortion drugs, need to seriously consider recusing themselves and abstaining from these discussions on medication abortion reversal. A leading opponent of medical abortion reversal is Dr. Mitchell Creinin, but he has a conflict of interest serving as a paid consultant of Danco Laboratories which distributes mifepristone, contrasts this with Dr. William Lile, board-certified obstetrician and gynecologist and one of 500 contact do-doctors for abortionpillreversal.com.

He has personally paid for the progesterone he has prescribed to 16 clients. These financials make Dr. Lile's testimony more credible than Dr. Creinin's. Organizations like Planned Parenthood, ACOG, and the AMA also advocate for abortion and reject medical abortion reversal and are compromised by financial gain from abortions. To ensure unbiased decision-making, the three Colorado state boards should seek input from organizations who don't receive financial gain on these procedures, such as AAPLOG, American Association of Pro-life Obstetricians and Gynecologists, to answer the three stakeholder questions.

Medication abortion reversal is generally accepted standard of practice when based on testimony that is not compromised by financial conflict of interest. And so, the two, uh, recommendations I would be making is that, uh, you inform the pregnancy centers that this is acceptable and you in-inform both, uh, pregnancy centers and abortion clinics that they should inform their clients that if they changed their mind about having an abortion after taking mifepristone, that abortion reversal with progesterone has a good chance of saving the baby's life. Thank you for your time.

**[00:24:09] Darcie:** Thank you. Next is Kaea Beresford. Kaea Beresford?

**[00:24:21] Kaea Beresford:** Hello, can you hear me?

**[00:24:22] Darcie:** Yes.

**[00:24:24] Kaea:** Hi. My name is Dr. Kaea Beresford and I am an emeritus member of, uh, The American College of, u-um, Obstetricians and Gynecologists, uh, and I personally will not financially benefit from any of this since I suffered a disability in the operating room and can no longer practice, I am representing myself. Um, but from ACOG, uh, reading, you know, both literature and what the professional organization recommends, they say facts are important.

Medication abortion reversal, and they put reversal in quotes, is not supported by science, and there's a lengthy article, but one of the big studies that was, um, a controlled IRB approved 2020 set-- um, it was- it was done in 2020 and that's the Creinin study that they had, uh, talked about earlier, they actually ended the study early because it was dangerous to women undergoing this, um, with the progesterone. So, I think it's important that we listen to science and the experts. I don't think everyone is

8



biased if they know what they're doing. I think that we should listen to expertise, um, and thank you for your time.

**[00:25:47] Darcie:** Thank you. Next is Chelsea Mynyk. Chelsea Mynyk, you are muted.

**[00:25:57] Chelsea Mynyk:** Great. Thank you. Um, my name is Chelsea Mynyk and I am a certified nurse midwife here in Colorado. Um, when considering the abortion pill reversal, this actually brings two issues to mind, safety and choice, and as a provider, both of these are very important. The abortion pill reversal uses bioidentical progesterone, meaning it is structurally similar to the progesterone our bodies naturally make. We use this to reverse the effects of mifepristone.

Progesterone has been used in pregnancy since the 1950s for conditions such as IVF, recurrent miscarriage, and research studies have shown that there are no increased risk of birth defects in children born after this reversal. Concerning that it's not approved by the FDA, there are many medications that we use and they're considered off-label, such as magnesium sulfate to slow or stop preterm labor and treat preeclampsia, methotrexate is used off-label to manage an unruptured tubal pregnancy, or Zoloft is used off-label to help men with premature ejaculation.

So, natural bioidentical progesterone has been proven to be safe and effective, as mentioned in some of the research studies earlier, and it can help support pregnancy. This should not be restricted for use in just one particular situation when it's politically driven. When we have become, or when have we become a profession that makes decisions based on political voices rather than our patients' needs. We are our patient's advocates, and that's what a midwife means to be with a woman. We are to support them in their decisions. And choice is the last one, to address quickly. We need to allow a woman to choose to continue her pregnancy, and the abortion pill reversal allows for that choice to stay there. Thank you so much.

