# Exhibit U:

# Transcript of August 4, 2023 Joint Shareholder Meeting



# Certificate of Accuracy

Transcription of **Joint Stakeholder Meeting 08 04 2023.mp4** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **11 August 2023**

| | |
|---|---|
| Signed | *MindCaplin* |
| Name | Mindaugas Caplinskas |
| Position | CEO |

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

1



**STAKEHOLDER MEETING**
**SB23-190**
**AUGUST 4, 2023**

[silence]

**[00:00:11] Darcie Magnuson:** Welcome and thank you for attending this joint stakeholder meeting via webinar. The date is August 4th, 2023, and the time is 1:31 PM. Before we get started, we would like to introduce the staff members from the division of professions and occupations that are present. My name is Darcie Magnuson and I'm a regulatory analyst with the Division of Professions and Occupations. Also attending is Paula Martinez, program director of the Colorado Medical Board, Roberta Hills, Program Director of the Colorado Board of Nursing, and Dmitry Kunin, Senior Program Director of the Board of Pharmacy, as well as Sarah Warner, director of External Affairs.

To provide you an overview of the process of today's meeting, um, why we are here today, we will talk about that first and then we will go through briefly the rulemaking procedure and stakeholder engagement process. We will then ask for feedback regarding the draft rules and then we will finish the meeting with the next steps regarding this legislative implementation of Senate Bill 23-190.

So why we are here today, um, we are here to discuss the rulemaking in compliance with Senate Bill 23-190. The legislature per this legislation required the boards to-- excuse me, the pharmacy board, the nursing board, and the medical board to adopt rules to implement this new law. We will discuss the proposed rules the boards will be considering and the feedback regarding, um, this legislative implementation will be limited to the draft rules which have been posted on each of the boards' websites. We will also drop a link to the draft rules, um, into the chat, um, for those of you, uh, that would like to follow along that way.

So Senate Bill 23-190 specifically says in the law the boards specified in subsection (2)(a) which as mentioned are nursing, pharmacy, and medical, shall promulgate applicable rules no later than October 1st, 2023 in consultation with each other concerning whether engaging in medication abortion reversal is a generally accepted standard of practice. Okay. So the rulemaking procedure, we did talk about this at the last meeting that we had regarding this legislative implementation, but just to give you, uh, an idea again of this process and where we're at. So the rulemaking process is governed by the Colorado Administrative Procedure Act which can be found in Title 24 of the Colorado Revised Statutes.

We are at the beginning-- well, somewhat still at the beginning of the process where we are seeking stakeholder engagement regarding the proposed rules. Once we have gotten stakeholder engagement, then the rules, um, will be filed with-- the draft rules will be filed with the Secretary of State and then each board will have a hearing on the



proposed rules and determine whether to adopt the rules. Um, and that will be done at the hearing that is open to the public, um, and we will go through those dates at the end of the meeting. They're also posted on the board's website which we can talk about more, but we'll specifically share the rulemaking hearing dates, um, later on in-in the meeting.

So how to participate today? Um, so we did have the stakeholder meeting before that is posted on the board's websites. We've also been receiving written comments that are posted on the board's website, um, and we will drop a link to the written comments. Um, it looks like we may have or we will be dropping one into the chat so that you can see all the written comments that we have received.

Just as a heads up, if you download that link, you can open it in a PDF format with bookmarks which may help because we've received a lot of written comments regarding this legislative implementation, so that way you can click through, um, and they're saved by the individual and/or the organization who submitted the comments. Um, we'll continue to rec-receive written comments through the rulemaking email address which was dropped into the chat. It's also posted on all of our notices and on the board's websites, um, and that's dora_ dpo_rulemaking@state.co.us for anyone that's participating by phone.

For today with the written comments, you can either raise your hand and we will unmute your line which we'll get to, or you can use the Q&A function of the webinar. We're gonna go through the draft rules, um, by board, taking comments that way, um, and then if there are general comments regarding the rules, we will take those as well. So we'll start with medical, then we'll go through nursing and then we'll go through pharmacy. So to give you an idea of how that will work.

Okay, so first up we have medical, um, and let me just-- before I go to take comments, I wanna give you a little bit more information about the process and ground rules. So as many of you are aware, um, the division has transitioned to a platform that is 100% virtual, um, and we appreciate your flexibility. DORA makes decisions every day that may affect your life and your business so your input is vital in the rulemaking process.

Throughout this process, our goal is to create regulations that clarify and explain legislation and implement and comply with the directives of Senate Bill 23-190. So, like I said, your input will be part of the information that goes to the Colorado Medical Board, the Board of Nursing, and the Board of Pharmacy as the boards determine what rules should be adopted in compliance with Senate Bill 23-190.

You may have heard at the beginning this meeting is being recorded. It will be posted on each board or program's website-- sorry, excuse me, each board's website by the close of business on Monday. All of the information regarding rulemaking is housed under the public notices tab on each board's website. If you have any trouble locating



anything, you can always send an email to the email address that we provided earlier and it's also in the chat.

Um, as the stakeholder meeting is held solely by webinar, please raise your hand using the hand icon and we will unmute your line. We are going to take individual comments. We wanna make sure we get through everyone, so if you have something as a follow-up comment, we're gonna get through all of the people who would like to speak first, and then if you have follow-up comments, we'll do that next just to make sure we hear from everyone. Um, before we start taking comments, we ask that you state your name and the name of the organization that you represent, if any.

