# Exhibit W:

# Transcript of September 20, 2023 Nursing Board Hearing



# Certificate of Accuracy

Transcription of **Nursing Board Rule Making Hearing 9-20-1.mp4** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **20 September 2023**

Signed    *MindCaplin*

Name    Mindaugas Caplinskas

Position    CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

1



# Certificate of Accuracy

Transcription of **Nursing Board Rulemaking Hearing 9-20-2.mp4** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **21 September 2023**

| | |
|---|---|
| Signed | *MindCaplin* |
| Name | Mindaugas Caplinskas |
| Position | CEO |

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com



# Certificate of Accuracy

Transcription of **Nursing Board Rulemaking Hearing 9-20-3.mp4** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **20 September 2023**

| | |
|---|---|
| Signed | *MindCaplin* |
| Name | Mindaugas Caplinskas |
| Position | CEO |

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com



# Certificate of Accuracy

Transcription of **Nursing Board Rulemaking Hearing 9-20-4.mp4** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **20 September 2023**

| | |
|---|---|
| Signed | *MindCaplin* |
| Name | Mindaugas Caplinskas |
| Position | CEO |

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

**4**



### COLORADO BOARD OF NURSING RULE MAKING HEARING TRANSCRIPT
### SEPTEMBER 20, 2023

**Part 1**

**[00:00:00] Joe Franta:** Hearing pursuant to its rulemaking authorities provided by Sections 12-20-204(1), 12-30-120(2)(b), 12-255-107(1)(j), and 24-4-103 of the Colorado Revised Statutes. The purpose of today's rulemaking hearing is for the board to adopt the proposed new Rule 1.35 rules and regulations regarding generally accepted standards of nursing practice regarding pregnancy-related services to implement Colorado Senate Bill 23-190 concerning policies to make punishable deceptive actions regarding pregnancy-related services on a permanent and emergency basis.

I'm Joe Franta, president of the board. Also, present with me are the following board members, Lori Rae Hamilton, Karrie Tomlin, Lenny Rothermund, Mackenzie Armani, Phyllis Graham-Dickerson, Brandy Valdez Murphy, Nichele Bratton, and Aecian Pendleton. We also have the following staff members present today. Roberta Hills, program director, John Roberts, first Attorney General, Elizabeth Kenney, assistant Attorney General regula-- Darcie Magnusson, regulatory Analyst, and Maria Hernandez, regulatory coordinator.

The notice of this permanent rulemaking hearing is filed with the Colorado Secretary of State in Office of Policy Research and Regulatory Reform on August 15th, 2023, and published in the Colorado Register on August 25th, 2023. Additionally, the notice and proposed rules were posted on the board's website and emailed to all licenses-- licensees and stakeholders-stakeholders. The Office of Policy Research and Regulatory Reform confirmed on September 3rd, 2023 that the board did not receive any requests for a cost analysis-- benefit analysis.

If the board adopts a proposed new Rule 1.35 to implement Colorado Senate Bill 23-190, the adopted rule will be filed with the Colorado Secretary of State and Office of Legislative Legal Services by September 21st, 2023, published in the Colorado Register by-- on October 25th, 2023, and will presumably become effective on October 1st, 2023 pursuant to the procedures set forth in Section 24-4-103 C.R.S. Of the Administrative Procedure Act.

If the board adopts a proposed new Rule, 1.35 rules and regulations regarding generally accepted standards of nursing practice regarding pregnancy-related service to implement Colorado Senate Bill 23-190, concerning policies to make punishable deceptive acting-- actions regarding pregnancy-related services on an emergency basis, then the rule will become effective on October 1st, 2023, pursuant to the procedures set forth in Sections 24-4-103 C.R.S., and SB23-190. During the rule-rulemaking hearing, stakeholders will be allowed the opportunity to provide testimony before the board deliberates on adapting proposed rules.

1



Members of the public will not be able to address the board during its deliberation. Board members may ask questions during testimony only to request clarification of the testimony and if necessary. When providing testimony, the board asks you to please speak loudly and clearly as this hearing is being recorded. State your name and the name of the organization that you represent if any. Limit your comments to two minutes and please try to keep all background noises to a minimum.

All written comments and stakeholder meeting recordings were provided to board members in advance of today's hearing. If you intend to repeat your comments, please do so efficiently. We will begin taking testimonies from the participants on the we-webinar. Please raise your hand by using the hand icon if you'd like to speak, and staff will unmute your line so you'll be heard by everyone or you can type in your comment in the Q&A section of the staff and staff will read it aloud.

**[00:03:57] John Roberts:** Mr. Chair, if I may. Uh, just to clarify for the record, this is John Roberts. Uh, Elizabeth Kennedy-- Kenny is not present today. Just, uh, you-you mentioned her in the opening, she is not present.

**[00:04:12] Joe:** Thank you. Darcie.

**[00:04:16] Darcie:** Thank you. Um, we will begin the testimony portion. The first hand raised is Lizzy Hinkley. Lizzy Hinkley, you are unmuted on our end.

**[00:04:27] Lizzy Hinkley:** Thank you. Good morning. My name is Lizzy Hinckley. I use she/her pronouns and I'm providing feedback on behalf of the Center for Reproductive Rights as well as our partners at Colo and New Era Colorado. We believe that proposed rules conflict with the requirements of CRS Section 12-30-120 subsection 2 and it's subject to legal challenge will be rendered void pursuant to CRS Section 24-4 103 and State Supreme Court precedent-precedent.

The statute presupposes that medication abortion reversal is unprofessional conduct unless the board adopts rules finding it is generally accepted standard of practice. It directs the boards to promulgate rules concerning whether medication abortion reversal is a generally accepted standard of practice. In other words, there exists a statutory presumption that medication abortion re-reversal is unprofessional conduct. The boards may rebut the presumption by issuing rules, finding that it is a generally accepted standard of practice.

The proposed rule turns this presumption on its head. It assumes the practice is not unprofessional conduct, and allows the board to find instances of unprofessional conduct on a case-by-case basis. This inversion of the statutory presumption contradicts the statute and if challenged will likely be found void. Further, the proposed rule fails to find whether medication abortion reversal is a generally accepted standard of practice. Based on testimony and evidence presented during the legislative process, the legislature found that medication abortion reversal is a deceptive practice not



supported by science or clinical standards and that licensees who perform medication abortion reversal are misleading their patients.

During its own rulemaking process, the medical board concluded the practice does not meet generally accepted standards of medical practice. We respectfully ask the board to abandon the proposed rules and draft new rules that do not conflict with the statute. As no new credible evidence has emerged rebutting the legislature's findings, we urge the board to privilege the legislature's findings and like the medical board draft new rules clearly stating that medication abortion reversal is not a generally accepted standard of practice.

Thank you.

**[00:06:48] Darcie:** Thank you.

[silence]

**[00:06:57] Darcie:** We had someone else, um, Mar Galvez Seminario. I hope I did not lower your hand. It looks like you're back. You are unmuted on our end.

**[00:07:12] Mar Gavez Seminario:** Hi, uh, my name is Mar Galvez Seminario. I'm the legislative and research coordinator at COLOR, um, and we're urging you to amend the proposed rules and concur with the medical board that administering medical-- um, medication abortion reversal does not meet, uh, generally accepted standards of practice. The original draft rule places an undue burden on vulner-vulnerable populations, who already do not have the resources or time to submit a complaint. From stories we've heard, we also know that the stigma and shame felt by those that have experienced it, um, will keep them from reporting no matter how great the harm.

By evaluating this on a case-by-case basis, you place the responsibility on our community members to ensure that medical practice is ethical rather than on experts and that is you. By not addressing whether APR meets generally accepted standards of practice and requiring, "Fully informed consent," for a procedure for which there is hardly any evidence on the risks, benefits, likelihood of intended outcome of the proposed treatment, et cetera.

You'd expect this pattern-- you'd extend this pattern of disinformation to providers who deceive and shame people about their decisions. Intentionally inflicting or even allowing medical mistrust causes harm, especially if it might prevent someone from seeking needed medical care in the future. These centers are not equipped to be a source of medical care and COLOR brought the original legislation, uh, Senate Bill 23,190 with new era that mandated the boards to rule on medication abortion reversal.

We brought this bill, now, law, because of the harm, we know, that anti-abortion centers cause. Centers that are intentionally made to look like medical clinics with



comprehensive care where most folks cannot tell the difference between them and real reproductive healthcare clinics, and these are the only places where this, uh, so-called treatment is administered. The boards have the opportunity through their legislative mandate to put an end to this harm. COLOR is urging you to clarify whether apr is generally accepted. Um, standard of practice.

