# Exhibit J:

# Transcript of Senate Judiciary Hearing on SB 23-190 (excerpts)



# Certificate of Accuracy

## Transcription of **Senate Judiciary [Mar 15, 2023 - Upon Adjournment]_2023-03-15.3gp** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **30 March 2023**

Signed: *MindCaplin*
Name: Mindaugas Caplinskas
Position: CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com



# COLORADO SENATE JUDICIARY COMMITTEE HEARING
# MARCH 15, 2023

**[06:07:27] Madam Chair:** All right- all right. Senate Judiciary is gonna come back to order. And, um, I want to, uh, extend my appreciation and gratitude-- that's cool, y'all wait, we got all day.

[laughter]

Thank you. I wanna extend my appreciation and gratitude to everyone who has, um, been here, um, I don't know, all day. Um, we are now gonna bring up Senate Bill 190, um, for consideration. And I'd like to, um, invite our sponsors, um, Senator Winter and Senator Marchman, uh, to tell us about this policy. Who'd like to begin? Senator Marchman.

**[06:08:13] Senator Marchman:** Thank you. When someone's making a decision to continue or end a pregnancy, they deserve accurate information about all of their options so they can determine what is best for their health and wellbeing. All people have the right to truth in advertising, and shouldn't have to worry about being misled or deceived when seeking essential healthcare services. These clinics use disinformation, intimidation, shame, and delay tactics to withhold essential and time-sensitive reproductive healthcare that members of the community deserve.

So what is an anti-abortion center? They're also known as crisis pregnancy centers and fake clinics. They are faith-based organizations that pose as a comprehensive reproductive healthcare clinic to intercept patients seeking abortion care. What would SB 23-190 do to regulate anti-abortion centers? Prohibit the use of deceptive advertising by anti-abortion centers, prohibit advertising for abortion pill reversal and define it as a deceptive trade practice, and make the prescribing offering or facilitation of abortion pill reversal unprofessional conduct for licensed, registered, or certified healthcare professionals.

So, some of the AACs' deceptive practices are, um, advertising to lure people in and steer them away from abortion and other time-sensitive reproductive healthcare procedures. Examples of this include: using language like "help is just a call away," on billboards, mass transit facilities, college campuses, and websites to target those with unplanned pregnancy- pregnancies, omitting, minimizing, or obscuring disclaimers that they don't offer or refer to abortion care or emergency contraception while advertising all options pregnancy-related services.

Additionally, anti-abortion centers use the following deceptive tactics to appear as reproductive healthcare facilities. They often use similar names or brownding- branding to nearby abortion clinics. Give the appearance of a medical facility with volunteers and scrubs, medical equipment, intake forms, language use such as women's clinic, mobile medical clinic, free ultra-ultrasounds, and free pregnancy testing.



Sharing medical misinformation, including offering and advertising abortion pill reversal treatment. By design, an increasing number look and operate much like traditional OBGYN providers offering ultrasounds, tests for sexually transmitted infections, in some instances even prenatal care.

Many boast of having medical directors and other licensed staff, doesn't include the word medical in their names, but beneath the veneer of medical professionalism is an industry that state and federal authorities have done almost nothing to regulate. The lack of signi-significant regulation means that, for the hundreds of clients whom pregnancy centers serve every year, there is no one playing an oversight role to make sure that centers are offering high-quality care and accurate information, or that staff are licensed and adequately trained.

No one protecting clients' ultrasensitive personal information, or inspecting facilities and equipment to verify that they're clean and up to date. No one taking substatin act-- substantive action if clients are mistreated or deceived.

There is a regulatory dead zone that allows pregnancy centers to dodge all the legal safeguards that attach to actual healthcare without being held to even basic consumer protection standards. The consequences extend far beyond the reproductive health front. It muddles medical trust. They trade on the goodwill of legitimate medicine to defraud patients. The move into medical services began in the '80s as centers started offering free pregnancy testing. The medicalization of pregnancy centers became a core strategy of anti-abortion activists in the 1990s following the advent of the ultrasound machine. Since then, centers have ramped up their medical services as a way to expand their reach and build credibility with clients, communities, and donors.

79% of centers provide free ultrasounds and 30% offer testing for sexually transmitted effect infections. Even as pregnancy centers have become more medicalized, complaints about their deceptive tactics have intensified, but there's been very little scrutiny of how these centers operate under the regulatory radar. Pregnancy centers typically recruit licensed doctors, nurses, and sonographers as part of their teams of staff and volunteers then piggyback on their professional licenses to legally provide medical services.

