# Exhibit N:

# Transcript of House Third Reading of SB 23-190 (excerpts)



# Certificate of Accuracy

Transcription of **Colorado House 2023 Legislative Day 083_2023-04-01-10.16.21_34910_14474_20.mp4** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **04 April 2023**

Signed: *MindCaplin*
Name: Mindaugas Caplinskas
Position: CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

1



**2**

Excuse me. Though this acts as if it is an all above approach is best, I believe we are dismissing adoption or birth as legitimate alternative choices. My love and constituents have voiced concern for months in opposition, and today, I rise to represent my district by urging a no vote. Thank you for your time.

**[01:45:20] Madam Speaker:** Representative Evans.

[silence]

**[01:45:29] Evans:** Thank you, Madam Speaker. When I came to this chamber, and I came to this body, I knew there would be things that we would agree on, there would be things that we would disagree on. And I knew that we would be dealing in two general areas. We would be dealing in the area of policy, and at times we would be dealing in the area of ideology. And I know that every single one of us in this chamber has deeply held beliefs. And I respect that, but when we take these seats, and we're legislating, we have to legislate on the basis of policy.

We have to legislate on the basis of a Colorado for all, and that's why bills like this, honestly, disappoint me, because when I read this bill, when I watch the debate, when I watch the conversations, unfortunately, what I see, and what many of my constituents see, is a situation in which a level playing field is not being established, but rather the government is taking the position of picking winners and losers, not on the basis of policy, but on the basis of ideology. And I fear for that.

I fear for that because when I came here, I came here having spent the previous 10 years of my life in law enforcement, where when people called me up, when people dialed 911, the first question was not, "Oh, what's your political affiliation, or what's your deeply held ideological belief?" The first question was, "How can I help? How can I solve that problem? How can I work together with the community, with the community members, to bring our community together?" That's what I dedicated 10 years of my life to doing.

Working in the community. Working with all stakeholders in the community. In a jurisdiction that leans blue, in a municipality that leans blue, and it didn't matter to me, because I was serving the people of my community, the people of Colorado, and I was trying as hard as I can to find that common ground, to find those areas where we can collaborate and work together for the betterment of everyone. And I could do that because I was empowered by a level playing field.

And so when I look at bills like this, when I read the rhetoric in the first part of the bill, in the legislative declaration, I ask myself, is this creating that level playing field? Is this empowering a Colorado for all in which policies establish a neutral level playing field in which ideologies can compete in the marketplace of ideas, but without the government picking winners and losers? And I don't see that, in the first part of this bill. In the

31



second part of the bill is, you've heard me speak before. I think that it is legislating in an area in which there is tremendous disagreement among the experts themselves.

I sat through numerous hours of testimony in committee, listening to medical professionals on both sides of this issue, talk about why they either agreed with or disagreed with these different medical treatments here. I'm not a doctor. I'm not a medical professional. This is not my area of expertise, but in between 12 years in the military and 10 years in law enforcement, with the vast majority of that being in command level positions, I've learned that I'm often called upon to make decisions in areas where I do not have particular subject matter expertise. And in those situations, I very seldom go wrong when I listen to honest and robust dialogue from the subject matter experts.

And so when I sat for over 12 hours in committee, and I listened to numerous, numerous examples of testimony, deeply divided, hotly debated testimony, from well-credentialed medical doctors on both sides of this issue, what I took away from that was, there is tremendous disagreement on this issue in the medical community itself. I heard testimony from doctors who say they have administered these procedures in the state of Colorado. And I asked them, "Have you been disciplined for that? Have you been brought up on ethics concerns by your governing board?" And the answer that I continued to receive was, no.

So, if we have governing boards in Colorado today, that are composed of these subject-matter experts, and if these procedures are occurring today, in Colorado, by licensed medical professionals who are not receiving complaints and who are not being investigated for these procedures, the only conclusion that I can come to is that this is not yet settled even in the medical community. And so, if it is not settled in the medical community, why is the legislature stepping in? Why are the voices of the subject-matter experts not being listened to? Why is a level playing field not being preserved? And that's my ultimate concern.

