# Exhibit V:

# Transcript of August 17, 2023 Medical Board Hearing (excerpts)



# Certificate of Accuracy

Transcription of **1. Zoom Webinar 2023-08-17 12-36-52.ogg** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **31 August 2023**

Signed *MindCaplin*

Name Mindaugas Caplinskas

Position CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

1



# Certificate of Accuracy

Transcription of **2. Zoom Webinar 2023-08-17 14-29-14.ogg** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **31 August 2023**

Signed *MindCaplin*

Name Mindaugas Caplinskas

Position CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com



## COLORADO MEDICAL BOARD ZOOM WEBINAR
## AUGUST 17, 2023

**Video: [Colorado Medical Board Rulemaking Hearing Excerpt from 8/17/23](#) (Larger transcription)**

**[pause 00:00:00] [pause 00:05:00] [pause 00:10:00]**

**[00:17:15] Dr. Flores:** Okay. It is 12:46. Are we still waiting for some stragglers?

[silence]

**[00:17:27] Speaker 1:** Anyone who's not on camera, can you unmute so we know if you're back.

[silence]

**[00:17:37] Dr. Flores:** Looks like the- most everybody, right?

**[00:17:42] Speaker 1:** Uh, not that quick.

**[00:17:44] Dr. Flores:** [laughs]

**[00:17:48] Speaker 1: [unintelligible 00:17:48]**

**[pause 00:17:50]**

**[00:18:07] Dr. Flores:** Okay. All right. Welcome back, everyone. I hope you had a good break and a good lunch, because we have much left to go. To remind everyone, we just exited, uh, executive session and we are returning back to discuss agenda item- [coughs] excuse me- agenda item number 1, emergency and permanent rulemaking hearing for Colorado Senate bill 23-190 concerning policies to make punishable deceptive actions regarding pregnancy-related services. Yeah. Any of our board members like to start off our discussion here. [silence] Nobody chimes in. I'm happy to. Okay. I'll start it off here.

I, um, I will say that I-I believe that I, um, I think I understand the intention of the legislators with this bill, um, and would like very much to, um, create rules that are, um, concurrent with that. Um, I, my concern here with, uh, the way the statute is written is currently is with the overly, I think, broad definitions of a, um, uh, a medical abortion and a reversal. Um, especially considering that, uh, most, if not all, of the written and verbal testimony was very specific as to the, uh, what they were discussing in terms of a medical abortion being that mifepristone and misopristol, um, and that the medication abortion reversal was progesterone.



Um, I-I am-I am concerned about that overly broad definition. From the point of view of the board, I'm a-I'm a little concerned with a divergence in the manner by which we normally determine the, um, the standard of practice, um, but I-I think there are probably ways that we can work through that. Dr. Bates.

**[00:20:29] Dr. Bates:** Yeah. I, um, and this-this board has a-a longstanding precedent of, um, when we- when we review, um, issues, um, it-it traditionally has been on a case by case basis. Um, the way that the legislation is drafted, um, is such that, um, it- we-we want to be able to reserve, I think our right to-to be able to, again, be able to review everything, um, independently. Um, yes, sticking with standard of care, um, but, um, but again, just-just that ability to-to look at each case on its own merits.

**[00:21:33] Dr. Flores:** Ms. **[unintelligible 00:21:33]**

**[00:21:35] Speaker 2:** Um, so I-I certainly agree with that, um, Dr. Bates, that we want to have that freedom to do that. Um, but I do also agree with Dr. Flores that we need to possibly address, um, the-the big I think example or, like, the intent or at least what everyone is discusing- discussing, um, with the specific example of, um, of maybe including that one example to capture majority of the situations, um, versus, you know, every scenario out there, because I don't think that we'll be able to do that.

Um, so, I think it would be helpful to have, um, some language added to this rule, um, about the specific example that everyone is talking about. So, um, I would be-- I think we should, um, add some language. And also I have- I do have a question just in terms of if we do add language, what is- what are the steps, I guess, in terms of, um, review and-and approval of that change?

**[00:22:47] Dr. Flores:** So, I'm not sure who's best answer. Is it Darcy or Ashley would be best to answer that particular question?

**[00:22:55] Speaker 1:** I can answer. No, go ahead, Ashley.

**[00:22:55] Ashley:** I can answer. No, go ahead. I , uh, I was just going to suggest that if you guys coalesce around some language to add to, uh, your draft rule here, um, you'll do it right here right now, um, in the meeting. Uh, Darcy will add it to the red line that's in front of you. You'll all make a decision around whether you want to adopt that. You'll take a vote, um, on whether or not to adopt the rule with that inclusion. Um, assuming that it falls still well within the scope of kind of the-the comments that have been presented both today and in your previous stakeholder, um, meetings or written testimony

**[00:23:41] Dr. Flores:** Dr. Bates.

**[00:23:43] Dr. Bates:** I was just going to say I'm very open to that idea of adding that, uh, more specificity to the language.

2

**4**



**[00:23:48] Dr. Flores:** Okay. Well, maybe we'll start with, does anyone want to make a motion to accept the current language of the rule as it stands in front of us before we start moving on to making any changes? Does anyone want to make that motion? Okay. Seeing none, um, maybe I can be the lucky character to start, um, making a couple of changes. I'm, um, kind of looking at it both, um, on the shared screen and on a separate screen here. I am looking all the way down.

I'm fine with everything down to D1. Um, I think I'm okay with everything through D1. Um, I think I'm okay with D2. Um, looking at D3. Um, what I was thinking of putting in-- Let me see if I have that right. What I was thinking of putting in there, and I'll just say it out loud first. The Colorado Medical Board does not consider progesterone reversal of a medication abortion using mifepristone and mis-misoprostol to be the generally accepted standard of practice. As such, the Colorado Medical Board will investigate these alleged deviations from generally accepted standards of practice in the same way that it investigates all other deviations from general standards of practice. Under Section 12-255-121CRS, licensees are expected to practice evidence-based medicine and any licensee who provides unscientific treatments that fall below the generally accepted standard of practice may be subject to discipline.

**[00:25:45] Ashley:** Can I ask a clarification question?

**[00:25:47] Dr. Flores:** Of course.

**[00:25:48] Ashley:** Maybe I have some postprandial confusion. I thought I heard that in the reverse. As in, like, the- essentially that the-the medication abortion reversal being progesterone, like, the medication. Could you reread that first part, I guess.

