# Exhibit Y:

# Transcript of September 21, 2023 Pharmacy Board Hearing



# Certificate of Accuracy

## Transcription of **Bella Pharmacy Board Hearing-2.mp4** in **English**

As an authorized representative of GoTranscript LTD, a professional transcription services agency, I, Mindaugas Caplinskas hereby certify that the above-mentioned document has been transcribed by an experienced, qualified and competent professional transcriber, fluent in the above-mentioned language and that, in my best judgement, the transcribed text truly reflects the content, meaning, and style of the original audio file and constitutes in every respect a complete and accurate transcription of the original audio. This audio file has not been transcribed for a family member, friend, or business associate.

This is to certify the correctness of the transcription only. I do not make any claims or guarantees about the authenticity of the content of the original audio file. Further, GoTranscript LTD assumes no liability for the way in which the transcription is used by the customer or any third party, including end-users of the transcription.

A copy of this transcription is attached to this certification.

Signed on **21 September 2023**

Signed: *MindCaplin*

Name: Mindaugas Caplinskas

Position: CEO

Mindaugas Caplinskas, CEO of GoTranscript LTD

**Address:** 166, College Road, Harrow, Middlesex, HA11BH, United Kingdom
**Phone number:** +1 (831) 222-8398 **Email:** support@gotranscript.com **Website:** www.gotranscript.com

1



**COLORADO PHARMACY BOARD HEARING
TRANSCRIPT
SEPTEMBER 21, 2023**

**[00:00:00] Darcie Magnuson:** Are you ready?

**[00:00:02] Avani Soni:** Yeah.

**[00:00:03] Darcie:** All right, one second.

**[00:00:06] Automated Voice:** Recording in progress.

**[00:00:09] Avani:** All right. The State Board of Pharmacy is now in session for an emergency and permanent rulemaking hearing pursuant to its rulemaking authorities provided by sections 12-20-204(1), 12-30-120(2)(b), 12-280-107(1), and 24-4-103 of the Colorado Revised Statutes. The purpose of today's rulemaking hearing is for the board to a-adopt- to adopt [chuckles] and adopt the proposed new rule, rule 33.00.00, uh, rules and regulations regarding generally accepted standards of pharmacy practice regarding pregnancy-related services.

Uh, to implement Colorado Senate Bill 23-190 concerning policies to make punishable deceptive actions regarding pregnancy-related services on a permanent and emergency basis. I am Avani Soni, the Board President. Also present with me are the following board members, Eric Frazier, Kristen Wolf, Patricia Evacko, Ryan Leyland, Alexandra Zuccarelli, and Jayant Patel. We also have staff members present today, Dmitry Kunin, Senior Program Director, Krista Batchelder, First Assistant Attorney General, and Darcie Magnuson, Regulatory Analyst, and Maria Hernandez, Regulatory Coordinator.

The notice of this permanent rulemaking hearing was filed with the Colorado Secretary of State, and Office of Policy Research and Regulatory Reform on August 15th, 2023, and published in the Colorado Register on August 25th, 2023. Additionally, the notice and proposed rules were posted on the board's website and emailed to all licensees and stakeholders. The Office of Policy Research and Regulatory Reform confirmed that on September 3rd, 2023, the board did not receive any requests for a cost-benefit analysis.

If the board adopts the proposed rule 33.00.00 to implement Colorado Senate Bill 23-190, the adopted rule will be filed with Colorado Secretary of State and Office of Legislative Legal Services by September 22nd, 2023, published in the Colorado Register on October 25th, 2023, and will presumably become effective on November 10th, 2023. Pursuant to the procedures set forth in section 24-4-103 of the Colorado Revised Statutes of the Administrative Procedures Act.



If the board adopts the proposed new rule 33.00, uh, dot 00 rules and regulations regarding generally accepted standards of pharmacy practice regarding pregnancy-related services to implement Colorado Senate Bill 23-190 concerning policies to make punishable deceptive actions regarding pregnancy-related services on an emergency basis. The rule will become effective on October 1st, 2023. Pursuant to the procedure set forth in section 24-4-103 of Colorado-Colorado Revised Statutes and Senate Bill 23-190.

During this rulemaking hearing, stakeholders will be allowed to-- allowed an opportunity to provide testimony before the board deliberates on adopting the proposed rules. Members of the public will not-will not be able to address the board during its deliberation. Board members may ask questions during testimony-testimony only to request clarification of the testimony, if necessary. When providing testimony the board asks that you, please speak loudly and clearly as this hearing is being recorded. State your name and the name of the organization you represent, if any.

Limit your comments to three to five minutes, and please try to keep all background noises to a minimum. All written comments and stakeholder meeting recordings were provided to the board members in advance of today's hearing. If you intend to repeat your comments, please do it efficiently. We will begin taking testimonies from participants in the webinar. Please raise your hand by using the hand icon if you'd like to speak, and staff will unmute your lines so you can be heard by everyone. Or you can type your comment in the Q&A section and the staff will read it aloud. All right

**[00:04:48] Darcie:** Thank you. This is Darcie. The first person with a raised hand is Karen McCormick. Karen McCormick, you are unmuted on our end.

**[00:05:01] Karen McCormick:** Okay. I think I'm unmuted on my end as well. Is that correct?

**[00:05:04] Darcie:** Correct.

**[00:05:06] Karen:** Um, thank you all very much. Um, I am representative Karen McCormick, one of the prime sponsors for Senate Bill 190. Thank you for the work that you do for the Board of Pharmacy. I really appreciate the work to further patient health. The legislative intent of Senate Bill 190 is to protect patients from false, harmful medical information and treatments. Abortion pill reversal as it exists, has no basis in science and has been deemed unethical by trusted medical professionals and organizations.

