# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

BELLA HEALTH AND WELLNESS
et al.,

    *Plaintiffs,*

    v.

PHIL WEISER, in his official capacity as
Attorney General of Colorado, et al.,

    *Defendants.*

Case No. 1:23-cv-939-DDD-SKC

# PLAINTIFFS' REPLY IN SUPPORT OF
# MOTION FOR A PRELIMINARY INJUNCTION

Mark L. Rienzi
Rebekah P. Ricketts*
Laura Wolk Slavis
Colten L. Stanberry
Kelly R. Oeltjenbruns
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
mrienzi@becketlaw.org

*Admitted only in Texas. Supervised by a
member of the D.C. Bar.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ...................................................................................... 1

BACKGROUND ....................................................................................... 3

ARGUMENT .......................................................................................... 6

I.  Plaintiffs are likely to succeed on the merits. ........................................... 6

   A. Colorado's ban on abortion pill reversal violates the Free
     Exercise Clause. .................................................................... 6

     1.  The ban burdens Plaintiffs' religious exercise............................ 6

     2.  The ban is not generally applicable. ...................................... 7

     3.  The ban is not neutral. ................................................... 13

   B. SB 23-190 violates the Free Speech Clause by discriminating
     based on content and viewpoint. ................................................ 15

   C. SB 23-190 violates the Fourteenth Amendment right of
     pregnant women not to be forced to undergo or continue an abortion. .......... 18

   D. The government cannot carry its burden under strict scrutiny. .................... 19

II. The remaining preliminary injunction factors favor relief. .................................. 21

CONCLUSION........................................................................................ 21

CERTIFICATE OF COMPLIANCE.................................................................... 23

CERTIFICATE OF SERVICE......................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Legal Def. Fund v. Kelly,*
    9 F.4th 1219 (10th Cir. 2021) .................................................................. 17

*Aurora Pub. Schs. v. A.S. and B.S.,*
    531 P.3d 1036 (Colo. 2023) ...................................................................... 16

*Axson-Flynn v. Johnson,*
    356 F.3d 1277 (10th Cir. 2004) ......................................................... 11, 13

*Blackhawk v. Pennsylvania,*
    381 F.3d 202 (3d Cir. 2004) ...................................................................... 8

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ................................................................................. 20

*Burwell v. Hobby Lobby Stores,*
    573 U.S. 682 (2014) ................................................................................... 7

*Cent. Rabbinical Cong. of U.S. & Canada v. NYC Dep't of Health &*
    *Mental Hygiene,*
    763 F.3d 183 (2d Cir. 2014) ...................................................................... 8

*Chaker v. Crogan,*
    428 F.3d 1215 (9th Cir. 2005) .................................................................. 17

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) ..........................................................................*passim*

*Colo. Christian Univ. v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) ......................................................... 13, 15

*Cruzan v. Director,*
    497 U.S. 261 (1990) ................................................................................. 19

*Dahl v. Board of Tr. of W. Mich. Univ.,*
    15 F.4th 728 (6th Cir. 2021) .................................................................... 12

*Denver Bible Church v. Azar,*
    494 F.Supp.3d 816 (D. Colo. 2020) ........................................... 6, 8, 9, 21

*Dobbs v. Jackson Women's Health Org.,*
  142 S.Ct. 2228 (2022) ............................................................................ 6

*Emp. Div. v. Smith,*
  494 U.S. 872 (1990) ............................................................................. 11

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
  No. 22-15827, 2023 WL 5946036 (9th Cir. 2023) ...........................................*passim*

*Fulton v. City of Phildelphia,*
  141 S.Ct. 1868 (2021) .........................................................................*passim*

*Heller v. Doe,*
  509 U.S. 312 (1993) ............................................................................. 6

*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) ............................................................... 22

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior,*
  88 F.3d 1191 (D.C. Cir. 1996) ................................................................ 16

*Kennedy v. Bremerton Sch. Dist.,*
  142 S.Ct. 2407 (2022) .......................................................................... 12

*Masterpiece Cakeshop v. Colo. C.R. Comm'n,*
  138 S.Ct. 1719 (2018) ........................................................... 7, 13, 14, 15

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ............................................................................ 17

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) ................................................................. 15

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't,*
  984 F.3d 477 (6th Cir. 2020) ............................................................. 8, 11

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ............................................................................ 17

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ....................................................................... 16, 18

*Roberts v. Neace,*
  958 F.3d 409 (6th Cir. 2020) ................................................................. 21

