IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-939-DDD-SKC

BELLA HEALTH AND WELLNESS, et al.,

    Plaintiff,

vs.

PHIL WEISER, in his official capacity as ATTORNEY GENERAL OF
COLORADO, et al.,

    Defendants.
_____

**REPORTER'S TRANSCRIPT**
HEARING ON MOTION FOR PRELIMINARY INJUNCTION, (cont'd)

_____

       Proceedings before the HONORABLE DANIEL D. DOMENICO,

Judge, United States District Court for the District of

Colorado, occurring at 9:30 a.m., on the 17th day of October,

2023, in Courtroom A1002, United States Courthouse, Denver,

Colorado.


For the Plaintiffs:
Mark Leonard Rienzi, Laura Wolk Slavis, Kelly R. Oeltjenbruns,
Colten L. Stanberry and Rebekah Perry Ricketts, The Becket Fund
for Religious Liberty, 1919 Pennsylvania Avenue NW, Suite 400,
Washington, DC 20006.


For the Defendant Phil Weiser:
Michael T. Kotlarczyk and Grant T. Sullivan, Colorado Attorney
General's Office, Ralph L. Carr Colorado Judicial Center, 1300
Broadway, Denver, CO 80203.

1  For Defendant Members of the Colorado Medical Board:
   Brian J. Urankar, Colorado Department of Law, 1300 Broadway,
2  Ralph Carr Judicial Center, Denver, CO 80203.

3

4  For the Defendant Members of the Colorado State Board of
   Nursing:
5  Elizabeth Virginia Kenny, Colorado Department of Law, 1300
   Broadway, Ralph Carr Judicial Center, Denver, CO 80203.
6

7  For the Defendant Michael Dougherty:
   David Evan Hughes, Boulder County Attorney's Office, P.O. Box
8  471, 1325 Pearl Street (80302), Boulder, CO 80306.

9

10 For the Defendant John Kellner:
   Josh Adam Marks, Berg Hill Greenleaf & Ruscitti LLP, 1712 Pearl
11 Street, Boulder, CO 80302.

12

13 For the Defendant Beth McCann:
   Andrew David Ringel, Hall & Evans LLC, 1001 Seventeenth Street,
14 Suite 300, Denver, CO 80202.

15

16

17  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Tammy Hoffschildt, 901 19th Street,
18     Room A251, Denver, Colorado, 80294, (303) 947-1905

19

20

21

22

23

24

25

1                        *    *    *    *    *

2                           **PROCEEDINGS**

3          (In open court at 9:35 a.m.)

4          THE COURT:  Good morning.  Let's take our seats.

5    We're here for a motions hearing in case number 23-cv-939,

6    Bella Health and Wellness versus Weiser.

7          Why don't I begin by asking counsel to introduce

8    yourselves and who you represent this morning.  For the

9    plaintiffs.

10         MR. RIENZI:  Mark Rienzi, for the plaintiffs, with me

11   at counsel table are Rebekah Ricketts, Colten Stanberry,

12   Laura Slavis and Kelly Oeltjenbruns.

13         THE COURT:  All right.  Thank you.  At the front

14   table.

15         MR. URANKAR:  Good morning, Your Honor.  Brian Urankar

16   for the Colorado Medical Board.

17         THE COURT:  Good morning.

18         MS. KENNY:  Liz Kenny on behalf of the Board of

19   Nursing.

20         MR. SULLIVAN:  Good morning, Your Honor.  Grant

21   Sullivan, on behalf of the Attorney General Weiser.

22         MR. KOTLARCZYK:  And Mike Kotlarczyk, also on behalf

23   of Attorney General.

24         MR. MARKS:  Good morning, Your Honor.  Josh Marks on

25   behalf of District Attorney John Kellner of the 18th Judicial

1    District.

2                THE COURT:  Welcome.

3                MR. RINGEL:  Good morning, Your Honor.  Andrew Ringel

4    on behalf of District Attorney Beth McCann.

5                THE COURT:  Good morning.

6                MR. HUGHES:  David Hughes, Deputy County Attorney on

7    behalf of District Attorney Michael Dougherty of the 20th

8    Judicial District.

9                THE COURT:  All right.  Thank you all for being here.

10               So we have a number of things going on, and I think if

11   it's all right with everybody, what I would like to do is

12   begin, sort of, progressing, I guess, from the certain more

13   technical to the maybe more substantive, and begin by

14   addressing the District Attorneys' Motions to Dismiss, and

15   probably move from there to discussing, and obviously these are

16   going to bleed into each other a little bit, perhaps, then

17   focus on the advertising issues, Section 1 and 2 of the Act,

18   and then probably take a recess at somewhere in there, and then

19   try to address, for the most part, Section 3.  The implications

20   of Section 3, sort of save that for last, to the extent that we

21   can separate things out.

22               I do think, probably, the DAs' issues is probably the

23   easiest to do separately.  So that's why I would like to start

24   with it.  I think the way to proceed on that is for me to just

25   tell you my inclination, based on what I have read and what I

1  heard last time and the supplemental -- the supplements that we

2  got from the district attorneys, is I'm inclined to grant those

3  motions.

4       But I do want to hear from everyone first.  I think

5  what makes sense though, is to let the plaintiffs begin by

6  explaining why my inclination is wrong, and then what the DAs,

7  to the extent they want to, respond to that.  So that's what I

8  would like to do.  If the plaintiffs want to start by

9  explaining their position on why the district attorneys should

10  remain in the case, why don't you go ahead and do that.

11       *MS. SLAVIS:*  Thank you, Your Honor.

12       *THE COURT:*  Go ahead.

13       *MS. SLAVIS:*  The cases make clear that in order to be

14  sufficient to defeat standing, a disavowal, which is the only

15  basis that the district attorneys have here to defeat standing,

16  it has to do two things.  It has to contain some sort of

17  reasoning and permanency, that provides notice to the

18  plaintiffs about the basis for the nonenforcement, and that can

19  either take the form of a recognition that there's a

20  constitutional defect in the law, so that it can't be enforced,

21  or it can take the form of a formalized adopted policy, again

22  including some sort of analysis, legal reasoning, providing the

23  basis for the nonenforcement decision.

24       And second of all, it has to clearly cover the entire

25  scope of the conduct that plaintiffs want to engage in.  And

1    those criteria make sense, because the whole point of

2    pre-enforcement standing is to alleviate the burden on

3    plaintiffs to either subject themselves to an unconstitutional

4    law on engage in self-censorship to avoid the consequences of

5    the law.

6         So if you have a disavowal that provides reasoning,

7    and clearly covers the scope of their conduct, then the threat

8    of enforcement or chill is alleviated.  Not just plaintiffs,

9    but the entire public is put on notice about what they need to

10   do to order the conduct to avoid either an enforcement action

11   or the need to chill their speech.

12        THE COURT:  So I'm sorry to interrupt, but what do

13   you -- what do your clients fear these district attorneys can

14   do to them or will do may do to them?

15        MS. SLAVIS:  We fear that the district attorneys could

16   change their present intention, which is not based in anything

17   legal and not formalized in any type of enforcement document.

18   They can change those prudential judgments about the best focus

19   of their office or the best use of public resources, and

20   decide, at any time, that they would like to begin enforcing

21   the law.  And, Your Honor, that concern is particularly

22   relevant here, because we're dealing with a brand-new law.

23   We're dealing with a law that specifically targets people like

24   plaintiffs who have unpopular views; that have been targeted

25   particularly by public interest groups, who have made it clear,

7

1    through their presence in the legislative and rulemaking

2    hearing, that they intend to put pressure on what those charged

3    with enforcing this law, to enforce it to the maximum extent

4    possible.

5            THE COURT:  I'm sorry to interrupt again.  So, but let

6    me ask a little more specifically.  Do you think the district

7    attorneys have the authority to enforce Section 3 of this Act?

8            MS. SLAVIS:  We think that the outcome of Section 3

9    will influence how Section 1 and Section 2 are enforced.  Yes,

10   Your Honor.

11           Section 3, the Boards have clearly stated that

12   providing abortion pill reversal is unprofessional conduct,

13   which means that Section 1, which prohibits advertising,

14   offering or providing that have same service.  The two of them,

15   they reinforce one another.  So the outcome of Section 3

16   absolutely impacts the ways that the district attorneys could

17   enforce Section 1 and 2.

18           THE COURT:  So the outcome of Section 1.  But the

19   district attorneys, I don't think you have argued, and I don't

20   understand them to have the authority to directly enforce

21   Section 3.  Do they?

22           MS. SLAVIS:  Not through the CCPA.  No.

23           THE COURT:  So when we are talking about the DAs, we

24   are all in agreement we are talking about Section 1 and 2.  And

25   I agree that the analysis of Section 3 probably has some --

1    some impact on how Sections 1 and 2 are interpreted and

2    applied.  So I agree with you on that, and that makes sense to

3    me.

4         But let me -- so you stated that the two reasons you

5    have this fear are that there's the district attorneys'

6    positions that they are not going to enforce this are not based

7    on any legal reasoning.  I'm not sure that I agree with that.

8    They do seem to be based on some legal reasoning, which is that

9    Section 1 is not an enforceable part of the Act, and it, in

10   fact, is not in the Colorado statute books, and so I'm inclined

11   to agree with them on that.  And that Section 2 only applies,

12   as we talked about last time, Section 2 only applies to

13   offering -- or to advertising that you offer abortion and

14   abortion services, which your client doesn't do, and so I do

15   think that there's some legal reasoning, and I guess I'm

16   curious why you think some sort of, I think you referred to an

17   enforcement document or something like, would be better than

18   what we have here?  As far as your clients are concerned.  If

19   they put out some, I mean, I don't know of any law that says

20   the district attorney that puts out some sort of formal

21   statement or something about their position is binding on them,

22   or it seems to me that coming into court and repeatedly

23   disclaiming any intention to enforce a law, provides better

24   protection than some document they might have created.

25         *MS. SLAVIS:*  So there's a number of responses to that,

1    Your Honor.  The first, I think broadest response, is that the

2    district attorneys have not disclaimed complete enforcement of

3    this law.  A lot -- the promises are largely conditional.

4            District Attorney Dougherty says he won't enforce

5    only, notably, offering and providing abortion pill reversal.

6    He doesn't say anything about Section 2.  He says, *I won't*

7    *enforce offering abortion pill unless and until the Boards have*

8    *engaged in the rulemaking*.  That's not a permanent broad

9    disclaimer of the entire law.  It's a conditional disclaimer

10   about part of the law, and the condition is now removed,

11   because the Boards have engaged in rulemaking and have declared

12   that this conduct is unprofessional conduct.  So that is

13   nothing close to a permanent disavowal of the entire law.

14           The same issue is present in District Attorney

15   Kellner's disavow.  He doesn't say, *I'm not going to enforce*

16   *this law*.  He says, *I'm not going to enforce it, unless and*

17   *until this Court determines the First Amendment issues*.  That's

18   a blatantly conditional promise.

19           And in terms of Your Honor's question about the

20   difference between an enforcement document.  You know, Section

21   2, the fear, the credible threat that plaintiffs face here, is

22   not that they think they advertise abortion and emergency

23   contraceptive services.  The fear is that what they do say

24   about themselves, that they do describe themselves as

25   comprehensive, full service, full continuum of care, that

1    either a private plaintiff, who, again, can enforce this law or

2    the district attorneys could determine that those terms

3    indicate that you provide abortion or emergency conception

4    services when you know or reasonably know that you don't.

5            Nothing in the district attorney's disavowals speaks

6    to that issue at all.  So plaintiffs get no notice --

7            THE COURT:  Well, their disavowals are pretty broad.

8    They don't say, *We're not going to enforce it*.  They say, *We*

9    *never enforce this Act, and we don't plan to on the basis of*

10   *this either*.  I mean that's -- they don't need to -- why should

11   they also have to say, *We're not going to enforce it in this*

12   *particular instance or this particular instance*?

13           MS. SLAVIS:  Because, Your Honor, the point of

14   pre-enforcement standing is to provide plaintiffs with the

15   ability to engage in conduct without either needing to subject

16   themselves to unconstitutional laws or to engage in

17   self-censorship, and a prudential judgment, like the best focus

18   of my office is not on this law or the best public uses of

19   public resources, those are prudential judgments.  You can

20   presume that an officer of the law, who gives a legal reasoning

21   behind why that law should or should not be enforced, will

22   continue to follow that reasoning.  But these aren't legal

23   reasonings.  These or prudential judgments, which can be

24   changed for any reason, at any time.  And like I mentioned

25   earlier, there's a particular risk that that could happen in

1   this case, because of the pressure that has been placed on the

2   government to enforce the law by public interest groups.  And

3   you know, just to reiterate, this doesn't have anything to do

4   with the separate issue of the private plaintiffs, who can

5   bring enforcement actions, and that the Supreme Court has told

6   us that, separate and apart from everything out, that bolsters

7   the credible threat of enforcement.

8            THE COURT:  What does that have to do with the

9   district attorneys?

10            MS. SLAVIS:  Because it speaks to the burden on

11   plaintiffs that is present in a pre-enforcement standing case.

12            THE COURT:  I get it.  I am just not sure whether that

13   bolsters the reason you need an injunction against -- or a case

14   at all, since these are motions to dismiss against those

15   defendants.

16            MS. SLAVIS:  Your Honor, the issue for the private

17   enforcement is simply that we know that the -- the private

18   plaintiffs can bring their own actions.  District Attorney

19   Kellner and McCann have specifically alluded to, that could

20   happen.  And again, instead of saying, *We would tell those*

21   *private plaintiffs something about why this law cannot be*

22   *enforced.  We actually are going to completely acknowledge that*

23   *it can be enforced, and simply punt it to the AG and tell them*

24   *to speak to the AG.*

25            All of those statements in the disavows simply return

1   to the same issue, which is that, without some sort of

2   explanation, from the district attorneys, about why they

3   believe that this was law cannot be enforced against our

4   plaintiffs legally, it simply is insufficient.

5           Your Honor asked earlier about not being sure where

6   this is coming from, in terms of a binding -- the need for some

7   sort of enforcement document, and that's present in the cases.

8   The cases, *Mink* and *Brown*, make clear that there needs to be

9   some sort of analysis that makes it clear that not only the

10  conduct that the plaintiffs want to engage in, but the future

11  conduct that they want to engage in, would be covered by the

12  disavow.  You get that from a legal -- a statement of legal

13  reasoning that can be applied, not only in this situation but

14  across others.  You don't get it from a prudential judgment

15  about the focus of an office that can be changed for any reason

16  and no reason at all.

17          *THE COURT:*  Okay.  I know I interrupted you a few

18  times, so go ahead.

19          *MS. SLAVIS:*  Thank you, Your Honor.  I guess, just in

20  closing, say that the district attorneys here have not cited

21  any case where the type of disavows they are attempting to make

22  here suffice.  *D.L.S.* and *Mink* and *Winsness* all engage --

23  involved instances where there was a recognition that the law

24  could not be constitutionally enforced.  The Court in those

25  cases said that that *constitutional defeat snuffed out any*

1    *credible threat*.

2           And the *Brown* case is a far cry from the facts in the

3    ground here.  It involved a law that had not been enforced for

4    50 to 60 years.  It involved a law where there actually was an

5    enforcement policy that described the criteria to be used, that

6    specifically said, *The policy was intended to carve out the*

7    *bigamist conduct that plaintiffs wished to engage in*.  And it

8    involved plaintiffs who could not be prosecuted either for past

9    conduct, because the Statute of Limitations had run, or any

10   future conduct, because they had moved out of the state.

11          So those cases that are cited in support of their

12   proposition, the facts -- this is a very fact-specific inquiry,

13   and the facts in the ground on those cases bear no resemblance

14   to the facts here, where you have a brand-new law that

15   specifically targets unpopular views in an attempt to censor

16   them, and you have plaintiffs with a very credible fear that

17   their speech will be chilled the second that the agreed-upon

18   nonenforcement decision expires.

19          And so for these reasons, Your Honor, the district

20   attorneys have not provided any sufficient disavow to defeat

21   standing and therefore their Motions to Dismiss should be

22   denied.

23          *THE COURT:*  All right.  Thank you, Ms. Slavis.  I will

24   give them a chance to respond and then I may let you come back

25   up too, if I need to.

1              So, however the district attorneys want to proceed.

2      Go ahead.

3              MR. MARKS:  Good morning, Your Honor.  Again, Josh

4      Marks, on behalf of the District Attorney John Killner.  I just

5      want to -- I'm not going to do an oral argument.  I just want

6      to respond to some of the points being made to you.

7              THE COURT:  Thank you.

8              MR. MARKS:  For trying to distinguish our situation

9      for some of the pretty solid Tenth Circuit authority on this

10     area.  One of the responses is that disavows require certain

11     things, and I think if you look at the *Brown* case, *Brown v*

12     *Buhman* case, the Tenth Circuit actually retreated from

13     recognizing a consistent set of indicia that needs to be in

14     disavowals, in prosecutorial disavowals, including, they

15     disavowed that there needs to be some recognition of

16     unconstitutional conduct.  They adopted or they found that the

17     case was moot when a DA said, against the bigamy statute, that

18     they were not going to enforce it, but they would enforce it if

19     there was other -- other criminal conduct surrounding

20     polygamist activity, and so it was quite conditional in terms

21     of the disavowals.

22             And that was a -- the Tenth Circuit found that the

23     case was moot, and there was no standing, even under those

24     circumstances.  And in the Utah -- in the *Brown* case, the Utah

25     County DA's discussion and policy was actually quite thin.  It

1    wasn't adopted policy.  It was just an affidavit, just like

2    they have done here, and that's consistent with *D.L.S.*

3    *Winness*, *Mink*, all the way through.  It's always been a series

4    of post-filing affidavits, that are filed by district

5    attorneys.  And because -- and the reasoning is because,

6    basically, there has to be, obviously, a threat of actual or

7    imminent injury, and those disavowals take it back below that

8    line, and there needs -- the fact that a district attorney or

9    their successor could change their mind has never nudged the

10   standing issue into actual or threatened injury.

11          The *Brown* case did that very thing.  The argument

12   there was that the local DA could change his mind or a

13   successor DA could come in and change the policy.  And each

14   time the Tenth Circuit, whether it was in *Winness* or in *Brown*,

15   has rejected that argument.

16          *THE COURT:*  But don't the plaintiffs have a point

17   that, at least in most of those cases, the defendants have

18   effectively if not explicitly said, the plaintiffs are right

19   about their argument about this law and therefore we are not

20   enforcing it.  That there's some sort of substantive agreement.

21   So then you say, *Well, there's no case or controversy, because*

22   *everybody, essentially, agrees*; whereas, this is not -- I mean

23   what if I uphold the entirety of the law?  And why wouldn't

24   that trigger some sort of reasonable fear that the district

25   attorneys would change their mind?  Isn't there some legitimate

1    concern that the reason here is that the district attorneys are

2    sort of taking a wait-and-see approach, rather than, sort of,

3    agreeing with the plaintiffs' substantive position.

