IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:23-cv-00939-DDD-SKC

BELLA HEALTH AND WELLNESS et al.,

     Plaintiffs,

v.

PHIL WEISER et al.,

     Defendants.

---

ORDER REGARDING MOTIONS TO DISMISS
AND MOTION FOR PRELIMINARY INJUNCTION

---

## INTRODUCTION

Colorado has long permitted pregnant women and their medical providers to choose to terminate their pregnancies through what is colloquially known as "the abortion pill" and is defined in state law as "medication abortion." It had, until recently, also allowed women who regretted starting that process to seek to reverse it through the use of a hormone called progesterone. In the law that is the focus of this case, however, the Colorado legislature effectively banned women and their medical providers from making this latter choice, which Colorado law calls "medication abortion reversal." This unique law declares, among other things, that medication abortion reversal amounts to "unprofessional conduct" under the state's medical licensing laws, subjecting doctors and nurses who administer this treatment to discipline and possible loss of their license to practice.

The Plaintiffs in this case are medical providers who say they have a religious duty to try to help women who wish to try to reverse a medication abortion. They brought this case arguing that the State's prohibition of this treatment violates their First Amendment religious and speech rights. To protect those rights, they seek a preliminary injunction shielding them from discipline for providing or advertising this procedure.

Defendants' position, as they accurately summarized at the hearing on the relevant motions, is that this case can be resolved in their favor through a simple application of *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-82 (1990). If *Smith* was all we had, they might be right. But while the Supreme Court has not explicitly overruled *Smith*, in the decades since that case was decided the Court has added considerable nuance and complexity to the analysis of cases like this one.

Under that more recent precedent, the State generally cannot regulate an activity if that regulation burdens religious exercise, provides for individualized exceptions, fails to regulate comparable secular activities that raise similar risks, and otherwise targets religious activity. The law at issue here runs afoul of these First Amendment principles. And because it does, the State must come forward with a compelling interest of the highest order to maintain the law. It has not even attempted to do so. Plaintiffs are therefore entitled to a narrow preliminary injunction as outlined below.

## Background

### I.   Medication Abortion and Its Reversal

The Colorado law at issue defines "medication abortion" as an "abortion conducted solely through the use of one or more prescription drugs." Colo. Rev. Stat. § 12-30-120(1)(b). Medication abortion typically involves the use of two medications—mifepristone and misoprostol—and is an FDA-approved method for terminating an early pregnancy. Doc. 99-1 at 3. Mifepristone inhibits the activity of progesterone, a naturally occurring hormone that plays an essential role in regulating female reproductive function. *See* Doc. 94 at 17-18; Doc. 99-1 at 3-4. Mifepristone causes the uterine lining to deteriorate, blocking oxygen and nutrition to the embryo and potentially resulting in detachment of the embryo from the endometrium. *See* Doc. 94 at 23-24; Doc. 99-1 at 4.

Mifepristone alone, however, is not fully effective in aborting an embryo. There appears to be some dispute as to just how effective mifepristone is alone, but studies estimate that 20-46% of patients who only take mifepristone will continue their pregnancies. Doc. 99-1 at 4; *See* Doc. 94 at 24. This is why patients also take the second drug—misoprostol—within a day or two of taking mifepristone to complete a medication abortion. Misoprostol dilates the cervix and induces muscle contractions, clearing the uterus of the embryo. Doc. 99-1 at 4. The full, two-drug regimen is highly effective at ending a pregnancy, causing 97% of early-term pregnancies to terminate. *See* Doc. 99-1 at 4-5.

But some women regret their decision to start the medication abortion regimen after taking the first pill but before taking the second. And others may have been coerced to start the regimen against their will. *See* Doc. 94 at 25. Defendants' expert states that, in such circumstances, the "current standard of care" is to advise the patient not to take the

second pill, misoprostol, and to have doctors closely monitor the patient. Doc. 99-1 at 7. Such monitoring may include medical visits and ultrasounds to ensure that the pregnancy continues normally and to check for any potential complications, including heavy bleeding, miscarriage, or early delivery. *Id.*

Other doctors and medical professionals, however, have investigated whether treatment with progesterone can reverse the effects of mifepristone, the first abortion pill, better than just watchful waiting and avoiding use of the second abortion pill. This is commonly called "abortion pill reversal" or "medication abortion reversal."

Indeed, progesterone has been prescribed for many uses in pregnant women to sustain pregnancy in other scenarios, including for recurrent miscarriages, prevention of preterm birth, and support of endometrial function for certain patients suffering from infertility. *See* Doc. 94 at 19; Doc. 102-1 at 5-6. Researchers have estimated that providers employ the use of progesterone in 5-12% of all pregnancies for a variety of reasons. *See* N.E. Simons et al., *The Long-Term Effect of Prenatal Progesterone Treatment on Child Development, Behaviour and Health: A Systematic Review*, 128 BJOG: Int'l J. Obstetrics & Gynaecology 964, 972 (2020), https://perma.cc/8F83-EMSB. The parties appear to agree that progesterone is "generally considered a low-risk medication" with "many off-label uses that meet generally accepted standards of medical practice." *See* Doc. 99-1 at 17. There is scientific debate, however, on how effective progesterone treatment is for at least some of the aforementioned conditions. *See, e.g.*, Doc. 102-1 at 7; Doc. 108-1 at 5.

While limited, some evidence also suggests that progesterone may also aid in preventing termination of a pregnancy after ingestion of the first abortion pill—a point hotly contested by the parties. Much of this

evidence is limited to animal studies and case studies in humans that are not as rigorous as placebo-controlled, double-blind studies, for instance. *See, e.g.*, Doc. 99-1 at 9-20 (Defendants' expert critiquing studies relied upon by Plaintiffs and their expert). Nonetheless, some doctors believe it makes biological sense that progesterone might counteract mifepristone's effects. *See, e.g.*, Ruth Graham, *A New Front in the War Over Reproductive Rights: 'Abortion-Pill Reversal*, N.Y. Times Magazine, July 18, 2017, https://perma.cc/CN75-8YEU (quoting Dr. Harvey Kliman, a doctor "in favor of abortion rights," as stating that he would prescribe progesterone to his daughter if she wanted to counteract mifepristone and that "I bet you it would work.").

But Defendants, their experts, and major medical industry bodies argue that using progesterone to counteract mifepristone is unproven, ineffective, and potentially unsafe. For instance, Defendants' expert Dr. Cohen notes that there may be an increased risk of hemorrhaging where a patient does not take the second abortion pill and also takes progesterone. But there is some uncertainty about whether this potential risk is due to the patient not completing the full abortion regimen (*i.e.*, taking the "watchful waiting" approach) or due to the patient *also* taking progesterone. *See* Doc. 99-1 at 15-16, 19-20.

## II. Bella Health and Plaintiffs

Plaintiff Bella Health and Wellness is an independent, faith-based Catholic medical center offering "life-affirming, dignified health care" to women, men, and children. Doc. 94 ¶ 30. Bella Health currently operates medical centers in Englewood and Denver, Colorado. *Id.* Prior to and during the early stages of this lawsuit, Bella operated another medical center in Lafayette that has since closed. *Id.*

Plaintiff Denise Chism is the co-founder and chief executive of Bella Health. She has worked as a nurse practitioner specializing in high-risk pregnancies for over twenty-seven years. *Id.* ¶ 31. Plaintiff Abby Sinnett also co-founded Bella Health and acts as its chief operating officer. *Id.* ¶ 32. She too is a nurse practitioner and specializes in labor and delivery. *Id.* Plaintiff Kathleen Sander is a medical doctor board-certified in obstetrics and gynecology and has worked at Bella Health for the past five years. *Id.* ¶ 33. Ms. Chism and Ms. Sinnett co-founded Bella Health's predecessor in 2014. Doc. 94 ¶ 43. Today, Bella Health has twenty providers and over 20,000 registered patients. *Id.* ¶ 44.[1]

Bella Health's articles of incorporation list several stated purposes for the organization, including to provide "spiritual, emotional, educational, charitable, and financial support of human dignity" in accordance with Catholic teachings, "to promote and protect life from natural conception to natural death," and "to deliver, and support the delivery of, charitable health services consistent with the teachings of the Catholic Church." Doc. 94 ¶ 50. Bella's patients and employees must sign forms acknowledging Bella's commitment to "life-affirming health care" and Bella's refusal to provide "contraception, sterilizations, or abortions." Doc. 94 ¶ 55.

