```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLORADO

 3               CASE NO. 1:23-CV-939-DDD-SKC

 4  _____

 5  BELLA HEALTH AND WELLNESS

 6  Et al.,

 7        Plaintiffs,

 8

 9  CHELSEA M. MYNYK,

10        Plaintiff-Intervenor,

11

12  V.

13

14  PHIL WEISER, in his official capacity as

15  Attorney General of Colorado, et al.,

16        Defendants.

17  _____

18

19               DEPOSITION OF NATHAN BLAKE

20          Date:              December 13th, 2024

21          Time:              Start Time: 9:00 a.m. MST

22                             End Time: 3:13 p.m. MST

23          Reporter by:       Nayah Graham

24          Transcribed by:    Melissa Iadimarco

25
```

Case
1:23-cv-00939-DDD-SPB

Exhibit
6



1    testimony you're about to give will be the truth, the

2    whole truth, and nothing but the truth?

3              THE WITNESS:  Yes.

4                       NATHAN BLAKE

5    was called as a witness and, after having been first

6    duly sworn, testified as follows:

7              THE REPORTER:  Thank you, so much.

8                       EXAMINATION

9    BY MS. RICKETTS:

10       Q.   Now, good morning, Mr. Blake.  You spoke last

11   time to my colleague Kelly, who has since gone in-house.

12   So your -- your stuck with us this morning.  I will

13   spare you the preliminaries, because I think you already

14   know them.  If you have any questions at any point

15   today, please just let me know.

16         Do you understand that you have been

17   designated to testify on behalf of the attorney general?

18             THE WITNESS:  Yes.

19   BY MS. RICKETTS:

20       Q.   Okay.  And how did you prepare for your

21   deposition today?

22       A.   I reviewed the relevant materials that, I

23   think, have been mostly provided in either exhibits or

24   filings or what the attorney general has turned over for

25   discovery requests.  I had conversations with my



1    the initial review that you've already alluded to --

2    alluded to and testified about earlier?

3    A.    It sits in a database, is -- is the answer.

4    Like, it doesn't -- there's no -- there's nothing that

5    happens automatically from there.

6    Q.    Fair enough.  It's a bad question.  Do some of

7    the complaints, then proceed to an investigation phase?

8    A.    Yes.

9    Q.    Do all complaints proceed to an investigation

10    phase?

11    A.    No.

12    Q.    Last time, I think you referred to a formal

13    investigation.  Do you recall that?

14    A.    I do.

15    Q.    Can you tell me what is a formal

16    investigation?

17    A.    So, that's the point where we get that front

18    office, AG level, approval to pursue something formally,

19    usually with a civil investigative demand; rather

20    than -- yeah.

21    Q.    Do you have a ballpark sense of how many

22    complaints your office receives every year?

23    A.    I think it's around 20,000.

24    Q.    And do you have a ballpark sense of how many

25    formal investigations the office opens or has live every



1    year?

2         A.    I do not.

3         Q.    You touched on this earlier, but am I right

4    that certain approvals are required to open a formal

5    investigation?

6         A.    Yes.

7         Q.    Can you tell me a bit about the factors that

8    are relevant to a decision to, I guess, both recommend

9    and ultimately approve a formal investigation?

10        A.    Yes, kind of generally speaking.  And it, kind

11   of, it can vary probably by who -- which level we're

12   talking about, along that chain that I described

13   earlier.  There can be an assessment of the harm that's

14   being done and how acute it is, maybe, kind of a public

15   safety element.  There can be an assessment of volume,

16   how many Coloradans are being effective.

17            There can be an assessment of whether the

18   conduct is ongoing.  It can be an assessment of maybe,

19   less so on the physical safety side and more so on the,

20   maybe, harm financially that could be occurring in any

21   one case, as the, maybe, the egregiousness of the

22   conduct itself, how -- how egregious it is in violation

23   of the Consumer Protection Act.

24            As, kind of, you go up the chain, I think

25   there's more concerns about resource prioritization and



1    the limited resources we have.  Which might include

2    assessments of, well, is this entity or person already

3    being investigated by a local entity or another state

4    agency or the state, you know, another state or federal

5    agency?  Is this the way that we want to prioritize our

6    limited resources?  How can we you know, coordinate with

7    other states?

