# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

BELLA HEALTH AND WELLNESS et al.,

    *Plaintiffs*,

CHELSEA M. MYNYK,

    *Plaintiff-Intervenor*,

    v.

PHIL WEISER, in his official capacity as Attorney General of Colorado, et al.,

    *Defendants*.

Case No. 1:23-cv-939-DDD-SBP

# PLAINTIFFS' MOTION
# FOR SUMMARY JUDGMENT

Mark L. Rienzi
Rebekah P. Ricketts
Laura W. Slavis
Michael J. O'Brien
Colten L. Stanberry
Amanda L. Salz
Amy Ren
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
mrienzi@becketfund.org

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION .................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................. 2

LEGAL STANDARD ............................................................................... 32

ARGUMENT ........................................................................................... 33

I. Plaintiffs have shown actual success on the merits of
Counts I-VII of the Amended Complaint. ........................................ 33

  A. Colorado's ban on abortion pill reversal violates the
Free Exercise Clause (Counts I-III). ........................................ 33

    1. The ban is not generally applicable because it treats
religious activity less favorably than comparable secular
activity (Count I) ............................................................... 34

    2. The ban is not generally applicable because it contains
mechanisms for individualized exemptions (Count II) ......... 39

    3. The ban is not neutral (Count III). ..................................... 41

  B. SB 23-190 violates the Free Speech Clause by discriminating
based on content and viewpoint (Count IV) ............................. 44

  C. SB 23-190 violates the First Amendment right to receive
information (Count V) .............................................................. 47

  D. SB 23-190 violates the Fourteenth Amendment right of
pregnant women not to be forced to undergo or continue
an abortion (Counts VI-VII) .................................................... 49

  E. SB 23-190 is void for vagueness (Count VIII) ......................... 50

  F. The government cannot carry its burden under
strict scrutiny. ....................................................................... 52

II. Plaintiffs easily satisfy the remaining injunctive-relief factors ...... 53

CONCLUSION ........................................................................................................ 55

CERTIFICATE OF SERVICE ............................................................................... 56

CERTIFICATE OF COMPLIANCE ....................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ................................................................. 43

*Animal Legal Def. Fund v. Kelly,*
    9 F.4th 1219 (10th Cir. 2021) ................................................. 45

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012) .............................................. 54

*Axson-Flynn v. Johnson,*
    356 F.3d 1277 (10th Cir. 2004) .......................................... 34, 39, 41, 52

*Black Emergency Response Team v. Drummond,*
    737 F. Supp. 3d 1136 (W.D. Okla. 2024) ............................... 51

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ................................................................. 53

*Burwell v. Hobby Lobby Stores,*
    573 U.S. 682 (2014) ................................................................. 33

*Chiles v. Salazar,*
    116 F.4th 1178 (10th Cir. 2024) ............................................. 43

*Church of Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) .......................................................... 41, 42, 43, 53

*Citizens United v. Gessler,*
    773 F.3d 200 (10th Cir. 2014) ................................................ 54

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ................................................................. 52

*Colo. Christian Univ. v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) .............................................. 43

*Cruzan v. Director,*
    497 U.S. 261 (1990) ........................................................... 49, 50

*Dobbs v. Jackson Women's Health Org.,*
   597 U.S. 215 (2022) ......................................................................... 48, 49

*Doe v. City of Albuquerque,*
   667 F.3d 1111 (10th Cir. 2012) ............................................................ 47

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
   100 F.4th 1251 (10th Cir. 2024) ..................................................... 34, 43

*Eisenstadt v. Baird,*
   405 U.S. 438 (1972) ............................................................................ 49

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................................ 54

*Fellowship of Christian Athletes v. San Jose Unified*
   *Sch. Dist. Bd. of Educ.,*
   82 F.4th 664 (9th Cir. 2023) ....................................................*passim*

*First Nat'l Bank of Bos. v. Bellotti,*
   435 U.S. 765 (1978) ............................................................................ 47

*Fulton v. City of Philadelphia,*
   593 U.S. 522 (2021) ........................................................ 34, 39, 40, 41, 52

*Hobby Lobby Stores v. Sebelius,*
   723 F.3d 1114 (10th Cir. 2013) ............................................................ 53

*Hynes v. Mayor and Council of Oradell,*
   425 U.S. 610 (1976) ...................................................................... 50, 52

*Jordan v. Pugh,*
   425 F.3d 820 (10th Cir. 2005) ...................................................... 50, 51, 52

*Kennedy v. Bremerton Sch. Dist.,*
   597 U.S. 507 (2022) ............................................................................ 43

*Kleinsmith v. Shurtleff,*
   571 F.3d 1033 (10th Cir. 2009) ............................................................ 51

*Masterpiece Cakeshop v. Colo. C.R. Comm'n,*
   584 U.S. 617 (2018) ...................................................................... 41, 43

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ....................................................................................... 46, 53

*Nat'l Fed'n of Blind v. Pryor,*
    258 F.3d 851 (8th Cir. 2001) ................................................................................ 52

*NIFLA v. Becerra,*
    585 U.S. 755 (2018) ....................................................................................... 44, 47

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................. 54

*Pahls v. Thomas,*
    718 F.3d 1210 (10th Cir. 2013) ............................................................................ 44

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992) ............................................................................................. 48

*Prairie Band Potawatomi Nation v. Wagnon,*
    476 F.3d 818 (10th Cir. 2007) ............................................................................. 32

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) .................................................................................. 44, 45, 48

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) .................................................................................. 44, 46, 48

*SEC v. GenAudio Inc.,*
    32 F.4th 902 (10th Cir. 2022) .............................................................................. 31

*SFFA v. President & Fellows of Harvard Coll.,*
    600 U.S. 181 (2023) ............................................................................................. 53

*Sorrell v. IMS Health,*
    564 U.S. 552 (2011) ............................................................................................. 47

*Stanley v. Georgia,*
    394 U.S. 557 (1969) ............................................................................................. 47

*Tandon v. Newsom,*
    593 U.S. 61 (2021) ......................................................................................... 34, 37

*TikTok Inc. v. Garland,*
    No. 24-656, 2025 WL 222571 (U.S. Jan. 17, 2025) ............................................. 44

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*,
455 U.S. 489 (1982) ......................................................................... 50-51

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ............................................................................. 45

*Whalen v. Roe*,
429 U.S. 589 (1977) ............................................................................. 49

**Statutes**

Colo. Rev. Stat. §6-1-103 ................................................................ 21, 31, 32

Colo. Rev. Stat. §6-1-105 .................................................................... 21, 46

Colo. Rev. Stat. §6-1-112 ................................................................ 21, 31, 32

Colo. Rev. Stat. §6-1-734 ......................................................................... 22

Colo. Rev. Stat. §12-20-403 ..................................................................... 18

Colo. Rev. Stat. §12-20-404 ..................................................................... 18

Colo. Rev. Stat. §12-30-120 ................................................................... 9, 23

Colo. Rev. Stat. §12-240-125 .................................................................... 19

Colo. Rev. Stat. §12-255-119 .................................................................... 19

Colo. Rev. Stat. §25-6-403 .............................................................. 18, 49, 50

Colo. Rev. Stat. §25-6-404 .................................................................. 18, 50

S.B. 23-190, 74th Gen. Assemb., Reg. Sess. (Colo. 2023) ...................................*passim*

**Other Authorities**

Amy G. Bryant, *Why Crisis Pregnancy Centers Are
Legal but Unethical*, AMA J. Ethics (Mar. 2018) .................................. 42

*The Cass Review*, Independent Review of Gender Identity
Services for Children and Young People (Apr. 2024) ............................ 38

Code of Canon Law of the Catholic Church ................................................. 4

Colorado Department of Regulatory Agencies – Stakeholder Meeting
(Aug. 5, 2023) ................................................................................ 27, 28

Colorado Department of Regulatory Agencies – Stakeholder Meeting
(June 5, 2023) ...................................................................................... 25

Colorado House Judiciary Committee Hearing (Mar. 28, 2023)................................. 24

Colorado House Session (Mar. 30, 2023)..................................................... 25

Colorado Senate Judiciary Committee Hearing (Mar. 15, 2023).................. 23, 24, 25

Colorado Senate Session (Mar. 21, 2023)..................................................... 24

U.S. Const. amend. XIV ...................................................... 49

Written Stakeholder Comments, Colorado Department
of Regulatory Agencies ...................................................................... 26, 27

**INTRODUCTION**

This Court enjoined Senate Bill 23-190 and its implementing rules back in October 2023, correctly holding that they do "not survive strict scrutiny triggered by the violation" of "'three bedrock requirements of the Free Exercise Clause.'" Dkt.113 at 32 (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (*FCA*)). In the 15 months since then, this case has only gotten easier as Colorado's claims about abortion pill reversal have collapsed under the weight of discovery.

It is now undisputed that progesterone—the naturally occurring hormone that is necessary to achieve and maintain pregnancy—is safe. It is similarly undisputed that progesterone is used for a wide variety of indications in obstetrics and gynecology—including treatment of recurrent miscarriages, prevention of preterm birth, and during in vitro fertilization (IVF) and frozen embryo transfer (FET) treatments. All of these and more are perfectly legal in the state of Colorado—and everywhere else.

Defendants' expert now says it is "possible" that progesterone could counteract the effects of mifepristone—just that the evidence is "not good enough" to say that it "does work" or "it doesn't." But she also denigrates the evidence supporting other off-label uses of progesterone that Colorado has not bothered to regulate, much less ban, as this Court already found. Dkt.113 at 34-35. Neither the Boards nor the Attorney General have ever taken disciplinary action against a licensee based on the use of progesterone. The Attorney General now refuses to take any position on whether abortion

pill reversal works or is safe. And the Boards have claimed discretion to make case-by-case determinations about whether they really want to enforce the ban.

What all of this confirms is that SB 23-190 and its implementing rules are unlawful. They violate the Free Exercise Clause by forcing Plaintiffs to choose between exercising their sincerely held religious beliefs and facing the loss of their licenses. They violate the Free Speech Clause by censoring speech about progesterone, censoring how pro-life providers describe themselves and their services, and preventing women from even learning about their options. And they violate the Fourteenth Amendment rights of Bella's abortion pill reversal patients—who have now given birth to at least 11 babies since this case was filed—to make their own medical choices.

Because the undisputed facts show that Plaintiffs are entitled to summary judgment, the Court should grant this motion, declare that SB 23-190 and its implementing regulations are unconstitutional, and make its preliminary injunction permanent.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### *Bella Health and Wellness.*

1.  Plaintiff Bella Health and Wellness ("Bella") is a nonprofit, faith-based medical clinic that offers life-affirming, dignified health care to women, men, and children from all backgrounds and faiths. Dkt.94, First Am. Verified Compl. ("Am.Compl.") ¶¶30, 41.

