# Exhibit 30



# Transcript of **Samuel Delp**

Thursday, November 14, 2024

*Bella Health and Wellness, et al. v. Phil Weiser*

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 148338

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
    BELLA HEALTH AND WELLNESS   )
 3  ET AL.,                     )CASE NO.1:23-CV-939-DDD-SKC
                                )
 4       PLAINTIFFS,             )
                                )
 5  CHELSEA M. MYNYK,           )
                                )
 6       PLAINTIFF-INTERVENOR,  )
                                )
 7                              )
    v.                          )
 8                              )
    PHIL WEISER, IN HIS         )
 9  OFFICIAL CAPACITY AS        )
    ATTORNEY GENERAL OF         )
10  COLORADO, ET AL.,           )
                                )
                                )
11                              )
         DEFENDANTS.             )
12                              )
                                )
13  _____

14

15

16             VIDEOCONFERENCE DEPOSITION
                     OF SAMUEL DELP
17

18             November 14, 2024.
            12:02 p.m - 2:58 p.m. MST
19

20

21

22

23  REPORTED BY:

24  ANNA SMITH, COURT REPORTER.

25  NOTARY PUBLIC, STATE OF COLORADO
```

Page 2

1             APPEARANCES:
2   For the Plaintiffs:
3       MARK L. RIENZI, ESQ.
        COLTEN L. STANBERRY, ESQ.
4       REBEKAH P. RICKETTS, ESQ.
        LAURA WOLK SLAVIS, ESQ.
5       MICHAEL J. O'BRIEN, ESQ.
        KELLY R. OELTJENBRUNS, ESQ.
6       The Becket Fund for Religious Liberty
        1919 Pennsylvania Ave, N.W.
7       Suite 400
        Washington, D.C. 20006
8       mrienzi@becketlaw.org
        cstanberry@becketlaw.org
9
10  For the Plaintiff-Intervenor:
11      KEVIN H. THERIOT, ESQ.
        JULIA C. PAYNE, ESQ.
12      GABRIELLA MCINTYRE, ESQ.
        Alliance Defending Freedom
13      15100 N. 90th Street
        Scottsdale, AZ 85260
14      ktheriot@adflegal.org
        jpayne@adflegal.org
15      gmcintyre@adflegal.org
16
    For the Defendants:
17
        BRIAN URANKAR, ESQ.
18      BRADY JEROME GRASSMEYER, ESQ.
        ELIZABETH V. KENNY, ESQ.
19      JENNIFER H. HUNT, ESQ.
        ZACH FITZGERALD, ESQ.
20      Colorado Attorney General's Office
        1300 Broadway
21      Denver, CO 80203
        brian.urankar@coag.gov
22      brady.grassmeyer@coag.gov
        elizabeth.kenny@coag.gov
23      jennifer.hunt@coag.gov
        zach.fitzgerald@coag.gov
24
25

Page 3

1            INDEX:
2
3   Style . . . . . . . . . . . . . . . . . . . . . . . . 01
4
5   Appearances . . . . . . . . . . . . . . . . . . . . . 02
6
7   Certificate of Reporter . . . . . . . . . . . . . . . 98
8
9   Certificate of Deponent . . . . . . . . . . . . . . . 99
10
11           EXAMINATIONS:
12
13  Direct Examination by Mr. Rienzi  . . . . . . . . . . 05
14
15           EXHIBITS:
16
17  Exhibit 123 DORA000001 OLLS Email . . . . . . . . . . 78
18
19  Exhibit 124 House Bill 22-1279  . . . . . . . . . . . 78
20
21  Exhibit 125 DORA Performance Plan FY22-23 . . . . . . 78
22
23  Exhibit 126 DORA Gender-Affirming Care Document . . . 85
24
25

Page 4

1       THE REPORTER:  All right.  We are on the record
2   at 12:02 p.m. MST time.  Will all parties except
3   for the witness please state your appearance, how
4   you're attending, and your location, starting with
5   plaintiff's counsel.
6       MR. RIENZI:  Mark Rienzi for the Bella Health
7   plaintiffs.  And I'm in Washington, D.C., along
8   with Colten Stanberry.
9       MR. THERIOT:  Kevin Theriot for Mynyk,
10  plaintiff-intervener.  And I am in Nashville,
11  Tennessee.
12      MR. URANKAR:  Brian Urankar for the Colorado
13  Medical Board.  And joined with me here is Jennifer
14  Hunt.  We are both attending remotely.  We are in
15  the Denver, Colorado, metro area.
16      MR. FITZGERALD:  Zach Fitzgerald for the Board
17  of Nursing, also in the -- well, Centennial,
18  Colorado, area.
19      MS. KENNY:  And Liz Kenny, also for the
20  Colorado Board of Nursing in the Denver metro area.
21      MR. GRASSMEYER:  And Brady Grassmeyer on behalf
22  of the Attorney General from Denver, Colorado.
23      THE REPORTER:  Okay, thank you.  Mr. Delp, will
24  you please state your full name for the record?
25      THE WITNESS:  Yes.  Hi.  My name is Samuel

Page 5

1   Delp.
2       THE REPORTER:  Okay.  Mr. Delp, will you please
3   hold your ID up to the camera?  Okay.  Thank you.
4           SAMUEL DELP,
5   Having been first duly sworn, was examined and testified
