# Exhibit 32

**ROBERTA HILLS - November 15, 2024**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-00939-DDD-SKC
_____

VIDEOTAPED DEPOSITION OF:
ROBERTA HILLS - November 15, 2024
_____

BELLA HEALTH AND WELLNESS, et al.,

Plaintiffs,

CHELSEA M. MYNYK,

Plaintiff-Intervenor,

v.

PHIL WEISER, in his official capacity as Attorney General of Colorado, et al.,

Defendants.
_____

PURSUANT TO NOTICE, the videotape deposition of ROBERTA HILLS was taken on behalf of the Plaintiffs at 1700 Lincoln Street, Denver, Colorado 80203, on November 15, 2024 at 9:12 a.m., before Ellie K. Liebenow, Registered Professional Reporter and Notary Public within Colorado.

ROBERTA HILLS - November 15, 2024

Page 2

```
 1         A P P E A R A N C E S
 2 For the Plaintiffs:
 3       MICHAEL J. O'BRIEN, ESQ.
         KELLY R. OELTJENBRUNS, ESQ.
 4       MARK K. RIENZI, ESQ. (via Zoom)
         The Becket Fund for Religious Liberty
 5       1919 Pennsylvania Avenue, N.W.
         Suite 400
 6       Washington, D.C. 20006
         mobrien@becketlaw.org
 7
 8 For the Plaintiff-Intervenor:
 9       JULIA C. PAYNE, ESQ. (via Zoom)
         KEVIN H. THERIOT, ESQ. (via Zoom)
10       Alliance Defending Freedom
         15100 North 90th Street
11       Scottsdale, Arizona 85260
         ktheriot@adflegal.org
12       jpayne@adflegal.org
13
   For the Defendants:
14
         ELIZABETH V. KENNY, ESQ.
15       ZACH FITZGERALD, ESQ.
         BRIAN URANKAR, ESQ.
16       BRADLEY JEROME GRASSMEYER, ESQ. (via Zoom)
         Colorado Attorney General's Office
17       1300 Broadway 8th Floor
         Denver, Colorado 80203
18       elizabeth.kenny@coag.gov
         zach.fitzgerald@coag.gov
19       brian.urankar@coag.gov
         brady.grassmeyer@coag.gov
20
21 Also Present:
22       Tom Rowles, Videographer
23
24
25
```

Page 4

```
 1 Exhibit 136   Letter from Hills to Chism, Re:     145
               Case Number: 2021-6953, 11/3/22
 2
   Exhibit 137   E-mail from Hills to Duran,         146
 3             Backlog, 3/15/23, with attached
               e-mail
 4
   Exhibit 138   E-mail from Cummings to Hills,      151
 5             E-mail to BON, 4/17/23
 6 Exhibit 139   E-mail from Hills to board members, 153
               IMPORTANT update SB 23-190,
 7             4/17/23, with attached e-mails
 8 Exhibit 140   Letter from Hills to Chism, Re:     155
               Case Number: 2021-6953, 5/8/23
 9
   Exhibit 141   Letter from Hills to Chism, Re:     158
10             Case Number: 2021-6953 - PANEL A,
               8/1/23
11
   Exhibit 142   Letter from Hills to Chism, Re:     159
12             Case Number: 2021-6953 - Panel A,
               8/2/23
13
   Exhibit 143   Bella Health and Wellness, et al.,  160
14             v. Phil Weiser, et al., No.
               23-cv-939 (D. Colo.) Board
15             Defendants' Privilege & Redaction
               Log - August 28, 2024
16
   Exhibit 144   E-mail from Hills to Harris and     173
17             others, email - correspondence ck,
               6/4/24
18
19 DEPOSITION EXHIBITS: (Previously Marked)
20 Exhibit 2     Senate Bill 23-190                   83
21
22
23
24
25
```