**[00:28:04] Darcie:** Thank you. Next is Tom Jensen. Tom Jensen, you are unmuted. Um, Tom Jensen, I show your hand is raised. If you unmute on your end, we should be able to hear you. Great.

**[00:28:28] Thomas Jensen:** Okay. Can you hear me now?

**[00:28:29] Darcie:** Yes. Thank you.

**[00:28:30] Thomas Jensen:** Okay, great. So, my name is Dr. Thomas Jensen. I'm board-certified endocrinologist here in the state of Colorado and I'm here today to talk about this, uh, uh, issue of abortion pill reversal. First, I wanna mention one thing, this did not come to us, to the board today because of patient advocacy groups or patients coming out reporting against harm by this practice of use of abortion pill reversal. We're here today because individuals in the state of Colorado, Colorado legislature decided

9

**10**



that they should put their, uh, decisions politically against doctors, and so this is what we have to remember, this is not patients reporting this problem.

This is legislators assigned to be doctors. Two, and second point is we need to have no harm. Okay? First off, as many have mentioned, progesterone has been shown to be very safe in pregnancy. The studies by Dr. Delgado looking at 754 women have shown that it's been safe with, uh, no increased risk of birth defects. The Creinin study, which is not a big study, I may add, which ended prematurely because two out of the five in the placebo arm needed an emergency D&C or blood transfusion. The one out of five with the progesterone arm did not need inter-intervention when she-she went to the ED.

In fact, there's been studies looking at the progesterone pill that shows that about 12.8% to 15.4% of women in a study from 2011 in BMJ, needed to go to the emergency room because of incomplete, uh, abortions or needed surgical management, okay, 'cause of hemorrhages or complications. Okay? So, Creinin's study does not show that this is unsafe. All right?

Finally, you know, we have to think about, you know, what alternatives can we offer to our patients? We don't really have much in the way of other alternatives, except the w-watch and wait procedure. And then, in addition, I'd say, how have we done this against other o-overzealous use of, say, antibiotics, which we show evidence that acute sinusitis doesn't improve with antibiotics, but we regu-regular routinely prescribe these all the time, and the Infectious Disease Society and ENT Society say we should not.

Has the Board come out against rules against doctors prescribing antibiotics for acute sinusitis? I don't think so. So, I think all those points suggest that we should not be egregiously going after doctors for this less rare practice. Thank you.

**[00:30:57] Darcie:** Thank you. Show that we've gotten through everyone, um, with raised hand. So, I will go over, or read for the recording the written questions, or comments that we have received through the Q&A. Um, first is from-- We have from Jennifer Barrett, MSN, RN, CNS, SANE-A, SANE-P, "Please provide clarification regarding the term 'medication abortion reversal.' What does this term actually mean and what meds are you referring to?"

Um, and you should be able to see, I think in the-the answered questions, um, from Sam Dell within the language of the bill, Senate Bill 23-190, abortion reversal is defined as medication abortion reversal, which means administering, dispensing, distributing, or delivering a drug with the intent to interfere with, reverse, or halt a medication abortion.

Um, Lindsey Carlson asked, "Not sure if this is the place to ask, but what was the original rationale for creating this law?" Um, as Sam Dell mentioned, Senate Bill 23-190 was passed by the legislature and signed by the governor during this legislative session. If you want to listen to all of the legislative, um, hearings on this, you can do



that on the Colorado State Legislature's website, um, and follow along through that in the process of how the law came to be.

Um, Stacy Swagger, "How can Dr. Beresford and others say there's no proof for progesterone use, when we have many physicians nationwide who say they have used this process? Are they calling all these physicians liars? Are we seeking license revocation for these physicians, if we believe they're doing this illegally, or recklessly? If we aren't seeking to revoke their right to practice, then why should we not take them at their word?"