We will be showing, as you can see on the screen right now, the draft rules. You can provide either general comments on the, um, proposed rules or specific language that you would like to be added or considered by the board or changed. We do ask that you keep your comments limited to two minutes. I will have a timer running to make sure that we're mindful of that since we do have a high attendance today. And we ask that you not repeat something that was already said but if you're in agreement with someone else, please let us know and we will note that.

And if you are using the audio through your computer, please remember to put any phones on vibrate or turn them off. And whether you are using computer or phone audio, try to keep background noises to a minimum when speaking. So we will begin with the medical rules. I, unfortunately, was not able to fit them all on one slide which is why we dropped them into the chat so you can follow along. I will do my best to navigate back and forth between the two slides while we're taking feedback regarding the medical rules, um, and then like I said, we'll proceed to nursing and then finally with pharmacy.

The first person that I show has a raised hand is Joelle Campbell or Joelle, excuse me, Joelle Campbell. I have unmuted you.

**[00:08:10] Joelle Campbell:** Hello. Thank you for, um, inviting us to share our feedback. Um, I really appreciate that. Let me just pull up my info. Okay. I'm an RN in the state of Colorado. Um, my name's Joelle Campbell. I'd like to point out first that all medicines were once experimental medicines. Um, we can't begin disciplining providers under false advertising laws because they gave a medicine for an off-label use with informed consent. Um, that's clear.

When I was getting my BSN at the University of Colorado, um, we learned the basics of evidence-based medicine, um, and the scientific method. You ask a question, you form a hypothesis, test that hy-hypothesis, gather data, share your findings. So what starts this whole process? The scientific method starts with a question. Um, if we claim to be a progressive free society, we should not be penalizing people who ask questions and innovate, even and especially when their questions challenge the current standards of practice.

3

**4**



Um, evidence-based medicine means no question should be off the table, um, even when someone questions a deeply held belief. I'm requesting three changes to the document. Number one, I'm requesting a section be added near the beginning clearly stating the board's commitment to evidence-based practice as a dynamic concept that corresponds with ethically testing new ideas. Number two, I request that you clearly state that no provider will be disciplined under false advertising laws for advising their patients that there is a chance of a medication working. Number three, we must say this very clearly and strongly. The state has no authority to weaponize their political beliefs to prevent ethical clinical use of off-labeled drugs. Thank you.

**[00:10:16] Darcie Magnuson:** Thank you. I am going to lower your hand and remove your permission to talk. And next, I show Thomas Peril. I have unmuted you. Thomas Peril?

[silence]

Okay. Um, if you unmute on your end, we should be able to hear you.

**[00:11:00] Thomas Peril:** Can you hear me now?

**[00:11:01] Darcie Magnuson:** Yes, we can.

**[00:11:03] Thomas Peril:** Okay, thank you. Uh, my name is Tom Peril. I'm a physician and, uh, I previously reviewed cases for the medical board. I-I have made some written comments with specific wording that I would like to recommend to the boards, uh, for their review. I-I think it refines the language in a-- in a way that's-that's positive. I-I just wanna emphasize that a generally accepted standard of practice does not need to be popular, common, or widely practiced.

It does not need to be seen as the only approach to a patient with the same or similar circumstances. Does not need to be based on high-level evidence. It certainly should not be dictated by ideology or political considerations. The board must decide what constitutes a generally accepted standard of care for women who immediately regrets her medication abortion decision after taking Mifepristone and after Ipec-Ipecac, is no longer an option.

The current time, there are only two possible acceptance standards of practice. APR using high-dose progesterone expected management. Based on multifaceted evidence, including understanding of the biological mechanism-mechanism of a competitive antagonist, animal studies that demonstrate that progesterone could prevent abortion following Mifepristone, a large randomized trial in humans that demonstrated that a progestin taken with Mi-Mifepristone can quadruple the odds of ongoing pregnancy, which was statistically significant and several case series showing that progesterone can dramatically increase the chances of ongoing pregnancy compared to store controls, APR is clearly a viable clinical option.

4



Furthermore, prog-progesterone use early in pregnancy for threatened miscarriage has been d-determined to be safe for women developing embryos and fetuses based on high-quality Cochrane and nice reviews. That's the highest quality reviews for safety. The only alternative is expected management. Expected management is associated with a 70 to 80% embryo and fetal mortality.

The written testimony from the ACOG, SMFM, and SFP acknowledges that, "Patients in early pregnancy who only-- uh, who use only Mifepristone may be at high risk for hemorrhage." Potential danger from Mifepristone as a single agent was flagged in some of the early studies, uh, examining Mifepristone as a board of patient agent. The concerns were signifi-- magnified by the adverse outcomes report in the Creinin small randomized trial. As a person who's reviewed cases for the board, if a case like this was referred to me, um, it's clear that the benefits of APR far outweigh the-the risk both for the woman and for the developing baby. Um, expected management--

**[00:13:30] Darcie Magnuson:** Dr. Peril, I'm sorry to interrupt you. Can you wrap up? Um.

**[00:13:34] Thomas Peril:** Yes.

**[00:13:34] Darcie Magnuson:** Okay.

**[00:13:34] Thomas Peril:** Expected management is associated with a unacceptable level of embryo and fetal mortality and increased risk of hemorrhage and, uh, requiring aggressive intervention. So I would ask the board to specifically say that APR is an accepted, generally accepted standard of practice today in Colorado. Thank you so much.