Thank you.

**Darcie:** Thank you. I'm just gonna change the slide so that we can see the entire-- gimme one second. Okay. Next is Catherine Wheeler. Catherine Wheeler, you are unmuted on our end.

**Catherene:** Good morning, thank you for this opportunity. I am a board-certified OBGYN physician. I practiced for 24 years. I represent myself. The one thing that I can say is a lot of medical evidence has been presented, and I'm just asking you to look at it for yourself. This includes a new animal study that has been published-- peer-reviewed, published this summer in June, which clearly shows effective safety-safety, uh, and at least a doubling of survival rate with natural progesterone. I use natural progesterone throughout my entire career during pregnancy, we all have, for multiple indications, FDA, ACOG, ASRM all declare that progesterone use-- natural progesterone use is safe in pregnancy.

I just ask you to look for yourself, um, before you dismiss me, as a pro-life OBGYN, I actually once believed ACOG in my training at face value and performed abortions. The reality of what I saw in the abortion room and for my patients who regretted their abortions did not fit the narrative of my training or my professional organization. And so I looked for myself at the relevant literature. I took innocent lives, you have the opportunity to save innocent lives. Truly life and death are in your hands and evidences there. I asked you to look at.

The American College of OBGYN says, "Well, if they regret their abortion, just don't take them **[unintelligible 00:11:08]**," but they base this on expert opinion and consensus according to their documents, not on evidence. A lot of evidence has been presented to you. There is no randomized control trial. There never will be probably, but a lot of evidence, all of it shows safety and effectiveness. We have something better. We have something safe to offer these desperate women.

As a woman who's **[inaudible 00:11:34]** lost babies to miscarriage, my heart breaks for women who are desperate to save their baby, and I ask you to look at the evidence for yourself.

Thank you very much for your consideration.

**[pause 00:11:44]**



**Joe: [unintelligible 00:12:14]** if you're trying to speak, you're muted.

[silence]

**[00:12:35] [END OF AUDIO]**



## Part 2

**[00:00:00] Nanette Santoro:** University of Colorado School of Medicine. Um, I speak as a citizen and not on behalf of the University of Colorado. And I would like to speak to the medical evidence that supports the usefulness of progesterone to reverse abortion. Uh, first of all, a systematic review of the medical literature on the effectiveness of medical abortion reversal was published in 2015 and was unable to identify any medical evidence of high quality.

Of the data available, it was concluded that it was not possible to say that high dose progesterone treatment after mifepristone led to continuation of pregnancy. So there is an absence of medical evidence that attests to its effectiveness. There is also a small trial that was reported in the journal *Obstetrics and Gynecology*, which is a peer-reviewed journal in the field, that attempting to antagonize mifepristone with high doses of progesterone can result in hemorrhage.

So this brings up the potential for actual harm. Uh, that was a small number of cases. But as, uh, said by the prior speaker, there will never be a randomized trial. I do not believe that that's true. I think without a randomized clinical trial, it is not responsible medical practice, and it is certainly not evidence-based practice to try to administer high-dose progesterone to antagonize a mifepristone-induced, uh, abortion. And that's concludes my comments.

**[00:01:43] Darcie Magnuson:** Thank you. The next individual with a raised hand is Thomas Perille. Thomas Perille, you are unmuted.

**[00:01:59] Thomas Perille:** Yes, thank you for the ability to, uh, talk to the nursing board. My name is Tom Perille. I'm a physician. And I, uh, previously served as a reviewer for the medical board and reviewed cases to, uh, determine whether, uh, care met the general accepted standard of practice. As in that capacity, I, uh, was made aware that the standard of practice is one where a clinician, uh, nurse, physician, pharmacist, uh, understands what the, uh, best evidence shows and what a prudent physician, given the evidence, would do under those circumstances also recognizing the risks and benefits of alternative approaches.

In the case of abort-abortion pill reversal, there is extensive low-level evidence that it is efficacious. Contrary to what Dr. Santorum said, the review that was published in 2015 was before the most relevant large case series demonstrating the efficacy of progesterone to reverse mifepristone compared to historic controls. There's also, in that original review in 2015, Dr. Grossman, one of the authors, suggested that if we could demonstrate that a progesterone could interfere with the efficacy of mifepristone, uh, uh, a-- as it pertains to the use of a contraceptive post, uh, medication abortion, that would be, uh, considered significant evidence in favor of progesterone use in that setting.



And there was a large randomized controlled trial, which demonstrated sistently significant increase in continuing pregnancies after the administration of progesterone, uh, I mean immediately following, uh, a medication abortion. And so there's randomized control data that suggests that the proof of principle, and there's a large case series published since 2015 demonstrating the efficacy compared to historic controls. Uh, and there's animal research and there's a biological plausible mech-mechanism.

And so, clearly, based on that, if I was reviewing this as a member of the nursing board, I would look at the evidence and say, "While it's slow level because there's not randomized control data, there's more than enough evidence given the-the, uh, perceived benefit, which is a 50% reduction in mortality." That's the most important outcome in medicine, is mortality reduction.

And if there's a 50% or more reduction in mortality, even if there's low-level evidence it behooves, the clinician to consider that is a-- is an accepted standard of care. The alternative is expected management. As-as Dr. Santoro said, that small study suggested that expected management may be dangerous. Because if you give mifepristone, at least in the setting of that small randomized trial that was, uh, uh, conducted by Dr. Creinin, it showed that the woman who did not get progesterone, the woman-- again, I repeat, the woman who did not get progesterone, had life-threatening complications.

And so if you're faced with a woman in the office who thinks she has made a tra-- a terrible mistake and wants to-to, uh, do whatever she can to save her now wanted baby, uh, not offering her progesterone, uh, may pose a risk to her health because of potentially life-threatening complications with an additional, uh-

**[00:05:16] Darcie:** Dr. Perille, can you- can you wrap up please?

**[00:05:18] Perille:** Yeah. With-with additional, uh, observation that-that the chances of survival of her-her- of her fetus is-is less than 50% compared to, uh, after adminis-administration of progesterone. So I encourage the nursing board to, uh, push up, push against the-- what the medical board did, and-and explicitly say that abortion reversal is an accepted standard of practice. Thank you so much.

**[00:05:41] Darcie:** Thank you. Just go to the next slide so that everyone can see all of the rules, hopefully. And next I show Katherine Kissler. Katherine Kissler, you are. unmuted.

**[00:06:02] Katherine Kissler:** Hi. I am an assistant professor at the University of Colorado and a nurse scientist. Um, but I speak on behalf of myself as-as a citizen and not on behalf of the University. I wanted to point you to clinicaltrials.gov to see the actual data from this study, um, that we've been talking about, about random-- the randomized control trial by Dr. Creinin about mifepristone antagonization, just so that we can clear up the questions, um, and the back and forth.

7

**11**



In this study, the, um, the sample was drawn from individuals who were planning a, um, a surgical abortion. They were given a-a single dose of mifepristone prior to the procedure, and then they were randomized to either receive progesterone capsules or placebo capsules and then followed, um, for outcomes. And this study, um, enrolled six individuals into each arm before they closed for safety reasons.

And the important thing to note is that the safety issue here was hemorrhage and emergency department visits due to hemorrhage. Two of those, uh, emergency visits occurred in the placebo group, that group that did not receive progesterone, and one occurred in the group that did receive progesterone. So the numbers here are really unclear about, uh, which- about which group is safer, but we see really the issue is with safety of mifepristone, not with the progesterone given after. And the suggestion is potentially that progesterone could be supportive, um, of protecting that individual who chooses not to take misoprostol after mifepristone. So I encourage you to go to clinicaltrials.gov. The ID number is 1353650, and I'll put that in the chat so you can see it for yourself.

**[00:08:07] Darcie:** Thank you. I don't have any more raised hands. Oh, I do now. Um, Natasha Berwick. I believe maybe that-- Okay, Natasha Berwick, you are unmuted on our end.

**[00:08:27] Natasha Berwick:** All right. Thank you so much. Uh, I would like to provide comment because in regards to these rules, they don't follow the legislative mandate as put out by SB 190, which, uh, we discussed with the medical board at length, which directs the nursing board as well as the pharmacy board to decide whether or not, uh, medication abortion reversal is or is not a medical standard of practice.