It's a system that works for other types of medical clinics because they face many levels of oversight. These include the federal patients privacy law, known as HIPAA, regulations that govern Medicaid and Medicare, and accreditation rules for the larger hospital systems to which many traditional clinics belong.

Just because a doctor promotes it does not mean it is accepted, peer-reviewed care. While there are exceptions, most pregnancy centers don't list a medical director in their publicly available documents. Pregnancy centers that provide ultrasound services should have a medical director who's a licensed physician. Some centers said they had



a licensed physician on staff or working as a volunteer, but not in a medical director role.

Medical directors at many centers specialize in fields outside of reproductive health. Centers often make it difficult to find out who works there and to check their credentials. Only four states have laws requiring sonographers to be licensed. Mainstream medical groups like the American Institute of Ultrasound and Medicine states that only technicians or nurses with training in obstetric sonography should perform prenatal ultrasounds, while a physician or an advanced clinical provider should interpret all of those results.

The issue of regulation is more urgent than ever in the post-Roe era. In areas that continue to allow abortion like Colorado, centers are doubling down on efforts to deter women, many from out of state, from following through with plans to end their pregnancies. Women's health advocates have been especially concerned, but sensitive health information collected by these pregnancy centers could be weaponized against abortion seekers.

Because most centers are not subject to the same privacy rules as medical clinics. Colorado has more than 50 religious-based pregnancy centers that encourage women to keep their babies or link them with adoption agencies. That compares with 18 Planned Parenthood Clinics, 10 of which offer abortion services, and 76 state-funded health clinic locations that offer low ca- low-cost birth control.

In five rural counties in Colorado, the only pregnancy center or clinic is a faith-based one. In fact, in three counties, Otero, Custer, and Fremont, the only thing that's available is a mobile unit from Pueblo. People deserve the right to make informed healthcare decisions that are right for them. AACs mislead and coerce people away from the healthcare services they seek and remove a person's right to personally-- personal bodily autonomy and decision-making.

People deserve the right to access critical healthcare in a timely manner. For people who have to take time off work, use public transportation, find childcare, and overcome other obstacles, a trip to an AAC delays-delays critical access to care or pushes care completely out of reach. People seeking information about abortion deserve medically accurate information from a trusted medical provider.

**[06:16:33] Madam Chair:** Thank you so much, Senator Marchman. Senator Winter.

**[06:16:37] Senator Winter:** Thank you, Madam Chair. Uh, thank you committee members. This is a consumer protection bill. This isn't a bill about limiting choice. It's about giving clear and honest information to consumers. We protect cumer- consumers from predatory pay loan, payday loans, we require honest disclosure for student loans and have numerous protections for consumer-consumers from debt collectors.



This bill is a consumer protection bill about deceptive trade practices and absolutely should be enforced by the attorney general's office. This is not about shutting down anti-abortion centers. This is about truth in advertising. Everyone should seek the care and counseling they choose when pregnant, including faith-based organizations, as long as it is a choice they are clearly making. Unfortunately, many anti-abortion centers are purposefully misleading about offering unbiased, medically-based comprehension-comprehensive healthcare. In fact, a study done in 2021 found that 85% of participants could not correctly identify even one anti-abortion center looking at their website. These centers use language such as to offer all options, women's clinic, medical clinic, offering free ultrasounds, pregnancy, and STI testing, and a range of choices.

This misinformation isn't just inaccurate and inconvenient for the consumer. Trying to persuade people to change their minds about their healthcare decisions is a violation of autonomy and it can be downright dangerous. Oftentimes, if ultrasounds are offered in these clinics, is not performed by someone that's certified to perform or has the basic background in education to interpret these ultrasounds.

In one instance, an ultrasound at a so-called clinic missed an ectopic pregnancy, putting the patient in danger. Many times anti-abortion clinics worked to delay time-sensitive healthcare from medical providers that do offer a full range of medically accurate treatment.

There was one patient from another state that paid for a plane ticket, food, lodging to travel to Colorado in order to seek abortion care to only find herself at an anti-abortion clinic, keeping her from time-sensitive healthcare. These centers are also-- also are not just untruthful in their mission, their goals and what they offer, they do purposely target young people, low-income communities, rural communities, and communities of color.

They're taking advantage of vulnerable populations that are already having a hard time accessing healthcare. Put simply, anti-abortion clinics should not act as though they offer a full range of reproductive healthcare when they are using deceptive untruthful practices to lure patients in.