Is that when we sit in these seats, and we push-push the red button or the green button, we are creating law for the state of Colorado. And that law needs to be made on the basis of a level playing field in the area of policy. And I don't see that this bill does that. And that concerns me. It concerns me because of my past experiences, and the fact that my constituents sent me here to work for all of them. On both sides of the aisle, and for those who don't even claim a side of the aisle. And when I see legislation like this, I worry for this state. I worry that rather than building bridges, the divide just gets deeper.

I worry that we are legislating on the basis of ideology and not policy, and that's of grave concern to me. So, out of respect for my conscience, out of respect for my constituents, out of respect for the gravity of this office, out of respect for all who have come before us, and who have allowed us to sit in this seat here to continue to advocate for that level playing field, I felt compelled this morning to come down to the well and ensure that



these remarks were on record, as the explanation for why I will be a no vote on this bill. Thank you.

**[01:53:06] Madam Speaker:** Representative Bradfield.

[silence]

**[01:53:16] Bradfield:** Thank you, Madam Speaker. Um, I think I must echo most of what Representative Evans was speaking about. I, too, do not come down to the well to make a personal plea or position statement very often. So, before I get into that part of it, I do wanna thank the people who have come down here, and have spoken, and have told their stories, and-and have shared their experiences, both good, but often so tragic. That must have been very difficult. I also wanna thank the men who, this is not their- their story. It can be their wife's story, their sister, their cousin, their friend, but they feel the pain as well. And I appreciate that.

Today, we are just dealing with, uh, Senate Bill 190. It's been so long I had to check. Uh, that I might-- I know I need to keep my comments to that bill and I will. I'm not young, so I can tell you that I do remember when women were asking for equality, the bra-burning eight days of the seven days. We've come a long ways, ladies, but this bill will take you back. Somebody is making a decision for you. I find that embarrassing. That's not going forward. That's a step back in my opinion. I think I've set for some of you who know me well, I often say I have a- I have had a blessed life. I'm fortunate. I am very fortunate that I come from the family I've got and the family I have.

So these are not experiences I can relate to, hence, I haven't been here but that doesn't mean that I don't have empathy, sympathy, and a desire to make it better for people that this bill does not. Another disappointment then in this, uh, chamber and because I follow the work of legislators before me, is that I feel that especially on these bills, the people who've been down here talking and actually really wanting to encourage a debate. It has really been a monologue.

But it's been a monologue of which probably was a lot of wasted breath. Um, the last thing I'm gonna say is I just reiterate what I have said before. This bill is embarrassing and is not taking any women forward, it is taking us back. And, uh, I would urge a no vote. Um, we can do better, Colorado. We can do better.

**[01:57:37] Madam Speaker** Representative Bockenfeld. This is your second time to speak, you have 2 minutes, 35 seconds.

**[01:57:44] Bockenfeld:** Thank you, Madam Speaker. In my, uh, my family, my wife and I have five children. Four of them were boys and one of them was a daughter, she was the youngest one. And, uh, learned real quick that raising a daughter is a lot different than raising boys after having four other ones. And, uh, but I thought about this situation

33

**4**



**5**

**[02:10:31] Hotaru:** Thank you.

**[02:10:34] Madam Speaker** Representative Luck.

**[pause 02:10:36]**

**[02:10:49] Luck:** Thank you, Madam Speaker. There's still a number of questions that this body needs to answer. First of all, how does this bill interact with RHEA? The Reproductive Health Equity Act, which says a public entity that's us shall not deny, restrict, interfere with, or discriminate against an individual's fundamental right to use or refuse contraception, or to continue a pregnancy and give birth.

Or to have an abortion in the regulation or provision of benefits, facilities, services, or information. When that particular bill was debated, it was debated as an absolute. There would be no restrictions. This bill is about restrictions. How does that work? Another question. By passing this bill, is this body engaging in-invidious discrimination? Is it running a foul of equal protection? Are we singling out one group even though we know in the same marketplace there are other groups engaged in similar behavior? How about questions relating to the prohibition or compulsion of speech?

We understand that that is not acceptable in a variety of settings, especially in non-commercial settings, which is what we find ourselves in when we're talking about pregnancy care centers. It's not a trade. It's a voluntary gratuitous service that is provided. There's no money exchanged. How about what is included in the pool of deceptive activity? The words are seemingly plain on the page, but as we have flushed out those words in committee hearings and on this floor, there are now questions, questions about whether a pregnancy care center is going to run afoul of this by adding the word abortion into their search engine optimization terms.