**[00:26:03] Dr. Flores:** Yes. And-and-and I'm sorry, that-that is a little bit, you know, I, um, it's not postprandial. Mine was during prandial, um, as I wrote this up, um, during the break. Um, and it's-and it's clunky and I would like a better way of saying it. I had, the Colorado Medical Board does not consider progesterone reversal of a medication abortion using mifepristone and misopristol to be the generally accepted standard of practice. It's clunky. I'm sure there's a better way to say it, but, um, but I wanted to include that specific example is what we do not consider the accepted standard of practice. And like I said, there may be an easier way to say that.

**[00:26:43] Ashley:** I-I appreciate you for repeating it, because the second time I-I heard it, I did hear it more clearly. Um, and I hear what you're- I hear what you're saying. I agree with the intent. Um, I do not currently have a better suggestion of phrasing.

**[00:27:00] Dr. Flores:** It does. Well, I mean, as we're discussing--

**[00:27:02] Dr. Bates:** Would that be number 4? Would that be number 4?

**[00:27:04] Dr. Flores:** Well, I think-I think this is maybe a combination, um-- I-I-I don't- I think I was maybe interested in chopping away kind of the specifics of what-- I think we



kind of have an idea of what informed consent is, and I'm not sure if we necessarily have to rehash that out. Um, and about proper documentation of consent and disclosures, I think-I think we kind of under-- So, I think I would be okay, essentially taking away 3 and 4 and replacing it with what I have. I-I think, as we discussed this, one of the things that I would want to know from the board if we were going to move forward with something like this is how does everyone feel about being explicit that we do not consider this-this specific practice to be the generally accepted standard of practice. Dr. Strauss.

**[00:28:02] Dr. Strauss:** Apologies, I did not unmute myself. Um, so I think if I go through 1, 2, 3, and 4 , 1 and 2 I'm most comfortable with, in terms of current language, I think there's- um, you know, Ashley's done a nice job trying to articulate some of the, um, intent of what we standardly do in 3 and 4. So, I-I don't think I'd initially be in supportive of striking those completely with the language that you mentioned to add, because I think there are concepts within 3 and 4 that also are, um, complimentary to the specificity that you're adding. So, I'm not sure how we want to structurally do it in terms of walking through the paragraphs. You know, are we generally okay with paragraph 1 and paragraph 2, because that's fairly standard as far as what we routinely do as a medical board with the inquiry panels.

Um, you know, I guess, I'll look at number 2, specifically that the, uh, case by case basis is important for us. I would say in sentence number 2 with the medical care, um, with the last part against the backdrop of evidence-based practice standards, I might suggest that we say- we add when available after standards. Uh, and my rationale for that is, um, as I believe one of the, um, individuals who testified earlier mentioned that the American College of Cardiology, you know, 40% of their practice guidelines are-are, um, Grade C or Category C. And I think in terms of the available high quality data that we have right now, it's really Category C again.

So, I want to be **[inaudible 00:29:42]** in my understanding, current state that we don't have a great deal of evidence-based practice standards in this situation currently. So, are paragraph 1 and 2 reasonable? Do we want to- and then finalize with specificity down below?

**[00:30:08] Dr. Flores:** I think so. I-I-I like that addition, Dr. Strauss. I-I think, kind of listening to your explanation as well, I think that, you know, um, 3 is kind of- is-is specific again to many of the things that we expect, um, kind of in our normal evaluation of care. And I think it is appropriate, again, for us to reiterate that. I don't think anything there deviates from kind of what we normally do when we evaluate care, or evaluate consent, and charting, and- but it's good to reiterate that. Does anyone have any issue with 3? Uh, well-- And I think-- I-I'm-I'm sorry. Um, **[unintelligible 00:31:00]**

**[00:31:00] Sam:** With 3, I guess, I'm with-with the language that-that you proposed, the first sentence,-

**[00:31:06] Dr. Flores:** Right. That's what I'm looking at too.

4



**[00:31:07] Sam:** -becomes a little wonky.

**[00:31:11] Speaker 3:** Do we have the sentence that you proposed, um, written out, Dr. Flores?

**[00:31:15] Dr. Flores:** I mean, I have have it written out on the third computer screen sitting in front of me.

**[00:31:19] Speaker 3:** Maybe just for, um--

**[00:31:22] Speaker 2:** If you want to read it, Dr. Flores- this says Darcy- I can type it in and then the board can see it and try to figure out where to plug it in.

**[00:31:28] Dr. Flores:** Okay. The Colorado Medical Board does not consider progesterone reversal of a medication abortion using mifepristone and misoprostol to be the generally accepted standard of practice. As such, the Colorado Medical Board will investigate these alleged deviations from generally accepted practice, excuse me, from generally accepted standards of practice in the same way that it investigates all other deviations from general standards of practice.

**[00:32:34] Dr. Strauss:** Ashley, legally would it be reasonable to say, "In similar fashion," as opposed to the same way? What-- Can you help us with legalese there in that last sentence?

**[00:32:43] Ashley:** Uh, sure. My suggestion might be, uh, to kind of crib, uh, it will investigate such, uh, alleged conduct, um, consistently with its evaluation of care pursuant to 12-240-121, uh, subsection 1, subsection J,CRS.

**[00:33:24] Dr. Flores:** So the only, um, the only question I have here, Ashley, is that in- in 4 of the original one, it says, um, in the same manner it investigates other alleged deviations from generally accepted standards of medical practice under 12-255-120. Are those different?

**[00:33:39] Ashley:** Uh, 255 is not our practice act.

**[00:33:42] Dr. Flores:** Okay. It's-- Okay.

**[00:33:43] Ashley:** You've-- I think you-you may have, uh--

**[00:33:46] Dr. Flores:** I-I cribbed from you.

**[00:33:48] Ashley:** I-I think you may actually have, uh, accidentally, uh, seen the language from- that's in front of the nursing board.

**[00:33:56] Dr. Flores:** Oh, it's okay.



**[00:33:59] Speaker 1:** Ashley, I didn't get the first part of your sentence. I only got the statute. I didn't know where you wanted to put it to, and I hope I- I don't know if I misspelled misopristol.

**[00:34:09] Sam:** Does-does this new paragraph, supplant number 4?

**[00:34:15] Dr. Flores:** Um, I-I think it would. And then I have-I have a piece of number 4 at the end of mine. It just- it's essentially that last sentence, um, licensees are expected to practice evidence-based medicine and any licensee who provides unscientific treatments that fall below the generally accepted standard of practice may be subject to discipline.

**[00:34:38] Dr. Schultz:** Yeah. I think I said consistent. Um, investigates consistent with, uh, in the same way that it, uh, consistent with the way it investigates all other deviations from generally accepted standards of practice.