The incidents of its use have increased so dramastic-- dra-dramastically over the past 18 months that the General Assembly found it necessary to call this out in statute as unprofessional conduct. The bill is not targeting progesterone. The bill is stating that its use when misleading people in the context of abortion pill reversal is harmful on many levels, physically, emotionally, and more. It is a lie and we can't afford lies in medicine. Your job as the Board of Pharmacies straightforward as regards to Senate Bill 90.



If you have gathered enough science-based evidence backed by peer-reviewed studies to conclude that engaging in abortion pill reversal as we know it is a generally accepted standard of practice, then you are asked to put that statement in your rules. If it meets the standards, then write it in the rules. If it does not, if you're unable to make that conclusion, then your assignment pertaining to Senate Bill 190 is complete. Again, I thank you for your service and wanted to make sure you were aware of the legislative intent.

**[00:06:43] Darcie:** Thank you.

**[pause 00:06:45]**

Next is Thomas Perille. Thomas Perille you are unmuted.

**[00:07:14] Thomas Perille:** Uh, members of the board, thank you for allowing me to speak. My name is Tom Perille, I'm a physician and I have worked with medical board previously, uh, reviewing the standard of care in many cases. I have also developed clinical guidelines for a large Colorado hospital and hospital-based system. So I'm quite familiar with the rules of evidence [sound cut] evidence and make recommendations based on that. Uh, generally, **[unintelligible 00:07:55]** center of practice does not need to be popular, common, or widely practiced. It does not need to be seen as the only approach to a patient with the same or similar circumstances.

Does not need to be based on high-level evidence. In fact, uh, the-the evidence for, uh, 40% of the clinical guidelines for, uh, American College of Cardiology are level C evidence, which is common. Unfortunately, we don't have double-blind, so placebo-controlled trials for the-- a good portion of what we recommend. The board must decide what constitutes a generally accepted standard of care for a woman who immediately regrets her medication, abortion decision after taking Mifepristone, and after Ipecac is no longer an option. At the current time, there are only two possible accepted standards of practice.

The abortion pill reversal protocol using high-dose progesterone and expect management based on multifaceted evidence including understanding of the biological mechanism, a competitive antagonist. Animal studies that demonstrate that progesterone could prevent abortion following Mifepristone. A large randomized trial in humans demonstrated a progesterone taken with Mifepristone can quadruple the odds of an ongoing pregnancy-pregnancy, which was statistically significant.

In several case series, showing that progesterone could dramatically increase the chances of an ongoing pregnancy compared to **[unintelligible 00:09:12]** controls. APR is clearly a viable clinical option. Furthermore, progesterone use **[unintelligible 00:09:18]** in pregnancy for threatened miscarriage has determined to be safe for women in developing embryos, and fetus is based on high-cut quality Cochrane and NICE reviews. So it's not-- safety is not an issue. The only alternative is expected

3

**4**



management. Expected management is associated with a 70 to 80% embryo and fetal mortality.

The written testimony from ACOG, SMFM, and SFP acknowledges that patients in early pregnancy who use only Mifepristone may be at high risk of hemorrhage. Potential danger from Mife-Mifepristone as a single agent was flagged in some of the early studies examining Mifep-Mifepristone is a **[unintelligible 00:09:54]** agent. The concerns were magnified by the adverse outcomes reported in **[unintelligible 00:10:00]** in small randomized trial in which the people who received placebo in that trial had, uh, had-had surgical intervention and transfusion. There was one, uh, person in the progesterone arm of the trial that-that had hemorrhage went to the ER but did not require any intervention. We know-

**[00:10:15] Darcie:** Excuse me, can you-can you wrap up, please?

**[00:10:17] Thomas:** Yes. So-

**[00:10:18] Darcie:** Thank you.

**[00:10:19] Thomas:** -what I would suggest that the pharmacy make it clear in-in your role that it is an accepted center of care to, uh, discuss, uh, abortion pill reversal and to not do so with deprived women of Colorado, and your pharmacy colleagues of the ability to practice the best evidence-based medicine that's-that is, uh, that we can. Thank you so much.

**[00:10:42] Darcie:** Thank you. Next is Mar Galvez Seminario. You are unmuted.

**[00:10:52] Mar Galvez Seminario:** Hello? Can you hear me?

**[00:10:53] Darcie:** Yes, we can hear you.

**[00:10:54] Mar:** Perfect. Um, my name is Mar Galvez Seminario. I'm the Legislative and Research Coordinator at COLOR. Um, we're urging you to amend the proposed rules and concur with the medical board that administering medical, um, medication abortion reversal does not meet generally accepted standards of practice. The legislative mandate was for the boards to decide whether APR meets those generally accepted standards. And these draft rules evade the question, so we're asking you to make a decision. Uh, the original draft will also places an undue burden on for vulnerable populations who already do not have the resources or time to submit a complaint.

Uh, from the stories that we've heard, we also know that the stigma and shame felt by those that have experienced it will keep from reporting no matter how great the harm. And by evaluating this on a case-by-case basis, you place the responsibility on our community members to ensure that the medical practice is ethical rather than on experts, which is you. Um, by not addressing whether APR meets generally standards,



uh, generally accepted standards of practice, and requiring fully informed consent for a procedure for which there is hardly any evidence on the "Risks, benefits, and likelihood of intended outcome of the proposed treatment."