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   141 S.Ct. 63 (2020) ................................................................................. 22

*Shrum v. City of Coweta,*
   449 F.3d 1132 (10th Cir. 2006) ................................................................ 14

*St. Vincent Catholic Charities v. Ingham County,*
   No. 19-cv-1050 (W.D. Mich. Mar. 7, 2022), ECF No. 74 ........................ 14

*Tandon v. Newsom,*
   141 S.Ct. 1294 (2021) ...................................................................*passim*

*United States v. Virginia,*
   518 U.S. 515 (1996) ................................................................................. 12

*Verlo v. Martinez,*
   820 F.3d 1113 (10th Cir. 2016) ................................................................ 16

*Virginia v. Black,*
   538 U.S. 343 (2003) ................................................................................. 17

*Walgreen Co. v. Charnes,*
   819 P.2d 1039 (Colo. 1991) ..................................................................... 16

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ................................................................................. 18

*Whalen v. Roe,*
   429 U.S. 589 (1977) ................................................................................. 19

## Statutes

Colo. Rev. Stat. §12-255-120 .......................................................................... 12

# INTRODUCTION

To hear the government tell it, this case is about ordinary health-and-safety regulations subject to rational-basis review. But that standard—as the government's own cases make clear—governs laws that do not burden constitutional rights. It has no application where, as here, the government has "banned" Plaintiffs' religious exercise while allowing comparable conduct, selectively targeted their speech as disfavored, and deprived their patients of information and help needed to stop ongoing abortions they no longer want. There is no avoiding the Constitution in this case.

The government's eagerness to avoid constitutional scrutiny makes sense. Colorado knows that SB 23-190 and its regulations cannot possibly pass strict scrutiny because progesterone is safe and its use in abortion pill reversal (APR) is well-supported. Even the government's own expert calls progesterone treatment "low risk," and at most claims APR is unproven. Tellingly, the government makes no attempt—none—to argue that this testimony is enough to survive strict scrutiny.

Under well-established precedent that the government simply ignores, its "ban" on Plaintiffs' free exercise is not neutral or generally applicable and is therefore subject to strict scrutiny. For example, it is clear under *Lukumi, Tandon,* and *Fulton* that laws restricting religious conduct are not generally applicable if they permit other activities that similarly threaten the government's asserted interests. Here, the government permits *all other* off-label uses of progesterone—including for treatment of recurrent miscarriage and IVF. Unable to assail progesterone itself as unsafe, the

government shifts to claiming the true danger of APR "may" lie in taking the first abortion pill but not the second. That argument fails both because it focuses on risks not from progesterone but from the abortion pills (which Colorado notably shows no interest in regulating), and because the government takes no steps at all to ensure that women take the second abortion pill.

Laws also fail general applicability if, as in *Fulton*, they leave the government discretion to grant individualized exemptions. Six months ago, the government emphasized that its discretion was so powerful that it could override even an express legislative command. Dkt.51 at 109:17-111:23. Now it has doubled down on that discretion, writing into each of the three rules a "case-by-case" approach that is the antithesis of a generally applicable standard. Strict scrutiny applies, and the government concedes the test by silence.

The government's other arguments fare no better. Of course the ban on even ***telling*** women about APR is a content- and viewpoint-based restriction of speech subject to strict scrutiny. And of course depriving women of the ability to use a low-risk hormone to reverse the effects of mifepristone undermines her right to decide to bear a child. It is preposterous and patronizing to claim that depriving her of the progesterone available to all other pregnant women somehow "does nothing but reinforce" her right to decide to keep her child. State.PI.Opp.28.

The State may wish to forget that this case is about real women who are trying to save their real babies. Chism Decl., Ex. 2. One of those healthy babies was born three

weeks ago, and several more are due in the coming months. *Id.* ¶¶7-9. The Constitution requires Colorado to carry a heavy evidentiary burden before foreclosing a low-risk treatment option for only these women, and the government has not come close.

An injunction preserving the status quo is urgently needed to protect Plaintiffs and the women they serve. It will be impossible later to rewind the clock for women deprived of information and treatment for babies they will lose while the case proceeds.