4            *MR. MARKS:*  Well, that was exactly the case in the

5    *Brown v Butman* case.  It was a Utah bigamy statute, and a local

6    DA there refused to acknowledge that the statute had

7    constitutional problems and also took a wait-and-see approach,

8    as well.  In fact, said, you know, *As of this time, I don't*

9    *have any present intent to prosecute under the bigamy statute,*

10   *but I could if it's accompanied by some other criminal conduct.*

11           So that DA went even further than what the DAs in this

12   case -- or what DA Kellner has said.  DA Kellner said, *Look, we*

13   *don't prosecute these kinds of CCPA claims.  I prosecute*

14   *criminal violations.*

15           So he has articulated a policy, a policy position here

16   that precludes the likelihood of prosecutorial enforcement.

17   But that's the point, is the *Brown* case answers that concern.

18           *THE COURT:*  Okay.  Thank you.

19           *MR. MARKS:*  I'm going to yield to my colleagues here.

20   They may have some followup for you.

21           *THE COURT:*  Sure.  Thank you.  All right. Mr. Ringel.

22           *MR. RINGEL:*  Thank you, Your Honor.  Briefly, the

23   issue that I wanted to respond to was the notion that other --

24   the private enforcement is relevant to the standing analysis.

25   If the Court looks at the *Winsness* case, it has a discussion,

starting at page 737 that discusses the *Nova Health Systems vs.*
*Gandy* case, which is 416 F.3d, 1149, which is a 2005 Tenth
Circuit decision, and notes that in that case one of the issues
with respect to standing is causation.  In other words, the
standing analysis means that there has to be a cognizable
injury caused by the particular defendant that you are suing,
and it cites that case for the proposition that, *A plaintiff*
*must show that his or her injury is fairly traceable to the*
*challenged action of the defendant, and not the result of the*
*independent action of some third party not before the Court*,
and that's what that argument is.  Essentially, that a private
party would be, potentially, able to enforce the CCPA.  I think
that's foreclosed by *Winsness* and the *Nova Health* decision.

     The last thing I would point out, Your Honor, is we're
not talking about the inability of the plaintiffs to redress
what they're doing.  There is still the argument that they
have, that the parts of the CCPA as amended by the new statute,
it is -- it is at least, potentially, something that could be
decided in the contents of the challenge, and the defendant --
the defense of the Attorney General.

     So we're talking about here, do the district attorneys
also need to be in the case?

     *THE COURT:*  Right.  Let me ask you -- let me ask you
this.  Say I uphold the law.  I don't grant a preliminary
injunction, and in a few months, District Attorney McCann

1    brings an -- starts investigating Bella, or someone else

2    engaged in this, for alleged violations of the CCPA.  Would she

3    be in contempt?  What -- would there be any redress, based on

4    what you have told me here?  Or would we just have a -- would

5    they be forced to defend themselves from scratch?

6         MR. MARKS:  So I think that the fundamental difference

7    would be this Court's upholding the constitutionality of the

8    statute.  If the statute is declared constitutional, that

9    changes the playing field.  Although, having said that, there's

10   nothing about the submissions that District Attorney McCann

11   provided to this Court that suggest that her decision not to

12   engage in the civil practice of law is contingent on this

13   Court's finding of constitutionality.  That's in some of the

14   other declarations from the other DAs, I believe, but not

15   District Attorney McCann's.  She has basically said, *I don't*

16   *enforce the CCPA.  I have not since I have been District*

17   *Attorney.  I don't intend to.  If I get a complaint from*

18   *someone saying that Bella or anyone else violated the CCPA, it*

19   *is our practice to send that to the civil enforcement*

20   *authorities in the Office of the Attorney General.*  And that

21   makes sense, Your Honor, because a district attorney doesn't

22   have the same competence to go into a civil district court in

23   the District of Colorado, and file a complaint and do initial

24   disclosures and do discovery in the same way that I do as a

25   civil practitioner; that's just not something that district

1    attorneys do.  So it's logical that District Attorney McCann

2    would say, *There's a whole unit in the Office of the Attorney*

3    *General that can do this, and they are much more competent than*

4    *I am and my office is to deal with this kind of issue.*

5              THE COURT:  Okay.  Thank you.

6              THE COURT:  Mr. Hughes.

7              MR. HUGHES:  Thank you, Your Honor.  So Bella Health

8    indicated that it closed its clinic in the 20th Judicial

9    District.  So the issue of present and future actions is kind

10   of off the table for DA Dougherty.  And the remaining question

11   is past actions that took place in the district.  The situation

12   is essentially the same as the first time we were here for DA

13   Dougherty.  The Court found that DA Dougherty's declaration was

14   sufficient to determine that they were not going to prosecute

15   under the circumstances at the time.

16             The rulemaking happened, but it happened after Bella

17   Health left the 20th Judicial District.  So from DA Dougherty's

18   standpoint, the situation for the first declaration is the

19   same.

20             In addition, DA Dougherty filed a second declaration

21   clarifying that issue, in case there's any doubt.

22             THE COURT:  Let me just ask you a little bit about how

23   meaningful it is that their location in the district is closed.

24   Obviously, the plaintiffs sued these DAs -- these particular

25   DAs for a reason, it seems, based on their locations at the

1    time, but when it comes to the CCPA, is the location of the

2    defendants really dispositive or even important?

3          What if a bunch of residents of Boulder County or the

4    district come to District Attorney Dougherty and say, *We have*

5    *been mislead by these advertisements*, could you not enforce it?

6          *MR. HUGHES:*  I think you are correct, that from a

7    technical standpoint the CCPA doesn't have a requirement that

8    the location is within the particular district that they are

9    being prosecuted, but as a practical matter and as a matter of

10   the declaration, that's the determination, as a matter of

11   policy, that DA Dougherty has made.

12         *THE COURT:*  Okay.  Then that may -- I guess I would

13   like you to respond to the question I asked Mr. Ringel about,

14   if I uphold the law, would anything change from District

15   Attorney Dougherty's perspective?  Would he then start

16   enforcing the law?

17         *MR. HUGHES:*  Not while -- I mean not against Bella

18   Health, while they are in the -- while they are not in the 20th

19   Judicial District.  There could be circumstances where DA

20   Dougherty would enforce the law, if it was in -- if a

21   violation, from his standpoint, occurred within his district.

22         *THE COURT:*  Okay.  All right.  Thank you.  Ms. Slavis,

23   I will give you a chance to respond, if you like.

24         *MS. SLAVIS:*  Thank you, Your Honor, two brief points.

25   District Attorney McCann said it all.  If you ultimately

1    determine that you want -- that this law will be upheld, that

2    changes the playing field.  The whole point of pre-enforcement

3    standing, and particularly the point of a preliminary

4    injunction is to protect plaintiffs while that litigation is

5    unfolding, so that, ultimately, if the determination on the

6    merits is against them, enforcement actions for the past

7    conduct cannot occur, and District Attorney McCann told you

8    today, because there's no legal reasoning behind the disavowal,

9    that they cannot promise.  They cannot disavow that past

10   conduct.  That could be occurring right now, and as soon as the

11   nonenforcement period expires.

12            And District Attorney Dougherty is sort of a variation

13   on that theme.  *There could be certain instances*, *Your Honor,*

14   *in which this law could be enforced*; that's what he said*.  Not*,

15   *I will not enforce this law against Bella for their past*

16   *conduct*.

17            And as to the issue about the effects of the

18   rulemaking.  The representations were made that we are going to

19   wait for the rulemaking to occur, to see what happens, because

20   it could be the case that the Boards decide this is totally

21   fine, and there is no unprofessional conduct here.  That's why

22   the previous promises were sufficient.  Not because -- so what

23   ended up happening?  What ended up happening, is that the

24   Boards determined it is unprofessional conduct.  And DA

25   Dougherty tells you in his declaration, *I won't enforce this*

1    *law, unless and until those rulemaking actions occur.*  Next

2    sentence, *Any enforcement action will certainly take account of*

3    *the outcome of those proceedings.*  That's not a disavowal.

4    It's the opposite of a disavowal.  And we know now what the

5    outcome of those rulemaking proceedings are, and what he will

6    do in the enforcement action against our clients.  That is a

7    credible threat.

8         And one point very, very briefly on *Brown*.  District

9    Attorney Kellner is just wrong on the meaning of *Brown* and what

10   *Brown* does.  *Brown*, the policy at issue in that case

11   specifically provided substantive protection to the plaintiffs

12   there, because he said, *This policy intends to exempt those who*

13   *are engaged in bigamist conduct for religious reasons.*  That's

14   a substantive promise.  There's nothing conditional about it.

15   The attempt to recharacterize the policy to say, *Well, it's*

16   *conditional, because if you engage in other criminal activity,*

17   *then you are covered*.

18        Plaintiffs here are asking for a disavowal that covers

19   only the conduct that they wish to engage in.  And in *Brown*,

20   that's precisely what he substantively promised.  If you only

21   engage in bigamist conduct, for the sake of bigamy, with no

22   future other crime attached to it, you are substantively

23   protected from enforcement.

24        And the district attorneys, again, given yet another

25   opportunity, in addition to their declarations, none of them

1    could stand up here and say, substantively, *for legal reasons,*

2    *I provide protection.  I promise not to enforce this law*

3    *against plaintiffs for their past or future conduct.*

4            So again, they have failed to give Your Honor a reason

5    to believe that their disavowals are sufficient to defeat

6    standing and the motions to dismiss should be denied.

7            *THE COURT:*  Let me ask you two questions that I think

8    are related.  One, does it matter -- Mr. Ringel is right that

9    you still have standing to bring the case, and so we're going

10   to get to the merits I think, whether the DAs are part of the

11   case or not, and so does that matter?

12           And related to that, you know, in some ways doesn't

13   Mr. Ringel's response actually provide some of the more

14   substantive protection you are talking about?  Obviously, if

15   you lose on the merits and I say, *This is fully constitutional,*

16   then there's nothing to -- you are not entitled to any

17   protection, and what I heard, basically, Mr. Ringel say is that

18   if you -- that that is what would change the -- change the

19   game, and so that -- unless you lose, you don't have anything

20   to worry about from them, and then it doesn't matter, right, if

21   you have lost on the merits?

22           So I think those are related.

23           *MS. SLAVIS:*  Well, I think to respond to the second

24   point -- I mean, this is why we're seeking a preliminary

25   injunction against -- to address the concern that you have

1    raised.

2         The reason we're seeking a preliminary injunction

3    against all enforcers of the law, is so that we are protected

4    during the pendency of litigation, including what the ultimate

5    determination of the merits are.

6         THE COURT:  Right.  And I think Mr. Ringel said you

7    have nothing to worry about during the pendency of the

8    litigation, because they are not going to do anything.  Maybe,

9    theoretically, they can do something after the litigation is

10   over, if you lose, but that -- then you don't need the

11   protection.  You are not entitled to any protection.

12        MS. SLAVIS:  Well, no, Your Honor, because the

13   current -- the promise for present intent not to enforce is not

14   based on any type -- it just returns you back to the initial

15   question.  Is a disavowal based on the primary focus of the

16   Office of Public Resources sufficient to protect our clients

17   from the credible threat of current enforcement?  And the

18   answer is no.  Which is why we have named all of these

19   defendants, and why we are seeking a preliminary injunction

20   against all of them, because they each pose a separate credible

21   threat to the enforcement of the law against our clients.

22        THE COURT:  All right.  Let me just -- I'm sorry, but

23   why -- as I said, you chose to sue these three -- these three

24   district attorneys, I think, on the theory that that's where

25   your client was -- had locations.

1            Why does the fact that you no longer have a location

2    in one of their districts, why is that irrelevant?  What is it?

3            *MS. SLAVIS:*  It's irrelevant because there is an

4    enforcement period that is currently up for discussion before

5    their clinic closed.  And as I stated earlier, the promise from

6    District Attorney Dougherty was not a promise that no

7    enforcement action would ever be brought.  It was a pause.  It

8    was a pause button, to see what the Medical Boards would do.

9    And then he says, *Any enforcement action will certainly take*

10   *those proceedings into account.*

11           So the pause button has been pressed again.  We are

12   back -- we've pressed play, and we know what the Boards have

13   said.  So that period of past conduct is now up for enforcement

14   again, and District Attorney Dougherty has told us what he

15   plans to do.

16           The Statute of Limitations has not run on the CCPA

17   actions, potential CCPA actions, and at any time he could

18   decide that for the period of time, while Bella's clinic was

19   still open in his district, he could come back and initiate an

20   enforcement action.

21           *THE COURT:*  Okay.  Thank you.

22           *MS. SLAVIS:*  Thank you, Your Honor.

23           *THE COURT:*  I appreciate that.  So who is going to

24   talk about more -- a little bit more broadly about Sections 1

25   and 2?

1              MR. RIENZI:  I am, for the plaintiffs, Your Honor.

2              THE COURT:  Why don't you go ahead.  Why don't you go

3       ahead and go first on that, Mr. Rienzi.

4              MR. RIENZI:  Thank you, Your Honor.  So starting with

5       Sections 1 and 2 of SB 23-190.  Start with Section 1.  We were

6       here last time, we heard Your Honor, we heard the arguments

7       about how it's just a legislative declaration.  For the reasons

8       set forth in the briefs, we don't think it's just a legislative

9       declaration.  It's certainly not a run-of-the-mill legislative

10      declaration.  It says that, *The point that the law is to make*

11      *punishable deceptive actions*.  It says that, *The legislature is*

12      *saying that the CCPA applies to advertising and providing for*

13      *or offering to provide or make available medication abortion*

14      *reversal*.  That is certainly what the people who enacted the

15      law understood themselves to be doing.  They understood

16      themselves to be banning advertising or offering to provide

17      abortion pill reversal.

18              But we amended the Complaint since then.  Right?  We

19      amended the Complaint since then to make clear that we are not

20      challenging Section 1 in isolation, as if it's the only thing

21      that exists.  We are also challenging Section 1, as it would be

22      enforced through the CCPA.  Because Section 1 says, *There's an*

23      *existing law, it bans, fraud; it bans consumer fraud*.  Section

24      1 is the legislature saying, *That law makes it illegal to do*

25      *what Bella does*, which is tell people about that abortion pill

1    reversal.  And the Attorney General got that too in some

2    respects.  The state defendants did.  Right?  So in one respect

3    they didn't.  If you look at their brief, they just don't

4    acknowledge that the -- there's been a change made, and that we

5    are not challenging Section 1 simply in isolation, but we're

6    also challenging the use of the CCPA to implicate or use

7    Section 1.

8            But the Attorney General also, on page 35 of the state

9    defendant's brief, makes it clear that they got the message

10   loud and clear from the legislature.  Right?  That they now

11   think something they didn't tell you in April.  They now think

12   that speakers who advertise abortion pill reversal, that other

13   sections of the CCPA already prohibit such false advertising.

14   So they are making very clear that there's a credible threat of

15   CCPA enforcement to effectuate Section 1.  And if you look on

16   page 35 of the brief, what statutes, what sections of the

17   statute that they cite, 6-1-105(1)(e), (1)(rrr).

18           If you take a look at Section 1 of section -- of SB

19   23-190, it's precisely the same sections.  So at the end of the

20   day, what we have here is a content-and-viewpoint based law.

21   The legislature has said, *There's something we don't want you*

22   *to tell people*.  *And if you tell people, we will punish it*.

23   And that *something* is a very clear subject matter and

24   viewpoint.  It's that, *If you have taken the abortion pill, at*

25   *least the first one, we might be able to help you with*

1    *progesterone*.  That's what the legislature is trying to make it

2    illegal to say in Colorado.  They've done that both in Section

3    1 where they say, *They are applying it and they are making it*

4    *punishable*, and by doing it through the CCPA, which the

5    Attorney General, in their brief, if you need a credible threat

6    of enforcement, they gave it to us in the brief.  They said

7    they think that's false advertising.  They think that's fraud,

8    under the CCPA.

9            So it's a content-and-viewpoint based law.  The only

10   way to apply is to look at the content and viewpoint of the

11   speech.  It's subject to strict scrutiny.  And my clients

12   should not have to wake up on Tuesday morning, and say, *Okay.*

13   *Pull down all of the ads, because the legislature has said that*

14   *this violates the CCPA, and the Attorney General has said this*

15   *violates the CCPA*, and so you are at risk of $20,000 per ad or

16   per-day-type fine.

17           *THE COURT:*  Isn't it pretty well established that

18   states the government can prohibit advertising illegal products

19   or services?

20           *MR. RIENZI:*  As a general matter, I think that's

21   probably true.

22           *THE COURT:*  Okay.

23           *MR. RIENZI:*  So then doesn't that argument depend on

24   what we do with Section 3?  That if they're allowed to make

25   this service, product, however you want to phrase it, illegal,

1    they can ban the advertising.

2            MR. RIENZI:  No.  Actually I don't think so.  I'm

3    thinking along with you, Your Honor.  In some states abortion

4    is legal, in some states abortion is not legal.  I'm not sure

5    that Texas, for example, could make it illegal for Colorado

6    practitioners to say, *Hey, abortion is available over here*.

7            THE COURT:  They couldn't.  I don't think they can

8    ban, necessarily, Colorado providers, but it seems to me they

9    can ban advertising of an illegal product.  I mean, we don't

10   have the interstate issue here, right?  Like, you can ban

11   saying, *Come to our Texas clinic and get an abortion*, right?

12           MR. RIENZI:  So I think they can ban the Texas

13   providers from providing it.  I think that's easy.  I guess I'm

14   less clear on the exact source of the law about what they can

15   do to the ban the illegal activity.  But here, ultimately, we

16   will get to this when we get to the Section 3 point.  The best

17   they've got is an argument that the science is unclear and it's

18   not yet proven, and in the middle of a debate, where they say,

19   *The science is unclear and it's not yet proven*, the state has

20   decided that there's something that you can't tell people.

21   *There's something that you are not allowed to tell people*.  It

22   is that this service might be available to them.  It's not just

23   something that applies to the nurse and doctors.  It applies to

24   anybody who might engage in the speech to tell you that you

25   could go get this service.  So Colorado has a

1    content-and-viewpoint based law.  They have said they think the

2    speech amounts to fraud, and my clients are clearly chilled in

3    their speech, because they have to stop engaging in the speech,

4    given the penalties that are attached to it.

5          I don't think the fact that part of that appears in a

6    legislative declaration, when mixed with all of the other

7    pieces, exempts it from First Amendment scrutiny.  And I do

8    think that strict scrutiny is the proper type of scrutiny

9    there.

10         If someone is advertising for a hitman, the government

11   is going to easily make that pass strict scrutiny.  Of course

12   they have got a compelling interest in that.  They don't come

13   anywhere close.  They cannot claim to come any place close in

14   this situation.

15         THE COURT:  Okay.  If you have something else go

16   ahead.  If not, I will let -- I will probably bring you back

17   up.

18         MR. RIENZI:  That is Section 1.  I'm happy to address

19   Section 2 now or after -- you have heard some about it.  So I

20   don't want to belabor.

21         THE COURT:  Go ahead, and I will let them address

22   Section 1, if you don't mind.

23         MR. RIENZI:  Thank you, Your Honor.

24         THE COURT:  Okay.  Mr. Sullivan.

25         MR. SULLIVAN:  Good morning, Your Honor.  Grant

1    Sullivan for the Attorney General.

2           May it please the Court.  Trying to focus on Section

3    1.  I think plaintiffs both lack standing to challenge Section

4    1 and it fails to state a claim, and that's for a few reasons.