Bella Health regularly prescribes progesterone to pregnant women, including those with prior miscarriage, first-trimester bleeding, prior preterm labor or delivery, and infertility. Doc. 94 ¶ 106. And pursuant to its religious commitment to "life-affirming" health care, Bella Health provides abortion pill reversal with progesterone. *Id.* ¶ 109. Indeed, Bella Health views offering abortion pill reversal as a "religious

---

[1]    Unless the context otherwise requires, Plaintiffs collectively are referred to as "Bella Health" in this Order.

obligation." *Id.* Bella Health has treated several women in this way, including during the pendency of this lawsuit. *Id.* ¶¶ 115-17.

Bella Health also advertises these services. On its website, Bella Health describes itself as a "comprehensive, life-affirming OB-GYN practice" and describes itself as providing a "full continuum of care." Doc. 94 ¶ 123. Bella Health does not expressly advertise that it does not offer abortion services but appears not to expressly advertise that it does, either. Bella Health does, however, expressly advertise abortion pill reversal on its website and in its social-media postings. *See id.* ¶¶ 125-31.

### III. The Passage of SB 23-190

In early 2023, the Colorado legislature debated Senate Bill 23-190 before passing it and sending it to the Governor, who signed it into law. *See* Doc. 94 ¶ 153; S.B. 23-190, 74th Gen. Assemb., 1st Reg. Sess. (Colo. 2023), 2023 Colo. Legis. Serv. Ch. 70 (West) [hereinafter SB 23-190]. SB 23-190 contained three sections. The first section, titled, "Legislative declaration" recites a number of findings and declarations made by the general assembly. These include that:

- "Anti-abortion centers are the ground-level presence of a well-coordinated anti-choice movement"; and

- "Some anti-abortion centers go so far as to advertise medication abortion reversal, a dangerous and deceptive practice that is not supported by science or clinical standards, according to the American College of Obstetricians and Gynecologists, or by the United States food and drug administration."

SB 23-190 § 1(1)(d), (f).

The law further notes that Colorado's consumer protection laws already protect consumers from false or deceptive advertising and that, in

light of SB 23-190, "[t]his prohibition on deceptive trade practices applies to disseminating or causing to be disseminated false advertising relating to the provision of abortion or emergency contraceptive services, or referrals for those services, and advertising for or providing or offering to provide or make available medication abortion reversal." *Id.* § 1(3)(b). Section One is not codified in Colorado Revised Statutes, however.

Section Two of the bill, in contrast, modified Colorado's Consumer Protection Act to add the following definition of a "deceptive trade practice" under that existing law:

> A person engages in a deceptive trade practice when the person makes or disseminates to the public or causes to be made or disseminated to the public any advertisement that indicates that the person provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives, when the person knows or reasonably should have known, at the time of publication or dissemination to the public of the advertisement, that the person does not provide those specific services.

*Id.* § 2(2) (codified at Colo. Rev. Stat. § 6-1-734(2)). The attorney general and district attorneys for the State's judicial districts are concurrently responsible for the enforcement of the Colorado Consumer Protection Act, including as amended by SB 23-190.

Section Three of SB 23-190 provided a new definition of "unprofessional conduct" under the State's medical-licensing laws. Section Three reads:

> A licensee, registrant, or certificant engages in unprofessional conduct or is subject to discipline pursuant to this title 12 if the licensee, registrant, or certificant provides, prescribes, administers, or attempts medication abortion reversal in this state, unless the Colorado medical board created in section 12-240-105(1), the state board of pharmacy created in section 12-280-104(1), and the state board

> of nursing created in section 12-255-105(1), in consultation with each other, each have in effect rules finding that it is a generally accepted standard of practice to engage in medication abortion reversal.

*Id.* § 3(2)(a) (codified at Colo. Rev. Stat. § 12-30-120(2)(a)). "Medication abortion reversal" is defined as "administering, dispensing, distributing, or delivering a drug with the intent to interfere with, reverse, or halt a medication abortion." *Id.* § 3(1)(c) (codified at Colo. Rev. Stat. § 12-30-120(1)(c)). And a "medication abortion" is defined as an "abortion conducted solely through the use of one or more prescription drugs." *Id.* § 3(1)(b) (codified at Colo. Rev. Stat. § 12-30-120(1)(b)).

Plaintiffs have also provided unofficial transcripts of some of the legislative debate surrounding SB 23-190. For instance, Plaintiffs allege that one bill sponsor stated, in reference to a package of bills including SB 23-190, that the package targeted "misinformation in our communities perpetrated by fake clinics." Doc. 94-9 at 3. Plaintiffs also allege that the same sponsor stated during a legislative hearing that "anti-abortion center"—a term used in the bill—referred to "crisis pregnancy centers and fake clinics. They are faith-based organizations that pose as a comprehensive reproductive healthcare clinic to intercept patients seeking abortion care." Doc. 94-10 at 3. Plaintiffs further allege that a representative noted in a legislative hearing that "many of these crisis pregnancy centers are religiously affiliated" which is "fine." Doc. 94-13 at 14. But that representative went on to say that it's an "issue" if the "religious mentoring and counseling . . . are riddled with . . . guilt-inducing anti-abortion messages." *Id.* Plaintiffs point to other comments made by legislators in a similar vein and comments suggesting that the legislators believed using the term "comprehensive" may run afoul of the bill's advertising rules. *See* Doc. 94 ¶¶ 159-185. For instance, one representative stated that "[c]omprehensive reproductive care includes . . . the

morning-after pill [and] . . . abortion or referral for abortion." Doc. 94-13 at 3.

## IV. The Defendants

Plaintiffs have sued Attorney General Phil Weiser in his official capacity as Attorney General of Colorado; members of the State's medical board (collectively, the "Medical Board"), all sued in their official capacities; and members of the State's nursing board (collectively, the "Nursing Board"), also all sued in their official capacities. These three sets of Defendants are referred to as the "State Defendants" or the "State" throughout this Order.

Plaintiffs have also sued three Colorado district attorneys in their official capacities: Beth McCann, the District Attorney of the 2nd Judicial District of Colorado where one of Bella Health's medical facilities is located; John Kellner, the District Attorney of the 18th Judicial District of Colorado, where another one of Bella Health's medical facilities is located; and Michael Dougherty, the District Attorney of the 20th Judicial District of Colorado, where one of Bella Health's former facilities was located.

## V.  Procedural History and The Boards' Decisions

The same day that the Governor signed SB 23-190 into law, the Plaintiffs filed this suit, along with an emergency motion seeking a temporary restraining order enjoining enforcement of the new law. Docs. 1, 7. I granted the Plaintiffs' motion for a temporary restraining order in part, and restrained the Defendants from enforcing the bill against the Plaintiffs pending a hearing at which the propriety of issuing a preliminary injunction could be determined. Doc. 8.

A preliminary-injunction hearing was held on April 24, 2023. Doc. 46. At that hearing, the Defendants represented that they would not enforce the new law at least until the rulemaking contemplated by the bill was completed. Given that representation, I found that injunctive relief was not necessary at that time, and I dissolved the temporary restraining order and denied the Plaintiffs' request for a preliminary injunction, but noted that the Plaintiffs could bring a new motion should the circumstances change. Doc. 48.

The boards have now completed the rulemaking process contemplated by SB 23-190. The Medical Board has adopted a final rule stating that:

> [T]he Board does not consider administering, dispensing, distributing, or delivering progesterone with the intent to interfere with, reverse, or halt a medication abortion undertaken through the use of mifepristone and/or misoprostol to meet generally accepted standards of medical practice . . . . For other conduct that could meet the definition of medication abortion reversal, the Board will investigate such deviation on a case-by-case basis.

Doc. 78. The State's pharmacy board and the Nursing Board have adopted final rules stating that they "evaluate[] generally accepted standards of . . . practice on a case-by-case basis," and that they "will not treat medication abortion reversal . . . as a *per se* act" of unprofessional conduct and will "investigate all complaints related to medication abortion reversal in the same manner that [they] investigate[] other alleged deviations from generally accepted standards of . . . practice." Docs. 94-24, 94-26. Thus, medication abortion reversal is considered unprofessional conduct under the provisions of SB 23-190 because none of the three boards has in effect a rule finding that it is a generally accepted standard of practice. *See* Colo. Rev. Stat. § 12-30-120(2)(a).