8              I think that's a pretty good review of -- of

9    most of the considerations that go into how we -- how

10   and when we pursue something.

11       Q.    Is it fair to say, that decision process is

12   made on an individualized case by case basis, involving

13   the types of factors you just laid out?

14       A.    Yes.

15       Q.    And does the attorney general have discretion

16   in deciding which investigations your office pursues?

17       A.    Yes.

18       Q.    So, fast forward.  I don't want to spend too

19   much time on investigatory tools for these purposes.  We

20   fast forward maybe through the investigation.  At some

21   point is a recommendation made, about how to proceed?

22       A.    Yes.

23       Q.    And again, just at a high level, what are the

24   types of enforcement options that are available to the

25   attorney general at that stage?



1  remember using from, like, an enforcement standpoint, is

2  filing something.

3       Q.   Let me make sure have the list right, because

4  I may not, but I -- I heard, one option is file a

5  lawsuit.  Another option is to refer.  Another option is

6  potential rulemaking.  Another option is potential --

7  pursue potential legislation.  Any others?

8       A.   In my list, I used the bully pulpit.  That's

9  another one.

10      Q.   What -- what do you mean by that, in this

11  particular context?

12      A.   The attorney general has a pretty big -- gets

13  a lot of attention from the press, although not

14  necessarily as much as our com's office would like,

15  always.  And so, has the ability to draw attention to

16  matters sometimes, just by communicating through the

17  press.

18      Q.   Is closing an investigation also an option

19  that's available to the attorney general, if he decides

20  to exercise it?

21      A.   Oh, certainly.  Yes.  I guess I understood

22  your question to be, kind of, how to pursue something,

23  but yes, it's an option; often.

24      Q.   And are the types of factors that are

25  relevant, at this stage, similar to the types of factors



```
 1   explain for me a little bit, what is -- what is the

 2   attorney general's role if the medical or nursing board

 3   decides to flip that switch, from a statutory

 4   perspective.

 5        A.    Yes.  The board sends a referral to our

 6   office, the lawyers that represent the board.  And our

 7   office -- with instructions about how they would like

 8   our office to proceed, meaning as I understand it, an

 9   outcome that they expect potentially.  Or at times, I

10   think even a process that they would recommend.

11            At that stage, our office, kind of similar to

12   lawyer/client relationships in other -- our office has

13   the ability to engage with opposing counsel, develop our

14   investigation, see if we can achieve what the board has

15   instructed us to do.

16            And if we can, then we do that and if not,

17   then our office goes back to the board and describes

18   what options are then available.  Then the board makes

19   another decision about how to pursue or -- or whether to

20   file something, you know, more aggressive or they --

21   they have a few different options, is my understanding.

22        Q.    Thank you.  So -- so just to make sure I'm

23   following.  Am I right that, in the context of this

24   category of referrals, the attorney general is acting in

25   an attorney/client relationship effectively with the
```



```
 1    referring boards?

 2         A.   Yes.

 3         Q.   Yeah.  That's a helpful clarification.

 4              You alluded to this earlier, but I just want

 5    to make sure I'm following.  Does the attorney general

 6    sometimes prosecute -- related to healthcare?

 7              THE WITNESS:  I'm sorry you froze up briefly

 8    in the middle of that, for me.

 9              MS. RICKETTS:  Can you hear me now?

10              THE WITNESS:  Yes.

11    BY MS. RICKETTS:

12         Q.   Does the attorney general sometimes prosecute

13    CCPA actions related to healthcare?

14         A.   Yes.

15         Q.   I think you indicated last time that many of

16    those CCPA actions related to -- to medical billing and

17    similar issues, but I -- I don't want to put words in

18    your mouth.  Can you -- can you give me a sense of, I

19    guess, what's within the umbrella of CCPA actions

20    related to healthcare?

21              MR. GRASSYMEYER:  Object to form.

22              THE WITNESS:  Well, just -- you had to clarify

23    the medical billing.  I don't -- I don't know that I'd

24    say many.  It is an area that the attorney general's

25    talked about publicly, as being an area that -- that
```



```
 1   BY MS. RICKETTS:

 2        Q.   Yes.

 3        A.   I guess I wouldn't say it's entirely

 4   irrelevant.  It could be something that is taken into

 5   consideration, but it's not a common practice to do so.

 6        Q.   Why would the attorney general not, at least,

 7   consider the views of the Colorado legislature, in

 8   deciding his enforcement priorities?

 9             MR. GRASSYMEYER:  Object to form.

10             THE WITNESS:  Our office is devoted to

11   upholding the law, the statutes that the legislature

12   passes.  This is not that.  And so, the viewpoints of

13   individual legislatures or collection of legislators may

14   be interesting to consider as we pursue something, but

15   our office is ultimately interested in pursuing,

16   upholding and enforcing the law.

17   BY MS. RICKETTS:

18        Q.   Are you aware of any reason why the attorney

19   general could not consider the legislative findings of

20   the general assembly, about matters of statewide

21   concern?

22             MR. GRASSYMEYER:  Object to form.

23             THE WITNESS:  I am trying to think of any

24   systematic or structural restrictions on what the

25   attorney general can consider, when deciding whether to
```