2.  Plaintiffs Denise ("Dede") Chism, MSN, PNNP, and Abby Sinnett, MS, WHNP, are mother-daughter nurse practitioners who founded Bella in 2014, following a medical mission in the Andes Mountains of Peru. Am.Compl. ¶42. On that trip, Dede and Abby became convinced that everyone has a story, every life should be protected, and every person deserves to know they are made good. *Id*. They ultimately discerned the Holy Spirit's call to open a Catholic medical clinic for women in the Denver metropolitan area. *Id*.

3.  Dede is co-founder and chief executive officer of Bella. Am.Compl. ¶31. She has worked as a nurse practitioner specializing in high-risk pregnancies for over 28 years. Am.Compl. ¶31. Abby is co-founder and chief operating officer of Bella. Am.Compl. ¶32. She has worked as a women's health nurse practitioner for over 12 years, and she worked as a labor and delivery nurse for seven years before that. Am.Compl. ¶32. Plaintiff Kathleen Sander, MD, OB-GYN, is a Board-certified obstetrician and gynecologist at Bella, where she has worked since 2018. Am.Compl. ¶33. All three named Plaintiffs have provided abortion pill reversal at Bella. Am. Compl. ¶¶ 31-33.

4.  Bella and its providers offer obstetrics-gynecology care as well as family medicine, pediatrics, and functional medicine. Am.Compl. ¶41. Today, Bella has 24 providers and more than 28,000 registered patients, many of whom are financially vulnerable. Sinnett Decl. ¶2. Bella's primary campus is located in Englewood, Colorado. Am.Compl. ¶45.

5.  Bella is organized as an association of the Christian faithful under Code of
Canon Law of the Catholic Church c.299 §1. Am.Compl. ¶47. It is included in the
federal group tax exemption of the Roman Catholic Church and operates with the
blessing of Archbishop Samuel Aquila of the Archdiocese of Denver. Am.Compl. ¶¶49,
51.

6.  Bella's Articles of Incorporation list several stated purposes, including to pro-
vide "spiritual, emotional, educational, charitable, and financial support of human
dignity" in accordance with Catholic teachings, "to promote and protect life from nat-
ural conception to natural death," and "to deliver, and support the delivery of, chari-
table health services consistent with the teachings of the Catholic Church."
Am.Compl. ¶50.

7.  Bella's core mission is to make people whole—body, mind, and soul—by prac-
ticing medicine that honors the innate dignity of every person. Am.Compl. ¶52. Bella
and its providers believe they are entrusted to continue the healing ministry of Jesus
Christ. *Id*.

8.  All providers employed by Bella sign a Provider Ethical Agreement, which af-
firms their agreement "not [to] provide or refer for abortion, sterilization, [or] contra-
ception." Am.Compl. ¶54; Ex.1.

9.  Bella patients sign a Practice Agreement, which states that Bella's "commit-
ment to you" is "to provide comprehensive, life-affirming health care with dignity and
compassion" and "to offer[ ] you medical solutions that respect your dignity, preserve

your integrity, and work in cooperation with your body." Am.Compl. ¶55; Ex.2. As the Agreement explains, Bella "do[es] not offer contraception, sterilizations, or abortions." Ex.2 at 1.

10. Bella's website describes it as a "comprehensive, life-affirming OB-GYN practice." Am.Compl. ¶123; Ex.3 at 2. It also describes Bella as offering a "full continuum of care and comprehensive health care at every stage of life." Ex.4 at 4; *see also id.* ("We are a life-affirming, full-service Family Medicine and OB-GYN medical center."); Ex.5 at 1 ("We are proud to be one of Denver's leading multi-specialty clinic[s] offering full OB-GYN care").

11. Bella does not provide or advertise abortion, emergency contraception, or referrals for abortion or emergency contraception. Sinnett Decl. ¶7. Bella's website and social media generally do not include express disclaimers that it does not provide services related to abortion or contraception. Am.Compl. ¶124. Bella refrains from providing these disclaimers because it wishes to create an open, welcoming environment to all women seeking care, including any women who have previously had an abortion or used contraception. *Id.*

### *Progesterone*

12. Progesterone is a naturally occurring hormone that, as the name indicates, promotes gestation. Ex.6 ("Wubbenhorst Report") 4.

13. Progesterone is necessary to achieve and maintain pregnancy. *Id.*; Ex.7 ("Cohen Tr.") 41:2-10.

14.   Among other things, progesterone is necessary to transform the endometrial lining of the uterus into a thickened state that is receptive to implantation of the developing embryo (blastocyst). Ex.8 ("Keenan Report") 6-7; Wubbenhorst Report 5; Cohen Tr.40:15-22.

15.   Progesterone also stimulates endometrial glands to produce nutrients that support the developing embryo, facilitates maternal immunological tolerance to the implanted embryo, and plays a role in suppressing uterine contractility prior to delivery. Keenan Report 6-7; Wubbenhorst Report 5; Cohen Tr.40:15-22.

16.   Progesterone performs its diverse biological functions by binding to progesterone receptors located within cells throughout the body. Keenan Report 7; Wubbenhorst Report 5; Cohen Tr.41:11-24.

17.   Bioidentical progesterone has the same chemical structure as naturally produced progesterone and has been used to support female fertility in a variety of ways for more than 50 years. Wubbenhorst Report 5; Keenan Report 7.

18.   Progesterone is prescribed for numerous indications in obstetrics and gynecology, including treatment of recurrent miscarriage, prevention of preterm birth, treatment of absent menstrual periods (secondary amenorrhea), treatment of excessive blood loss during menstruation, treatment of premenstrual syndrome, and prevention of irregular thickening of the endometrium (endometrial hyperplasia) during menopause. Wubbenhorst Report 5-6; Keenan Report 7-8, 9; Cohen Tr.44:23-45:23, 48:1-49:8.

19.    Progesterone is routinely used to treat luteal phase deficiency (LPD), also known as luteal phase defect, a condition characterized by inadequate endometrial maturation during the luteal phase. Keenan Report 8; Wubbenhorst Report 5-6; Cohen Tr.49:12-18.

20.    Progesterone is routinely used during assisted reproductive technology (ART) cycles, including during in vitro fertilization (IVF) and frozen embryo transfer (FET) treatments, where it is used to support endometrial function and help prevent miscarriage. Keenan Report 8-9; Wubbenhorst Report 5-6; Cohen Tr.49:19-21.

21.    Researchers have estimated that providers use progesterone in 5-12% of all pregnancies. Ex.9 at 972.

22.    Progesterone is a safe medication. Ex.10 ("Cohen Report 1-C") at 1; Dkt.99-1 at 17; Keenan Report 11; Wubbenhorst Report 9-10.

23.    The FDA historically classified the drugs pregnant women might take into five risk categories (A, B, C, D, or X) to indicate the potential of a drug to cause adverse effects during pregnancy. Am.Compl. ¶69.

24.    Progesterone is classified as Category B—the same category as Tylenol, which is available over the counter and is the most commonly used pain reliever during pregnancy. Wubbenhorst Report 10.

25.    Providers may prescribe or use prescription drugs both for uses suggested on the FDA-approved labeling, *i.e.*, "on-label uses," and for uses that do not appear on the FDA-approved labeling, *i.e.*, "off-label uses." Am.Compl. ¶71.

26. The FDA has long stated that "[o]nce a [drug] product has been approved for marketing, a physician may prescribe it for uses or in treatment regimens or patient populations that are not included in approved labeling." Ex.11 at 5.

27. Obstetricians frequently prescribe drugs for off-label uses during pregnancy. Wubbenhorst Report 6.

28. All uses of progesterone except two—treatment of endometrial hyperplasia and secondary amenorrhea—are considered "off-label" uses. *Id.*

29. Progesterone has many off-label uses that meet generally accepted standards of medical practice. Dkt.99-1 at 17.

30. The Progesterone in Spontaneous Miscarriage (PRISM) study examined the use of progesterone to treat recurrent miscarriage. Ex.12; Wubbenhorst Report 7; Keenan Report 10. It concluded that "[p]rogesterone therapy in the first trimester of pregnancy did not result in a significantly higher rate of live births among women with threatened miscarriage overall. However, an increase in live births was observed in the subgroup of women with early pregnancy bleeding and a history of previous miscarriages." Ex.12 at xxiv; *see* Ex.13.

31. In November 2021, the United Kingdom's National Institute of Health and Care Excellence (NICE) published new guidelines based on a research review (including the PRISM study) that recommended progesterone therapy for women with early pregnancy bleeding and at least one previous miscarriage. Ex.14; Wubbenhorst Report 9; Keenan Report 10.

32. NICE stated that "there was no evidence of harms for women or babies" from the use of progesterone, including "no increase in risk of stillbirth, ectopic pregnancy, congenital abnormalities or adverse drug reactions." Ex.14 at 16; Wubbenhorst Report 9-10; Keenan Report 10.

***Mifepristone***

33. The "abortion pill" commonly refers to the use of prescribed drugs to terminate pregnancy. Wubbenhorst Report 10. This procedure is also known as "medication abortion." *Id*.; *see* Colo. Rev. Stat. §12-30-120(1)(b).

34. The current abortion-pill regimen consists of two drugs: mifepristone and misoprostol. Wubbenhorst Report 10. Under the FDA-approved protocol, a woman takes mifepristone orally, followed up to 48 hours later by misoprostol. Ex.15; Wubbenhorst Report 16.

35. Mifepristone is a progesterone antagonist. Wubbenhorst Report 11. In the abortion-pill regimen, mifepristone works by binding to the progesterone receptors in cells in the uterus and throughout the body. *Id*.; Cohen Tr.65:13-22.

36. By blocking the progesterone receptors, mifepristone causes the uterine lining to deteriorate, blocking oxygen and nutrition to the developing embryo and rendering the uterus vulnerable to contractions. Wubbenhorst Report 11; Cohen Tr.65:13-22.

37. Mifepristone alone is not always effective in ending a pregnancy. Wubbenhorst Report 11-24; Dkt.99-1 at 4-5.

38. Misoprostol, the second drug in the abortion-pill regimen, is included in the protocol to improve its overall efficacy rate. Wubbenhorst Report 11-12; Cohen Tr.91:10-14.

39. Misoprostol works by binding to smooth muscle cells in the uterine lining, thereby causing contractions that mechanically expel the embryo from a woman's uterus. Wubbenhorst Report 11-12; Cohen Tr.91:5-9.

40. In 2023, a scoping review (DeBeasi) was published to analyze studies documenting the continuing pregnancy rate after ingestion of mifepristone alone. Ex.16 at 3.

41. The scoping review concluded that the continuing pregnancy rate after ingesting mifepristone alone is ≥ 25% for gestational ages ≥ 49 days. Ex.16 at 1, 8.