6           as follows:
7       THE REPORTER:  All right, thank you.  You may
8   begin.
9   DIRECT EXAMINATION BY MR. RIENZI:
10  Q.   Good afternoon, Mr. Delp.  How are you?
11  A.   I'm well.  How are you?
12  Q.   Good, thanks.  Nice to see you again.  I'm
13  going to be asking you some questions today, and I'd
14  like to start by just going over a few preliminary
15  matters.  Have you been deposed before?
16  A.   Yes.
17  Q.   Roughly how many times?
18  A.   Two or three.
19  Q.   So I'll give, then, a quick review, but
20  sounds like you probably know how this goes.  I'm going
21  to ask you questions.  The court reporter is trying to
22  make a record, so we'd ask that you say yes or no rather
23  than "uh-huh" or shaking your head.  If anything I say
24  is unclear, please just let me know.  We'll try to
25  restate it for you.  And do you understand that you're

Page 34

1 happens next? What does it do with it?
2  A. When a -- when a complaint comes in, it goes
3 through an initial review process to assess the
4 complaint to determine whether or not there's a need for
5 any priority action on the part of the board and then,
6 the -- the complaint is opened and -- and the complaint
7 processing begins.
8  Q. When you said there's an initial review, who
9 does the initial review?
10  A. So there's a group within the division that
11 includes the program directors and the deputy division
12 directors that will initially read a complaint,
13 determine whether there is a -- a public safety concern
14 related to the complaint.
15  Q. And can you get, like -- what would be an
16 example of a public safety concern?
17  A. Any -- any complaint that, you know,
18 involved a public health issue. A particularly
19 egregious patient harm issue that -- that might have the
20 risk of continuing if there weren't some more timely
21 intervention on the part of the board.
22  Q. And you said when there's a -- a public
23 health issue of that kind, there's the ability to take
24 priority action. Can you describe what that would be?
25  A. So the board has the ability to suspend --

Page 35

1 summarily suspend licensees, ask licensees to -- to
2 enter into voluntary cessation of practice agreements
3 pending investigations. The board could order someone
4 to undergo a mental health or substance use evaluation.
5 So those would -- those would be examples of initial
6 priority actions that the board --
7  Q. And when it's a priority action, how quickly
8 can the board act?
9  A. It depends on the board and how quickly the
10 program director could convene the board if it's
11 necessary to review the information.
12  Q. What's the fastest you've ever seen the
13 Medical Board or Nursing Board act on a priority action?
14  A. I've seen them act same day.
15  Q. You said if it's not one of those priority
16 actions, then, I think you said, a case gets opened and
17 the process starts; is that accurate?
18  A. Correct.
19  Q. Can you then describe for me what that --
20 actually one more question about the priority actions.
21 Is there any set rulebook or list that tells the people
22 doing that initial review which ones count as priority
23 actions and which ones do not?
24  A. The division has a policy that guides the
25 review of those types of cases and will -- and provide

Page 36

1 some types of cases that -- that may fall within
2 priority delegation.
3  Q. But is it fair to say it's got to be pretty
4 individualized or case-by-case?
5  A. They're all reviewed on a case-by-case
6 basis. And it's the -- even if the division were to
7 flag the case as a priority doesn't necessarily mean
8 that the board will take any immediate action.
9  Q. So the board has some discretion -- even if
10 the division says we think this is a priority, the board
11 has some discretion to decide what, if anything, it's
12 going to do; is that fair?
13  A. The board has all of the discretion to
14 decide what to do.
15  Q. Okay. Now can you tell me about the -- you
16 said in the -- kind of -- the non-priority cases -- in
17 the mine run cases, is what I'm thinking of them as --
18 you said, I -- the -- I wrote "open process." I'm not
19 sure if I wrote the right words but a case gets opened
20 and the process starts. Can you tell me what that
21 process looks like?
22  A. Sure. So we'll open a case in -- in our
23 system -- in our computer system that we'll assign a
24 number to the -- to the complainant. It will become a
25 case number and then the -- the respondent would then