Page 3

```
 1            I N D E X
 2 EXAMINATION OF ROBERTA HILLS:                    PAGE
   November 15, 2024
 3
   By Mr. O'Brien                                  6, 181
 4
   By Ms. Kenny                                      177
 5
 6                                               INITIAL
   DEPOSITION EXHIBITS:                         REFERENCE
 7
   Exhibit 127   Reporter's Transcript Hearing on     98
 8             Motion for Preliminary Injunction
 9 Exhibit 128   Exhibit R: Nursing Board Notice     107
               of Proposed Rulemaking
10
   Exhibit 129   Exhibit Q: Medical Board Notice of  111
11             Proposed Rulemaking
12 Exhibit 130   Board of Nursing Full Board Open    113
               Session Agenda, Wednesday,
13             September 20, 2023
14 Exhibit 131   Department of Regulatory Agencies   122
               Division of Professions and
15             Occupations - State Board of
               Nursing Nursing Rules and
16             Regulations 3 CCR 716-1
17 Exhibit 132   Letter from Hills to Chism, Re:     134
               License Number: RN.0099483,
18             Case Number: 2021-6953, 11/2/21
19 Exhibit 133   Letter from Hills to Chism, Re:     137
               Case Number: 2021-6953, 5/4/22
20
   Exhibit 134   Letter from Norton to Hills, Re:    138
21             Complaint No. 2021-6953, License
               No. 0099483- Denise Mary Chism,
22             5/4/22
23 Exhibit 135   E-mail from Berry to                 143
               dora_nursingboard@state.co.us and
24             Hills, OI: Case 2021-6953/Chism,
               Denise, 9/1/22
25
```

Page 5

```
 1            WHEREUPON, the following proceedings
 2 were taken pursuant to the Federal Rules of Civil
 3 Procedure.
 4         *     *     *     *     *
 5            THE VIDEOGRAPHER: Good morning,
 6 everybody. We are now on the record. The time is
 7 9:12 a.m. on Friday, November 15th, 2024. We're at
 8 Wells Fargo Center, 1700 Lincoln Drive -- Lincoln
 9 Street, Denver, Colorado 80203. We're here for the
10 videotaped deposition of Roberta Hills taken in the
11 matter of Bella Health and Wellness, et al. versus
12 Weiser, et al.
13            This is being filed in the United States
14 District Court for the District of Colorado. The case
15 number is 1:23-cv-939-DDD-SKC. The videographer today
16 is Tom Rowles. The court reporter is Ellie Liebenow.
17            Will counsel please state their
18 appearances beginning with the plaintiff's counsel.
19            MR. O'BRIEN: Michael O'Brien of The
20 Becket Fund for Religious Liberty for the plaintiffs.
21            MS. OELTJENBRUNS: Kelly Oeltjenbruns of
22 The Becket Fund for Religious Liberty for the
23 plaintiffs.
24            MS. KENNY: Liz Kenny for the Colorado
25 Board of Nursing.
```

**ROBERTA HILLS - November 15, 2024**

Page 6

1  MR. FITZGERALD: Zach Fitzgerald also
2  for the Colorado Board of Nursing.
3  MR. URANKAR: Brian Urankar for the
4  Medical Board.
5  THE VIDEOGRAPHER: Thank you. Can the
6  court reporter please swear in the witness and then we
7  can get started.
8  ROBERTA HILLS,
9  having been first duly sworn to state the whole truth,
10 testified as follows:
11 (Deponent's reply to oath: I do.)
12 EXAMINATION
13 BY MR. O'BRIEN:
14  Q. Good morning, Dr. Hills. My name is
15 Mike O'Brien. I'm going to be asking you some
16 questions today. As I said, I represent the
17 plaintiffs in this case. I'd like to start by going
18 over a few preliminary things, one of which I think
19 we've just learned off the record. The first
20 question, have you been deposed before?
21  A. Yes, one time.
22  Q. And what was that matter?
23  A. I don't remember.
24  Q. Were you a party in the case?
25  A. I represented the Board of Nursing.