Um, and then finally, Chanel Heermann, um, MD, DFA, PA, "A licensed to practice medicine in Colorado. The various suggestion that treatments with modest evidence can be considered standard of care, flies in the face of the principles of evidence-based medicine. Generally accepted standards of practice are based on evidence, and the consensus of our colleagues. Neither of these standards can recommend reversal of abortion.

Similarly, the suggestion that experts in all aspects of women's reproductive care, including abortion services, should be disregarded as biased, and biased is circular logic. The same bias could be applied in reverse, stating that any physician already providing these reversals, or affiliated with these crisis pregnancy centers should be similarly recused."

Okay. Um, and then it looks like, um, Angela Mojica, "The Colorado Reproductive Health Equity Act states that, 'A pregnant individual has a fundamental right to continue a pregnancy and give birth, or to have an abortion, and to make decisions about how to exercise that right,' and that, 'A public entity shall not deny, restrict, interfere with, or discriminate against an individual's fundamental right to use, or refuse contraception, or to continue a pregnancy and give birth, or to have an abortion in the regulation or provision that benefits the facilities, services, or information, or deprive through prosecution, punishment, or other means, an individual of the individual's right to act, or refrain from acting during the individual's own pregnancy, based on the potential, actual, or perceived impact of the pregnancy, the pregnancy's outcome-outcomes, or on the pregnant individual's health.' Um, please consider the impleme-- Implications of removing this option for women, and vote to allow the use of progesterone to reverse the effects of Mi-Mifepristone. Thank you for your time."

Um, Kaya Bereford, "There's no proof for progesterone used for this indication. It is not standard of care." That takes us to the end of the written. Um, and I'm gonna go back to raised hands. Uh, Thomas Perille. I have unmuted you. Thomas Perille.

**[00:35:35] Thomas Perille:** Yes. Thanks for this opportunity to talk to you. I am a, uh, retired board-certified internal medicine specialist, and I have some relevant experience pertaining to this topic. I, uh, am an individual who, uh, served for the medical board to



evaluate cases to determine whether a practitioner demonstrated a generally accepted standard of care and practice. And so, I-I'm familiar with those standards.

They include determining whether a, uh, medical provider exercised the degree of care, skill, and diligence expected of the ordinary, careful practitioner in the same or similar circumstances, and also to determine whether a prudent practitioner might have treated the patient differently. Uh, based on that standard. Um, it's clear that abortion pill reversal would meet-- Would-would be an accepted standard.

That is because there is, uh, a moderate level of evidence that a progestin can reverse the abortive **[unintelligible 00:36:31]** effects of Mifepristone. There's a low level of evidence that, uh, progesterone, specifically, can double the chances of **[unintelligible 00:36:40]** pregnancy in women, who have previously taken Mifepristone. Uh, there's level, uh, C, uh, evidence that expected management, which is the only alternative therapy is potentially more dangerous, associated with increased risk of hemorrhage, and needs for surgical intervention, transfusion compared to, um, the administration of progesterone.

Um, so, you know, based on that standard, uh, that I've used as a person who evaluated cases for the medical board, this would meet a generally accepted standard of practice. I've also have relevant experience because I, uh, created guidelines, and it's quite clear that you could have a Class 1 recommendation, which is the strongest class of recommendation on, uh, based on low-level evidence-- Well, level C evidence.

That's because when the benefit, perceived benefit, in this case, a life saved, far exceeds the risk, in-in-in this case, progesterone has been demonstrated to be, uh, moderately, I mean by-- Based on moderate evidence to be safe in analogous obstetric indications. So, it's a- it's, uh, benefit is huge. The-the-the risk is low. Therefore, this is at least a Class 2A recommendation based on, uh, Class C, or limited data evidence, but, uh, it could be as much as a Class 1 recommendation, uh, uh, you know, to be fair.

So, I-I hope you take that into consideration, as you adopt these rules. And I-I think that there's-- We should actually, uh, make a effort to endorse this as a best practice, accepted standard of practice, given the current level of evidence. Thank you so much.