**[00:13:53] Darcie Magnuson:** Thank you. Next, I show Erica Pike. You are unmuted.

**[00:14:07] Erica Pike:** Hi. Thank you so much. Um, Erica Pike here. I'm the Director of Policy and Government Relations with the Colorado Academy of Family Physicians. Um, our membership was in support of, um, Senate Bill 190 and we believe the boards really must develop a definitive ruling on abortion reversal as the legislative intent, um, was written. Um, our doctors, uh, believe that, uh, and with the evidence from our medical asso-- uh, the American Medical Association, ACOG and the Family Physician Academy, um, for America, um, have documentation of rever-- the reverse of the-- reversing the effects of abortion medication is not the standard, um, care of practice and, um, as the draft ruling exists today, it would allow for this practice to be deceptively offered to individuals at risk to their health and safety. So we ask and encourage the board to update their ruling. Thank you.

**[00:15:13] Darcie Magnuson:** Thank you. I am going to move just so that we can see the full draft rule, um, and then we will continue. Next is Karen McCormick. You are unmuted, Karen McCormick.



**[00:15:33] Karen McCormick:** I am here. This is state representative Karen McCormick representing the General Assembly and regarding rule under D, standard of care considerations number two. I understand that the board does not regularly adopt rules establishing a single standard of care applicable to all situations. I understand that well as a veterinarian, um, practicing veterinary medicine and the General Assembly also understood that.

That is why in this particular case, being that abortion pill reversal is particularly harmful by taking the place of honest, ethical patient care that the General Assembly has called it out as unprofessional conduct for you in law. Your only task was to determine if at this time in the practice of medicine, if abortion pill reversal is a generally accepted standard of practice scientifically based. If you are able to say that, then that is what goes into the rules. Otherwise, the law stands as is and abortion pill reversal is considered unprofessional conduct.

And then under number three, language referring to informed consent requirements and documentation before providing abortion pill reversal makes the situation even worse. This gives latitude for a licensee to continue to offer this so-called treatment as long as they follow informed consent rules, and as long as no one files a complaint to the board about this practice.

This will allow patients to continue to be misled and harmed by not receiving, um, the information that is science-based, honest, ethical, and factual treatment options. Um, when often time is of the essence. I would ask that you reconsider your draft rules and carefully reread the instructions in CRS 12, 31 22, um, parentheses A as well as B, that the rules need to be written that it is generally accepted standard of practice, or if you can't do that, um, then our law stands. Thank you.

**[00:17:37] Darcie Magnuson:** Thank you, representative Dr. McCormick. Um, next is Sarah Peterson. Sarah Peterson, you are unmuted.

**[00:17:51] Sarah Peterson:** Hello. Thank you. Um, my name is Sarah Peterson. I am a board-certified OBGYN and complex family planning specialist practicing-practicing here in Denver. I also serve as the vice chair for the Colorado section of the American College of Obstetricians and Gynecologists. I'm also a member of the Medical Advisory Committee of Cobalt, and I'm here to strongly request that the medical boards reject the proposed rule that would consider medication abortion reversal as a generally accepted standard of practice.

I would like to be very clear. Medication abortion reversal is not an accepted standard of medical practice. There should be no reason to examine each instance on a case-by-case basis as there is no abortion reversal treatment that is based in science or that meets any generally-accepted clinical standards.



To allow consideration of this rule is dangerous and would compromise patient care and safety. And we cannot allow junk science that was previously referenced in this meeting to dictate public policy or change standards of practice. ACOG is the leading professional membership organization for OBGYNs and they produce practice guidelines that healthcare professionals should follow when practicing evidence-based medicine. ACOG is-is widely accepted amongst OBGYNs and providers of reproductive healthcare as the go-to organization we should use to guide sound medical practice in ethically responsible patient care.

The data and studies that are used by proponents of medical abortion reversal to support their claims are the weakest form of scientific studies and several of the studies that were cited here today were unethically run as they did not have institutional review board approval or any ethical review committee at all involved. The only known study that has been conducted with IRB approval and a randomized control study design, which is considered the gold standard, was ended early due to safety concerns among participants.

ACOG is very clear on their stance regarding medication abortion reversal. It is not a recognized or accepted medical practice and the implications of allowing its acceptance as a reasonable medical practice can and will have grave consequences to pregnant people here in Colorado. Thank you for your time to be able to speak.

**[00:19:58] Darcie Magnuson:** Thank you. [silence] Next is Lloyd Bens or Bennis. I apologize for mispronouncing names. You are unmuted on our end. [silence] Lloyd Bennis?

**[00:20:17] Lloyd Bennis:** Okay. Can you hear me?

**[00:20:18] Darcie Magnuson:** Yes, we can.

**[00:20:20] Lloyd Bennis:** All right. Uh, [throat clear] my name is Lloyd Bennis. I represent myself. I submitted a written testimony that contains the source material for my following words. Proposed Rule D4 says the board will treat medication abortion reversal as a per se act of unpro-- of professional conduct. Will not treat it as an-- a per se act of unprofessional conduct.