Additionally, uh, these rules follow the same, uh, theme that that first round from the medical board followed as well that this would require informed consent. But as, uh, many have pointed out, because there is no precedent for, um, medication abortion reversal, it is virtually impossible to do informed consent because there is no, uh, generally accepted standard of practice or study that demonstrates that medication abortion reversal is, uh, that it works in the way that it says that it does. And so I would urge you to revise these rules to follow the legislative mandate of SB 190 which directs the nursing board to decide whether or not, uh, medication abortion reversal is or is not a medical standard of practice.

**[00:09:56] Darcie:** Thank you.

**[pause 00:09:57]**

**[00:10:12] Darcie:** I don't have any other raised hands. Um, just as a reminder, um, once the board closes the hearing portion, members of the public are not able to address-address the board during its deliberation. Um, with that said, Lloyd Bens, Benes you are unmuted.



**[00:10:32] Lloyd Benes:** Uh, yes. Can you hear me?

**[00:10:34] Darcie:** Yes.

**[00:10:35] Lloyd:** Um, uh, Darcie, I sent you, uh, two emails, uh, saying that, uh, Dr. Scott Sundheim would like me to, uh, read his, uh, testimony and, um, I don't believe I got a reply from you. And I would also like-

**[00:10:50] Darcie:** I did-- Yeah, uh, let me just clarify. Yes, I received your email last night at 10:00 and then the other one this morning and I did respond and say that was fine for you to read his comments on his behalf.

**[00:11:00] Lloyd:** And then I'll still be able to, uh, do my own comments?

**[00:11:04] Darcie:** Yes, that's fine.

**[00:11:05] Lloyd:** Okay, thank you so much. I'll, uh, go ahead and start with, uh, Dr. Sundheim's, uh, uh, comment. My name is Scott-- Dr. Scott Sundheim, I have been a practicing physician in Colorado since 2006. Everyone interested in this discussion wants to be known as showing love and care towards pregnant patients in Colorado. Both those for and those against SB 23-190 also wish to be known as providing the best evidence-based medicine.

However, the Colorado medical board in their August 17 meeting failed to discuss the evidence their own Colorado physicians brought to the table. Certainly not in an open meeting and pre-presumably not in the, uh-uh, closed-door meeting which was the executive session. Is this the precedent that Colorado wishes to sent to the nation? Even medical professionals discuss, uh, controversial subjects that they jettison intellectual discussion and explanations? I did not expect non-medical legislators to participate in full discussion of evidence-based medical care, they would need years of medical training for that task. I did expect more of the 13 providers on the Colorado Medical Board.

They failed to support their position in any way. We expect more from medical trainees every day. When other states review Colorado's actions whether to mimic them or to enact laws opposite them, shall they follow these same emotional tribal methods for making decisions? Thus, I asked your board to consider the evidence for progesterone use for pregnant patients who have taken an anti-progesterone, but then freely changed their mind.

The evidence is moderate, not the strongest level that we all wish existed, but it is as strong as so many of our current medical therapies such as for overdoses like beta blockers and calcium channel blockers, that have that-- The evidence shows that such progesterone use is safe and likely effective, with a number needed to treat of just three. Do not be disingenuous in rejecting this therapy while accepting other therapies



with similar modest evidence. Show the medical expertise and exper-- experience of doctors of the nursing publicly explain in detail why this life-saving therapy should be held to a different standard than the rest of modern medicine, or better yet, rule that it is an acceptable option for the patients and doctors who choose to use it. Thank you. Dr. Scott Sundheim.

[silence]

**[00:13:49] Darcie:** And, uh, mm, are you wanting to provide your testimony now?

**[00:13:53] Lloyd:** I would- I would like to do that if I may.

**[00:13:57] Darcie:** Yes, please.

**[00:13:59] Lloyd:** All right. My name is Lloyd Benes, representing myself and I want to say to the board members, thank you for being here today at this meeting. You have busy lives, with jobs, families, maybe children, and even grandchildren, for all these I pray, may the blessing of the Lord be upon you, I bless you in the name of the Lord. May the blessing of the Lord be upon you, I bless you in the name of the Lord. I have just shared love.

Now I share integrity by bringing up the principle of recusal. Rule 21 (c) of the Colorado House says a member who has an immediate personal or financial interest in any bill or measure proposed or pending before the General Assembly shall not vote upon such a bill or measure. Applying that principle to the boards, anyone on the medical nursing or pharmacy boards who performs abortions or participates in abortion procedures, including prescribing or selling medical abortion drugs needs to recuse themselves and abstain from voting on rules. Decades ago, paid scientists of tobacco companies claim there was no link between lung cancer and smoking. Testimonies and arguments by those with financial ties to the subject matter must be carefully scrutinized to maintain integrity in evaluation processes.

Finally, I ask you if a woman who is enmeshed in sex trafficking, is forced by her trafficker into a medical abortion, and wants to reverse her abortion through APR from a medical professional and you interfere with that, how is that different from aiding and abetting sex trafficking? Last night, I attended a class called Trafficking 101, put on by Denver Senior Criminal Investigator, Adam String, and survivor of human trafficking, Maria Tell. Maria describes that when she was pregnant, her trafficker forced her to a clinic to have an abortion.

I quote, "When we walked into that Planned Parenthood in Denver, I was walking with my head down, staring at the ground. I was walking behind him. Traffickers forced their victims to stare at the ground. A lack of eye contact- eye contact is a red flag." She goes on, "As I am inside this Planned Parenthood, I asked a staff member if I could leave. She told me I could not leave and it's too late."

10

<span style="color:red">14</span>



Therefore, instead of proclaiming APR is not an accepted standard of practice, it would be more appropriate to add these words to the draft rules at the end of Section D3. Abortion providers must inform pregnant women about the availability of abortion pill reversal during informed consent. Failure to provide this essential information violates informed consent principles. Thank you for your time.

**[00:16:54] Darcie:** Thank you. The next person with a raised hand is Marcel McClinton. Marcel McClinton, you are unmuted.

**[00:17:09] Marcel McClinton:** Thank you. Uh, first I'd like to apologize to everyone for having to endure, um, the, whatever it is that we just heard. Um, it's 9:30 in the morning and it's very early for that.

**[00:17:23] Darcie:** Let me just interrupt. We don't wanna be critical of other people, so if you can keep your testimony to what you have to say, we don't wanna go back and forth.

**[00:17:32] Marcel:** Absolutely. My apologies. Um, essentially, I wanted to say that, um, abortion pill reversal has been denounced by accredited medical institutions such as the American College, um, of OBGYNs and the Medical, uh, American Medical Association, yet 45% of Colorado anti-abortion centers still offer it. Um, and essentially, uh, long story short, the-- this board has not followed the guidance, um, of the Colorado legislature, uh, the mandate that was put into effect with SB 91-- uh, 190 passing.

Um, and then finally providing abortion pill reversal, um, whatever that-that really is, disregards human dignity and forces people to be test subjects. Um, there is no correlational data to support that pro-- that progesterone can actually continue a pregnancy after the first pill in, uh, medical abortion is ingested. Um, I-I can't close this with a song, but, uh, I'll leave you with that. Thank you.

**[00:18:40] Darcie:** Thank you. Um, the next person is Arianna Morales. Arianna Morales, you are unmuted.

**[00:18:49] Arianna Morales:** Hi, everyone. Good morning. Thank you so much. Um, thank you for having me and for taking the time to promulgate rules around the supposed treatment known, um, as abortion reversal. The treatment that we're talking about today. Um, Senate Bill 190 clearly stated in language that was supported by the majority of general assembly and, um, the majority of young people that I've spoken to across the state, um, how they felt about this unethical treatment being provided across the state.

The current rules being proposed right now by the nursing board do not follow the legislative mandate and also do not protect Coloradans who are being promised a treatment that is yet to be studied by any peer reviewed board and has been loudly



denounced by, um, the American College of Obstetricians and, um, other well-known institutions.

Um, I am asking today that the nursing boards follow the ask of the general assembly to promulgate rules around, um, again this supposed treatment known as abortion pill reversal, and also follow the request of young people across Colorado to have, um, their medical treatment be ethical, well studied and transparent. Um, and that is not something that we're able to do with abortion pill for reversal, as again, it has not been studied enough. So thank you so much for hearing me today.