In addition to misinformation, many places are advertising and offering abortion reversal. The American College of Obstetricians and Gynecologists and other medical experts have refuted the efficacy of abortion pill reversal and say it's unproven and unethical. It is not based in science and does not meet medical standards.

In a case in North Dakota, a brief from the American Medical Association said "The fact that there are physicians experimenting with using progesterone to counteract mifepristone does not constitute credible, medically-accepted evidence that the experiment is effective or safe. Because there's no credible scientific evidence that a medicated-- a medication abortion can be reversed, physicians cannot, without misleading them, tell their patients that it may be possible to do so, nor can they tell



their patients that information and assistance is available to reverse a medication without misleading them."

ACOG has stated that the so-called abortion reversal procedures are unproven and unethical. The studies on the practice do not sign- stand up to scientific scrutiny. The case studies on this practice lack supervision from institutional review boards or an ethical review committee, which is required to protect human research subjects raising serious questions regarding the ethics and scientific validity of the results.

Case studies with no control groups are among the weak-weakest forms of medical evidence. Subsequent case series used to support use of Medicaid abortion reversals have had similar limitations, including no ethics approval, no control group underreporting of data, and no reported safety outcomes.

A 2020 study intending to evaluate medication abortion reversal in a controlled board-reviewed ethic-reviewed setting was ended early due to safety concerns among the patients. **[unintelligible 06:21:37]** though on this important consumer protection bill because transparency and truth and advertising are essential to informed consent in medical decision-making, particularly related to time-sensitive services like abortion and emergency contraception.

**[06:21:56] Madam Chair:** Thank you, Senator Winter, for walking us, um, through and- and to both of you for walking us through, um, sort of the rationale behind, um, Senate Bill 190. I'd like to see if there are questions for our bill sponsors from members of the committee prior to us proceeding to witness testimony. Senator Van Winkle.

**[06:22:16] Senator Van Winkle:** Thank you, Madam Chair. And I am just now learning actually in recent days about the abortion reversal pill, uh, that you mentioned in your introductory statements. Why would a woman seek a abortion reversal pill?

**[06:22:33] Madam Chair:** Senator Winter.

**[06:22:36] Senator Winter:** I'm not-- I think one of the things we make a mistake in doing in these conversations is trying to place assumptions on medical decisions that women are making. And I think whether that she is, um, a-a pregnant person is seeking to, uh, have an abortion, um, get the morning after pill, or besides that, they would like to explore not taking the second dose of a medication-- medicated abortion, I'm not going to speculate as to why they are making that personal medical choice.

**[06:23:14] Madam Chair:** Further questions? Senator Gardner.

**[06:23:17] Senator Gardner:** Thank you, Madam Chair. Um, and, uh, this is either for Senator Winter or Senator Marchman. Um, uh, your bill is, uh, not-not very long text-wise. It-it's interesting, um, setting aside the, uh, legislative declaration, which doesn't seem to be designed to go in the, uh, CRS, but, um, contains a lot of conclusions, um,

5

**6**



cost or no cost all options resource for unplanned pregnancies. Over the last decade of working with college students, I have noticed a sharp rise in the number of students who struggle with financial-financial access to health care.

Even at a relatively rich institution like DU, I encounter students every day who are struggling with their mental health or disabilities and cannot access the services they need because they cannot afford them. Anti-abortion centers can capitalize on the vulnerabilities since they swoop in and represent themselves as the affordable choice when, in fact, nothing they do is about respecting students' choices.

I, therefore, think that the status quo of allowing anti-abortion centers to deceptively advertise their services on college campuses creates a considerable safety issue for a vulnerable population of young people. Another thing that I encounter every day is students' extreme reluctance to seek out support when they are struggling. Since it is so rare that they do not seek out care when they need it, and it's often the case that they reach out for support at the last possible second, it is crucial that when they seek out care, they're able to access it in a timely manner and without delays. They also need to be able to trust that those they reach out to will help them in the ways that they want to be helped, which in some cases looks like providing accurate information about abortion referrals and/or abortion care. This bill is urgently necessary to protect a broad swath of young people against the dangers of ideologically driven interventions in their lives that can and do compromise their health and well-being. For all these reasons, I support this bill on the strongest possible terms. Thank you again for hearing my perspective.

**[08:02:53] Mr. Vice Chair:** Thank you. Uh, Mitchell Creinin, can you hear us? There you are.

**[08:03:00] Mitchell Creinin:** Okay, thank you for allowing me to participate. I am Dr. Mitchell Creinin. I'm a board-certified obstetrician-gynecologist, and a board-certified complex family planning specialist, and a tenured professor at the University of California, Davis. I'm here on my-- speaking on my own behalf. Uh, I am the only investigator who has ever studied mifepristone reversal.