Are they gonna run a file based off of what they're saying in their clinics when someone walks through the door? Switching over into the other half of the bill, there are questions about why it's even needed. Medical boards already have this authority. They can already regulate. In fact, they have a duty to regulate in this space, a duty to determine if these things are-are not acceptable. Have there been complaints, formal complaints filed against doctors? We didn't hear about any. Have women reported generally of harm in Colorado? Again, no one, as I remember in testimony spoke to that.

In fact, all of the testimony we heard about the abortion pill reversal was positive while children who were alive because of it sat in their laps. Have there been malpractice suits? Again, no evidence to that. And will our direction now tip the scales? What is the harm of allowing naturally occurring progesterone to be used? What is the harm? We've heard the one study that was mentioned, the one study that all of this is built off of, which again I'm going to reiterate, included 10 people. 10. All of them abortion-minded, all of them who took the first pill, five of them weren't given any progesterone. They were given a placebo. Another five of them were given progesterone. There was harm.



There were three women who hemorrhaged, two of them very badly. One to the extent of needing a transfusion and having complications. Two that needed hospitalization. You wanna guess which groups were which? The two that had harm were the two that were not given-- two of the five that were not given progesterone.

So why are we saying to the women of Colorado, "It's okay, you change your mind, just don't take the second pill." When the only study we have actually substantiates the use of progesterone. These are all questions. Is the harm that we might provide a false hope to women by saying, you may have an opportunity to-to change this. You may. I highly doubt that doctors because I've been in doctor's offices, are saying, "Yes, guaranteed your child will survive if you take this pill." That again would be considered malpractice. We again, already have rules about that.

So if that's where the harm is, show me- show me a doctor who's out there saying, if you take this pill, you will for sure give birth to a healthy child, and that first pill won't have any impact. I dare you to find me one, but let me now switch to what is the harm of not allowing these pills. There was a story shared in testimony about a woman who was given the first abortion pill, unbeknownst to her by her boyfriend. You see, you can buy the abortion pill regimen online and have it shipped to you. And so someone, her boyfriend, not wanting to go through with this pregnancy, gave it to her, unbeknownst to her. And so she wanted a way outside of a choice she didn't make.

Are we closing the door on girls like that? I heard from a doctor who said, "This is going to create a lot of difficulty in my practice. I'm an OB." And you see, what happens if a woman comes in and she is asking for progesterone because she's in the midst of miscarrying, how do I know if that woman is there miscarrying because she took a pill, in which case, by this law, I would not be able. 'Cause we're assuming, which we heard testimony in this direction too, that the medical boards are just gonna rubber stamp. They're gonna take the political cues of this body and rubber stamp this decision.

And so what happens when sh--I now have to discern, I now have to determine whether or not she's there because she took the abortion pill or because she is just naturally miscarrying. A month ago, the first Thursday in March to be precise, I walked into an emergency room experiencing pain. Within the next week, it became obvious. And, uh, sadly, um, I learned that I lost my child. And I will tell you that if there was anything that could have been done, I would've done it.

Why would we send women across state lines in moments of panic, in moments of deep and excruciating pain to get a pill that is a naturally occurring hormone? Why would we do that? There's been no demonstration of harm. Thank you.

**[02:19:50] Madam Speaker** Assistant mi-- sorry, Minority Leader Lynch.

38

**6**



**[02:24:15] Marshall:** I represent the most conservative district held by my caucus and I am the most conservative person in my caucus I believe. And because of that, whenever I've had to been outta step, it's been my policy to always support my caucus members on their amendments to get the bill they desire to the floor and not speak against that bill, um, even if I may have to vote against it in the end. However, on this case, I have been subjected to quite a lot of anger and angst of people encouraging others to call into question my reasons for voting no on this bill. So I believe I need to explain it. Uh, when I ran, I ran on a commitment that I would fight against any rollback of abortion rights in Colorado, but I wouldn't support any further expansions of abortion rights in Colorado. And I'm a man, I believe in integrity and wish to keep to that commitment, but this bill wasn't about an expansion or a rollback, so it falls outside that commitment.