**[00:34:56] Dr. Flores:** And I'm sorry, I didn't see the order here. I see both, uh, Dr. Schultz and Dr.-

**[00:34:58] Ashley:** Sorry.

**[00:34:59] Dr. Flores:** Strauss' hands up. No, no, no, it's okay. Um, Dr. Schultz.

**[00:35:03] Darcy:** Um, first, Darcy, it's mute.

**[00:35:05] Speaker 1:** Yep.

**[00:35:05] Darcy:** Misoprostol. Perfect. You fixed it. Uh, sorry. Prostol. No. The-the P-R-O. Yep. Since you asked. Um, and then, uh, what would- how would you feel, Dr. Flores and others, about perhaps narrowing in just a little bit more? The Colorado Medical Board does not consider progesterone administration with the intention of reversal of a medication abortion.

Um, and yeah, then leave the rest. Just to also kind of throw i- in honor of the statute, um, and the discussion, you know, and-and the concept of intent. Um, you know, what the intention is. Is the intention, you know, for example, a patient is, um, uh, bleeding out and that's-that's what they need or is the intention specifically to, uh, reverse the medication abortion piece of things?

**[00:36:13] Dr. Flores: [inaudible 00:36:13]** This sentence is just- it's-it's a little clunky, like mine was clunky. Dr. Strauss, are you going to fix the clunky?

**[00:36:31] Dr. Strauss:** Uh, nope. Wasn't going to fix the clunky

**[00:36:34] Dr. Flores:** Please then, go ahead. I'm sorry.



**[00:36:37] Dr. Strauss:** Uh, I think just from cleaning up language, I think you can delete Colorado and medical from both of those statements with the board, because I think that's consistent with the language above. Um, I think it fixes if you want to put the specificity that you added before after 4. I think, if I look at 4, the first sentence I think is important to articulate because we're-we're really making a statement there that, you know, per se, active that we don't treat it as a per se act of unprofessional conduct. I think that's important as a- as a statement. Um, and then I think the second part below that, um, we've kind of restated below, so we can absolutely combine those.

Um, but it's style, depending on how you want it to flow. And I-I guess, I would ask as we're discussing this, so I get the idea of specificity, and I just want to put this out there to think about, um, knowing that medicine changes quickly. Currently, medication abortions are, uh, with mifepristone and misoprostol, uh, don't know if in the future, within a month, six months or a year, they'll be different, uh, medications that pop up that are, um, able to be used. And if there will be something other than progesterone, which will be one of the standard treatments for reversal.

Um, so I think the count-- that's the counterpoint of being, um, carving out the specificity. But I do think we can do both. I think if we're- if we use that as an example, but it is not excluding, uh, and Ashley, you can help us with carving that so that we're using an example, but not excluding other newer medicines so we don't have to revise this again when different medicines kind of slide into these treatment algorithms.

**[00:38:42] Ashley:** So, um, thank you for raising that point. I do think that, um, right. Let's kind of back- let's back up and let's talk about the definitions in the statute, which are quite broad and do not reflect any particular drug or drug combination, right? It is the definition of, uh, medication abortion, which does not reflect any particular drug. Um, it is, uh, medication abortion reversal, uh, defined as any drug, uh, but not progesterone.

I think I heard Dr. Flores propose that we get concrete in some language around specific drugs, um, which were the subject of a lot of tests, in fact, all of the stakeholder testimony. I-I think that, um, if you are going-- And so, what you're basically saying is there is a limited subset of conduct that currently exists that all of the testimony related to, that you're interested in calling out. specifically. I'm not sure that there's, uh, motivation, or at least I haven't heard that yet from Dr. Flores' proposal at the outset to get more broad than what we presently understand as being a-a concerning practice. To get to your point, Dr. Strauss, I think we, uh, keep it focused on those drugs. If there are new therapies that happen, uh, that have evolved and develop over time, then I think we amend to the rule, and you can do that. Um, short of- short of, uh, identifying specifically certain medications, I think you're back to the more generic, uh, conversation and discussion, and that's where it gets tricky. And maybe that's part of the reason why the statutory language is so broad, because it's not intended to, um, be limited specifically to progesterone, even though all of the comments and-and kind of the concerning practice as articulated by the law, uh, has to do with progesterone.

**[00:41:33] Dr. Strauss:** Roland, may I comment?



**[00:41:35] Dr. Flores:** Oh, oh, please. I'm- I couldn't tell if that was a previous, uh, hand raised or not **[unintelligible 00:41:39]**

**[00:41:39] Dr. Strauss: [unintelligible 00:41:39]**

**[00:41:40] Dr. Flores:** I apologize. Go ahead.

**[00:41:43] Dr. Strauss:** Um, so-so, Ashley, I think if we, I might suggest that if we read through Section 4, that, um, your intent with the language with Section 4 was more evergreen in that it would cover more, um, changes in medical practice, you know, over the, let's say it could be six months, could be a year, it could be two years out. And that it might be reasonable for us to then call out with specificity, uh, Dr. Flores's example below, uh, but also really deals with both issues. Um, as a possible suggestion.

**[00:42:26] Ashley:** Uh, let me make-- let me see if I, uh, can respond to that. Um, recognizing that we're in open session, and some of this probably, uh, could be construed as, uh, legal advice. Paragraph 4 is drafted to, right, other than sentence number 1, paragraph 4 reflects the way that this board does its business. Um, and-and evaluates generally accepted its standards of medical practice. Uh, this board has been reluctant historically to make, uh, wide-ranging, uh, pronouncements on standard of care, uh, because there are always circumstances that you cannot contemplate that may, uh, influence your opinion.

Um, it sounds as if, uh, Dr. Flores, and he can correct me if I'm wrong, but it sounds as if Dr. Flores is trying to capture one particular situation that, uh, the board believes to fall outside of, uh, generally accepted standards and medical practice. To the extent that that's the case, um, then I think you take out the language of sentence number 1 in paragraph 4, and you not repeat it at the beginning of paragraph 5. And then it does become more of a per se, uh, type of violation if in fact, uh, it is this board's conclusion that the administration of progesterone with the intention of causing or with the intention of attempting medication, abortion reversal, following, uh, first dose of mifepristone, um, because that is not, uh, in your determination, something that meets generally accepted standards of medical practice.

I-I think part of my hesitation and reluctance is because I'm not entirely sure what the policy goal is, um, from adding-adding the language. Is it to create a-a-a setting that is, that deviates from generally accepted standards of practice. Is it to say, we lean this way, but we're gonna look at it on a case-by-case basis anyway? I don't know the answer to that. I think those are two very different situations and we can- we can craft language for either circumstance, but I'm not sure I understand where- where you want to head.