You'd extend this pattern of disinformation to providers who deceive and shame people about their decisions. Um, intentionally inflicting or even allowing medical mistrust causes harm, especially if it might prevent someone from seeking needed medical care in the future. These centers are not equipped to be a source of medical care, and COLOR brought the original legislation SB23-190, along with New Era Colorado that mandated the boards to rule on this APR reversal.

We brought this bill now law because of the harm that we know that anti-abortion centers cause. Centers that have intentionally ma-- that are intentionally made to look like medical clinics with comprehensive care where most folks cannot tell the difference between them and real reproductive healthcare clinics. The boards have the opportunity through their legislative mandate to put an end to this harm, and COLOR is urging you to clarify whether APR is a generally accepted standard of practice. Thank you so much for your time.

**[00:12:58] Darcie:** Thank you. Next is Natasha Berwick. Natasha Berwick, you are unmuted.

**[00:13:08] Natasha Berwick:** Hi, can you hear me?

**[00:13:09] Darcie:** Yes.

**[00:13:10] Natasha:** Hi. My name is Natasha Berwick and I'm the Political Director at New Era Colorado, a nonpartisan nonprofit that's a national leader in engaging young people in the political process. I am here today as a representative of our organization. We started The Brazen Project, which is a portion of New Era to create a space on college campuses across the state for open conversations about abortion access. We, along with COLOR proposed this legislation because 18 zip codes across Colorado have anti-abortion clinics, and of all the clinics in Colorado 45% offer abortion pill reversal.

We understand that the boards don't regularly adopt rules establishing a single standard of care applicable to all situations and that generally, um, y'all investigate things on a case-by-case basis. However, this bill demands the board's act out of the norm and determine whether or not so-called medication abortion reversal is a generally accepted standard of practice. As written, the board's draft rule skirts this question ignoring the guidance of the most relevant professional organizations, including the American Medical Association, and the American College of Obstetricians and Gynecologists who've both denounced medication abortion reversal.



As well as people who are seeking safe, accessible, and transparent reproductive care across the west. The American College of Obstetricians and Gynecologists says that claims regarding abortion reversal treatment are not based on science and do not meet clinical standards. Um, and it ranks its recommendations on the strength of evidence and does not support prescribing progesterone to stop a medication abortion. The American Medical Association also says that because there is no credible scientific evidence that a medication abortion can be reversed.

Physicians cannot, without misleading them, tell their patients that it may be possible to do so, nor can they tell their patients that information and assistance is available to reverse the medication abortion without misleading them. They further say that this is a claim wholly unsupported by the best and most reliable scientific evidence contributing their legal and ethical obligations as medical providers. We really hope that you, uh, reconsider the draft rules that you've proposed. Um, and thank you for your time.

**[00:15:22] Darcie:** Thank you. Anyone else who would like to testify? Um, as mentioned at the beginning, once the board closes the hearing portion, the testimony portion of the rulemaking hearing members of the public will not be able to address the board during its deliberation. So if you would like to testify, this is your opportunity to do that. And you can raise your hand and we will unmute your line, or you can type into the Q&A if you haven't already testified, um, by raising your hand. Lloyd Benes, I have unmuted you. Lloyd Benes.

**[00:16:11] Lloyd Benes:** Yes. Are you able to hear me?

**[00:16:13] Darcie:** Yes.

**[00:16:15] Lloyd:** Yes. Um, I have been asked by, uh, Dr. Cathrine J. Wheeler to read her, uh, testimony. Is it all right if I proceed to do that?

**[00:16:24] Darcie:** Yes.

**[00:16:26] Lloyd:** All righty. [clears throat] Hello, my name is Dr. Cathrine J. Wheeler, representing myself. I'm a board-certified OBGYN, who practiced for 24 years. I had a significant experience prescribing natural progesterone for many indications, including pregnancy, and with 24 years of no harmful effects. This is in line with FDA, ACOG, and ASRM's recognition of natural progesterone safety during pregnancy, FDA, Class B. The question is, therefore, not safety, but effectiveness.

As pharmacists- as pharmacists, I ask you to do due diligence as your individual responsibilities to patients and the medical professionals of Colorado, and personally evaluate the literature, not simply rely on statements from medical organizations. All of the relevant scientific evidence has been submitted by many professionals, including myself into the written comments. Thus, I will not reproduce those again, what you have before you.

6



I have also submitted a rebuttal to the references that ACOG submitted prior to the Board of Medicine's decision. I would draw your attention as the pharmacy board to number one, the manufacturer's research showing the reversibility of Mifepristone binding and thus plausibility of natural progesterone as a reversible agent. Number two, the RCT showing increased failure of Mifepristone when DMAP depo medroxyprogesterone acetate, DMPA, is administered for contraception concurrent with mifepristone.

While this is not natural progesterone, it again demonstrates the plausibility of reversal of mis-- mifepristone binding, the best explanation for the increasing mifepristone failure to complete abortion. Number three, the large case studies by Delgado published after the 2015 **[unintelligible 00:18:23]** systemic review showing more than a doubling of fetal survival were historical controls, Mifepristone alone. Number four, new research published in June 2023. A randomized control animal study confirmed that even after the pregnant rants began to bleed from the mifepristone, those that received natural progesterone more than doubled the fetal survival rate compared to placebo.

**[00:18:50] Darcie:** Mr. Benes, can you please wrap up for Dr. Wheeler?

**[00:18:53] Lloyd:** Yes. Natural progesterone for re-reversing the effects of mifepristone has moderate and low evidence for safety, plausibility, and effectiveness. However, you need to please evaluate the literature for yourself. It is your duty to do so. All of us, including professional medical or-organizations can be wrong. Example, postmenopausal, hormonal replacement therapy, lobotomy, and many other treatments. Please look past the politics and advocacy and follow the evidence. Thank you for your consideration, Cathrine J. Wheeler, medical doctor.