## BACKGROUND

Numerous categories of scientific evidence support the use of progesterone to reverse the effects of mifepristone. Decl. of Dr. Monique Wubbenhorst, Ex. 1 ¶¶7-47. These include:

- The biochemistry of progesterone and its role in female fertility and pregnancy, *id.* ¶¶8-13;

- Studies on progesterone's effectiveness in treating threatened miscarriage, including the 2020 Progesterone in Spontaneous Miscarriage (PRISM) study, *id.* ¶¶14-20;

- Basic science evidence about how mifepristone works to suppress progesterone production, *id.* ¶¶23-24, and how introducing higher doses of the receptor agonist (*e.g.*, progesterone) can counteract the effects of a receptor antagonist (*e.g.*, mifepristone), *id.* ¶¶34-35;

- Animal studies (Yamabe 1989, Camilleri & Sammut 2023) indicating that administering supplemental progesterone can counteract the effects of mifepristone, *id.* ¶¶37-38;

- A series of three case reports (Delgado 2012, Garratt & Turner 2017, Delgado 2018) following women who received progesterone therapy after taking mifepristone but decided to continue their pregnancies, *id.* ¶¶39-44;

- A 2020 ACOG bulletin warning patients that using a progestin—a synthetic progesterone-like compound—as contraception on "day 1 of the medication abortion regimen *may increase the risk of ongoing pregnancy*," *id.* ¶46 (emphasis added); and

- A 2020 study by Dr. Mitchell Creinin—the same study Defendants cite in support of their alleged safety interest, State.PI.Opp.12—that attempted a randomized controlled trial of APR and found that four of five women (80%) in the progesterone group continued their pregnancies, compared with two of five (40%) in the placebo group, Ex. 1 ¶47.

Defendants' expert nonetheless claims there is "*no* scientific support" for APR. Cohen Decl. at 8 (emphasis added). But Dr. Cohen fails to acknowledge, much less rebut, the animal studies, the 2017 case series, the ACOG bulletin, or the efficacy results of the Creinin study. Ex. 1 ¶¶48-49. Instead, she focuses all her criticism on Dr. Delgado's 2012 and 2018 case series, which she variously characterizes as "low-quality," "methodologically flawed," and "plagued by ethical concerns." Cohen Decl.

¶¶18-30. But as Dr. Wubbenhorst explains, Ex. 1 ¶¶51-59, these critiques are deeply flawed—and mostly reduce to complaints that the Delgado studies are case series rather than randomized controlled trials. Nowhere does Dr. Cohen acknowledge the appropriate role of case series in studies involving pregnant women—or the obvious ethical problems that would preclude assigning a woman who decided to continue her pregnancy to a placebo in a randomized controlled trial. *Id.* ¶¶52-53.

Moreover, what Dr. Cohen touts as "[s]cientifically valid research" refuting APR are two articles—both by Dr. Daniel Grossman, a paid advisor to Planned Parenthood. Cohen Decl. at 16; Ex. 1 ¶¶60-63 & n.82. Grossman's first article is a 2015 literature review that *predates* two of the relevant case series, the recent studies on progesterone, the most recent animal study, and the 2020 ACOG bulletin and Creinin study. Ex. 1 ¶61. And the second is a three-page opinion piece, not a research study. *Id.* ¶63.

Finally, Dr. Cohen expressly concedes that progesterone is a "low-risk medica-tion." Cohen Decl. ¶36. And although the government suggests a safety concern re-lated to women not taking the second abortion pill, State.PI.Opp.12, Dr. Cohen's own proposed standard of care—"expectant management"—likewise entails women not taking the second abortion pill. Cohen Decl. ¶14 ("the patient would not take miso-prostol").

In sum, there is ample scientific evidence to support the use of progesterone for APR—and Dr. Cohen's contrary claim is simply wrong.

## ARGUMENT

### I.  Plaintiffs are likely to succeed on the merits.

According to the government, this case involves nothing more than a run-of-the-mill health regulation, which is "entitled to a strong presumption of validity" and subject only to rational-basis review. State.PI.Opp.10 (quoting *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2284 (2022)). What Defendants conveniently fail to mention is that this deferential framework applies only where constitutional rights are not at issue. *Dobbs*, 142 S.Ct. at 2283 (applying rational basis because abortion right "has no basis" in the Constitution); *see also Heller v. Doe*, 509 U.S. 312, 319 (1993) (presumption of validity applies only where a law "neither involv[es] fundamental rights nor proceed[s] along suspect lines."). But here, Defendants' burden on constitutional rights requires strict scrutiny, which the government does not even attempt to pass. Plaintiffs are thus likely to succeed on the merits.