5           One, Section 1 is merely a legislative preamble.  It's

6    not codified in statute.  It does not amend the CCPA in anyway.

7    I think *Webster*, cited in our Motion to Dismiss, is really

8    controlling here.  That's from the US Supreme Court, and it

9    that dealt with very similar legislative preamble from the

10   Missouri legislature, where Missouri declared, not in statute

11   but in a legislative preamble, that life begins at conception.

12   This is pre-*Dobbs*.  Plaintiffs brought suit to challenge that

13   saying, *That threatens our right to receive an abortion in*

14   *Missouri*.

15          *THE COURT:*  Let me ask you a couple of questions about

16   that.  I think the plaintiffs are right.  This is -- at least

17   part of Section 1 is quite a bit different than that.  I mean,

18   saying life begins at conception, doesn't really have, sort of,

19   legal implications, necessarily; whereas, if, say, Section 1

20   were in the statute, at least 3 B would seem like the kind of

21   thing that actually would have legal implications.  It reads

22   like a law.

23          *MR. SULLIVAN:*  I agree.  It is an unusual legislative

24   declaration.  I don't think it is much different, though, from

25   *Webster*.  The *Webster* declaration was similar in that it said

1    that, *State laws in Missouri shall be interpreted to provide*

2    *unborn children with all of the rights, privileges and*

3    *immunities available to other persons.*

4          So there you have the Missouri legislature, in the

5    legislative declaration, saying how this should impact other

6    state laws, but, nonetheless, Justice Rehnquist says, *We don't*

7    *have an authoritative interpretation of what this means from*

8    *the Missouri courts.  It's enough to know that if this*

9    *legislative preamble is ever applied in some concrete way by*

10   *Missouri courts, then a challenge could be brought in federal*

11   *court and heard by a federal court.*  Because that hadn't

12   happened, it had not been applied in any sort of concrete way,

13   the Supreme Court said, *We are not going to intervene at this*

14   *point.*  I think that's controlling here.

15         We don't have any sort of authoritative interpretation

16   of 3 B from a Colorado court.  Our position is that the act is

17   unambiguous.  So Colorado courts would not look to legislative

18   history, including this legislative preamble

19         I think it's also important to note that I'm not aware

20   of any case where a Court looks to the legislative history of

21   one Act, here Senate Bill 190, to then turn around and

22   interpret a different Act that's been in Colorado for 54 years;

23   the CCPA.  So I don't think, even if there were some reliance

24   on this legislative preamble, because the statute is found to

25   be ambiguous, I don't know that it could be used to interpret

1    the CCPA.

2           THE COURT:  Well, I don't know.  I'm not sure I agree

3    with that.  I don't have my book in front of me, but I think

4    that the -- that the Bill, the session law is referenced in the

5    CCPA now, because it does amend it, at least in part.

6           So I think -- I'm not sure I agree with that.  It

7    certainly wouldn't shock me for a Colorado court or another

8    court to look to this legislative declaration, if they are

9    interpreting part of a CCPA case, that involves these issues,

10   at least.  So I'm not sure I agree with that.

11          But let me ask you about, sort of, the specifics of

12   what we're talking about here.

13          MR. SULLIVAN:  Sure.

14          THE COURT:  So maybe one way is the Plaintiffs'

15   Exhibit G, which is social media post, brochure and welcome

16   card, that says things like, *Did you know that after taking the*

17   *abortion pill there's an option to try to reverse it*?  And the

18   first -- it describes the first pill and what it does, and then

19   it says, *A.P.R. can be effective within 72 hours*.  Is that

20   legal, in the state's view; that kind of advertising,

21   currently?

22          MR. SULLIVAN:  Under Section 2?  Just generally?

23          THE COURT:  You pick.

24          MR. SULLIVAN:  Well, I will defer to my colleague with

25   the Medical Board to answer any Section 3 questions.

1          Section 2 is a purely false advertising is a ban that

2     is narrow.  It prohibits advertising for abortions or emergency

3     contraceptives when that person knows or reasonably should know

4     they don't offer those services.  So I think the statements

5     that you described in Exhibit G would not run afoul of that.

6     They are not advertising either abortions or emergency

7     contraceptives.  So right there Section 2 doesn't apply.

8          THE COURT:  So it doesn't apply to Section 2.  I think

9     I agree with you, based on a reading of Section 2.  But the

10     plaintiffs, I think, as Mr. Rienzi pointed out, at least in the

11     Amended Complaint, their claim is that -- that the general CCPA

12     prohibition, at least when interpreted in light of Section 1,

13     would suggest, to a reasonable person in your client's shoes,

14     that they need to take this sort of stuff down, because it

15     suggests they are offering a service that, under Colorado law,

16     is illegal, and under Section 1 is explicitly called out as

17     false advertising.

18          MR. SULLIVAN:  So our position in our brief and today

19     hasn't changed.  Section 1 is not in the CRS.  It is not

20     substantive law.  It's not going to be used by a regulator to

21     guide that regulator's enforcement actions or investigative

22     decisions.

23          (1)(rrr) stands by itself.  Really, I think it is

24     speculative to suggest that this is going to come up through a

25     a (1)(rrr) action, when you have a more specific ban in Section

1    3 now and through the Boards' rulemaking.  And so if it's going

2    to come up at all, it's going for come up through a Section 3

3    type enforcement action not a (1)(rrr) action.

4         THE COURT:  So the state's position is that, at least

5    until we resolve the Section 3 issue, that advertising for

6    abortion pill reversal is not forbidden; if you can actually

7    provide it and it's not otherwise misleading or false, right?

8    I know all of the caveats you gave before.

9         MR. SULLIVAN:  Right.  The reason those caveats are

10   important is because any type of enforcement action is going to

11   depend on what the facts are on the ground, and we just don't

12   have facts to know.  I mean, we do have the record that's been

13   developed under Section 3.  That's why I say, I think, any sort

14   of enforcement action would come under Section 3, not Section

15   1, which, again, is not substantive law.

16        THE COURT:  Okay.  I have sort of chopped this up a

17   bit, but did you have anything else on section -- your read of

18   Section 1?

19        MR. SULLIVAN:  Not Section 1.  We think *Webster*

20   controls.  We do have argument on Section 2.

21        THE COURT:  Let's see -- do any of the other

22   defendants want to say anything about Section 1, or counsel for

23   any of the other defendants?  I don't think so.  Okay.  So why

24   don't I let you both respond to that and then go head with your

25   Section 2 argument.  Mr. Rienzi.

1          *MR. RIENZI:*  Thank you, Your Honor.  First, I think

2     *Webster* is just quite different for the reasons we said in the

3     briefs.  It doesn't purport to bind enforcers.  It didn't

4     specify a particular law that they said applies in a certain

5     way.  Just very different from what we have here.

6          Mr. Sullivan just did not answer the question, *Are*

7     *these ads, that are in front of the Court, that are in the*

8     *Complaint, you have got them, he has got them; is it illegal to*

9     *do this or not?*  Like, that's the question we're asking.  If

10    you notice you asked him the question, his first answer was to

11    say, *Well, not by Section 2.*  Okay.  Fine.  I'm not saying

12    those ads are forbidden by Section 2.  He is not either.

13    That's fine.

14          Are they forbidden?  Is it illegal?  Is is the

15    government of Colorado's view that it violates the CCPA to do

16    that?  In their brief, which he did not address, on page 35, he

17    refers to that as such false advertising and cites (1)(rrr).

18    What should we do with that?  We have the government of

19    Colorado, the legislature saying this speech is illegal.  The

20    legislature saying to run it through the CCPA.  The enforcement

21    authorities stand up in Court and do not give you or us a

22    direct answer, *Are these ads legal*?

23          On Tuesday, if we run them, will the State of Colorado

24    prosecute us or not?  In April they gave us an answer, and the

25    answer was, *Definitely not till the Boards speak*, and that was

1    the basis of Your Honor holding back last time.  They said, *No,*

2    *we're not going to*.  Today they are not saying, *No, we're not*

3    *going to*.  Today they're saying, *Well, I think it would be more*

4    *likely to happen some other way*.  But they are not saying this

5    is legal.

6           We have a right to come forward into a federal court

7    and to seek pre-enforcement standing.  We engage in the

8    advertising, the state has said it's no good, both in the

9    statute and now in the brief.  We have a right to come forward

10   and say, *We would like a First Amendment ruling as to whether*

11   *they can force us to stop engaging in that speech*.  Our conduct

12   is arguably proscribed.  It's more than that.  They have now

13   said it in the brief.  It's arguably proscribed.  We have a

14   credible threat of enforcement, because the statute tells them

15   what to do, and when asked by Your Honor whether they are going

16   to do it or not, they do not give a direct answer.

17          We think that Section 1 needs to be part of the case.

18   We think we certainly have standing for it, and frankly we need

19   an injunction so that on Tuesday morning we know whether we

20   have to take down all of ads, because Colorado has decided that

21   that content and that viewpoint is illegal to engage in; that

22   it is, in the Attorney General's words, *False advertising under*

23   *the CCPA*.  We need a ruling so that we know we don't have to

24   fear that, or we know what the legal means and bounds are of

25   our conduct.  The law is squarely targeted precisely at what we

1    do.  We put it in front of you.  We don't have a clear answer.

2              *THE COURT:*  Thank you.

3              *MR. RIENZI:*  On Section 2, again, to be clear, our

4    view is not that we indicate we provide abortion and

5    contraception.  We don't think we do.  Our view is that the

6    people who enacted this law, who have been highly active in the

7    process, since the enactment of the law, they think that the

8    kinds of statements, *We engage in, full continuum of care, full*

9    *service, comprehensive*; they think these statements mean, *I*

10   *include abortion and I include contraception*.  We don't think

11   they do.  But our conduct is arguably proscribed, because the

12   state has decided to have a more specific prohibition that

13   applies to pro-life speakers than applies to everybody else.

14   They have said -- you know, they say in their brief, *It doesn't*

15   *really add anything*.  If it doesn't really add anything, then

16   what's the valid, legitimate purpose of putting it in there,

17   right?

18             My clients are subject to this vague indicate rule,

19   which we know from the people who passed the law, what they

20   thought it meant.  All we're saying is we want it to be clear,

21   that when we engage in the kind of advertising that we have

22   engaged in since Bella began, about the scope of its services,

23   that we are not violating the law.  But we have been saddled

24   with extra restriction that applies to us, that doesn't apply

25   to an abortion provider about the scope of their services.

1          The legislature has singled out people on one side of

2     the debate.  That is not even inference; that is right on the

3     face of the law --

4          THE COURT:  Well, I mean, is it unfair to say it

5     singles out one side of the debate?  Because what we're talking

6     about here is advertising the provision of services, which you

7     know, there is this Commercial Speech Doctrine, a difference

8     between advertising for products and services versus debate.

9          Now, we can question the legitimacy of the Commercial

10    Speech Doctrine, but it exists, and so is it really fair to say

11    this is singling out a side of the debate, as opposed to people

12    who provide one type of service versus others are treated

13    differently, which is not on constitutionally suspect usually.

14         MR. RIENZI:  Your Honor, the legislature wrote into

15    the law that the point of this was to get the antiabortion

16    centers.  So this is not simply confusion about services

17    offered, generally.  This is the legislature deciding, there's

18    a very hot public debate post --

19         THE COURT:  Sure.  Let me -- let's flip it around.

20    Let's say we lived in a different state and the legislature,

21    after *Dobbs*, decided to ban all abortion, and along with it,

22    ban advertising that you provide abortion.  Would that be a

23    First Amendment problem?  Like a speech problem?

24         MR. RIENZI:  I suspect a ban on the speech would at

25    least get First Amendment analysis.  Yeah.  I mean, I don't

1  think the First Amendment would disappear.  I think you have to

2  do First Amendment analysis in the case.

3      Of course *Dobbs* made clear that there's not a

4  constitutional right at issue.  So that's also very different

5  from what we have here.  But the point is they are saying it

6  adds nothing, right?  They are saying it adds nothing, right?

7  But if it adds nothing, then the only purpose it serves is to

8  select a particular group.  I think the language was, *to make*

9  *them at risk from the more specific restriction on their*

10  *conduct*.

11      The government doesn't gets to say, *we want to have*

12  *more specific restrictions on false advertising by the*

13  *pro-lifers but not the pro-choicers*, but that's what they are

14  doing here.

15      I didn't see them to make a commercial speech argument

16  in the brief.  I'm not sure they have made it.  But I'm not

17  sure you could say that it's all commercial speech.  Certainly

18  not if you are saying we give comprehensive care to people.

19  I'm not sure that's just commercial speech.  I think you have

20  to do analysis about that.  They have not begun to make that

21  argument here.

22      So we have got speech that we engage in.  It is

23  precisely what the legislature said this was all about.  It's

24  only targeted at us.  It's only targeted to people on one side

25  of the debate.

1          If the abortion clinic wants to tell lies about

2     A.P.R., if the abortion clinic wants to go out and not be clear

3     about the services they offer, they are just subject to the

4     background general rules that everybody else is subject to.

5     They don't have a special provision that applies to them.

6          When the legislature singles out one side of the

7     debate, which is what I think they have done here and says,

8     *Special rules for you*, then under *RAV vs. St. Paul* and other

9     Supreme Court cases, the answer is that gets real scrutiny.

10    Maybe in the end you would say they could survive strict

11    scrutiny.  They didn't even make the argument here.   Maybe

12    someday you might say they survived strict scrutiny; but not

13    here, not now, based on what they presented.

14         Let me offer an alternative.  We also, in the

15    Complaint, asked for declaratory judgment.  If ultimately the

16    answer is that the government is going to come in and say, *We*

17    *have looked at the ads you have put in front of us, and we've*

18    *looked at the words you said,* and they got close to this in

19    April, but not the all the way there, but if they come in and

20    they say, *We look at that, that is not banned*.  We can get a

21    declaratory judgment at the end of the case that says, *Here's*

22    *the declaration that that kind of speech doesn't violate the*

23    *law, and it's binding on them*, well, that would be a real

24    relief that we can get on Section 2.

25         So for standing purposes that's more than enough.

1   Right?  We've got speech we want to engage in.  They are at

2   least suggesting that that speech is illegal.  We have good

3   reasons to fear that it is about our type of speech, about

4   comprehensive and so forth, and so that's why we need relief in

5   Section 2.

6           THE COURT:  Okay.  I don't think I have any questions.

7           MR. RIENZI:  Thank you, Your Honor.

8           MR. SULLIVAN:  Your Honor, Section 2 is a ban on false

9   advertising, nothing else.  Let me turn to the viewpoint

10  discrimination arguments that counsel just made.  Section 2

11  prohibits false advertising of abortions regardless of the

12  speaker's views.  If a Planned Parenthood clinic advertises

13  that it provides abortions, but it only provides wellness

14  checks, it's in violation of Section 2.  If a pro-choice doctor

15  advertises that he provides abortions, but he doesn't, and the

16  reason he is making that false advertisement is just to get

17  patients in the door to offer other services for monetary

18  reasons, that doctor violates Section 2.  Section 2 is not

19  concerned with the speaker's viewpoint on pro-abortion or

20  antiabortion.

21          Plaintiffs also argue that the Act discriminates on

22  viewpoint, because it doesn't regulate those who do offer

23  abortions.  I'm not, truthfully, sure what to make of this

24  argument.  It's true that Section 2 is not concerned with

25  people that truthfully advertise their services.  Again, this

1    is a false advertising ban.  The CCPA does not generally

2    regulate truthful advertisements, and states are certainly

3    allowed to treat fraudulent advertisements differently from

4    truthful advertisements, as Your Honor alluded to earlier.

5    Were that not the case, then no state would be able to have a

6    CCPA or its equivalent.

7            Let me turn to the content-based discrimination

8    arguments that plaintiffs make.  As I understand their argument

9    they are arguing that Section 2 is content based because it

10   applies to false advertisements about abortions and emergency

11   contraceptives but not other treatments, whether they be

12   pregnancy related or otherwise.

13           This is a new argument for plaintiffs, this

14   underinclusivity argument.  It's not found in their Complaint.

15   But in any event, the First Amendment allows states to be

16   underinclusive with their false advertising bans.  This is the

17   *RAV* case by Justice Scalia.  Justice Scalia was clear that a

18   state may choose to regulate price advertising in one industry

19   but not others, because the risk of fraud, in its view, is

20   greater in that area.

21           So here, Colorado can choose to prohibit false

22   advertising on abortions and emergency contraceptives while

23   leaving other forms of fraud for another day.  The Colorado

24   General Assembly does not have to act in one fell swoop to ban

25   all false advertising.

1          The General Assembly could have chosen to ban this

2    particular type of false advertising because of the

3    time-sensitive nature of abortions, for example.

4          THE COURT:  Let me ask you a couple of questions about

5    that.

6          MR. SULLIVAN:  Sure.

7          THE COURT:  As a general principle, obviously, you are

8    rights.  You don't have to, necessarily, ban all types of fraud

9    equally, and so I guess my question is, isn't there some limit

10   to that?  I mean, what if the state just said -- what if the

11   state just said, *We think these, you know, pro-life or crisis*

12   *pregnancy centers are just too dishonest*, which seems to be the

13   motivation here, *and we're just going to ban them from*

14   *advertising at all.  There's just too much risk of dishonesty,*

15   *and you can advertise abortion services, but not crisis*

16   *pregnancy centers.*  Wouldn't that be problematic?

17         MR. SULLIVAN:  I think that would be problematic,

18   because that would be banning a particular view within the

19   subclass.

20         I was trying to think through, you know, an example.

21   The one that came to mind for me was, if Colorado added to its

22   law that Colorado -- if Colorado were to ban false advertising

23   of abortions, if the advertisement mentions alternatives to

24   abortion; such as, adoption.  So if Colorado were to say, *You*

25   *can't falsely advertise that you offer abortions, if you also*

1    *mention alternatives to abortion.*  I think that would be

2    viewpoint discrimination within the subclass.  That's the state

3    expressing disagreement with a particular view within the

4    subclass.

5            Justice Scalia kind of gives some examples of that.

6    Justice Scalia is very clear in *RAV* that within particular

7    industries, so here the health industry, the state acts

8    comfortably within its police power by regulating and say and

9    the examples that *RAV* gives are the airline industry or the

10   legal profession.

11           So here we don't have any sort of discrimination

12   within the subclass.  It's just a flatout ban on false

13   advertising that you offer abortions or emergency

14   contraceptives, when you know that you did not and do not offer

15   those services.

16           *THE COURT:*  So you reviewed the -- the exhibits that

17   we've had now and before, and is -- do any of them violate

18   Section 2?  Any of Bella's advertisements violate Section 2?

19           *MR. SULLIVAN:*  So standing alone, and I am looking at

20   Amended Complaint paragraph 123, these are the statements that

21   I believe plaintiffs are asserting give them a credible fear of

22   enforcement.  The statements are that, *They provide*

23   *comprehensive, life-affirming ob/gyn practice.  They offer a*

24   *full continuum of care and comprehensive healthcare every stage*

25   *of life, and they are a life-affirming, full-service family*

1    *medicine and ob/gyn medical center.* Again, paragraph 123 of

2    the Complaint.