The Plaintiffs have amended their complaint in light of the completion of the rulemaking process and filed a renewed motion for a preliminary injunction. Docs. 92, 94. Also before the Court are motions to dismiss filed by the district attorneys, Docs. 58, 67, 95; the attorney general, Doc. 68; and the Nursing Board, Doc. 107. The preliminary-injunction motion, two of the district attorneys' motions to dismiss, and the attorney general's motion to dismiss have been fully briefed. District Attorney Dougherty's and the Nursing Board's motions have not been fully briefed. A hearing on all these motions was held on October 17, 2023. Doc. 110.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss for lack of subject-matter jurisdiction, "mounting either a facial or factual attack." *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). Factual attacks go "beyond the allegations in the complaint and adduce[] evidence to contest jurisdiction." *Id.* In such cases, a district court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Id.* Reliance on such evidence does not necessarily convert the motion to one for summary judgment. *Id.*

When presented with a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007). But "mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice" to state a plausible claim for relief. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007)). So a court should "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018). To succeed on a motion for preliminary injunction, the moving party must show: (1) that it is "substantially likely to succeed on the merits"; (2) that it will "suffer irreparable injury" if the court denies the injunction; (3) that its "threatened injury" without the injunction outweighs the opposing party's under the injunction; and (4) that the injunction is not "adverse to the public interest." *Mrs. Fields*, 941 F.3d at 1232; *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth preliminary-injunction factors "merge" when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

### I.   Motions to Dismiss and Subject-Matter Jurisdiction

In their motions to dismiss and in their responses to the preliminary-injunction motion, Defendants raise several defenses, including the Court's alleged lack of subject-matter jurisdiction. Before entering an injunction, a court must first determine whether standing exists. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) ("[W]e cannot reach the merits based on 'hypothetical

standing,' any more than we can exercise hypothetical subject matter jurisdiction."). I therefore resolve all of Defendants' pending motions in this Order, including the subject-matter jurisdiction issues raised therein.

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). To establish standing, a plaintiff must show (1) an injury in fact, (2) a causal connection between the injury and the alleged conduct, and (3) redressability. *Id.* at 157-58. An "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 158 (internal quotation marks omitted).

But an injury in fact need not amount to an "actual arrest, prosecution or other enforcement action." *Id.* For First Amendment claims, "two types of injuries may confer Article III standing to seek prospective relief," even if a plaintiff has "never been prosecuted or actively threatened with prosecution." *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003); *accord Colo. Union of Taxpayers, Inc. v. Griswold*, No. 22-1122, 2023 WL 5426581, at *1 (10th Cir. Aug. 23, 2023).

The first type of injury requires only that a plaintiff intends to "engage in conduct that would . . . arguably violate the law" and that such conduct would "give rise to a credible fear of an enforcement action." *Griswold*, 2023 WL 5426581, at *1. The second type of injury occurs where a plaintiff is "chilled" from doing constitutionally protected conduct, typically speech. Under the latter theory, the plaintiff must provide (1) evidence that in the past they engaged in the type of speech or

conduct affected by the challenged government action; (2) evidence that the plaintiff has a present desire, though no specific plans, to engage in such speech or conduct; and (3) a plausible claim that the plaintiff has no intention to engage in such speech or conduct because of a credible threat that the law will be enforced. *Peck v. McCann*, 43 F.4th 1116, 1129-31 (10th Cir. 2022).

Under either of these two standing theories, the third "credible threat" prong of this test is the same and includes a multi-factor analysis. *Griswold*, 2023 WL 5426581, at *3 n.4 ("We have never interpreted a 'credible fear' differently based on the plaintiff's theory of standing."). The non-exhaustive "credible fear" factors are:

- Whether there is evidence of past enforcement against the same conduct;

- Whether authority to initiate charges is not limited to a prosecutor or an agency and, instead, any person could file a complaint or grievance against the plaintiff; and

- Whether the state disavowed future enforcement.

*See Peck*, 43 F.4th at 1132; *see also Griswold*, 2023 WL 5426581, at *3 (noting that courts consider "at least" these three factors).

The credible-fear prong "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1132.[2] And the "threat of prosecution is generally credible where a challenged provision on its face proscribes the conduct in which a plaintiff wishes to engage, and the state has not disavowed any

---

[2] *Peck* addressed free speech which is only partly at issue here. Defendants have not provided any argument why *Peck* should not apply as to other First Amendment claims, however, such as religious freedom claims. Given this, the Court sees no reason not to apply *Peck*'s standard as a whole to the claims here.

intention of invoking the provision against the plaintiff." *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 901 (10th Cir. 2016) (internal quotation marks and alteration omitted).

### A.   The District Attorneys

Each of the district attorneys has moved to dismiss Plaintiffs' claims on similar standing grounds—namely, that Plaintiffs face no credible threat of enforcement by the district attorneys. The parties agree that the district attorneys *could* enforce the advertising-related provisions of SB 23-190 under the Colorado Consumer Protection Act ("CCPA"). The question, however, is whether Plaintiffs objectively fear that the district attorneys *will*.

District Attorney McCann declared, prior to the filing of the amended complaint, that her office has not initiated *any* civil proceeding to enforce the CCPA in the past six years. Doc. 58-1 at 1-2. She is also unaware of any such civil enforcement action prior to her time in office. *Id.* at 1-2. District Attorney McCann further declared, "I have no intent to investigate or prosecute an action under the CCPA for the purpose of enforcing SB 23-190, either against the Plaintiffs or anyone else." *Id.* at 2.

District Attorney Kellner provided a similar declaration, also prior to the filing of the amended complaint. He stated that he is unaware of any CCPA enforcement by his office at any time. Doc. 67-1 at 1. He stated that he "will not enforce this civil penalty statute against these Plaintiffs. Further, any person who complains about an advertisement that is believed a violation of this statute will be advised to contact the Attorney General's Office." *Id.* at 2.

District Attorney Dougherty also provided a declaration prior to the filing of the amended complaint stating that he did not understand SB 23-190 to prohibit the advertising of abortion pill reversal despite the legislative declaration found in Section One of the bill. Doc. 32-4 at 2-3. While somewhat caveated, he suggested that he would not prosecute Plaintiffs for their advertisements as alleged in the then-operative complaint. *See id.* at 3-5. But since then, Bella Health has ceased operations in District Attorney Dougherty's jurisdiction. After the filing of the amended complaint, District Attorney Dougherty provided a new declaration stating:

> Because the Colorado Medical Board did not complete its rulemaking before Bella Health's Lafayette location closed and because Bella Health's remaining locations are not within the Twentieth Judicial District, I will not investigate or prosecute an action against Bella Health under the CCPA for the purpose of enforcing SB 23-190.

Doc. 95-1 ¶ 8.

These declarations are sufficient to defeat standing as to the district attorneys. First, there is an apparent longstanding lack of enforcement of the CCPA, at least as to two of the district attorneys. Such has been the case for many years as to District Attorneys McCann and Kellner. While SB 23-190 did amend the CCPA, there is no apparent reason why those two district attorneys' offices would change their policy of never pursuing civil enforcement actions under that law. And as to District Attorney Dougherty, it appears that his office generally does not and has not pursued civil enforcement actions against defendants based outside of his jurisdiction. *See* Doc. 95-1 at 3.

As to the second credible-fear factor, it appears that any third-party complaints brought to the attention of the district attorneys would, at most, be referred to the attorney general. While this likely supports a

finding of standing as to the claims brought against the attorney general, the opposite appears to be true as to the district attorneys.

Finally—and most importantly—all three district attorneys have provided clear disavowals, two of which came prior to the filing of the operative complaint. *See Mink v. Suthers*, 482 F.3d 1244, 1255 (10th Cir. 2007) (finding lack of standing and stating "it is significant" that disavowals came after original complaint but prior to operative, amended complaint). Indeed, "assurances from prosecutors that they *do not intend to bring charges* are sufficient to defeat standing." *Id.* (emphasis added) (alteration omitted). Plaintiffs have such assurances from all three district attorneys.