Nathan Blake

Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
pg 10 of 29

CONFIDENTIAL

12/13/2024

Page 100

```
 1            THE WITNESS:  Our office does not have a
 2   position on it.
 3   BY MS. RICKETTS:
 4       Q.   Mr. Blake, are you aware of any CCPA actions
 5   or investigations about access to abortion, before
 6   SB-190 was passed?
 7       A.   I am not.
 8       Q.   Sitting here today, are you aware of any CCPA
 9   actions or investigations about access to abortions in
10   the State of Colorado?
11       A.   I am not.
12       Q.   Are you aware of any CCPA actions or
13   investigations about access to emergency contraception
14   before SB-190 was enacted or today?
15       A.   No.
16       Q.   What about referrals for abortion and
17   emergency contraception; is your answer the same?
18       A.   What do you mean by referrals?
19       Q.   Are you aware of any CCPA action or
20   investigations involving referrals for abortion?
21       A.   Oh, I see.  No, I'm not.
22       Q.   I think, last time you testified that you were
23   not aware of any CCPA actions or investigations
24   involving medication abortion reversal; is that right?
25       A.   That is correct.
```



Nathan Blake
Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
pg 11 of 29
CONFIDENTIAL
12/13/2024
Page 101

1      Q.   That's still true?

2      A.   Yes.

3      Q.   From your office's point of view, was there an

4   existing problem with access to abortion or emergency

5   contraception or medication abortion reversal when

6   SB-190 was passed?

7           MR. GRASSYMEYER:  Object to form.

8           THE WITNESS:  I don't think our office has a

9   position on the factual landscape prior to this.

10  BY MS. RICKETTS:

11     Q.   Do you think the Consumer Protection section

12  was just asleep at the wheel on the question of access

13  to abortion and emergency contraceptives in the State of

14  Colorado?

15          MR. GRASSYMEYER:  Object to form.

16          THE WITNESS:  I do not think the Consumer

17  Protection section was asleep at the wheel.

18  BY MS. RICKETTS:

19     Q.   That would be a major oversight, correct?

20     A.   For what.

21     Q.   For the Consumer Protection section to

22  overlook problems in the State of Colorado with access

23  to abortion and emergency contraception?

24     A.   If those existed.

25     Q.   Yes, if those existed?



Case No. 1:23-cv-00939-DDD-SBP     Document 177-6     filed 01/31/25     USDC Colorado
pg 12 of 29

1    guess it would need to be, like, one of those three

2    categories; not necessarily all of them.  And, you know,

3    I guess I'm not -- not sure we've taken a position on

4    whether any of those apply here.

5          It's -- but I also, you know, we did what we

6    did in the context of how this law was enacted and some

7    of the considerations that were envisioned and described

8    as being necessary for the boards to consider.

9       Q.   Does the attorney general have a position

10   about whether SB 23-190 is necessary for the immediate

11   preservation of the public peace, health or safety?