42. The scoping review stated that "the continuing pregnancy rate for each of the 12 studies that verified embryo survival never exceeded 25 percent," except for one. Ex.16 at 4.

43. Dr. Mitchell Creinin estimated that only 25% of women receiving mifepristone and placebo would have continuing pregnancies. Ex.17.

44. Mifepristone's binding to the receptor is neither complete nor permanent. Cohen Tr.69:13-22; 70:1-12.

45. When mifepristone releases from the receptor, it is possible for progesterone to attach to the receptor. Cohen Tr.168:6-13.

46. Mifepristone has a high first-pass metabolism. Cohen Tr.67:1-17.

47. Mifepristone is metabolized into metabolites. Cohen Tr.67:15-16.

48. Mifepristone's metabolites bind to the receptor less strongly than progesterone does. Cohen Tr.167:14-168:5.

49. There is no known way to have an ongoing pregnancy without progesterone binding to the receptor. Cohen Tr.44:15-18.

50. In every pregnancy that continues after ingestion of mifepristone, the progesterone must be attaching to the receptors. Cohen Tr.200:16-20; 201:3-6.

***Abortion Pill Reversal***

51. Some women change their minds about terminating their pregnancies after taking mifepristone but before taking misoprostol. Am.Compl. ¶90; Wubbenhorst Report 14.

52. Some women take mifepristone under duress or because they were tricked or forced to do so. Am.Compl. ¶91; Sinnett Decl. ¶4.

53. When a woman has taken mifepristone and then wants to continue her pregnancy, some providers prescribe supplemental progesterone in an attempt to counteract the effects of the mifepristone. Wubbenhorst Report 14.

54. Using progesterone to counteract the effects of mifepristone in these circumstances is commonly known as "abortion pill reversal." *Id*.

55. The use of progesterone to counteract the effects of mifepristone is off-label. Wubbenhorst Report 15. It is a basic principle of biochemistry that the activity of a

receptor antagonist can be inhibited by increasing the concentration of the receptor agonist. Wubbenhorst Report 15-16.

56. Abortion pill reversal is modeled on these basic principles of biochemistry. *Id*.

57. Several studies have investigated the use of progesterone to counteract the effects of mifepristone. Wubbenhorst Report 17-22.

58. In 1989, researchers designed a study (Yamabe) to investigate "the role of progesterone in the maintenance of pregnancy," using groups of pregnant rats. Ex.18 at 2; Wubbenhorst Report 17. After four days, only 33.3% of the rats receiving mifepristone alone remained pregnant, but 100% of the rats who were given progesterone and mifepristone together remained pregnant. Ex.18; Wubbenhorst Report 17.

59. In 2023, researchers conducted another animal study (Camilleri & Sammut) to evaluate the "non-simultaneous, subsequent administration" of progesterone following mifepristone in a population of pregnant rats. Ex.19 at 8; Wubbenhorst Report 17. No rats who received mifepristone alone at first-trimester human gestational age equivalent remained pregnant, while 81.3% of rats who received mifepristone followed by progesterone at the same stage remained pregnant. Ex.19; Wubbenhorst Report 17.

60. In 2012, Dr. George Delgado and Dr. Mary Davenport published a small case series that followed seven women who had taken mifepristone and then received pro-

gesterone after seeking medical assistance to continue their pregnancies. Ex.20; Wubbenhorst Report 18. Four of the six women (66%) who completed the study carried their pregnancies to term and delivered healthy live infants. *Id.*

61. In 2017, a similar small case series (Garratt & Turner) was published in the *European Journal of Contraceptive and Reproductive Health Care.* Ex.21; Wubbenhorst Report 18. In that study, two out of three women (66%) who received progesterone after taking mifepristone carried their pregnancies to term and delivered healthy live infants. *Id.*

62. In 2018, Dr. George Delgado and his co-authors published a larger case series that followed 754 pregnant women who had taken mifepristone but not misoprostol and were interested in continuing their pregnancies. Ex.22; Wubbenhorst Report 18-19. The study analyzed the charts of 547 women who met inclusion criteria and received progesterone therapy within 72 hours after taking mifepristone. Ex.22 at 25-26. The study reported an overall fetal survival rate of 48% (257 live births, plus four viable pregnancies lost after 20 weeks gestation). *Id.* at 26. It also reported fetal survival rates of 64% for the subgroup of women who received progesterone intramuscularly and 68% for the subgroup of women who received a high dose of oral progesterone followed by daily oral progesterone until the end of the first trimester. *Id.*

63. The use of progesterone to counteract the effects of mifepristone is biologically plausible. Ex.23 ("Cohen Report 1-D") at 1; Cohen Report 1-C at 1; Cohen Tr.192:10-16.

64. Dr. Harvey Kliman, the director of the reproductive and placental research unit at the Yale School of Medicine, told the *New York Times* that using progesterone to reverse the effects of mifepristone "makes biological sense" and is "actually totally feasible." Ex.24 at 7. Dr. Kliman, who is "in favor of abortion rights" and does not "advocat[e] widespread use of the treatment," stated that "if one of his daughters came to him and said she had somehow accidentally taken mifepristone during pregnancy … he would tell her to take 200 milligrams of progesterone three times a day for several days, just long enough for the mifepristone to leave her system: 'I bet you it would work.'" Ex.24 at 1; Cohen Report 1-C at 1.

65. A 2020 joint practice bulletin published by the American College of Obstetricians and Gynecologists (ACOG) warns that "[p]atients who select depot medroxyprogesterone acetate (DMPA)"—a synthetic progesterone-like compound—"for contraception should be counseled that administration of DMPA on day 1 of the medication abortion regimen *may increase the risk of ongoing pregnancy*." Ex.25 at 15 (emphasis added); Wubbenhorst Report 20-21.

66. Dr. Mitchell Creinin started a study to estimate the efficacy and safety of mifepristone antagonization with high-dose oral progesterone. Ex.17; Cohen Tr.129:22-130:3; Wubbenhorst Report 22.

67. Dr. Creinin planned to enroll 40 pregnant women in two groups. Ex.17 at 158. Participants in one group ingested mifepristone followed by progesterone. *Id.* Participants in the other group ingested mifepristone followed by a placebo. *Id.* The study was halted after 12 women were enrolled, and only 10 women completed it. *Id.*

68. The placebo arm of the Creinin study is essentially expectant management. Cohen Tr.130:13-16.

69. Four of the five women in the progesterone group of the Creinin study had continuing pregnancies with gestational cardiac activity approximately 2 weeks (15 ± 1 days) after ingestion of mifepristone. Ex.17. Two of the five women in the placebo group had continuing pregnancies with gestational cardiac activity approximately 2 weeks (15 ± 1 days) after ingestion of mifepristone. *Id.*

70. Three women in the Creinin study had severe bleeding. Ex.17. Two of the three women who had severe bleeding were in the placebo group. *Id.* Those women required suction aspiration procedures to control bleeding, and one of them required a blood transfusion. *Id.*; Cohen Tr.134:13-20. One of the three women in the study who had severe bleeding was in the progesterone group. Ex.17. No intervention was needed for that woman. *Id.*

71. The safety concern identified in the Creinin study would occur anytime a pregnant woman takes mifepristone without misoprostol. Cohen Tr.135:7-11.

72. When a woman has taken mifepristone and then wants to continue her pregnancy, some providers offer expectant management. Dkt.99-1 at 7.

73. Defendants claim that expectant management is the standard of care. Dkt.99-1 at 17; Dkt.99 at 4.

74. Expectant management includes not taking misoprostol. Dkt.99-1 at 7.

75. The safety concern identified in the Creinin study would occur in the case of expectant management. Cohen Tr.135:7-20.

***Bella's experience with abortion pill reversal.***

76. Bella and its providers regularly prescribe progesterone to pregnant women, including those with a history of prior miscarriage, a history of preterm labor or delivery, first-trimester bleeding, or infertility. Am.Compl. ¶¶106-07.

77. Bella and its providers have a religious obligation to treat all women at risk of miscarriage, whether that risk arises biologically, due to physical trauma, or because the woman willingly or unwillingly ingested mifepristone. Am.Compl. ¶108.

78. As a matter of conscience, Bella and its providers cannot refuse to help a woman who desires to continue her pregnancy simply because she first took mifepristone. Am.Compl. ¶109.

79. Bella and its providers have a religious obligation to offer abortion pill reversal as long as they have the means and ability to do so. Am.Compl. ¶109.

80. Bella has treated dozens of abortion pill reversal patients who successfully maintained their pregnancies. Am.Compl. ¶114; Sinnett Decl. ¶5.

81. Bella describes and promotes the availability of abortion pill reversal on its website, social media accounts, and in brochures and posters describing Bella's services. Am.Compl. ¶¶125-31; Ex.26; Ex.27.

82. Bella's website contains the following FAQ: "I took the abortion pill, but I've changed my mind. Is there anything you can do to help?" The answer explains:

> If you've initiated a chemical abortion by taking the first abortion pill (mifepristone, also known as Mifeprex or RU-486), we may be able to save the life of your child. If we act quickly, there is a possibility we can save your baby through a safe, painless therapy known as Abortion Pill Reversal (APR). We've helped dozens of women just like you. No judgment. No questions. Just excellent medical care and complete support. We are here for you.

Ex.26 at 1; Am.Compl. ¶126.

83. Bella and its providers share an inherently close relationship with their patients. Am.Compl. ¶118.

84. Bella's patients have a strong interest in keeping their personal reproductive health care decisions private. Am.Compl. ¶119.

85. Bella's prospective abortion pill reversal patients face an obstacle in asserting their own rights. Am.Compl. ¶120. Once those patients identify themselves, they are in a race against time to access abortion pill reversal before the unwanted abortion takes place. *Id.*

*Reproductive Health Equity Act*

86. The Reproductive Health Equity Act (RHEA), which was signed into law on April 4, 2022, declares that "[a] pregnant individual has a fundamental right to continue a pregnancy and give birth or to have an abortion and to make decisions about how to exercise that right." Colo. Rev. Stat. §25-6-403(2); Ex.28.

87. RHEA makes it unlawful for a "public entity" to "[d]eny, restrict, interfere with, or discriminate against an individual's fundamental right … to continue a pregnancy and give birth or to have an abortion in the regulation or provision of benefits, facilities, services, or information," or to "[d]eprive" an individual of the "right to act or refrain from acting during the individual's own pregnancy based on the potential, actual, or perceived impact on the pregnancy, the pregnancy's outcomes, or on the pregnant individual's health." Colo. Rev. Stat. §25-6-404.

88. The Attorney General has publicly affirmed his "commitment to steadfastly defend the Colorado Reproductive Health Equity Act." Ex.29.