Page 37

1 receive what we refer to as a "30-day letter," giving
2 them an opportunity to respond to the allegations within
3 the complaint.
4  Q. Now, I know you said before that at some
5 level the board has, "all the discretion," about what to
6 do about priority actions, but am I right in
7 understanding, like the "30-day letter" -- am I right in
8 thinking that is not discretionary, that's automatic by
9 law?
10  A. Correct.
11  Q. You mentioned a couple minutes ago a
12 document that -- or a policy that guides the division in
13 thinking about which ones are priority actions. Is that
14 a public document?
15  A. I think it's a -- it's a -- it's likely a
16 Quora-able document. It's not posted on the public
17 website though.
18  Q. Can you tell me, like, what is the document
19 called? Does it have a name or a --
20  A. It's -- it's the -- we refer to it as
21 "Policy 8024."
22  Q. Policy 8024?
23  A. Yes.
24  Q. Thank you. I was asking you some questions
25 about how the Nursing Board makes rules and I just want

Page 38

1  to make sure, does the Medical Board make rules in the
2  same way the Nursing -- you described that the Nursing
3  Board makes rules?
4      A.   Correct.
5      Q.   Okay.  So you said in the normal process
6  then a case would be opened and a 30-day letter gets
7  sent.  And, I think as I understand it, the 30-day
8  letter is non-discretionary.  The board doesn't have to
9  sit and think about that.  That's not a judgment call,
10 it just -- it's automatic; is that right?
11     A.   Yes.
12     Q.   Okay.  What happens after the 30-day letter?
13     A.   If the respondent has responded to the
14 complaint, all of the information that was gathered up
15 to that point would be -- including the initial
16 complaint that came in -- would be gathered up and
17 placed on a board agenda for the board to review.
18     Q.   And does that happen at the full board
19 level?
20     A.   No, those -- those cases at that point would
21 be provided to whatever panel was assigned to that
22 particular case.
23     Q.   And how many -- scratch that.  Are those
24 panels called the inquiry panels?
25     A.   Yes.

Page 39

1      Q.   How many inquiry panels does the Nursing
2  Board have?
3      A.   There are two inquiry panels for the Nursing
4  Board.
5      Q.   And how many does the Medical Board have?
6      A.   Two.
7      Q.   Are there substantive or practice area
8  differences between the two panels?
9      A.   It depends on the board, but generally the
10 program director will do her best to ensure that the
11 practice areas are evenly distributed among -- between
12 both of the panels.
13     Q.   And so, it's not like one board gets all of
14 the cancer cases and one board gets all the knee surgery
15 cases.  They could -- cases could go to either panel; is
16 that true?
17     A.   Yes.  The -- the -- there -- there can
18 occasionally be a situation where there might be
19 particular expertise on one of the -- on one of the
20 panels and the program director might direct a case to a
21 particular panel.
22     Q.   And is it the program director who decides
23 which panel gets a case?
24     A.   Generally, the complaints are -- the cases
25 that come through are automatically distributed based

Page 40

1  upon, you know, alphabet.  They're -- I know the Nursing
2  Boards have been distributed alphabetically.  I don't
3  recall if that's still how the Medical Board distributes
4  their cases.
5      Q.   Once an inquiry panel gets the complaint,
6  what does the inquiry panel do with it?
7      A.   They can do a number of things at that
8  point.  They can decide they want to open -- they want
9  to further investigate.  They can dismiss the case.
10 They can table it for some additional information, or
11 they can issue discipline.
12     Q.   In choosing among those four outcomes or
13 paths that you decided, I guess, how does the board
14 choose among those choices?
15     A.   They review all of the cases on an
16 individual basis and they make -- you know, they'll make
17 a determination as to whether or not, generally, they
18 need additional information or whether they have the
19 ability to take some definitive action with the
20 information they have.
21     Q.   And is that something that the program
22 director can tell the inquiry panels what to do or do
23 the inquiry panels have discretion to make those
24 decisions?
25     A.   The inquiry panels have the discretion to

Page 41

1  make -- the discretion to make the decision.