Page 7

1  Q. So you were deposed in your capacity as
2  a representative of the Board of Nursing?
3  A. Right. I -- the case had to do with a
4  licensee suing the hospital for reporting a complaint.
5  MR. URANKAR: Sorry, Michael, just to
6  interject, I think the Zoom feed might be muted.
7  THE VIDEOGRAPHER: Let me plug it in.
8  It's not plugged in.
9  MR. O'BRIEN: We'll take a pause while
10 we get things set up.
11 THE VIDEOGRAPHER: We're going off the
12 record.
13 MR. O'BRIEN: Thanks, Brian.
14 THE VIDEOGRAPHER: The time is 9:14.
15 (Recess taken, 9:14 a.m. to 9:16 a.m.)
16 THE VIDEOGRAPHER: We're now back on the
17 record. The time right now is 9:16. Would the Zoom
18 Room please name your appearances.
19 MR. GRASSMEYER: Brady Grassmeyer on
20 behalf of the Attorney General.
21 MR. RIENZI: Mark Rienzi on behalf of
22 the Bella plaintiffs.
23 MS. PAYNE: Julia Payne on behalf of
24 Chelsea Mynyk.
25 THE VIDEOGRAPHER: So we can get

Page 8

1  started. Thank you.
2  Q. (BY MR. O'BRIEN) All right. Dr. Hills,
3  back to that --
4  MS. OELTJENBRUNS: Are we back on the
5  record? We're back on the record?
6  THE VIDEOGRAPHER: Yes, sir -- ma'am.
7  Q. (BY MR. O'BRIEN) Dr. Hills, back to the
8  other deposition that you took --
9  A. Yeah.
10  Q. -- I think you said that it involved a
11 complaint by a hospital?
12  A. It was a licensee who the hospital had
13 complained -- sent a complaint to the board on, and
14 that case had ended, and the licensee now was suing
15 the hospital for filing the complaint.
16  Q. I see. Do you remember how that case
17 resolved?
18 MS. KENNY: Objection; form.
19  A. I think -- I think the -- the hospital
20 lost, I think, but I don't know.
21  Q. (BY MR. O'BRIEN) All right. So we have
22 a court reporter with us here today. So I'm just
23 going to go over the ground rules for how, you know,
24 the operation works. How long ago was that
25 deposition, by the way?

Page 9

1  A. Well, probably three years ago.
2  Q. Okay. So just a brief refresher, we've
3  got the court reporter here. So you'll need to answer
4  audibly rather than nodding or shaking your head just
5  so it can get written down on the record, all right?
6  A. Yes.
7  Q. We'll also just have to be careful to
8  take turns. I don't want to interrupt you just so
9  that the court reporter can get the back-and-forth
10 without us talking over each other. And I'll do my
11 best not to -- not to interrupt. Is that fair?
12  A. Sounds good.
13  Q. Your attorney, as we just saw, might
14 object throughout the day. Unless -- unless she
15 instructs you not to answer, you know, the objection
16 will go on the record and you can just proceed to
17 answer the question. If I phrase it poorly though,
18 I'm happy to rephrase. I don't want to confuse you or
19 anything like that, so please -- please do let me know
20 if -- if I could be clearer.
21  A. Sounds good.
22  Q. Great. We'll also take breaks
23 throughout the day. Happy to work with your timing.
24 If you'd like a break, just let me know. And the only
25 thing I ask is that we take -- we don't break while a

Page 34

1 know her background -- I -- she was on when I came
2 on -- in terms of her education. And what is our
3 other -- I'm trying to remember who our other public
4 member is. I'm sorry. I don't remember.
5      Q.   (BY MR. O'BRIEN)  That's totally fine.
6 What's -- was that CDPHE?
7      A.   Right.  Colorado Department of Public
8 Health and Environment.
9      Q.   So the full board is 12, and then there
10 are panels on the board; is that right?
11           MS. KENNY:  Objection; form.
12      A.   Right.  There are panels, yeah.
13      Q.   (BY MR. O'BRIEN)  How many panels?
14      A.   Two.
15      Q.   Two panels of six members each?
16           MS. KENNY:  Objection.  Sorry.
17      A.   It's -- one panel has six.  One has
18 five.  And then the board president attends both.
19      Q.   (BY MR. O'BRIEN)  Who selects panel
20 membership?
21           MS. KENNY:  Objection; form.
22      A.   The panel is selected based on a
23 vacancy.  So if we get a vacancy in Panel A, then
24 that's what -- where that person would be replaced, on
25 Panel A.