**[00:38:10] Darcie:** Thank you. Next is Kara Brown. Kara Brown, you are unmuted.

**[00:38:22] Kara Brown:** Thank you very much for this opportunity. Um, I am a board-certified family nurse and physician, who's also boarded in adolescent medicine practice role medicine here in Johnstown, um, and have delivered over 500 babies. I-I wanna speak-- I wanna first thank all my colleagues who have spoken to the-the science and the evidence, and encourage you, uh, all to read Dr. Perille's written statement that outlines it in great detail.



I wish to speak a little bit more to, um, to how it, um, uh, will affect me as a rural physician, and as a woman taking care of large numbers of adolescents. And I feel like this puts me in a-a very difficult spot, should a young woman come into my office having made a decision the day before, two days before, and wishing she hadn't? Having a boyfriend who said, "I-I don't want this child," and then the next day calls her, and has changed his mind.

This is the only opportunity I have to-to make a difference in this young woman's life, and I wish this to not be taken away from me. I've even thought, "Well, what will I do if this happens? Will I send them 45 minutes north of Wyoming? What colleague in Wyoming do I know that I can send them to?" And this is the first time in my career that I've ever been told I couldn't save a life, or at least try to save a life with something that's safe, and a reasonable alternative.

There's gathering evidence. We want-- they want to say there's not adequate evidence, but, um, there's over 5,000-- 4,000 babies that have been saved so far. There's over 1,300 providers who are doing this in every-- In all our states, and 86 other countries that have been documented. So, I would ask for you to look hard at the evidence, and give us the opportunity as physicians to help our patients in this state, and not have to send them elsewhere. Thank you.

**[00:40:24] Darcie:** Thank you. Next is Tamra Axworthy. You are unmuted. Tamra Axworthy.

**[00:40:38] Tamra Axworthy:** Yes, good afternoon. Thank you for your time. [crosstalk]

**[00:40:40] Darcie:** Sorry, I'm having a hard time understanding you. You're--

**[00:40:46] Tamra:** Oh, am I loud enough?

**[00:40:47] Darcie:** It's just very quiet.

**[00:40:50] Tamra: [inaudible 00:40:51]** Is this sounding better?

**[00:41:00] Darcie:** A little bit. Um, it sounds like you might be [crosstalk] far from your microphone. I'm not sure.

**[00:41:07] Tamra:** The reason I'm **[unintelligible 00:41:07]** I'm not sure. **[unintelligible 00:41:07]** Is this better?

**[00:41:12] Darcie:** A little bit.

**[00:41:17] Tamra:** Okay. **[inaudible 00:41:15]** Again, thank you for the time this afternoon. My name is Tamra Axworthy, and I'm speaking for the **[unintelligible 00:41:20]** nurse, **[unintelligible 00:41:22]** in Colorado. **[unintelligible 00:41:23]** has



not **[unintelligible 00:41:25]** admitted **[unintelligible 00:41:28]** the **[unintelligible 00:41:28]** as well as **[unintelligible 00:41:29]** person and options for patients.

Was something that typically happens in the future **[unintelligible 00:41:36]** decision, but the **[unintelligible 00:41:38]** has been **[unintelligible 00:41:39]** times for the day, was that it took some physician's right to prescribe **[unintelligible 00:41:43]** after the approved medications. This bill will now **[unintelligible 00:41:46]** potentially **[unintelligible 00:41:39]** physicians who have appropriate care for their patients.

The **[unintelligible 00:41:50]** position made the difference between a woman **[unintelligible 00:41:52]** and first **[unintelligible 00:41:55]** percent success into this **[unintelligible 00:41:59]** provide treatment. Victims are **[unintelligible 00:42:04]** to evaluate through individual needs **[unintelligible 00:42:06]**. Diabetic patients will be the most receptive of this because of their medical conditions.