I applaud this compassionate stance for women who are considering med, uh, reconsidering medical abortion. This rule unites pro-life and pro-life-- pro-choice advocates on an important issue. Freedom of choice means just that, choice, and choice includes the right to change your mind. I found an integrity example of recusal principles.

Iowa's Pro-abortion Supreme Court Justice Oxley recused herself from an abortion ban case due to her law-- former law firm's involvement in challenging it. Recusal of principles apply to everyone. The Colorado House has ruled 21C, a member who has



an immediate personal or financial interest in any bill or measure proposed before the general assembly shall disclose the fact of the house and shall not vote upon such bill.

Thus, members of the three boards who perform or participate in abortion procedures, including prescribing or selling medical abortion drugs must recuse themselves and abstain from voting on rules. Recusal principles also apply to testimony brought to the boards. Planned Parenthood and Danco Laboratories sell Mifepristone and have vested interest in pushing the claim that Mifepristone cannot be reversed.

Dr. Creinin, the chief critic of APR, is a paid consultant of Danco Laboratories, but during his testimony before the house this March 28th and in his written testimony to these three boards on May 31st, he did not disclose his affiliation with Danco. Transparency and disclosure prevent bias. Testimonies with financial ties require careful scrutiny for integrity of the evaluation process.

I further propose these additional words at the end of Section D3. Abortion providers must inform pregnant women about the availability of abortion pill reversal during informed consent. Failure to provide this essential information violates informed consent principles. Thank you for the chance to give feedback on these draft rules.

**[00:22:41] Darcie Magnuson:** Thank you. [silence] Next is Scott Sunheim. You are unmuted, Scott Sunheim.

**[00:22:56] Scott Sunheim:** Hello. Thank you for the chance to speak. I'm a licensed medical doctor in Colorado. I practice emergency medicine and I'm also the medical director of Life's Choices, uh, two pregnancy centers in Loveland and in Longmont.

In both settings, I regularly treat pregnant patients and their unborn babies. I do prescribe progesterone when it's indicated, including if the woman requests after Mifepristone use. Clearly, I judge this evidence to be sufficient to support its use. The state has heard a plethora of evidence back in March and in June and now, uh, from many expert clinicians saying that yes, we, uh, view the evidence as-as supporting this practice.

ACOG and the AMA are not representative of all physicians and while these other people judge differently, differences of opinion are a daily occurrence in clinical medical practice so that's not at all unusual. I can agree with, uh, the opponents of the draft rules who are against abortion pill reversal.

I can agree that-that these draft rules are not yet adequate to the task given to the board. The board has 13 providers given the task of determining the question and they can't sidestep that task. It's like an incident in the ER early one morning when the staff asked a police officer, "Hey, if I do X, Y, and Z, is that illegal?" And the officer said, "Well try it and find out."



And that was meant as a joke. But the current draft is not a joke. Uh, what it does is threaten me with unethical conduct ruling by the board. And per my contract, I would lose my job, would not be able to support my family. So the medical board must rule and I ask that it determine that medical personnel who obtained proper and formal consent are practicing within the standard of care as of August 2023. Thank you.

**[00:24:57] Darcie Magnuson:** Thank you. [silence] Next is Lizzie Hinkley. You are unmuted, Lizzie Hinkley.

**[00:25:08] Lizzie Hinkley:** Thank you. My name's Lizzie Hinkley. I use she/her pronouns and I'm providing feedback on behalf of the Center for Reproductive Rights as well as our Colorado partners at Colo and New Era. We also submitted a written comment. We believe the proposed rules conflict with the requirements of CRS12-30-120 Subsection 2, and if subject to legal challenge will be rendered void pursuant to CRS24-4-1038A and Colorado Supreme Court precedent.

The statute presupposes that medication abortion reversal is unprofessional conduct unless the boards adopt rules finding it is a generally accepted standard of practice. It directs the boards to promulgate rules concerning whether engaging in medication abortion reversal is a generally accepted standard of practice. In other words, the statute creates a presumption that medication abortion reversal is unprofessional conduct although the boards may rebut the presumption by determining that it is within a generally accepted standard of practice.

The proposed rule turns this presumption on its head. It assumes that medication abortion reversal is not unprofessional conduct and allows the board to find instances of unprofessional conduct on a case-by-case basis where a licensee falls below the standard of care and administering medication abortion reversal. This inversion of the statutory presumption contradicts the statute and is likely void. Further, the proposed rule fails to find whether it is a generally accepted standard of practice to engage in medication abortion reversal.

Based on testimony and evidence presented during the legislative process, the legislature found that medication abortion reversal is a deceptive practice not supported by science or clinical standards. And that licensees who perform medication abortion reversal are misleading their patients. We respectfully ask the board to abandon the proposed rules and draft new rules that do not conflict with the statute.

As no new credible evidence has emerged rebutting the legislature's findings, we urge the board to privilege the legislature's findings and draft new rules finding that medication abortion reversal is not a generally accepted standard of practice. Thank you.

**[00:27:26] Darcie Magnuson:** Thank you. [silence] Next is Faith Winter. I have unmuted you, Faith Winter.



**[00:27:38] Faith Winter:** Hi everyone. Uh, my name is Faith Winter. I am a senator and one of the legislative sponsors of this proposal and I thank you for doing this meeting today and taking in public comment. And I just wanna make it incredibly clear what the legislative intent was because I don't think these draft rules meet legislative intent.