**[00:20:06] Darcie:** Thank you. Anyone else? Sheryl Van Denend, you are unmuted. Sheryl Van Denend.

**[00:20:29] Sheryl Van Denend:** Good morning. Thank you. Um, I-- when I registered-- I am a registered nurse. I have been a nurse for 30 years. I currently work in the mom baby unit at Sky Ridge, but I do not represent them. I'm representing just my personal, um, testimony. Sorry. I did submit a wri-- a written, uh, letter to you guys, but I-- after listening to this meeting, um, I-I just feel like I have to speak. I'm-I'm really, really, um, I guess abhorred at this-this ideal that using a medication to give an abortion to someone is considered ethical, and then providing them with an option in the fact that they would change their mind is considered unethical. That in itself is ridiculous. It's just ridiculous.

Um, the original rule opens with, in Colorado, a pregnant individual has a fundamental right to continue a pregnancy or to terminate a pregnancy by abortion. You will be taking away a person's right to choose if they decide they do not wanna go through with an abortion. You're removing that right from them. You're also causing us as healthcare, um, workers to not be able to tell the truth to a patient. As a nurse, my role is to advocate for the patient, to give them the full scope of their options and to support whatever decision they make. You are removing that right from them to even-- even if there's a chance that this could work, you're- you're taking it away and that's just wrong.

Um, I-I personally have a family member that's trying to have a baby. She takes high-levels of progesterone to sustain any pregnancy that she gets. So for you to say, there's not evidence-based research out there, you're not- you're not willing to look at it. So I would really encourage you as a nursing board to look at all the evidence and stop the politics and-and, um, actually give care to the oath that you took to do no harm to serve our p-- our patients regarding whatever the decision they do make. If they want to have an abortion, they can do that. But this is an extreme overreach of government control in-in how we are being told to respond to people as professionals.

And I think it's completely wrong. And I-I completely disagree. I-I-I don't even support the-the bill that was passed from the medical board. It's-- I just feel like it's-- Colorado's the most liberal state in abortion options as it is. Why do we have to spend time doing this and fight, you know, fighting for this to become a law. Really law is there nothing better that you guys can be working on? It's-it's unbelievable to me that this is even in a



discussion. It's just-- I feel like it's just wrong. So thank you for your time and thank you for listening to my opinion.

**[00:23:26] Darcie:** Thank you. Next is Brittany Vanbenschoten. Sorry if I mispronounced your name. You are unmuted on our end. Brittany Vanbenschoten.

**[00:23:46] Brittany Vanbenschoten:** Hello, my name is Brittany Vanbenschoten. I've been a nurse for 17 years, Bachelor's trained. I would suggest that if this rule is passed, that it be reworded. I find that it is very biased and unscientific. I feel that it should also be reworked and not be permanent in nature to allow a space in the future for more research, as said by the previous speaker, to allow choice and medical freedoms. Whatever those choices may be, we should explore them with research. I also feel that there is too much bias in this rule and unscientific in the matter that it states that abortion is safe. No medical procedure is safe. All medical procedures come with risks. And a part of informed consent is expressing that risk. Thank you for listening.

**[00:24:51] Darcie:** Thank you. Um, we have a comment in the Q&A from an anonymous attendee, "Stop the politics. Colorado is the most liberal state for abortion." Anyone else who would like to testify, uh, please raise your hand and we will unmute you or you can type in through the Q&A and we will read your testimony out loud for the members of the public and for the board and the recording. Go ahead and pause here for another couple of minutes to make sure we've heard from everyone. Um, Camila Navarrette, you are unmuted Camila Navarrette.

**[00:25:50] Camila Navarrette:** Yes. Hello. My name is Camila Navarrette, and I wanna express my disappointment, um, that the board not follow the legislative mandate of SB 190. The abortion pill reversal has been denounced by accredited medical institutions such as the American College of Obstetricians and Gynaecologists and the American Medical Association. 45% of Colorado anti-abortion centers still offer it. Providing the abortion pill reversal disregards human dignity and forces people to test subjects. There's no correlation, um, correlational data to support that progesterone can actually continue a pregnancy after the first pill and a medical abortion is ingested.

Abortion pill reversal is a part of America's long history of preying on pregnant people of color and pregnant people living on lower incomes to test unproven treatments pushed by the wealthy and the powerful. It is unprofessional conduct for a licensed healthcare provider to offer patients an experimental treatment for which there is no rigorous scientific evidence outside of a regulated study setting.

Because there is no credible scientific evidence that medical-- medication abortion can be reversed, physicians cannot without misleading them tell patients that it is possible to do so. Nor can they tell their patients that information and assistance available to reverse medication abortion without misleading them. They fully that this is a claim wholly in support, um-- and yeah, I always want to-- I want to express my



disappointment about not following the legislative mandate of SB 190 and would call on our boards to protect, um, the people of Colorado.

**[00:27:22] Darcie:** Thank you.

**[pause 00:27:23]**

**[00:27:35] Darcie:** Anyone else? Tiffany Sharp, you are unmuted. Tiffany Sharp.

[silence]

**[00:27:51] Tiffany Sharp:** Can you hear me?

**[00:27:52] Darcie:** Yes.

**[00:27:56] Tiffany:** Hi, my name is Tiffany Sharp **[inaudible 00:27:59]**

**[00:28:04] Darcie:** Ms. Sharp your-your connection seems to be a little bit spotty. Like you're breaking up quite a bit.

**[00:28:15] Tiffany: [inaudible 00:28:16]**

**[00:28:19] Darcie:** Yeah, that's not any better. I don't know if it's just me having issues but--

**[00:28:23] Tiffany:** Okay.

**[00:28:23] Darcie:** Okay, it's not just me.

**[00:28:28] Tiffany:** Okay.

**[00:28:29] Darcie:** That seems to be better. You wanna try again?

**[pause 00:28:31]**

**[00:28:45] Darcie:** I was able to hear the last couple of words you said fairly clear, so I don't know-- It looks like we lost you on the list. You can also type into the Q&A and I can read your testimony out loud if that's helpful.

**[pause 00:29:05]**

**[00:29:32] Darcie:** While we give, um, Ms. Sharp a chance to type in her Q&A, um, does anyone else want to provide testimony?

**[00:31:18] Darcie:** Just so everyone is aware, you may have seen Ms. Sharp is typing in her testimony. So once we receive that, we will read it. Um, and then if anyone else



wants to provide any final thoughts who hasn't already testified, you can raise your hand, and we will unmute your line, uh, before the board concludes the testimony portion of the hearing.

**[pause 00:31:37]**

**[00:35:06] Darcie:** And while we wait, it seems like there's some conversation going back-and-forth in the Q&A. If you've already testified, I'm not reading what you're adding into the Q&A to give everyone an opportunity to testify once. We don't have the back-and-forth conversation. And same thing with articles that are being added into the Q&A. We can't read those, of course, the entire article for the testimony.

So if you did submit it as part of your written comments, those are all included, um, on the website for everyone to see as well as the board members. Um, so just an FYI as to why I am not reading those additional Q&A comments, um, out loud for everyone. Um, and, Ms. Sharp, I hope you're still, um, typing. We are-- It looks like just waiting on your testimony as we don't have any additional raised hands, um, and no other new testimony in the Q&A. Hopefully you are wrapping that up so we can, um, continue to move on with the hearing.

**[pause 00:36:04]**

**[00:38:13] Darcie:** Okay. I apologize, Ms. Sharp said she cannot get her speech to load into this, so she'll send it to the board separately later and apologizes for the delay. Um, and I'm sorry that the audio wasn't working. Um, and I believe, uh, that does conclude. It does not look like we have any other, um, written testimony through the Q&A or any other raised hands. So I will turn it back to you, Mr. President. Um, and you can conclude the hearing portion and we can move into the board's deliberation.

**[00:39:01] [END OF AUDIO]**

15

<span style="color:red">19</span>



## Part 3

**[00:00:00] Darcie Magnuson:** About what happened when the medical board went out of the public webinar. Um, and so my response, which everyone should be able to see in the Q&A, is that this is not a forum to discuss the medical boards, um, rulemaking hearing and why the medical board went into executive session. Um, so I will not be answering that any further. If the nursing board chooses to go into executive session, the legal basis will be set forth in the motion should the board choose to do that. Um, so with that, I will turn it over to the president, um, and you can wrap up the hearing portion and move into the board's deliberations.