There are only three studies that have ever been published. And all of the prior testimony that related to numerous studies and many, uh, people in studies is blatantly false. There are three studies, and that is it. Two of those studies, or what qualify as studies, are simply case reports with less than 10 patients each. There is also my study, which is a randomized trial, which we stopped early after enrolling 12 patients, and that's the evidence. Period. There is a report with upwards of 750 people that supposedly received mifepristone and then supposedly received progesterone.

The problem is that doesn't qualify as a study. And basis for all of the discussion around mifepristone reversal is tethered on this one report. Well, to reach an evidence level of a study, at the lowest level, a case study or case series, which is what this



report tried to be, needs to report on the outcomes for all of the individuals who were included, not just the individuals who had the result that was desired by the investigators.

So, this larger report of 750 people is not a study because they only reported the outcomes for those people that had continuing pregnancies, which was about 50%, and not the other half, said nothing about what happened to the other 50% who didn't have the desired outcome. Therefore, it's not a study. So, all of this discussion is about a treatment that is purported by anti-abortion clinics to be proven and effective, and there are no studies to do so. So, this is misleading.

This bill is about medical fraud, and that's all it's about. It's not about when life begins. It's not about abortion. It's about the ability of clinics to move forward with medical fraud, and that's just not right.

**[08:05:10] Mr. Vice Chair:** Thank you. Um, colleagues, is there any questions? Senator Roberts.

**[08:05:15] Senator Roberts:** Thank you, Mr. Chair. Thank you all for your testimony and your time this evening. Um, Ms. Gavin, I wanted to go back to you and, uh, get into the legal analysis a little bit more and, uh, I think you were- you were just ending, or your time ran up when-- just when you were making your point.

Can you walk me through a little bit more of the legal analysis of how, uh, this doesn't violate the First Amendment as deceptive health information? Is that-- Deceptive health information, is that under the existing deceptive trade practices, or is there case law that leads to that conclusion? Can you just walk me through that?

**[08:05:46] Mr. Vice Chair:** Ms. Gavin.

**[08:05:47] Ms. Gavin:** Yes, thank you. Oops.

**[08:05:49] Mr. Vice Chair:** Oops, it happens.

**[08:05:50] Ms. Gavin:** Thank you. Um, I-I was speaking to, uh, the Deceptive Trade Practices Act and also just to the common law on First Amendment rights. Um, so, uh, content-based regulations tend to be, uh, trigger strict scrutiny. Um, there I-- has been a split on the US Supreme Court as to whether, um, content-based-- false-false content-based statements trigger strict scrutiny or immediate scrutiny.

So, strict scrutiny meaning that the law is presumed unconstitutional unless the government can show, um, that the challenge law is the least restrictive means of targeting speech while also serving a compelling government interest. Um, if we were to apply intermediate-intermediate scrutiny, which is a lower standard, the law must further an important government interest by means that are substantially related to that interest.

40

8



Uh, my argument is that this law can meet either test.

Um, Colorado has already adopted the Uniform Deceptive Trade Practices Act, which states that in part it's a deceptive trade practice to knowingly or recklessly make a false representation to the characteristics, uses, or benefits of products or services, or to knowingly or recklessly engage in any unfair, unconscionable, deceptive, deliberately misleading, false or fraudulent act of practice.

So, that is already an existing restriction on speech that exists, and the law that is being proposed in this bill is arguably a more compelling government interest because it's not just about commercial trade practices, it's about healthcare. Um, as I said, the consumers that we're talking about are women who are seeking healthcare, uh, related to their pregnancy, and they are being deceived into thinking that they're receiving healthcare, but they're actually receiving, um, propaganda from anti-choice, uh, activists, um, disguised as healthcare. And so arguably there's a more compelling government interest here, and this law is more narrowly tailored to address that government interest in that it specifically addresses AACs.

**[08:08:00] Mr. Chairman:** Senator Roberts.

**[08:08:01] Senator Roberts:** Thank you, Mr. Chair. Thank you for that. And just so one follow-up. So that subcategory of healthcare information is that-that doesn't currently exist in Colorado law. Is that right? And if not, is it-- is there anywhere in case law that sort of creates that category or other states maybe, or have categorized a-a specific category of healthcare?

**[08:08:21] Mr. Chairman:** Ms. Gavin?

**[08:08:22] Ms. Gavin:** Um, I-I am not sure, uh, about the answer to that question. So, I would, um, I-I would defer to another, uh, panelist.