So I could look upon it on its merits, but the bill is about deceptive trade practices applying somewhere where it had not before. So it is a government restriction on speech, and for many days I kept asking and frustration, why does the Deceptive Trade Practices Act not already apply here? There knowing in my own mind what the issue would be. And that's because it's not commercial speech, it is Core First Amendment Speech. We cannot just wave a Magic Wand, and turn it into commercial speech. I was very sympathetic to the reasons we're doing this.

The idea that women are being deceived, seeing, uh, abortion, you know, pregnant, we have options, and believing that they could find abortion services, that her abortion referrals and going in. That is a serious problem because if they get delayed, and they get delayed beyond being able to get a medical abortion, and now they have to have a surgical, that is a serious issue. So I was very sympathetic, but I couldn't get over the fact that this is a burden on Core First Amendment Speech.

I kept pushing and asking, and finally, the third attorney on the panel gave a beautiful exposition of the law and admitted this is a novel extension, and one we believe is defensible. And I found out later, my dear friend and colleague who I have so much respect for from Denver, planted a lot of that information with that attorney knowing me so well on what would get me thinking about it in the terms I was looking at it.

So it was whether it was defensible, and I was given many examples, but every example I was given of advertising purely on the advertising, I could not see it passing a motion to dismiss on a Deceptive Trade Practices Act. A park bench that says, "Pregnant, you have options, solely that," and people saying, "That's deceptive."

I'm like, "It-it may be to the person reading it, but I don't know how you are going to be able to say the person putting that message out is engaging in deceptive practices." I would fight in the red states, in Ohio and Tennessee against their gag orders on family planning, on their forced disclosures that there is a, uh, a medicated abortion reversal because that would be wrong under First Amendment Principles. So I cannot in good



faith vote for something that I think is appropriate--inappropriate under First Amendment Principles, just because I may believe in the other policy.

So I believe this was the wrong tool to get to where we need, and I offered some suggestions on where we may be able to go to get there. Then on the second part, a couple of our colleagues who have pointed out us directing by legislative fiat to the medical boards that certain conduct is unprofessional. We sat through hours of testimony, and add two to three docs that actually engaged in these practices. And we've asked them like, "Are you not subject to discipline by the medical boards for unprofessional conduct? Has anyone ever, um, have you ever been subject to that"?

And the answers were, "No. The medical boards already have this authority. We give them the authority. Why do we have these medical boards? If we are going to by Legislative fiat, tell them what's unprofessional conduct"? We have an administrative state for a reason, and I believe there's probably only two to three members here that who're probably qualified enough to be on a medical board and make those decisions.

It's my strong suspicion that this is probably medical quackery, but that's not a decision within my expertise. We have those boards for a reason, and we should defer to their expertise, and let them do their job. And so for those reasons, I'm going to be a no on this bill. Thank you.

**[02:29:30] Madam Speaker** Representative Mabrey.

**[02:29:38] Mabrey:** Thank you, Madam Speaker. Members, I am primarily up here today too. to talk about my, um, different analysis under the first amendment but I-I do believe that this, um, law will be upheld, um, under the first amendment. But first I just wanna recognize that in committee and in this chamber, we heard stories of crisis pregnancy centers providing misleading information to people seeking reproductive care.

These were people who, based on their own research, went to these crisis pregnancy cen-centers seeking options, people who were contemplating seeking, um, abortions. And they did not choose an option, uh, that would not provide abortions. That we heard testimony in this chamber from one of our colleagues who-who-who went to one of these centers thinking that they did in fact, um, provide, uh, abortion services. So these patients were time limited in their available healthcare options and-and they were misled, um, uh, to these crisis pregnancy centers.

Untruthful speech, whether commercial or otherwise, has never been protected for its own sake. The Supreme Court said this in 1974 in a case called Gertz v. Welch. I also, uh, want to recognize that our colleague from Loveland mentioned, um, past uh, cases, um, where courts have discussed laws that regulat-regulated, uh, crisis pregnancy centers. This law is distinct from those, and I believe it will be upheld because unlike past state attempts to regulate crisis pregnancy centers, we are not compelling an