**[00:45:31] Dr. Flores:** Dr. Shackelford.

**[00:45:35] Dr. Shackelford:** Well, um, if we left that first sentence in paragraph four as it was, and then add at the beginning of- of the first sentence of paragraph five,



something like, although, or while the board will not treat, um, the board, does not consider progesterone administration, et cetera. That would allow for the- the previous statement, uh, in paragraph four, as well as, uh, pointing out this- this, uh, specific ex- exception to, um, the general assumption that we're-- there's not really a, uh, the act itself is not a problem. It's the use of this particular, uh, this particular drug in this case. Thank you.

**[00:46:40] Dr. Flores:** Dr. Shackelford, is your hand still up or no? There we go. Sam.

**[00:46:49] Sam:** I just have a question for the board relative to the added language and then the consideration of cases on a case-by-case basis. And this might be something for Ashley to weigh in on. Um, where does it get you? So, if you still say the treatment of a medication abortion reversal with progesterone is not considered, um, standard of practice. However, the board will consider things on a case-by-case basis. Where does it get you? What are you gaining by that?

**[00:47:29] Dr. Shackelford:** Well, I-I-I guess, and I'm- I'm sorry. I'm-- I've got so many windows open I'm having trouble finding it, but I think that the statute asked us specifically to make that determination, correct? And I think here then we are making that determination by saying that it is not the generally accepted standard of practice. And as such, we'll investigate it as we investigate, as-as, honestly, our only means of enforcing any of these rules is to investigate it, I think. Dr. Strauss is in there if he wants to chime in with Sam and I just looking at each other.

**[00:48:20] Dr. Strauss:** Uh, happy to continue to talk, but I don't want to, um, take over the discussion. Um, but I think one of my areas that I've been struggling with is to, uh, provide some protections for physicians who are treating patients that have gotten to this place using other medicines. So, I think some of the examples that were discussed in open session about, uh, an ER doc treating a calcium channel blocker, overdose, beta-blocker overdose, other examples or opioid overdoses or someone who's received methotrexate, um, making sure that the language doesn't unintentionally penalize, um, the docs who are seeing patients who have, um, as a patient-initiated a medication abortion, not a fin- physician initiated.

And so, I'm not sure if the specificity of adding the progesterone administration gives a narrow enough window to say, you know, these other things I just mentioned are outside of that specifically and at the purview of the, uh, inquiry panels depending on what the complaints are. Um, but I wanted to hear what other panel members think on that.

**[00:49:45] Dr. Schultz:** I was just gonna say that I-I agree. And Dr. Flores, I agree with you that I think that the benefit of adding it is that partially that's what the statute seemed to have tasked us with addressing is, you know, unless, um, unless we, uh, you know, feel that it is generally accepted standard of practice which it does not seem like there is a lot of debate on the board about that specific example being generally accepted standard of practice.



It seems like there is a consensus among the board members about that and I hope I'm not speaking for anyone else, but certainly don't feel like I've heard that specific piece debated, um, amongst our group. So, you know, if that piece of the-of the legislation-the legislation, um, we're-we're addressing it while also leaving some room exactly as Dr. Strauss said for, um, you know, to take into account the-the various human factors too.

**[00:50:53] Sam:** No, that's fair. Thank you. I appreciate that.

**[00:50:55] Speaker 2:** I'm sorry, Sam. Go ahead.

**[00:50:58] Sam:** No, I was gonna say that's, uh, I understand the comment. Thank you. I appreciate that.

**[00:51:03] Speaker 2:** Dr. Schultz, I-I don't disagree with you, but I guess I just wanna push back a little bit on the specific reference to a medication in this piece. And so, in hearing your commentary as it relates to the sentiments of the board about whether Mifepristone, um, or, I'm sorry, progesterone is considered, um, generally accepted standards of practice. I heard you say if I'm tracking, um, that the sentiment is that we believe it is not, and because it is not, we feel like it's already covered in other parts of the Medical Practice Act, and including it here is either redundant or potentially sort of tying this language to a point in time that I think someone made the point earlier that, you know, nature of medical care is that it evolves pretty rapidly. Do we feel like we need to add it here or, um, do we feel like that, um, is already covered in the scope of-of our work?

**[00:51:57] Dr. Schultz:** I think that's a great question and I think that we could have a lot of healthy debate on that. Um, I-I do agree that I think, um, I think we would be, if this was in front of, if we had this case as a hypothetical case, um, in front of the inquiry panel where a provider had-had given progesterone with a specific intent as a medication abortion reversal, and I-I think that we were, you would be hard pressed to find an expert to say that that is accepted standard of care. Um, and so I very much agree with what you're saying. Um, and you know, I do agree that I think we should be, to some degree careful with not limiting our language.

And I think Dr. Shackleford had some good suggestions about how we tie in, you know, the start of number four and the start of number five, um, and balancing both pieces. Um, you know, I think it's-it's the, to me the-the debate is, you know, how does the board want to try to manage the intent of the legislation, which was written in a broad fashion but, you know, we know is referring to at least a specific, pretty specific example. Um, or we have a pretty specific example on how we wanna balance the broad language of the statute with also the specific request of, you know, whether engaging in me-medication abortion reversal as generally accepted to, uh, standards of practice and how we wanna balance that. And, you know, I'm, I think there's a lot of good potential points of view of how we do that.



**[00:53:44] Speaker 2:** Yeah, I-I see that. I mean I-I'll just call out. I think ultimately, I'm comfortable if we land either way but, um, from a sort of broader forward-thinking perspective, I'm not as comfortable with the logic that we call out specific medications, um, as-as a standard for our precedent as we work through these types of exercises. Because ultimately, you know, I-I think that sets a, an interesting or potentially confusing precedent for us as an inquiry panel when we try to work through these matters, but also because I think ultimately our action would not be tied to a specific section in an act, but it would be tied to whether and to what extent, uh, that practice meets, uh, generally accepted standards of care.

And if not, then, you know, it kind of falls into our-our regular protocol. So, I just wanna call out. I think Dr. Shackleford's points are well taken. I think we could argue it either way. Um, but if I-if I, you know, could choose blank slate, I think I would err on the side of not having a specific call out, um, to a-a very specific protocol in this space. But I understand why we might land in that direction. Thank you for your feedback.

**[00:55:02] Darcy:** This is Darcy. I wanted to go back to Dr. Shackleford. Um, and it sounded like the board was leaning toward keeping subsection four with the-the first sentence in that paragraph and removing that sentence from subsection five. Is that accurate? I didn't do it while Dr. Shackleford was talking, but I wanted to make sure I went back to that because I know Dr. Strauss also mentioned it as a follow-up.