**[00:19:35] Darcie:** Thank you.

**[00:19:35] Lloyd:** And, uh, [clears throat] I wonder if I could also, uh, [coughs] give the testimony for Scott Sundheim, doctor?

**[00:19:45] Darcie:** Yes, please keep it limited to the two minutes.

**[00:19:53] Lloyd:** My name is Scott Sundheim. I have been pra-practicing physician in Colorado since 2006. Everyone interested in this discussion wants to be known as showing love and care towards pregnant patients in Colorado. Both those four and those against SB23-190 also wish to be known as providing the best evidence-based medicine. However, the Colorado Medical Board in their August 17th meeting failed to discuss the evidence of their own Colorado physicians brought to the table. Certainly not an open meeting and presumably not behind closed doors.

Is this the precedent that Colorado wishes to set to the nation, that when even medical professionals discuss controversial subjects that they jettison intellectual discussion and explanations? I did not expect non-medical legislators to participate in a whole



discussion of evidence-based medical care. They would need years of medical training for that task. I did expect more of the 13 providers on the Colorado Medical Board. They failed to support their position in any way. We expect more from medical trainees every day.

When other states review Colorado's actions, whether to mimic them or to enact laws opposite them. Shall they follow these same emotional methods for making decisions? Thus, I ask your board to consider the evidence for progede-- progesterone use for pregnant patients who have taken an anti-progesterone but then freely changed their mind. The evidence is moderate, not the strongest level that we all wish existed. But it is as strong as so many of our current medical therapies, such as for overdoses like beta-blockers and calcium channel blockers.

The evidence shows that such progesterone use is safe and likely effective with a number needed to treat of just three. Do not be disingenuous in rejecting this therapy while accepting other therapies with similar modest evidence. Show the medical expertise and experiences of doctors of pharmacy. Publicly explain in detail why this life-saving therapy should be held to a different standard than the rest of modern medicine, or better yet rule that it is unacceptable opt-option for the patients and doctors who choose to use it. Thank you.

**[00:22:00] Darcie:** Thank you.

**[00:22:02] Lloyd:** I wonder if I can now give my, uh, testimony.

**[00:22:05] Darcie:** Yes, please.

**[00:22:08] Lloyd:** [clears throat] My name is Lloyd Benes, representing myself, and I want to say to the pharmacy board members, thank you for being here today at this meeting. You have busy lives with jobs, families, maybe children, or even grandchildren. For all these, I pray, may the blessing of the Lord be upon you, I bless you in the name of the Lord. May the blessing of the Lord be upon you, I bless you in the name of the Lord.

Having invoked a blessing, it's time to invoke integrity. If a pregnant woman is trapped in sex trafficking and is forced by her trafficker into a medical abortion, but wants to reverse her abortion through APR from a medical professional, and you interfere with that. How is that different from aiding and abetting sex trafficking? I just attended a class called Trafficking 101, put on by Maria Tell, a survivor of human trafficking, and Denver Senior Criminal Investigator, Adam String.

Maria states that when she was pregnant her trafficker forced her to a clinic to have an abortion. Maria said, "When we walked into that Planned Parenthood in Denver, I was walking with my head down staring at the ground. I was walking behind him. Traffickers force their victims to stare at the ground. A lack of eye contact is a red flag. While in



Planned Parenthood, I asked a staff member if I could leave, she told me I could not leave and it's too late."

Therefore, instead of proclaiming APR is not an accepted standard of practice, it would be more appropriate to add these words to the draft rules at the end of Section D3. Abortion providers must inform pregnant women about the availability of abortion pill reversal during informed consent. Failure to provide this essential information violates informed consent principles. Let's explore another principle that of recusal. Rule 21(c) of the Colorado House says, "A member who has an immediate personal or financial interest in any bill or measure proposed or pending before the General Assembly shall not vote upon such bill or measure."

Applying that principle to the boards. "Anyone on the pharmacy board who participates in abortion procedures including prescribing or selling medication aborting, abortion drugs, should consider the need to recuse themselves and abstain from voting on rules." Decades ago, the paid scientists of tobacco companies claimed there was no link between lung cancer and smoking. Testimonies and arguments by those with financial ties to the subject matter must be carefully scrutinized and maintain integrity in evaluation purposes. Thank you for letting me provide testimony.

**[00:24:53] Darcie:** Thank you. Anyone else? This is the last call, uh, if anyone would like to provide testimony today before the board begins its deliberations. Trevor Malloy. Trevor Malloy, you are unmuted.

**[00:25:16] Trevor Malloy:** Thank you. Can you hear me?

**[00:25:17] Darcie:** Yes.

**[00:25:21] Trevor:** The right of women to continue their pregnancies is a fundamental right enshrined in Colorado's Reproductive Health Equity Act. 1200 medical professionals serve women providing safe abortion pill reversal care to women who withdraw consent from abortion. Women who give informed consent to safe and effective reversal care to continue their pregnancies. The United States National Institutes of Health published a case series detailing the successful reversal of the effects of mifepristone using progesterone. The NIH case series worth of 754 patients.

Consent is ongoing and can be withdrawn during any act. Women are worth having the right to withdraw their consent to abortion and choose to consent to continue their pregnancies. Abortion pill reversal offers her that choice. When a person changes their mind and withdraws consent from sex, to force sex to be continued is rape. When a pregnant person changes her mind and withdraws consent from abortion, what is it to force abortion to be continued? Would you force abortion on women? How can you consider taking a choice to continue pregnancy away from a woman?