### A.  Colorado's ban on abortion pill reversal violates the Free Exercise Clause.

#### 1.  The ban burdens Plaintiffs' religious exercise.

Defendants summarily assert that APR is not Plaintiffs' religious exercise, but "simply a tool" that Plaintiffs say "helps continue pregnancies." State.PI.Opp.19. But the government "does not have the power to decide what tasks are a necessary part of an individual's religious [exercise]." *Denver Bible Church v. Azar*, 494 F.Supp.3d 816, 833 (D. Colo. 2020). As the amended complaint makes abundantly clear, Plaintiffs are "religiously compelled" to offer APR as part of their mission to "continue the

healing ministry of Jesus Christ." Am.Compl. ¶¶6, 52, 109. In this respect, Plaintiffs are just like the religious parties who wanted to bake a cake in *Masterpiece*, run a foster agency in *Fulton*, or exclude abortion-inducing drugs from their healthcare plan in *Hobby Lobby*: they are engaged in a religious exercise that the government seeks to punish. It is the religious party's beliefs—and not the government's—that dictate whether the prohibited conduct is a religious exercise. *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1876 (2021).

Here, Defendants didn't just "incident[ally]" burden this core religious exercise, *contra* State.PI.Opp.20—they "banned it" outright under threat of lost licenses and crippling penalties. *Id.* at 14. "If these consequences do not amount to a substantial burden, it is hard to see what would." *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 691 (2014) (emphasis added). And because that ban is neither generally applicable nor neutral, it "must undergo the most rigorous of scrutiny," *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 521 (1993), even were the burden merely incidental, *Fulton*, 141 S.Ct. at 1876. Defendants make no attempt to meet that bar.

### 2. The ban is not generally applicable.

***Failure to prohibit comparable secular conduct.*** A law fails general applicability when it "treat[s] *any* comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021), or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," *Fulton*, 141 S.Ct. at 1877; *see also Lukumi*, 508 U.S. at

547 (when a law "leaves appreciable damage to … supposedly vital interest[s] unprohibited … [t]here can be no serious claim that those interests justify" the burden on religion).

Courts routinely find health-and-safety laws not generally applicable where they "regulate[] religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Cent. Rabbinical Cong. of U.S. & Canada v. NYC Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014) (health regulation of herpes not generally applicable where it regulated religious conduct "implicating fewer than 10% of the cases of neonatal HSV" but not secular conduct); *see also Lukumi*, 508 U.S. at 543-45 (asserted interest in animal cruelty undermined by failure to regulate nonreligious animal killings and deaths; public health interest undermined by failure to regulate disposal of organic garbage); *Tandon*, 141 S.Ct. at 1297 (health regulations burdening religion not generally applicable where government failed to prohibit 'nonreligious' harms to health interests); *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 482 (6th Cir. 2020) (similar); *Denver Bible*, 494 F.Supp.3d at 834-35 (similar); *Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*, No. 22-15827, 2023 WL 5946036, at *17-18 (9th Cir. 2023) (school asserted anti-discrimination interest but permitted groups to discriminate for non-religious

reasons); *Blackhawk v. Pennsylvania*, 381 F.3d 202, 211 (3d Cir. 2004) (Alito, J.) (exemptions for zoos and circuses undermined interest in preventing "keeping of wild animals in captivity").

Here, the government has pursued its stated interests only against APR and not against comparable activities. Defendants first claim a general interest in avoiding "experimental procedures in the clinical context, without the benefit of the safeguards of formal research." State.PI.Opp.14, 25. This argument "does not pass the straight-face test." *FCA*, 2023 WL 5946036, at *20. SB 23-190 and its regulations do nothing to regulate "experimental procedures in the clinical context" generally. They target one, and only one, treatment: progesterone for APR, even though their own expert acknowledges that progesterone is "low-risk." Other experimental treatments, and all other uses of progesterone—including to prevent recurrent miscarriage or preterm birth, treat infertility, and support IVF—are left unregulated. Nor do Defendants contest that the vast majority of progesterone uses in OB-GYN are off-label uses. And while they claim that "*other* potential off-label uses of progesterone" have "scientific" and "reliable" evidence to support them, State.PI.Opp.25, they completely fail to identify what that supposedly more reliable evidence is and which uses it supports. Defendants cannot rely on mere "ipse dixits" to "explain why religion alone must bear the burden of the [law]." *Lukumi*, 508 U.S. at 544.