3            I think read in context with the other statements, on

4    the same website, statements that, *They are pro-life; that they*

5    *are faith-based; that they are committed to upholding the*

6    *dignity of life; and that they are the best response to*

7    *entities like Planned Parenthood,* I don't think any patient,

8    and certainly not the Attorney General, could be deceived or

9    confused into thinking that this clinic offers abortions or

10   emergency contraceptives.

11           *THE COURT:* So you emphasize, and they seem to be

12   pretty careful about this, that when they use the word

13   comprehensive or anything like that, they tend to also include

14   some variations of *life affirming* or something like, which is a

15   point you emphasize.

16           What if they don't? Would comprehensive reproductive

17   care, standing alone, violate Section 2?

18           *MR. SULLIVAN:* Standing alone, no. I think we need

19   additional facts. If there was evidence that a patient saw

20   this and called the clinic and said, *Hey, I'm interested in*

21   *abortion. I see you offer a full service of care*, and the

22   response on the other end of the line was, *Sure. Come on in,*

23   *we will talk about that. We can talk about getting you an*

24   *abortion.* If that was the response, and that's what an

25   investigation revealed, that would be a problem. But standing

1    alone, the statements in paragraph 123 do not violate Section

2    2.

3         THE COURT:  Does advertising, as things stand right

4    now, does anything prohibit the plaintiffs or anyone else from

5    advertising abortion pill reversal as a service they provide?

6         MR. SULLIVAN:  Well, I think that would lead to

7    Section 3 problems.  But Section 2, I don't -- again, Section 2

8    is a false advertising ban.  Falsely advertising that you

9    provide abortions when you do not.

10         Nothing that I have seen in the exhibits, that

11    plaintiffs attach to their materials suggest any sort of

12    Section 2 violation.

13         THE COURT:  Okay.  If you have a response, Mr. Rienzi.

14         MR. RIENZI:  Yes, Your Honor.  First, Your Honor...

15    this is a question, I will ask it to Your Honor, because I feel

16    I should turn around and ask Mr. Sullivan.  I wasn't sure who

17    Mr. Sullivan was speaking on behalf of.  Is it just the

18    Attorney General's Office or also the Boards?  I don't know if

19    that's a fair question to ask.  I will just point it out --

20         THE COURT:  That's a good question.

21         MR. RIENZI:  That's something I'm uncertain about as

22    we go through these arguments.

23         Look, I just don't think you can plausibly read the

24    legislative history and plausibly read the background of the

25    statute, and say this is like regulating the airline industry

1    but not the widget industry.  This is about regulating one side

2    of the hottest-button cultural debate in America, on purpose.

3    They said so.  They didn't hide it.  Right?  This is about the

4    fact that they think anti -- the pro-life centers are part of

5    the antichoice -- the well-coordinated antichoice movement.

6         So this law did not come about because people sat

7    around and said, *Wait, let's think about what are some types of*

8    *fraud.  Oh, there is one*.  It came about because people were in

9    the middle of the heat of the abortion debate.  It's all over

10   the legislative history.  It's all over the preamble that the

11   whole legislature voted for.

12        *THE COURT:*  I disagree with some of your

13   characterizations, I guess.  But in general, I get your point,

14   and it's well taken, but isn't Mr. Sullivan right that

15   that's -- what they've done here, whatever their motivations,

16   what they've actually done is just say, *You can't falsely*

17   *indicate you are providing abortion services, if you are not*?

18   And you don't do that, according to the state, according to

19   you.  What's the problem?

20        *MR. RIENZI:*  So --

21        *THE COURT:*  I get the background is a problem, but

22   what they actually did is pretty narrow.

23        *MR. RIENZI:*  So one, the background is a problem not

24   just generically in the background.  It's a legal problem, for

25   the reasons we laid out in the brief, under *Reed vs Town of*

1    *Gilbert* and other cases.  Even if they enact a law that is on

2    its face not content based; and I don't think they did.  But

3    even if they had, doing it out of disagreement with one side of

4    the abortion debate is a problem and does trigger strict

5    scrutiny under *Reed*.

6         *THE COURT:*  Let me ask you a follow-up question to

7    that.

8         How do I go about distinguishing things like that?

9    There are different motivations.  What if there is some

10   evidence that some people are, if not mislead, confused about

11   what a crisis pregnancy center does, and then there are other

12   legislators or witnesses who are blatantly, and this will get

13   us in this Section 3 a little bit, but who said things that

14   were blatantly antireligious; how do I balance those out?  And

15   why would the exact same law, depending on what a few people in

16   the process said, why would the exact same law be

17   constitutional one day and not the other, based on something

18   like that?  Shouldn't I be looking at the law itself, and

19   seeing how it matches up to the Constitution; not all that kind

20   of thing?

21        *MR. RIENZI:*  The short answer is, I feel your pain of

22   the difficulty of that, but, you know, the Supreme Court has

23   been quite clear that both our ways you can get to strict

24   scrutiny.  Both the process was bad and infected with

25   discrimination against one viewpoint and also the end result

1    was infected.  So there are just two existing paths under

2    existing Supreme Court law.  I think they both are tripped

3    here.  So to be clear, I don't think you need to go down this

4    one.  I think you could do it on the face of the law.  Again,

5    this is not widgets or airline things.  This is in the big

6    fight about abortion.  And maybe someday they will come to you

7    they will say, *I have evidence that there are actually misled*

8    *people out there.  I have evidence that people complained to*

9    *us.*  But if you recall, when people sat here and took an oath

10   and told you the truth in April, they swore to you, they

11   actually never heard of a problem with these things.  They had

12   no evidence, never happened.

13        *THE COURT:*  Sorry to interrupt.  That would be

14   important.  I would have to do that if we are in strict

15   scrutiny, right?  If we are in rational basis, I don't know

16   that I need them to provide real evidence.

17        *MR. RIENZI:*  Even if you called it commercial speech,

18   I don't think you get to rational basis here, where they have

19   just picked out one particular side of the debate to apply it

20   to.  I don't think under commercial speech it's just rational

21   basis.  They have some burden.  So far they have come forward

22   with nothing.

23        Again, I would just reiterate, for standing purposes,

24   we have also sought declaratory relief.  It's great that

25   Mr. Sullivan gave you some of those answers, which seemed

1    pretty good, that that paragraph was good, but, of course, we

2    are exposed to litigation not only from Mr. Sullivan, if he is

3    just the Attorney General's office, but I don't know what the

4    Boards think about it, unless I know that he was speaking for

5    them.

6            We are exposed to the district attorneys.  We are

7    exposed to private complaints.  All of that makes it clear that

8    we have a credible fear of enforcement for our conduct that is

9    arguable proscribed.

10           If, at the end of the day, the answer is we get a

11   clear order from a federal court that says, *What Bella is*

12   *engaged in does not violate law,* that would be an enormous help

13   to us.  We have relief that we can get and we do need.

14           So, for standing purposes, I do think the prayer for

15   relief, and it's in paragraph C 4 in the Complaint, I do think

16   that's very important.

17           And again, I will just reiterate, on Section 1 in the

18   CCPA, the state still has not said that it's legal for us to

19   engage in A.P.R. advertising on Tuesday morning.  They have

20   said it doesn't violate Section 2, quite carefully.  They have

21   not said it doesn't violate the CCPA.  We need that protection.

22           *THE COURT:*  Thank you, Mr. Rienzi.

23           Mr. Sullivan, can I bring you back up one more time

24   and ask you to answer the question about who you're exactly

25   talking about, and related to that, what your view on how some

1   of the various state -- state defendants, their role, again

2   trying to mostly focus here on the CCPA Section 1 and 2 issues.

3            What role do various entities and individuals have as

4   to that?

5            MR. SULLIVAN:  Absolutely, Your Honor.  So just to

6   clarify who my client is, I represent Attorney General

7   Phil Weiser.  I will let counsel for the Medical Board speak as

8   to the -- any kind of lingering questions on the interaction

9   between Section 2, Section 3.

10           But from the Attorney General's perspectives on the

11  CCPA issues, Section 1 is not law and Section 2 is just a false

12  advertising ban and for the reasons I gave earlier, the

13  statements in paragraph 123 of their Amended Complaint are not

14  violations of Section 2 standing alone.

15           THE COURT:  Is there -- I'm not aware of it, and it's

16  probably unfair to ask you, but do you know of any sort of just

17  blanket prohibition in the CCPA or anywhere else on advertising

18  illegal product or service?  Do you know what I'm saying?  If

19  you are right about -- if Section 3 makes abortion pill

20  reversal illegal, does it automatically mean that some of their

21  advertisement about it would also be illegal?

22           MR. SULLIVAN:  The only provisions that come to mind

23  are the ones we have been talking about; (1) (e) and (1)(rrr).

24  Those are, kind of, the general deceptive trade provisions of

25  the CCPA.  So I'm not aware of anything beyond those; the

1    general provisions.

2         THE COURT:  Okay.  Do you want to talk about any of

3    the other parts of your Motion To Dismiss that we have not

4    talked about so far?  I mean, I kind of get it, but --

5         MR. SULLIVAN:  Unless the Court has questions.  I want

6    to be helpful to the Court, but I also realize we have

7    important Section 3 issues to discuss, as well.  I'm happy to

8    answer any remaining questions about the remaining parts of our

9    motion.

10        THE COURT:  Let me just ask a big-picture question

11   here.  Do you think the plaintiffs, against any of the

12   defendants, and I know you don't, technically, represent the

13   others, necessarily, but do you think the plaintiffs have

14   standing against anyone to bring challenges to Sections 1 and

15   2 -- or any of their claims related to the CCPA, is probably a

16   better way to put it, since it's not a direct challenge to

17   Section 1 anymore?

18        MR. SULLIVAN:  I think the standing arguments that we

19   make against Section 1 and 2 apply equally to all the

20   defendants.  I will let counsel state whether or not they agree

21   with the AG's Motion To Dismiss in that regard, but from our

22   view those are kind of case-wide standing defects.

23        THE COURT:  Okay.  Thank you.  So before we get off of

24   Sections 1 and 2, let me ask if any of the other defendants

25   want to weigh in?  Might be a little bit curious just to get

1    the Board and the Board members' perspective on what their role

2    might be, when it comes to those sections of the Act and the

3    CCPA, or is that just something you don't care about?

4           MR. URANKAR:  Good morning, Your Honor.  This is

5    Brian Urankar, on behalf of the Medical Board, also speaking on

6    behalf of the Nursing Board today.

7           Again, the Board would join with the AG's positions on

8    Sections 1 and 2.  I think, to a certain extent obviously, the

9    Medical Board's determination in particular would weigh on

10   whether or not abortion pill reversal could be a deceptive

11   trade practice that could be prosecuted.  However, the Medical

12   Board has zero jurisdiction over that sort of enforcement.

13   They only enforce the Medical Practice Act.  So to the extent

14   there's any sort of advertising concern, it would be -- from

15   the Medical Board's perspective, it would be under the Medical

16   Practice Act.

17          THE COURT:  Are you aware of any instance where, say,

18   any of these Boards that you represent have taken action

19   against a provider for, essentially, advertising or promoting

20   something that they don't actually provide?

21          MR. URANKAR:  Something they don't actually provide?

22   No, Your Honor.

23          THE COURT:  How about for advertising something that

24   is illegal?

25          MR. URANKAR:  Not off the top of my head, Your Honor.

 1    I think where they can run afoul, because there is a provision

 2    in the Medical Practice Act that permits the Board to

 3    discipline for deceptive advertising for doctors.  So I could

 4    see a situation where if there was a standard of care deviation

 5    for providing an X treatment.  So let's -- for example, using

 6    stem cells to treat back pain, something like that, and the

 7    Board says, *There's no science there.*  You can't actually use

 8    that treatment correctly.  I could see a world where there's

 9    two violations brought, that's purely a hypothetical.  I'm not

10    aware of that, specifically.

11         *THE COURT:*  Okay.  All right.  Thank you.  Is there

12    anything else you wanted to add?

13         *MR. URANKAR:*  Not on 1 and 2, Your Honor.

14         *THE COURT:*  All right.  I think that's all I have got,

15    unless any of the other defendants want to say anything on

16    those sections?  And this is a pretty good time, I think, to

17    take about a 15-minute recess, till 11:15.  So we will be in

18    recess until then.

19         *THE COURTROOM DEPUTY:*  All rise.  Court is now in

20    investigate.

21       (Recess at 11:01 a.m.)

22       (In open court at 11:19 a.m.)

23         *THE COURT:*  All right.  Let's take our seats.  Thank

24    you, everyone.  So I appreciate the argument and explanations,

25    so far.

1          As I said, we're not going to necessarily be able to

2     keep completely clean lines between everything, but I think

3     we've done pretty well so far.

4          So why don't we turn to what's left, essentially,

5     largely, the implications of Section 3 of this Act.  We can

6     talk about the others.  And I will start with the plaintiffs.

7     Mr. Rienzi, again, go ahead.

8          *MR. RIENZI:*  Thank you, Your Honor.  Turning to

9     Section 3, now, to the meat of many of the fights going on

10    here.

11         If you recall last time we were in your courtroom,

12    back in April, the defendants promised to act as if the law

13    didn't exist for a period of time.  We were waiting to see if

14    the -- if the Boards would take the off-ramp, for lack of a

15    better term, the off-ramp that the legislature had offered

16    them, where they could have turned off the fact that this is

17    unprofessional conduct.  That happened over the summer.  They

18    enacted their rules.  None of them took the off-ramp.

19         So where we are is that under the statute, providing

20    abortion pill reversal, which my clients do, is unprofessional

21    conduct.  The defendants have agreed to hold back for a couple

22    of weeks, to give us until 11:59 on Monday night, the 23rd, but

23    after that our conduct is, to use the government's words,

24    *banned*.

25         If I could just start with a few minutes on the

1    science, because I think that's where some of these fights are.

2    Obviously, much of this case is about a hormone called

3    progesterone.  It's a natural hormone.  It's named progesterone

4    because it helps gestation, pro-gestation.  It's been in

5    clinical use particularly in pregnant women for more than 50

6    years.  It has a very strong safety record.  Most of the uses

7    in obstetrics and gynecology are off-label uses.  In other

8    words, they are not the use for which someone went through full

9    FDA-approval clinical trials.

10          As Dr. Wubbenhorst explains, I don't think I have seen

11   the defendants disagree with, particularly when you are dealing

12   with pregnancy, lots of drugs get into use, based on things

13   likes case series, but they are not full FDA approvals, and

14   it's used for a lot of things, including prevention of

15   miscarriages, prevention of early pregnancy bleeding,

16   prevention of preterm birth, prevention of certain types of

17   infertility.

18          Again, it's had a long record and it's considered

19   safe.  I don't think there's a serious dispute about that

20   either; that's either in our Complaint; that's in

21   Dr. Wubbenhorst's expert report.  The most, the expert from the

22   government says is, they say, *Well, low risk is not no risk*.  I

23   take the point, but I don't think it gets them very far.  It's

24   used all the time for pregnant women.  It's very safe.  They

25   don't give any examples of lack of safety for progesterone.

1            THE COURT:  Could I just ask you, before you go on.

2      Do you know of any other form of abortion pill reversal than

3      progesterone?

4            MR. RIENZI:  So, short answer is no.  I'm not aware of

5      one.  There's not one that my clients use.  I have not seen the

6      studies about other things you could take to try to fend off

7      the mifepristone.

8            I also want to be clear, I don't know that for sure;

9      that's my best knowledge.

10           What's often publicly called the abortion pill is

11     really a two-pill sequence.  First of those pills is called

12     mifepristone, and mifepristone works by interfering with the

13     progesterone that helps a woman stay pregnant.  The FDA says

14     it's, quote, *A drug that blocks a hormone called progesterone*

15     *that is needed for a pregnancy to continue,* closed quote.

16     Blocking that hormone often kills the baby, but not always,

17     right?  So it often kills the baby, but doesn't always kill the

18     baby.  So there's a two-pill regimen for abortion.  First, it's

19     mifepristone, then 24 to 48 hours later there's another drug

20     called misoprostol, which is taken to empty the uterus and

21     finish the abortion.  Taken together, those are highly

22     effective; 97, 98 percent of the time that will result in an

23     aborted baby.

24           As the Court is aware, because we are here, and you

25     have been reading things, there's something called abortion

1    pill reversal.  Some women regret having taken the first

2    abortion pill.  Some women get forced to take the first

3    abortion pill, and those women sometimes seek medical help,

4    saying, *I wish I didn't take that*, or *I wish my boyfriend had*

5    *not forced that into me or my parent, and I would like your*

6    *help trying to see if there's anything you can do to save my*

7    *baby*.  That's the context in which my clients encounter this

8    situation.

9         It has long been suspected that using exogenous

10   progesterone, that's progesterone from outside the body, might

11   help counteract the effects of mifepristone.  Mifepristone

12   interferes with progesterone, so maybe some extra progesterone

13   might help.

14        Again, last time we were here, the government promised

15   that it wasn't going to interfere with my clients doing that

16   for women.  It wasn't going to stop my clients from providing

17   those women with progesterone.  It was going to act like the

18   law never existed.  The government touted its discretion.  They

19   emphasized to Your Honor that they had discretion, so much so

20   that even in the face of the state legislature calling it

21   unprofessional conduct, they said they have discretion to say,

22   *We're not doing anything about that*; that was the claim.

23        They testified that they had never used any other law

24   in their arsenal, whether it's the CCPA or the background

25   Medical and Nursing Practice laws.  They never used any of

1   those to come after A.P.R.  They testified they had not heard

2   about any complaints from anybody or any women who claim to

3   have been harmed by A.P.R.

4          Some stuff has changed, some stayed the same, right?

5   So today they are in front of you, they have a clear position

6   on A.P.R.  They say, *The A.P.R. violates the basic tenets of*

7   *medicine.*  They say that, *The state cannot tolerate medical*

8   *providers doing so, engaging in A.P.R. and therefore they have*,

9   quote, *banned A.P.R.*  They say it's fraud to tell people you

10  can do this, and our reprieve from all that expires at 11:59 on

11  Monday.

12         Some things are still the same.  They are still

13  emphasizing their discretion.  In fact, I would argue that in

14  the recent rules they have doubled or tripled down on their own

15  discretion to do case-by-case analysis.  I think that's

16  important under the Free Exercise clause, for reasons we will

17  get to.  They are still without evidence of anybody claiming to

18  be harmed or any other jurisdiction that feels the need to have

19  a rule like this.

20         So they came to you last time they said, *We have never*

21  *had a complaint.  No one has ever shown up and said they got*

22  *hurt by their doctor giving them progesterone*.  I think that's

23  still true.  I think it's much more damning than it was in

24  April.

25         Let me start with the Free Exercise claims.  The

1    government clearly here has burdened Bella's Free Exercise of

2    Religion.  The Complaint establishes that Bella engages in

3    abortion pill reversal as part of its religious mission to help

4    women.  The government doesn't deny that it's religious, or

5    even to deny that Bella does this for religious reasons, but

6    they kind of denigrate it as simply a tool, as if maybe it's

7    not a religious exercise, but a tool.  They point out that it's

8    not really part of religious worship, like gathering for

9    sacraments or something like that.