Plaintiffs resist this conclusion on several grounds. They first argue that the law is new and therefore inherently lacks any prior enforcement history. While SB 23-190 is new, the CCPA is not. And there's no suggestion, at least in the Kellner and McCann declarations, that their lack of prior enforcement hinged on amendments to the CCPA. Rather, those district attorneys appear not to bring civil enforcement actions under the CCPA as a matter of general policy and leave that to the State's civil enforcement arm found within the attorney general's office. And as to District Attorney Dougherty, there is no evidence in the record that his office pursues or has pursued enforcement actions against defendants located outside of the bounds of his judicial district.

Plaintiffs next argue that any person may bring a CCPA action. While true, this is more relevant as to the attorney general, not the district attorneys, for the same reasons just explained. And standing is generally evaluated for each claim and as to *each defendant*, not collectively. *See In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1126 (S.D. Fla. 2019) (holding that "standing is defendant specific" (citing

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006))); *see also Jackson v. Fed. Bureau of Prisons*, No. 4:19-cv-00287, 2019 WL 8752339, at *3 (M.D. Pa. Dec. 9, 2019) (collecting cases). Plaintiffs may credibly fear enforcement by the attorney general based on the availability of third-party CCPA complaints. But Plaintiffs' fear of enforcement by the district attorneys on this ground is tenuous at best given that these complaints either would not be pursued by the district attorneys or would be referred to the attorney general.

Finally, Plaintiffs take issue with the district attorneys' disavowals, characterizing them as not adequate. Plaintiffs note that in *Mink* and the cases that the *Mink* court reviewed, the prosecutors tended to abandon enforcement due to their belief that the law in question was unenforceable, often due to intervening Supreme Court precedent. While such controlling law may further diminish a credible fear of enforcement, I do not read those cases to *require* disavowals to be predicated on controlling legal authority barring enforcement. *See, e.g.*, *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004) (holding that prosecutor's disavowal was "sufficient to defeat standing" and only that any "lingering threat of prosecution that *might have* survived the prosecutors' affidavits has now been snuffed out" by controlling Supreme Court precedent (emphasis added)). Indeed, "such disavowals are important only in cases in which, without a disavowal, the plaintiff seeking to enjoin enforcement would have a reasonable basis for concern that he might be prosecuted." *Winsness v. Yocom*, 433 F.3d 727, 733 (10th Cir. 2006 (quoting *Lawson v. Hill*, 368 F.3d 955, 959 (7th Cir. 2004)). In cases where a statute is so obviously unconstitutional or inapplicable, then, there is already a very low probability of prosecution. To *require* disavowals to always be based on the legal impossibility of enforcing the statute would therefore render this factor largely irrelevant. *See id.*

Plaintiffs also cite *Peck* and *Ward* for the proposition that standing exists where "a government disavowal failed to disclaim permanent future enforcement of the plaintiff's conduct." But in *Peck*, the state maintained a "staunch refusal to disavow prosecution" *at all* because doing so would jeopardize its federal funding. 43 F.4th at 1133. And in *Ward*, the plaintiff had "been given *no assurances* that he will not be charged." 321 F.3d at 1268 (emphasis added). In contrast, here the district attorneys have all said they either "do not intend" to prosecute Plaintiffs or "will not" prosecute Plaintiffs. That, it seems, is "sufficient" under *Mink* even if the disavowal does not amount to a binding policy on all of the prosecutor's successors in perpetuity. *See* 482 F.3d at 1253. Indeed, facing a similar argument, the *Mink* court noted that the mere "possibility" of future enforcement need not be "reduced to zero," even if a disavowal may not bind future district attorneys. 482 F.3d at 1255.

Even if the district attorneys' disavowals alone are not sufficient to defeat standing, the ultimate question is whether Plaintiffs have "an objectively justified fear of real consequences" from these defendants. *See Peck*, 43 F.4th at 1132. They do not. All three district attorneys have stated, unequivocally, that they will not enforce SB 23-190 against the Plaintiffs at all. There is a long history of non-enforcement of the CCPA by at least two of these district attorneys. And as to the third, Plaintiffs no longer operate in his jurisdiction. These factors, taken together, show that Plaintiffs lack an objectively justified fear of enforcement by these prosecutors. Plaintiffs therefore lack standing to bring their claims against these three defendants, and Plaintiffs' claims as to these three defendants will be dismissed.

### B. The Attorney General, Medical Board, and Nursing Board

For purposes of the first preliminary-injunction motion, the attorney general, Medical Board, and Nursing Board raised several standing arguments. But much of those arguments focused on the pending rulemaking that had not finished. That rulemaking has since been completed, and Section Three's prohibition on medication abortion reversal is unquestionably the law now in Colorado.

Perhaps unsurprisingly, therefore, the State Defendants appear to have abandoned many of those standing arguments as to Section Three in opposing the second preliminary-injunction motion. The State Defendants maintain their defense that there is no standing for advertising-based claims, arguing that (1) Plaintiffs are not violating that part of the law, and (2) Plaintiffs do not credibly fear enforcement under that part of the law. The attorney general has also separately raised an Eleventh Amendment defense in his motion to dismiss. And the Nursing Board has raised its own standing arguments in its recent motion to dismiss, arguing that (1) Plaintiffs lack standing as to Section Two claims because the Nursing Board lacks enforcement authority under the CCPA, and (2) Plaintiffs lack standing as to Section Three claims due to the Nursing Board's equivocal rule regarding enforcement and the lack of redressability for such claims. *See* Doc. 107.

#### 1. Plaintiffs "Arguably" Violate the CCPA's Advertising Rules

As noted above, for a pre-enforcement action, Plaintiffs must show that they intend to "engage in conduct that would arguably violate the law." *Griswold*, 2023 WL 5426581, at *1. The question here remains: what is the law? Section One of SB 23-190, if it amounted to substantive

law that proscribes conduct, clearly prohibits much of Plaintiffs' advertising that amounts to "advertising for . . . medication abortion reversal." SB 23-190 § 1(3)(b). But Section One has not been codified and is titled as a legislative declaration.

If Section One is ignored, Defendants have a fairly strong argument that Plaintiffs' advertisements do not run afoul of Section Two's prohibition on advertising abortions if a provider does not, in fact, provide abortions. Even so, there remains some debate about whether Plaintiffs' advertisements regarding "comprehensive" care, if not caveated with sufficient language like "life-affirming," could be construed as running afoul of the plain language of Section Two because it may confuse customers into believing that Plaintiffs offer abortions.

In any event, Section One cannot be ignored entirely. It seems unlikely that Section One has no bearing on how a Colorado court may interpret the CCPA in light of SB 23-190. Indeed, Colorado courts may turn to legislative declarations to determine a law's purpose and to interpret other sections, particularly where other sections are ambiguous. *See People ex rel. T.B.*, 452 P.3d 36, 43 (Colo. App. 2016). Even if no court has found the phrase "deceptive trade practice" to be ambiguous under the CCPA as it existed prior to SB 23-190, that may not be the case going forward in light of SB 23-190. And there are other terms in the law that a court may find ambiguous that would bear on these issues.

Given all this, it seems at the very least "arguable" that some of Plaintiffs' advertisements, such as those regarding "comprehensive" care could run afoul of the laws on the books. It also is at least arguable that Plaintiffs' advertisements for medication abortion reversal, standing alone, violate the CCPA in view of Section One's legislative declaration. These uncertainties in Colorado law render Plaintiffs "arguably" in

violation of the CCPA based on their advertisements and website state-
ments as alleged in the verified amended complaint. This is particularly
so under the "not . . . difficult" and "extremely low" evidentiary bar for
demonstrating the credible-fear element of pre-enforcement standing.
*Peck*, 43 F.4th at 1133 (quoting, in part, *Mangual v. Rotger-Sabat*, 317
F.3d 45, 47 (1st Cir. 2003)).

For similar reasons, Plaintiffs have plausibly stated a claim for relief
that application of SB 23-190, either directly through Section One or
through the CCPA in view of Section One, proscribes their conduct and
may violate their First Amendment rights. As suggested in Plaintiffs'
amended complaint and as further clarified at the hearing on these mo-
tions, Plaintiffs seek relief from the CCPA being enforced against them
in view of Section One of SB 23-190, even if it's debatable whether Sec-
tion One itself has the force of law. And for the reasons stated above,
Plaintiffs arguably run afoul of the law's potential prohibition on adver-
tising abortion pill reversal. Therefore, regardless of the precise statu-
tory basis, Plaintiffs' advertising-related claims survive this attack as
well.