12          MR. GRASSYMEYER:  Object to form.

13          THE WITNESS:  I think you've already asked

14   that and th answer is, no, we don't have a position.

15   BY MS. RICKETTS:

16      Q.   Mr. Blake, as we look at SB 23-190, tell me if

17   you disagree, but I don't think I've located any reason

18   that the legislature offered for this law, that the

19   attorney general agrees with.

20          MR. GRASSYMEYER:  Object to form.

21   BY MS. RICKETTS:

22      Q.   Am I right about that?

23      A.   To my knowledge, we did not take a position on

24   this piece of legislation.

25      Q.   So what, if any, are the reasons that the



Nathan Blake
Case No. 1:23-cv-00939-DDD-SBP     Document 177-6     filed 01/31/25     USDC Colorado
pg 13 of 29
CONFIDENTIAL
12/13/2024
Page 115

1    attorney general thinks, supports this law?

2              MR. GRASSYMEYER:  Object to form.

3              THE WITNESS:  I just don't think it's

4    something that's in -- that -- that our office has

5    considered about whether to -- there's all sorts of

6    bills that get passed.  Some of them we take a position

7    on and others, we do not.  This is one we did not and we

8    have not brought any cases under it.  We've not started

9    any investigations under it.

10             As I indicated earlier the applicable session,

11   to our office, we believe did not add any additional

12   tools in out toolbox, that we didn't have before.  So

13   beyond that, I don't know that we have -- we've been

14   pretty consistent that we don't have a position on this,

15   from passage through today.

16   BY MS. RICKETTS:

17       Q.   Are you here on behalf of the attorney general

18   defending SB 23-190?

19             MR. GRASSYMEYER:  Object to form.

20             THE WITNESS:  I am not counsel in this case.

21   BY MS. RICKETTS:

22       Q.   But you are here representing the attorney

23   general and chief legal representative of the State of

24   Colorado, correct?

25       A.   Yes, with respect to our office's enforcement



1        Q.   Can you help me understand why the attorney

2    general has no view on these questions?

3             MR. GRASSYMEYER:   Object to form.

4             THE WITNESS:   I can.   Our office, as indicated

5    before, has had the ability to pursue these claims if we

6    wanted to, if we thought there was validity and it fit

7    into all the other categories of considerations that we

8    might take in to pursue an investigation.   Even before

9    this legislation was passed, we didn't.   Since the

10   legislation has been passed, we haven't.

11            And on our -- I've mentioned our lack of

12   resources many times, I think, over the course of these

13   two depositions.   And our priority is to protect

14   Coloradans and ensure their safety.   And our office is

15   committed to that and those have been our priorities.

16   And that's what we continue to do.   And just because

17   somebody files a lawsuit against us doesn't necessarily

18   mean we're going to change our approach to prioritizing

19   how we already were prioritizing our efforts to protect

20   Coloradans.   And so we've not changed our practices to

21   investigate this, just based on a lawsuit being filed

22   before we ever started any sort of investigation on it.

23   BY MS. RICKETTS:

24       Q.   Does your office typically form views about

25   whether an advertisement is deceptive in the course of



Nathan Blake
Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
pg 15 of 29
CONFIDENTIAL
12/13/2024
Page 128

1    litigation?

2            MR. GRASSYMEYER:  Object to form.

3            THE WITNESS:  In litigation that we initiate

4    or that is initiated against us.

5    BY MS. RICKETTS:

6        Q.    I guess that's my question, Mr. Blake.

7        A.    I guess I'm not aware of other situations

8    where our office has been a defendant in this type of

9    litigation.  So I couldn't speak for normally or not.

10   Normally we, as I've described a few times, started

11   inquiry, determined whether there's enough information

12   to go off of, that we think the CCPA might have been

13   violated.  Gather additional information through the

14   course of an investigation, and then decide whether to

15   pursue a CCPA enforcement action.

16           At that point, we certainly have gotten enough

17   information to determine whether our office has a

18   position about whether something has violated the CCPA,

19   among other things, might be deceptive or false.  And

20   then, we file a lawsuit.

21           In this case, most of those things that I just

22   mentioned have not occurred, if not all of them.  So

23   it's an unusual lay of the land.  And we're not -- we

24   haven't done an investigation here.