*Colorado Medical and Nursing Licensing Regimes*

89. As "regulator[s]" of their respective professions, the Colorado Medical Board and State Board of Nursing "may investigate, hold hearings, and gather evidence in all matters related to the exercise and performance of [their] powers and duties." Colo. Rev. Stat. §12-20-403(1).

90. Each Board may discipline licensees who engage in "conduct that constitutes grounds for discipline or unprofessional conduct." *Id.* §12-20-404(1). The Colorado

Medical Board has authority to impose disciplinary action, including a suspension or revocation of license to practice medicine and a fine of up to $5,000 per violation. *Id.* §12-240-125(5)(c)(III). The State Board of Nursing also has authority to impose disciplinary action, including a suspension or revocation of license to practice nursing and a fine between $250 and $1,000 per violation. *Id.* §12-255-119(4)(c)(III).

91. If a Medical Board investigation "discloses facts that warrant further proceedings by formal complaint," the complaint "shall be referred" to the Attorney General, who then "shall prosecute those charges." *Id.* §12-240-125(4)(c)(V), (5)(d). If a Board of Nursing investigation discloses "facts … that warrant further proceedings by formal complaint," the Board "should … refer[]" the matter to the Attorney General, who then "shall prosecute" the complaint. *Id.* §12-255-119(3)(c)(V), (4)(d).

92. The Boards retain discretion about whether and how to investigate and punish any provider for unprofessional conduct or violating generally accepted standards of practice. Ex.30 ("Delp 11/14 Tr.") at 36:3-14, 43:7-20; Ex.31 ("Shackelford Tr.") at 34:4-12, 47:18-48:24; Ex.32 ("Hills Tr.") at 76:9-22, 79:18-21, 124:24-125:6.

93. The Boards review and decide disciplinary cases on a case-by-case basis. Delp 11/14 Tr. 36:5-6, 13-14, 40:15-16, 40:25-41:1, 43:16-20; Hills Tr. 76:9-16, 79:18-21; Shackelford Tr. 34:9-12, 48:18-24.

94. Prior to the enactment of Senate Bill 23-190, the Boards had never received any complaint about medication abortion reversal. Ex.33 at 14-15.

95. Neither the Boards nor the Attorney General have taken disciplinary action against a Medical Board or State Board of Nursing licensee based on the use of progesterone. Ex.34 at 7-8; Ex.35 at 5-6; Ex.36 at 4; Ex.37 at 2-3.

96. The Boards have never found that a Colorado Medical Board or State Board of Nursing licensee engaged in unprofessional conduct or was subject to discipline based on the use of progesterone. Ex.34 at 8-9.

97. There is no prohibition in the state of Colorado against the use of progesterone to treat threatened miscarriage, to prevent preterm birth, to treat premenstrual syndrome, for luteal phase support (including during IVF or frozen-embryo transfer), for luteal phase defect, or for hormonal therapy after menopause, or for "gender affirming care." Ex.38 at 12-14.

98. In 2023, Colorado became the first state in the country to explicitly include gender-affirming care services in its benchmark health insurance plan for essential health benefits. Ex.39 at 1; Ex.40 at 5; Delp 11/14 Tr.85:18-86:5, 78. The benchmark plan lays out services that insurance companies must cover for individual plans and small group plans. Ex.39 at 1; Ex.40 at 5; Delp 11/14 Tr.85:18-86:5, 78:15-79:6.

99. The University of Colorado School of Medicine provides gender-affirming hormone therapy and gender-affirming surgery. Ex.41.

100.    Neither the Boards nor the Attorney General have taken disciplinary action against a Medical Board or State Board of Nursing licensee based on the use of hormones for gender-affirming care. Ex.34 at 10-11; Ex.36 at 6; *see also* Ex.35 at 9-10; Ex.37 at 6.

101.    Neither the Boards nor the Attorney General have taken disciplinary action against a Medical Board or State Board of Nursing licensee based on the provision of expectant management, the provision of abortion, or the use of a placebo. Ex.34 at 5-7, 9-10; Ex.36 at 3-5; *see also* Ex.35 at 7-8; Ex.37 at 4-5.

### Colorado Consumer Protection Act

102.    The Colorado Consumer Protection Act (CCPA) makes it a "deceptive trade practice" to "knowingly or recklessly make[] a false representation as to the characteristics, … uses, [or] benefits … of goods, … [or] services," Colo. Rev. Stat. §6-1-105(1)(e), or to "knowingly or recklessly engage[] in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice," *id.* §6-1-105(1)(rrr).

103.    The Attorney General is "concurrently responsible" for CCPA enforcement, *id.* §6-1-103, and can seek a civil penalty of up to $20,000 per violation, *id.* §6-1-112(1)(a).

104.    The Attorney General has discretion to decide whether and how to pursue a particular action under the CCPA. Dkt.51 at 71:1-5, 77:5-14.

***Senate Bill 23-190.***

105.    On April 14, 2023, Governor Jared Polis signed into law Senate Bill 23-190, which took effect immediately. Ex.42.

106.    Section 1 of SB 23-190 declares that "anti-abortion centers" are the "ground-level presence of a well-coordinated anti-choice movement" and engage in "deceptive advertising tactics to target and acquire clients." §1(1)(a), (d)-(e). It specifically accuses "[a]nti-abortion centers" of "go[ing] so far as to advertise medication abortion reversal, a dangerous and deceptive practice that is not supported by science or clinical standards." §1(1)(f).

107.    Section 1's final subsection "declare[s]" that Sections 6-1-105(1)(e) and (1)(rrr)—two of the CCPA's prohibitions on deceptive trade practices—"appl[y] to … advertising for or providing or offering to provide or make available medication abortion reversal." §1(3).

108.    Section 2 of SB 23-190 targets speech by those who do not provide or refer for abortion or emergency contraceptives. It adds a new provision to the CCPA stating that it is a "deceptive trade practice" to "make[ ] or disseminate[ ] to the public … any advertisement that indicates that the person provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives, when the person knows or reasonably should have known … that the person does not provide those specific services." §2(2); Colo. Rev. Stat. §6-1-734(2).

109.    Section 3 of SB 23-190 bans abortion pill reversal treatment, making it "un-professional conduct" for a licensee to "provide[ ], prescribe[ ], administer[ ], or at-tempt[ ] medication abortion reversal in this state." §3(2); Colo. Rev. Stat. §12-30-120.

110.    The statute provided a single mechanism to undo its prohibition on abortion pill reversal. Under Section 3, abortion pill reversal is "unprofessional conduct"—un-less the Colorado Medical Board, the State Board of Nursing, and the State Board of Pharmacy, "in consultation with each other," adopt "rules finding that it is a generally accepted standard of practice to engage in medication abortion reversal" by October 1, 2023. §3(2)(a)-(b).

### Legislative Record

111.    Senator Janice Marchman, one of the SB 23-190's sponsors, explained that the bill's reference to "anti-abortion centers" referred to "faith-based organizations" that offer alternatives to abortion, which she described as "fake clinics." Colorado Senate Judiciary Committee Hearing at 5:44:34 PM (Mar. 15, 2023), https://bit.ly/40VkaRq; Ex.43 at 3:1-6.

112.    Senator Marchman claimed that these religious organizations "trade on the goodwill of legitimate medicine to defraud patients" by "us[ing] disinformation, in-timidation, shame, and delay tactics to withhold essential and time-sensitive repro-ductive healthcare" and by "lur[ing] people in and steer[ing] them away from abor-tion." Colorado Senate Judiciary Committee Hearing at 5:44:23 PM

(https://bit.ly/40Vx6XF), 5:45:21 PM (https://bit.ly/3CHpIFP), 5:47:56 PM (https://bit.ly/4157sQp) (Mar. 15, 2023); Ex.43 at 2:22-24, 3:14-15, 5:8-9.

113.    Senator Marchman also stated that these organizations were "the only ones that can prescribe abortion pill reversal." Colorado Senate Session at 7:13:13 PM (Mar. 21, 2023), ; Ex.44 at 2:21-22, 5:15, https://bit.ly/4hC54Wt; Ex.44 at 2:21-22, 5:1521, 2023), https://bit.ly/4hC54Wt; Ex.44 at 2:21-22, 5:15.

114.    Senator Faith Winter, the bill's other Senate sponsor, accused anti-abortion centers of "taking advantage of vulnerable populations" by "purposely target[ing] young people, low-income communities, rural communities, and communities of color." Colorado Senate Judiciary Committee Hearing at 5:54:47 PM (Mar. 15, 2023), https://bit.ly/4jGe1A4; Ex.43 at 10:6-11. 15, 2023), https://bit.ly/4jGe1A4; Ex.43 at 10:6-11.

115.    Senator Marchman explained that SB 23-190 would "prohibit" advertising for abortion pill reversal and "define it as a deceptive trade practice." Colorado Senate Judiciary Committee Hearing at 5:45:03 PM (Mar. 15, 2023), https://bit.ly/3EhApzq; Ex.43 at 3:8-9.

116.    Legislators also identified the terms "comprehensive" and "full range" of services (or similar terms) as deceptive advertising when used by a pro-life provider. Colorado Senate Session at 5:35:15 PM (https://bit.ly/42ymZZS), 5:44:37 PM (https://bit.ly/42zfvG1) (Mar. 21, 2023); Ex.44 at 3:4, 9:5; Colorado House Judiciary

Committee Hearing at 4:28:15 PM (Mar. 28, 2023), ; Ex.45 28, 2023), https://bit.ly/3Csdile; Ex.45 at 3:16-22.

117.    For example, Senator Marchman described "anti-abortion center[s]" as "faith-based organizations that *pose as a comprehensive reproductive healthcare clinic*." Colorado Senate Judiciary Committee Hearing at 5:44:35 PM (Mar. 15, 2023), ; Ex.43 15, 2023), https://bit.ly/4gfzPzy; Ex.43 at 3:1-5.

118.    Senator Winter claimed that "many anti[-]abortion centers are purposefully misleading about offering unbiased, medically-based, comprehensive healthcare. … [A]nti-abortion clinics should not act as though they offer a *full range of reproductive healthcare*." Colorado Senate Judiciary Committee Hearing at 5:53:15 PM (https://bit.ly/4jz9qiV), 5:55:09 PM (https://bit.ly/4hDcXes) (Mar. 15, 2023); Ex.43 at 9:4-6, 10:12-14 (emphasis added).

119.    Representative Karen McCormick, one of the bill's House sponsors, stated that "[c]omprehensive reproductive care includes the following: Access to contraception, emergency contraception, … [and] abortion or referral for abortion." Colorado House Session at 11:22:32 AM (Mar. 30, 2023), https://bit.ly/4aDWrbC; Ex.46 at 4:1-6.

***SB 23-190 Rulemaking***

120.    On June 5, 2023, the Colorado Medical Board, Board of Nursing, and Board of Pharmacy held a joint stakeholder meeting about SB 23-190's implementation.