2      Q.   We've been going for about an hour.  I could
3  go a few more minutes or I could take a quick break here
4  and then pick up again.  It's up to you.
5      A.   I could take a break at whatever point you
6  --
7           MR. RIENZI:  Yeah.  Let's take a short break
8  now if that's okay.
9           THE WITNESS:  Okay.
10          THE REPORTER:  We're going off the record at
11 1:02 p.m.
12          (A short break was taken.)
13          THE REPORTER:  Okay.  We are back on the record
14 at 1:14 p.m.
15 BY MR. RIENZI:
16     Q.   Mr. Delp, before the break, we were talking
17 about how the different inquiry panels have -- sometimes
18 have different -- have members with different kinds of
19 expertise.  Do you recall that?
20     A.   Yes.
21     Q.   Is there anyone on the Board of Nursing who
22 has expertise in obstetrics and gynecology?
23     A.   I don't know.
24     Q.   How about on the Medical Board?
25     A.   I don't know.

Page 42

1  Q.  Do you know any of the expertise of any of
2  the members of those boards?
3  A.  I don't know the specific expertise of each
4  of the individual members. I know of the general
5  breakdown of the expertise, for example, on the Nursing
6  board because it's defined in staffing.
7  Q.  But you're not aware of anyone on either
8  Board who has OB/GYN expertise; is that true?
9  A.  That's correct.
10 Q.  We were talking about how the board goes
11 about deciding how to respond to a complaint. And I
12 believe you ran through a few different choices they
13 could have. They could investigate further. They could
14 dismiss a complaint. They could table the matter to
15 consider it further. I believe you said a fourth, and
16 I'm looking for it -- or they could issue some
17 discipline. Are those basically the four choices, or is
18 it -- or are there more than that?
19 A.  Those are generally the -- the four things
20 that they might initially do.
21 Q.  And how do the boards decide which of those
22 is the appropriate action in a given case?
23 A.  They'll make that decision based upon their
24 discussion, the discussion that they have among
25 themselves with input from the Attorney General's

Page 43

1  Office, the general counsel that -- that is there for
2  the board, program director participates in those
3  conversations. But -- but really, it's whether the
4  board believes they have enough information to move
5  forward or whether they need additional information
6  before they can make that.
7  Q.  Do they sometimes decide that a particular
8  violation is not severe enough to merit discipline?
9  A.  Yes.
10 Q.  How do they make that decision?
11 A.  So, again, through their conversation,
12 through their analysis of the Practice Act and rules, if
13 they determine -- they'll determine whether or not they
14 believe that there's been a Practice Act or a rule
15 violation.
16 Q.  But even if there's been a violation, do
17 they still retain discretion as to whether they impose
18 discipline or must they impose discipline?
19 A.  The board maintains the discretion as to how
20 and what discipline and if they will discipline.
21 Q.  And you mentioned the Attorney General's
22 Office participates. Can you tell me how the Attorney
23 General's Office participates in those decisions? And
24 to be clear, I'm not asking for any legal advice from
25 the Attorney General or about any particular case at

Page 44

1  this point. I'm just asking for general understanding
2  of how the Attorney General participates in that
3  process.
4  A.  So each of the boards has general counsel
5  from the Attorney General's Office that participates in
6  the board meetings.
7  Q.  Can the Attorney General -- can that general
8  counsel -- can they instruct the board as to what to do?
9  A.  No.
10 Q.  So they're just there in an advisory role;
11 is that accurate?
12 A.  Yes.
13 Q.  And are there some cases in which the board
14 decides to call in an expert?
15 A.  Yes.
16 Q.  How does the board decide when to call in an
17 expert?
18 A.  They can make that determination if they
19 believe that there's been a standard of care issue. And
20 they would do that, typically, by referring the case to
21 the Office of Investigations. So that would be the
22 example of how they would open an investigation, and --
23 and then they would retain the expert to review the
24 case.
25 Q.  And where is the Office of Investigations?

Page 45

1  A.  The Office of Investigations is a specific
2  area of the division.