Page 35

1      Q.   (BY MR. O'BRIEN)  Do board members ever
2 switch panels?
3      A.   We did have an occasion where that
4 occurred, and it was because I had too many on one
5 panel.
6      Q.   How did that come about?
7      A.   To be honest, I don't know how it came
8 about.  But, I mean, I -- I'm not sure.  I guess
9 maybe -- I just -- I don't know how I -- I had
10 someone -- too many on one, but I did.  And so we
11 switched.
12      Q.   Other than getting the numbers right,
13 are there criteria for which board member goes on
14 which panel?
15           MS. KENNY:  Objection; form.
16      A.   Well, I think a public member on each
17 panel, and we have two LPNs, so an LPN on each panel.
18      Q.   (BY MR. O'BRIEN)  And what's an LPN?
19      A.   A licensed practical nurse.
20      Q.   Is there any other mix of experience
21 that's aimed for when composing panel membership?
22           MS. KENNY:  Objection; form.
23      A.   No.  Really since I've -- now that I've
24 been in this role for a while, I know that we're just
25 replacing those that have -- I don't know how the

Page 36

1 other mixup occurred, but it did occur.  It's just a
2 replacement now.
3      Q.   (BY MR. O'BRIEN)  Are you the only one
4 who selects panel members?
5           MS. KENNY:  Objection; form.
6      A.   I think -- it's a -- it's a process, and
7 it -- the board members are selected by the governor's
8 office by the governor, and so people apply to that
9 office.
10      Q.   (BY MR. O'BRIEN)  I understand.  But
11 when selecting who's going on which panel, is that --
12 is that up to you?
13           MS. KENNY:  Objection; form.
14      A.   Yes, it is.
15      Q.   (BY MR. O'BRIEN)  Does any current board
16 member have OB/GYN experience?
17      A.   Yes.
18      Q.   Who?
19      A.   Jessica Pettigrew.
20      Q.   Anyone else?
21      A.   Not that I'm aware of.
22      Q.   How long has Jessica Pettigrew been a
23 board member?
24      A.   Since July.
25      Q.   Since July of this year?

Page 37

1      A.   Of this year.
2      Q.   In 2023, did any then board member have
3 OB/GYN experience?
4      A.   No.
5      Q.   Since you became program director, and
6 excluding Jessica Pettigrew, has any other board
7 member had OB/GYN experience?
8      A.   No.
9      Q.   For how long does the same panel serve?
10           MS. KENNY:  Objection; form.
11      A.   How long does -- I don't exactly
12 understand what you're asking.
13      Q.   (BY MR. O'BRIEN)  That's fine.  Totally
14 fair.  Am I understanding you right that outside of
15 having to fix the numbers, will the panel stay the
16 same until a vacancy arises?
17           MS. KENNY:  Objection; form.
18      A.   Correct.
19      Q.   (BY MR. O'BRIEN)  How do vacancies
20 arise?
21      A.   Life happens for some of the board
22 members and they will resign, or some are unhappy with
23 actions and resign kind of out of protest.
24      Q.   During your tenure as program director,
25 has any board member resigned out of protest?

Page 74

1  Q. (BY MR. O'BRIEN) What does that mean?
2  A. They need legal advice.
3  Q. Any other times the board would enter
4  executive session?
5  A. If it's an open meeting and there's
6  confidential information and they want to discuss the
7  case. They would also do it for discussing
8  confidential information.
9  Q. Outside of getting legal advice or
10 discussing confidential information, are there -- is
11 there any reason that the board would enter executive
12 session?
13 A. Not that I'm aware of.
14 Q. And we've been discussing the board
15 review and complaints in this process. Would that be
16 a panel of the board or the full board?
17     MS. KENNY: Objection; form.
18 A. Complaints are reviewed in panel.
19 Q. (BY MR. O'BRIEN) Who sets the agenda
20 for panel meetings to review complaints?
21     MS. KENNY: Objection; form.
22 A. Well, I have a complaints manager that
23 retrieves the cases that are ready to be on the
24 agenda, and she puts them on.
25 Q. (BY MR. O'BRIEN) What's her name?