**[unintelligible 00:42:11]** has been released.**[unintelligible 00:42:15]** what medications **[unintelligible 00:42:19]** this for the medical **[unintelligible 00:42:21]** maybe quite literally by the current demand and **[unintelligible 00:42:26]** literally everything from **[unintelligible 00:42:31]** to verify whether it's a intrauterine device **[unintelligible 00:42:37]** online, using them to **[unintelligible 00:42:49]** after the **[unintelligible 00:42:52]** for this, has provided evidence **[unintelligible 00:42:55]**

So that's the thing I'll ask and many others in Colorado take some **[unintelligible 00:43:08]** medical and **[unintelligible 00:43:18]** other options. **[unintelligible 00:43:21]** Thank you so much. It's needed for the current **[unintelligible 00:43:29]** as well. **[unintelligible 00:43:31]**

**[00:43:34] Darcie:** I-I think I probably wasn't the only one, but I still had a hard time, um, understanding you. It sounded like you may have been reading from something. If I can suggest that you send that in, so that we make sure we get your comments. You can send that to the rulemaking email address, which is dora_dpo_rulemaking@state.co.us. And that's posted on the notice. Just to make sure that we get the-the full context of what you were saying, 'cause I still had a hard time understanding you.

**[00:44:05] Tamra:** Okay.

**[00:44:05] Darcie:** Okay. Thank you. Next is Krista Brown. I have unmuted you. Krista Brown.

**[00:44:16] Krista Brown:** Okay. My name is Krista Brown, and I oversee the APR Network. We connect women e-exercising the right to reproductive care, and options to continue a pregnancy after taking Mifepristone. I am a nurse licensed in Colorado. Every day we assist callers who find us in desperation. They're often tearful, anxious, and afraid. They come from all classes, ages, ethnic and economic backgrounds.

14

<span style="color:red">15</span>



Many are in challenging circumstances, or have influencers who choose abortion for them. Some are medical professionals. Some have been trafficked, or in pros-- Or used in prostitution. Most are alone, and all desperately want help. Progesterone treatment is commonly used in preventing recurrent miscarriage, or preterm birth IVF support, and treatment during menopause and gender transition.

It should not be a privilege to make this reproductive choice, but rather a right. Just as those who choose to continue a pregnancy after IVF. Condemning these patients to complete an abortion they do not want, is not choice. It's unethical to withhold information, and access to this care from those requesting it. Our network has assisted women in 86 different countries in all states in the US.

Our data shows more than 4,500 women have successfully reversed Mifepristone. Since the progesterone counteracts the harmful effects of the Mifepristone, we do not see ill-effects on the mothers, and no increased birth defects for the babies born after successful reversal. The APR Network consists of nearly 1,400 providers, clinics, and hospitals, all committed to assisting women reverse the effects of Mifepristone, and exercise their right to continue their pregnancies.

As a study conducted by Mitch Creinin proved true, abortion pill reversal provides better outcomes than expected-expectant management. In that study, 80% of the women who receive progesterone after Mifepristone had continuing pregnancies, but only 40% who received a placebo had ongoing pregnancies. [silence]

**[00:46:30] Darcie:** Sorry, are you-- I didn't know the timer was going off. Are you finished, or did you have a couple more things to say, because we lost you? [silence] So, I don't know if it's just me. Sam, can you hear, it looks like she-- [silence] Okay.

**[00:47:00] Sam:** Darcie? Darcie. I can hear you.

**[00:47:03] Darcie:** Okay.

**[00:47:04] Sam:** We can hear you, Darcie.

**[00:47:05] Darcie:** Thank you. I wasn't sure if it was me 'cause I think my internet might have glitched. So, um, Krista Brown, if you have anything else to say, um, go ahead. You're still unmuted. I just didn't wanna cut you off, 'cause I think I might've dropped my connection.

**[00:47:22] Krista:** Okay. Do you know where it ended?

**[00:47:24] Darcie:** Right when the time was going off. So, if you were close to finishing up there, unless Sam or Dimitri, if-if you heard everything then, but I wanna make sure for the record-- [crosstalk]



**[00:47:35] Sam:** I believe we heard everything.

**[00:47:36] Darcie:** Okay.

**[00:47:38] Krista:** Okay.

**[00:47:39] Sam:** You may have dropped momentarily, Darcie.

**[00:47:40] Darcie:** Okay, great. Then, thank you. I'm sorry about that. Um, we will move on to Gina Moore. Um, you are unmuted.