Um, so we talk about the rules should be concerning whether engaging in medication abortion reversal is generally accepted standard of practice or not. That's not what these rules actually get to. And the reason that myself and the other sponsors brought these rules is because we feel that pregnant people are going into these, um, anti-abortion and pregnancy clinics and being shamed into practices that aren't okay. And these practices are not proven.

They're not scientifically driven. We've heard a lot of conversations around, um, making sure that we're res-- That-that we-- That what we are doing is responding to our patients and having these three boards propose these rules that they do not define whether or not medic-medication abortion reversal is generally accepted standard of practice. And so the boards have proposed a complaint-based system is not what we wanted.

That's not legislative intent. That's actually the reverse of the legislative intent. Um, and I'm asking that we hold up legislative intent on what was actually passed. Thank you.

**[pause 00:29:32]**

**[00:29:47] Darcie Magnuson:** Sorry, I clicked the wrong thing. Thank you for that. Let me get back to the screen share and I will move on. Um, one second. **[pause 00:29:56]**

**[00:30:07] Darcie Magnuson:** Okay. Sorry about that. Uh, next is Catherine Wheeler. Catherine Wheeler, you are unmuted.

**[00:30:17] Catherine Wheeler:** Thank you. My name is Catherine Wheeler. I'm a board-certified OB-GYN physician. I practiced for 24 years. I'm in agreement with Joelle Campbell, Tom Peril, Lloyd Benes, Scott Sundheim. As an OB-GYN, I did perform abortions.

You're hearing opposite evidence, and so I'm asking you to look for yourself at the evidence, not just the comments, uh, which is what I have done. You have received a lot of evidence and testimony, both in writing and oral, and it is low to moderate evidence. However, most of the ACOG guidelines are low to moderate evidence, and these are guidelines and opinions, not something physicians are required to follow. ACOG only represents, uh, 7% to 14% of its members who provide abortions. AMA only represents 10% of US physicians.

Since the last shareholders meeting, there is new evidence, which is a rat study, a prospective randomized placebo-controlled trial, which confirmed even rats that had begun to bleed from mifepristone, in other words, beginning their-their loss of the



pregnancy, 81% had live births when given progesterone. So we do have new evidence that affirms the other evidence. This is scientific evidence that's been presented. That's how we prot- practice medicine.

ACOG's only recommendation is expectant management, but when I go to Practice Bulletin 225, reaffirmed in 2023, I quote, "The following recommendations are based primarily on consensus and expert opinion," which is Level C, not evidence. And it says, "In the very rare case that patients change their mind about having an abortion after taking mifepristone and want to continue the pregnancy, they should be monitored expectantly." They also admit that there's a risk of hemorrhage much higher in this situation.

And I see I'm running out of time. I asked you to have an unbiased review of all of the evidence that's been presented. Uh, the impact is on Colorado women who have the right to choose to continue their pregnancy, the lives of their unborn baby, the practice of medicine in Colorado, and your own personal responsibility. Thank you.

**[00:32:34] Darcie Magnuson:** Thank you. Next is Kaea, I believe I'm-I'm not mispronouncing your name, Beresford. Kaea Beresford, you're unmuted.

**[00:32:49] Kaea Beresford:** Thank you. Can you hear me?

**[00:32:50] Darcie Magnuson:** Yes.

**[00:32:52] Kaea Beresford:** Hi. My name is Kaea Beresford. I'm an, uh, emeritus member of American College of Obstetricians and Gynecologists, and I practiced in northern Colorado. Um, I would-- I agree, uh, with Dr. Peterson McCormack and, um, Senator Winter, Center for Reproductive Rights, and I'm sorry, I forgot the name of the family practitioner who also spoke.

Um, I have no financial obligation s- 'cause I am, uh, no longer practicing and no conflicts there. Uh, as a doctor who also did research, you go through internal review board. It's very, uh-- it's very intense, you have to prove, uh, like your literature search and if, you know, are you going to call your study off if there are certain things that come up. But for human studies, it's a very rigorous process to get, uh, an evidence-based study going. Um, if there wasn't evidence-- if there was a human study, uh, I think that would make this much easier to say if it is or is not effective or cause harm, uh, but there isn't one.

And, you know, physicians that I know, you know, any one of us that you asked if we're just going to go anecdotally, none of us think that this is standard of care and neither does ACOG who is the American College of Obstetricians and Gynecologists. Thank you.



**[00:34:21] Darcie Magnuson:** Thank you. Next is Denise Lichtenberger. You are unmuted, Denise Lichtenberger.

**[00:34:35] Denise Lichtenberger:** Yes. Thank you. My name is Denise Lichtenberger. I am a registered nurse in Denver. Um, this is the first time I've ever done something like this, so thank you for the opportunity.

Uh, I'd like to start by saying that abortion pill reversal is definitively not a generally accepted standard of medical practice. At the very least, abortion pill reversal is a misleading experiment. None of the reports that APR proponents point to serve as high-quality research in humans that includes a control group or even just a comparison group and none of the reports use appropriate oversight by an ethics committee. At the very worst, abortion pill reversal is a threat to women and pregnant people by potentially causing delays in accessing legitimate medical care.