**[pause 00:00:39]**

**[00:00:50] Darcie:** Looks like you're on mute.

**[00:00:54] Joe Franta:** Thank you. It appears we do not have any more or any, uh, testimony. The testimony portion of this rulemaking hearing is now concluded. Are there any board members, um, present that need a sharp break before we start the deliberations?

**[00:01:08] Automated:** Recording stopped.

**[00:01:14] Joe:** [silence] Seeing no such requests. We can start our deliberations.

**[pause 00:01:18]**

**[00:01:36] Joe:** And I believe Darcie's put up the red line version for us to go through and review.

**[pause 00:01:44]**

**[00:02:10] Darcie:** And this is Darcie. I added into the comments, um, of the draft rules, what the medical board did. You did hear testimony about that. Um, and the statute does require the boards to collaborate. So I just added that into the comments so this board could see what the medical board did.

**[pause 00:02:30]**

**[00:03:03] Brandy Murphy:** I'd like to see an amendment to mirror the language adopted by the medical board in number four. If the current language remains, it will be a no vote.

[silence]

**[00:03:21] Joe:** Are there other comments on Section 4?



**[00:03:28] Carrie:** It looks to me like it mirrors the language pretty closely.

**[pause 00:03:33]**

**[00:03:56] Carrie:** It is not as specific regarding the two medications, but that seems to be the only thing I can see that's different in the two, um, paragraphs and in the-the blue line copy from our agenda or from our, uh, packet does have that in there.

So it looks like, I'm not sure which is the more recent form. Yeah, 'cause that's in the blue line copy that for-- that's in our packet, not this red line copy.

**[00:04:34] Joe:** Yeah. Carrie, the, um, the second one that came out with the, um, add-on.

**[00:04:39] Carrie:** Yeah.

**[00:04:40] Joe:** That's actually the medical board's rules.

**[00:04:43] Carrie:** Ah.

**[00:04:43] Joe:** And then the link we started with is the 1.35 versus the 1.32 from the medical board.

**[00:04:54] Carrie:** I see.

[silence]

**[00:05:01] Joe:** It did have, um, some, um, questions or something. Um, there was some evidence that talked about, um, regulatory statute and conflict there. And I was-was considering, do we want to talk about that in executive and get some legal advice on that?

[silence]

**[00:05:28] Lori Ray:** That would work. Uh, I always wonder about putting in the whole of accepted practice 'cause, I mean, that-- that's part of healthcare too. We're always evolving and-and, um, accepted practice can change, uh, very quickly.

**[pause 00:05:53]**

**[00:06:06] Speaker 6:** Yeah, I-I agree with what you're saying on how evidence-based practice can change as we do or do not continue to do research on whatever it is we're talking about. And that can also change informed consent. So I also thought it was interesting when some of those comments were being brought up on how to create an-an effective informed consent if we have very limited, uh, information.



**[00:06:31] Lori Ray:** Mm-hmm. And everybody's cases are so specific to what's going on. And I-I definitely do not want to put, um, constraint, um, on anybody that, um, that their-their case is different. Their-- it's between their doctor or the medical professional and the patient, not legislation.

**[00:07:06] Speaker 6:** I did have one thought on, um, when it's brought forth as our duty as medical providers to have these ethical conversations, um, what does that mean for, you know, what-what is this rule or the-the senate ruling or even this amended rule mean for any healthcare provider advocating with giving whatever information we have? Or is this solely just addressing medication administration in a substance and not necessarily information as a conversation?

[silence]

And I guess what I mean by that, would it be unprofessional conduct to have a conversation with somebody that, you know, either the progesterone does exist, although it's not well supported, or, um, you know, no, this is a bad idea. Is that gonna be a future, uh, concern for a nurse who has that conversation? Will they be deemed as engaging in unprofessional conduct because of that?

**[pause 00:08:24]**

**[00:09:14] Joe:** Do think it's important to amend, um, in four-- kind of in line with the medical board. They brought up some good points and I think we have the same feeling, um, as far as what generally accepted practice means and then how it can flex and change over time.

**[pause 00:09:36]**

**[00:10:26] Lori Ray:** So [crosstalk]

**[00:10:28] Joe:** Go ahead.

**[00:10:28] Lori Ray:** How would- how would you change it up?

**[00:10:33] Joe:** Well, I think with what the medical board said, um, it-- it's always tough when you say generally accepted standards of practice. The evidence that, um, was presented had some anecdotal, um, pros and cons and-and then there was some, you know, clear statements by organizations that drive practice guidelines, um, that this is not generally accepted practice. And I- and I think that's the-the hard part there.

[silence]

**[00:11:15] Lori Ray:** And guide me again to where the medical board part was because I think-- What was it? Darcie said she posted something.



**[00:11:24] Roberta:** It was in your add-on. It's an add-on.

**[00:11:27] Joe:** Okay. And correct- [crosstalk]

**[00:11:28] Roberta:** And-

**[00:11:28] Darcie:** Hi, Lori Ray. It's also showing on the screen. I don't know if you can see it, but, um, the subsection four, they modified and replaced it with the language that you're seeing in the comment there on the side. And then, like Roberta said, the entire rule that was adopted by the medical board on August 17th was added into your packet just so the board could see.

**[pause 00:11:53]**

**[00:12:08] Lenny:** And this is Lenny. I-I have a quick question. Do you think that the bill is maybe narrowing it-- narrowing it down a little bit too much? They're-They're just concentrating on-on the two drugs, uh, at play. Um, you know, what-what the ever-changing medical, you know, research, are we gonna be back here in another year discussing the same thing again with two other drugs?

[silence]

**[00:12:40] Joe:** That's a good point. Lenny. I-I kind of thought about that, too. Um, maybe a more general language in there through the use of reversal agents or something. I'm not sure exactly what the words could be on that.

**[00:13:01] Carrie:** Well, I think in our rule number four, it says just medication revers-- abortion reversal. It's not specific to any medication or procedure. Just it's the medication reversal. So--

**[00:13:20] Lori Ray:** He- He's just looking at the medical one. So Lenny, we didn't put the meds, I guess, in ours.

**[00:13:26] Carrie:** No, we didn't.

**[00:13:29] Lenny:** I- I'm just looking at the one that was sent out. The-The blued out one.

**[00:13:33] Carrie:** That's the medical board, Lenny. That was my confusion, too.

**[00:13:36] Lenny:** Oh, okay, okay

**[00:13:37] Lori Ray:** Yeah, me too. [chuckles]

**[00:13:39] Carrie:** Yeah. I didn't catch that it was from the medical. The one that's on the screen that Darcie posted. I-- it's more general, and I think that actually is better for

19



nursing in that it's not specific to any specific procedure except that it's the medication reversal. So I think that actually makes more sense for nursing 'cause then it doesn't matter what the agent is, it's the proc-- procedure of the medication, abortion reversal, whatever the- whatever the procedure is that they're using for that, whether it's progesterone or something different in the future.

**[00:14:17] Darcie:** And you may need to look at the definition of medication abortion reversal, too. I can't recall, um, if it-- those agents are specified in the definition, but that's something to consider as well.

**[00:14:28] Carrie:** Uh, I-I think I looked that up and I don't recall if it was specific. Um. Hmm.

**[00:14:39] Speaker 6:** So in the bill itself, it says medication abortion reversal means administering, dispensing, distributing, or delivering a drug with the intent to interfere with reverse or halt a medication abortion. It doesn't specifically name those two medications.

**[00:14:55] Carrie:** Yeah. I agree. I just found it. And-And-And that covers any changes of future practice if there's new meds and then new reversal meds.

**[pause 00:15:05]**

**[00:15:19] Lori Ray:** So then we would adjust ours to remove. Uh, Darcie can you go back to four, please? Thank you. To remove the discipline part, right? To mimic the medical.

**[pause 00:15:42]**

**[00:16:14] Speaker 6:** You're muted, Carrie.

**[00:16:19] Carrie:** Sorry, thank you. Um, I think if we say where it says, per se, act subjecting the licensee to discipline in that they say it's-it's not a per se act of unprofessional conduct. And then they'll review the case and then determine if it's subject to discipline at-at the last line. And I think that covers both considerations. We're not automatically considering it a problem, but we'll review it and determine if the situation does warrant discipline at the time.

**[pause 00:16:50]**

**[00:17:12] Darcie:** Does the board want me to drop that language from the comment into the draft and see if that makes sense for this board changing, of course, the statute and modifying it to work for nursing?