**[08:08:32] Mr. Chairman:** Okay.

**[08:08:32] Ms. Gavin:** Um, I-I--the-the law that I reviewed didn't speak specifically to healthcare. I was simply saying that, you know, from my perspective as uh, an attorney, I would think that because it's healthcare, not just commercial, uh, information, that-that would be a compelling government interest.

**[08:08:49] Mr. Chairman:** Okay. Thank you. Oh, Senator Gonzalez.

**[08:08:53] Senator Gonzalez:** Thank you, Mr. Chair. Um, I apologize. Uh, Dr. is it Cronin or Crinin?

**[08:09:02] Dr. Cronin:** Thank you.

41

9



**[08:09:04] Senator Gonzalez:** Um, I walked in, um, just as you were, um, uh, speaking, and I missed the majority of your testimony, but it's my understanding that, um, you have, um, worked, uh, on, uh, the study that has been referred to, um, uh, at great length, uh, thus far during this hearing. And I wanted to, uh, take an opportunity to ask you, um, uh, because we've heard some testimony from previous witnesses that abortion pill reversal is safe and effective. Um, can you speak to that, uh, given, uh, the, um, your knowledge and expertise?

**[08:09:44] Dr. Cronin:** Sure. Thank you for asking. I think one of the important things about looking at all of these questions, and a lot of the testimony that's been provided before is that science is not about seeing a patient who experienced, you know, outcome A. Or saying, I saw one person who reported outcome B. Science is about looking at something systematically. Um, that's why we do studies to really test if an outcome is due to the intervention or the treatment, um, or if it occurs by chance. So, when you look at this, the information that was available even before I started my study, it was two case series and that's it.

A case series is when somebody has a certain condition or/and somebody gives them a treatment and says, what happens? Uh, it doesn't prove any cause and effect, it doesn't show any outcome. It just says, you know, I gave this and this is what happened. Maybe it might be reasonable there should be real studies done. There is a 2018 report from, uh, led by, uh, Delgado and colleagues that was published in, um, what would be considered an ir-, uh, unreputable journal. It's not even a-a standard medical journal.

The, uh, there was no, um, there was no criteria that were done that would allow any reputable journal to publish anything like this, um, without getting into large amounts of detail. But it didn't meet the minimum criteria even for a case series, which is that when you treat all the people, you report the outcomes on all the people. Uh, so therefore, with those three things in existence, that means the only data that really looks at Mifepristone reversal are a couple of case series with less than 10 people each.

And then the study I attempted to do, keeping in mind that Mifepristone and Misoprostol together are very effective, very safe, well- very well proven, uh, treatment with a death rate that's lower than Tylenol, a death rate that's lower than Viagra, right? So, let's get the safety really clear what the combination of the two drugs represents. If you give the first drug and then try to do what we did, which is that give women Mifepristone with an established pregnancy and then randomize them to a placebo or progesterone in a blinded fashion.

So, they didn't know what they were getting and we didn't know what they were getting. With the idea of following them for two weeks to see what happens even over two weeks. Is there any sense that the pregnancies do continue at a different rate between the groups. Well to even test that you need at least 20 women in each group to have any statistical sense, any reasonable outcome that you can say I can say, statistically



this matters. We had to stop the study after 12 women were enrolled because three of the women had such significant bleeding that had to be rushed to the emergency room or they called in an ambulance.

I can tell you in decades of providing medical abortion care, that's incredibly rare. You have to have 3 out of 12 to have that happen. That's more than rare. So, we stopped the study, not knowing again what women had received because we were all blinded. And once, uh, the study was stopped, we could then find out from the pharmacy what they received. It turns out two of the people had received placebo and one had received progesterone. So, in a small study, all we could say is that when you give them a progesterone by itself and you don't give Misoprostol bad things can happen.

But what that also means is that we have no data. Just like if you went to your physician and had a tumor, a lung cancer, for example, your-your doctor would be able to say, "Well, based on the biopsy it's this type of lung cancer, and based on the CAT scans, you have this much advancement of the disease." So specifically, for you if we give you this treatment, I can tell you what the outcomes might be rather-- and if you have a slightly different disease process, I can tell you what the outcomes would be. With this I have no idea number one if progesterone works. Number two, how likely is it that somebody will hemorrhage?