**[00:55:36] Dr. Shackleford:** Well, may I comment? Dr. Shackleford. Um, it's in-in-in framing it the way that I was suggesting, either while or although, uh, and then comma after conduct, um, it- the second part of that sentence would specifically address the concerns, um, uh, voiced in-in the law itself. Uh, so- and-and- as-as was pointed out previously, uh, the practice that has been named in practically all of the, uh, the comments both, uh, today and in previous, uh, stakeholder meetings. So, um, it-it-it, actually, I would put, although in front of- at the beginning of that sentence, that- I mean, that's just- I'm-I'm thinking that makes it stronger.

Um, but you know, I- that's kind of my thought on, um, how to, uh, allow for the, um, the statement really that the board does not and will not treat medication abortion reversal per- as a per se act of unprofessional conduct. However, uh, the board does not consider this particular intervention to be, um, uh, proper practice, let's say. So-- and-and of course, these are linguistic kinds of-of-- it's a little bit of acrobatics, but-but I think it matters and thank you.

**[00:57:31] Dr. Bates:** So, the way we have that setup, it sounds-- I mean, five almost repeats everything out of four now. Could we just chop four out?

**[00:57:43] Dr. Shackleford:** I-I-- excuse me for jumping in. I wouldn't think so because it-- four goes into, um, the specific way that-that the board investigates complaints. Uh, so meaning that it is complaint driven and that it emphasizes that so that we are, um, in other words, it-it restates that it's very difficult to have a, uh, a per se behavior simply because there are so many different potential deviations or-or permutations on a



particular behavior that-- And we do take all of those things into account in our- in our, uh, deliberations surrounding each complaint that-that is received.

So, I think in-in reiteration may-maybe it is too much, but I-- it's-it strikes me that-that's leaving it in four makes sense. Simply to set out the-the-- essentially the-the-the way that the board functions.

**[00:58:44] Dr. Flores:** Well, the-the first sentence of four is now the first sentence of five, and the last sentence of four is the last sentence of five. And the-the highlighted part on the screen of four, we'll investigate all complaints, um, is in five now. Um, as such, the board will investigate these alleged deviations in the same way that it investigates all other deviations from generally accepted standards of practice. So, I-I think it's all there. Everything in four is in five, right? Am-am I misreading this?

**[00:59:20] Darcy:** No, I agree. I mean, I-- it looks to me like that phrasing is, even the statute part seems to match.

**[00:59:28] Dr. Flores:** So, we could just chop all of four out.

**[00:59:32] Dr. Strauss:** So, Darcy, can you strike- can you just put a line through for five strike, although the board treat unprofessional conduct to the-- however, just put a strike through, but don't delete it. And then to roll into your point, um, the-the language that's actually repeated right is what she had taken, and the licensees are expected to practice evidence-based medicine on the last part. Can you strike that? Because your-your intent really here is this middle piece with this medication abortion reversal, and I think we talked about why you wanna list progesterone administration specifically.

And I think I-I actually agree with Amy's comments too, in terms of really making this an evergreen document, and does it make sense to use this at all? But then the second part with using Mifepristone and Misoprostol, again, if we're being narrow, right? For, how about the people who had one dose of Mifepristone and never got Misoprostol or never got a second dose of Misoprostol? You know, the more specific we get, the more there are holes in that. Um--

**[01:00:38] Dr. Flores:** You wanna just put and or, and/or?

**[01:00:43] Dr. Strauss:** Well, if it's, or then if somebody's just using Cytotec or Misoprostol, again, I'm not trying to get in the weeds here.

**[01:00:49] Dr. Flores:** Oh, you have to a little bit.

**[01:00:52] Ashley:** If I could perhaps offer up some language that's a little more consistent with the statutory, um, kind of directive. Uh, I've-I've sent, I've taken that language that you guys have been kind of trying to work your way through at the beginning of paragraph five. I've sent it to Darcy. Perhaps she can, um, add it in as the first sentence of paragraph five, and perhaps it is a little bit more consistent with the



definitions within the statute, but pulls in the specific, um, medications that you've expressed some concern about.

Or perhaps we can flash it on the screen so that, uh, Darcy, do you see my, yeah, there. I guess it should be administering. I've got a typo there. But [pause] wait, I feel like is, are we missing a--

**[01:02:24] Male Speaker:** A complete sentence at the end.

**[01:02:25] Ashley:** Yeah. The board does not consider the administration of progesterone with the intent to interfere with reverse or halt of medication abortion undertaken, oh, sorry. Yes. To be, to meet generally accepted standards of medical practice. Sorry.

**[01:02:51] Darcy:** Say that again, Ashley. Where do- where do I need to add, sorry. On the same--

**[01:02:53] Ashley:** At the end of, uh, at the end of what's now the new five through the use of Mifepristone to meet generally accepted standards of medical practice. Is that, yeah. Under Section 12.241.21.1.J. Does that capture your, what you're trying to accomplish?

**[01:03:32] Dr. Flores:** And-and then after that, do we want to say as such, and as-as it is in five?

**[01:03:40] Ashley:** Mm. No.

**[01:03:43] Dr. Flores:** Okay.

**[01:03:43] Ashley:** Uh, I mean, you can, I-I think the question for you is, are you making a determination right now right here that when someone gives progesterone following the administration of Mifepristone it is not generally accepted standard of medical practice. If that's what you're deciding, then you don't need your case-by-case language. You may want your case-by-case language for other situations that would meet the definition of medication abortion reversal that are not involving progesterone.

**[01:04:27] Dr. Flores:** Though are we able to do this goes a little bit to the function of the board and I think maybe some of the, um, comments and the, um, stakeholders didn't necessarily have a good understanding of how this worked on our board. But are we able to even-even hand out discipline without doing our normal investigation?

**[01:04:51] Ashley:** Oh, you're gonna have to investigate. You're gonna have to have a-you're gonna have to open a case, you're going to have to, um, investigate it. You're gonna have to be able to prove that there is some sort of violation.

**[01:05:04] Dr. Flores:** And-and-and--



**[01:05:05] Ashley:** This doesn't supplant that.

**[01:05:08] Dr. Flores:** Is that then, I mean, I guess then, like I said, we're just reiterating that we're gonna have to do the thing that we always do, which is investigate these deviations, correct?

**[01:05:18] Ashley:** You're gonna have to investigate, regardless of whether you say you're gonna consider it case-by-case. Case-by-case consideration means we may change our mind. It may be generally accepted standards under certain circumstances. We've talked about the-the broad nature of the definition of medication abortion reversal. You're calling out, you're-you're calling out a specific example of medications. There may be other examples, right, Dr. Flores, you were, uh, you and others were talking, uh, earlier in open session about other potential, uh, administrations of medication that could be, uh.