Would you tell a woman her only legal option is to continue terminating her pregnancy? Would you objectify and degrade women by not believing women are intelligent and capable to decide whether she wants to consent to abortion reversal care? Would you get in between a woman and her healthcare provider administering abortion reversal care? Would you take away consent from women? There are tens of thousands of women who have taken safe progesterone internationally and throughout the United States. This should be recognized as a generally accepted standard of care for Colorado pharmacists to it. Thank you.

**[00:27:13] Darcie:** Thank you. [silence] All right, anyone else?

**[pause 00:27:24]**

Okay, I'm not seeing any more raised hands, and we have not received any testimony through the Q&A. So at this point in time, I will turn it back to the chair to conclude the hearing portion and move into the board's deliberations.

**[00:27:58] Avani:** All right. Um, so it appears we do not have any more, um, testimony. The testimony portion of this rulemaking hearing is now concluded.

**[00:28:10] Automated Voice:** Recording stopped.

**[00:28:11] Avani:** Um. [chuckles] So now is the opportunity for the board to deliberate on the rules. Um, does someone wanna begin discussion?

**[00:28:29] Darcie:** And this is Darcie, just so the board is aware. I changed the screens. That's the same language that you were seeing on the slide, except that I added into the comments what the medical board did on August 17th, and what the nursing board did on September 20th. Simply because the statute requires the boards to collaborate, and so I wanted the board to be able to see what the other two boards did. The language is the same as what you were sh-- what was being shown. This also gives me a chance to make any edits if the board wants to do that during its deliberation.

**[00:29:09] Male Speaker 1:** Uh, I'm-I'm a non-pharmacist, but it seems to me this is such a hot political item where forgetting the medication part of it for a moment, that this is, in my opinion, entirely about the deceptive practices of saying that if you're gonna come in here, you might get an abortion versus reversing that abortion. So it's deceptive and this, uh, bill is intended to stop those deceptive practices.

And if they wanna advertise the fact that they can continue their pregnancy, then they should just say that so that women have a choice and they can go to one or the other. Uh, the testimony that I heard from people, uh, was-- looked like it was much faith-based, and of course, it's a- it's a huge internatio-- uh, a national, uh, hot potato, where,



uh, people are strong on either side of it. But in this case, I think it's just about deceptive practices, the forgetting the medication part of this.

**[00:30:17] Avani:** Um, I do like the-the verbiage that's added by the medical board. Um, does anyone else have any input on that?

**[00:30:32] Eric Frazer:** I mean, it-it seems okay to me because, uh-- I-I mean, I still think people should have the choice to use this, you know, if they discuss it with their doctor and this is what they want to do, then they can try it. It sounds like it's not-- and-and in my experience, um, you know, because we dispense a lot of natural progesterone from my pharmacy, or maybe not natural, but bioidentical progesterone from my pharmacy, um, especially for people who have, uh, history of not being able to maintain their pregnancies that they'll use progesterone in order to help that process. Not necessarily saying that it's going to work a hundred percent, but it-it may give some improvement in the outcomes.

Um, and that it's not dangerous to the patient as far as what I've seen, and, um, I think what some of our testimonies have provided. Um, so anyway, I-I guess what I'm saying here is the verbiage seems okay because I think it allows this to occur if it's something that the patient wants to do and their doctor is on board and they feel it's safe and appropriate. Um, but yeah, maybe just more around the deceptive practice of saying like, "This is-is a hundred percent going to work. This is going to be a reversal of your abortion." Um, so I mean-I mean, am I reading that correctly that this is saying that it's going to be handled on an individual case-to-case basis?

**[00:32:07] Darcie:** Yes.

**[00:32:08] Dmitry Kunin:** Yes, Eric, you're-

**[00:32:08] Eric:** And not necessarily against the rules-

**[00:32:10] Avani:** Yeah.

**[00:32:10] Eric:** -to-to administer this procedure, it's just maybe how you approach it with your patient is-is the thing that should be in question.

**[00:32:21] Dmitry:** That's exactly what-what it's saying, Eric. Um, so you're-you're in line with that and, you know, the reference point for what the medical board did that's on the screen like Darcie said, is just that. So-so you're informed if you weren't tuning into the medical board or the board of nursing meetings. Um, to those boards, naturally their profession is different than ours, however, it may be connected. So you do not by any means need to, um, look at what happened there and do the same thing here, right? So what's been drafted here, um, has been drafted **[unintelligible 00:33:00]** as a place that may make sense, um, for the board of pharmacy. Um, but I wanted to provide that clarity.



**[00:33:12] ?Female Speaker 1:** Yeah.

**[00:33:12] Avani:** Is there a reason-- oh, go ahead.

**[00:33:15] Kristen Wolf:** No, you go ahead.

**[00:33:16] Avani:** Um, I-- so the reason I like the verbiage from the medical board is, you know, it still supports the use of evidence-based medicine. Um, and it does discuss generally accepted standards of care. Um, and I feel like that-that really it-it allows people to use their clinical judgment given the situation. It highlights the, um, deceptive practices, which is what the whole thing is about. Um, and it wouldn't be like every single progesterone prescription that was filled would come to the board as a complaint. It really specifies that it would be handled on a case-by-case basis.

We wouldn't have pharmacies questioning every single progesterone and calling offices to ask for diagnosis codes or anything like that. Um, they could feel comfortable like, you know, the patient and the provider have made a decision. Um, but if a complaint does come to the board, uh, and there is a question of the deceptive practices then, you know, it still allows more discipline. So, um, I like the verbiage there, helping to kind of clarify all of that. It doesn't just leave like an open door for--

**[00:34:42] Alex:** It-it-- and this is Alex. I-- I'm reading it the same way where it's got some structure, but it's also got some flexibility, which seems appropriate.