Defendants also posit a safety interest that is not about progesterone at all, but about ensuring that women take the second abortion pill. *See* State.PI.Opp.3. The

government asserts that failing to take the second pill "may" increase risk of hemorrhage from mifepristone. State.PI.Opp.3. But its own regulations only exacerbate that claimed risk. Defendants urge that the treatment option for women who change their mind after taking mifepristone should be limited to "expectant management"— i.e., "watchful waiting" after not taking the second abortion pill. State.PI.Opp.4-5. If not taking misoprostol is the problem, why does the government endorse it? And Defendants nowhere claim to require providers to follow up with patients to ensure they have taken misoprostol, or even tell patients about the alleged "increased" health risks from "using mifepristone alone." State.PI.Opp.3.[1]

Defendants ignore all this, contending that SB 23-190 and the Medical Board rule are generally applicable because "[t]here are no exceptions to the law or rule, secular or otherwise." State.PI.Opp.24. But this argument directly conflicts with *Tandon*— which Defendants fail to cite, let alone distinguish. *Tandon* concerned "a blanket restriction on at-home gatherings of all kinds, religious and secular alike." 141 S.Ct. at 1298 (Kagan, J., dissenting). And *Monclova* involved an order "closing every school in the county—public, private, and … parochial." 984 F.3d at 479. But the categorical nature of the restriction could not save either scheme. That's because general applica-

---

[1]   Nor do Defendants explain why taking progesterone would worsen the alleged risk. The same study that Defendants rely upon indicates that the risk of hemorrhage is greater for women who take mifepristone *without* progesterone. Ex. 1 ¶66. Yet the government nowhere explains why it relies on the Creinin study to show an alleged safety concern while ignoring its results suggesting progesterone mitigates the hemorrhage concern (and also generated an 80% survival rate). *Id.* ¶67.

bility "is measured" by examining "the *interests* the State offers in support of its restrictions on conduct." *Id.* at 480; *Tandon*, 141 S.Ct. at 1296; *see also Fulton*, 141 S.Ct. at 1877 (similar); *FCA*, 2023 WL 5946036, at *17-18 (considering all school activities implicating anti-discrimination interests, not just subset of student-run activities). Defendants cannot "myopic[ally] focus" on SB 23-190 in isolation, *Monclova*, 984 F.3d at 481, but must instead show they have equally regulated other activities affecting their asserted efficacy and safety interests. They have failed to do so.

**Discretionary exemptions.** SB 23-190 and its regulations also fail general applicability because they leave the Boards discretion to grant exemptions. *Fulton* makes clear that such a system "'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." 141 S.Ct. at 1879. The justification for such discretion is irrelevant: its "*mere existence … is enough to render a policy not generally applicable.*" *FCA*, 2023 WL 5946036, at *15-17 (emphasis added). And "greater discretion in the hands of governmental actors makes the action … more, not less, constitutionally suspect." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298-99 (10th Cir. 2004).

Such discretion is baked into the Boards' regulations that evaluate all APR complaints (Nursing, Pharmacy) or some of them (Medical) on a case-by-case basis. Am.Compl. ¶¶202-07. Defendants try—but fail—to evade *Fulton* and *FCA* by claiming that the Nursing Board's rule accounts for the "complex[ities]" of nursing practice.

State.PI.Opp.19; *see id.* at 26-27. Tellingly, Defendants cite nothing in the rulemaking record, let alone the rule's plain text, to support this claim. *Id.*; Cullen Decl. ¶¶8-12. Perhaps the Nursing Board could have written a rule accounting for the disparate "levels of patient care" among its licensees, *id.* at 27, but the actual rule grants unbridled discretion for "case-by-case" decisions. *Id.* The Nursing Board must stand on the rule it actually wrote, not its post hoc attempt to evade a constitutional violation. *See Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2432 n.8 (2022) ("Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" (alteration in original)); *see also Dahl v. Board of Tr.*, 15 F.4th 728, 733-34 (6th Cir. 2021) (court must "put front and center the terms of the policy itself[.]").

The Medical Board tries a similar tack, claiming its discretion merely accounts for scientific advancement. State.PI.Opp.26. This dodge fails for the same reason: the rule's plain text indisputably affords discretion, the "mere existence" of which destroys general applicability. *FCA*, 2023 WL 5946036, at *15. And the State never even tries to explain away the discretion granted by the Pharmacy Board.