10        I would just say neither of those works from a First

11   Amendment point of view.  It's simply not the case that the

12   only religious exercises are worship or that things that people

13   do for religious reasons don't count and don't get Free

14   Exercise scrutiny.

15        To give you a few examples from recent Supreme Court

16   cases.  The same arguments could have been made in *Fulton*,

17   right?  They were running a foster care agency.  It's not a

18   sacrament.  It's something they do out of their religious

19   beliefs, so to here.  *Masterpiece Cake Shop*.  Baking the cake

20   was not his sacrament.  It was something he did or didn't do

21   out of his religious beliefs.

22        *Yoder*, not sending their children to a high school;

23   that was not a sacrament; that was something they were engaged

24   in for religious reasons.

25        *Smith* actually also makes it clear that religious

1    exercise includes action and refraining from action, and talks

2    about things like not using certain modes of transportation.

3            So it's just clear, this is a religious exercise, and

4    they have now banned plaintiffs' religious exercise, and so we

5    need to do Free Exercise scrutiny.

6            THE COURT:  So let me -- this gets to the core, I

7    guess, of the difficulty I have.  You are right about all of

8    that, but isn't one of the reasons that a religious or a

9    sacrament is different, not that it's more religious or more

10   worthy, necessarily, of protection, but that it's only a

11   religious thing.  You know, if you ban worship or a religious

12   right, that it's targeted at the religious aspect of it because

13   there's really no other aspect.

14           The match between what your client does and religion,

15   to them, certainly is they overlap, but it's not -- there's

16   also other purposes someone could engage in this and that just

17   makes it harder to figure out, to me at least, how all of these

18   doctrines apply, and how, you know, I feel like there's case

19   law pointing different directions on some of this, and so to

20   me, that's one of the difficulties, is when your religious

21   activity is something that other people could at least engage

22   in for nonreligious reasons, that makes it harder to apply some

23   of those cases, to me at least.

24           MR. RIENZI:  The Supreme Court has directly addressed

25   that, Your Honor.  Let me start with *Tandon*.  In *Tandon* it was

1  not a ban on prayer meetings in houses, just a ban on meetings

2  in houses.  Right?  People could have those meetings for

3  religious reasons or for nonreligious reasons.  What the Court

4  said is that for those plaintiffs, that's a religious exercise,

5  and so the way the Courts have to analyze that is they have to

6  look and see, *Well, did the government allow comparable secular*

7  *things to go forward that threatened their interests in the*

8  *same way*?

9        You can say the same things you just said about

10 *Masterpiece*.  Someone would refuse to bake a cake for a

11 same-sex wedding on a nonreligious ground.  Maybe they have

12 secular objections to something.

13       The behavior that's banned in any of those cases I

14 mentioned, was not banned only for religious people.  It was

15 banned broadly, and people could can engage in it for religious

16 reasons or not religious reason.  From a constitutional point

17 of view, the way the Court has made clear that you do the

18 analysis, is you say, *Is this a religious exercise for the*

19 *plaintiffs*?  I think that's absolutely clear here.  Then you

20 say, *Okay.  Well, did the government violate the Free Exercise*

21 *clause when it banned her religious exercise*?  And then you do

22 things like the analysis in *Tandon*, to see how did they treat

23 comparable conduct.  You do things like analysis in *Fulton*.

24 You say, *Did the government leave itself discretion?  Did it*

25 *leave itself discretion to do case-by-case analysis?*  Where

1   they may say, *This reason or that reason is good enough to do*

2   *A.P.R., but not your religion*.  They have left themself that

3   kind of discretion here.

4          Do the analysis in *Masterpiece*, again baking the cake,

5   could have been religious or nonreligious reason.  You do the

6   analysis in *Masterpiece* and say, *Did the government act with*

7   *animus here*?  *Is there even reason for a slight suspicion of*

8   *animus?*  And I would suggest there's far more than that.

9          The problem Your Honor points out is real and fair,

10  but the Supreme Court has squarely addressed how to deal with

11  it, and they have said, by their example in *Tandon*, just to

12  take the first one, in *Tandon* they said, right, we have got a

13  ban that was not a ban on prayer meetings; it was a ban on all

14  meetings.  People could do that for religious meetings or

15  secular.  They said here is how you do the analysis, *You should*

16  *look to see did the government leave open, leave unregulated*

17  *comparable activity that threatens the government's interests*

18  *in the same way?*

19          I'm happy to turn to that and go through those, but I

20  want to make sure I addressed your question.

21          *THE COURT:*  You did, yeah.  This is a good time for

22  that.

23          *MR. RIENZI:*  Given that they banned my client's

24  religious exercise, from a for-exercise point of view, the

25  question is, is it a neutral and generally applicable law?  We

1    think it's not.  I think there are three reasons, *Tandon*; it's

2    not generally applicable under *Tandon*, because it doesn't get

3    comparable behavior; talk about that in a moment.

4          *Fulton*, gave themselves discretion.  Again, I think

5    they doubled and tripled down on that discretion, with all of

6    the case-by-case stuff they say in their new rules.

7    *Masterpiece* and *Lukumi* animus.

8          *If I can start with Tandon*.  *Tandon* makes clear that

9    when you are trying to figure out if a law is generally

10   applicable and therefore avoids strict scrutiny, what you have

11   to do, is you have to ask, *Did the government ban comparable*

12   *secular activity, that undermines the government's interests in*

13   *a similar way*?  And the Court explained that the way you figure

14   out if something is comparable, is from the point of view of

15   the government's asserted interests.  Right?  So you look at,

16   *What's the government saying is its reason here?  Did they*

17   *leave other things open there?*

18         The government talks about having an interest in

19   safety, but I don't think there could be any doubt that they

20   have not regulated generally here.  They have not regulated all

21   of the other uses of progesterone that the general population

22   might take, and particularly all of the other uses of

23   progesterone that pregnant women take.

24         Pregnant women take progesterone, for example, to

25   prevent miscarriages and for other things that I mentioned

1    before.  The government doesn't ban any of those.  If

2    progesterone were dangerous, they would, but they have not.

3            They also mention a safety concern that women who take

4    the progesterone, might also not follow through and take the

5    misoprostol.  Also might stop after mifepristone, and they say

6    that that *may be associated*, is their words, and I will direct

7    Your Honor to the one article they pointed to on that, but they

8    say*, It may it may be associated with some risks of hemorrhage*.

9    But the problem with that interest, Your Honor, is that --

10   several fold; one, they don't do anything, anywhere to make

11   people take the second pill.  They don't report to regulate the

12   women.  They don't report to regulate the people who prescribe

13   it, to make them, for example, just followup with the women.

14   Right?  Make sure that they took it.  And most importantly,

15   their own recommended path, their own recommended standard of

16   care, from their own expert's mouth says*, If you have decided*

17   *you want to keep the baby, don't take the misoprostol*.  Right?

18           So there's a lot of situations in which people can be

19   not taking the misoprostol.  And women, to be clear, absolutely

20   have the right to decide, *You know what, I started this but*

21   *holy smokes I don't want to finish it.  I'm not taking the*

22   *pill.*  They have got that right, and I don't hear the

23   government to be saying otherwise.  But in a world where, in

24   all of those other situations, someone cannot take that pill,

25   and where their own recommended standard of care called

1    *expectant management*, which their expert describes, as not

2    taking the misoprostol, they simply can't say that they have

3    regulated, generally.  There's one and only one place they have

4    regulated progesterone.  There's one and only one place they

5    have said they have a concern with don't take the second pill

6    and it's with abortion pill reversal; that's the opposite of a

7    generally applicable law.

8          They also -- I will get to the discretion under

9    *Fulton*, but the discretion here also matters for *Tandon*.  The

10   Nursing Board also says, *They want to retain discretion for*

11   *case-by-case decisions*.  Right?  There may be some places where

12   abortion pill reversal is okay.  Even the Medical Board holds

13   out room for that, if it's something other than progesterone.

14   The pharmacy holds out for that.  If they were regulating

15   generally they would say, *No one can do this*.  They have not

16   said that at all, so they fail general applicability.

17         One other thing I would say, Dr. Wubbenhorst

18   establishes this, Dr. Cohen doesn't disagree and doesn't rebut

19   it, and I don't hear the government to be rebutting it, it's

20   also in the Complaint.  Progesterone is widely used, it's

21   widely used off label.  It's widely used based on case series.

22   It happens every day in Colorado and every day all over the

23   country.  They don't regulate unapproved uses of medicines.

24   They just targeted this one.

25         At one point in their brief they say, *Well, we are*

1    *worried about using unapproved medicines without the safeguards*

2    *of formal research, so that's our interest.* Right? But that

3    interest, again, is targeted like a laser, at this particular

4    exercise by my clients.

5            In other words, this rule that they passed, doesn't

6    stop people in Colorado from giving experimental therapies

7    without research safeguards. In fact, we could walk out the

8    door today and offer every single other experimental therapy

9    known to man, without formal research safeguards, and these

10   rules don't say a word about it. We could keep doing it,

11   that's behavior they have left unregulated under this rule.

12           Flip it. We could walk out tomorrow and design a

13   study for A.P.R., and we could have all of the formal research

14   safeguards you could want and more, and it is still illegal

15   under this rule. It's still unprofessional conduct. They have

16   not generally regulated to stop people from doing unproven

17   therapies, without research safeguards, is I think the way they

18   say it. They have specifically regulated this. It's not a

19   generally applicable law.

20           *THE COURT:* So let me ask you, I think -- I mean

21   that's obviously true. They have not regulated that. But

22   can't we be -- I think Justice Gorsuch talks about turning the

23   dials of the level of generality on these questions. You can

24   always sort of do that. And isn't that part of the problem?

25   Couldn't -- as a general matter, can't a state ban particular

1    medical procedures or uses of particular drugs without

2    triggering strict scrutiny, just as a general matter?

3         MR. RIENZI:  I'm not sure they can in the way they

4    have done it here, Your Honor.  In other words, if they say, *My*

5    *fear is progesterone is dangerous for people*, which I don't

6    think they really actually get to saying that; but if they said

7    that, then the correct *Tandon* inquiry is, *Okay, tell me about*

8    *all of the other uses of progesterone and why all of them are*

9    *fine*?  Or if they say, *Not taking pill two is dangerous*, right?

10   If that's our religious exercise, *Tandon* says that they have

11   got to show that they have regulated elsewhere, and the Court

12   says you focus on their stated interest, and they say it's on

13   the interest.  It's not on the reasons why someone engages in

14   the behavior.  Right?  It's on the government's interest, and

15   you say, *Did they regulate the other places*?  And the answer

16   here is they just didn't.  They just did not.

17        THE COURT:  So I guess I'm asking a sort of even more

18   basic question.  I understand your position about what they did

19   here, but just as a general matter, say this were the reverse,

20   say they passed the statute that said medication abortion is

21   ban -- banning medication abortion and that was what the law

22   said.  A state, in general, could do that, right?

23        MR. RIENZI:  So the question the Court would need to

24   ask in a case brought about that is, *Government, why did you*

25   *ban medication abortion reversal*?  Then you would need to look

1    and say, *Okay, did they leave other similar conduct that*

2    *threatens the interests in the same way, unregulated*?  That's

3    precisely what *Tandon* says to do, and so if if they say, *We've*

4    *banned it for reason A*, and then they let a bunch other things

5    that threaten reason A happening, then they would and should

6    lose under Free Exercise and under *Tandon.*

7         If they actually regulate all of the things that

8    implicate reason A, then they would be able to argue it's

9    generally applicable, but they are miles away from that here.

10   They have not regulated generally.

11       THE COURT:  But I think you are answering a much more

12   sophisticated question than I'm asking.  What if their answer

13   was, to their reason that they did it was, *We think medication*

14   *abortion is immoral*.  What's a -- and then someone wants to

15   challenge that.  How would I...

16       MR. RIENZI:  So we have not had governments making the

17   argument that*, I banned it because it was immoral*, in some

18   time, but they could.  If they did that, I mean I guess one

19   question would be, *Did you also ban surgical abortion*?  *Did you*

20   *ban other ways people kill infants in the womb*?  If their

21   argument is, *I think every time you kill baby in utero it's*

22   *immoral*.  I would love it if Colorado makes that argument

23   someday.  But if that's their argument, then the question for

24   the Court, in a Free Exercise challenge, if somebody brought

25   one, would be, *Okay, did you pursue that interest against*

1    *comparable behavior that undermines your interests*?  If so,

2    it's generally applicable.  Even in that circumstance, the

3    question that must be asked, according to *Tandon* is *Did you*

4    *pursue that interest against comparable conduct that threatens*

5    *it*?  If they were allowing surgical abortions, they are

6    allowing a bunch of other things, but just not this, then maybe

7    they would lose on that too.  Here, they are allowing every

8    other use of progesterone.  They are allowing, in their own

9    standard of care, *Don't take pill two*, to be the advice of

10   doctors, they are saying, that's fine.  If that's the thing

11   that supposedly creates a safety problem, which is what I think

12   they are saying, then they have got a real problem.  They have

13   not regulated generally, and therefore strict scrutiny applied.

14         To be clear, strict scrutiny doesn't always mean we

15   win.  Here it does, because they don't make the argument.  But

16   strict scrutiny doesn't mean you win.  It means the Court is

17   obligated to give a hard look and say, *Does the government have*

18   *a good reason what they are doing*?  *Do they have a good enough*

19   *reason for it that makes it okay under the Constitution to*

20   *punish somebody's religious exercise*?  That's what the next

21   level the analysis would be if they failed it in your hypo.

22         *THE COURT:*  My common law professor told me that

23   you -- you would always win if I apply strict scrutiny.

24         *MR. RIENZI:*  Well, Your Honor, I would love to argue

25   cases in front of your common law professor all day long.  I

1    hope you took good notes.

2         THE COURT:  Let me just ask you this, and this may be

3    something that you are going to get to later, so if it is, you

4    can continue.  But one of the biggest questions I have for you,

5    is something I hinted at, I think, a bit ago, which is, *Lukumi*,

6    a lot of these other cases you know that most of the people, I

7    think *Lukumi* uses almost all of the people who are going to be

8    affected by this law, are part of a religious -- share this

9    religious motivation, I guess I will say.  Do we know that

10   here?

11        MR. RIENZI:  I don't think we know it with certainty,

12   but I think we know it with probability.  The legislature

13   certainly said *they are mostly faith based*.  I can check with

14   somebody to make sure I have my quote on that right, but I

15   believe they said, *These are mostly faith-based clinics*.  I'm

16   not aware of, but I wouldn't pretend to perfect knowledge, I'm

17   not aware of people who are doing it who are not religious.

18   But again, in cases like *Tandon* and others, that's not actually

19   the test.

20        THE COURT:  Okay.  Why not?

21        MR. RIENZI:  Why is that not the test?

22        THE COURT:  Yeah.  What if you are -- what if 90

23   percent of the people doing abortion pill reversal are doing so

24   for secular reasons, your client is the only one?

25        MR. RIENZI:  That could have been precisely the facts

1    of *Tandon*, that people are meeting in houses, with more than

2    three families present, for reasons that weren't about God.

3    Totally possible, right?  The answer is what the Supreme Court

4    did in *Tandon*, which is, when you face the religion claim, you

5    have to ask the question, *Did they regulate all of those*?  *Did*

6    *they regulate everything that threatens their interest*?  And

7    what the Court in *Tandon* said is, *No.  There's a lot of places*

8    *who are letting people from three different families mingle.*

9    *You're not pursuing this interest broadly, therefore the*

10   *religious claimant wins*.  That's the way you do the analysis,

11   and *Tandon* is an exact match for the situation you described.

12        Of course people can meet in houses for reasons that

13   aren't religious.  They wouldn't have a religious exercise

14   claim, so they wouldn't have a free exercise claim if they are

15   doing it for reasons that don't implicate Free Exercise.  Where

16   it implicates Free Exercise, *Tandon* tells you how to do it,

17   which is you have to check the government, *How well did you*

18   *pursue your interest broadly*?  The answer here is, *They just*

19   *haven't*, period.

20        *THE COURT:*  Thank you.

21        *MR. RIENZI:*  If I can shift to the *Fulton* argument?

22        *THE COURT:*  Sure.

23        *MR. RIENZI:*  And so to be clear, *Tandon* is one way you

24   can say the law is not generally applicable.  That is

25   sufficient to get to strict scrutiny and resolve the case.

1          *Fulton* is another separate path that can get you to

2     say the law is not generally applicable, and that would be

3     sufficient to get to strict scrutiny.

4          *Fulton* says that *the mere existence of retained*

5     *discretion to grant exemptions triggers strict scrutiny.*

6     Right.  In *Fulton* the government had a provision in its

7     contract said, *Well, we reserve the right to grant waivers at*

8     *our discretion.*

9          Well, the precise same thing is going on in this case.

10    The precise same thing is going on, except, I would say, that

11    they have doubled and tripled down on it.

12         Back in April their argument was*, We have tons of*

13    *discretion.  I don't care if the legislature banned it.  I can*

14    *still decide when and whether and how I'm going to enforce my*

15    *law*.  Right?  In the new rules, they didn't shy away from that

16    discretion.  They embraced case-by-case discretion.  They said,

17    *I'm leaving myself room to think about it, because I think*

18    *there are places where I might want to allow it*.  The Medical

19    Board reserves a little less of that discretion than the

20    others.  Medical Board says, *Somebody comes up with some*

21    *non-progesterone A.P.R., I will think about that case-by-case*.

22    The Nursing and Pharmacy Boards say, *We are going to think*

23    *about them all case-by-case*.

24         Well if government is saying, *I'm going to think about*

25    *it case-by-case, and I am going to think about whether your*

1   *religious reason is good enough or somebody else's some other*

2   *reason is good enough*, that is the opposite of a generally

3   applicable law.  That's *Sherbert*.  That's, *I couldn't take the*

4   *job, I couldn't go to the job because it violated my sabbath*

5   and Indiana said *That's no good on their case-by-case analysis*.

6        And one place I would suggest Your Honor can look on

7   this is the *Axson-Flynn* case from the Tenth Circuit.  This

8   comes out of *Fulton*.  It was in *Smith*.  It's been at the

9   Supreme Court for a long time, but almost 20 years ago the

10  Tenth Circuit explained in *Axson-Flynn* precisely this

11  principle.  Where the government has set up a system where

12  there's case-by-case evaluation, that's not a generally

13  applicable law, and that triggers strict scrutiny and that's

14  precisely what they've done here.

15       *THE COURT:*  So, but isn't there sort of in almost

16  every law that sort of inherent -- well let's just say, say

17  that instead of doing it through the Boards, they just passed a

18  criminal prohibition and said it's a felony.  There's always

19  prosecutorial discretion to say, *I'm going to not prosecute*

20  *this person or that person for whatever reason*.  *Let these*

21  *people off with a warning*.  Does that mean that every criminal

22  law is not generally applicable?

23       *MR. RIENZI:*  No.  *Smith* made clear that there's a

24  distinction between an across-the-board criminal prohibition,

25  which, of course, as you say, a prosecutor could always decide

1    not to prosecute one.  Right?  But there's a difference between

2    that and when the government sets up a system of case-by-case

3    exemptions, as it did in *Sherbert vs. Verner*.  The Supreme

4    Court in the *Smith* case draws precisely the distinction and

5    says*, Case-by-case adjudication, individualized examination,*

6    *that gets treated differently, that is strict scrutiny, that's*

7    *not neutral and generally applicable.*

8         The Nursing Board tries to save it by saying, *It's not*

9    *really case-by-case at all.  It's actually one thing we are*

10   *thinking of.*  Maybe I'm paraphrasing, here is what my

11   understanding is the Nursing Board is saying in its brief.  It

12   looks like we set up case-by-case authority for everything.