### 2.  Plaintiffs Credibly Fear the Attorney General's Enforcement

The attorney general next argues that Plaintiffs lack a credible fear
of enforcement for any advertising-based claim under the CCPA. But his
arguments are unpersuasive.

Regarding past enforcement, the attorney general has not suggested
that he does not regularly enforce the CCPA, and the district attorneys
have stated that they would refer complaints to him. And any lack of
enforcement under the CCPA, as amended by SB 23-190, does little to
diminish a fear of enforcement given how new the law is. Indeed, a new

law's "existence alone may create a threat that is credible enough to create standing." *Brown v. Herbert*, 850 F. Supp. 2d 1240, 1248 (D. Utah 2012).

As to third-party enforcement, Defendants do not dispute that third parties may bring complaints under the CCPA that could also trigger an enforcement action by the attorney general. This factor also therefore weighs in favor of standing.

And as to disavowal, the attorney general cites to the April preliminary-injunction hearing where *counsel*, not the attorney general himself, provided some limited disavowals as to advertisements that contain the word "comprehensive." Counsel made similar concessions at the October hearing on the present motions. While relevant, these concessions do not have the same sort of force as the attorney general forswearing enforcement under penalty of perjury like the district attorneys have. And in any event, this limited "disavowal" provides Plaintiffs with no protection as to their advertisements for medication abortion reversal which, as stated above, arguably run afoul of the CCPA in view of Section One.

Given all this, Plaintiffs credibly fear enforcement by the attorney general. The attorney general has provided no sworn disavowal, there is a history of past enforcement of the CCPA, and third parties can trigger an investigation and even bring their own suits. All factors weigh in Plaintiffs' favor, and they therefore have standing as to advertising-based claims and Section Three-based claims brought by the attorney general (which the attorney general must bring upon referral by the boards as discussed below).

### 3.   Plaintiffs Credibly Fear the Nursing Board's Enforcement

In its motion to dismiss (filed after the State Defendants' joint response to the second preliminary-injunction motion), the Nursing Board argues first that Plaintiffs lack any credible fear that the Nursing Board would discipline them for providing medical abortion reversal. The Nursing Board notes that it adopted a rule stating that it would evaluate such issues on a "case-by-case" basis and that it retains discretion to not discipline licensees even where a violation may be found. This argument suffers from several flaws.

First, the Nursing Board cites no authority for the proposition that a state agency's discretion, standing alone, can defeat standing. Indeed, prosecutors have wide discretion whether to bring charges, what charges to bring, and what sort of sentence to seek in court—analogous discretion to that exercised by the Nursing Board. That does not mean Plaintiffs lack pre-enforcement standing. To the contrary, the threat of potential enforcement, even if there are several administrative hoops that must happen before any sort of discipline occurs, is sufficient to confer standing in this context. As the Tenth Circuit held in *303 Creative LLC v. Elenis* in the related context of ripeness:

> Certainly, the record would be better developed, and the legal issues would be clearer, if Appellants had denied services to a customer, that customer filed a complaint, and that complaint was adjudicated through the appropriate administrative and judicial channels. Yet, as discussed above, Article III does not require a pre-enforcement plaintiff to risk arrest or actual prosecution before bringing [a] claim in federal court.

6 F.4th 1160, 1176 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023). Indeed, the threat of a burdensome investigation, standing alone, can bolster a finding of standing. *See id*. at 1174.

Second, SB 23-190 does not appear to give the Nursing Board discretion to find that medication abortion reversal does not amount to unprofessional conduct. The Nursing Board argues that there is no "*per se*" ban on medication abortion reversal. But SB 23-190 states that performing medication abortion reversal amounts to "engag[ing] in unprofessional conduct" or "subject[s] [a provider] to discipline" "*unless*" the three boards all find that medication abortion reversal is "a generally accepted standard of practice." Colo Rev. Stat. § 12-30-120(2)(a) (emphasis added). The boards did not find medication abortion reversal to be a "generally accepted standard of practice." So it is *per se* unprofessional conduct under the statute. The Nursing Board repeatedly leans on the Nurse Practice Act but ignores this newer statute that clearly states that medication abortion reversal *is* unprofessional conduct as a matter of law.

Third, the Nursing Board has provided no enforcement disavowal whatsoever. Instead, the Nursing Board appears to argue only that it is *possible* that it won't discipline Plaintiffs or that any discipline *might be* minimal. That is a far cry from the showing needed to defeat pre-enforcement standing.

Next, the Nursing Board argues that any remedies sought here would not redress Plaintiffs' alleged injuries (or potential future injuries). The Nursing Board notes that it retains some discretion to discipline Plaintiffs for other reasons, such as whether Plaintiffs' conduct meets the generally accepted standard of care, putting aside SB 23-190. The Nursing Board appears to argue that it could or would discipline Plaintiffs for conducting medication abortion reversal pursuant to its power under the Nurse Practice Act and without regard to SB 23-190. And because Plaintiffs have couched their requested relief within the confines of SB 23-190, the Nursing Board argues, Plaintiffs' alleged

injury—the threat of being punished for conducting medication abortion reversal—cannot be redressed because any remedy can only affect the enforceability of SB 23-190, not the Nursing Practice Act.

Plaintiffs may not have referenced the Nurse Practice Act in the amended complaint because it appears not to have been raised as a separate basis for potential discipline until now. In any event, the Nursing Board's discretion under that Act does not negate Plaintiffs' credible fear of being punished for administering abortion pill reversal treatment. And the Court can redress that injury with injunctive or declaratory relief.

The Nursing Board raises a related argument that, because it lacks authority to enforce the CCPA, Plaintiffs lack a credible fear of enforcement as to their advertising-based claims (and fail to state a claim under Rule 12(b)(6)) as to the Nursing Board. But this argument fails for similar reasons. As counsel for the Nursing Board suggested at the hearing, at least the Medical Board can discipline providers for "deceptive advertising" under the Medical Practice Act. Doc. 111 at 54 (counsel appearing on behalf of both the Medical Board and Nursing Board); *id.* at 54-55 (describing Medical Board's enforcement authority under Medical Practice Act). It seems that the Nursing Board exercises similar broad authority under the Nurse Practice Act. *See* Colo. Rev. Stat. § 12-255-120; *see also* Doc. 107 at 9 (Nursing Board noting that it considers "any other information about [a] licensee's conduct collected during the Board's investigation" when deciding on discipline under Nurse Practice Act). Because the claimed injury here is not being allowed to advertise abortion pill reversal, Plaintiffs credibly fear enforcement by the boards even if under this separate but related statutory basis rather than under the CCPA itself. And both SB 23-190 and Plaintiffs' advertisements certainly could inform the Nursing Board's discipline decisions even if

technically made pursuant to the Nurse Practice Act. Plaintiffs have therefore met the low bar to establish standing and to state a claim as to their advertising-based claims.

The Nursing Board's cited cases also do not support its apparent position regarding redressability. In *Lujan v. Defenders of Wildlife*, the Supreme Court held that the plaintiff could not show redressability largely because the relief sought would have to be provided by non-parties whom plaintiff never sued. *See* 504 U.S. 555, 568-71 (1992) (holding that defendant Secretary's regulation likely could not bind non-party funding agencies who ultimately provided the funding sought by the plaintiff, rendering injury not redressable). Such is not the case here. The Nursing Board's other cited case, *Opala v. White*, is also inapposite. 454 F.3d 1154, 1155 (10th Cir. 2006). There, a justice of the Oklahoma Supreme Court sought court intervention because his colleagues on the bench did not elect him to be chief justice. 454 F.3d 1154, 1155 (10th Cir. 2006). The Tenth Circuit held that any relief it could grant would be, at best, retroactive because the plaintiff sought to "reinstate the predetermined sequential order" for appointment to chief justice that existed prior to his injury. *Id.* at 1159-60. The facts at issue here are very different. And the legal principle applied in *Opala*—that a court cannot provide retroactive relief under *Ex parte Young*—does not apply here. Plaintiffs do not seek retroactive relief; they have not been disciplined yet. Instead, they seek prospective relief to prevent that from happening. Declaratory and injunctive relief in this context therefore is available to redress the claimed injuries.