25       Q.    You testified a moment ago that the priority



1     of the office is and remains to protect Coloradans; is

2     that right?

3         A.   Yes.

4         Q.   And consistent with the priority of protecting

5     Coloradans, your office has chosen not to prioritize the

6     question of whether these statements are true or false;

7     is that correct?

8              MR. GRASSYMEYER:  Object to form.

9              THE WITNESS:  Yeah.  I mean, we have decided

10    to pursue the priorities of Attorney General Weiser and

11    the administration, with respect to the CCPA, as we were

12    doing before this lawsuit was filed.

13             MS. RICKETTS:  Let's take a quick look at

14    another exhibit.  I think this one is new.  Brady,

15    please jump in if you think I'm wrong about that.

16             MR. GRASSYMEYER:  Yeah.  I trust your

17    assessment.  I don't have the list right in front of me.

18             MS. RICKETTS:  That's a perilous proposition,

19    given how big the binders are.  I believe this will be

20    marked as the new Exhibit 164.

21             (Exhibit 164 marked for identification.)

22             MS. RICKETTS:  So, Mike, if you could scroll

23    down to give Mr. Blake a chance to look at this one.

24    BY MS. RICKETTS:

25        Q.   And, Mr. Blake, my first question here is just



Nathan Blake

Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
pg 17 of 29

CONFIDENTIAL

12/13/2024

Page 130

1    whether you recognize this document?

2        A.    I do.

3        Q.    And what is it?

4        A.    This is, as I understand it, an FAQ on Bella

5    Health's page about abortion pill reversal.

6        Q.    And are you aware that this FAQ page was also

7    attached to the complaint in this case?

8        A.    Yeah, that's how I became aware of it.

9        Q.    So if we could just quickly go to Page 1, I'd

10   like to direct your attention to the first full

11   paragraph beginning, "If you've initiated."

12           Can you take a look at that for me?

13       A.    I've read it.

14       Q.    Does the attorney general have any position

15   about whether the statements contained in that paragraph

16   are true?

17       A.    We do not.

18       Q.    And does the attorney general have any

19   position about whether this FAQ page, as a whole, is

20   truthful?

21       A.    We do not have a position on that.

22       Q.    Do you have any plans to form a view about

23   whether these are true statements?

24       A.    No, we don't have an investigation.  And I'm

25   not aware of any plans to begin an investigation.



Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
pg 18 of 29    CONFIDENTIAL

```
 1        Q.   Is it your testimony that my clients will not

 2   face future prosecution under the CCPA, based on this

 3   FAQ page?

 4             MR. GRASSYMEYER:  Object to form.

 5             THE WITNESS:  No, that's not my testimony.

 6   BY MS. RICKETTS:

 7        Q.   Can you give my clients any assurances at all

 8   that they will not face future prosecution under the

 9   CCPA based on this advertisement?

10             MR. GRASSYMEYER:  Object to form.

11             THE WITNESS:  I guess what I'd say is:  We

12   continue to evaluate complaints, information, et cetera

13   that comes into our office about whether the CCPA has

14   been violated.  When that happens, given all the

15   contexts that I described before about resources and

16   priorities, et cetera, we'll make decisions about

17   whether to pursue an investigation into those, into

18   those complaints potentially or the information that we

19   might receive.  It's not something we've begun or have

20   plans to begin in this case.

21        Q.   So is the only way to find out whether your

22   office thinks these statements are true is to wait for

23   the attorney general to file a lawsuit?

24             MR. GRASSYMEYER:  Object to form.

25             THE WITNESS:  It's not -- it's a shorthand
```



Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
                                pg 19 of 29
CONFIDENTIAL

1    abbreviated version of, I would say, of describing the

2    process that would occur if we were to go down the path

3    of an investigation.  Right.  There's a lot of back and

4    forth.  There's documents.  The investigation involves,

5    you know, ascertaining all the context that I've kind of

6    cited to repeatedly.  So I guess I don't -- I don't --

7    yeah.