Colorado Department of Regulatory Agencies – Stakeholder Meeting (June 5, 2023),
https://bit.ly/3Erpmnc; Ex.47.

121.    No member of the Medical Board or State Board of Nursing had experience
with OB-GYN at the time of the SB 23-190 rulemaking. Delp 11/14 Tr.42:3-16; Hills
Tr.37:2-4.

122.    Before the June 5, 2023 stakeholder meeting, Plaintiffs submitted a public
comment describing the scientific evidence about abortion pill reversal, and also ex-
plaining "why the claims about abortion pill reversal in SB 23-190 are unsupported
by credible medical data." Ex.48 at 2.

123.    On July 14, 2023, the Medical Board issued a proposed rule implementing
SB 23-190. Dkt.73; Ex.49. The proposed rule did not find that abortion pill reversal
is unprofessional conduct. It instead stated that "[t]he Board will not treat medication
abortion reversal as a *per se* act of unprofessional conduct. Rather, the Board will
investigate all complaints related to medication abortion reversal in the same man-
ner that it investigates other alleged deviations from generally accepted standards of
medical practice." Ex.49 at 12; *see also* Ex.50 at 3.

124.    Three bill sponsors of SB 23-190—along with more than a dozen other state
senators and representatives—submitted a comment "express[ing] our dismay and
disappointment in the proposed draft 'rules' to SB190." Written Stakeholder Com-
ments at 1239, Colorado Department of Regulatory Agencies, https://perma.cc/53ZP-
HBKF. The legislators emphasized their "frustrat[ion]" that the draft rule "would

have the opposite effect" of their intent in passing SB 23-190, which was to "stop" abortion pill reversal. *Id.*

125.    Plaintiffs submitted a second rulemaking comment urging the Boards to conclude, consistent with credible medical data, that abortion pill reversal is a generally accepted standard of practice. Ex.51. Numerous other Colorado doctors submitted comments asking the Boards to reach that same conclusion. Written Stakeholder Comments at 1020-21, 1045-50, https://perma.cc/53ZP-HBKF.

126.    At the second joint stakeholder meeting on August 5, 2023, two of the bill sponsors of SB 23-190 showed up to testify against the draft rules. Ex.52 at 13:7-14:16, 22:4-23:5.

127.    Representative McCormick stated that because abortion pill reversal is "particularly harmful" the "General Assembly has called it out as unprofessional conduct for you in law." Colorado Department of Regulatory Agencies – Stakeholder Meeting at 15:59 (Aug. 5, 2023), https://bit.ly/4gl9YGc; Ex.52 at 13:16-19. She asked the Boards to "reconsider your draft rules and carefully reread the instructions" in the statute. Colorado Department of Regulatory Agencies – Stakeholder Meeting at 17:14 (Aug. 5, 2023), https://bit.ly/3WH7evT; Ex.52 at 14:12-13.

128.    Senator Winter similarly stated that "I just wan[t] [to] make it incredibly clear what the legislative intent was because I don't think these draft rules meet legislative intent." Colorado Department of Regulatory Agencies – Stakeholder Meet-

ing at 27:53 (Aug. 5, 2023), https://bit.ly/40XM4fP; Ex.52 at 22:7-10. She further insisted that the draft rule "is not what we wanted. That's not legislative intent. That's actually the reverse of the legislative intent." Colorado Department of Regulatory Agencies – Stakeholder Meeting at 29:13 (Aug. 5, 2023), https://bit.ly/3EvSc5S; Ex. 52 at 22:22-23:2.

129.    At its final rulemaking hearing on August 17, 2023, the Medical Board reversed course. Dkt.78. It now announced that "the Board does not consider administering, dispensing, distributing, or delivering progesterone with the intent to interfere with, reverse, or halt a medication abortion undertaken through the use of mifepristone and/or misoprostol to meet generally accepted standards of medical practice." Ex.53 at 6. But "[f]or other conduct that could meet the definition of medication abortion reversal, the Board will investigate such deviation on a case-by-case basis." *Id*.

130.    On September 20, 2023, the Nursing Board convened its own final rulemaking hearing. Unlike the Medical Board, the Nursing Board adopted (with a minor modification) its draft rule. The Nursing Board rule states that "[t]he Board will not treat medication abortion reversal … as a *per se* act subjecting a licensee to discipline." Ex.54 at 2. Instead, the Board will investigate complaints about medication abortion reversal "on a case-by-case basis," "in the same manner that it investigates other alleged deviations from generally accepted standards of nursing practice." Ex.54 at 1-2.

## *Procedural History*

131.    On April 14, 2023, hours after SB 23-190 was signed into law, Plaintiffs filed this lawsuit and moved for a temporary restraining order and preliminary injunction. Dkts.1, 7. This Court entered a temporary restraining order that night. Dkt.8.

132.    After a hearing, the Court initially declined to enter a preliminary injunction given Defendants' sworn assurances that they would "not enforce [SB 23-190] against any licensee" until after the Boards conduct the rulemaking process contemplated by the statute. Dkt.48 at 3.

133.    On September 22, 2023—two days after the rulemaking concluded—Plaintiffs filed an amended verified complaint and renewed their preliminary injunction motion. Dkts.92, 94.

134.    This Court issued a preliminary injunction on October 21, 2023. Dkt.113.

## *Patient Outcomes*

135.    Since SB 23-190's enactment, dozens of women have sought or received abortion pill reversal treatment at Bella. Sinnett Decl. ¶3.

136.    Between the filing of this lawsuit in April 2023 and the close of discovery on December 13, 2024, those women have given birth to at least 11 babies. Sinnett Decl. ¶5.

137.    Multiple patients who received abortion pill reversal treatment at Bella are maintaining healthy pregnancies and are expected to give birth later this year. Sinnett Decl. ¶6.

138.    Plaintiffs' expert Dr. Monique Wubbenhorst, M.D., M.P.H., analyzed outcomes for Bella's abortion pill reversal patients. Ex.55 ("Wubbenhorst 12/6 Supplement") at 1.

139.    Dr. Wubbenhorst opined that it is reasonable to evaluate the success of a particular abortion pill reversal treatment by whether the patient remains pregnant approximately two weeks after mifepristone exposure. Wubbenhorst 12/6 Supplement 3 & n.10 ("this is the approach adopted by Dr. Creinin"). She stated that for patients who continued progesterone treatment and whose pregnancy status was known at the end of two weeks, 26 of 33 pregnancies (78.79%) were continuing, compared to 7 out of 33 pregnancies (21.21%) that ended in loss. *Id.* at 3.

140.    Dr. Wubbenhorst also analyzed the number of live births among Bella's abortion pill reversal patients. *Id.* She stated that a total of 24 pregnancies resulted in 16 live births (18 babies) and 8 miscarriages, yielding a live birth rate of 66.67%. *Id.*

141.    Defendants' expert Dr. Rebecca Cohen, M.D., also opined on the outcomes of Bella's abortion pill reversal patients. Ex.56 ("Cohen 10/10 Supplement"). Dr. Cohen declined to analyze the number of continuing pregnancies approximately two

weeks after mifepristone exposure, stating that this is a "surrogate endpoint." *Id.* at 1.

142.    Dr. Cohen did analyze the number of live births among Bella's abortion pill reversal patients. Cohen 10/10 Supplement. She stated that the "rate of livebirth" was 50.0%, and that it could be as high as 63.6% if all ongoing pregnancies continued to live birth or as low as 36.3% if all ongoing pregnancies ended in loss. *Id.* at 3. Dr. Cohen did not provide an update to her analysis at the close of discovery.

143.    Defendants' expert Ms. Patricia Cullen, Ph.D., did not opine on the outcomes of Bella's abortion pill reversal patients. Dkt.99-2; Ex.57. Ms. Cullen testified that she does not consider herself an expert on obstetrics and gynecology or on progesterone, mifepristone, or medication abortion reversal. Ex.58 ("Cullen Tr.") at 227:12-228:2.

### *Harm to Plaintiffs*

144.    Under SB 23-190, it is now unprofessional conduct to provide abortion pill reversal in Colorado. §3(2).

145.    SB 23-190 bans abortion pill reversal in Colorado. *Id.*; Dkt.99 at 14.

146.    Under SB 23-190, providers who offer abortion pill reversal are subject to discipline and risk losing their licenses. Am.Compl. ¶¶7, 21.

147.    Absent relief, SB 23-190 forces Plaintiffs to choose between exercising their sincerely held religious beliefs by providing abortion pill reversal and facing the loss

of their licenses, the loss of their malpractice insurance, and severe financial penalties. Am.Compl. ¶¶21, 214.

148.    Absent relief, SB 23-190 subjects Bella to financial penalties up to $20,000 per violation if it continues to publicize abortion pill reversal. Am.Compl. ¶¶215-19; Colo. Rev. Stat. §§6-1-103, 6-1-112(1)(a).

149.    Absent relief, SB 23-190 subjects Bella to financial penalties up to $20,000 per violation if it continues to describe itself as a "comprehensive" or "full service" OB-GYN practice. Am.Compl. ¶221; Colo. Rev. Stat. §§6-1-103, 6-1-112(1)(a).

150.    Absent relief, SB 23-190 will prevent Bella's current and prospective patients from receiving abortion pill reversal or information about that treatment from providers in Colorado. Am.Compl. ¶222.

151.    Absent relief, women in Colorado may miss the critical window needed to effectuate their choice to continue their pregnancies, and Bella will miss the opportunity to help them. Am.Compl. ¶222.

## LEGAL STANDARD

"Summary judgment must be granted if 'there is no genuine dispute as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *SEC v. GenAudio Inc.*, 32 F.4th 902, 920 (10th Cir. 2022). "To defeat a motion for summary judgment, [the nonmovant's] evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id*. (alteration in original).

A party is entitled to a permanent injunction at the summary-judgment stage when it proves, as a matter of law, "(1) actual success on the merits; (2) irreparable

harm unless the injunction is issued; (3) the threatened injury outweighs the harm
that the injunction may cause the opposing party; and (4) the injunction, if issued,
will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wag-
non*, 476 F.3d 818, 822 (10th Cir. 2007). Aside from requiring a showing of actual
success on the merits, the standard for a permanent injunction is identical to the
standard for a preliminary injunction. *Id.*

## ARGUMENT

### I. Plaintiffs have shown actual success on the merits of Counts I-VII of the Amended Complaint.

#### A. Colorado's ban on abortion pill reversal violates the Free Exercise Clause (Counts I-III).

In its preliminary injunction order, this Court concluded that Plaintiffs "demon-
strated a likelihood of success on the merits of their free-exercise claims against Sec-
tion Three of SB 23-190." Dkt.113 at 31; *see also* Dkt.147. What was then predicted
has now been proven.