3  Q.  Of the DPO?
4  A.  Correct.
5  Q.  And so, sometimes the Office of
6  Investigations does investigations at the direction of
7  the Nursing Board; is that right?
8  A.  Yes.
9  Q.  And when the Office of Investigations is
10 finished with an investigation, how do they report it
11 back to the boards?
12 A.  So they'll provide the board with any of the
13 documentation that they will receive during the
14 investigation, along with a report of their
15 investigation finding. And if they did retain an expert
16 or they were instructed to retain an expert from the
17 board, they would provide that expert's report as well.
18 Q.  So the expert retention happens at the
19 Office of Investigations level; is that correct?
20 A.  Yes.
21 Q.  And again, this happens in the context of
22 particular complaint investigations rather than at the
23 rulemaking process; is that correct? Scratch that
24 question. Bad question. Too complicated. What you
25 just described for me about using the Office of

Page 78

1 deposition Exhibit number 2. We've had the Board
2 of Nursing rule, which was prior deposition Exhibit
3 number 95.
4      And then we've had two new exhibits. The email
5 thread, which should be 123. So the email thread,
6 the only email thread we've looked at today should
7 be Exhibit 123. And the new statute, the
8 Reproductive Health Equity Act, the last statute we
9 were discussing just a few minutes ago should be
10 Number 124.
11      (Exhibits 123 and 124 marked for identification.)
12      MR. URANKAR: That's consistent with my notes
13 as well. Thank you for doing that.
14 BY MR. RIENZI:
15   Q.   Great. Thank you all. Okay, Mr. Delp, we
16 want to give you another one which we now know we can
17 call 125, which is the documents labeled, "Division of
18 Regulatory Agencies Performance Plan." This is the one
19 for, "Fiscal Year 2022-2023." And the first question is
20 just going to be: Is this something you are familiar
21 with?
22      (Exhibit 125 marked for identification.)
23   A.   Yes, I'm generally familiar with it.
24   Q.   I want to look at the top page first. Those
25 logos on the left-hand side there, are those familiar to

Page 79

1 you?
2   A.   Yes.
3   Q.   Okay. And what are they?
4   A.   Those would have been at the time, you know
5 -- I actually don't recall if they still are -- but
6 department logos.
7   Q.   And if we can scroll to the next page? You
8 mentioned Patty Salazar before. Who is Patty Salazar?
9   A.   She's the executive director of DORA.
10   Q.   And you report to Patty Salazar; is that
11 correct?
12   A.   Yes.
13   Q.   Have you ever discussed SB 23-190 with Patty
14 Salazar?
15   A.   No.
16   Q.   Have you ever discussed SB 23-190 with
17 anybody else at DORA?
18   A.   During the time that the boards were engaged
19 in the rulemaking process, they would have -- in the
20 beginning parts of that process, been involved with the
21 program directors and board council, just in terms of a
22 discussion about the understanding of the requirements
23 of SB 23-190.
24   Q.   And how do you typically communicate with
25 the members of your staff?

Page 80

1   A.   Communicate some -- I have regular meetings
2 with my staff members. So we communicate certainly that
3 way. Obviously the email communication, meetings that
4 end up on my calendar for various reasons.
5   Q.   Have you emailed with members of your staff
6 about SB 23-190?
7   A.   I'm sure there were emails in the beginning
8 relative to my involvement and as I mentioned, just the
9 -- the general understanding of -- of what the statute
10 required.
11   Q.   Did you search for those emails to produce
12 them in this case?
13   A.   Yes. I mean, I would have produced anything
14 that I had at the time if I was requested to do it for
15 discovery.
16   Q.   Were your emails requested for discovery?
17   A.   I -- I honestly don't recall. I don't
18 recall specifically what each of the discovery items
19 were requested. There were several.
20   Q.   Do you ever communicate with your staff
21 members by text message?
22   A.   We use Google Chat to -- to communicate, you
23 know, brief types of -- types of items.
24   Q.   Do you know whether you searched Google Chat
25 for messages related to the statute?

Page 81

1   A.   I don't believe Google Chat retains messages
2 for any length of time. So I don't -- I don't
3 necessarily have the ability to search Google Chat.
4   Q.   Do you know that for sure?
5   A.   I'm not 100 percent sure if it's maintained