Page 75

1  A. Annadella Duran.
2  Q. How many -- will the board consider a
3  given complaint at more than one panel meeting, or is
4  each complaint resolved by the end of the meeting?
5     MS. KENNY: Objection to form.
6  A. Some complaints, the board wants more
7  information, and so it will -- the more information
8  will be gathered and brought back.
9  Q. (BY MR. O'BRIEN) You mentioned
10 retaining experts to give a recommendation on whether
11 a provider has met the standard of care. So let's
12 just turn to the standard of care a little bit, if
13 that's all right. Generally speaking, how does the
14 Nursing Board decide the generally accepted standards
15 of care?
16     MS. KENNY: Objection; form.
17 A. Well, there is a fair amount of evidence
18 out there, so they use a lot of -- of the research
19 that's out there to determine practice standards. And
20 we know that when -- when a practitioner at the same
21 education, knowledge, and skill level -- we match --
22 they'll -- they will look at what is the standard for
23 other practitioners at that same education, knowledge,
24 and skill level in the same context and what is that
25 standard of practice then based on the research and

Page 76

1  that other folks practicing at that same level.
2  Q. (BY MR. O'BRIEN) And is that
3  determination made at the inquiry panel level?
4  A. That -- the expert will weigh in on the
5  case, and then the board members will review that
6  expert's analysis of the case and -- and where the
7  person has met the standard and where the person has
8  not met the standard and then act on it.
9  Q. So the board members exercise judgment
10 over -- whether in a given case the standard of care
11 has been met?
12 A. Yep.
13     MS. KENNY: Objection; form.
14 Q. (BY MR. O'BRIEN) Is it always a
15 case-by-case analysis?
16 A. Yes.
17 Q. The rule we were discussing that you
18 mentioned that Sam Delp drafted, that involved the
19 standard of care; right?
20     MS. KENNY: Objection; form.
21 A. That involved reviewing cases on a
22 case-by-case basis.
23 Q. (BY MR. O'BRIEN) Do you recall any
24 other instance in which Mr. Delp drafted a Board of
25 Nursing rule?

Page 77

1     MS. KENNY: Objection; form.
2  A. Well, he was program director for a
3  while, so -- and so he worked on some of the education
4  rules when I was the education manager.
5  Q. (BY MR. O'BRIEN) He drafted those
6  education rules himself?
7     MS. KENNY: Objection; form.
8  A. Well, with stakeholder input, and then
9  the board members always revise and tweak things.
10 Q. (BY MR. O'BRIEN) When the board is
11 making a standard of care determination in a given
12 case and hires an expert, is it relying on an expert
13 in the relevant field of nursing?
14     MS. KENNY: Objection; form.
15 A. Correct.
16 Q. (BY MR. O'BRIEN) Does the Nursing Board
17 ever set the standard of care or make a determination
18 of what the standard of care is at the full board
19 level?
20     MS. KENNY: Objection; form.
21 A. No.
22 Q. (BY MR. O'BRIEN) You said that that was
23 no?
24 A. I said no.
25 Q. When no expert is retained in a case and

Page 78

1 the panel makes a determination on the standard of
2 care, does the panel ensure that someone on the panel
3 has relevant experience in the field?
4          MS. KENNY:  Objection; form.
5     A.   The -- the panel will have people that
6 have relevant experience or they wouldn't be -- or
7 they wouldn't make that determination.
8     Q.   (BY MR. O'BRIEN)  So the only cases in
9 which an expert wouldn't be retained to opine on
10 standard of care in a case would be where there's
11 already a board member with subject matter expertise?
12          MS. KENNY:  Objection; form.
13     A.   The only time they wouldn't use an
14 expert is if it were not very complex and there were
15 people on the board that had that -- shared that
16 expertise or knew that the -- the practice and -- and
17 it made good sense that they could act on it.  We
18 could have people with expertise on the board, but the
19 case is so complex that we would want an expert.
20     Q.   (BY MR. O'BRIEN)  So if, say, a -- there
21 was no board member with OB/GYN experience to assess
22 the standard of care in a case, the proper course
23 would be for the board to retain an expert?
24          MS. KENNY:  Objection; form.
25     A.   It would, yes.