**[00:47:54] Gina Moore:** Hi, thank you for allowing me to speak. My name is Gina Moore. I am a Pharmacist, and Associate Professor at the University of Colorado School of Pharmacy. But, um, speaking today, um, on behalf of the Colorado Pharmacist Society and the legislative chair, we did send in a letter, I won't highlight all of the pieces of that, but just wanted to touch on a few things.

Um, first one is, you know, I think the first question is whether or not the Boards, um, the Boards really are being charged with whether or not this is a generally accepted standard of practice. Um, I would agree. And I think our Board agrees with, um, Dr. Herman who typed in her message that we were unable in a literature search to really determine that there is much evidence, if the evidence is weak at best, to determine, you know, whether this is a generally accepted standard of practice.

And why-- While we don't, you know, while we do represent a lot of our members with a variety of different, um, ethical and religious beliefs, we don't believe that's really the question being asked. And-and the question is simply whether or not it's the standard of practice, and we-we're not able to come up with evidence that would support that.

Even looking at the drug compendia, which are used for reimbursement purposes, um, for different off-label uses of drugs, and certainly, off-label uses of drugs is commonplace. Um, but recognized compendia don't have information on progesterone as an abortion reversal agent. Um, our bigger concern though is really about rulemaking, and whether or not a pharmacist would knowingly, um, dispense progesterone, and be accused of unprofessional practices.

Um, as many of the prior speakers noted, progesterone is commonly used. Um, we know it's commonly used as an adjunct to, um, reproductive, um, therapies. It is safe. We recognize that. It's dispensed widely, but whether or not we were to know that it's being used for abortion reversal, and be, um, determined to be guilty of unprofessional conduct, is that where we're really concerned that, um, should the Boards find that this is the standard of care, we would strongly encourage carefully-- The Boards to carefully consider rulemaking, um, as to whether or not a pharmacist would determine the indication for use of progesterone, and knowingly dispense it and, um, and be accused



of unprofessional conduct. So that's our bigger concern. Um, thank you for the opportunity to-to comment.

**[00:50:28] Darcie:** Thank you. Next is Katie Levin-- Lavin. Um, Katie, I-I unmuted you.

**[00:50:40] Katie Levin:** Yes, can you hear me?

**[00:50:41] Darcie:** Yes.

**[00:50:43] Katie:** Hello, and thank you to the Board members for allowing me the opportunity to testify. [clears throat] My name is Katie Levin, and I live in Glenwood Springs. I am an RN with 22 years of experience in women's health, and I am an employee of Heartbeat International. My role at Heartbeat International is working on the Abortion Pill Reversal Hotline, taking calls from women who have taken the abortion pill, have changed their minds, and want to stop the process.

I'm deeply concerned about this bill, because I am convinced it would be harmful to women in Colorado. Mifepristone and misoprostol have quite a lot of risks. Between 2000 and 2021, the FDA documented 4,207 adverse events after chemical abortion. There were 26 deaths, 1,045 hospitalizations, 603 blood transfusions, and 413 infections. Abortion pill reversal provides another choice for women, many of whom are desperate to stop their abortions.

During each of my shifts answering hotline calls, I encounter multiple women from all over the US and the world, who regret their decision to take the abortion pill. Sometimes they tell me they are worried, it is too late. When they hear that it might not be, it is easy to hear the relief in their voices. Most of them thank me profusely for helping them with this second chance.

If, um, progesterone is given under the supervision of a health care provider, so women can reach out if they experience any problems, nurses are readily available, in case the client can't reach the provider. And as hotline nurses, we also educate each woman, so they can give informed consent, and so they know what to expect from the process if they choose to move forward.