Now, I reviewed the written statements submitted to the boards, and one of them compared APR with Narcan and Vitamin K further stating, "A woman who has a right to an abortion also has the right to reverse that choice." Now that seems really reasonable. It's a compelling argument, except that APR cannot be compared to Narcan or Vitamin K.

High-dose progesterone in this case is not a rigorously researched evidence-based reversal agent as the others are. By far, quality evidence does not support APR as an authentic reversal agent after mifepristone intake. And as such, the choice that women would be making, women who take mifepristone and then wish to keep their pregnancies, is regrettably not an informed choice. Therefore, arguments that this legislation somehow violate a patient's choice, autonomy, or right to change their mind, it's quite simply inappropriate and specious. Abortion is an essential part of comprehensive medical and reproductive care, while abortion pill reversal is a political tool and unprofessional conduct. Thank you.

**[00:36:36] Darcie Magnuson:** Thank you. Next is Sidney Fisk. Sidney Fisk, you are unmuted.

**[00:36:49] Sidney Fisk:** Hi. Thank you so much. My name is Sidney Fisk, and I work as an o-organizer for Cobalt. Um, I am here today to affirm that abortion pill reversal is not a standard of care that should be accepted in Colorado, um, and then if this board has any interest in protecting its patients, um, and protecting Colorado in general, um, they will make the appropriate ruling.

We've heard tons of evidence domestically that the ACOG doesn't support APR as a legitimate medical practice, and we also know that the, uh, royal federations, um, don't believe this either. So in the UK, um, if you are on ACOG, which is the royal, uh, version of the Colleges of-of Obstetricians and Gynaecologists, um, they also note that a medical-medical abortion reversal is not a legitimate method of care.



They asked, "Can abortion be reversed by taking progesterone?" And their response actually is anti-abortion groups claim that early medical abortions can be reversed by taking progesterone after the first prescribed medication of mifepristone. However, there is no evidence to suggest that taking progesterone will reverse an abortion and the ACOG and, uh, Faculty of Sexual and Reproductive Healthcare does not recommend using any progesterone in this way.

So not only have there been no successful studies in the US, even our counterparts in the UK can identify that this is not a legitimate medical service but it is another tool of the anti-abortion movement to scare and intimidate people who are capable of pregnancy. If we're going to be real and look at this on-on another layer, we know that these AACs are located in neighborhoods of color, are located in neighborhoods where people are low-resourced, and it's experimental and it's reminiscent of healthcare providers experimenting on bodies of color in the past.

It's remini-- it's reminiscent of sterilizing-- for sterilization, it's reminiscent of eugenics, and it's absolutely unacceptable to say that folks who have obviously an extreme bias can take an illegitimate, illegitimate science and force it on bodies of color and use them as an experiment to figure out if this is something that their-their-their movement can use as a tactic. Thank you so much for your time.

**[00:39:26] Darcie Magnuson:** Thank you. Next is Mar Galvez Seminario. Mar Galvez Seminario, you are unmuted.

**[00:39:40] Mar Galvez Seminario:** Hi. Thank you. Uh, my name is Mar Galvez Seminario. I'm the legislative and research coordinator for COLOR. Uh, we're urging you to actually address whether administering abortion pill reversal meets generally accepted standards of practice. By drafting a rule that attempts to remain neutral on abortion pill reversal, you're legitimizing the unproven treatment and continuing this country's long and ugly history of using communities of color as test subjects for questionable medical experiments.

By valuing-- by evaluating this on a case-by-case basis, you're placing the responsibility on our community members to ensure that medical practice is ethical rather than- rather than on the actual experts that is you.

Um, from stories we've heard, we also know that the stigma and shame felt by those who have experienced it and even have had harm with it are too ashamed to come forth, um, and don't have the resources to report or know where to report to. And by not addressing whether APR meets generally accepted standards of practice, um, and requiring fully informed consent for a procedure for which there is hardly any evidence for the, "risks," benefits, likelihood of intended outcome, et cetera, you're extending this pattern of disinformation to providers who deceive and shame people about their decisions.



Um, intentionally inflicting or allowing medical mistrust causes harm, especially if it might prevent someone from seeking needed medical care in the future. These centers are not equipped to be a source of medical care.

COLOR brought this original legislation, um, that mandated that the board's rule on medical abortion reversal, uh, because of the harm that we know that anti-abortion centers cause. They intentionally are made to look like medical clinics with comprehensive care where most folks cannot tell the difference between them and real reproductive healthcare clinics. But it's well known that these centers are the only places where reversal is administered and the advertisement and the prescription of this treatment is one of their main tactics of deceptive propaganda.

The boards have the opportunity through their legislative mandate to put an end to this harm. COLOR is urging you to clarify whether APR is a generally acc-accepted standard of practice. Thank you.

**[00:41:43] Darcie Magnuson:** Thank you. Joelle Campbell, I see your written comment in the Q&A, which, uh, repeats your oral comments today. So I am going to answer those live and then other stakeholders will be able to see those, but I'm not gonna repeat them as they were already part of the recording.

I don't have any more raised hands. Oh, hold on one second. Um, let me-- Katie O'Donnell, you are unmuted. Katie O'Donnell. Unless that was an error. Okay. All right. I am going to move on to-- I know some of the comments have been related to all three of the boards draft rules. I'm gonna move to nursing and see if we have any comments-- additional comments other than what has already been said regarding the draft rules for the board of nursing.