[silence]



[00:17:36] **Joe:** Yeah, it might be useful just to see what it looks like in a-- in a final ease, but--

**[pause 00:17:43]**

[00:18:36] **Speaker 6:** So I feel like if we're evaluating on a case-by-case basis, does this-- what if it's-- I mean, what if it's not reported, but the procedure or, you know, some, a marginalized populations were mostly brought up on the ones least likely to report, um, issues. Even if they occur, um, those won't get brought up then, or they may not get brought up for board reviewal.

[silence]

[00:19:14] **Carrie:** Well, we'd struggle with that anyway, because even if it's happening, if we're not notified in any way, then we're not gonna be able to evaluate it, even if it's happening. Um, sorry, my puppy. Um, I'm not sure there's a way around that.

[00:19:42] **Joe:** Carrie, you said a couple--

[00:19:43] **Lori Ray:** And then the other thing when we're looking at case-by-case basis, um, is we as healthcare providers, uh, we, you know, we understand the scientific treatments and looking at that. And the only way that we do go forward is by continued science. And sometimes, uh, there's influences by other non-healthcare people, um, that don't wanna believe one way. You know, for example, with some of the medication treatments that came through with COVID, um, you know, and-and some non-medical people were very, uh, persuasive in what treatments were gonna be okay and what treatments weren't. And is this gonna open it up if we're on a case-by-case basis.

[00:20:42] **Joe:** I think the board historically has pretty much treated everything case by case, um, for review, and-and as far as discipline.

[00:20:53] **Lori Ray:** Okay.

[00:20:54] **Joe:** I think there is a question on some of the information reviewed it. You know, we don't-- we don't make, um, general standards of care. We don't create those. Those are drawn from the scientific side of things. So I don't know if we-- if we start saying this is, you know, these blanket things are it. I, you know, I don't think we have the basis to do that. We have to look and be flexible, see what the, you know, um, standards of care at the time and what the new research might bring.

**[pause 00:21:45]**

[00:22:02] **Lori Ray:** If we say medication abortion undertaken under section 12-255-1201, what is that? What would that read like?

21



**[pause 00:22:20]**

**[00:22:36] Carrie:** I don't have my books readily available.

**[00:22:44] Speaker 6:** Could you repeat that, please, Lori Ray?

**[00:22:50] Lori Ray:** So basically taking out the prepositional phrases. So undertaken and that way it would take out the medications, it would take out the generally accepted standards, and it would just leave shooting them straight to the section.

**[pause 00:23:09]**

**[00:23:22] Carrie:** No, I don't think we should include the medications. Um.

**[00:23:27] Lori Ray:** Well, that would take it out.

**[00:23:29] Carrie:** Yeah. And leave to meet generally accepted standards under this section.

**[00:23:37] Lori Ray:** Mm-hmm.

**[00:23:38] Carrie:** Take all that out.

**[00:23:38] Lori Ray:** Take that all out. Take all that out. Shoot them straight. 212255120.

**[pause 00:23:48]**

**[00:24:02] Joe:** So take out the part, um, she just highlighted, Lori Ray, is that-- do you understand?

**[00:24:15] Lori Ray:** I don't know. That's how it reads right there. That's what I was trying to read, 255-120.

**[pause 00:24:21]**

**[00:25:07] Joe:** Do you prefer the original version before?

**[00:25:14] Lori Ray:** Of what?

**[00:25:17] Joe:** Well, the original version of before keeps it pretty general and just talks about reversal agents which is broader than specifying the medications was Carrie's concern.

**[pause 00:25:32]**



**[00:26:04] Carrie:** Well, in that-

**[00:26:06] Lori Ray:** So what if we pick out the last sentence of the original one?

**[00:26:14] Carrie:** Oh, no, I think that covers us. I think we need that sentence to say we're not gonna-- because if we make it so that it says we use that first sentence, and I think if we take out undertaken through the use of the medications and stop at the second medication, uh, mifepristone and then say to meet generally accepted standards under section such then, yeah, stop there. Good.

Then the rest of it, I think, meets and makes covers what we want. So we're-we're saying it's not automatically unprofessional or a disciplinary, but we don't consider it accepted standard. And we're gonna review it if it comes before us, case by case, and depending on the situation, it may meet the requirements for discipline because it-it-it may not be the medication or the procedure. It may be how it was handled. It may be the interaction, it may be something else that is disciplinary appropriate, not the fact that it was a reversal

**[00:27:22] Lori Ray:** In the-- In the nursing one, that's the original one. Just shooting them towards section 12-255-120 would take care of what you're saying. Why say about the licensees on the general accepted, blah-blah-blah?

**[pause 00:27:44]**

**[00:28:07] Carrie:** I mean, it's technically a given, but, and then--

**[00:28:13] Lori Ray:** Brandy, you're good at words. **[unintelligible 00:28:14]**, do you have any suggestions?

**[pause 00:28:17]**

**[00:28:52] Speaker 6:** What was your question again, Lori Ray?

**[00:28:56] Lori Ray:** I didn't know if Brandy-- oh, sometimes she has some really good suggestions on wordsmithing.

**[00:29:09] Michelle:** I like the broadness of the original number four. This is Michelle. Um-

**[00:29:14] Lori Ray:** Mm-hmm.

**[00:29:15] Michelle:** -I think if we can add something about, uh, case-by-case basis, that's not in the original number four. I think that will cover everything. It takes out the, um, names of the medications, it takes out progesterone and it leaves it, kind of, open



for things that may be coming in the future. Um, but I think we do need to clarify that. We will look at it on a case-by-case basis.

**[00:29:58] Lori Ray:** So basically you like the original nursing one, right, and not the medical one, Michelle?

**[00:30:04] Michelle:** Yes.

**[00:30:05] Lori Ray:** Okay.

**[00:30:06] Carrie:** I can-- if I think, um, in the original-- if where there it says rather the board will investigate all complaints related to medication abortion reversal, um, in the same manner, that it investigates other alleged deviations from generally accepted standard of nursing practice, um, we could-- I mean, that almost says it, but we could put it in there, um, in the same manner, on a case-by-case basis, that it investigates other alleged deviations. That may be where it would fit.

**[00:30:59] Brandy:** The bill asks that we make a determination if it is a generally accepted standard of practice.

**[pause 00:31:04]**

**[00:31:16] Carrie:** Yeah.

**[00:31:23] Joe:** So in the original form maybe the board will investigate all complaints on a case-by-case basis related [crosstalk] to medication abortion reversal in the same way it investigates all other deviations?

**[00:31:39] Carrie:** Mm-hmm. That'd be another good way.

**[00:31:44] Lori Ray:** And I would still take out the last sentence after reviewing number two, that we, you know, don't really-- we don't make rules around a single standard of practice. **[unintelligible 00:31:56].**

**[00:32:12] Darcie:** I know there was a comment earlier about whether the board needed to get, um, legal advice. This is Darcie. Um, is that something that the board still is considering before making any, um, adoptions to the rule?

**[pause 00:32:25]**

**[00:32:39] Joe:** I think if we can adjust the languages we just said, um, I don't know if we need to get legal advice or not. How do the other board members feel?

**[00:32:51] Lenny:** I agree with you, Jim.

**[00:32:56] Carrie:** I have a legal question regarding what Brandy just mentioned.

24

<span style="color:red">28</span>



[silence]

**[00:33:10] Joe:** Do we want to move into executive to discuss anything as far as the legality con-- consultation?

**[00:33:22] Lori Ray:** That's fine.

[silence]

**[00:33:31] Darcie:** Roberta, do you have that motion?

**[00:33:35] Roberta:** Uh, um, Joe has the script for executive session.

**[00:33:37] Joe:** Yeah. I have the script. [crosstalk]

**[00:33:42] Darcie:** Sorry, Roberta, you'll turn the recorder on for that.

**[00:33:44] Roberta:** Uh, Anadela do you have the recorder on?

**[00:33:47] Anadela:** It's on.

**[00:33:51] Joe:** Hey, sounds like we want to head to for discussion for some legal advice. This is Joe Franta, and the time is 10:32. This is a meeting with the State Board of Nursing. Can I have a motion that the board enter an executive session for the purpose of discussing with counsel disputes that are subject to pending and imminent court action, discussing specific claims or grievances and receiving legal advice on specific legal questions pursuant to the Colorado revised statutes section 24642382 including agenda items one and two for emergency and adopting rules.

Also the legal basis for potential disciplinary action were warranted. Recommended for settlement guidance for matters discussed in open session today and referred for discipline and discussion in executive sense specifically, again, agenda items one and two from today's meeting. Is there a motion?