Uh, number three, if it does work, does it work differently at different gestational ages? Does it matter how long it's been since you've taken the Misoprostol? These are all the tenants and many more questions that any healthcare provider would want to be able to say to a patient "I have a proven treatment and I know how well it works, and I can provide you with adequate counseling about the pros and cons of the treatment." That doesn't exist and the FDA allows off-label treatment. If you tell the patient, it's off-label and if there's adequate medical evidence to prove it's effective and safe, and none of that exists for this. So, any claim that this treatment works and he claimed that it's safe or effective is misleading and medical fraud.

**[08:14:24] Madam Chair:** I want to thank you, um, for that response, doctor. Um, it is, uh, quite helpful and clarifying, uh, for me. Um, so just to, um, reiterate, um, there is, um, do you believe that, um, abortion pill reversal is any more effective than not taking the second pill in the medication abortion regimen?

**[08:14:54] Dr. Cronin:** We have zero medical evidence that it does. And in fact, if I want to look at the evidence that could exist that I could try to translate like using progesterone and somebody having a miscarriage, we have lots of evidence that it does absolutely nothing. In fact, there's a big difference, for example, of a doctor trying to give progesterone to a patient who maybe has had multiple miscarriages and saying, maybe I can help you not lose this pregnancy, and giving progesterone after Mifepristone. Miscarriage is a process where the majority of cases occur because there's a genetic abnormality of the pregnancy, right?



So, giving anything is unlikely to help. And in fact, studies have shown that people that have even repetitive miscarriages giving them high doses of progesterone does nothing to increase the likelihood of them having another continuing pregnancy. It doesn't work. Mifepristone binds, as a prior, uh, person has stated in prior testimony, binds incredibly strongly to the progesterone receptor more strongly than progesterone itself, and it has a long half-life, meaning it sticks around in the body for a long time. There is no medical sense that by giving more progesterone, that it's going to reverse the effects.

If I have you in a really tight bear hug and I am able to hold that bear hug for 24 to 48 hours, and you just put more people around me who want to give you a hug, does that mean I'm going to let go? No, it doesn't. So that's the idea of what happens between Mifepristone and progesterone. So, giving more progesterone doesn't displace Mifepristone from the receptors. It doesn't make it come off. It doesn't make any medical sense that it could work. Now, if somebody really thinks it does, then do a large appropriate study to prove that our understanding that we've had for decades of how hormones work doesn't seem to work when it comes to Mifepristone and progesterone. And tell me more than I saw one patient who had this and one patient who had that because the data doesn't support it. Thank you for your question.

**[08:16:59] Madam Chair:** Uh, thank you, doctor, and thank you for explaining it to a Judiciary Committee Member in terms of the bear hug-ish because as a, uh, as a non-doctor, I very much appreciate that. So just thank you. Um, uh, Senator Van Winkle.

**[08:17:18] Senator Van Winkle:** Thank you, Madam Chair and thank you, doctor, for your testimony. I was trying to follow along and it was pretty quick going through it, uh, going through the con- your- the study you did I think it was 20 women, 12 got the, um, APR, the rest got a placebo, and then there were complications. Could you tell me which- from which group did the complications come from, from both groups, one group or-- Please explain that.

**[08:17:47] Madam Chair:** Dr. Cronin.

**[08:17:46] Dr. Cronin:** Yeah, there were-- yes, there were 12 women that were recruited before we ended the study. Again, I can give you the results knowing after the fact that we're unblinded at the time, we didn't know what people had received. There were-- it turns out we had six in each group. There was one person in each group that stopped on their own before, um, anything happened because they had side effects. One of them happened to have severe nausea and vomiting at pregnancy and just wanted her planned abortion. The-- another one, um, had started to have some light bleeding and said, "I don't want to wait, I just want to have my planned abortion."

So, the other five people who were waiting, planning to go through the two weeks, there were two in the people that received placebo, and one in the group that received progesterone that have significant bleeding. So that's one out of five in the progesterone



group, and two out of five in the placebo group that had really significant heavy bleeding and had to go, um, urgently to the hospital. When you look at who made it two weeks, there were four out of five in the progesterone group, and two out of five in the placebo group that made it for the two weeks. Those numbers are too small to say with any certainty whether something works or doesn't work.

All it means is that, in an early study, to see if there's any sense of whether this might work in patients who were not at risk for taking the drugs, there was a safety signal that would be- would indicate it wasn't good for people not at risk to continue. Whenever any drug that you've taken, Senator, any drug that you've taken that's gone through FDA approval, the very first studies were first to establish safety. Those are phase one studies. But you take the range of dose that you're gonna- you're potentially gonna use as a treatment and say, is it safe for me to even try to use this range of dose? So, safety studies always come first, and this study didn't pass. This treatment didn't pass.