**[01:06:07] Dr. Flores:** Construed.

**[01:06:08] Ashley:** Construed as a medic-- that could, that falls within the definition of medication abortion reversal, right?

**[01:06:15] Dr. Flores:** Yes.

**[01:06:16] Ashley:** And so, for those circumstances, you may wanna consider those on a case-by-case basis. And so, you might add a sentence that says, for other, uh, for other conduct that could meet the definition of medication abortion reversal, the board will review that on a case-by-case basis.

**[01:06:36] Dr. Shackleford:** And there is a-a comment in the Q&A section, uh, specifically about that, the use of, uh, um, of, um, Misoprostol as a single agent, and, uh, that would potentially address that. Thank you.

**[01:06:58] Ashley:** And I- I'll just, Dr. Shackleford, thank you for that comment. What I-what I do wanna reiterate and-and reflect is that for the record, is that, uh, you guys have already taken public testimony and-and it is no longer appropriate for-for the public to-to engage.

**[01:07:21] Dr. Shackleford:** Thank you. I apologize for-

**[01:07:22] Ashley:** No, you're fine.

**[01:07:23] Dr. Shackleford:** -bringing that in.

**[01:07:24] Ashley:** No-no.

**[01:07:26] Dr. Bates:** So, help clarify for me how what we have maybe for five now is different than what we have in four. It seems to me like four-



**[01:07:42] Ashley:** Uh,

**[01:07:43] Dr. Bates:** -it-it adds specifics, but is-is the point still the same?

**[01:07:52] Ashley:** Uh, I think, no. I think that, uh, parts of four, uh, can sit side by side with what you've got in new five. Uh, but as crafted and as it feels like this board is coalescing around, there is a, uh, subset of conduct, uh, that could meet the definition of medication abortion reversal that you are saying now is in fact, uh, a deviation from generally accepted standards of medical practice. Um-

**[01:08:31] Dr. Bates:** And that's captured in five.

**[01:08:32] Ashley:** That is captured in the first sentence of five, which is different than the first sentence of four.

**[01:08:43] Dr. Bates:** I was looking at the second sentence of four, I guess.

**[01:08:47] Ashley:** Um-

**[01:08:48] Dr. Bates:** Oh, uh, yeah, it defines it more thoroughly, I guess.

**[01:08:56] Speaker:** Dr. Strauss, you're in there too, if you wanna jump in. You're muted, sir.

**[01:09:07] Dr. Strauss:** Yeah, she just deleted old five, which was what I was gonna request in terms of trying to compare. So, from my-from my standpoint, new five, uh, has most of the intent of the specificity that Dr. Flores you started with. Uh, it doesn't specifically call out drugs. It-it calls up the Mifepristone, um, and the high dose progesterone, is that satisfactory in general? And I would agree that the first, we-we do need to figure out what we want to do with the first sentence or four, or the first sentence of five.

[silence]

**[01:09:52] Darcy:** Dr. Strauss, do you want me to put that back in?

**[01:09:55] Dr. Strauss:** No, I don't want you to take any action at this point. That was a question. Um, okay.

**[01:10:00] Male Speaker: [unintelligible 01:10:00]** my question for the group is, uh, where this started when Dr. Flores gave us some original language, do we feel like the intent of that specific example is captured in five adequately?

[silence]

**[01:10:26] Dr. Flores:** My only-- And this is a little wordsmithing. I might snatch away high dose. I don't know that I want someone coming back to me and being like, "Well,



this isn't really a high dose." That's up for debate. I'd rather have a practice we don't consider meeting the standard, just not be there. [pause] And then, do we want-- I mean, in four, as I'm looking at this now, is, does everything-- Is everything in four, except the last sentence in four, repeated in five? Can we just take the last sentence from four, put it at the end of five and cut away four, then? [pause] Thanks.

**[01:11:20] Ashley:** Dr. Flores, I would actually argue that the first sentence in four is materially different than five.

**[01:11:30] Dr. Flores:** Sure.

**[01:11:30] Ashley:** Uh, and so from a policy standpoint, you go with one or the other.

**[01:11:37] Dr. Flores:** Okay. You're talking about the first sentence of four and the first sentence of five are materially different?

**[01:11:45] Ashley:** Yes.

**[01:11:48] Dr. Flores:** Yeah.

**[01:11:48] Ashley:** I think they send a mixed message.

**[01:11:50] Dr. Flores:** I was thinking of-- My thought was to cut, all of four, except licensees are expected. Take that sentence and put it at the end of five and then four is gone.

**[pause 01:12:00]**

**[01:12:16] Dr. Flores:** Oh, God, hands are up. I'm sorry, I'm like looking at my own handiwork there. I apologize. Uh, Beckett.

**[01:12:23] Beckett:** Yeah. Sorry, this is tiny and potentially, like, ridiculously in the weeds, so I apologize if it is. And this is a question for the, uh, the doctors, which is, would we consider adding the word, in number five, um, in that first sentence, so we consider the board does not currently consider administering dispensing? Because I was wondering, we currently feel like there's not enough evidence. Is that-is that any important wiggle room for potentially, you know, whether this guidance would be changed in the future? And again, that might be a ridiculously **[unintelligible 01:12:59]**.

**[01:13:05] Dr. Flores:** Uh, so I don't know- I don't know, Ashley, in terms of how something like this, which is kind of a-a document that's out there forever, deals with things when you say stuff like currently.

**[01:13:16] Ashley:** Yeah, I would not include, uh-- I-I appreciate the concern and the question. Um, I think that if, uh, if medical advances evolve over time, uh, then you revisit your rule.



**[01:13:31] Beckett:** Cool. Thank you, Ashley.

**[01:13:34] Dr. Flores:** Dr. Bates.

[silence]

**[01:13:43] Darcy:** You're on mute.

**[01:13:44] Dr. Flores:** You're muted, sir.

**[01:13:47] Dr. Bates:** Sorry. Uh, and, uh, Section five with, uh, Mifepristone, do we need to add Misoprostol too? Or Misoprostol because there-there's, um, literature or part of the research studies involved in that?

**[01:14:11] Ashley:** Is the real question, uh, the use of progesterone following the first dose? And is the first dose always Mifepristone?

**[01:14:24] Dr. Bates:** Yes, the first dose is always Mis-Mifepristone. Oh, you know what? I-I don't wanna overspeak that. The-- I think in some cases, historically, Mifepristone has been used by itself, it's less effective. So, I, uh, I can't speak as an expert.