**[00:34:55] Krista Batchelder:** I think it's very important-- I agree with all of my colleagues on this. Um, there we-- we're looking at the deceptive practice, not the actual medications. And I don't feel like a pharmacist should, um, unfortunately, be put in the position like Avani was saying in a-in a retail pharmacy of having to get diagnosis codes and figuring out if we're doing this appropriately. I think this allows for, um, the relationship between a-a physician and a patient. And has some flexibility that we can still say, you know, they still can be brought up if-if deceptive practices are-are thought to be happening that they can still be brought up for discipline.

**[00:35:54] Ryan Leyland:** Yeah, I like-- this is Ryan. I like the flexibility of taking a case by case. Um, during the testimony, an interesting point kind of stuck out with me is will-- and I don't know the answer to this, will a case-by-case kind of methodology marginalize those who may not bring it up? Um, that's definitely something that is not-- it doesn't-- we don't want to do, um, just to marginalize anybody. And we wanna make sure that, um, reporting is open and available, um, but does anybody have any thoughts on that?

**[00:36:30] Avani:** That's a good point and I-I think that this actually does not marginalize. I think it actually makes a statement that we will take deceptive practices seriously, and if a complaint comes to the board that we are going to look into it with our full attention. Um, so I don't feel like it-it does. Um, when-- if we were to include the verbiage, just like the-- what's included with the-- from the medical board.



Um, I think it implies that if you have a complaint, we are going to look into it seriously, but if we do-- don't put anything in there, um, it kind of-- it-it almost makes it like a free for all. Even though it says, you know, the board evaluates generally accepted standards on a case-by-case basis. Um, that opens the door for all kinds of scenarios, and this targets the deceptive practices.

**[00:37:33] Dmitry:** I mean, doesn't, number three already cover that? Um, I-I would, uh, urge the board to consider and-- consider some caution in the specificity of that four, especially when it comes to the me-medications listed. We usually don't include specificity for medications knowing that the landscape of healthcare, um, can and does change, um, with much faster pace than our rules can keep up with.

**[00:38:02] Avani:** Mm-hmm. The-

**[00:38:02] Kristen:** I like-

**[00:38:02] Avani:** The reason-- go ahead.

**[00:38:05] Kristen:** Oh, I was just gonna say I like it the way it is personally. Um, I think that it aligns with the-the intent of the bill. Um, and I like being able to use our own judgment, um, in it. Um, I understand the-the bill-- what the bill considers and this rule is to align with it, but I-I like aligning with more like the nursing side of it and the medical profession. You know, there's-- they're separate disciplines, right? And so to say that we need to follow the same language, I don't know if I agree with it. I like the flexibility that exists in three myself as it is right now.

**[00:38:52] Avani:** Mm-hmm. What I liked about the number four that's on the side, it says specifically, the board does not consider administering, dispensing, distributing or delivering progesterone with the intent to interfere, uh, reverse or halt medication abortion undertaken through the use of mifepristone and misoprostol to meet like-- but it-but it-- I don't know that it necessarily is a bad thing. It-- I don't know. Because I feel like all-- we would start seeing complaints from all kinds of people like, oh, this pharmacy filled a progesterone this pharmacy filled a progesterone.

It be-- if it's not, um-- if we're not outlining that it's gonna be kind of addressed on a case-by-case basis. Um, while we don't agree that it's on, um-- it's a generally accepted practice, um, we want to look into it further. It's not just about filling the prescription. It's about the whole situation. And was that person, uh, being deceived when they were told that they could get that medication? And I know it doesn't cause any harm, um, that the progesterone is safe and effective. And that's not what's in question.

**[00:39:18] Kristen:** Dmitry, do you know if there's any, um-- if any organizations like health-based organizations have exep-- exemptions to this? I saw something about that, um, and I don't know if that's-if that's still the case. Do you know?



**[00:40:38] Dmitry:** Um, are you-are you talking about like national associations or-or like, uh, local or regional?

**[00:40:43] Kristen:** Like-like a Catholic-based, um, health institution. I-I-I thought I had heard that-

**[00:40:50] Dmitry:** Oh.

**[00:40:50] Kristen:** -there was an exemption given at one point to that for this. Do you know?

**[00:40:57] Dmitry:** That I am not aware of. Um, just so there's clarity and we can always seek this if needed in executive sub-session. Um, I-- and-and I don't know if it would apply. Kristen, is that still something you know? And if you feel like there's value we can lean that way, but I-I don't know.

**[00:41:18] Krista:** I'm sorry, Dmitri, can you repeat your question? Because I wanna think about whether I can speak about that here or whether that's something that we need to go-

**[00:41:24] Dmitry:** Sure.

**[00:41:25] Krista:** -to the executive session.

**[00:41:26] Dmitry:** Uh, Kristen, do you wanna go ahead and repeat it?

**[00:41:28] Kristen:** Yeah. So, um, has there-- have there been any legal exemptions to this based on the entity, the pers-- like the organization? So if it's a ha-- it's-a-it's a Catholic-based health system, is there any exemptions given to this based on that?

**[00:41:53] Krista:** I mean, the bill which was, I think, I believe it was provided in your packet. So Senate Bill 23190 that's all there is at the moment.