Nor does it matter that practice standards involve "mixed question[s] of law and fact." State.PI.Opp.26. The same is true for every not-generally-applicable discretionary policy, particularly the "good cause" unemployment-benefits exemption in *Sherbert* and relied upon in *Fulton*. 141 S.Ct. at 1877 (discussing *Sherbert*); *Axson-Flynn*, 356 F.3d at 1297-98 (similar). In sum, because the Board rules contain a "system[,]"

in which case-by-case inquiries are routinely made, such that there is an individualized governmental assessment," they are not generally applicable. *Id.* at 1297 (cleaned up); *FCA*, 2023 WL 5946036, at *17. Having reserved itself such discretion, the government must prove under strict scrutiny why it cannot give Plaintiffs' religious exercise the same "solicitude." *Fulton*, 141 S.Ct. at 1879.

### 3. The ban is not neutral.

The Free Exercise Clause "bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 138 S.Ct. 1719, 1731 (2018). It thus protects against not only overt animus, *id.* at 1732, but also any facially neutral law that "inten[ds] to treat [the religious] differently," *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008), or marks religion for "distinctive treatment," *Lukumi*, 508 U.S. at 534; *Shrum v. City of Coweta*, 449 F.3d 1132, 1144-45 (10th Cir. 2006) (collecting cases).

State Defendants dispute none of the bill sponsors' remarks—referring to "fake clinics" that "shame" and "harm" women and engage in "delay tactics," "disinformation," and "intimidation." Am.Compl. ¶¶160-68. Nor do they dispute that these remarks were targeted at "faith-based organizations." *Id.* ¶160. They instead contend that this Court should simply overlook them as mere legislative history. State.PI.Opp.20. But the neutrality animus inquiry *requires* the court to consider "contemporaneous statements made by members of the decisionmaking body." *Masterpiece*, 138 S.Ct. at 1731; *see also* Opinion at 12-13, *St. Vincent Catholic Charities*

*v. Ingham County*, No. 19-cv-1050 (W.D. Mich. Mar. 7, 2022), ECF No. 74 (considering public statement of legislators)).

Nor is it somehow dispositive that the Boards were more restrained than the legislature—*after* they were named in a lawsuit alleging religious animus. *Contra* State.PI.Opp.22-24. The statute was the impetus for the rulemaking. And when the bill sponsors showed up to demand that the Boards "reconsider your draft rules" and "carefully reread the instructions" in the statute, the Medical Board complied. Am.Compl. ¶¶200-02. At a minimum, that intervention is additional evidence that legislative animus infected the rulemaking process.

State Defendants further contend their hostility is permissible because statements made in *Lukumi* and *Masterpiece* were worse. State.PI.Opp.21-22. But nothing in those cases sets a floor for constitutional violations. Instead, the government violates the First Amendment whenever "unconstitutional animus infected the proceedings" in any way, as it did here. *Meriwether v. Hartop*, 992 F.3d 492, 517 (6th Cir. 2021) (discussing *Masterpiece*); *see also Weaver*, 534 F.3d at 1260 (rejecting argument that neutrality is only violated with evidence of "hatred[] or bigotry"). Plaintiffs need only point to a "slight suspicion" of intolerance, *Masterpiece*, 138 S.Ct. at 1731, which they have clearly done, PI.26-27. Moreover, Defendants' failure to contest that the law largely affects "religiously affiliated" entities confirms that "the burden of the

[law], in practical terms, falls on [religious] adherents but almost no others," a "religious gerrymander" the First Amendment does not tolerate. *Lukumi*, 508 U.S. at 535-36; PI.27-28.

## B. SB 23-190 violates the Free Speech Clause by discriminating based on content and viewpoint.

*Section 1.* Section 1 "applies" two of the CCPA's prohibitions on deceptive trade practices to "advertising for or … offering to provide or make available medication abortion reversal." §1(3). The amended complaint plainly challenges Section 1 "both on its own and through the CCPA." Am.Compl. ¶¶154, 230, 266-67, 269-71, 276, 281, 293, Prayer a, c, d, f. Defendants simply ignore this, failing to proffer a single justification for Section 1's content- and viewpoint-based targeting of Plaintiffs' speech. They have accordingly waived any Section 1 merits arguments. *See Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016).

Instead of engaging the merits, Defendants rehash their claim that Section 1 is a "legislative declaration." State.PI.Opp.29-30 & n.7; *cf.* Dkt.68 at 3-4. But as Plaintiffs previously explained, *see* Dkt.71 at 6-8, Section 1 "applies" the CCPA to "advertising for … medication abortion reversal" irrespective of its statutory heading—and it thus "creates, eliminates, or modifies vested rights or liabilities," *Aurora Pub. Schs. v. A.S. and B.S.*, 531 P.3d 1036, 1047 (Colo. 2023), and evinces an "intention to bind … regulated parties," *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1223 (D.C. Cir. 1996). It is therefore substantive law.