13   But really what that is about is there are different levels of

14   nurses, some nurses write prescriptions, some nurses are

15   subordinate to the nurses who write prescriptions.  I think

16   they are saying, for the ones that write prescriptions, this is

17   banned.  We want to leave room, the subordinate nurse, who has

18   to obey whoever is above them in the chain of command, we don't

19   want to put them in the horns of an impossible dilemma.  That's

20   the government's reason for saying we need to leave this

21   discretion.

22        One, that's nowhere on the face of the law.  The face

23   of the law just gives them case-by-case discretion; that's not

24   what their rule says.  They could have written a rule that said

25   that, but that's not what their rule says.  It's nowhere in the

1    legislative history of the statute or in the rulemaking

2    history.

3          But two, even if that's what they mean and only what

4    they mean, it still triggers strict scrutiny under *Fulton*.

5    Why?  Because they have left themself case-by-case authority to

6    decide that there are some reasons that are good enough to let

7    someone do A.P.R. and avoid punishment.  The reasons they say

8    are, *My boss told me to*, ought to be a good enough reason not

9    to get punished.  I'm sympathetic with that.  But once they say

10   *My boss told me too* is a good enough reason not to do it.  They

11   don't get to turn around to the religious people and say*, Your*

12   *religious reason is not good enough*.

13         The whole reason that neutrality and general

14   applicability make the government prove its case, is to deny

15   the government the ability to look at people and say, *That*

16   *reason is good enough, but your religious ones, not quite good*

17   *enough*.  Even if you take the Nursing Board at their face

18   value, even they have written a rule they are defending, it

19   would trigger strict scrutiny under *Fulton*, because they are

20   saying, *This reason is good enough to continue giving somebody*

21   *A.P.R. and not get punished, and this other reason, your*

22   *religious reason is not good enough*; that's what triggers

23   strict scrutiny

24         *THE COURT:*  Let me ask you, I think, two questions,

25   going back a little bit to what I just asked.

1          So couldn't you read, even with these rules,

2     essentially aren't they saying, *Yes, it's banned*, or *it is*

3     *inherently unprofessional conduct*, but the question for the

4     boards is, *What do they do when someone commits unprofessional*

5     *conduct?*  And what they inherently always do is do this kind of

6     case-by-case analysis.  And why -- isn't that exactly what a

7     prosecutor does?  It's illegal, but we do a case-by-case

8     analysis about whether to charge someone or not and why is that

9     any different?

10          MR. RIENZI:  Your Honor, one, it is different because

11     *Smith* says so, and I don't want to just make the appeal to

12     authority, but it is just true.  *Smith* was an across-board

13     prohibition.  They did think it was an issue for something like

14     *Sherbert* where the government said, *I'm going to decide*

15     *case-by-case*.

16          Two, just to be clear, I don't think their

17     case-by-case authority solves -- even if they were just like,

18     *We will think about it later*.  Doesn't solve my client's

19     problem that at the highest level, at step zero of the

20     analysis, Colorado has made their conduct unprofessional

21     conduct under the law, and I don't think they need to wait for

22     somebody to begin investigating them or wait for somebody to

23     prosecute them.  At which point, by the way, they deal with

24     *Younger* abstention.  I don't think they need to wait and say,

25     *Well, I'm going to sort of run out there naked and exposed and*

1    *risk my license and risk my career, risk my entire entity, and*

2    *I am going to risk tens of thousands of dollars in fines and*

3    *then someday they are going to start investigating me, and when*

4    *they do, I'm going to try to go to federal court then.*  And the

5    answer under Tenth Circuit law is going to be, *Younger*

6    abstention.  *Go through the state process for five years.*

7    That's the not way it's supposed to work when you are trying to

8    vindicate constitutional rights.

9             The state had banned our behavior.  They are reserving

10    the right to make case-by-case analysis, which triggers *Fulton*.

11    And *Fulton* they had not even exercised the discretion.  Right?

12    It was just the mere reservation of discretion met.  You don't

13    have a generally applicable law.  If that's the way they are

14    describing it here, they don't have a generally applicable law

15    either.  They are going to think about it.  Some reasons are

16    good enough.  Religious reasons apparently are not, and that

17    triggers strict scrutiny.  It doesn't mean we automatically

18    win.  It means there's a test to be applied.  Here it means we

19    win, because they don't pretend they could pass that test.  But

20    if you had a drug that was actually dangerous.  If you have

21    some evidence of harm, they have a much different story, but

22    they have none of that, which is why they fail under strict

23    scrutiny.  But under *Tandon* and *Fulton* and *Smith*, there's no

24    path other than strict scrutiny with the law the way they wrote

25    it.

1          THE COURT:  Okay.  I guess it's an odd quirk that

2     maybe they would have been better off making this a felony

3     instead of just making it unprofessional conduct, but maybe

4     that's a problem with *Smith*.

5          MR. RIENZI:  To be clear, Your Honor, I think there

6     are many problems with *Smith*.  I want to be clear I'm not

7     defending it.

8          Look, in terms of could -- ask the question that's

9     behind that.  Is it possible to write a law that's more of a

10    neutral and generally applicable law?  Yes, that's possible.  I

11    don't think just banning A.P.R. would get you there for the

12    *Tandon* reason.

13         In other words, if you made A.P.R. a felony, I think

14    it would still get subject to strict scrutiny, because it would

15    fail the *Tandon* analysis on general applicability, because it's

16    not regulating all of the other uses of progesterone.  It's not

17    regulating any other use of any off-label drug.  It's not

18    regulating telling women not to take pill two.

19         The interests that they state still are not covered by

20    the felony law, so I don't think it would get them out of the

21    woods anyway.

22         THE COURT:  Fair enough.

23         MR. RIENZI:  The third path to strict scrutiny, which

24    I don't need to spend a ton of time, unless Your Honor wants

25    to, is the *Masterpiece, Lukumi* argument that there is obvious

1    animus on the face of the passage of this law.  *Masterpiece*

2    and *Lukumi* make it crystal clear that looking back at the

3    history and the lead up to the law is part of what a Court must

4    do to see if there's animus here.  I don't think there's much

5    doubt that there is.  We have collected all of the citations

6    and information in the brief.  I don't think they get out of

7    it -- to go to their responsive brief -- I don't think they get

8    out of it, by saying, *Well, by the time the Boards were acting,*

9    *they stopped saying stuff like that*, which is essentially what

10   they said in defending the Boards.

11           One, the Boards are only passing this law because the

12   legislature told them to; two, the people who said that stuff

13   showed up the Boards, banged their fists on the table

14   metaphorically, and said *Go write a stricter law*.  I don't

15   think you can say, *Well, because after we got sued we stopped*

16   *talking that way*, or the different entities stopped talking

17   that way.  I don't think that gets the government out of the

18   fact that there's a real *Masterpiece* and *Lukumi* problem here.

19           *THE COURT:*  How tight does the fit between the

20   evidence that you cite for animus have to be to the religion

21   and not to the Act?  Again, as we talked about, for your

22   clients this is, I don't think it's disputed, a religious

23   activity they are engaged in, but it's not necessarily, and so

24   if there's animus towards this activity, but not necessarily

25   towards the religious motivation behind it, does that matter?

1    How do I account for that?

2         *MR. RIENZI:* I think there's both kinds of animus

3    clearly on the record, to go back to the first half of the

4    hearing.  I think under *Reed* and other cases that's relevant

5    from the speech point of view.  Sometimes they are saying, *I*

6    *don't like the antiabortion people*.  Right?  Without saying

7    *These are faith-based clinics parading masquerading as medical*

8    *clinics*, which by the way, the claim that Bella is fake would

9    be absurd.  This is a real serious medical operation.  They are

10   faith-based, but the people who passed the law act like there's

11   this dichotomy, right?  The religious people are over here

12   doing these bad things, and the real medical people hang out

13   over at Planned Parenthood or someplace else.  I grant that

14   they don't, every time, say, *religion, religion, religion*.  But

15   they do say it repeatedly in the legislative history.  And we

16   think that's enough for the animus.

17        And to be clear, I also think all of the rest of it

18   applies squarely on the free speech side under *Reed vs Town of*

19   *Gilbert*, as an example of where the government is regulating

20   because of disagreements.

21        This is also -- just to recall, this is in the wake of

22   the leaked Dobb's opinion.  There's a big flurry of politicians

23   all across the country saying, *I must do something strong to*

24   *show how in favor of abortion I am*.  That's the frenzy in which

25   this happened.  And I think if you read the legislative history

1    and you read the statement at the front of the law, it's pretty

2    clear why they are doing what they're doing.

3             I think there's more than enough on each side of that

4    equation to get there.

5             THE COURT:  Okay.  Thank you.

6             MR. RIENZI:  Under strict scrutiny, I will be pretty

7    brief on this one.  They don't make the argument that they can

8    pass the test.  I think that's, frankly, because they can't.

9    If you had a drug that was dangerous, if you had evidence of

10   who had ever been harmed, ever, the government might have a

11   decent shot at passing strict scrutiny, but they don't have any

12   of that.  Right?  And that goes back to what they swore to you

13   last April.  Right?  They have never heard of anybody harmed.

14   We did this process now in three Boards, the Medical Board, the

15   Pharmacy Board and the Nursing Board.  They still have not

16   showed you any evidence of any person, ever, harmed by this.

17   It doesn't harm anybody.  The best they can say is, *Well, I*

18   *don't agree with your science, and I think you shouldn't be*

19   *relying on animal studies and case series and basic biological*

20   *things*.  *I think you should look at something else then*.

21            If you read carefully in Dr. Cohen's declaration, at

22   the end of the day, the best she can say*, There's not enough*

23   *proof.  It's inconclusive.*  Maybe it's you can't disaggregate

24   the effects of not taking misoprostol versus progesterone;

25   that's her argument.

1          I don't think that's nearly enough to satisfy strict

2     scrutiny.  In other words, I don't see how the government has a

3     compelling government interest in the face of what it says.

4     *Gosh, we can't figure this one out.*  *It's totally safe and we*

5     *can't figure it out.*  That's not a good strict scrutiny

6     argument; that's why they didn't make it.  They didn't confer

7     with the strict scrutiny argument.  They don't tell you there's

8     a compelling interest in stopping this.

9          If there were a compelling interest, they would not

10    have behaved the way they did in April.  Colorado never banned

11    this before.  Neither has any other state.  They showed up in

12    this courtroom in April and said, *We're totally fine doing*

13    *nothing for six months while we wait.*  That's not what you do

14    when you have a compelling interest, when people are getting

15    hurt.  Responsible government entities don't do that.  They did

16    it.  Right?  They have never used any of their tools against

17    this, because there's no problem, and that's why they didn't

18    come forward and try to claim they could satisfy strict

19    scrutiny.

20         For those reasons they fail under the Free Exercise

21    Clause.  They have not carried their burden.  And at every path

22    you get to strict scrutiny, and they can't possibly carry it.

23    So on the merits of that claim, what we would ask, is before

24    the clock strikes midnight on Monday night into Tuesday, we

25    would ask Your Honor for an injunction so we can keep treating

1    patients, because they do keep coming.  They have kept coming

2    during this case.  The women keep showing up.  People actually

3    want this treatment.  We are treating them.  And we want to

4    keep treating them.  We think we have every right to keep

5    treating them, because they have not carried their burden.  So

6    we are asking for a preliminary injunction.

7            On all of the other factors, balance of harms, given

8    they have never done anything about this before, given they

9    willingly passed up enforcement for those six months; given

10   that no other state does it; given that they have no evidence

11   that progesterone is dangerous; given that their own expectant

12   management care plan says don't take misoprostol too; in light

13   of all of that, there's no harm that the government can point

14   to.  They have not been harmed in the past six months.  They

15   have not told you about any harm they have suffered in the past

16   six months or the years before that.  They are not harmed.

17           On the flip side of that, this is life and death to

18   the women who knock on our door.  This is life and death to

19   these women, who, by all rights, have the right to decide for

20   themselves whether they want that abortion going on in their

21   body to keep going.  All they are asking for is, *Hey, if there*

22   *is something that you know that might know work, can you give*

23   *it a shot and help me*?  *Is it safe?  Do you have reason to*

24   *believe it works?  Give it a shot*.  We have been doing that, we

25   have been saving babies, we have been taking care of these

1    women.

2         So one side you have a government that's exercised no

3    energy at all to prosecute this any place ever, and has no

4    evidence of any harm.  On the other hand you have life and

5    death for these women.  It's really life and death to my

6    clients too.  They wake up in the morning wanting to serve

7    these people.  They feel God put them here to serve these

8    people.  They are doing -- they are very responsible physicians

9    and nurses.  They want to exercise their religion by helping

10   these people.  There's no harm and there's real urgency for us.

11        With that, if we are good on Section 3, I should

12   probably sit down, but I'm happy to discuss further if you

13   like.

14        *THE COURT:*  No.  I think I have asked all of the

15   questions that I have right now.

16        *MR. RIENZI:*  Thank you, Your Honor.  Mr. Urankar.

17        *MR. URANKAR:*  Thank you, Your Honor.  I want to

18   briefly touch on the science a little bit.  I think Mr. Rienzi

19   does a decent job, but I think there's some important

20   distinctions for the Court to have.

21        He is obviously right, progesterone is an important

22   pregnancy hormone.  Obviously, a hormone operates by attaching

23   to a body's receptor, and then that causes the biological

24   impact that the hormone would cause.  So progesterone by itself

25   in the body isn't going to do anything.  It has to attach to a

1    receptor.

2          What misoprostol is, in the presence of progesterone,

3    is it's a competitive antagonist; meaning, it binds more

4    tightly and more preferentially to that receptor than

5    progesterone can, which prevents progesterone from having an

6    effect.

7          The proponents of so called medication abortion

8    reversal, claim that by flooding the zone with progesterone

9    somehow you are going to defeat the fact that misoprostol has a

10   higher affinity for those binding receptors, and they base that

11   largely on some studies that studied the use of progesterone to

12   treat threatened miscarriage.

13         Those studies actually came to the incorrect

14   conclusion, where originally it was thought that you could use

15   progesterone to treat threatened miscarriage, but as Dr. Cohen

16   explains in her declaration, that was kind of actually more of

17   a symptom of the failing pregnancy, the drop in the

18   progesterone levels, rather than the cause of the failing

19   pregnancy.  Those studies actually show that the progesterone

20   is only really a treatment for recurrent miscarriages.  The

21   current state of the art on that is that they theorize that

22   there's -- a patient has deficient progesterone, which is what

23   is causing the recurrent miscarriages.  Totally irrelevant when

24   we have a drug that comes into the body that binds more tightly

25   to the receptor, prevents it from operating.

1        THE COURT:  All right.  Let me -- say I -- my basic

2    position, I think is, given the posture of this case, I should

3    defer to your scientific -- more importantly to your client's

4    scientific judgment.  But I do have some questions.  You know,

5    say that the plaintiffs are just wrong, and this is not

6    effective.  Say I agree with you about that.  Does that

7    change -- why does that change the legal analysis at all?  I

8    mean, they seem to believe sincerely that it helps, or may

9    help, and they may be wrong about that, but do I have to become

10   a scientific arbiter to decide this case?  What difference does

11   it make to me?

12       MR. URANKAR:  To your first point, I think you do

13   actually have to defer to the State Medical Board's

14   determination of the standard of care.  *McCroskey* is very

15   clear, which is Colorado Supreme Court precedent interpreting

16   state statute, and they say explicitly they are the ones who

17   decide what the standard of care is.  When they spoke and rule

18   I think you are correct, Your Honor, I think that kind of

19   forecloses that, and you do have to give the benefit of the

20   doubt to the Medical Board.  I think it's important because it

21   both talks to the rational basis behind the law, which under

22   *Dobbs*, I think quite clearly, if a state wants to ban abortion,

23   its presumptively valid and it's entitled to rational basis.

24       THE COURT:  Let me just save us all some time.  If

25   we're applying rational basis, you are going to win and if we

1    are applying strict scrutiny, you are going to lose.  So the

2    question is which level of scrutiny applies?

3              MR. URANKAR:  Yes, Your Honor.  And I think why it's

4    relevant, that it doesn't work, is it goes to the neutrality of

5    the law.  Because it goes to whether or not this is an act

6    that -- I think the Court said, you know, anybody could do this

7    act for nonreligious reasons.  That's actually not quite true.

8    It's a very highly regulated act of medicine.  So you have to

9    be a licensed healthcare provider to actually perform that act.

10   The fact that it doesn't work, pushes us towards a neutral law

11   that is targeted at conduct rather than specific religious

12   practice where state's police powers are quite clear.

13             So moving to neutrality, Your Honor.  I think with

14   respect to the neutrality analysis, obviously we are in the

15   *Lukumi* territory, and I think *Grace United*, which is the Tenth

16   Circuit case that applies it, specifically, *A law is neutral so*

17   *long as its object is something other than the infringement or*

18   *restriction of religious practices.*

19             So when the Court -- if the Court decides to look at

20   the legislative history and the statements of the legislators,

21   the question still is, is the object of the bill to infringe or

22   restrict a religious practice?  And I think the Court is keying

23   in on the fact that the statements of the legislatures, which

24   generally Courts don't wade into that territory, but the

25   statements here aren't concerned about what the plaintiffs'

1    claim is their religious practice.  They are concerned about

2    the medication abortion reversal treatment that's unscientific

3    and it's dangerous.  It can be dangerous.

4         THE COURT:  Well, you are right that is what I'm

5    keying in on.  I guess my -- I guess there are some questions I

6    have, which is, the Medical Board never saw it fit to ban this

7    before.  They spent the last six months deciding whether to

8    take, I don't know what we call the unless clause.  Whether to

9    adopt a rule that would sort of undue what the legislature did.

10   So it's really the legislature that chose to ban this, not the

11   expert Medical Board; is that right?

12        MR. URANKAR:  I would disagree.  I would say that they

13   were directed to the general -- directed by the General

14   Assembly to make a call as to whether or not it was

15   unprofessional conduct, and they did make that decision.  They

16   said, *After reviewing the evidence it's unprofessional conduct.*

17   They were certainly directed by the General Assembly to make

18   that call, but it was still the Medical Board's call.

19        THE COURT:  Okay.  But they've never done this before.

20   There's no evidence that they ever disciplined anyone for doing

21   this before or since this statute passed; is that accurate?