### 4. Plaintiffs' Claims Against the Attorney General Are Not Barred by the Eleventh Amendment

The attorney general has also moved to dismiss under the Eleventh Amendment as to any Section Three-related claims. Doc. 68 at 14-17.

The Eleventh Amendment has been held to bar citizens from suing states, including their own, in federal court. *See* U.S. Const. amend. XI; *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 827 (10th Cir. 2007). But this immunity does not extend to state officials sued in their official capacity where the plaintiff seeks only prospective relief based on federal law under what is known as the *Ex parte Young* exception. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)). For this exception to apply, however, the defendant officer must have "some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157. But this need not be any "special connection" to the challenged statute; instead, the officer need only "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Edmondson*, 594 F.3d at 760 (internal quotation marks omitted).

The attorney general argues that he has no "particular duty" or "demonstrated willingness" to enforce Section Three of SB 23-190. The attorney general concedes that state statute "direct[s]" him to prosecute complaints referred to him by the Medical and Nursing Boards. Doc. 68 at 16. But he argues that these "client-service duties" are too general to overcome the Eleventh Amendment, citing *Edmondson*. But in *Edmondson*, the Tenth Circuit held that there was no duty to enforce an employment-specific part of an Oklahoma statute and only a duty to enforce a housing-specific part not at issue in the case. *See* 594 F.3d at 750. The attorney general also cites *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021). But in that case, there was no specific statute authorizing the governor or attorney general to

prosecute claims on behalf of the relevant state agencies. *Id.* at 966. Instead, any enforcement authority only derived from a "general enforcement power." *See id.* at 967.

In contrast, the attorney general admits here that he has a "client-service duty" in the exact context at issue in this case. Indeed, as Plaintiffs note, Colorado law specifically *requires* the attorney general to bring charges referred to him by the Medical and Nursing Boards. *See* Doc. 71 at 24-26. Just because SB 23-190 did not create this duty does not mean that the Eleventh Amendment shields the attorney general from liability for enforcing provisions in that law under an enforcement authority provided in a closely related statute. *See Finstuen v. Crutcher*, 496 F.3d 1139, 1151 (10th Cir. 2007). Indeed, the "Young" in *Ex parte Young* itself was a state attorney general with enforcement authority akin to that involved here. *See* 209 U.S. at 150-61.

The attorney general also suggests that, without a referral from the boards, he has no duty and no demonstrated willingness to enforce Section Three. But there is no evidence suggesting that the boards will not make such referrals. To the contrary, neither board (nor the attorney general) has made any sort of disavowal as to the enforcement of Section Three. This argument, therefore, is unavailing, and the Eleventh Amendment does not bar Plaintiffs' Section Three claims against the attorney general.

To summarize, the attorney general's standing arguments fail, as do his arguments that Plaintiffs fail to state a claim for part of their advertising-related claims and that the Eleventh Amendment bars their Section Three claims against him. The Nursing Board's related arguments fail for similar reasons. Both the attorney general's and the Nursing Board's motions to dismiss will therefore be denied, and the

Court has subject-matter jurisdiction over this dispute as to the State Defendants.

## II.  Plaintiffs Are Entitled to a Narrow Injunction

### A.  Likelihood of Success on the Merits

#### 1.  Plaintiffs Are Likely to Succeed on Their Section Three Claims

Plaintiffs have demonstrated a likelihood of success on the merits of their free-exercise claims against Section Three of SB 23-190. The First Amendment of the United States Constitution declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. Under the Constitution's protection, as applied to the states through the Fourteenth Amendment, government action may not restrict the free exercise of religion.

The Supreme Court has long held that laws may burden religious exercise only "so long as they are neutral and generally applicable." *Smith*, 494 U.S. at 878-82. If neutral and generally applicable, a law need only satisfy minimal scrutiny by being rationally related to a legitimate government end. *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) ("In effect, *Smith* creates a 'safe harbor'—if the law is 'a valid and neutral law of general applicability' . . . ."). In contrast, "if a law that burdens a religious practice or belief is not neutral or generally applicable, it is subject to strict scrutiny, and 'the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest.'" *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004); *see also Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

There is no question whether Section Three burdens Bella Health's free exercise of religion. It does. Bella Health considers it a religious obligation to provide treatment for pregnant mothers and to protect unborn life if the mother seeks to stop or reverse an abortion. Doc. 92 at 29 ("As a matter of conscience, Plaintiffs cannot refuse to administer progesterone to a woman who desires to continue her pregnancy simply because she took mifepristone."). The State Defendants have not contested that SB 23-190 burdens Bella Health's religious practice. Indeed, it is not up to the State or the Court to second-guess the sincerity of Bella Health's religious motivations or to suggest alternative means of satisfying Plaintiffs' religious calling.

The more difficult question is whether Section Three's prohibition on abortion pill reversal is neutral and generally applicable. It is not for three reasons. *First*, the law treats comparable secular activity more favorably than Bella Health's religious activity. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). *Second*, the law contains mechanisms for exemptions that undercut the State's expressed interests. *See Fulton v. City of Philadelphia,* 141 S. Ct. 1868, 1877 (2021). *Third*, the law's object and effect is to burden religious conduct in a way that is not neutral. *See Lukumi*, 508 U.S. at 546; *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (describing these as "three bedrock requirements of the Free Exercise Clause that the government may not transgress, absent a showing that satisfies strict scrutiny"). As discussed below, Section Three does not survive the strict scrutiny triggered by the violation of these "bedrock requirements." *Christian Athletes*, 82 F.4th at 686.

a.  **Section Three Likely Treats Religious Activity Less Favorably Than Comparable Secular Activity**

Plaintiffs have shown that the State's regulation of progesterone usage treats some comparable secular uses more favorably than Bella Health's religiously motivated usage. "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296. "[W]hether two activities are comparable . . . must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

The State first argues that abortion pill reversal stands alone and that there is no comparable secular activity. In other words, according to the State, its asserted interest is so narrowly defined as to only encompass a ban on abortion pill reversal, and possibly only progesterone-based abortion pill reversal. But "[o]nly by adjusting the dials *just right*—fine-tuning the level of generality up or down for each case based solely on the identity of the parties and the substance of their views—can you engineer the" the State's conclusion that there is no comparable secular activity. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1739 (2018) (Gorsuch, J., concurring). Nor can the State simply rely on the fact that this law implicates health and safety issues to suggest that there can never be comparable secular activities. *See, e.g.*, *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 835 (D. Colo. 2020) (holding that law that exempted secular gatherings that posed similar threats of COVID-19 exposure as religious gatherings undermined state's asserted interest in protecting the public from COVID-19); *see also Tandon*, 141 S. Ct. at 1296 ("Comparability is

concerned with the risks various activities pose, not the reasons why people gather."); *Lukumi*, 508 U.S. at 538 (holding that stated interest of "protecting the public health" in banning animal sacrifice was underinclusive due to city's failure to also ban improper disposal of garbage by restaurants or hunters from bringing their kill to their houses, for instance).

To the extent the State has interests broader than the banning of progesterone-based abortion pill reversal, it suggests that it seeks to prevent off-label use of drugs where there is "neither scientific evidence demonstrating that [the use] can achieve its intended benefit, nor is there scientific evidence assessing its potential risk to patients." Doc. 99 at 25. In other words, the State's asserted interests are protecting patients from off-label uses of prescription drugs (or perhaps from any form of treatment) that lack evidence of (1) efficacy and (2) safety.

Viewed broadly, the State's regulatory regime is vastly underinclusive as to comparable secular activities. The State has provided little, if any, evidence that the legislature has regulated the off-label use of hormones or any other drugs prophylactically in the way it has done here. This mirrors the level of generality considered in *Lukumi*, where the state failed to regulate many other secular activities such as pest extermination, euthanasia of stray dogs, and even fishing, all of which the Court suggested were comparable to ritual animal sacrifice for purposes of this analysis. *See* 508 U.S. at 543-44.