8            I mean, it is normally the case that folks who

9    have violated the CCPA don't know that, or maybe they do

10   know that and keep on doing it, but are -- they maybe

11   don't -- just find out our office's position until kind

12   of an enforcement action or an investigation starts or

13   an enforcement action is filed or something like that.

14           I don't -- I don't really have a position on

15   when or how your client might find something out.

16   BY MS. RICKETTS:

17       Q.   Mr. Blake, as you alluded to earlier:  Sitting

18   here today, there's a federal court injunction that

19   protects plaintiff's ability to say everything that's

20   contained in this document.  The trouble, I think for us

21   and the troubling thing for me is that they have to

22   decide how to go forward, if that injunction were at

23   some point in the future to go away.

24           And so I guess my question to you, and maybe

25   you've already answered it, but I just want to make sure



```
 1    I'm following.  Is there any other way for my clients to

 2    find out whether the attorney general thinks these

 3    statements are true without subjecting themselves to the

 4    risk of tens of thousands of dollars of penalties under

 5    the CCPA?

 6              MR. GRASSYMEYER:  Object to form.

 7              THE WITNESS:  I don't -- I guess my view is

 8    that as long as folks are not engaged in deceptive

 9    conduct or unfair acts and practices, or I guess a

10    pretty long laundry list of violations and the Colorado

11    Consumer Protection Act.  You know, adhering to the law

12    is an obligation of all of us.  And then that is your

13    client's obligation, as well.

14              So if they're not engaged in deceptive

15    conduct, then they'll be okay.

16    BY MS. RICKETTS:

17        Q.    Respectfully, Mr. Blake, that's why we're

18    here, because our clients do not believe that they're

19    engaged in deceptive conduct.

20              The question I'm trying to figure out is what

21    the attorney general's position is about the speech that

22    they want to engage in.  And it sounds like what I

23    understand from your testimony today is that the

24    attorney general simply has no view?

25        A.    That is correct.
```



1      Q.   Has the attorney general's office had any

2   communication with other state attorneys general about

3   enforcement actions involving medication abortion

4   reversal?

5      A.   Not that I'm aware of.

6      Q.   Was the attorney general's office made aware

7   of a joint letter with other state attorneys general

8   about pregnancy centers?

9           MR. GRASSYMEYER:  Object to form.

10          THE WITNESS:  Not that I'm aware of.

11   BY MS. RICKETTS:

12      Q.   You're not aware of any communications between

13   your office and the California Attorney General's office

14   about that letter?

15      A.   I'm -- I'm not.  Yeah, I'm not aware of that.

16          MS. RICKETTS:  Go to Topic 7, please.  If we

17   could scroll down.  If you could take a look at that one

18   for me, please?

19          THE WITNESS:  Yes.

20   BY MS. RICKETTS:

21      Q.   Mr. Blake, have you been designated as to

22   Topic 7?

23      A.   Yes, I have been.

24      Q.   And what did you do to prepare to testify

25   about Topic 7?



Nathan Blake
Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
pg 22 of 29
CONFIDENTIAL
12/13/2024
Page 170

1      A.    Talked with our -- a person in our office who
2  does searches or is able to do searches in our database
3  of investigations.  To request that she execute an
4  extensive search, not just in category but description,
5  through that database to -- with each of these words or
6  all these words.
7           And then with respect to L in particular,
8  evaluated some past cases that I've kind of referenced,
9  I think, and maybe both testimonies, like, opioids, but
10 there have been a few others, just to remember what
11 cases those were.
12     Q.   And what was the name of the -- the person who
13 assisted with those searches?
14     A.   That's a great question.  Kelli, let me see.
15 Kelli Elmblade.  E-L-M -- Kelli E-L-M-B-L-A-D-E.
16     Q.   And when you refer to searches, are those
17 searches of the complaint database that we discussed
18 earlier?
19     A.   No.  It's a little different, because this is
20 a request, as I understood it, about investigations.
21 And so, once, kind of, our informal inquiry gets
22 approved by the front office to turn into an
23 investigation.  Everything goes into something called
24 pro law, which is kind of a clunky case management
25 system that we use as -- to track our investigations.