There is "no question" whether SB 23-190 burdens Plaintiffs' religious practices
and beliefs: "It does." Dkt.113 at 32. Bella and its providers are "religiously com-
pelled" to offer APR as part of their mission to "continue the healing ministry of Jesus
Christ." Am.Compl. ¶¶6, 52, 109; *see* Am.Compl. ¶227 ("As a matter of conscience,
[Plaintiffs] cannot refuse to administer progesterone to a woman who desires to con-
tinue her pregnancy simply because she first took mifepristone."). SB 23-190 bans
this religious exercise outright. Plaintiffs are thus forced to choose between exercising
their sincerely held religious beliefs and facing the loss of their licenses, the loss of

their malpractice insurance, and severe financial consequences. Am.Compl. ¶21. "If these consequences do not amount to a substantial burden, it is hard to see what would." *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 691 (2014).

SB 23-190 is therefore subject to strict scrutiny unless it is both "neutral" and "generally applicable." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004). Colorado's ban on abortion pill reversal fails this requirement in three distinct ways: It treats religious activity less favorably than comparable secular activity, it contains mechanisms for individualized exemptions, and its primary object and effect is to burden religious conduct in a way that is not neutral. It therefore violates all "three bedrock requirements of the Free Exercise Clause." *FCA*, 82 F.4th at 686.

### 1. The ban is not generally applicable because it treats religious activity less favorably than comparable secular activity (Count I).

First, Section 23-190 is not generally applicable because it "treats comparable secular activity more favorably" than Plaintiffs' "religious activity." Dkt.113 at 32 (citing *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). This rule is strict: A law is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. The comparability of "two activities" is "judged against" the "government interest that justifies the regulation at issue." *Id.* Once a plaintiff shows that any comparable secular conduct is treated more favorably, strict scrutiny is triggered.

*Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1277-78 (10th Cir. 2024) ("lower bar" for secular over religious exemptions triggers strict scrutiny by making a "value judgment in favor of secular motivations").

Colorado has asserted interests in prohibiting the off-label use of drugs based on the "lack of scientific evidence" about their "potential risks" and "efficacy." Dkt.99 at 25. These claims about safety and effectiveness have now collapsed under the weight of discovery.

First, there is no evidence that abortion pill reversal is dangerous. The Boards' own expert, Dr. Rebecca Cohen, admitted as much, opining that "progesterone itself is safe." Cohen Report 1-C at 1; *see also* Cohen Tr.124:12-125:2 ("my concern was not that [abortion pill reversal] is dangerous"); Dkt.99-1 at 17 ("low-risk medication").[1] That concession makes perfect sense given the essential role of progesterone during pregnancy, *id.* 41:2-10, and the decades-long history of safely using progesterone for numerous indications in obstetrics and gynecology, *id.* 44:25-49:24—including treatment of recurrent miscarriages, prevention of preterm birth, luteal phase support during IVF or frozen-embryo transfer, treatment of premenstrual syndrome, and hormone therapy after menopause, Wubbenhorst Report 4-10. Plaintiffs' expert Dr. Jeffrey Keenan, a 40-year OB-GYN and reproductive endocrinologist, put it this way: "I

---

[1]    Although Defendants jointly disclosed Dr. Cohen as an expert on three separate occasions, Ex.59, Ex.60, Ex.61—and cited her testimony throughout joint briefing, Dkt.99 at 2-7, 12-14, 19, 25—toward the end of discovery, the Attorney General attempted to disclaim reliance on Dr. Cohen, Ex.62. Even after 18 months of litigation, the Attorney General now refuses to opine whether abortion pill reversal is safe or effective.

have treated many thousands of patients, perhaps in excess of ten thousand patients, with natural progesterone therapy in my practice. I can say with no doubt at all that natural progesterone poses no risk of harm to a woman or her pregnancy and poses no risk of miscarriage, birth defect, or any other significant problem." Keenan Report 11. Tellingly, Colorado has not regulated any of these uses of progesterone.

The only safety concerns Colorado can muster relate not to the use of progesterone but to the use of *mifepristone*, particularly in the *absence of misoprostol*. Cohen Tr.135:7-20 ("Any time someone takes mifepristone and does not take misoprostol, that risk [of bleeding] is present."); *id.* at 133:24-134:12. And those concerns apply equally to "[e]xpectant [m]anagement," which Dr. Cohen says is the relevant standard of care, Dkt.99-1 at 17, and in which patients also refrain from taking mifepristone, Cohen Tr.125:3-12, 126:5-9, 127:23-128:6. Yet Colorado has taken no action to discipline providers who offer expectant management or regulate patients who fail to complete the medication abortion regimen. Ex.34 at 6-7. That is fatal to Defendants' safety argument, because *Tandon*'s comparability analysis "is concerned with the risks various activities pose," not the "reasons why" people engage in them. 593 U.S. at 62. Because the only alleged safety risk applies equally to Defendants' *own* proposed standard of care—and because Colorado has taken no action to regulate that treatment—there is no safety justification for SB 23-190.

Defendants' alternative claim is that SB 23-190 is justified because abortion pill reversal is not effective. Dkt.99 at 25 (claiming no "scientific evidence" that abortion

pill reversal "can achieve its intended benefit"). That argument was tenuous at the outset of this case—and discovery has now conclusively rebutted it, exposing Colorado's regulatory regime as vastly underinclusive.

For example: Dr. Cohen repeatedly denigrates the evidence that supports other uses of progesterone. *See* Dkt.113 at 35 (noting "[s]imilar scientific uncertainty" as to "some of those other uses"). According to Dr. Cohen, the use of progesterone to treat threatened miscarriage is a "theory" that "reli[es] on low-quality case series." Dkt.99-1 at 8; *see also* Cohen Report 1-C at 2; Cohen Report 1-D at 1. She also derides the use of progesterone to treat premenstrual syndrome as "clinically ineffective," Cohen Report 1-C at 1, and says using progesterone for luteal-phase support "has not shown to be beneficial in all methods of assisted reproduction," Cohen Report 1-D at 1.

Yet Colorado has taken no steps to regulate—much less ban—these (or any other) uses of progesterone. Ex.38 at 11-14. Neither the Boards nor the Attorney General have ever taken action against a licensee based on the use of progesterone. Ex.35 at 2-3; Ex.34 at 7-9; Ex.37 at 2-3. Nor have they enacted any rule barring the off-label use of drugs—or requiring such uses to be supported by "strong" evidence.

Colorado not only fails to ban other off-label uses of progesterone—it *actively promotes* the off-label use of progesterone in so-called "gender affirming care." There is no prohibition in Colorado on the use of progesterone for gender-affirming care, and

Defendants have never taken action against a licensee on that basis. Ex.38 at 12.[2] In fact, Colorado openly encourages this use, boasting that it "is the first state in the country to explicitly include gender-affirming care services in its [insurance] plan." Ex.39 at 6; *see* Ex.40 (listing progesterone in Division of Insurance gender-affirming care coverage guide). The University of Colorado School of Medicine provides a "[v]ast spectrum of gender-affirming hormone therapy and gender-affirming surgery," Ex.41 at 1, despite acknowledging that "[t]here is no way to predict what your response to hormones will be," Ex.64 at 1. And the Attorney General has joined multi-state amicus briefs, including in the U.S. Supreme Court, defending gender-affirming care for minors despite the "risks" of that treatment. Br. of States of Cal., Colo. et al. as Amici Curiae at 8, *United States v. Skrmetti*, No. 23-477 (U.S. filed Sept. 3, 2024), 2024 WL 4101407; *cf. The Cass Review* at 13, 33, 194, Independent Review of Gender Identity Services for Children and Young People (Apr. 2024), https://perma.cc/J5GN-ELUY (benefits of "masculinising/feminising hormones in adolescents are unproven"). That Colorado has banned the off-label use of progesterone for abortion pill reversal, while at the same time championing the off-label use of hormones (including progesterone) for gender-affirming care, speaks volumes about the political expedience of its asserted interests and the vast underinclusivity of its regulatory regime.

---

[2]    The Attorney General (and chief legal officer for the state of Colorado) dubiously claims that he is "without sufficient information to admit or deny" whether there is such a prohibition in Colorado. Ex.63 at 11-12.

Moreover, Colorado's claims that abortion pill reversal does not work have also fallen apart in the course of discovery. Dr. Cohen admitted that it is "possible" that progesterone could counteract the effects of mifepristone in some cases. Cohen Tr.216:9-217:2. At most, she says "[t]he evidence that we have is not good enough" to say that it "does work" or "it doesn't.". *Id*. at 142:4-8; *see also* Cullen Tr.226:13-20 (not aware of "any medical reason to make it illegal to help" woman seeking abortion pill reversal). What Dr. Cohen does not—and cannot—dispute is that babies continue to be born to Plaintiffs' abortion pill reversal patients, including at least 11 babies born since this lawsuit was filed in April 2023. Sinnett Decl. ¶5; Cohen 10/11 Supplement 3 (estimating "rate of livebirth" of "50%"); Wubbenhorst 12/11 Supplement 3.

In sum, discovery in this case has conclusively shown that "there are multiple comparable secular medical practices" that SB 23-190 "does not ban." Dkt.113 at 35. It is therefore not generally applicable and is subject to strict scrutiny.

### 2. The ban is not generally applicable because it contains mechanisms for individualized exemptions (Count II).

SB 23-190 is also not generally applicable for a second, independent reason: It "contains mechanisms for exemptions that undercut the State's expressed interests." Dkt.113 at 32, 36-37. Under *Fulton*, a law is not generally applicable if it "'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" 593 U.S. at 533. "[T]he mere existence of government discretion is enough to render a policy not generally applicable." *FCA*,

82 F.4th at 685. And the "greater [the] discretion in the hands of governmental ac-

tors," the "more, not less, constitutionally suspect." *Axson-Flynn*, 356 F.3d at 1298-

99.

Section 23-190 and its implementing regulations contain "multiple mechanisms

for exceptions." Dkt.113 at 36. *First,* Section 3 bans abortion pill reversal "unless" all

three Boards determine that "it is a generally accepted standard of practice."

§3(c)(2)(a). By granting the Boards discretion to flip the statutory "off" switch, Colo-

rado "undermine[d]" its own "contention that its [law] can brook no departures." *Ful-*

*ton*, 593 U.S. at 542; Dkt.113 at 36.

*Second,* the Boards' implementing rules have exemptions baked in. The Medical

Board rule prohibits the use of progesterone for abortion pill reversal, but allows the

Board to evaluate any "other" types of abortion pill reversal "on a case-by-case basis."