6 anywhere, but it's not -- not maintained by me locally.
7   Q.   Do you know whether other members of your
8 staff searched their individual email accounts for
9 emails related to this statute?
10   A.   I -- I don't recall specifically what the --
11 what the requests were in terms of what to produce for
12 each individual.
13   Q.   Can you scroll down to this page, please?
14 First, actually, I should say at a high level, do you
15 know what this document is? I know we've just zoomed in
16 on one page. I'm happy to go back to the cover page if
17 that's helpful. But do you know what this document is,
18 this Performance Plan document?
19   A.   Generally, yes.
20   Q.   And what is it generally?
21   A.   It's just a -- it's the -- the document that
22 the division uses to measure and outline performance
23 objectives.
24   Q.   And are you involved in the creation of the
25 Performance Plan?

Page 82

1    A.   I am now.  I was not involved in the
2  creation of this document.
3    Q.   And that's because in '22-'23, you were a
4  senior program director as opposed to a division
5  director; is that right?
6    A.   Correct.  This would have been fiscal year
7  '22, and during that time I was a senior program
8  director.
9    Q.   Are you familiar with DORA's EDI efforts?
10   A.   Generally, yes.
11   Q.   Have you participated in EDI training at
12 DORA?
13   A.   Yes.
14   Q.   Have you had your employees participate in
15 EDI training at DORA?
16   A.   I believe it was a department-wide
17 requirement and everybody participated.
18   Q.   You know, roughly, how many hours of EDI
19 training you've had at DORA?
20   A.   I don't recall the specific number of hours,
21 no.
22   Q.   Now, did you participate in special training
23 because you're a supervisor?
24   A.   Yes.
25   Q.   What did you learn in the EDI training you

Page 83

1  went through at DORA?
2    A.   The overall EDI training -- to the best of
3  my recollection, what I specifically learned was the --
4  the importance and the benefits of having a diverse
5  workforce and the benefits that can come along with it,
6  and the importance of inclusion as it relates to the
7  diversity aspect of the workforce.
8    Q.   Is the EDI effort within DORA only focused
9  on -- in other words, is it only internally focused on
10 the DORA workplace, or does it also have anything to do
11 with how DORA interacts with regulated entities?
12        MR. URANKAR:  Form.
13        THE WITNESS:  I would say, to a -- to a certain
14   extent it's both.
15 BY MR. RIENZI:
16   Q.   [Indiscernible] EDI plan specifically for
17 the DPO?
18   A.   There -- to my knowledge, there isn't a
19 specific DPO plan that deviates from the department-wide
20 plan.
21   Q.   So there's a department-wide plan that
22 covers everybody, including DPO; is that fair?
23   A.   Yes.
24   Q.   If we can scroll to the bottom of this page.
25 If you see on the bottom, there's a box that says

Page 84

1  "DORA's EDI work in action.  Gender-affirming care for
2  Colorado Division of Insurance."  Do you see that?
3    A.   Yes.
4    Q.   I'll give you a minute to read that before I
5  ask you a question or two about it.
6    A.   Okay.
7    Q.   Are you familiar with DORA's effort to get
8  gender-affirming care into insurance plans?
9    A.   No.
10   Q.   Are you familiar with the Division of
11 Insurance?
12   A.   Yes.
13   Q.   And is the Division of Insurance also part
14 of DORA?
15   A.   Yes.
16   Q.   Had you not heard anything previously about
17 Colorado's efforts to have gender-affirming care
18 included in insurance plans?
19   A.   No.
20   Q.   Have you taken specific actions based on the
21 EDI training in terms of how DPO deals with, say, racial
22 diversity?
23   A.   In terms of the inclusivity and awareness
24 aspects of EDI, general practices within DPO weren't
25 necessarily altered.

Page 85

1    Q.   Do the board members take this EDI training?
2    A.   I don't know.
3    Q.   Do you do anything specifically to carry out
4  your EDI obligations as it relates to religion?
5    A.   I don't -- I don't believe there's anything
6  specific we do related to religion.
7    Q.   Do you recall any training for your
8  employees on how to deal with religious diversity among
9  the people they regulate?
10   A.   Some of the Practice Acts have specific
11 exemptions for religious activity that the program
12 directors and board members are familiar with as they --
13 as they need to be.  But I don't -- I don't believe