Page 79

1     Q.   (BY MR. O'BRIEN)  What's -- just kind of
2 zooming way out, what's the relationship between DORA
3 and the Nursing Board?  Can you just elaborate on that
4 a little bit for me?
5          MS. KENNY:  Objection; form.
6     A.   The Nursing Board is part of the
7 Division of Professions and Occupations, which is one
8 of the divisions of DORA.  And the overriding mission
9 of DORA, which is public protection and like a
10 balanced business environment, is what we abide by as
11 well.
12     Q.   (BY MR. O'BRIEN)  I see.  But DORA
13 doesn't tell the Nursing Board how to decide cases?
14     A.   No.
15          MS. KENNY:  Objection; form.
16     A.   DORA does not tell the Nursing Board how
17 to decide cases.
18     Q.   (BY MR. O'BRIEN)  So does the Nursing
19 Board have discretion to decide standard of care in
20 cases on a case-by-case basis?
21     A.   Yes.
22          MS. KENNY:  Objection; form.
23     Q.   (BY MR. O'BRIEN)  What's the
24 relationship between the legislature and the Nursing
25 Board?

Page 80

1          MS. KENNY:  Objection; form.
2     A.   Well, it's not formal, so it's pretty
3 informal.  And so the legislature is crafting
4 legislation.  If it gets passed, they would be in
5 contact to find out information for a fiscal note.  I
6 think they'd be looking at what's it going to cost.  I
7 think that's about as close as we get.
8          MR. O'BRIEN:  I think this is a good
9 natural breaking point --
10          MS. KENNY:  Okay.
11          MR. O'BRIEN:  -- for me and to not, you
12 know --
13          MS. KENNY:  Sure.
14          MR. O'BRIEN:  -- extend it much further.
15          MS. KENNY:  What are you thinking?
16 11:30.  Do you want to take like a longer break or a
17 short break?
18          MR. O'BRIEN:  I think it probably makes
19 sense to do a longer one.
20          MS. KENNY:  Okay.
21          MR. O'BRIEN:  If that works for
22 everyone.  We can go off the record, yeah.
23          THE VIDEOGRAPHER:  Let's go off the
24 record.  We're going off the record.  The time right
25 now is 11:25.

Page 81

1          (Recess taken, 11:25 a.m. to 12:20 p.m.)
2          THE VIDEOGRAPHER:  We're now back on
3 record.  The time right now is 12:20.
4     Q.   (BY MR. O'BRIEN)  Hi, Dr. Hills.  Let's
5 continue.  Are you aware of a treatment called
6 medication abortion reversal?
7     A.   I am.
8     Q.   What's your understanding of it?
9     A.   Just that there's medication out there
10 that will reverse abortions.  I think it's -- contains
11 progesterone.
12     Q.   And are you familiar -- have you heard
13 this medication abortion reversal also referred to as
14 abortion pill reversal?
15     A.   Not that I'm aware of.
16     Q.   Okay.  I'll try to use the terminology
17 medication abortion reversal, and -- but if I slip in
18 and say abortion pill reversal, I just mean --
19     A.   Okay.
20     Q.   -- medication abortion reversal; fair?
21 When did you first become aware of medication abortion
22 reversal?
23     A.   Well, probably in -- probably in 2023, I
24 think.
25     Q.   Do you know if it was before SB -- if