Um, as far as rules and regulations, Heartbeat International already has many in place. So, any abortion pill reversal would be under these rules and regulations, please find that abortion pill reversal is safe, and within the standard of care.

**[00:52:51] Darcie:** Thank you. Um, and that takes us to-- We don't have any more raised hands, so I will go back to the written-- Um, additional written comments or questions that we received. Um, Tom Jensen, "Mifeprex-Mifeprex-," Uh, prex sorry, "-never underwent a randomized control trial. Abortionpill.org reports Mifepristone causes abortion in up to 85% of the time. So the fact a large case series shows 64% to 68% live births is evidence."



Stacy Swager, "Not a question. I agree with Dr. Perille. This was all meant-- All I meant by my last questions. He was much more eloquent." Uh, Lindsey Carlson, "For Senate Bill 23-190, 'Concerning policies to make punishable, deceptive actions regarding pregnancy-related services.' My understanding is that the purpose of the law is to decrease deceptive trade practices, such as lying to patients that you provide abortion or emergency contraception if you do not, and promoting abortion reversal as a standard of care, if it is not. Our purpose is to determine if this is a standard of care, or is it considered deceptive to offer this to a patient as an option."

Lindsay Carlson continuing, "If it is a standard of care, what are the requirements? AC-- ACOG's, A-C-O-G'S, concern is partially based on legislation in other states that requires prescribers to recite a script to the patient that their abortion can be reversed with progesterone, which could be misleading and deceptive if this is- this is adopted in Colorado, as part of the requirements."

Thomas Perille, uh, "Standard of care has nothing to do with a clinical consensus as some have suggested. It can be based on low-level evidence, especially when the potential benefit is large and the risk is low, particularly when the benefit is a saved life."

Um, and then Lindsay Carlson, "Misleading or deceptive due to limited studies and not 100% going to reverse an abortion." We will, uh, wait here to see if anyone else would like to, um, speak or provide any other comments or-- Either through raising your hand, or through the Q&A. Um, and if we don't have anyone else, then we will move on and talk about next steps. So, we'll just pause here for a few more minutes.

**[pause 00:55:42]**

**[00:56:02] Darcie:** And while we wait, like I mentioned, if you do want to follow up with any written comments, um, those are always helpful for the Boards. And you can send those to the rulemaking email inbox, which, um, is dora_dpo_rulemaking@state.co.us. That email address is included everywhere. So, hopefully, um, if I'm speaking too quickly, you can find it on the notice for today's meeting that was sent out, it's on the Board's website. Um, so feel free to continue to provide written comments. And like I said, we post those for others to see and review.

**[pause 00:56:39]**

**[00:57:44] Darcie:** Um, Lindsay Carlson, "I would prefer to use off-label, and not have it officially labeled as standard of practice. Why are the only options having HCP subject to discipline for providing off-label, or to have it accepted as a standard of practice?"

**[pause 00:58:00]**

**[00:58:17] Darcie:** Right. I'm going to go ahead and move on. So, next steps, um, we do want to continue to receive feedback on behalf of the three Boards. And then from



there, we will draft and post the proposed rules for feedback. We currently are planning on a second stakeholder meeting, which is tentatively scheduled for August 4th of 2023. We will send out, um, notice for that to all licensees, and people who have signed up to receive stakeholder, um, updates.

And then from there, all of the stakeholder comments and recommendations will be presented to each Board before the rulemaking hearings, which are tentatively scheduled for the Colorado Medical Board on August 17th, 2023, uh, the Colorado Board of Nursing on September 20th, 2023, and the Colorado Board of Pharmacy on September 21st, 2023. Um, and with that, that does conclude, um, the stakeholder meeting.

Like I mentioned, the best place to find the most updated information is on each Board-Board's website under the Public Notices tab. And you're always welcome to submit written comments to the rulemaking inbox. Um, and we thank you for your participation today, um, and the written comments and verbal comments that we did receive. So we are going to end the webinar at this time.

**[01:00:06] [END OF AUDIO]**