**[pause 00:42:59]**

Joelle Campbell, I see your hand is raised again. I have unmuted you.

**[00:43:47] Joelle Campbell:** Hello again. Um, thank you for letting me speak again. I just have a follow-up comment. Um, a lot of the arguments here in favor of restricting women's access to progesterone are based on the authority of ACOG and other, um, other agencies like them.

I'd like to remind everyone that medical experts get their authority from research. Um, and as it was stated earlier, there are no human studies on progesterone as a follow-up for mi-mifepristone therapy. So, um, what I'm proposing is let's do some research respectfully to the state lawmakers. You're asking the wrong question here. Um, you're asking whether something is generally accepted. Obviously, there are those who accept and some who reject this practice. What we should be asking is, who is willing to spearhead some ethical human studies? Let's not outlaw something that hasn't been tested, please. Thank you.

14

**15**



**[00:44:46] Darcie Magnuson:** Thank you. And just as a reminder, if we can keep the comments related to the draft rules, that would be great. Okay. I'm not seeing any other raised hands. I'll move on to pharmacy

**[pause 00:45:07]**

while we take a look at these. I do appreciate all of you being here today. And given the number of people who are attending, I appreciate you, um, honoring the two-minute ask that we had to limit your time and test or, excuse me, comments to, given that we did schedule this meeting for longer. If anyone didn't get to finish their comments, I think now it would be appropriate to do that. Um, and then if anyone else wants to add anything, this would be your opportunity as well.

So we will go ahead and wait here to see if anyone wants to add anything to comments already provided regarding the draft rules or if anyone else would like to provide comments. Um, Catherine Wheeler, you are unmuted. Catherine Wheeler, we should be able to hear you when you unmute.

**[00:46:38] Catherine Wheeler:** Thank you very much for the extra opportunity. I did, uh, because ACOG clearly is setting a standard here, I did wanna address some of the other things in their comments. Uh, one of them as they presented evidence was a, uh, "potential for mental health problems," or harm from progesterone, but the evidence that was given was actually just a quote from a survey of women who were seeking an abortion and were be-- to be told by law that there was a potential for reversal, and that was labeled as a stigma. And I want you to note that they did not actually present any evidence for women experiencing mental health from progesterone for reversal of the harm of mifepristone.

The second is that there was a, uh, under ACOG's comments a potential for physical harm to the baby, but the research that was cited was a risk for hypospadias in the offspring. And the drug that was actually tested was not progesterone; it was a synthetic progestin 17α-hydroxyprogesterone acetate. And the FDA had noted this in their thorough review that while this is a-a risk with this specific progestin, it is not a risk with progesterone, and that the progesterone itself is not a cause of increase in birth defects.

The next thing I'd like to say is that ACOG referred to legal cases in state agencies as scientific evidence was-- which it is not. And one of the references was from Louisiana in 2017, which was before the large case series was published. So thank you for the additional time.

**[00:48:26] Darcie Magnuson:** Thank you.

**[pause 00:48:28]**

15

**16**



Thomas. I know that I mispronounced your name the first time, and I think I'm going to do it again. Thomas Peril. Um, let me-- You are unmuted. I apologize.

**[00:48:50] Thomas Peril:** Yes. I mean, you know, it-it's-it's disheartening to me that medical professionals are ignoring a multifaceted body of evidence to support, uh, APR and are blatantly trying to bully the-the-the boards into, uh, declaring it unprofessional conduct.

The-the reason why, uh, these ACOG, SMFM, and SFP have chosen to oppose APR, they candidly revealed in their own testimony, they basically fear that the concept of APR acknowledges ambivalence among women about their abortion decision may contribute to abortion stigma. What translated basically they're more concerned about the image of abortion as a uniformly good choice than the wellbeing of the woman in their exam room who desperately wants to save the life of her child after taking mifepristone. That should shock the conscience of the boards.

I hope again that you make it pretty clear that it-- that abortion pill reversal, while not supported by high-level evidence, it's supported by multifaceted, uh, avenues of evidence, including one randomized large, uh, controlled trial of a different progesterone that showed that you could reverse the effects of mifepristone. Please, be sure to make an acceptance standard of care in Colorado that support the women of our state. Thank you so much.

**[00:50:13] Darcie Magnuson:** Thank you. Um, and I do notice a lot of hands that are coming back up. I don't want this to turn into a debate, so I understand that people-- We wanna hear from you, we wanna hear your opinions regarding the draft rules, but I just want you to keep that in mind as well. So, um, I will continue to move on to, um, Sidney Fisk. You are unmuted.

**[00:50:41] Sidney Fisk:** Thank you again, uh, for this opportunity to make additional comment. Again, my name is Sidney Fisk, and I'm a regional organizer for Cobalt. Um, upon further evaluation and simply actually sitting behind my computer right now doing research, it's becoming more and more apparent to me that APR was not something that was sought out to solve a real medical problem. It's not something that's ever been used to solve a real medical problem effectively, and it's not something that has, um, had robust studies.