**[00:34:52] Carrie:** This is Carrie. I'll move.

**[00:34:53] Joe:** Is there a second?

**[00:34:55] Michelle:** This is Michelle. I'll second.

**[00:34:57] Joe:** I'll do roll call voting. Lori Ray.

**[00:35:01] Lori Ray:** Aye.

**[00:35:02] Joe:** Harry.

**GoTranscript**

**[00:35:03] Harry:** Aye.

**[00:35:04] Joe:** Lenny.

**[00:35:05] Lenny:** Aye.

**[00:35:06] Joe:** Mackenzie.

**[00:35:06] Mackenzie:** Aye.

**[00:35:07] Joe:** Phyllis.

**[00:35:08] Phyllis:** Aye.

**[00:35:09] Joe:** Brandy.

**[00:35:11] Brandy:** Aye.

**[00:35:12] Joe:** Michelle.

**[00:35:13] Michelle:** Aye

**[00:35:14] Joe: [unintelligible 00:35:14]**.

**[00:35:16] Speaker 8:** Aye

**[00:35:17] Joe:** Myself. Aye. Motion carries.

**[00:35:22] Michelle:** So you know that we--

**[00:35:22] Joe:** As a reminder, we need to log totally off of this and log into the executive session link.

**[00:35:28] Michelle:** Okay. Which was in the email that Anadela sent.

**[pause 00:35:32]**

**[00:36:04] [END OF AUDIO]**



**Part 4**

**[00:00:00] Joe:** It looks like all the board members are back. I think we were having some conversation about the language and modification of four. Um, does anybody wanna take a stab at that?

**[00:00:33] Darcy:** And this is Darcy, just to clarify, is it the added four or are we, just so I know where to start making the changes?

**[00:00:41] Joe:** I think the original four is easier to change to what we were discussing before we went out. Um.

**[00:00:58] Carrie:** I think we actually decided to keep most of the original but remove that last sentence. Yeah. Lori Ray, is that what you remember?

**[00:01:13] Lori:** I agree.

**[00:01:15] Carrie:** Yeah.

**[00:01:22] Lori:** Annie, you can delete the medical board's version.

**[00:01:29] Lenny:** We're gonna add in the case-by-case version or not?

**[00:01:31] MacKenzie:** I do like the-- Yeah, I was gonna say I do like the medical board's inclusion of evidence-based practice though because I think that would give some note that the evidence-based practice is dynamic instead of static.

**[00:01:58] Joe:** [silence] So add that last sentence up there. Is that what you're suggesting?

**[00:02:04] Carrie:** Well, but that's the one that Lori Ray didn't like. And I mean, in some ways it-it is-- I mean, we understand that's what we're doing. That's what we're basing our, what we do on is evidence-based practice which if we're gonna leave it in, it should say evidence-based practice, not medicine for nursing. Um.

**[00:02:33] Joe:** Could we add that evidence-based practice piece into the sentence above? So, accepted standards of nursing practice and then something about evidence-based practice.

**[00:02:49] Carrie:** Standards of nursing practice under, um.

**[00:02:53] MacKenzie:** So what Lori Ray was saying was that having this additional sentence is like repeating, um, sorry, not repeating, it's redundancy.

**[00:03:02] Joe:** Right.

27

**31**



**[00:03:02] Lori:** So, Mackenzie, did you look at the 12, whatever it was-

**[00:03:07] MacKenzie:** Yes, I did.

**[00:03:07] Lori:** The 665-120? Okay. All right, and then also did we look at, um, number two because number two even talks about the case by case there. Um, so I don't know if we need to have it in both the spots.

**[00:03:26] Carrie:** Mm, that's a good point, Lori.

**[00:03:29] Lori:** Um, and then evidence-based is ready and number two also.

**[00:03:36] Joe:** Yep.

**[00:03:37] Carrie:** Yeah.

**[00:03:38] MacKenzie:** Oh yeah. Okay.

**[00:03:41] Carrie:** Yeah.

[silence]

**[00:03:48] Carrie:** Yeah, I think- I think, Lori, you're right, I think two covers those issues that that last sentence is essentially saying it again. So, I think that's--

[silence]

**[00:04:08] MacKenzie:** I agree I think that makes sense. Thank you.

**[pause 00:04:10]**

**[00:04:25] Carrie:** Yeah, I think that looks good.

**[00:04:32] Joe:** Any other suggestions as far as changes? [silence] Right. May I--

[crosstalk]

**[00:04:49] MacKenzie:** Let's get ready for the motion but one second, let me turn the recorder on.

**[00:04:52] Automated Voice:** Recording in progress.

**[00:04:56] Joe:** May I have a motion that the board make the following findings. These- so these rules is clear provisions of the nurses and nurse prac- Nurse Aids Practice Act Section 1255101 et cetera. It is CRS, the attached permit and rule is promulgated to comply with state law. The purpose of the proposed new rule 1.35 rules and regulations

28



regarding generally accepted standards of nursing practice regarding pregnancy-related services is to implement thorough the Senate Bill 23-190, concerning policies to make punishable, deceptive actions regarding pregnancy-related services.

Pursuant to the board's rule-making authority in sections 1222041, 123122B, 12255107 and 244103 CRS, the Board hereby adopts these rules as amended. I move that we adopt the proposed rule 1.35 on a permanent basis as amended and incorporate by reference the statements of basis purpose and statutory authority pursuant to section 244103 for CCRS. Can someone move on that?

**[00:06:10] Lenny:** This is Lenny. So moved.

**[00:06:12] Joe:** Is there a second?

**[00:06:13] Carrie:** This is Carrie. I second

**[00:06:15] Joe:** We'll do roll call vote. Lori Ray?

**[00:06:19] Lori:** Aye.

**[00:06:20] Joe:** Carrie

**[00:06:21] Carrie:** Aye.

**[00:06:22] Joe:** Lenny.

**[00:06:23] Lenny:** Aye.

**[00:06:24] Joe:** MacKenzie?

**[00:06:25] MacKenzie:** Aye.

**[00:06:26] Joe:** Phyllis.

**[00:06:27] Phyllis:** Aye.

**[00:06:28] Joe:** Brandy.

**[00:06:29] Brandy:** Aye.

**[00:06:32] Joe:** Michelle.

**[00:06:34] Mitchelle:** Aye.

**[00:06:35] Joe:** Ician.



**[00:06:36] Ician:** Aye.

**[00:06:37] Joe:** Myself. The motion carries. The second motion. We may have a motion that the board would make the following findings. Basis for these rules is to carry out the provisions of the nurse in Nurse Aids Practice Act at section 1255101, et cetera. The CRS, the attached emergency rule is promulgated to comply with the state law by adopting rules in advance of the October 1st, 2023 deadline within Senate bill 23-190. The board finds that adoption of new rule 1.35 rules and regulations regarding generally accepted standards of nursing practice regarding pregnancy-related services.

Imperatively necessary to comply with state law for the preservation of public health, safety, and welfare in compliance with the requirements of Section 244103 CRS and would be contrary to the public interest. The board finds it imperatively necessary to adopt a 1.35 on emergency basis in order to comply with the legislative's directive in Senate bill 23-190 to promulgate the rules no later than October 1st, 2023 pursuant to the rule board's rule-making authority provided by sections 1222041 123122B, 125255107 and 2441036A CRS.

The board hereby adopts rule 1.35. I move that we adopt rule 1.35 on an emergency basis effective October 1st, 2023 and incorporate by reference the statements of basis, purpose, and statutory authority pursuant to section 2441034C CRS. Is there a motion?