**[08:19:37] Senator Van Winkle:** Okay. Thank you.

**[08:19:40] Dr. Cronin:** Thank you.

**[08:19:41] Madam Chair:** Are there any other questions for this panel of witnesses? Senator Gardner?

**[08:19:47] Senator Gardner:** Thank you, Madam Chair. Uh, doctor, to follow up on that, so, uh, I-I don't know, I'm a lawyer not a doctor. And, um, I-I don't know, you know, but prior to March 2020 I-I sort of trusted the science but now, I don't know, you know. One study says one thing and one study says another and one study is terminated because the results, uh, is-is your study inconclusive or how would you characterize that?

**[08:20:23] Madam Chair:** Dr. Cronin.

**[08:20:25] Dr. Cronin:** Thank you. So, my study was inconclusive as far as showing whether or not the treatment might work. My study was very conclusive that there was a safety signal, that means it's unsafe to provide this treatment unless you're going to do something under a study, because there's no proof that it's safe, and no proof that it works.

**[08:20:48] Madam Chair:** Senator Gardner.

**[08:20:49] Senator Gardner:** Thank you. Uh, now what this bill does, uh, with respect to medical practice standards, is it-it declares, um, that-that someone who owns a medical license, uh, has engaged in unprofessional conduct and, uh, and is subject to discipline, uh, if they administer, uh, medication, abortion reversal. Uh, are you aware of whether in Colorado or any of the other states, uh, a medical board, Board of Medical

45

13



Examiners or whatever board, there is a governing board, are you aware of any that have made such a holding or finding or even a finding in a case?

**[08:21:40] Madam Chair:** Dr. Cronin.

**[08:21:41] Dr. Cronin:** Not in the United States, but I am aware of it in other countries. So, it does occur.

**[08:21:50] Senator Gardner:** Well, I-I-- what countries, doctor?

**[08:21:56] Dr. Cronin:** The United Kingdom.

**[08:21:59] Senator Gardner:** Um, they're the people who had brought us thalidomide babies, right?

**[08:22:06] Dr. Cronin:** I don't think that has any relevance for your question.

**[08:22:08] Senator Gardner:** Well, I-I just-- well-well, it-it might in my view, I-I mean, their-their standards, uh, may not be our standards. Um, uh, any-anyway, doctor, let me- let me continue. Um, they're already in medical practice standards, um, there are already provisions that would, um, permit the discipline of a physician for engaging in unprofessional conduct. Is that correct? Is that in your experience correct?

**[08:22:44] Madam Chair:** Dr. Cronin.

**[08:22:44] Dr. Cronin:** Yes. Yes.

**[08:22:45] Senator Gardner:** Um, I mean, might it be possible that advances, um, in science or-or something might make-- in the future might make some sort of medica- medication abortion reversal process safe? Um, is that, you know, in the realm of possibility?

**[08:23:06] Dr. Cronin:** I think it is very possible that somebody could develop something that could, uh, make the action of Mifepristone, uh, not effective. It's always possible, but at this current time, there are people who are touting that a current treatment is effective, is proven safe, and they can provide it in a way that's equal to any other medication. And I don't think that is true at all right now or potentially in the near future. I also have heard testimony that people that uh, doctors see hundreds or thousands of people, uh, who have, uh, received treatment or need a treatment, yet there is no evidence ever published, ever, of these numbers being so large.

In the State of Nebraska when they passed a law requiring the patients be informed of medication re-- abortion reversal, and that it was required in the State of Nebraska that doctors who provided this treatment, uh, reported to the state in the same way they report abortions, the-- before Nebraska outlawed abortions, there had been zero



reported to the state. All the other states that passed abortion reversal laws did not have a reporting mechanism as part of the requirement, so we don't know anything, but in the State of Nebraska, they were zero.

**[08:24:25] Madam Chair:** Senator Gardner.

**[08:24:27] Senator Gardner:** Thank you, Madam Chair. Well, uh, to go back to the beginning, I-I think you said it-it-it's within the realm of possibility that-that in the future medication, uh, abortion reversal might-- there might be some way that it would be safe. Um, and yet if we pass this bill, we will have placed in law a standard of practice, uh, with regard to that broad-based procedure. Um, why-why is our current medical practice standard sufficient for a board of physicians to determine whether, um, using this procedure is professional conduct or not? Why-why is that not okay? It's okay for every other thing that-that physicians do with few exceptions?