**[01:14:47] Dr. Flores:** And/or seems to capture both of those, right?

**[01:14:52] Dr. Bates:** Yeah. I think that's not Ashley's question.

**[01:14:55] Dr. Flores:** Yeah. And it looks like there are some states where miso-Misoprostol is used.

**[01:15:04] Sam:** As a first or sole agent?

**[01:15:06] Dr. Flores:** That's what it looks like.

**[01:15:07] Sam:** Okay.

[silence]

**[01:15:16] Dr. Flores:** Are-are we comfortable deleting four now and getting rid of that completely?

**[01:15:25] Speaker:** Dr. Bates, do you still have a comment or are you raised hand just, oh, stepped over. No, you're fine, sir.

**[01:15:30] Dr. Bates:** I'm lowering it.

**[01:15:38] Ashley:** If we-- before we take a motion and vote on this, can we scroll back up to one, two, three, just to kind of look at the flow again? Thank you.



[silence]

**[01:16:43] Darcy:** I'm just gonna scroll down to show three in its entirety.

[silence]

**[01:17:55] Dr. Strauss:** The second to last sentence in four that begins with four other contact that could meet the definition of medication abortion reversal. Uh, should there be a comma after reversal and delete then, or is that just a style thing?

**[01:18:12] Dr. Bates:** I like the comma better.

[silence]

**[01:18:19] Dr. Schultz:** I have a question when people are ready,

**[01:18:24] Speaker:** Please. Dr. Schultz.

**[01:18:26] Dr. Schultz:** The sentence at the end of bullet two. For that reason, the board does not regularly adopt rules establishing a single standard of care applicable to all situations. I think that our current version of four is congruent with that sentence. But I was, you know, I was wondering if other people had input on it, like, do we need to consider removing that sentence because we have listed a specific example or, I mean, I think you could also potentially make an argument that we don't regulate adopt rules. I get it that is still true. Um, both things could be true as well, that we don't regularly do this, but also here we're putting our nickel down.

Um, so I just wanted to kind of call that out to get some reflections on should we be leaving that sentence in? Should we take it out? Should we edit it or should we-- are we all comfortable with it?

**[01:19:28] Sam:** I'd be inclined to remove it, to avoid confusion.

**[01:19:38] Dr. Flores:** Any-anyone opposed to removing it?

**[01:19:42] Dr. Schultz:** At risk of asking a legal question? Ashley, do you have any concerns? What am I allowed to ask you that.

**[01:19:51] Ashley:** Uh, you're certainly allowed to ask. Um, I-I-I think arguably you are establishing a standard of care applicable to at least, uh, a subset of, uh, of these circumstances. And so, m-my suggestion is to delete it.

[silence]

**[01:20:35] Darcy:** Dr. Flores, this is Darcy. I-- it seems like we might be getting close to a motion. So, when you call for the motion, I will turn the recorder on. Just let me know.



**[01:20:44] Dr. Flores:** Thank you. I'm sorry. I was actually, as we were sitting here reviewing the language for calling for the motion, so. All right. Um, okay. Does anyone have any further discussion or wordsmithing or ads or deletes to what we have before I begin the-the kind of the script for making a rule change here? And we are going, this will be a-a permanent rule change, correct? Not an emergency rule.

**[01:21:17] Darcy:** Both. Uh, there will be two motions, one emergency, one permanent.

**[01:21:22] Dr. Flores:** Okay. So, I-so I wanna start with the emergency.

**[01:21:27] Darcy:** No preference on my end. Um, as long as we have the board call for both.

**[01:21:31] Dr. Flores:** Okay.

**[01:21:32] Ashley:** Is there a way we could just look at the full text as we're making the motions?

**[01:21:39] Darcy:** Let me see if I can. I have so many.

**[01:21:42] Ashley:** I wonder if you could just-- I know if you-- I wonder if you just like copy and paste it into a new doc and we can just, you know, just copy it correctly.

**[01:21:54] Darcy:** Let me-- I can't even get to the, uh, Zoom.

**[01:22:01] Ashley:** You can do multiple pages. Do you want-- if you hit multiple pages right under one page?

**[01:22:05] Darcy:** I can't get to it 'cause it's-- okay, I'm just gonna hit **[unintelligible 01:22:08]**. Okay.

**[01:22:12] Ashley:** Perfect. Thank you.

**[01:22:14] Darcy:** Too small.

**[01:22:16] Ashley:** Is-- I mean it meets the level that I had requested.

**[01:22:21] Daryc:** Okay.

**[01:22:21] Ashley:** So **[unintelligible 01:22:22]**

**[01:22:27] Dr. Flores:** Okay. To make sure that I understand this as well, we need the emergency adoption in-in addition to the permanent adoption because-

**[01:22:38] Darcy:** The emergency to meet the statutory deadline of October 1st.

**[01:22:43] Dr. Flores:** Okay.



**[01:22:43] Darcy:** Um, if the board adopted the rules today on a permanent basis only the rules will not take effect before October 1st.

**[01:22:50] Dr. Flores:** Okay.

**[01:22:50] Darcy:** So that's why, um, we need both.

**[01:22:54] Dr. Flores:** Okay, perfect. All right. So, uh, we have got two things we're gonna need here. We will need, um, a motion for permanent adoption and a motion for emergency adoption. And, um, and I will read through, uh, the text. Let's start with a permanent adoption and I'll-I will, um, and I'll read that text to begin with. May I have a motion that the board make the following findings?

**[01:23:21] Automated Voice:** Recording in progress.

**[01:23:23] Dr. Flores:** Excuse me. May I have a motion that the board make the following findings? The basis for these rules is to carry out the provisions of the Medical Practice Act at sections 12- 240-101 at SEC C.R.S. The attached permanent rules are promulgated to comply with state law. The purpose of the proposed new rule 1.32 rules and regulations regarding generally accepted standards of medical practice regarding pregnancy-related services is to implement Colorado Senate Bill 23-190.

Concerning policies to make punishable deceptive actions regarding pregnancy-related services. And to exercise the board's statutory authority to promulgate rules pursuant to sections 12-20-204 and 12-240-1061A C.R.S. Regarding generally accepted standards of medical practice. Pursuant to the board's rulemaking authority in Sections 12-20-2041, 12-30-122B, 12-240-1061A and 24-4-103 C.R.S. The board hereby, um, adopts rule 1.32 as both presented and amended. I move, uh, so, um, do we have a motion from someone to adopt the permanent rule?

**[01:24:46] Dr. Schultz:** , I make that motion

**[01:24:49] Dr. Strauss:** Second. Straus.

**[01:24:55] Sam:** Second here.

**[01:24:57] Dr. Flores:** Okay. Is there- is there any discussion? Okay, so hopefully I'm reading this. I move that we adopt new rule 1.32 and 3CCR713-1 on a permanent basis as presented and amended and incorporate by reference the statements of basis, purpose and statutory authority pursuant to section 24-4-103 4CCRS. All in favor.