**[00:42:01] Kristen:** Okay.

**[00:42:02] Dmitry:** And yeah, the question aside, Kristen, I-I-I think, um, going back to the discussion Avani and you were having. Um, Avani this-- the case-by-case language and number three without specificity that we're looking an-and number four is something the board already naturally does and-

**[00:42:30] Avani:** Mm-hmm.

**[00:42:30] Dmitry:** -doesn't really spell out standards of care as it relates to this discussion elsewhere, um, with that level of specificity, if that may make sense. So you would still be-- the board would still be able to apply those considerations of standards of-



**[00:42:48] Avani:** Mm-hmm.

**[00:42:48] Dmitry:** -care in three in the way it's been provided, if that makes sense.

**[00:42:55] Eric:** Yeah. Like what I'm reading is I think number three that we have there, it says what it needs to say for us for our purposes. But number four, um, you know, reading it, it's-it's saying that this is not-- um, they don't consider it to meet the standard of care. And then at the end of four, that if you don't meet the standard of care, you may be subject to discipline. Like it sounds just kind of more threatening than it needs to be.

**[00:43:24] Avani:** Oh, I see that as well. Um, I-I-I do see that three does allow the flexibility. So if you guys feel comfortable without like making it match the medical board, I'm-I'm fine with that right now.

**[00:43:43] Ryan:** Yeah, I'm comfortable with that because you definitely don't want to cut off the idea of-

**[00:43:47] Avani:** Mm-hmm.

**[00:43:48] Ryan:** -of the standard of care changing.

**[00:43:52] Avani:** Mm-hmm.

**[00:43:52] Ryan:** Um, and what that might look like in the future, we can always-- I think this lets us and gives us the flexibility to look back on a specific case, what the standard of care was at that moment in time-

**[00:44:02] Krista:** Okay. Thank you.

**[00:44:03] Ryan:** -and assess appropriately.

**[00:44:09] Avani:** Um, okay. Cool. Um, so--

**[00:44:23] Darcie:** This is Darcie. If you're ready to call for the motion, I can turn the recorder on. Just let me know, um, if the board has any additional deliberation.

**[00:44:34] Avani:** Yeah. Does anybody-- so are we kind of at a consensus? Is the-- does anybody else have anything else they wanna discuss?

**[00:44:42] Male Speaker 1:** Um, as a non-pharmacist, can I just ask the question that, when medication is prescribed, how many times do you call the doctor on the concern that it's not appropriate? And in this particular case to see why A for no other, uh, term would you-- when prescribing this or when-when dispensing with this medication, would you send a note to the doctor's office saying that, okay, you prescribed this, uh, then I'm sure-- you know, is there some methodology that's saying that, okay, that you've done your due diligence or that I'm gonna be okay on this end and you won't have a case



later on? I mean, I hope that's not a dumb question, but it's-it's a non-pharmacist question, I guess.

**[00:45:25] Avani:** No, I think that that's a good point, and that's one of the concerns that I had was that we will see people attempting-- like pharmacists attempting to, you know, protect themselves by documenting. Um, so that, you know, while it's, um, it's-- it-- you know, let's say we don't adopt number four, we keep it 3 as it is, it's still-- because it's in the medical board it's still implied like it shouldn't be prescribed. And then, you know, by filling those medications we are maybe a little bit complicit in that.

So they are going to potentially delay care for some people because they're waiting for documentation or trying to get that information. And I really don't like that because we don't-- we know that progesterone is safe and effective no matter like, you know, what it's being used for. Um, and I don't like the idea of us delaying that to other people. Um, and I don't feel like we should put the pharmacist in a position to question every single progesterone prescription that comes in. So, yeah, I think that--

**[00:46:40] Eric:** I think that's a good point. I mean, if you're-- like when I'm questioning something or I'm going to call the doctor, it usually has to do with the safety of the medication and the appropriateness-

**[00:46:49] Avani:** Mm-hmm.

**[00:46:50] Eric:** -of it being prescribed. But with progesterone, it's pretty-- it would be pretty rare to come across that-

**[00:46:55] Avani:** Mm-hmm.

**[00:46:56] Eric:** -where I would really question the purpose of it.

**[00:47:00] Ryan:** And you'll see a spectrum, right? As you'll see pharmacists more comfortable with dosing and kind of that characteristic the treatment, certain doctors prescribing it. That the pharmacist knows that-that-that the medical necessity and the scope kind of all fit. And, um, they do-- they've done due diligence in the past. You'll see a spectrum of pharmacists where they're comfortable and then they're not comfortable and it's kind of across the board.

Um, if you-- I think putting in a requirement or anything that we would require diagnosis codes or anything would definitely cause delays of care across the board. Um, and the further along as we kind of see cases and more cases throughout time, pharmacists will become more comfortable. But in the retail setting, if-if we see something that's abnormally high, we usually call the physician, um, to discuss, to make sure we're doing what's right for the patient. Um, and we just collaborate, um, and coordinate. That's what I'd like to believe most pharmacists do. So it's kind of my take on some of the information that I see.



**[00:48:15] Avani:** All right.

**[00:48:15] Dmitry:** [unintelligible 00:48:15] good question. Thank you, board, for supporting that. Go ahead, Darcie.

**[00:48:21] Darcie:** All right. Are you ready?

**[00:48:24] Avani:** Yes.

**[00:48:25] Darcie:** Alrighty.

**[00:48:26] Automated Voice:** Recording in progress.

**[00:48:30] Avani:** May I have a motion that the board make the following findings? The basis for these rules are to carry out the provisions of the pharmacist pharmacy business and Pharmaceuticals Practice Act as Section 12-280-101, et cetera, the Colorado Revised Statutes. This attached permanent rule is promulgated to comply with the state-- sorry, state law. The proposed new rule 33.00.00 rules and regulations regarding generally accepted standards of pharmacy practice regarding pregnancy-related services to implement Colorado Senate Bill 23-190, concerning policies to make punishable deceptive actions regarding pregnancy-related services.