Even if Section 1 lacked independent legal force, Plaintiffs also challenge—but Defendants fail to address—the CCPA provisions implementing its prohibition. Am.Compl. ¶¶266-67, Prayer. Section 1 prohibits a new type of speech—advertising for APR—as a deceptive trade practice. That is why Defendants have suddenly decided that "speakers who advertise abortion pill reversal" face liability under the same CCPA sections as those listed in Section 1. State.PI.Opp.35. That content-based approach "draws distinctions based on the message a speaker conveys" and triggers strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

**Section 2.** Defendants claim that Section 2 "does not pick ideological winners." State.PI.Opp.34-35. But by regulating only speakers who do *not* provide abortion or emergency contraceptives, Section 2 regulates speech "on only one side of the abortion debate," while leaving misrepresentations by abortion and contraception providers untouched—"a clear form of viewpoint discrimination." *McCullen v. Coakley*, 573 U.S. 464, 485 (2014).

The CCPA's general false-advertising prohibitions also cannot save Section 2. State.PI.Opp.35. Even within a category of "proscribable speech," the First Amendment imposes "a 'content discrimination' limitation," barring regulation "based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386-87 (1992); *see also Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1232 (10th Cir. 2021) (First Amendment scrutiny applies to "restrictions on false statements of fact".."). That is the case here—Section 2 subjects particular

speakers to "additional civil penalties for violating the more specific prohibition" that other speakers do not face. State.PI.Opp.32. Combined with the vitriolic legislative record, this targeting shows that Colorado "singled out for opprobrium only that speech directed toward one of the specified disfavored topics." *Chaker v. Crogan*, 428 F.3d 1215, 1225 (9th Cir. 2005) (cleaned up) (quoting *Virginia v. Black*, 538 U.S. 343, 362 (2003)).

Nor is Section 2 like a ban on commercial misrepresentations about radon. State.PI.Opp.37. Bella's speech is targeted because it concerns a controversial social and political issue—not a commercial issue like radon contamination. Colorado enacted SB 23-190 out of disagreement with the message of "anti-abortion centers." §1(1)(c)-(e); Am.Compl. ¶¶159-169. Under *Reed* and others, this again suffices to show content-based discrimination. *See* 576 U.S. at 164; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). And if Defendants were actually concerned about "time-sensitive" medical treatments for pregnant patients, State.PI.Opp.37, they would also outlaw statements falsely "indicating" that APR is unsafe or unsupported by scientific evidence.

Defendants would prefer to avoid the merits of Sections 1 and 2 entirely—which is why they also recycle standing arguments from their pending motion to dismiss. *See* State.PI.Opp.29 n.5; *compare id.* at 29-34, *with* Dkt.68 at 5-8. Plaintiffs have fully responded to those arguments already at Dkt.71 at 8-12. Additionally, Defendants

failed to make any credible-threat argument as to Section 1, despite Plaintiffs' amended complaint. *See supra* at p.15.

The District Attorneys also repeat many motion-to-dismiss arguments that their purported disavowals defeat Plaintiffs' standing, *compare* DAs.PI.Opp.4-6, *with* Dkt.58 at 5 (McCann MTD), *and* Dkt.67 at 5 (Kellner MTD), which fail for reasons already explained, Dkt.71 at 20-21. To the extent they raise new arguments, they fail for the reasons provided in Plaintiffs' sur-reply, Dkt.101, and thus provide no reason to deny a preliminary injunction.

### C. SB 23-190 violates the Fourteenth Amendment right of pregnant women not to be forced to undergo or continue an abortion.

Within the right to refuse "unwanted medical treatment," *Cruzan v. Director*, 497 U.S. 261, 278 (1990), patients enjoy "the right to decide independently, with the advice of [their] physician, to acquire and to use needed medication," *Whalen v. Roe*, 429 U.S. 589, 603 (1977). Regardless of whether SB 23-190 "compel[s] a patient to take misoprostol," State.PI.Opp.28, SB 23-190 violates this right by preventing physicians from advising patients about using progesterone to support their decision to not take misoprostol and from providing that service. And though a patient may not always have "a constitutional right to mandate which medications they receive to treat a particular illness," *id.* at 28, Colorado has "no interest" outweighing the patients' "liberty interest" where (1) progesterone has lawfully been used in Colorado for APR for years with zero reported harms, (2) progesterone is widely authorized in other juris-

dictions for APR, and (3) Colorado now refuses to permit advertisement and administration of progesterone for APR because of safety concerns related to the failure to take misoprostol—which women not taking misoprostol would face anyway. *Cf. Cruzan*, 497 U.S. at 278 (discussing balancing of liberty interest against State's interest).