22        MR. URANKAR:  I believe that's accurate, Your Honor.

23        THE COURT:  Okay.  Go ahead.

24        MR. URANKAR:  And I think one of the pieces of

25   evidence that they point to, with respect to showing animus

1    among legislatures, as we spell out in our brief, I think the

2    proper adjudicatory body to focus on under *Masterpiece* is

3    actually the Medical Board, which they can't point to any

4    animus.  If you look at the statements of legislatures, I think

5    the best indication of what their actual intent with this Bill

6    is, the letter that they provided to the Boards, all three

7    Boards, during the rulemaking process, and what they said in

8    there, was quote, *We believe Coloradans have the right to sound*

9    *and credibly tested medical protocols for their reproductive*

10   *health.  As we developed an introduced SB 190, we focused on*

11   *the harm that the practice of medication abortion reversal*

12   *causes patients and potential patients in Colorado, and as the*

13   *legislation moved through the process, we prioritize how the so*

14   *called treatments can impact patients, and our intent in this*

15   *legislation was to stop and limit the harm caused by these*

16   *practices.*

17           That letter makes it clear, Your Honor, the

18   legislature was saying, *We want a prophylactic approach to this*

19   *risk*, because the General Assembly has determined this is a

20   risk to the public, which they can do.  And they said, *We don't*

21   *want to go through the normal Medical Board process of waiting*

22   *for a complaint to come in and waiting for harm to occur to a*

23   *patient.  We want a prophylactic defense.  And specifically, we*

24   *want the Medical Board to make its stance known now, rather*

25   *than later, whether or not this is deviation from generally*

1    *accepted standards of care*, and that's what they did.

2         THE COURT:  So I agree with that, and you are right

3    they do have the authority to make these sort of prophylactic

4    judgments, I think.  I mean, they haven't, in the past, as far

5    as I know, but what is the interest that's being served by this

6    law?

7         MR. URANKAR:  The interest is protecting patients from

8    a procedure that all of the credible science says, at best,

9    doesn't work.  That's an at best.  That's not saying -- that's

10   not factoring in that the science there just isn't really clear

11   about what the actual risk profile is of this specific

12   protocol.

13        Mr. Rienzi wants to talk about how safe progesterone

14   is, but that's not how the practice of medicine works.  You

15   have to focus on both the medication and the treatment that you

16   are going to use it for.  Another example that keeps popping up

17   in their brief is Tylenol.  Same classification of safety as

18   progesterone.  Tylenol can be a low-risk medication.  If you

19   take too much of it, you will cause liver damage.  If you try

20   to treat your cancer with Tylenol, it is not a safe medication.

21   It can't be used for that.

22        THE COURT:  Right.  But isn't Mr. Rienzi's point that

23   that just shows that you haven't banned Tylenol, because there

24   are instances where -- you haven't even banned it for various

25   particular uses, despite these risks.  And so there's lots and

1    lots, almost every medication, in fact, Colorado allows

2    doctors, medical professionals and their patients to decide how

3    to balance those risks off label, other than this one drug.

4    This is the one procedure where the State of Colorado has

5    decided that it's not willing to let patients and medical

6    professionals weigh those decisions.  Isn't that his point,

7    that that suggests that it's not generally applicable, because

8    the interest in protecting patients from off-label use or

9    unproven uses is not consistently applied by Colorado.

10        *MR. URANKAR:*  I would disagree with that for two

11   points; one, Your Honor, I would say, first of all, the Medical

12   Board does regulate the use of off-label progesterone and it

13   does regulate the use of Tylenol.  It does it, not in a

14   prophylactic approach, but if you use progesterone in an

15   off-label manner, that deviates from generally accepted

16   standards of care, you are still subject discipline from the

17   Medical Board.  Same thing with Tylenol.  So it is actually

18   regulated.  They have not put out a prophylactic protection

19   saying this is specifically going to be a deviation if you use

20   this medication to treat this specific condition.

21        *THE COURT:*  So you said, I think, if my understanding

22   of one of the factual clarifications you wanted to make was

23   that this doesn't really -- if you are starting to have a

24   miscarriage or there's a problem with the pregnancy, that

25   progesterone often, at least, has been used to try to save a

1    pregnancy; is that right?  But your view is that it now is

2    clear that doesn't really work?

3        MR. URANKAR:  No, Your Honor.  Well, so the previous

4    thought was that it could be used to prevent any threatened

5    miscarriage; threatened miscarriage is a medical term.  As the

6    literature developed, it's quite clear that not every person

7    who has a threatened miscarriage is a candidate for

8    progesterone.  It's only patients who have recurrent

9    miscarriages, and the current theory is that they have a

10   deficiency of progesterone, and so by giving exogenous, it

11   increases the likelihood of survival of that pregnancy, but it

12   is irrelevant when mifepristone is in the mix.

13       THE COURT:  It doesn't help most people who maybe have

14   a threatened miscarriage, right?  Unless it's one of these

15   recurrent situations?

16       MR. URANKAR:  Correct.  That's what Dr. Cohen's two

17   declarations explained.

18       THE COURT:  So is a medical professional who provides

19   progesterone in that circumstance not the recurrent one, but

20   the others, and not trying to reverse a medication abortion,

21   are those people disciplined?

22       MR. URANKAR:  So I think your question is if they

23   deviate from the standard of care for treating a miscarriage --

24       THE COURT:  No.  No.  No.  I didn't ask about the

25   standard of care.  I asked if -- because you pointed out that

1    according to the plaintiffs, and some medical people seem to

2    agree that they think progesterone does more than it seems to

3    actually do, according to the current science, right?  That's

4    like the basic point of what you said.  And so a lot of the

5    uses that people thought were okay, actually it doesn't help at

6    all, and so for those cases has anyone been disciplined for

7    providing it?

8         *MR. URANKAR:*  I don't know, off the top of my head.  I

9    have not surveyed those, Your Honor.  I think, technically

10   speaking, if it's not the generally accepted standard of care

11   to use progesterone to treat that miscarriage, theoretically it

12   could be a deviation, but you are now in *McCroskey* land where

13   the question is the Medical Board sets the standard of care and

14   not every single deviation is necessarily going to result in

15   discipline.  *McCroskey* uses the specific example of there could

16   be times where you amend or you modify a record, that's

17   technically a deviation, but it's not warranting discipline.

18   There could be other times where you make a change to a medical

19   record that very much warrants discipline.

20        So I think, technically, you could be, but I think

21   it's a weighing of whether or not it warrants discipline in

22   that specific case, which is very fact specific, Your Honor.

23        *THE COURT:*  Okay.  But the point is, the state has

24   chosen to specifically say that using progesterone, since

25   that's as far as anybody here knows, the only way of trying to

1    perform abortion medication abortion reversal, right, is

2    through progesterone?  And the state says, in this one way, it

3    always is a violation.  Is always unprofessional.  But in -- if

4    you do it in these other ways, even though they are not

5    supported by the current science, maybe it is, maybe it isn't,

6    right?

7            MR. URANKAR:  Are you talking about the case-by-case

8    analysis, Your Honor?

9            THE COURT:  Yeah -- no, actually I'm not.  The statute

10   says, flat out, using progesterone in this way is banned.  Is

11   unprofessional conduct.  Banned, as your brief called it.

12   Other forms -- other uses of progesterone, which you just told

13   me are also not supported by modern -- by the most current

14   scientific analysis.  You say may be violations, but what we

15   know for sure, there's no blanket prohibition or no blanket

16   statement that it's unprofessional conduct to use progesterone,

17   except say in the -- in the circumstance of recurrent

18   miscarriages, right?  No one else -- there's no other blanket

19   statement like that anywhere, rule, statute?

20           MR. URANKAR:  I would agree.  And I mean, I guess,

21   the -- how would that be logically applied to all of the

22   regulation of medicine?  Would they have to make their stance

23   know on every single --

24           THE COURT:  Well, that's a great question.  And you

25   know, before this case, the State of Colorado just let you sort

1    of figure it out as you went.  Now we have a statute that

2    applies to this one mean -- one use of this drug, and so the

3    plaintiffs' argument is that one use is mostly done by

4    religious people, and the state knew that, and they banned it

5    and that's a constitutional problem.  Why are they wrong?

6         *MR. URANKAR:*  I think they are wrong; one, because I

7    don't think you can make the comparability analysis they are

8    trying to make, just based on progesterone itself, because

9    again the practice of medicine is very fact specific, and so it

10   calls to determine standard of care -- a deviation of standard

11   of care, it's both the treatment, it's going to be a regimen,

12   it's going to be all of that.  So you can't just take

13   progesterone out in a vacuum and just analyze the use of

14   progesterone, itself.

15        I think what can be helpful is an example of what I

16   think would be comparable -- a rule that would violate the

17   comparable secular activities ban, Your Honor.  So I think the

18   rule would run afoul of, *Fulton*, if the rule said something to

19   the effect of, *No one can do progesterone therapy to reverse a*

20   *medication abortion, unless you petition the Medical Board for*

21   *permission, and we will exempt you from this specific*

22   *definition of unprofessional conduct, so long as we approve*

23   *your research*.  Basically turning into an I.R.V.   In that

24   circumstance, the Board would be put in a position to weigh the

25   various reasons why someone wants to do this specific treatment

1    and that would be a violation of *Fulton*.  But because the

2    practice of medicine is so fact specific of medication to

3    treatment, you can't just compare the medicine in a vacuum.  I

4    think the only comparable secular activity would have to be

5    something very narrow like that.

6          *THE COURT:*  So what's the difference between your

7    example and what we have here, which are rules where the Board

8    says, *We will consider this on a case-by-case basis*?  What's

9    the logical difference.

10         *MR. URANKAR:*  The difference is the case-by-case

11   language, is just a reflection of the status quo before this

12   Bill was even passed.  It's a reflection -- I mean the language

13   is very, very close to *McCroskey*, Your Honor.

14         So to the Court's point, we don't look at criminal

15   courts as like a discretionary weighing.  It's the due process

16   that's involved in a quasi adjudicatory system that the Medical

17   Board is.  I don't think saying we are going to treat it on a

18   case-by-case basis actually is an individualized exemption that

19   runs afoul of *Fulton*.

20         The other reason is it's not an individualized

21   exemption.  It is the standard of care.  So that provision of

22   the rule basically says, *Yes, this medication cannot be used to*

23   *treat this, because it's not scientifically validated*.  The

24   Medical Board's comments in the rulemaking specifically say

25   that.  They say, *It's not the act that matters, it's the*

1   *treatment.*  And so if another treatment comes along that

2   actually does reverse the effects of mifepristone, something

3   that breaks the affinity between the progesterone receptor and

4   mifepristone, that could be within the standard of care.

5   That's what that is a recognition of.  It's not an

6   individualized exemption.

7        If that medication comes along or a new protocol comes

8   along or if even progesterone somehow gets validated, even

9   though the overwhelming science says it won't be, that becomes

10   the standard of care, but it's not an individual exemption that

11   runs afoul *Fulton.*

12        *THE COURT:*  So, if I agree with you, and deny this

13   injunction, and Bella says, *Well, we are continuing to do this*

14   *anyway,* and a complaint comes in, what would -- how would the

15   Medical Board handle that or the Nursing Board, either one?

16        *MR. URANKAR:*  I think they would both handle it in the

17   way they handle most complaints.  So a complaint would come in,

18   it gets triaged by Department of Regulatory Agency, depending

19   on the risk-to-patient safety, it may get prioritized.  They

20   will then send out a 30-day letter, referenced as a 30-day

21   letter.  It goes out to the licensee and says*, We have gotten*

22   *this complaint.  You have 30 days to respond*.  The licensee

23   then responds to the complaint, that information goes on to the

24   Office of Investigations, which retains an expert in that

25   field.  So in this case it would be an ob/gyn, most likely, or

1    it would be an advanced practice nurse that has that

2    qualification.  They would review it to see if it deviated from

3    generally accepted standards of care, and if they opined that

4    it did, per *McCroskey*, the factual analysis of law and fact, if

5    they opined that it was a deviation from the generally accepted

6    standards of practice, they would then notify the licensee and

7    they would either begin negotiations or they would refer it to

8    the Attorney General for formal charges in front of the OAC.

9         THE COURT:  Okay.  And where -- where in that process

10   or stages where someone would have discretion to say, *We're not*

11   *going to -- we're not going to go to the next step in this*

12   *process*?

13        MR. URANKAR:  So generally speaking, like the Office

14   of Investigations would return their file to the Board,

15   basically say this is what our investigation showed, this is

16   what the -- this is what the expert opined.  What do you want

17   to do?  The Board's technically broken in different panels.

18   They inquiry panel that has it would analyze whether they want

19   to just dismiss it outright.  Maybe they want do a letter of

20   concern, which is technically a dismissal.  Maybe they think

21   it's a small deviation, and so they say*, Offer the licensee a*

22   *letter of admonition*, which is the lowest form of public

23   discipline; that's probably your first layer of discretion of

24   *Okay, we have unprofessional conduct*.  *Now what's the proper*

25   *sanction that protects the public* good?  I think that's your

1    first part, when they get into negotiation, Your Honor.

2           The second part would come, let's say negotiations

3    fall apart, it would come after the OAC, where there's an

4    initial decision by an administrative law judge.  The findings

5    of fact of the ALJ are binding on the Court -- or on the

6    Medical Board, excuse me, but they can change the ultimate

7    conclusions of law.  So the specific, like, deviation, for

8    example, they can, and they can also change the recommended

9    sanction, because the ALJ only makes a recommendation on that.

10          *THE COURT:*  Okay.  Do you think -- what if -- so you

11   mentioned a new medication could come along.  What if someone

12   did some really super robust study and it actually proved -- I

13   know your position is this is very unlikely -- but it proved

14   that progesterone, itself, actually is effective at reversing

15   medication abortions.  Do you think your clients would be able

16   to -- what could they do differently under -- given the

17   statute?

18          *MR. URANKAR:*  I think they could very clearly change

19   the rule, Your Honor, and they even specifically said that in

20   rulemaking.  One of the board members says, *If the science*

21   *changes, we can change that.*

22          *THE COURT:*  So they could go back and adopt a rule

23   that would say, *Now we think it is a generally accepted*

24   *standard or practice*?

25          *MR. URANKAR:*  I don't think it would be so blanket to

1   say, *Now you can do it*.  It would be something -- so if you are

2   using the specific example progesterone, I think, yes, they

3   would change it to say*, Use of progesterone meets generally*

4   *accepted standards of practice*.  If the literature moved and

5   the actual science moved to prove it, I think they could just

6   change the rule, Your Honor.

7         THE COURT:  Okay.  Okay.  All right.  Thank you.

8         MR. URANKAR:  And specifically, with respect to the

9   fact that the law still defines it as unprofessional conduct, I

10  don't think that changes *McCroskey*.  I don't think the analysis

11  changes, whatsoever, Your Honor.  The express holding of

12  *McCroskey* is the Medical Board determines what is a deviation

13  from the standard of care.  So even if it stays defined in the

14  statute as unprofessional conduct, I don't think that modifies

15  the analysis whatsoever, either.

16        THE COURT:  Well, I'm not totally sure I agree with

17  you.  I mean, this statute is pretty specific, and normally, I

18  think you are right under *McCroskey*, but if the Medical Board,

19  does what the legislature tells it to do, right, and so it's

20  the -- what -- what would power of the Medical Board would

21  supersede the legislature?

22        MR. URANKAR:  Well, I think the General Assembly is

23  presumed to know the law that it passes, and the Court's

24  interpretations of the law, and *McCroskey* I think is from '91.

25  It's a longstanding law.  They didn't do anything to overrule

1    *McCroskey*, which very clearly says they have the sole decision

2    to determine what the standard of care is.  I think unless they

3    did an express overruling of *McCroskey* that still stands.  It's

4    still clear that they have the discretion to determine what is

5    a deviation from generally accepted standards of care,

6    Your Honor, and I don't think this bill does anything other

7    than add a definition of unprofessional conduct, which there's

8    a laundry list, and not all of them get disciplined.

9        *THE COURT:*  Before I forget, are you speaking for --

10   are any of the other defendants going to want to address this,

11   are you speaking for everybody?

12       *MR. URANKAR:*  I'm speaking on behalf of Medical Board

13   and Board of Nursing.  If there are any questions that go into

14   Section 1 and 2, I could probably answer some of the, but I

15   might defer back to Mr. Sullivan.

16       *THE COURT:*  No, no.  This is about Section 3.  I just

17   want to make sure nobody else wants to say anything about it.

18   So if not, that's fine.

19       I do -- I do have a couple of questions, given that.

20   Do you contest -- I take it the state doesn't contest the

21   plaintiffs' assertion that, for them, at least, doing this is a

22   re-- part of their religious devotion, right?

23       *MR. URANKAR:*  We do not challenge that they see it as

24   a religious exercise, Your Honor.

25       *THE COURT:*  And do you dispute that the majority of

1    entities or maybe individuals who do this, also view it as a

2    religious activity?

3            MR. URANKAR:  I can't say one way or the other,

4    Your Honor, because that's not in the record.  I mean, this is

5    obviously a pre-enforcement case and really early on in

6    litigation.  We have not had discovery.  That's not in the

7    record.  So I'm not comfortable saying one way or the other

8    that the majority is or there isn't.  I think there's a lot of

9    people who morally object to performing abortions that could be

10   found in this camp.  I don't know, and I don't think it's our

11   position to say that without discovery.

12           THE COURT:  Does it matter for the legal analysis?

13           MR. URANKAR:  I don't think it particularly does,

14   Your Honor, because at the end of the day *Lukumi* focuses on

15   whether or not the object is to target something and is it

16   because of its religious practice, and I think the law -- it's

17   facially neutral.  I don't even hear them saying it's not

18   facially neutral.  I think it's clear from the legislature

19   statements and the statement of the Medical Board that the

20   intent here was the specific act, which is the practice of

21   medicine or the practice of a healing art is the prescription

22   of a drug to treat a condition.

23           THE COURT:  Let me ask you for your take on *Lukumi*.  I

24   agree with your, sort of, recitation of its holding, but

25   there's a couple of issues I have.

1          Number one, the -- I think the section of *Lukumi* that

2   has the sort of most evidence of animas, of direct animus

3   towards a religious group, the *Santeria*, the Practitioner of

4   Santeria was only joined by, I think, two justices, and the

5   other -- the majority, the opinion of the Court didn't turn on

6   those statements, still held that even if you didn't have those

7   statements, I think, that the -- that what happened was

8   unconstitutional, and the way I think I read *Lukumi*, given

9   that, is that when you are trying to figure out the object of

10  the law, like you said, it's not so much necessary that the

11  government entity have been thinking, *I really hate the people*

12  *who practice this religion.  Let's find ways to harass them.*

13  In that case, I don't really get the sense, even with whatever

14  that section is, even with that evidence, that that was quite

15  what was going on.  More, that the city, in that case, really

16  was -- objected to animal sacrifice and wanted to ban it and it

17  happened to be that the people who engaged in animal sacrifice

18  were a part of this religion.

19          So it wasn't a scenario where the government was

20  saying, *We want to pick on this religious group and let's find*

21  *some activity that they like that they can ban*.  It was, *Here's*

22  *an activity that we object to, that is engaged in by a*

23  *religious group let's ban that activity*, and that was enough,

24  at least for the majority in that case, that if you -- and that

25  seems, potentially, to be where the plaintiffs are in this

1    case.

2            I don't necessarily think that a majority or even very

3    many of the supporters of this law were thinking like *We really*

4    *dislike Catholics, and let's find a way to ban something*

5    *Catholics want to do*.  But it does seem like they saw an

6    activity that they understood to be engaged in by members of a

7    religious group who understood it on their side, at least, to

8    be religiously motivated and banned that, and isn't that the

9    problem that *Lukumi* got at?