Even viewed more narrowly, the State's regulation of progesterone for treatments affecting pregnant women is underinclusive as to comparable secular uses of progesterone. For example, the State Defendants argue that other uses for progesterone are not comparable to abortion pill reversal because that usage is uniquely unsupported by scientific

- 34 -

literature. But that isn't quite so. Similar scientific uncertainty (even if arguably not to the same exact *degree*) remains as to some of those other uses, even according to Defendants—a point that Defendants' expert has made in relation to the use of progesterone to treat threatened miscarriages in the first trimester. *See* Doc. 99-1 at 8-9. Yet the State does not ban the use of progesterone in that context despite relying on a *New England Journal of Medicine* article to argue that it may be ineffective for this purpose. *See id.* The State similarly does not regulate patients or doctors who fail to complete the full two-pill medication abortion regimen despite relying on evidence suggesting that doing so may raise safety risks. *See* Doc. 99-1 at 19 (noting that a practice bulletin warns clinicians that "use of mifepristone without misoprostol could be associated with increased risk of hemorrhage").[3] This under-inclusivity of regulation in a closely related context further undermines the State's asserted interest in protecting patients from treatments or protocols with uncertain efficacy or safety.

At this stage, Bella Health has adequately shown that there are multiple comparable secular medical practices that Section Three does not ban. There is not typically a problem with singling out a drug or medical practice for strict regulation, even if comparable activity goes unregulated. But doing so in a way that burdens religious activity triggers strict scrutiny. *See Lukumi*, 508 U.S. at 545 (holding that improper disposal of animal carcasses was "a general problem that causes substantial

---

[3]   Not only does the State not bar the use of mifepristone without the follow-up use of misoprostol, the State argues that this is the "standard of care" for patients who regret taking the first pill. Doc. 99 at 4 ("The current standard of care for patients who do change their mind before ingesting misoprostol is to determine whether the pregnancy has continued, and if so, begin expectant management, also known as watchful waiting.").

health risks, but which [the city] addresses only when it results from religious exercise"); *Christian Athletes*, 82 F.4th at 686 (holding that "favoring comparable secular activity is sufficient" to trigger strict scrutiny under *Tandon*). Such is the case here.

### b. Section Three and the Boards' Rules Contain Mechanisms for Individualized Exemptions

Section Three is also not generally applicable because it allows individualized exemptions that would undermine the State's asserted interests, thereby triggering strict scrutiny. *See Fulton*, 141 S. Ct. at 1877 ("A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.") (internal quotation marks omitted). "Our Circuit has held that a system of individualized exemptions is one that 'give[s] rise to the application of a subjective test.'" *Axson-Flynn*, 356 F.3d at 1297 (quoting *Swanson v. Guthrie Ind. Sch. Dist. No. I-L*, 135 F.3d 694, 701 (10th Cir. 1998).

Section Three and its implementing rules contain multiple mechanisms for exceptions. At the initial stage, the uniformity of Section Three's application was dependent on the outcome of three boards' rulemaking. The fact that the law itself included this discretionary measure "undermines the [State's] contention that its [regulations] can brook no departures." *Fulton*, 141 S. Ct. at 1882. And though medication abortion reversal is now uniformly considered "unprofessional conduct" under the statute, the implementing rules promulgated by the boards still afford discretion, at least according to the State, under *Fulton*'s exception analysis. The Medical Board prohibits the usage of *progesterone* for abortion pill reversal outright, but maintains that the administration of other drugs for abortion pill reversal will be evaluated on a "case-by-case" basis. The other boards purport to retain even greater discretion, claiming

that they will evaluate all abortion pill reversal on a "case-by-case" basis. While I am not so sure that the boards retain full discretion to determine whether medication abortion reversal is unprofessional conduct given the clear language of SB 23-190 (which appears to create a *per se* ban), this remains the State's position about how it will enforce SB 23-190.

In any event, as counsel explained at the hearing, the boards have discretion throughout the disciplinary process to decide whether and how to punish a provider who engages in unprofessional conduct or the provision of treatment outside generally accepted standards of practice. This is the same type of "subjective test" addressed in *Axson-Flynn* that triggers strict scrutiny under *Fulton*. *Axson-Flynn*, 356 F.3d at 1297 (holding that a law contains individualized exemptions when it contains "systems that are designed to make case-by-case determinations"); *Fulton*, 141 S. Ct. at 1877 ("A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions."). Case-by-case determinations like those involved here invite government officials to "consider the particular reasons for a person's conduct." *Fulton*, 141 S. Ct. at 1877. Such determinations, under binding Tenth Circuit and Supreme Court precedent, are not generally applicable.

### c. The Object and Practical Effect of Section Three Is to Primarily Burden Religious Conduct

Finally, *Lukumi* provides a likely third avenue for Plaintiffs to succeed on the merits of their free-exercise claims. Under *Lukumi*, particularly when viewed in light of more recent cases like *Tandon* and *Fulton*, the central question is whether a religious practice was the "object" of the legislation. *See Lukumi*, 508 U.S. at 535-36. Such is the case where the legislature prohibits an activity knowing that the "burden" of the

law or its "effect . . . in its real operation" will fall predominantly on religious adherents. *See id.* at 535-36. Under this analysis, Plaintiffs need not show explicit animus or "targeting" of religion *qua* religion on the part of legislators to prevail.[4] It is enough to show targeting of a practice the legislature understands to be undertaken for religious reasons by those who will bear the burden of the regulation.

The object of Section Three of SB 23-190 is the interruption of a medication abortion by use of any drug, not just progesterone. Colo. Rev. Stat. § 12-30-120(2)(a). The target of the bill is plainly abortion bill reversal. And the legislature knew that the burden of this prohibition, in operation, would primarily fall on religious adherents. For example, Section One of SB 23-190 warns of the dangers of "anti-abortion centers, also known as 'crisis pregnancy centers'" that "aim 'to prevent abortions by persuading people that adoption or parenting is a better option.'" SB 23-190 § 1(1)(c) (quoting an article from the American Medical

---

[4]    Plaintiffs ask the Court to rely on *Masterpiece* and dicta in *Lukumi* to find that individual legislators expressed animus toward religion itself during the legislative debate over SB 23-190. In *Lukumi*, Justice Kennedy took notice of city council members' statements as evidence that they passed the ordinance to "target animal sacrifice by Santeria worshipers *because of* its religious motivation." *Lukumi*, 508 U.S. at 541-42 (emphasis added). But this analysis was not part of the majority opinion. *See id.* at 522-23. And in *Masterpiece*, the relevant comments came from members of an adjudicative body, not legislators—a point that the Court used to distinguish the case from *Lukumi*. 138 S. Ct. at 1730 (noting that statements made by lawmakers are "made in a very different context" from those made by an adjudicatory body and distinguishing *Lukumi* on this ground). While legislators' statements seem relevant to show that the "object" of the law here was a religious practice, I do not read these cases to require Plaintiffs to show that the law targets a religious practice *because* it is religious. Instead, it is sufficient that the legislature had knowledge that the predominant effect of the law would be to burden religious practice and that the law does indeed have that effect.

Association's Journal of Ethics that appears to note that these centers are primarily religiously-motivated). SB 23-190 further warns that "[a]nti-abortion centers are the ground-level presence of a well-coordinated anti-choice movement." *Id.* § 1(1)(d). "Crisis pregnancy centers" or "anti-abortion centers" are generally understood to be primarily run by Christians, as the members of the legislature explained. One bill sponsor stated during a legislative hearing that "anti-abortion center"—a term used in the bill—referred to "*faith-based organizations* that pose as a comprehensive reproductive healthcare clinic to intercept patients seeking abortion care." Doc. 94-10 at 3 (emphasis added). A representative also noted in a legislative hearing that "many of these crisis pregnancy centers are *religiously affiliated*." Doc. 94-13 at 14 (emphasis added). It seems clear then, both given this legislative history and the bill's text itself, that the legislature was aware that the burden of this prohibition would primarily fall on religious adherents.

The State is right that it generally has the power to "prophylactically" ban certain practices and uses of approved medicines even without evidence of prior complaints or harm without banning all other practices that might be in a similar position. But when the practice it chooses to ban is one that it knows is undertaken for religious reasons, it loses the protections of *Smith*'s "safe harbor" rule.

### d.  Section Three Is Unlikely to Survive Strict Scrutiny

Because Section Three of SB 23-190 is not neutral and generally applicable, it must satisfy strict scrutiny. *Fulton*, 141 S. Ct. at 1881. "[H]istorically, strict scrutiny requires the State to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.'" *Id.* (quoting *Lukumi*, 508 U.S. at 546). The State has not even attempted to argue that Section Three satisfies this exacting standard.