Nathan Blake

Case No. 1:23-cv-00939-DDD-SBP     Document 177-6     filed 01/31/25     USDC Colorado
pg 23 of 29

CONFIDENTIAL

12/13/2024
Page 171

```
 1   So, to my knowledge, all matters are in there, all

 2   investigative matters in -- under the CCPA.

 3       Q.   So, am I right in thinking that once a formal

 4   investigation is approved in your office, it then gets

 5   logged in the case management system in some way?

 6       A.   Yes.

 7       Q.   Okay.  I will try to move as efficiently as we

 8   can through this list.  No. 7A, has the attorney general

 9   ever taken any enforcement action under the CCPA

10   concerning the provision, advertising or recommendation

11   of progesterone?

12       A.   No.

13       Q.   Has the attorney general ever opened a formal

14   CCPA investigation concerning the provision, advertising

15   or recommendation of progesterone?

16       A.   No.

17       Q.   Has the attorney general ever taken any

18   enforcement action under the CCPA concerning the

19   provision, advertising or recommendation of

20   mifepristone?

21       A.   No.

22       Q.   Has the AG ever opened a formal CCPA

23   investigation concerning the provision, advertising or

24   recommendation of mifepristone?

25       A.   No.
```



1        Q.    Has the attorney general ever taken any

2   enforcement action under the CCPA concerning the

3   provision, advertising or recommendation of medication

4   abortion?

5        A.    No.

6        Q.    Has the attorney general ever opened a formal

7   CCPA investigation concerning provision, advertising or

8   recommendation of medication abortion?

9        A.    No.

10       Q.    To your knowledge has the attorney general

11  taken any enforcement action or opened a formal

12  investigation concerning abortion, generally?

13       A.    No, not to my knowledge.

14       Q.    Has the attorney general ever taken any

15  enforcement action, under the CCPA, concerning the

16  provision, advertising or recommendation of medication

17  abortion reversal?

18       A.    No.

19       Q.    Has the attorney general ever opened a formal

20  CCPA investigation concerning the provision, advertising

21  or recommendation of medication abortion reversal?

22       A.    No.

23       Q.    Has the attorney general ever taken any

24  enforcement action, under the CCPA, concerning the

25  provision, advertising or recommendation of expectant



Nathan Blake
Case No. 1:23-cv-00939-DDD-SBP     Document 177-6     filed 01/31/25     USDC Colorado
pg 25 of 29
CONFIDENTIAL
12/13/2024
Page 173

 1    management?

 2         A.    No.

 3         Q.    Has the attorney general ever opened a formal

 4    CCPA investigation concerning the provision, advertising

 5    or recommendation of expectant management?

 6         A.    No.

 7         Q.    Has the attorney general ever taken any

 8    enforcement action, under the CCPA, concerning the

 9    provision, advertising or recommendation of induced

10    vomiting?

11         A.    No.

12         Q.    Has the attorney general ever taken a formal

13    CCPA -- strike that.  Has the attorney general ever

14    opened a formal CCPA investigation concerning the

15    provision, advertising or recommendation of induced

16    vomiting?

17         A.    No.

18         Q.    Has the attorney general ever taken any

19    enforcement action, under the CCPA, concerning the

20    provision, advertising or recommendation of hormones to

21    treat gender dysphoria, facilitate gender transition or

22    provide gender affirming care?

23         A.    No.

24         Q.    As the attorney general ever opened a formal

25    CCPA investigation concerning the provision, advertising



Nathan Blake
Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
CONFIDENTIAL
pg 26 of 29
12/13/2024
Page 174

```
 1   or recommendation of hormones to treat gender dysphoria,

 2   facilitate gender transition or provide gender affirming

 3   care?

 4        A.   No.

 5        Q.   Has the attorney general ever taken any

 6   enforcement action, under the CCPA, concerning the

 7   provision, advertising or recommendation of

 8   testosterone?

 9        A.   No.

10        Q.   Has the attorney general ever opened a formal

11   CCPA investigation concerning the provision, advertising

12   or recommendation of testosterone?

13        A.   No.

14        Q.   And are your answers the same for estrogen, as

15   for testosterone?

16        A.   Yes.

17        Q.   Are your answers the same for estradiol, as

18   for testosterone?

19        A.   Yes.

20        Q.   Are your answers the same for hCG, as for

21   testosterone?

22             MR. GRASSYMEYER:  Object to form.

23             THE WITNESS:  Yes.

24   BY MS. RICKETTS:

25        Q.   So, has the attorney general ever taken any
```

Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
pg 27 of 29

CONFIDENTIAL

1    enforcement action or opened any formal investigation,

2    under the CCPA, for any of the hormones listed in Topic

3    7?