Ex.53. The Nursing and Pharmacy Boards' rules retain even more discretion, allow-

ing them to evaluate *all* abortion pill reversal on a "case-by-case basis." Ex.54; Ex.65.[3]

Both rules contain "system[s] of individual exemptions, made … at the 'sole discre-

tion' of the [Boards]," *Fulton*, 593 U.S. at 535—and are thus classic examples of rules

that violate general applicability. *See* Dkt.113 at 36-37.

---

[3]    Colorado claims that the reason the Nursing Board rule diverges from the Medical Board rule is
to account for the "complexities" of nursing practice. Dkt.99 at 14. That makes no sense, as Colorado
has no stronger interest in preventing a physician—as opposed to a nurse with prescriptive author-
ity—from using progesterone for abortion pill reversal. Hills Tr.125:21-126:10 (did not "recall that the
[nursing] board even discussed," in rulemaking, "trying to avoid situations where a nurse might violate
a generally accepted standard of practice because a superior ordered them to prescribe or administer
a treatment").

*Third,* the Boards retain discretion about whether and how to investigate and punish any provider for unprofessional conduct or violating generally accepted standards of practice. Delp 11/14 Tr. 36:9-14, 43:16-20; Shackelford Tr.34:4-12, 47:18-48:24; Hills Tr.76:9-22, 79:18-21, 124:24-125:6. And the Attorney General also retains discretion about how to proceed when the Boards refer a licensee for prosecution. This discretion impermissibly "invite[s] [Colorado] to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537; *see also Axson-Flynn*, 356 F.3d at 1298 (a law contains individualized exemptions when it contains "systems that are designed to make case-by-case determinations"); *FCA*, 82 F.4th at 687 (school district's "discretion to grant individualized exemptions … on an ad hoc basis" rendered student-group antidiscrimination policy not generally applicable); Dkt.113 at 37.

The "mere existence" of any one of these discretionary mechanisms for individualized exemptions would be enough to render SB 23-190 not generally applicable. *See FCA*, 82 F.4th at 687-88. Taken together, there can be no serious dispute that SB 23-190 fails general applicability. It is therefore subject to strict scrutiny, which it fails.

### 3. The ban is not neutral (Count III).

Separate from general applicability, SB 23-190 also fails the neutrality standard because its "object" is "to infringe upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993); *see* Dkt.113 at 37-38. Because government hostility to religion can be "masked,

as well as overt," courts must "survey meticulously" all evidence of a law's purpose, including "the legislative or administrative history." *Lukumi*, 508 U.S. at 534, 540. If the record shows even "subtle departures from neutrality" or creates even "slight suspicion[s]" of religious intolerance, the law violates the Free Exercise Clause. *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018).

On its face, SB 23-190 shows that Colorado knew the "burden" of the law, "in practical terms, falls on [religious] adherents but almost no others." *Lukumi*, 508 U.S. at 536-37. Section 1 expressly targets "anti-abortion centers, also known as 'crisis pregnancy centers,'" that "aim 'to prevent abortions by persuading people that adoption or parenting is a better option.'" §1(1)(c). It derides these centers as "the ground-level presence of a well-coordinated anti-choice movement," accusing them of "us[ing] deceptive advertising tactics to target and acquire clients from historically marginalized groups" and "go[ing] so far as to advertise medication abortion reversal." §1(1)(c)-(f). The source quoted in the legislative declaration, from the American Medical Association Journal of Ethics, recognizes that "[m]ost [crisis pregnancy centers] are religiously affiliated," and claims that "religious ideology … takes priority over the health and well-being of the women seeking care at these centers." Amy G. Bryant, *Why Crisis Pregnancy Centers Are Legal but Unethical*, AMA J. Ethics (Mar. 2018), https://perma.cc/Z8QW-9FFR. Section 1 thus confirms that Colorado knew the "anti-abortion centers" targeted by the law were primarily religious providers.

The legislative history is even more explicit. During legislative hearings, one bill sponsor explained that the bill's use of "anti-abortion center" referred to "faith-based organizations that pose as a comprehensive reproductive healthcare clinic to intercept patients seeking abortion." Ex.43 at 3; *see also* Ex.46 at 54:3-4 (bill sponsor stating that "many of these crisis pregnancy centers are religiously affiliated"). She further stated that these "fake clinics" were "the only ones that can prescribe abortion pill reversal." Ex.43 at 3; Ex.44 at 2. The sponsors of SB 23-190 did not hide their disdain for these religious providers—accusing them of "sham[ing]" women and engaging in "delay tactics," "disinformation," and "intimidation." Ex.43 at 2.

All of this demonstrates that SB 23-190 was "enacted "*because of*," not merely "in spite of,"' [its] suppression of … religious practice." *Lukumi*, 508 U.S. at 540 (emphasis added). The record here shows far more than "subtle departures from neutrality" that violate the Free Exercise Clause. *Masterpiece*, 584 U.S. at 638. *Compare Does 1-11*, 100 F.4th at 1268-70, 1275-77 (policies were not neutral where government "passe[d] judgment upon and presuppose[d] the illegitimacy of certain religious beliefs"), *with Chiles v. Salazar*, 116 F.4th 1178, 1223 (10th Cir. 2024) (ban was neutral where "[n]othing in the record suggests the [law's] aim is to infringe or restrict practices because of their religious motivation"). The law is thus "plainly unconstitutional," *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008), and must be "'set aside' … without further inquiry," *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022).

**B. SB 23-190 violates the Free Speech Clause by discriminating based on content and viewpoint (Count IV).**

The First Amendment prohibits the government from "excis[ing] certain ideas or viewpoints from the public dialogue." *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023). Section 1 and Section 2 of SB 23-190 do exactly this by regulating speech based on its content and viewpoint. They are thus "presumptively unconstitutional" and subject to strict scrutiny. *See NIFLA v. Becerra*, 585 U.S. 755, 766 (2018).

A law is content-based if it "on its face draws distinctions based on the message a speaker conveys" or if it "cannot be justified without reference to the content of the regulated speech, or [was] adopted by the government because of disagreement with the message the speech conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (cleaned up); *accord TikTok Inc. v. Garland*, No. 24-656, 2025 WL 222571, at *5 (U.S. Jan. 17, 2025). A law is viewpoint based if it "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "Both content- and viewpoint-based speech restrictions are presumptively invalid." *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013). SB 23-190 is both.

***Content discrimination.*** SB 23-190 is facially content-based because it applies only to speakers who discuss certain topics. Section 1, both on its own and through the CCPA, creates a targeted "prohibition on deceptive trade practices" that applies

44

to speakers who advertise one particular message by "offering to provide … medication abortion reversal." §1(3)(b).[4] By contrast, a speaker who advertises abortion is not subject to the law. Similarly, Section 2 applies only to speakers whose advertisements "indicate[ ]" that they provide or refer for abortion or emergency contraceptives. §2(2). Speakers who *do* provide abortion and emergency contraceptives cannot violate Section 2. Both provisions "single[ ] out specific subject matter for differential treatment," *Reed*, 576 U.S. at 169, and are therefore content based. *See Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (cleaned up) (law is content-based where it "requires enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred").

SB 23-190 is also content-based because Colorado enacted it out of "disagreement with the message [the speech] conveys." *Reed*, 576 U.S. at 164 (alteration in original); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("The government's purpose is the controlling consideration."). That disagreement is plain from Section 1's litany of claims about "anti-abortion centers"—including that they "use deceptive advertising tactics to target and acquire clients from historically marginalized groups" and "go so far as to advertise medication abortion reversal, a dangerous and deceptive practice that is not supported by science or clinical standards." §1(1)(c)-(f). SB 23-190's sponsors underscored their disagreement with "anti-abortion centers,"

---

[4]   Although Section 1 is labeled a "legislative declaration," it is "unlikely that Section One has no bearing on how a Colorado court may interpret the CCPA in light of SB 23-190." Dkt.113 at 22.

decrying them as "fake clinics" and accusing them of "sham[ing]" women and spreading "disinformation." Ex.43 at 2:22-3:2. Because SB 23-190 is "targeted at specific subject matter" and was enacted due to "'disagreement' with its message," it is "content based even if it does not discriminate among viewpoints." *Reed*, 576 U.S. at 167, 169.

***Viewpoint discrimination.*** But SB 23-190 *does* discriminate among viewpoints, making the First Amendment violation here "all the more blatant." *Rosenberger*, 515 U.S. at 829. Section 1 explicitly targets the views of "[a]nti-abortion centers" for their role in the "anti-choice movement." §1(1)(d). It effectuates that targeting by prohibiting (on its own and through the CCPA) advertising or counseling patients about abortion pill reversal. §1(3)(b). Section 1 thus plainly discriminates against the viewpoint that progesterone treatment can reverse the effects of the first abortion pill—while providers remain free to advertise and discuss with patients any other form of progesterone treatment. *See* Ex.38 at 11-14; Cohen Tr.48:1-50:7.

Section 2 suffers the same constitutional flaw. It prohibits false advertising by speakers who do not provide abortion or emergency contraceptives, leaving false advertising by speakers who do provide abortion or emergency contraceptives untouched. §2(2). Moreover, the preexisting CCPA contained at least two provisions that already prohibited the same conduct prohibited by Section 2. Colo. Rev. Stat. §6-1-105(1)(e), (1)(rrr). Section 2 adds nothing to the authority the Attorney General already had. So the only purpose of Section 2 is to "target[] … particular views taken

by speakers on a subject." *Rosenberger*, 515 U.S. at 829. Because SB 23-190 targets "speech on only one side of the abortion debate," it is "a clear form of viewpoint discrimination." *McCullen v. Coakley*, 573 U.S. 464, 485 (2014).

The Supreme Court "has stressed the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'" *NIFLA*, 585 U.S. at 756; *id.* at 795 (Breyer, J., dissenting) (but agreeing). Colorado "may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health*, 564 U.S. 552, 578-79 (2011); *see First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785-86 (1978) ("Especially where, as here, the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended."). As a content- and viewpoint-based restriction of speech, SB 23-190 is "presumptively unconstitutional" and subject to strict scrutiny, *NIFLA*, 585 U.S. at 766, which it fails.

### C. SB 23-190 violates the First Amendment right to receive information (Count V).

"The Supreme Court has repeatedly recognized that the First Amendment includes not just a right of free speech, but also a right to receive information." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1118-19 (10th Cir. 2012) (collecting cases). SB 23-190 violates the First Amendment by depriving Bella's current and prospective patients of their "well established … right to receive information," *Stanley v. Georgia*,

394 U.S. 557, 564 (1969), prohibiting them from viewing advertising or even speaking

with a provider about the use of progesterone to reverse the effects of mifepristone.

Section 1, both on its own and through the CCPA, makes it a deceptive trade prac-

tice to "advertis[e] for or provid[e] or offer[ ] to provide" abortion pill reversal. §1(3)(b).