14 there hasn't been any specific training for employees
15 relative to religions, specifically outside of the
16 general EDI training.
17   Q.   Okay.  Can we look at the next document,
18 please?  I'm going to show you a document that we're
19 going to call Exhibit 126.  And first, I want to ask you
20 if you recognize the logos at the top?
21        (Exhibit 126 marked for identification.)
22   A.   Yes.
23   Q.   Are those DORA logos?
24   A.   That's the specific logo for the Division of
25 Insurance.

Page 86

1  Q.  And do you recognize this document?
2  A.  No.
3  Q.  Have you ever seen those logos on a document
4  that did not come from the Division of Insurance?
5  A.  Not -- not that I recall.
6  Q.  Okay. Are you familiar with an entity
7  called -- you can take that one down -- called UC
8  Health?
9  A.  Yes.
10 Q.  What is UC Health?
11 A.  It's a -- a hospital entity in the -- in
12 Colorado.
13 Q.  And is it a state entity?
14 A.  I don't know if it's considered a state
15 entity or not.
16 Q.  Is it the University of Colorado's medical
17 school?
18 A.  Yes.
19 Q.  Okay. Is the University of Colorado a
20 government-run institution?
21 A.  University of Colorado would be a state
22 institution.
23 Q.  And I'm going to get the pronunciation of
24 this wrong, but have you heard of UC Anschutz Medical
25 Campus?

Page 87

1  A.  Yes.
2  Q.  And what is UC Anschutz Medical Campus?
3  A.  That is the -- the main campus of UC Health
4  and -- and their medical program.
5  Q.  And that's all -- that's also part of the
6  University of Colorado's medical school; is that
7  correct?
8  A.  I believe so, yes.
9  Q.  I believe you testified in court last April,
10 that at the time, neither of the boards you were
11 representing were investigating Bella. And again, I'm
12 -- we can put your testimony in front of you if my
13 question's unclear or you need to look at it, but I'm
14 just asking: Do you recall testifying that neither of
15 the boards was then investigating Bella?
16 A.  Yes.
17 Q.  Okay. And at the time, you said that in
18 Federal Court, one, I assume it was true. Was it true?
19 A.  Yes.
20 Q.  At the time you said that, was there any
21 plan to launch later investigations of Bella?
22 A.  None that I would be aware of.
23 Q.  How about now? Are there any ongoing
24 investigations of Bella by the boards now?
25 A.  Not that I'm specifically aware of.

Page 88

1  Q.  Are there any that you're generally aware
2  of?
3  A.  I know that there's been one complaint
4  that's been open, but I don't recall that it's
5  specifically about -- whether or not it's specifically
6  about Bella.
7  Q.  Is it possible that's the complaint about
8  ivermectin? Oh, I'm sorry. You're saying you know
9  there's one complaint related to medication abortion
10 reversal -- is that what you're saying?
11 A.  Correct.
12 Q.  And is that the complaint related to the
13 plaintiff intervener, Chelsea Mynyk?
14 A.  Yes.
15 Q.  Other than that complaint, are you aware of
16 any investigations going on related to medication
17 abortion reversal?
18 A.  Not that I'm aware of.
19 Q.  Are you aware of any plans to investigate
20 Bella after this case is over?
21 A.  No.
22 Q.  Are you aware if that topic has been
23 discussed by the boards?
24 A.  Not to my knowledge.
25 Q.  Have you seen any documents produced by

Page 89

1  Bella in this litigation?
2  A.  The only -- the only documents I would have
3  specifically reviewed or seen were documents provided as
4  part of, as I mentioned earlier, the discovery request.
5  Q.  But -- so I just want to separate out two
6  different things. Right? One, is the boards responding
7  to discovery requests. Right? That's you all
8  collecting documents and giving them to us. And I'm not
9  meaning to ask you about that right now.
10 So what I want to ask you about is documents that
11 were produced by Bella to your attorneys. Have you seen
12 any documents that were produced by Bella to your
13 attorneys in this case?
14 A.  Nothing that specifically comes to mind.
15 Q.  Do you recall signing the protective order
16 in this case?
17 A.  I -- I would need to see it.
18 Q.  Okay. I'm actually not saying that you did.
19 I'm actually asking if you did. So I'm not asserting
20 that you did. I don't have it. I'm just asking. So is
21 your answer: You don't know?
22 A.  I don't -- I don't recall.
23 Q.  Okay. I want to circle back to the issue of
24 documents and ways that you communicate with your team
25 and just make sure I have a full handle on it. I think