Page 122

1 revised Board of Pharmacy rule that you said you were
2 attaching in the memo?
3           MS. KENNY:  Objection; form.
4      A.   Yeah, it's what -- it's the information
5 **they wanted the board members to see and the revised**
6 **rule, yep, the appendix.**
7      Q.   (BY MR. O'BRIEN)  You're saying this is
8 what you said it was.  It's the pharmacy's revised
9 rule?
10     A.   Yes.
11     Q.   I'm going to go through just one more
12 line of questioning kind of related to this, and then
13 I think it will be a good time for a break.  Just a
14 heads-up.  I'd like to mark for identification
15 Exhibit 131.
16          (Deposition Exhibit 131 was marked.)
17     Q.   Dr. Hills, do you recognize this
18 document?
19     A.   Yes.
20     Q.   What is it?
21     A.   It's our Rule 1.35.
22     Q.   Is this the final rule that was issued
23 at the board meeting that we just discussed?
24     A.   It was the rule that -- yes, that was
25 **agreed upon.**

Page 123

1      Q.   And I'm looking at Subsection D-2, which
2 reads, The board evaluates generally accepted
3 standards of nursing practice on a case-by-case basis.
4 Each instance of nursing care will involve its own
5 unique set of facts that the board must evaluate
6 against the backdrop of evidence-based practice
7 standards.  For that reason, the board does not
8 regularly adopt rules establishing a single standard
9 of practice applicable to all situations.  Did I read
10 that correctly?
11     A.   You did.
12     Q.   And is that, in substance, the same
13 language as the Nursing Board's proposed rule that we
14 examined earlier?
15     A.   It was.
16          MS. KENNY:  Objection; form.
17     Q.   (BY MR. O'BRIEN)  And looking at -- on
18 the next page, Subsection 4, which reads, The board
19 will not treat medication abortion reversal provision,
20 prescription, administration, or attempt at any of the
21 preceding conduct with respect to medication abortion
22 reversal as a per se act subjecting a licensee to
23 discipline.  Did I read that correctly?
24     A.   You did.
25     Q.   And then the next sentence, Rather, the

Page 124

1 board will investigate all complaints related to
2 medication abortion reversal in the same manner that
3 it investigates other alleged deviations from
4 generally accepted standards of nursing practice under
5 Section, so on.  Did I read that correctly?
6      A.   Yes.
7      Q.   Is that, in substance, the same language
8 as the language in the proposed rule that we examined
9 earlier?
10     A.   Yes.
11          MS. KENNY:  Objection; form.
12     Q.   (BY MR. O'BRIEN)  So the Nursing Board's
13 final rule didn't change from the proposed rule; is
14 that right?
15     A.   Correct.
16          MS. KENNY:  Objection; form.
17     Q.   (BY MR. O'BRIEN)  Do you know why the
18 Medical Board decided in its final rule to designate
19 use of progesterone for medication abortion reversal
20 as falling below the generally accepted standard of
21 practice?
22          MS. KENNY:  Objection; form.
23     A.   I do not.
24     Q.   (BY MR. O'BRIEN)  And just to confirm,
25 the Nursing Board, with respect to medication abortion

Page 125

1 reversal, stuck with case by -- a case-by-case
2 approach to assessing compliance with generally
3 accepted standard of practice?
4          MS. KENNY:  Objection; form.
5      A.   **The Nursing Board did stick with that**
6 **case-by-case.**
7      Q.   (BY MR. O'BRIEN)  Does the Nursing Board
8 have any similar rule about other uses of
9 progesterone?
10          MS. KENNY:  Objection; form.
11     A.   No.
12     Q.   (BY MR. O'BRIEN)  To your knowledge, did
13 the Nursing Board receive any inquiries from the
14 legislature about this rule?
15     A.   No.
16     Q.   Do you know why the Medical Board would
17 leave open for case-by-case determination assessments
18 of nonprogesterone abortion reversal treatments?
19          MS. KENNY:  Objection; form.
20     A.   I don't know.  I don't know why.
21     Q.   (BY MR. O'BRIEN)  In the course of
22 rulemaking, did the Board of Nursing discuss trying to
23 avoid situations where a nurse might violate a
24 generally accepted standard of practice because a
25 superior ordered them to prescribe or administer a