We have different international governments recognizing that-that APR is a part of a prop-propaganda from the anti-abortion movement. I don't think that the boards ought to be bullied by religion, by anti-abortion agendas. Um, I think that the board of medication, nursing, and pharmaceuticals should be dictated by just those things. And we revere ACOG, we revere, uh, RCOG. And I think that these boards do actually represent the vast majority of people in their professions and that the vast majority of people in their professions would never prescribe this.



And, uh, that we ought to look for the established science, which is that this is a dangerous and unproven, uh, medical practice. And per-perhaps people would like to see it studied more. And that's not the topic of this debate, but, you know, medical practices are studied thoroughly, thoroughly, uh, before they become standards. Um, and we-we have to protect the marginalized people who are being targeted by this arm of propaganda. Thanks.

**[00:52:44] Darcie Magnuson:** Thank you. Um, again, uh, asking for people to bring it back to the rule discussion. Um, I'm going to go next to someone that we haven't heard from yet, and that is Romana Shadad. You are unmuted. Ramana Shadad. We should be able to hear you.

**[00:53:05] Ramana Shadad:** Yeah. Hi. Um, I'm, uh, a new nurse, I guess I should say. Um, regarding this, uh, yes, as the previous person who was here talking about it, I believe also that, um, as far as what my experience has been and what I have seen happening in the practice, there is no place and space for people's religions and other things, um, and their personal opinions superseding what science says and what scientific research and, uh, scientific practices, um, you know, have proven.

And, um, I am very sure of the fact that, um, when-when abortion is practiced, it's not, um, taken lightly and it is- it is there for a reason which is greater than, you know-- it's like it's a risk problem and all of those things. And we-we cannot put everybody in the same boat and like paint everything in the same brash and say, "Hey, this is how it is, and we're going to have everybody follow this rule because we say so. We-we believe it. And so everybody else should believe it too." So I'm of that opinion, um, from my experience of what I've seen in the medical field and what I have experienced, um, you know, broadly, as long as I have, um, you know, worked. Thank you so much. That's what I wanted to say.

**[00:54:38] Darcie Magnuson:** Thank you. Um, next is Representative Karen McCormick. You are unmuted. Representative Karen McCormick. Looks like you are still-- Okay. You may-- You lowered your hand. If you want to provide anything else, just raise your hand again. Um, Lizzie Hinkley, you're unmuted.

**[00:55:19] Lizzie Hinkley:** Thank you. Um, again, I'd just like to underscore that what's before the board today is implementing rules that carry out the statutory mandate. And it's very simple. The statute found that a presumption that it's unprofessional conduct to engage in abortion pill reversal unless, and only unless, the board's issue rules by October 1st stating that abortion pill reversal is a generally accepted standard of practice. These rules conflict directly as drafted with the statute. Should there be a legal challenge, they likely will be found void. And I just wanna urge the board and others here to focus on what the actual charge of the board is in rulemaking. Thank you.

**[00:56:14] Darcie Magnuson:** Thank you. Um, and we did receive a written comment from Sarah Peterson providing here the statement from ACOG regarding medication

17

<span style="color:red">18</span>



abortion reversal that is also supported by the Society of Family Planning for reference. I'm going to answer that live and then you should be able to see it, um, as stakeholders and then we will-- Um, I have Joelle Campbell. You are unmuted. Joelle Campbell.

**[00:56:49] Joelle Campbell:** Excellent. Thank you for allowing me to speak again. Um, I think we can find a middle ground here. Um, if the boards can affirm their commitment to evidence-based medicine and acknowledge that evidence-based medicine is a dynamic, um, thing that depends on current evidence and new evidence, I think we can co- all come behind that and say, yeah, generally accepted practice, um, to be evidence-based. And that includes being able to be free to use new and innovative solutions for the patients that rely on us for help.

Um, I respect that, you know, the opponents of progesterone therapy don't want people to be jerked around. Um, they don't want pregnant people to be forced into making certain decisions. Um, but I think as far as the draft rules go, um, I really think we should add a section that says something about evidence-based practice is a dynamic concept that corresponds with ethically testing new ideas. And that is what we support. Um, I think that's a good middle ground that we can all come around. Thank you.

**[00:58:07] Darcie Magnuson:** Thank you. Okay. I don't see any other raised hands and we don't have any other comments in the Q&A. I'm just monitoring quickly here before wrapping up the meeting. Okay. Um, so talking about next steps, we thank you for participating in today's meeting. The boards will continue to-to solicit stakeholder feedback. Please submit written comments to dora_dpo_rulemaking@state.co.us. Like I already said, that email address was dropped into the chat. It's also posted on all notices for meeting-- meetings and rulemaking hearings.

The stakeholder comments and program recommendations will be presented to each board before the rulemaking hearings, which are scheduled on August 17th of 2023 for the Colorado Medical Board, September 20th, 2023 for the Colorado Board of Nursing, and September 21st, 2023 for the Colorado Board of Pharmacy. The stakeholder meeting notices and rulemaking hearing notices, um, will-- are always emailed to licensees and stakeholders, and they're posted on each board's website under the public notices tab.

They are also posted on the department's public calendar. This is where you can find the draft rules, the written comments, the webinar registration links, and the webinar recordings. Um, again, thank you. That does conclude our stakeholder meeting for today, and we appreciate you being here and providing comments.

[silence]

**[01:00:14] [END OF AUDIO]**