**[00:08:21] Carrie:** This is Carrie is. I So move.

**[00:08:22] Joe:** Is there a second?

**[00:08:24] Lenny:** This is Lenny, I'll second.

**[00:08:27] Joe:** Do roll call vote. Lori Ray.

**[00:08:29] Lori:** Aye.

**[00:08:30] Joe:** Carrie.

**[00:08:31] Carrie:** Aye.

**[00:08:32] Joe:** Lenny.

**[00:08:33] Lenny:** Aye.

**[00:08:33] Joe:** Mackenzie?

**[00:08:34] MacKenzie:** Aye.

**[00:08:35] Joe:** Phyllis.



**[00:08:37] Phyllis:** Aye.

**[00:08:37] Joe:** Brandy

**[00:08:38] Brandy:** Nay

**[00:08:40] Joe:** Michelle?

**[00:08:41] Mitchelle:** Aye

**[00:08:43] Joe:** Ician.

**[00:08:44] Ician:** Aye.

**[00:08:45] Joe:** Myself. Aye. Motion carries and further discussion. Um, John, did you wanna speak to the date issue? [silence]

**[00:09:07] Roberta:** Joe, did you get the motion that was discussed in, uh, executive on that you move to--

**[00:09:15] Joe:** Well, I-I just had, uh, the motion to move that date to the 31st, but it was-- I wonder if we were--

**[00:09:22] Roberta:** So suspend the enforcement. I don't think-- I think John can speak to us in executive.

**[00:09:30] Joe:** Okay.

**[00:09:32] John:** And the-- Joe, the-the date for suspension was through October 23rd.

**[00:09:39] Joe:** 23rd?

**[00:09:40] John:** Yes sir.

**[00:09:43] Joe:** Someone want to make the motion to suspend the date till October 23rd on these two?

**[00:09:51] Lori:** This is Lori Ray. I move to make the motion to suspend, uh, 1.35 through October 23rd, 2023.

**[00:10:02] Lenny:** This is Lenny. I'll second.

**[00:10:04] Joe:** We have a motion and a second. We'll do roll call vote. Lori Ray.

**[00:10:07] Lori:** Aye.

31

**35**

**[00:10:08] Joe:** Carrie.

**[00:10:10] Carrie:** Aye.

**[00:10:11] Joe:** Lenny.

**[00:10:12] Lenny:** Aye.

**[00:10:14] Joe:** Mackenzie?

**[00:10:16] Mackenzie:** Aye.

**[00:10:18] Joe:** Phyllis.

**[00:10:19] Phyllis:** Aye.

**[00:10:20] Joe:** Brandy?

**[00:10:21] Brandy:** Aye.

**[00:10:23] Joe:** Michelle?

**[00:10:24] Michelle:** Aye.

**[00:10:25] Joe:** Ician?

**[00:10:26] Ician:** Aye.

**[00:10:27] Joe:** Myself aye. Motion carries. All right. We got through agenda items one and two. Uh--

**[00:10:36] Automated Voice:** Recording stopped.

**[00:10:42] Joe:** Agenda item three is--

**[00:10:45] Roberta** Do we have, uh, Dmitry?

**[00:10:47] Dmitry:** Yes, Roberta, I'm here.

**[00:10:48] Roberta:** Oh, good.

**[00:10:49] Dmitry:** And I'm ready.

**[00:10:51] Joe:** Hey, Dmitry, welcome to the board of nursing, um, review. Do you want to, um, make any comments on the proposal that was sent to us?



**[00:11:01] Dmitry:** So, Joe, if-- Joe and the board, if you don't mind, I can present the material, make it as efficient as possible for you, um, if that's okay.

**[00:11:09] Joe:** Yeah, that's fine.

**[00:11:11] Dmitry:** Thanks, Joe. Um, I-I know this is an emergency meeting, so I'll try and keep it short and efficient for the board. Um, I'll give you some quick history. I know I've been before this board a number of times for something similar. So in our statute, um, 12-28601, uh, we have had a requirement, um, to collaborate with the medical board, the board of Nursing, and CDPHE to get feedback on, um, any development there is on statewide protocols related to, um, prescription to dispensation on certain categories of drugs.

The statute doesn't technically require us to collaborate with, um, these boards, uh, for revisions, uh, but rather for development, but out of just goodwill and good collaboration that we've had with these boards and support in the past, we continue to do so. So our statute specifically says, um, that statewide drug therapy protocols developed by the board, Colorado Medical Board, and statewide Board of Nursing in collaboration with CDPHE. Um, so that's where it's coming from.

So I do appreciate the ability to be able to get this into your emergency meeting only because it's already-- it was presented late in our rule-making kind of timeline throughout the year. We've already presented it to the medical board and they didn't have any further feedback, um, to provide to the pharmacy board. Uh, we've reached out to CDPHE and also have not heard any feedback, um, about that.

It will be presented to the Board of Pharmacy, uh, at their rulemaking hearing, um, in the first week of October. So I'm just here to really quickly, um, pres-present it to you, get feedback. It's already in your packet, so I'm not gonna go through the details. I'll just go through, um, that it's a revision not to the actual board rule 17, but to the appendix related to it, specifically Appendix A.

Um, there's just some minor revisions, um, that are through Appendix A and also a repeal of the algorithms that were, um-- that are already becoming outdated in some ways as rules do that were originally put in here, um, for treatment. Treatment, um, is still referred to the most current clinical guidelines, not to what is clinically available in board rule. And this kind of goes along with the natural intent to not have clinical guidelines, um, in our board rules as they do get outdated and board rules, um, are timely to change, right?

They cost a lot of time or take a lot of time. Um, and we also don't wanna confuse-confuse clinicians and pharmacists of whether to go to their clinical guidelines or to board rule to find those guidelines. So the revisions are relatively small, they're being presented to you just to collect feedback. There's no specific motion that the board needs to make. Um, in fact, the medical board didn't say anything and that was fine.



Um, so I'll just be bringing anything back, uh, to the Board of Pharmacy as they consider this adoption, um, in early October. And if there's no comments, that's okay too, very s-similar to the medical board. Um, Joe, I'll hand it back to you.

**[00:14:37] Joe:** Yeah-

**[00:14:37] Dmitry:** Appreciate your time.

**[00:14:37] Joe:** -we didn't have anything on the changes you proposed, so I'm comfortable with that.

**[00:14:42] Dmitry:** Thank you.

**[00:14:45] Joe:** All right. I think we've gotten through our agenda. Is there anything else I need to address before we close? I'd like to thank everyone for your attendance and participation during today's meeting. Before we adjourn, there are a few items to be addressed. Next meeting will be held on Wednesday, October 25th, 2023 via webinar. Are there any board members in attendance today that know that they will not be able to attend the next meeting? If you find that you're not able to attend the next meeting, please inform the program director at least two weeks prior if possible, to help ensure a quorum.

Then the questions for you, do you attest and affirm that all conflicts of interest have been disclosed and confidentiality of all board matters has been maintained since the previous board meeting? We'll do it by roll call again. Alright, Lori Ray.

**[00:15:41] Lori:** Yes.

**[00:15:42] Joe:** Michelle?

**[00:15:44] Michelle:** Yes.

**[00:15:45] Joe:** Carrie?

**[00:15:45] Carrie:** Yes.

**[00:15:46] Joe:** Lenny?

**[00:15:47] Lenny:** Yes.

**[00:15:48] Joe:** Phyllis?

**[00:15:49] Phyllis:** Yes.

**[00:15:50] Joe:** Ician?

**[00:15:51] Ician:** Yes.

**[00:15:53] Joe:** Um, MacKenzie?

**[00:15:55] MacKenzie:** Yes.

**[00:15:56] Joe:** Brandy?

**[00:15:57] Brandy:** Yes.

**[00:15:58] Joe:** Myself. I Or Yes. I need a motion now to adjourn the meeting. Does anybody wanting to do that?

**[00:16:09] Speaker 2:** This is Lori, I move to adjourn.

**[00:16:10] Carrie:** This is Carrie. I'll move to adjourn.

**[00:16:11] Joe:** I heard Lori Ray first, we'll consider Carrie the second and we'll do roll call vote again. Lori Ray.

**[00:16:19] Lori:** Aye.

**[00:16:20] Joe:** Michelle?

**[00:16:22] Michelle:** Aye.

**[00:16:23] Joe:** Carrie.

**[00:16:24] Carrie:** Aye.

**[00:16:24] Joe:** Lenny.

**[00:16:25] Lenny:** Aye.

**[00:16:26] Joe:** Phyllis.

**[00:16:27] Phyllis:** Aye.

**[00:16:28] Joe:** Ician?

**[00:16:30] Ician:** Aye.

**[00:16:32] Joe:** Mackenzie?

**[00:16:33] MacKenzie:** Aye.

**[00:16:34] Joe:** Brandy?



[00:16:35] **Brandy:** Aye.

[00:16:36] **Joe:** Myself. Aye. The meet-- this meeting of State Board Nursing is adjourned at 11:21.

[00:16:46] **Michelle:** Thank you.

[00:16:47] **Everyone:** Thank you.

[00:16:47] **Speaker:** Thank you. Thank you, Joe, for doing such a great job.

[00:16:52] **[END OF AUDIO]**