**[08:25:20] Dr. Cronin:** Well, in my experience as an obstetrician-gynecologist, I have lived through, uh, legislative actions which have, uh, legislated my practice of medicine, uh, beyond just what goes on by the medical board. I have, uh, practiced in Pennsylvania for 17 years, where the medical board there decided I had to tell patients that abortion caused breast cancer. I had to inform patients seeking abortions of certain things that, interestingly, I didn't have to tell any of my prenatal patients. So, the fact is that state legislatures do, uh, legislate how medicine can be practiced and what physicians have to say or not say at certain times.

Um, also, we live in a world where, um, as an obstetrician, I am told that I have to allow a patient to stay in the hospital after delivery for a certain period of time. Or, um, that also, um, uh, that, um, if I have a patient who is being evaluated for breast cancer, that my mammogram has to report things in a certain way. Um, so keep in mind that during the COVID-19, uh, pandemic, the FT-FTC, uh, sometimes sent cease and desist letters to companies that falsely advertise their products, uh, treated, or-- that their products treated or prevented COVID-19. So even though this could be, uh, under the form of a medical board, uh, there are, uh, legislative actions, um, that take place to jurisdict how physicians talk to patients or interact with patients all the time.

**[08:26:51] Madam Chair:** Senator Gardner,

**[08:26:53] Senator Gardner:** Uh, thank you. Well, um, I-I don't, uh, I-I guess my point, doctor, wasn't that legislatures don't do that. My-my point was, uh, as I think some of your examples show that, um, the legislatures may be not the one best position to tell physicians what the standard of practice is. Um, would you agree with that?

**[08:27:16] Madam Chair:** Um, Dr.-- Go ahead, please. Sorry.

**[08:27:21] Dr. Cronin:** Um, I think that, uh, legislatures can optimally help, um, ensure that patients get, um, appropriate care especially since some of the examples are

47



because insurance companies won't cover things. Some of the examples are because, um, uh, the inability, uh, in certain states to access care without the legislature making sure that it's available. Um, and also in this case, um, I think a lot of this has to do more with, uh, what is, would be, uh, more appropriate for the legal experts here about, um, fraud and the laws around fraud.

Um, I think that medical boards I would, uh, actually like it that both the legislature and the medical board were both on board with this. Um, I would like a joint effort if you ask my preference. 'Cause the bottom line is lying isn't illegal, except when it is.

**[08:28:18] Senator Gardner:** Tha-thank you. Uh, well, doctor, um, I-I-I heard you said, say you would leave fraud to the lawyers or at least indirectly say that whatever indirectly means these days. Um, what is medical fraud?

**[08:28:38] Dr. Cronin:** No, to correct my statement I-I-I was answering your, uh, saying that the legal specifics of your question would be better left to the attorneys rather than me as a physician. Medical fraud is when you make a statement, uh-uh, regarding medical care or healthcare, that is, um, simply a lie and not based on fact. So, none of you can tell me that there is a fact that medical abortion reversal has been proven to be safe and effective. There is no fact. So, nobody can sit up there or sit behind and provide any testimony to say that that is a proven fact because there is no science to support that at all. Anything that meets the standard of science does not- does not exist, and that is medical fraud.

**[08:29:24] Madam Chair:** Senator Gardner.

**[08:29:24] Senator Gardner:** Thank you. Well, I appreciate your testimony doctor. I don't think I've heard anybody say, uh, um, what-what you assert as medical fraud this evening. Uh, quite to the contrary, I think, um, I think I kind of come away from it, uh, the same way I came away from COVID. I don't even know whether I was better off wearing a mask or not. Or whether or not my grandchild not being in school was better for her or not. So, um, I-I thank you for your testimony and being here.

**[08:29:56] Madam Chair:** Oh, okay. Um, seeing, are-are there any quest- further questions for this panel of witnesses? Seeing none, I wanna thank you all, um, for sharing your testimony, um, with us today as we debate the merits of this policy. I'm gonna shift now to a prop- a panel of opponents, and I'm gonna welcome, uh, Fallon Whitely, Diane Ferraro, uh, Brittany Vessely and Dr. Katherine Wheeler. We'll go ahead and begin with Fallon Whitely.

**[08:30:52] Fallon Whitely:** Hello, Madam Chair and committee members. My name is Fallon and almost four years ago I received abortion pill reversal. I was being pushed and pressured into an abortion I didn't want to have. The CU Boulder Clinic knew I didn't want to have an abortion, but gave me the pills anyways and tried to force me to take them in their office. After I went home and took the pills, I regretted my decision and