**[01:25:29] Dr. Schultz:** Aye.

**[01:25:29] Dr. Strauss:** Aye.

**[01:25:30] Darcy:** Aye.



**[01:25:30] Dr. Bates:** Aye.

**[01:25:32] Dr. Flores:** Any opposed? So, moved. Okay. Here's the motion for the emergency adoption. May I have a motion that the board makes the following findings. The basis for these rules is to carry out the provisions of the Medical Practice Act at sections 12-240-101 at sec CRS. The attached emergency rule is promulgated to comply with state law by adopting rules in advance of the October 1, 2023 deadline within SSB 23-190.

The board finds that immediate adoption of new rule 1.32 rules and regulations regarding generally accepted standards of medical practice regarding pregnancy related services. Is imperatively necessary to comply with state law or for the preservation of public health, safety, or welfare and compliance with the requirements of section 24-4-103 CRS would be contrary to the public interest.

The board finds it is imperatively necessary to adopt rule that rule 1.32 on an emergency basis in order to comply with the legislator's--legislature's directive in SB 23-190 to promulgate rules no later than October 1, 2023. Pursuant to the board's rulemaking authority provided by sections 12-20-2041 12-30-122 B, 12-240-10618, and 24-4-1036s CRS. The board hereby adopts rule 1.32. Is there a motion to emergently adopt Rule 1.32

**[01:27:15] Dr. Shackelford:** Shackleford so moved.

**[01:27:18] Dr. Bates:** Ms. Bates second.

**[01:27:20] Darcy:** Oh Bates, you can have it.

**[01:27:21] Dr. Flores:** All right, so Dr. Shackleford and Dr. Bates, is there any discussion? Okay, I move that we adopt rule 1.32 on an emergency basis and incorporate by reference the statements of basis, purpose and statutory authority pursuant to section 24-4-1034 C- CRS. All those in favor say aye.

**[01:27:45] Dr. Bates:** Aye.

**[01:27:45] Dr. Shackelford:** Aye.

**[01:27:46] Dr. Schultz:** Aye.

**[01:27:46] Darcy:** Aye

**[01:27:49] Dr. Flores:** Any opposed? Motion passes. Okay. Well, there we are. We are at, uh-

**[01:28:00] Automated Voice:** Recording stopped.



**[01:28:03] Dr. Flores:** -we're at two o'clock guys, this has been a long haul. Um, I think we probably need another break for at least a few minutes. Is everyone okay with a 10 minute or do we need maybe 15 minutes away from this for a bit? Anybody have a preference?

**[01:28:18] Dr. Schultz:** I would vote for 10.

**[01:28:19] Dr. Flores:** All right. Let's maybe meet in the middle since we're about to be near round number. Let's say, uh, we'll meet back here at 2:10. Uh, give me a sec. The board will take a short break. Please ensure all cameras are turned off and everyone is muted during the break. This meeting will resume at 2:10. Thank you everyone.

**[01:29:21] [END OF AUDIO]**



**Video: [Colorado Medical Board Rulemaking Hearing Excerpt from 8/17/23](#)** (Smaller transcription)

**[00:00:00] Speaker 1:** So, that's my only comment right now.

**[00:00:04] Speaker 2:** Yeah, and I would just say-- sorry, I'm just reading-- I didn't even raise my hand this time. Good it's a one-liner. Uh, I mean, I think there is a difference between, like, treating something like a miscarriage, which, you know, which is something that has come up multiple times in the written testimony, and specifically medication abortion reversal. And, you know, I-I-- so, for example, with the bleeding concerns, I mean, uh-- anyways, I just-- I think that we can spell-spell this out a little bit.

**[00:00:35] Dr. Flores:** Ta-- oh, uh, Ms. **[unintelligible 00:00:36]**.

**[00:00:38] Speaker 4:** Sorry, I don't mean to squelch the conversation. I do, uh, uh, because I think this is a really interesting discussion and I think, um, it is worthwhile to, um-- for the board members to kind of talk through this, there are a handful of legal concepts that have been raised, um, and at least one question presented by Dr. Shackelford that I do want to address. I would like to give you, uh, attorney-client protected advice, and at some point, I definitely do wanna go into executive session to talk about those things, uh, whether that be right this minute or if you wanna continue having some conversation, um, I-I'm-I'm ambivalent to, that's certainly up to the discretion of the board. But, uh, but I-I do think I want to, um, address some of the, uh, comments and-and kind of, uh, address some-some legal issues and-and points that have come up as a result of those.

**[00:01:45] Dr. Flores:** Anyone else have any other comments or points to make before we might go into executive session? Okay. [clears throat] I think now is as good a time as any. Maybe this time now, Paula, are we gonna turn the recorder on? I might be messing it up again. You're muted.

**[00:02:10] Paula:** Thank you.

**[00:02:11] Dr. Flores:** Yes.

**[00:02:11] Paula:** Yes, we're ready.

**[00:02:13] Dr. Flores:** Fantastic.

**[00:02:14] Paula:** Good time.

**[00:02:15] Dr. Flores:** Good times for all. Okay. So, uh, this is Dr. Flores, and the time is 10:39 AM. This is a meeting of the Colorado Medical Board. Can I have a motion that the board enter into executive session for the purpose of discussing with counsel, uh, [coughs] and getting legal advice on specific legal questions pursuant to Colorado Revised Statutes, Section 24-6-402 3(a)(II)? [coughs] And we will be discussing--



**[00:02:45] Speaker 2:** So we're--

**[00:02:47] Dr. Flores:** I'm sorry.

**[00:02:47] Speaker 2:** Oh, sorry. I thought you were done, Dr. Flores. Keep going.

**[00:02:49] Dr. Flores:** Al-almost. So close. And we'll be discussing emerging-- emergency and permanent rulemaking hearing for the Colorado Senate Bill 23-190 concerning policies to make punishable deceptive actions regarding pregnancy-related services.

**[00:03:02] Speaker 2:** There really was more then. Uh, so moved on.

**[00:03:05] Bates:** This is Bates. I'll second.

**[00:03:08] Dr. Flores:** Okay. Um, all those in favor of going into executive session?

**[00:03:12] Board Members:** Aye.

**[00:03:20] Dr. Flores:** Oh, here we go. Is none opposed? [silence] Okay, I think, um, we will, um, be going into executive session. Um, what-- I believe it was unanimous. I'm sorry, I lost the-the view of everyone. It was unanimous. Okay. All right. Um, [clears throat] so, um, all board members should leave the open webinar and enter the executive session meeting. I'll see everyone there.

**[pause 00:03:55] [00:08:47] [END OF AUDIO]**