Pursuant to the board's rulemaking authority in Sections 12-20-204(1), 12-30-120(2)(b), 12-280-107(1), and 24-4-103 of the Colorado Revised Statutes. The board hereby adopts these rules. I move that we adopt the proposed new rule, 33.00.00 on a permanent basis, and incorporate by reference the statements of basis, purpose, and statutory authority pursuant to Section 24-4-103(4)(c) of the Colorado Revised Statutes. So-- and that was a motion. Would someone like to second that motion? [chuckles]

**[00:50:15] Eric:** This is Eric. I'll second.

**[00:50:18] Avani:** All right. Any further discussion? Uh, all in favor?

**[00:50:25] Board:** Aye.

**[00:50:26] Avani:** Any opposed? All right. Motion carries. Looks-

**[00:50:34] Dmitry:** Avani.

**[00:50:34] Avani:** -like there's a- yes.

**[00:50:35] Dmitry:** Sorry. I do have to ask for one-one comment and, uh, ask for one other motion. Um, just a reminder to any attendees, um, you're not able to directly communicate with the board. Um, so please make sure you keep any channels of communication off, um, and away from the board. Uh, two is, if I could get a second motion just to be consistent with the other two boards, uh, from the medical board and



the board of nursing in terms of timing of enforcement. Um, they all provided a second motion to delay enforcement on this adoption until October 23rd. So just need a motion for that.

**[00:51:18] Darcie:** And this is-this is Darcie, Dmitry. I think that that will be after the emergency adoption. So far we've done permanent. Is that right?

**[00:51:26] Dmitry:** Okay. Thank you.

**[00:51:30] Avani:** Okay, so, um, keep going on-- okay.

**[00:51:35] Darcie:** Emergency, yes.

**[00:51:37] Avani:** Okay. All right. So, uh, onto the emergency basis, may I have a motion that the board make the following findings? The basis for adopting the new Rule 33.00 is to carry out the provisions of the pharmacist pharmacy business and Pharmaceuticals Practice Act at section 12-280-101, et cetera, Colorado Revised statutes. Um, the attached emergency rule is promulgated to comply with state law by adopting rules in advance of the October 1st, 2023 deadline within Senate Bill 23-190. The board finds that the adoption of the new rule to 33.00.00 rules and regulations regarding generally accepted standards of nursing practice regarding pregnancy-related-- sorry, can I just ask why that says nursing?

**[00:52:36] Male Speaker 2:** Yeah.

**[00:52:38] Krista:** Typo.

**[00:52:40] Avani:** Okay. [chuckles] All right. So gen-- so it should say rules and regulations regarding generally accepted standards of pharmacy practice regarding pregnancy-related services is, uh, imperatively necessarily-- necessary to comply with state law for the pre-preservation of public health, safety, or welfare and compliance with the requirements of section 24-4-103 of the Colorado revised statutes would be con-contrary to the public interest.

The board finds it is imperatively necessary to adopt Rule 33.00.00 on an emergency basis in order to comply with the legislature's directive in Senate Bill 23-190 to promulgate rules no later than October 1st, 2023. Pursuant to the board's rulemaking authority provided by sections 12-20-204(1), 12-30-120(2)(b), 12-280-107(1), and 24-4-103(6)(a) of the Colorado Re-revised Statutes. The board hereby adopts rule 33.00.00. I move that we adopt Rule 33.00.00 on an emergency basis. Um, if-- should I just change it here October 1st, change that or--

**[00:54:20] Darcie:** So **[inaudible 00:54:20]** the effective-the effective date is still October 1st, but-

**[00:54:25] Avani:** Okay.



**[00:54:25] Darcie:** -then after this, you'll make the other motion to delay enforcement until October 30-- October 23rd.

**[00:54:31] Avani:** Okay, so I move that we adopt Rule 33.00.00 on an emergency basis effective October 1st, 2023. And incorporate by reference the statements of basis, purpose, and statutory authority pursuant to section 24-4-103(4)(c) of the Colorado Revised Statutes. Um, so may-

**[00:54:59] ?Female Speaker 1:** I second.

**[00:54:59] Avani:** -I have a-- thank you. Any further discussion? All in favor?

**[00:55:08] Board:** Aye.

**[00:55:11] Avani:** Any opposed? All right. Motion carries. And then we have a second motion, um, to delay the enforcement to October 23rd-- after October 23rd, 2023.

**[00:55:32] ?Female Speaker 1:** I'll motion for that.

**[00:55:37] Ryan:** And I'll second.

**[00:55:38] Avani:** Great. Any further discussion? All in favor?

**[00:55:45] Board:** Aye.

**[00:55:47] Avani:** Any-any opposed? Okay, motion carries.

**[00:55:55] Automated Voice:** Recording stopped.

**[00:56:02] Dmitry:** Thank you, Darcie. Looks like-

**[00:56:04] Darcie:** Thank you.

**[00:56:06] Dmitry:** Darcie is there anything else you needed from our end?

**[00:56:08] Darcie:** No. Thank you. I will request the Attorney General's opinion on both the emergency and permanent adoption.

**[00:56:15] Dmitry:** Thanks, Darcie. We'll see you in two weeks.

**[00:56:19] Avani:** Thanks.

**[00:56:18] Darcie:** Looking forward to it.

**[END OF AUDIO]**