### D.   The government cannot carry its burden under strict scrutiny.

Defendants have utterly failed to argue that any of their asserted interests are compelling, let alone that SB 23-190 and its regulations are "actually necessary" to achieve them. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). They thus "essentially concede[] that [they] cannot meet this standard." *FCA*, 2023 WL 5946036, at *22.

***No compelling interest.*** Defendants do not dispute that no member of the Colorado legislature or Boards has ever received a complaint about the publication or provision of APR, nor that any such complaint factored into the legislative or rule-making proceedings. PI.35. Nor do they dispute that, despite claiming that Section 1 and 2 added nothing substantive to the CCPA's scope, they have never pursued any claims now covered by Section 1 or 2. PI.37-38; State.PI.Opp.29-30, 35. Defendants thus completely fail to explain how they could possibly have a compelling interest in fending off a nonexistent harm, especially where they've never utilized the numerous existing regulatory tools. *See* PI.35-38. Governments also fail to show a compelling interest where, as here, a law "leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547.

Furthermore, APR is safe and there are strong and unrebutted scientific reasons supporting its efficacy. *See supra* at pp.3-5. This comports with Plaintiffs' own experience safely and successfully administering APR to dozens of women and caring for them up to and beyond the birth of their healthy children—including during this litigation. Am.Compl. ¶18. The government has no compelling interest.

***Not Narrowly Tailored.*** Defendants have "failed to offer any showing that [they have] even considered less restrictive measures than those implemented here," thus flunking narrow tailoring. *FCA*, 2023 WL 5946036, at *22. Here, the government has singled out only one use of progesterone as allegedly dangerous, leaving untouched the majority of situations where women take progesterone for other reasons, including to prevent threatened miscarriage. And if Defendants were truly concerned with ensuring women take both abortion pills, they easily could have used their existing arsenal of other tools, including changing their own standard of care—or actually requiring providers to follow up with every patient to ensure she has taken the pill. Defendants' failure to regulate vast swaths of conduct implicating these interests dooms any hope that Defendants have met their burden. *Lukumi*, 508 U.S. at 543-47; *see Denver Bible*, 494 F.Supp.3d at 834-35; *Roberts v. Neace*, 958 F.3d 409, 415-16 (6th Cir. 2020); *FCA*, 2023 WL 5946036, at *22. Other states' experience matters too, and Colorado does not identify any that have needed anything like its attempted ban.

## II. The remaining preliminary injunction factors favor relief.

Defendants acknowledge that once Plaintiffs establish likelihood of success, irreparable harm follows. State.PI.Opp.38; *see Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020). Bella has carried that burden, and it faces such harm: if no injunction issues by October 23, 2023, Plaintiffs face the choice of giving up their religious exercise and chilling their speech—or losing their licenses and malpractice insurance and suffering severe financial penalties. Am.Compl. ¶23. Absent an injunction, Plaintiffs' patients would be forced to undergo unwanted abortions or attempt to carry their babies without progesterone's benefits, *id.* ¶213. Later relief will never be able to help the women and babies who would be deprived of care during the lawsuit. And regardless of what "Colorado's legislature … believes to be the public interest," State.PI.Opp.39, it never advances that interest by enacting unconstitutional laws. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013)

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction.

Dated: October 9, 2023

Respectfully submitted,

/s/ Mark L. Rienzi

Mark L. Rienzi
Rebekah P. Ricketts*
Laura Wolk Slavis
Colten L. Stanberry
Kelly R. Oeltjenbruns
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
mrienzi@becketlaw.org

*Admitted only in Texas. Supervised by a member of the D.C. Bar.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing reply complies with the type-volume limitation set forth in Judge Domenico's Civil Practice Standard III.A.1, as modified by the Court's order dated September 26, 2023. Dkt.93,

/s/ Mark L. Rienzi
Mark L. Rienzi

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2023, I electronically filed the foregoing Motion for a Preliminary Injunction with the Clerk of Court via CM/ECF, which will provide electronic copies to counsel of record.

/s/ Mark L. Rienzi
Mark L. Rienzi