10           MR. URANKAR:  I think *Lukumi*, even if you exclude the

11   analysis of the statements, just the analysis of the statutory

12   religious jerrymander that occurred in *Lukumi*, I think it was

13   more specifically targeted at Santeria.  Because as the Court

14   noted, the statutes themselves had a million exemptions for

15   different types of animal sacrifice, including kosher

16   slaughter.  So I think I would disagree with that.  I would say

17   that even the statutes, themselves, without looking at the

18   statements of the city council, all of those, was very

19   specifically targeted at a very specific type of animal

20   sacrifice practiced by that religion and I think --

21           THE COURT:  Why isn't this -- I mean I ... we can go

22   in circles, I guess, on this, because as I said before, the

23   case law points in different directions and makes me chase my

24   tail a little bit.

25           Why isn't this similar to that?  This law bans a

1    specific use, essentially, of one specific drug in one specific

2    scenario.  It allows the use of this, as far as the State of

3    Colorado is concerned -- at least as far as the legislature was

4    concerned, you can use progesterone for anything else.  As the

5    plaintiffs point out, you can stop taking -- you don't have to

6    the take the second abortion pill.  You can sort of run this

7    risk of where -- which is where, based on my reading of the

8    evidence here, the main actual risk is in stopping in between

9    the two abortion pills.  Whether you take progesterone doesn't

10   seem to add some to that risk.  Even if it did, as I read

11   *Lukumi*, as it's been interpreted by *Fulton* and *Tandon*, you do

12   have to look at what is the interest being protected to decide

13   whether it's a generally applicable law, and if the interest

14   here is protecting people, even sort of at its narrowest level

15   of generality, protecting people from off label or unnecessary

16   use of progesterone, the state allows that in lots of ways.

17   Just like you just said, the city in *Lukumi* allowed animal --

18   killing of animals in lots of circumstances.  What's the

19   difference?

20       MR. URANKAR:  A couple of responses to that,

21   Your Honor.

22       First of all, again, you can't say that it's safe

23   because progesterone is a low-risk medication.  We don't know

24   what the longitudinal studies would show.  The two examples

25   that both experts point to is Lidomide and DES.  DES is a

1   semisynthetic hormone --

2       THE COURT:  We would have a different case if the

3   state had just banned progesterone, but that's their point, is

4   it didn't.  It only banned its use in one circumstance and that

5   circumstance is the one in which, at least as far as we know in

6   this case, people who do so for a religious reasons.

7       MR. URANKAR:  So, specifically, they banned this

8   practice because this use of this medication for this

9   indication, this medical indication, reversing an abortion,

10  doesn't work; that's why they specifically banned it.

11      Turning back to *Lukumi* and *Grace United*, the holding

12  is clear that it's as long as the law is -- *A law is neutral so*

13  *long as its object is something other than the infringement or*

14  *restriction of a religious practice.*  I think the important

15  thing, the overarching case that we are in is *Employment*

16  *Division versus Smith*, Your Honor.

17      So in *Smith*, specifically, the act that was banned was

18  the use of peyote, which I think was beyond any dispute, is an

19  actual sacrament in the practice of indigenous religions, and I

20  think in that case it was obviously constitutional.  It was

21  subject to rational basis.  I think the importance of *Lukumi*

22  is -- the question the Court has to answer is, was it the

23  specific target of a -- was it specifically targeting a

24  religious practice?  And here, I don't think the record or the

25  Bill itself support the idea that this -- the law or the rule

1    was specifically done because its people who have a religious

2    belief do it.  They banned it because it's a dangerous practice

3    that's unstudied.

4         THE COURT:  But lots of unstudied practices are not

5    banned, like this.

6         MR. URANKAR:  I would -- there's not a blanket, like,

7    statement affirmatively from the Medical Board, yes,

8    Your Honor.  But again, I would say that it is regulated.  It's

9    quite heavily regulated by the Medical Board.

10        THE COURT:  It's definitely regulated.  I agree with

11   that.  Thank you.  I appreciate that.

12        MR. URANKAR:  Your Honor, is there any other questions

13   that I can help you address when you come to your decision?

14        THE COURT:  Let me give you a chance to just answer

15   this question that I think the plaintiffs raised, and it's

16   somewhat significant; which is, why was it not until the

17   legislature did this, that if this was dangerous, as you said,

18   and unproven and puts everyone at risk, why wasn't it until --

19   why did the Medical Board never do anything about it before?

20   Not just flatly say it's prohibited, but didn't even discipline

21   anybody, as far as we have been told?

22        MR. URANKAR:  I mean, this is partially speculation on

23   my part, Your Honor, but I think if you look at Dr. Cohen's

24   declaration, I think the evidence on it is that it's actually a

25   fairly rare occurrence where someone changes their mind after

1    taking mifepristone.  I think there's a likelihood it has not

2    been presented to the Board, because when we are not taking a

3    prophylactic approach, which we are here, it's -- care comes to

4    the attention of the Medical Board when someone files a

5    complaint.  It could just be it's a rare occurrence and no one

6    has filed a complaint yet, so they have not investigated it,

7    but I think that's probably why, Your Honor.

8            THE COURT:  Okay.  Thank you.

9            MR. URANKAR:  Do you have any other questions for me?

10           THE COURT:  I don't.

11           MR. URANKAR:  With that, Your Honor, I would just say

12   this case presents a straightforward application of *Smith*.  I

13   think the law is neutral and generally applicable.  It's

14   clearly governing the practice of medicine, which is under

15   *Dobbs* and *Goldfarb*.  It's a compelling state interest.  It's a

16   place where the law is presumptively constitutional and it's

17   subject to rational-basis review.  When a patient presents to a

18   licensed healthcare professional in the state, they expect to

19   receive care that's rooted in evidence-based medicine, and the

20   State Regulatory Boards, specifically Nursing and Medical, are

21   charged with protecting the public health from the improper

22   practice of the healing arts, and that's exactly what they did

23   both through this law and the implementing regulations,

24   Your Honor.

25           THE COURT:  All right.  You did trigger one more

1    question, which is kind of related to what you already said,

2    which is, I think -- I think the language you used was

3    unproven.  You know, protecting the public from unproven

4    medical practices.  But isn't -- tell me about how this applies

5    to say testosterone clinics and other places that clearly are

6    using hormone therapy for all sorts of -- all sorts of things

7    that I don't think are FDA approved and probably are at least

8    as questionable in their efficacy as this.  So the state -- I

9    mean, you have to agree the state is more aggressive about this

10   than about other things that present that same problem.

11        MR. URANKAR:  I would respectfully disagree,

12   Your Honor.  Under 12-240-121, the part of the Medical Practice

13   Act that defines unprofessional conduct, prescribing hormones

14   to increase sports performance is defined as unprofessional

15   conduct.  So they've actually banned that.

16        THE COURT:  What about support like -- no offense --

17   but hair growth and performance, like the things I hear ads

18   for, that's not sports performance, but different kinds of

19   performance.

20        MR. URANKAR:  Those get regulated, Your Honor.  Those

21   get disciplined.

22        THE COURT:  All right.  Maybe I will file a complaint

23   under the CCPA with some of those things.  Thank you,

24   Mr. Urankar.

25             Okay.  Mr. Rienzi, I will give you a few minutes to

 1   rebut, if you would like.

 2          *MR. RIENZI:*  Thank you, Your Honor.  Just a few

 3   points.  The recurrent miscarriage point, that's very

 4   significant.  Maybe they've never heard of anyone doing

 5   abortion pill reversal before, maybe.  But they surely heard of

 6   people taking progesterone for recurrent miscarriages, because

 7   people have been doing it for decades.

 8          They took the position from the podium, and Dr. Cohen

 9   takes the position in her declaration, that that's not proven

10   for most of the situations that it gets used.  So for the

11   recurrent miscarriages, yes, but for all of the other

12   miscarriage management, Dr. Cohen's point is people are wrong

13   about that.  They are doing that.  The Board has never

14   disciplined anybody for it.

15          I take the point that Mr. Urankar can't be expected to

16   have an encyclopedic knowledge of every complaint they have

17   ever done, but they would have some burden to come in and show

18   they are treating that as a problem, but they are not treating

19   it as a problem.  They don't have a special standard of care

20   that they have articulated about it, even though they came up

21   today and they said *We don't think it works*.  Right?

22          And the truth is, that's true for tons of things in

23   medicine.  That's true for tons of things that are used in

24   obstetrics and gynecology.  They don't have full, random

25   controlled clinical trials with placebos.  They don't do that

1    that often on pregnant women, and they haven't regulated it.

2    So under *Tandon*, that's a comparability problem, that alone is

3    enough to say they need to pass strict scrutiny.

4         THE COURT:  So let me ask you about this, because I

5    think you would agree with Mr. Urankar's point, that the state

6    can take a prophylactic approach to potential medical problems,

7    in general, right?  It can say, *Man, this seems really*

8    *dangerous*.  The state could say we're not going to have --

9    we're not going to allow medical professionals to use drugs,

10   unless they are supported by studies and we approve it or

11   something in advance, right?  They could do that.

12        MR. RIENZI:  They could have written a very different

13   law that just said, *No use of off-label drugs*.  They would

14   never do that, but they could have.  Or *no use of drugs that*

15   *aren't supported by randomized clinical trials*.  They could

16   have done that, and if they did that, then when they came up

17   and said, *Well, our interest is we think those things are*

18   *dangerous*, then when you did the *Tandon* comparability analysis

19   you would say, *Well, at least they regulated all of the things*

20   *that did that*.

21        Instead they come in and they say, *We think these*

22   *things are dangerous, but we don't regulate them the same way*

23   *anyplace else*.  Anyplace else it's*, Well, maybe we will get you*

24   *on case-by-case basis*.  *Maybe we will think about what the*

25   *dosage was and think about the scientific judgment*.  They are

1   not regulating the same thing in the same way over here.  They

2   are doing it in a very targeted way.

3           So if that's their interest, they failed, and I think

4   the concessions on miscarriage mean they have they have a

5   *Tandon* problem they can't solve.

6           THE COURT:  So I think Mr. Urankar is right that it's

7   not in the record how -- what portion of the -- the groups or

8   individuals who do this are religiously motivated.  Does it

9   need to be?  I mean what -- and go ahead and answer that.  Then

10  I have a followup.

11          MR. RIENZI:  Short answer is, it's in there in at

12  least absolute terms.  It's just not in there in percentage.

13  Paragraph 161 of the Complaint, which is in evidence, it's a

14  verified Complaint, no one has disputed this, paragraph 161,

15  this is from Senator Marchman, one of the sponsors of the Bill,

16  says, *Colorado has more than 50 religious-based organizations*,

17  that's our word not hers, back to the quotes, *More than 50*

18  *religious-based entities that encourage women to keep their*

19  *babies or link them with adoption agencies*.  She calls those

20  *ideologically driven.  They are trading on the goodwill of*

21  *legitimate medicine that defraud patients*.  *They use*

22  *disinformation to shame.  These fake clinics are the only ones*

23  *that can prescribe abortion pill reversal*.

24          I don't know how many pro-life clinics there are in

25  Colorado.  I would be thrilled if there's 5,000, but I don't

1    think so.  Right?  She is coming in and saying there's 50

2    religious ones.  I think that's more than enough for anything

3    that you need to do under the *Lukumi* and *Masterpiece*, to say

4    this is focused on religion.

5          Again, I take -- your analysis of *Lukumi* makes

6    complete sense.  There were only two justices on Section 2 A of

7    that, and the justices then went on and looked at *Okay, how*

8    *does this treat other comparable things*?  Very much what *Tandon*

9    does.  They said, *That's enough*, and so I think the law is just

10   not generally applicable and they can't get out of it.

11         *THE COURT:*  So to -- to decide what the object of the

12   law is targeted at a religious practice, do I look just at

13   your -- your -- it's clearly targeted at the practice your

14   client is engaged in, but as I said, I don't think it's

15   inherently a religious practice; as in, it only is that or it

16   only could be that.

17         Would every plaintiff who came -- even if you would,

18   sort of, maybe be surprised, it's probably not a surprise in

19   this case that there are people who have religious motivations

20   when abortion is at stake, but say some other medication, and

21   you know, a reasonable person would say, *I didn't really*

22   *realize there was a religious aspect to that*; had to do with

23   some complex testing question about how a particular drug was

24   tested, I don't know.

25         Would -- and they came in in the same position as you,

1    they said, this bans -- *This is very important to my religious*

2    *exercise, but it's prohibited by the state.*  Is the question

3    the same?  Or do I have to look to statements like the one you

4    just pointed out where I have to say, well it's -- *There's*

5    *reason to think that the law was passed, because of that not*

6    *just because it happens to impact a religious interests.*

7         MR. RIENZI:  So I think if you had a legislature that

8    was totally unaware that some practice was a religious

9    practice, and just happened to ban it for reasons that had

10   nothing to do with that, I think that would be a harder

11   *Masterpiece* and *Lukumi* claim to make.  But here, that's not the

12   case.  They were very much aware; they said it; it was part of

13   their litany of problems with abortion pill reversal, was these

14   religious clinics doing it.

15        So I take the point that if it was an unknown thing,

16   it would be harder to prove that they are targeting a religious

17   exercise, but here they were very well aware of it, and so I

18   don't think they can get out of it by saying, Well, *you know,*

19   *we hated it for lots of reasons.  It was the religion, but*

20   *religion-plus.*  Marchman is very clear, it's the religious

21   entities who are the problem.  Right?  They are the *fake*

22   *clinics.*  They are *The people misleading people*; that's the

23   problem Senator Marchman set out to solve.

24        I think under *Lukumi* and *Masterpiece* that has to be

25   looked at.  They would love to ignore it.  You can't ignore it.

1    And to be clear, you don't need it.  I want to go back to

2    something I said before.  We don't need to go down that path,

3    because the *Tandon* and *Fulton* aspects are really clear.  So

4    even if they really truly had no idea that this was religious

5    they would still get strict scrutiny and they have got nothing

6    to pass it.

7          The Board tried to get out of *Fulton* by saying, *Well,*

8    *it's different if we just say we reserve case-by-case*

9    *authority.  Then if we say apply to us, and you can get a*

10   *waiver.*  I don't see anything in *Fulton* that makes that so.

11   And I don't think *Axson-Flynn* allows it.

12         *Axson-Flynn* says if you have a system that is

13   case-by-case, then you get strict scrutiny under *Smith*, and

14   that's long before *Tandon* and *Fulton*; but *Tandon* and *Fulton*

15   just drive the point home.

16         If what's going on is you have reserved your authority

17   to grant case-by-case exceptions, that's the opposite of a

18   generally applicable law.  Then we don't have a generally

19   applicable law and that triggers strict scrutiny.

20         Mr. Urankar said, *Well, we could wait for longitudinal*

21   *studies.  They might show us that the use of progesterone for*

22   *A.P.R. is dangerous*.  One, that points out they have no safety

23   case to make today.  Right?  Today, in your courtroom, they've

24   got nothing to safety.  Right?  They're saying, *Maybe somehow*

25   *in the future*.

1          The problem with that, of course, is that for all

2     sorts of other things, like miscarriage prevention, you could

3     say the exact same thing; *Maybe someday we will figure out if*

4     *that's a problem*.  *Maybe someday there will be a reason to*

5     *think it's dangerous*.  I don't think that's terribly likely,

6     given the widespread use of progesterone during pregnancy for

7     more than 50 years.  So I think it's terribly likely we are

8     going there, but the fact they regulated it here and they don't

9     regulate it any other places means they have to face strict

10    scrutiny and they fail it.

11         Two last quick points, Your Honor.  One, Mr. Urankar

12    said at times that, *Well, no we do really regulate all of those*

13    *other things*.  *Trust me, we regulate them*.  But they regulate

14    them differently.  Right?  Everybody else can practice medicine

15    as best they see fit, someday maybe somebody makes a claim they

16    can make a defense against.

17         My clients face the legislature and the the Medical

18    Board at least saying, *That's unprofessional conduct*.  They are

19    not saying, *Let's think about*.  They are not saying, *Let's*

20    *figure out what's really dangerous*.  *Hey, did you save the*

21    *baby?*  That would be a great question to ask, if they want to

22    have a case-by-case, because we have got lots of those.  Right?

23    So the case-by-case that everybody else gets to wait for and go

24    defend themselves, my clients don't.  My client's behavior is

25    unprofessional conduct on day one.

1          Lastly, Your Honor, at times the government wants to

2     act like this law doesn't mean that much.  Right?  In the end,

3     *We're still going to do our thing as Nursing and Medical*

4     *Boards.  We are going to apply it later.  Doesn't mean that*

5     *much.*  If it doesn't mean that much, that's extra reason to

6     enjoin it.  Right?  It means a lot to my clients.  They just

7     can't go out tomorrow, or Tuesday, and engage in unprofessional

8     conduct and try to continue running a medical practice engaging

9     in what is unprofessional conduct and banned.

10          And lastly, Your Honor, I would just say, this is an

11    extraordinary case.  Everybody in the courtroom recognized that

12    in April.  I think we generally recognize it today.  This is

13    not normal practice.  This is not the Mine Run of how the State

14    of Colorado or any other state government operates on these

15    things.  They've acted differently.

16          So a ruling here wouldn't open up the whole world to

17    anything.  It would just say, *Look, they have acted*

18    *differently.  They made an assertion of what their reason was*

19    *and they don't pursue it every place, they made an assertion*

20    *what they are banning, but they reserve case-by-case*

21    *discretion*.  They came out here guns blazing against religious

22    clinics, and that's not allowed under the First Amendment.

23    These are very unique case-specific things.  I think it's

24    perfectly plausible to write an opinion that says, *In these*

25    *circumstances the government doesn't get the benefit of the*

1    *doubt*.  Government benefit of the doubt is for rational basis

2    where there's no constitutional interest at stake.  There are

3    constitutional interests at stake here.  They do not deny that

4    it's a religious exercise.  Where constitutional interests are

5    at stake, they have to justify their law.  All they have got

6    is, *It might not work, and maybe someday someone with figure*

7    *out it's dangerous*.  I don't think that's actually going to

8    happen, but that's not enough to defeat an injunction today.

9    So we would ask Your Honor to enter that injunction.  Again, if

10   it's at all possible by 11:59 Monday night.

11           *THE COURT:*  All right.  Thank you.  I'm not going to

12   rule today on any of this, but I do plan to get out an order on

13   the preliminary injunction by Monday night.  Probably won't do

14   the Motions to Dismiss by then, but I do expect to rule one way

15   or the other by then.

16           *MR. RIENZI:*  Thank you, Your Honor.

17           *THE COURT:*  Thank you.  And unless there's anything

18   else, I will just thank everybody, once again, for the effort

19   and the thoughtfulness of the briefing and argument in this

20   case.  As I said I will be -- quite a few outstanding motions.

21   I will be dealing with the preliminary injunction first,

22   obviously, given the time-sensitive nature of that, and then we

23   will see what else we can do quickly.  But I will take the

24   motion under advisement and the Court will be in recess.

25           *THE COURTROOM DEPUTY:*  All rise.  Court is now in

1    recess.

2         (Recess at 12:52 p.m.)

3                        **REPORTERS' CERTIFICATE**

4              I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6              Dated at Denver, Colorado, this 20th day of October,

7    2023.

8

9                                   ss/Tammy Hoffschildt.

10                         _____

11                         Tammy Hoffschildt, FCRR,CRR,RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25