The State's interests in regulating the medical profession, generally, are too broadly formulated. *See Fulton*, 141 S. Ct. at 1879-81. Its more specific interests, in protecting the public from off-label uses of progesterone that lack evidence of efficacy and safety, are undermined by the disparate treatment of comparable secular activity, and the case-by-case possibility of individualized exceptions. *See Tandon*, 141 S. Ct. at 1296; *Fulton*, 141 S. Ct. at 1877. The State Defendants maintain that the law should be scrutinized under the rational-basis test, and so do not engage in a substantive defense of the State's compelling interests or narrow tailoring of the law. *See* Doc. 99 at 10-12. As a result, the State has not carried its burden to show that it has narrowly tailored its restrictions to an interest sufficiently compelling to justify an infringement on Plaintiffs' Free Exercise rights.

### 2. A Limited Injunction as to Plaintiffs' Advertising-Based Claims is Appropriate

Plaintiffs also argue that SB 23-190's prohibitions on advertising violate their free-speech rights. These claims invoke a number of broad, potentially thorny constitutional issues. But the Court need not resolve those issues to maintain the current status quo given the parties' apparent shared understanding on several key issues.

First, Plaintiffs suggested at the hearing that allowing them to continue using phrases including "comprehensive, life-affirming OB-GYN practice," "comprehensive, life-affirming health care," "comprehensive healthcare," "full continuum of care," and "full-service Family Medicine and OB-GYN medical center" to describe their healthcare practice would be sufficient to protect their interests pending a final determination of their claims on the merits. Defendants do not really take issue with any of this. Indeed, Defendants have argued that this language does not run afoul of Section Two of SB 23-190. *See* Doc. 111 at 45-46 (defense counsel

stating that Plaintiffs' advertisements would not deceive a patient into thinking that Plaintiffs offer abortions). Given that Defendants do not substantively resist this preliminary relief, and given the irreparable harm to Plaintiffs if their free-speech rights are violated, I will enjoin the Defendants from enforcing Section Two on the basis of Plaintiffs' use of these phrases to preserve the status quo pending trial.

Plaintiffs also want to continue advertising abortion pill reversal. This, too, seems unoffensive to Defendants. Arguing that Section One of SB 23-190 has no operative effect, Defendants stated, "If the legislature had wanted to create a statute making 'advertising for or providing . . . medication abortion reversal' unlawful under the CCPA, it would have done so." Doc. 99 at 30. Defendants made similar concessions at the hearing. *See* Doc. 111 at 52 (arguing that Section One "is not law" and suggesting that advertisement of abortion pill reversal is not *per se* unlawful under SB 23-190). Thus, it seems, Defendants' position is that simply advertising medication abortion reversal is not a violation of the CCPA. While Plaintiffs are "arguably" violating the law as stated above, this apparent common understanding among the parties warrants enjoining the State Defendants on this basis as well to protect Plaintiffs' free-speech rights which may be at risk absent court intervention. This is particularly so in the face of apparently no resistance from the State on this issue at this time.

## B.  Irreparable Harm

"When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" to obtain a preliminary injunction. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (alteration omitted) (upholding finding of irreparable harm in pre-enforcement First Amendment case). Indeed, the "loss of First

Amendment freedoms, for even minimal periods of time, *unquestionably* constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis added). This principle applies in pre-enforcement cases as well. *See Awad*, 670 F.3d at 1131; *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (upholding irreparable-harm holding in pre-enforcement First Amendment case); *Citizens United v. Gessler*, 773 F.3d 200, 218-19 (10th Cir. 2014) (same). In response, Defendants reiterate their arguments about Plaintiffs' likelihood of success disposed of above. Given that Defendants raise no other arguments, and that Defendants concede that this factor "collapses" with the first factor, Doc. 99 at 38, I find that Plaintiffs would suffer irreparable harm absent a preliminary injunction here.

## C.   Balance of Equities and the Public Interest

As to the balance of equities and the public interest, these factors "merge" when the government is the party opposing the injunction. *Nken*, 556 U.S. at 435. But where a law is likely unconstitutional, the interests of the government "do not outweigh" the plaintiff's interest in having its constitutional rights protected. *Awad*, 670 F.3d at 1131.

The State does not specifically identify its interest in avoiding a preliminary injunction for purposes of these factors. *See* Doc. 99 at 39. Instead, it refers generally to SB 23-190. As the Plaintiffs have pointed out, they and their clients believe their practice of medication abortion reversal implicates matters of life and death. *See* Doc. 94 ¶ 116 (alleging that, since SB 23-190's enactment, one of their patients who underwent abortion pill reversal gave birth to a healthy baby, with three more such patients scheduled to give birth before year's end). Meanwhile, the State has repeatedly declined to enforce the law, first for the nearly six months it took the boards to complete their rulemaking, and now again for three

weeks pending a decision on the Plaintiffs' preliminary-injunction motion. *See* Doc. 88. And the law itself provided a mechanism for undoing its own prohibitions. *See* SB 23-190 § 3(2).

Regardless of the interests that the State may have, those interests cannot outweigh the Plaintiffs' interest in protecting their First Amendment rights. *See Awad*, 670 F.3d at 1131. Defendants' cited cases, purporting to stand for the proposition that the interests of the public or the voters can trump Plaintiffs' First Amendment rights, are either unhelpful or distinguishable. *E.g.*, *Fish v. Kobach*, 840 F.3d 710, 755-56 (10th Cir. 2016) (upholding injunction in favor of party *claiming violation of constitutional right* to vote in part based on the public's interest in "broad exercise of the right to vote"); *Thompson v. Dewine*, 959 F.3d 804, 812 (6th Cir. 2020) (finding plaintiffs were not likely to succeed on the merits and that enjoining defendant state official from conducting state's elections pursuant to a statute would irreparably harm the state). To the contrary, "when a law is likely unconstitutional, the interests of those the government represents, such as voters, do not outweigh a plaintiff's interests in having its constitutional rights protected." *Citizens United*, 773 F.3d at 218 (alterations omitted).

### D.  Security Is Not Necessary to Issue a Preliminary Injunction Here

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." The parties have not briefed this issue. In the Tenth Circuit, district courts have "wide discretion" in determining "*whether* to require security." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (emphasis added). Where there is "an absence of proof showing a likelihood of

harm" to the enjoined party, failing to require a bond is permissible. *See id.*

Defendants have not suggested that enjoining them would cause any monetary damages, nor have they requested a bond. Given the current record, therefore, I find it appropriate to waive a security bond in this case. If Defendants believe a bond is necessary, however, they may file a motion promptly to address this issue.

## CONCLUSION

It is **ORDERED** that:

The district attorneys' motions to dismiss, **Docs. 58, 67, 95**, are **GRANTED**, and Plaintiffs' claims against District Attorneys McCann, Kellner, and Dougherty are **DISMISSED WITHOUT PREJUDICE**;

The attorney general's motion to dismiss, **Doc. 68**, is **DENIED**; and

The Nursing Board's motion to dismiss, **Doc. 107**, is **DENIED**.

It is **FURTHER ORDERED** that Plaintiffs' Motion for a Preliminary Injunction, **Doc. 92**, is **GRANTED** as follows:

Pending a final determination of Plaintiffs' claims on the merits, Defendants, their officers, agents, servants, employees, attorneys, and any others who are in active concert or participation with them are **PRELIMINARILY ENJOINED** from—

Taking any enforcement action under SB 23-190, its implementing regulations, or the Colorado Consumer Protection Act against Plaintiffs and all those acting in concert with them based on their provision of abortion pill reversal treatment;

Taking any enforcement action under SB 23-190 or the Colorado Consumer Protection Act against Plaintiffs and all those acting in

concert with them based on the Plaintiffs' use of the phrases "comprehensive, life-affirming OB-GYN practice," "comprehensive, life-affirming health care," "comprehensive healthcare," "full continuum of care," and "full-service Family Medicine and OB-GYN medical center" to describe their healthcare practice; and

Taking any enforcement action under SB 23-190 or the Colorado Consumer Protection Act against Plaintiffs and all those acting in concert with them based on the language of Plaintiffs' "Abortion Pill Reversal" webpage, Doc. 94-3.

DATED: October 21, 2023                    BY THE COURT:

                                           ~~Daniel D. Domenico~~
                                           United States District Judge