4         A.    The hormones meaning G through -- A, B, G

5    through K.

6         Q.    Correct.

7         A.    Not to my knowledge.

8         Q.    I going to skip over L for just a minute and

9    come back.  M, has the attorney general ever taken any

10   enforcement action, under the CCPA, concerning the

11   provision, advertising or recommendation of placebo

12   treatments?

13        A.    No.

14        Q.    As the attorney general ever opened a formal

15   CCPA investigation concerning the provision, advertising

16   or recommendation of placebo treatments?

17        A.    No.

18        Q.    Has the attorney general taken any enforcement

19   action, under the CCPA, concerning off label

20   prescription of drugs?

21        A.    Yes.

22        Q.    Can you tell me about that?

23        A.    Yes.  I think I described this either last

24   time or maybe earlier today, but our investigations into

25   opioids manufacturers, distributors and some publicity

Nathan Blake
Case No. 1:23-cv-00939-DDD-SBP    Document 177-6    filed 01/31/25    USDC Colorado
pg 28 of 29
CONFIDENTIAL
12/13/2024
Page 176

1   agencies involve off label prescription of drugs.

2   Ultimately, all of those were -- were settled.  And so,

3   I'm not sure that it, like, made it into, like, a

4   consent judgment necessarily on them, but that was -- it

5   was the type of thing that was included in -- in what we

6   were looking at, with respect to those companies.

7           Previously, and this is going back a ways, but

8   we've had -- what we found was, I think, five previous

9   cases that were not related to opioids, from 2014 to

10  2021, that involved off label prescription of drugs.

11  That we -- I think, all of them involved kind of a

12  multi-state action.  Where we joined with other states

13  to conduct an investigation and then ultimately, I think

14  all of those are settlements; the entity consent

15  judgments.

16      Q.   Do you recall what medications were at issue,

17  in the five cases you mentioned?

18      A.   I do not.  I could cite the cases, but I don't

19  have -- I don't remember.  And so, I kind of -- I know

20  the manufacturer, but I don't remember the drug that's

21  at issue.

22           MR. GRASSYMEYER:  And Becky, not to interrupt.

23  We have a list of the off labeled drugs that are search

24  identified, and we're happy to provide that to you in --

25  with the rest of the deposition materials.



Nathan Blake

Case No. 1:23-cv-00939-DDD-SBP     Document 177-6     filed 01/31/25     USDC Colorado
pg 29 of 29

CONFIDENTIAL

12/13/2024
Page 180

```
1              MR. GRASSYMEYER:  Object to form.

2              THE WITNESS:  I don't know if an affirmative

3    decision has been made along those lines.  It is the

4    case that we have not formed a position on it.  Our

5    office has not formed a position on it.

6    BY MS. RICKETTS:

7        Q.   Does the attorney general have any plans to

8    form an opinion about the safety and effectiveness of

9    medication abortion reversal in this case?

10             MR. GRASSYMEYER:  Object to form.  And Mr.

11   Blake, to the extent that the answer requires you to

12   divulge conversations that the attorney general may have

13   about the legal strategy and the arguments that the

14   lawyers will make in this case, I'll instruct you not to

15   answer.  You can answer if you know, generally.

16             THE WITNESS:  I'm not aware of any plans to

17   take a position on medication abortion reversal?

18   BY MS. RICKETTS:

19       Q.   Are you aware of any plans to take a position

20   on the safety or effectiveness of medication abortion

21   reversal in the future?

22             MR. GRASSYMEYER:  Object to form.

23             THE WITNESS:  I am not.

24             MS. RICKETTS:  No further questions.

25             MR. GRASSYMEYER:  And no question for me.
```