And Section 3 makes it unprofessional conduct even to "attempt" abortion pill rever-

sal. §3(2)(a). These provisions are content-based on their face, as they "single[ ] out"

for "differential treatment" only one "specific subject": abortion pill reversal. *Reed*,

576 U.S. at 169. For the same reasons explained above, *infra* pp.45-46, they were also

enacted out of "disagreement with the message" of abortion pill reversal, *Reed*, 574

U.S. at 164, and they discriminate against that viewpoint by "target[ing] ... particu-

lar views" on the subject, *Rosenberger*, 515 U.S. at 829. More troubling still, these

provisions rob women of the ability to make an informed choice—which is critically

important in the abortion context, where "devastating psychological consequences"

can follow if a woman "discover[s] later" that her "decision was not fully informed."

*Planned Parenthood v. Casey*, 505 U.S. 833, 882 (1992), *overruled on other grounds

by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

These constitutional problems are not merely hypothetical. Dozens of women have

sought or received abortion pill reversal treatment at Bella since this lawsuit was

filed. Ex.66 at 7-10. At least five of those women disclosed to a provider that they

were coerced into taking mifepristone in the first place. Ex.66 at 36-37. But for this

Court's preliminary injunction, none of those women could lawfully have received information from a Colorado provider about abortion pill reversal—much less attempted it.

Because Sections 1 and 3 plainly engage in content and viewpoint discrimination about abortion pill reversal, they are subject to strict scrutiny, which they fail. *Infra* Section I.F.

### D. SB 23-190 violates the Fourteenth Amendment right of pregnant women not to be forced to undergo or continue an abortion (Counts VI-VII).

The Fourteenth Amendment protects the right to refuse "unwanted medical treatment." *Cruzan v. Director*, 497 U.S. 261, 278 (1990). That includes the "right to decide independently, with the advice of [her] physician, to acquire and to use needed medication." *Whalen v. Roe*, 429 U.S. 589, 603 (1977). And it specifically includes the right to decide "whether to bear or beget a child" and to do so "free from unwarranted governmental intrusion." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972); *cf. Dobbs*, 597 U.S. at 295 ("It is hard to see how we could be clearer" that *Dobbs* does not "cast doubt" on *Eisenstadt*).

The Fourteenth Amendment further forbids states from "deny[ing] to any person … the equal protection of the laws." U.S. Const. amend. XIV, §1. Colorado's Reproductive Health Equity Act (RHEA) specifically recognizes that "[a] pregnant individual has a fundamental right to continue a pregnancy and give birth or to have an abortion and to make decisions about how to exercise that right." Colo. Rev. Stat. §25-6-403(2). It also forbids public entities from (1) "interfer[ing] with" the "fundamental

right … to continue a pregnancy" in the "regulation or provision of services[ ] or information," or (2) "[d]epriv[ing]" any individual of her "right to act … during [her] pregnancy" based on "the potential, actual, or perceived impact on the pregnancy, the pregnancy's outcomes, or on the pregnant individual's health." Colo. Rev. Stat. §25-6-404(1).

SB 23-190 strips all of these rights. By prohibiting the use of progesterone if—and only if—a woman has first taken mifepristone, it runs roughshod over a woman's right to refuse an "unwanted" abortion. *Cruzan*, 497 U.S. at 278. Rather than respecting the "fundamental right" of all Colorado women to "continue a pregnancy," SB 23-190 flagrantly "interfer[es]" with that right for a particular subset of women, Colo. Rev. Stat. §§25-6-403(2), 25-6-404(1), by making it illegal to help women who ingested mifepristone and choose to keep their babies. None of that can be squared with the Fourteenth Amendment.

## E. SB 23-190 is void for vagueness (Count VIII).

A statute is unconstitutionally vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Jordan v. Pugh*, 425 F.3d 820, 824-25 (10th Cir. 2005). Courts "deciding whether a challenged statute provides fair notice" consider, *inter alia*, "the enactment's purpose" and "the interpretations of individuals charged with enforcement." *Id.* at 825. The vagueness test "applies with particular force" in reviewing "laws dealing with speech." *Hynes v.*

50

*Mayor and Council of Oradell*, 425 U.S. 610, 620 (1976); *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 499 (1982) ("interfere[ence] with the right of free speech" is "perhaps the most important factor" and triggers "a more stringent vagueness test").

Section 2 of SB 23-190 fails to provide fair notice of what is prohibited. Under Section 2, any advertisement that falsely "indicates" that the person "provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives" is prohibited as a deceptive trade practice. §2(2). "Indicates" is not a defined term, and Section 2 offers no standards or guidance on what sort of advertisement "indicates" that an entity offers abortions or emergency contraceptives. Am.Compl. ¶312. The Attorney General has claimed that "indicates" has "a plain and ascertainable meaning," Dkt.68 at 13—but to this day, the Attorney General fails to say what that meaning is. This alone is fatal. *See Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1148-49 (W.D. Okla. 2024) (prohibition on educational instruction that "presents" racial or sexual stereotyping or bias—where statute "includes no definition or limiting modifier for the term 'presents'"—"is so indefinite 'that persons of common intelligence must necessarily guess at its meaning and differ as to its application'" (applying *Jordan* and quoting *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1038 (10th Cir. 2009))).

Even if Section 2 did provide adequate notice—it does not—it still permits arbitrary and discriminatory enforcement. SB 23-190's "purpose," *Jordan*, 425 F.3d at

825, is to target "antiabortion centers," §1(1)(c)-(e). And its sponsors repeatedly claimed that the terms "comprehensive" and "full range" of services (or similar) are deceptive when used by a pro-life provider. *Supra* p.24. These are the same terms that Bella routinely uses to describe its core identity, *supra* pp.4-5, raising a "real and substantial" "potential chilling effect" on Bella's "protected expression," *Jordan*, 425 F.3d at 828. But after more than *21 months* of litigation—and despite voluminous discovery into Bella's advertisements and services—the Attorney General still refuses to offer an interpretation of Section 2 or any opinion on whether Bella's advertisements comply with the statute. *Cf. Nat'l Fed'n of Blind v. Pryor*, 258 F.3d 851, 857 (8th Cir. 2001) (statute not vague where, in response to alleged ambiguities, AG offered "reasonable interpretation," allaying concerns of arbitrary enforcement). That leaves Plaintiffs vulnerable to future enforcement actions based on discriminatory purposes—including disapproval of their beliefs, viewpoint, and message.

Section 2 is thus "invalid because of vagueness," *Hynes*, 425 U.S. at 620, and should be set aside for that reason alone.

**F. The government cannot carry its burden under strict scrutiny.**

For the reasons above, SB 23-190 is invalid unless it can survive strict scrutiny, "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). That means Defendants face the "daunting task of establishing that the [law] was narrowly tailored to advance a compelling governmental interest."

*Axson-Flynn*, 356 F.3d at 1294. Neither "speculation" nor "broadly formulated inter-
ests" will suffice. *Fulton*, 593 U.S. at 541-42.

Now that Colorado's stated interests in ensuring safety and effectiveness have
collapsed, Defendants cannot show *any* valid interest in preventing Plaintiffs from
publicizing or providing abortion pill reversal—much less an "exceedingly persua-
sive" compelling interest. *SFFA v. President & Fellows of Harvard Coll.*, 600 U.S.
181, 217 (2023); *see supra* Section I.A.1. In fact, the evidence described above confirms
there is no "'actual problem' in need of solving," *Brown v. Ent. Merchs. Ass'n*, 564 U.S.
786, 799 (2011).

Even if Colorado could muster a compelling interest, SB 23-190 is not narrowly
tailored. To the contrary, SB 23-190 is fatally "underinclusive in substantial re-
spects." *Lukumi*, 508 U.S. at 546. That is because Colorado has failed to show that it
pursues its alleged interests against other comparable treatments. *See supra* Section
I.A.1. And Colorado has no evidence that existing laws aimed at protecting patients,
regulating medical practice, and preventing false advertising have been ineffective.
*See, e.g.*, *McCullen*, 573 U.S. at 494 (law failed even intermediate scrutiny where "the
Commonwealth has not shown that it seriously undertook to address the problem
with less intrusive tools readily available to it"). SB 23-190's "absence of narrow tai-
loring suffices to establish [its] invalidity." *Lukumi*, 508 U.S. at 546.

## II. Plaintiffs easily satisfy the remaining injunctive-relief factors.

"[I]n First Amendment cases, the likelihood of success on the merits will often be
the determinative factor." *Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1145 (10th

Cir. 2013). But as this Court found at the preliminary injunction stage, the remaining injunctive-relief factors—irreparable harm, balance of the equities, and public interest—also favor an injunction. *See* Dkt.113 at 41-43.

**Irreparable harm.** "[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). And "the loss of First Amendment freedoms," in particular, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, as Defendants previously conceded, the irreparable-harm factor "collapses" into the merits. Dkt.99 at 38. Because SB 23-190 violates Plaintiffs' and their patients' constitutional rights, *supra* Section I, they will be irreparably harmed without a permanent injunction. This is especially true given the harm that would befall women who are denied this treatment—including the mothers of the 11 babies born to Bella APR patients since the outset of this case.

**Balance of the equities and public interest.** When the government is the party opposing the injunction, the balance-of-the-equities and public-interest factors merge. Nken v. Holder, 556 U.S. 418, 435 (2009). Defendants have yet to identify any interest in avoiding a permanent injunction. Dkt.113 at 42. Any interest they may assert will pale in comparison to Plaintiffs' interest in protecting their constitutional rights. See Citizens United v. Gessler, 773 F.3d 200, 218 (10th Cir. 2014) (alterations in original) ("when a law … is likely unconstitutional, the interests of those the government represents, such as voters[,] do not outweigh a plaintiff's interest in having

its constitutional rights protected"). The balance of the equities and public interest undoubtedly weigh in Plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for Plaintiffs on all claims and provide the declaratory and injunctive relief set forth in the First Amended Complaint.

Dated: January 31, 2025                  Respectfully submitted,

                                    /s/ Mark L. Rienzi
                                    Mark L. Rienzi
                                    Rebekah P. Ricketts
                                    Laura W. Slavis
                                    Michael J. O'Brien
                                    Colten L. Stanberry
                                    Amanda L. Salz
                                    Amy Ren
                                    The Becket Fund for Religious Liberty
                                      1919 Pennsylvania Ave, N.W.
                                    Suite 400
                                    Washington, D.C. 20006
                                    (202) 955-0095
                                    mrienzi@becketfund.org

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2025, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of Court via CM/ECF, which will provide electronic copies to counsel of record.

/s/ Mark L. Rienzi
Mark L. Rienzi

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief contains 12,546 words. I further certify that this brief and the brief filed by Plaintiff-Intervenor do not exceed a combined 17,500 words. Dkt.175. As to all other matters, I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

/s/ Mark L. Rienzi
Mark L. Rienzi