Page 126

1 treatment?
2          MS. KENNY:  Objection; form.  And, Mike,
3 if you're asking for anything that is not in the
4 public record, we're going to assert a privilege here.
5 And I'm going to direct you, Dr. Hills, not to answer
6 with respect to any nonpublic information.
7     Q.   (BY MR. O'BRIEN)  Yeah.  Please answer
8 without divulging nonpublic information.
9     A.   **I don't recall that the board even**
10 **discussed it.**
11         MR. O'BRIEN:  All right.  I think now is
12 a good time for a break.
13         MS. KENNY:  Okay.  How long do you
14 think?
15         THE VIDEOGRAPHER:  We're going to go off
16 the record right now.  And we're going off the record.
17 The time is 1:31.  Thank you.
18         (Recess taken, 1:31 p.m. to 1:52 p.m.)
19         THE VIDEOGRAPHER:  We're now back on the
20 record.  The time is 1:52.
21     Q.   (BY MR. O'BRIEN)  Dr. Hills, do you
22 agree that a pregnant woman has a fundamental right to
23 continue a pregnancy and give birth or to have an
24 abortion and to make decisions about how to exercise
25 that right?

Page 127

1     A.   Yes.
2          MS. KENNY:  Objection; form.
3     Q.   (BY MR. O'BRIEN)  And are you aware some
4 women try to continue a pregnancy and give birth by
5 taking progesterone for medication abortion reversal?
6          MS. KENNY:  Objection; form.
7     A.   Yes.
8     Q.   (BY MR. O'BRIEN)  Do you think that
9 medication abortion reversal works?
10         MS. KENNY:  Objection; form.
11    A.   **I don't know.  I haven't studied it.**
12    Q.   (BY MR. O'BRIEN)  Do you think it could
13 work?
14         MS. KENNY:  Objection; form.
15    A.   **I really don't know.**
16    Q.   (BY MR. O'BRIEN)  Are you familiar with
17 Bella Health and Wellness?
18    A.   **Yes.**
19    Q.   How?
20    A.   **Just the name.**
21    Q.   When did you first become familiar or
22 learn about Bella?
23    A.   **When the -- when I heard that you had**
24 **sued the State.**
25    Q.   Are there -- does the Nursing Board have

Page 128

1 any existing investigations into Bella?
2          MS. KENNY:  Objection; form.
3     A.   **We don't regulate Bella, so no.**
4     Q.   (BY MR. O'BRIEN)  Any plans to
5 investigate Bella?
6          MS. KENNY:  Objection; form.
7     A.   **Not that I'm aware, no.**
8     Q.   (BY MR. O'BRIEN)  Are you familiar with
9 Dede Chism?
10    A.   **Yes, yes.**
11    Q.   How?
12    A.   **Just that the name is -- she -- it's a**
13 **case.  We have a case with -- where a complaint was**
14 **filed.**
15    Q.   When did you first learn of Dede Chism?
16    A.   **You know, I don't know.**
17    Q.   Are there any existing investigations by
18 the Nursing Board into Dede Chism?
19    A.   **I don't know that either, to be honest.**
20    Q.   To your knowledge, does the Nursing
21 Board have any plans to investigate Dede Chism in the
22 future?
23         MS. KENNY:  Objection; form.
24    A.   **I don't know.**
25    Q.   (BY MR. O'BRIEN)  Do you know if any

Page 129

1 potential investigations into Dede Chism have been
2 considered?
3          MS. KENNY:  Objection; form.
4     A.   **I don't -- I don't remember the details**
5 **of the case, to be honest.**
6     Q.   (BY MR. O'BRIEN)  Okay.  Are you
7 familiar with Abby Sinnett?
8     A.   **Yes.**
9     Q.   How?
10    A.   **Abby Sinnett was also a case at the**
11 **board.**
12    Q.   When did you first learn of Abby
13 Sinnett?
14    A.   **When we received a complaint.**
15    Q.   About when was that?
16    A.   **You know, I don't know.  I don't know**
17 **the dates.**
18    Q.   Are there any existing investigations by
19 the Nursing Board into Abby Sinnett?
20    A.   **I don't know.**
21    Q.   Are there any plans to investigate Abby
22 Sinnett?
23         MS. KENNY:  Objection; form.
24    A.   **I just -- I really don't know.  I don't**
25 **know where those cases are.**