# Exhibit 43



Transcript of **Colorado Senate Judiciary Committee Hearing (March 15, 2023) [excerpts]**

Wednesday, March 15, 2023

*Transcription for Becket Law*

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 150348

1

2

3

4

5

6

7

8                       TRANSCRIPT OF AUDIO RECORDING

9            Colorado Senate Judiciary Committee Hearing

10                     (March 15, 2023) [excerpts]

11

12

13

14

15

16

17              This is a true and accurate transcription
                    of the audio recording posted at
      https://sg001-harmony.sliq.net/00327/Harmony/en/PowerBrowser/P
18        owerBrowserV2/20241217/41/14343 from time stamps
          5:43:13 PM - 5:59:58 PM and 7:38:40 PM - 8:07:05 PM

19

20

21
                The audio recordings were transcribed by:
22
                      Lisa M. Sparling, RPR, FPR
23              National Certified Stenographer
            Notary Public, State of Florida at Large

24

25

Page 2

1          * * * * *

2  [5:43:13 PM - 5:59:58 PM]

3          CHAIRPERSON SENATOR JULIE GONZALES:  All right, all

4  right.  Senate Judiciary is going to come back to order,

5  and I want to extend my appreciation and gratitude --

6  That's cool, y'all.  I'll wait.  We got all day.

7          Thank you.  I want to extend my appreciation and

8  gratitude to everyone who has been here, I don't know,

9  all day.  We are now going to bring up Senate Bill 190

10  for consideration, and I'd like to invite our sponsors,

11  Senator Winter and Senator Marchman, to tell us about

12  this policy.  Who'd like to begin?

13          Senator Marchman?

14          SENATOR JANICE MARCHMAN:  Thank you.

15          When someone's making a decision to continue or end

16  a pregnancy, they deserve accurate information about all

17  of their options so they can determine what is best for

18  their health and well-being.  All people have the right

19  to truth in advertising and shouldn't have to worry about

20  being misled or deceived when seeking essential health

21  care services.

22          These clinics use disinformation, intimidation,

23  shame, and delay tactics to withhold essential and

24  time-sensitive reproductive health care that members of

25  the community deserve.

Page 3

1          So, what is an anti-abortion center?  They're also

2  known as crisis pregnancy centers and fake clinics.  They

3  are faith-based organizations that pose as a

4  comprehensive reproductive health care clinic to

5  intercept patients seeking abortion care.  What would SB

6  23-190 do to regulate antiabortion centers?  Prohibit the

7  use of deceptive advertising by anti-abortion centers,

8  prohibit advertising for abortion pill reversal and

9  define it as a deceptive trade practice, and make the

10  prescribing, offering, or facilitation of abortion pill

11  reversal, unprofessional conduct for licensed,

12  registered, or certified health care professionals.

13          So, some of the AAC's deceptive practices are

14  advertising to lure people in and steer them away from

15  abortion and other time-sensitive reproductive health

16  care procedures.  Examples of this include using language

17  like, "help is just a call away" on billboards, mass

18  transit facilities, college campuses, and websites to

19  target those with unplanned pregnancies, omitting,

20  minimizing, or obscuring disclaimers that they don't

21  offer or refer to abortion care or emergency

22  contraception, while advertising all options

23  pregnancy-related services.

24          Additionally, anti-abortion centers use the

25  following deceptive tactics to appear as reproductive

Page 4

1  health care facilities:  They often use similar names or

2  branding to nearby abortion clinics to give the

3  appearance of a medical facility with volunteers in

4  scrubs, medical equipment, intake forms, language used

5  such as "women's clinic, mobile medical clinic, free

6  ultrasounds," and "free pregnancy testing."  Sharing

7  medical misinformation, including offering and

8  advertising abortion pill reversal treatment.

9          By design, an increasing number look and operate

10  much like traditional OB/GYN providers, offering

11  ultrasounds, tests for sexually transmitted infections,

12  and in some instances, even prenatal care.  Many boast of

13  having medical directors and other licensed staff.

14  Dozens include the word "medical" in their names, but

15  beneath the veneer of medical professionalism is an

16  industry that state and federal authorities have done

17  almost nothing to regulate.

18          The lack of significant regulation means that for

19  the hundreds of clients whom pregnancy centers serve

20  every year, there is no one playing an oversight role to

21  make sure that centers are offering high-quality care and

22  accurate information or that staff are licensed and

23  adequately trained.  No one protecting clients'

24  ultra-sensitive personal information or inspecting

25  facilities and equipment to verify that they're clean and

Page 5

1  up-to-date.  No one taking substantive action if clients

2  are mistreated or deceived.

3          There is a regulatory dead zone that allows

4  pregnancy centers to dodge all the legal safeguards that

5  attach to actual healthcare without being held to even

6  basic consumer protection standards.  The consequences

7  extend far beyond the reproductive health front.  It

8  muddles medical trust.  They trade on the goodwill of

9  legitimate medicine to defraud patients.

10          The move into medical services began in the '80s as

11  centers started offering free pregnancy testing.  The

12  medicalization of pregnancy centers became a core

13  strategy of anti-abortion activists in the 1990s

14  following the advent of the ultrasound machine.

15          Since then, centers have ramped up their medical

16  services as a way to expand their reach and build

17  credibility with clients, communities, and donors.  79%

18  of centers provide free ultrasounds and 30% offer testing

19  for sexually transmitted infections.

20          Even as pregnancy centers have become more

21  medicalized, complaints about their deceptive tactics

22  have intensified, but there's been very little scrutiny

23  of how these centers operate under the regulatory radar.

24  Pregnancy centers typically recruit licensed doctors,

25  nurses, and sonographers as part of their teams of staff

Page 6

1    and volunteers, then piggyback on their professional
2    licenses to legally provide medical services.  It's a
3    system that works for other types of medical clinics
4    because they face many levels of oversight.
5        These include the federal patient privacy law, known
6    as HIPAA, regulations that govern Medicaid and Medicare,
7    and accreditation rules for the larger hospital systems
8    to which many traditional clinics belong.  Just because a
9    doctor promotes it does not mean it is accepted,
10   peer-reviewed care.
11       While there are exceptions, most pregnancy centers
12   don't list a medical director in their publicly available
13   documents.  Pregnancy centers that provide ultrasound
14   services should have a medical director who's a licensed
15   physician.  Some centers said they had a licensed
16   physician on staff or working as a volunteer, but not in
17   a medical director role.  Medical directors at many
18   centers specialize in fields outside of reproductive
19   health.
20       The centers often make it difficult to find out who
21   works there and to check their credentials.  Only four
22   states have laws requiring sonographers to be licensed.
23   Mainstream medical groups, like the American Institute of
24   Ultrasound and Medicine states that only technicians or
25   nurses with training in obstetric sonography should

Page 7

1    perform prenatal ultrasounds, while a physician or an
2    advanced clinical provider should interpret all of those
3    results.
4        The issue of regulation is more urgent than ever in
5    the post-Roe era.  In areas that continue to allow
6    abortion, like Colorado, centers are doubling down on
7    efforts to deter women, many from out of state, from
8    following through with plans to end their pregnancies.
9    Women's health advocates have been especially concerned
10   that sensitive health information collected by these
11   pregnancy centers could be weaponized against abortion
12   seekers, because most centers are not subject to the same
13   privacy rules as medical clinics.
14       Colorado has more than 50 religious-based pregnancy
15   centers that encourage women to keep their babies or link
16   them with adoption agencies.  That compares with 18
17   Planned Parenthood centers, 10 of which offer abortion
18   services and 76 state-funded health clinic locations that
19   offer low-cost birth control.  In five rural counties in
20   Colorado, the only pregnancy center or clinic is a
21   faith-based one.  In fact, in three counties, Otero,
22   Custer, and Fremont, the only thing that's available is a
23   mobile unit from Pueblo.
24       People deserve the right to make informed health
25   care decisions that are right for them.  AACs mislead and

Page 8

1    coerce people away from the health care services they
2    seek and remove a person's right to personal, bodily,
3    autonomy, and decision-making.  People deserve the right
4    to access critical health care in a timely manner.  For
5    people who have to take time off work, use public
6    transportation, find child care, and overcome other
7    obstacles, a trip to an AAC delays critical access to
8    care or pushes care completely out of reach.  People
9    seeking information about abortion deserve medically
10   accurate information from a trusted medical provider.
11       CHAIRPERSON SENATOR JULIE GONZALES:  Thank you so
12   much, Senator Marchman.
13       Senator Winter?
14       SENATOR FAITH WINTER:  Thank you, Madam Chair.
15       Thank you, committee members.  This is a consumer
16   protection bill.  This isn't a bill about limiting
17   choice.  It's about giving clear and honest information
18   to consumers.  We protect consumers from predatory payday
19   loans.  We require honest disclosure for student loans
20   and have numerous protections for consumers from debt
21   collectors.  This bill is a consumer protection bill
22   about deceptive trade practices and absolutely should be
23   enforced by the Attorney General's office.
24       This is not about shutting down anti-abortion
25   centers.  This is about truth in advertising.  Everyone

Page 9

1    should seek the care and counseling they choose when
2    pregnant, including faithbased organizations, as long as
3    it is a choice they are clearly making.  Unfortunately,
4    many antiabortion centers are purposefully misleading
5    about offering unbiased, medically-based, comprehensive
6    health care.
7        In fact, a study done in 2021 found that 85% of
8    participants could not correctly identify even one
9    anti-abortion center looking at their websites.  These
10   centers use language such as to offer all options,
11   women's clinic, medical clinic, offering free
12   ultrasounds, pregnancy and STI testing, and a range of
13   choices.  This misinformation isn't just inaccurate and
14   inconvenient for the consumer.  Trying to persuade people
15   to change their minds about their healthcare decisions is
16   a violation of autonomy and it can be downright
17   dangerous.
18       Oftentimes, if ultrasounds are offered in these
19   clinics, it is not performed by someone that's certified
20   to perform, or has a basic background in education to
21   interpret these ultrasounds.  In one instance, an
22   ultrasound at a so-called clinic missed an ectopic
23   pregnancy, putting the patient in danger.  Many times
24   anti-abortion clinics work to delay time-sensitive health
25   care from medical providers that do offer a full range of

Page 10

1    medically accurate treatment.
2        There was one patient from another state that paid
3    for a plane ticket, food, lodging to travel to Colorado
4    in order to seek abortion care, to only find herself at
5    an anti-abortion clinic, keeping her from time-sensitive
6    health care.  These centers also are not just untruthful
7    in their mission, their goals, and what they offer, they
8    do purposely target young people, low-income communities,
9    rural communities, and communities of color.  They are
10   taking advantage of vulnerable populations that are
11   already having a hard time accessing health care.
12       Put simply, anti-abortion clinics should not act as
13   though they offer a full range of reproductive health
14   care when they are using deceptive, untruthful practices
15   to lure patients in.  In addition to misinformation, many
16   places are advertising and offering abortion reversal.
17       The American College of Obstetricians and
18   Gynecologists and other medical experts have refuted the
19   efficacy of abortion pill reversal and say it's unproven
20   and unethical.  It is not based in science and does not
21   meet medical standards.
22       In a case in North Dakota, a brief from the American
23   Medical Association said the fact that there are
24   physicians experimenting with using progesterone to
25   counteract mifepristone does not constitute credible,

Page 11

1    medically accepted evidence that the experiment is
2    effective or safe.  Because there is no credible
3    scientific evidence that a medication abortion can be
4    reversed, physicians cannot, without misleading them,
5    tell their patients that it may be possible to do so, nor
6    can they tell their patients that information and
7    assistance is available to reverse a medication without
8    misleading them.
9        ACOG has stated that the so-called abortion reversal
10   procedures are unproven and unethical.  The studies on
11   the practice do not stand up to scientific scrutiny.  The
12   case studies on this practice lack supervision from
13   institutional review boards or an ethical review
14   committee which is required to protect human research
15   subjects raising serious questions regarding the ethics
16   and scientific validity of the results.  Case studies
17   with no control groups are among the weakest forms of
18   medical evidence.
19       Subsequent case series used to support use of
20   medicated abortion reversals have had similar
21   limitations, including no ethics approval, no control
22   group, under-reporting of data, and no reported safety
23   outcomes.  A 2020 study intending to evaluate medication
24   abortion reversal in a controlled, boardreviewed,
25   ethic-reviewed setting was ended early due to safety

Page 12

1    concerns among the patients.
2        I urge a yes vote on this important consumer
3    protection bill because transparency and truth in
4    advertising are essential to informed consent in medical
5    decision-making, particularly related to time-sensitive
6    services like abortion and emergency contraception.
7        CHAIRPERSON SENATOR JULIE GONZALES:  Thank you,
8    Senator Winter, for walking us through -- and to both of
9    you, for walking us through sort of the rationale behind
10   Senate Bill 190.
11       I'd like to see if there are questions for our bill
12   sponsors from members of the committee prior to us
13   proceeding to witness testimony.
14       Senator Van Winkle?
15       SENATOR VAN WINKLE:  Thank you, Madam Chair, and I
16   am just now learning, actually, in recent days about the
17   abortion reversal pill that you mentioned in your
18   introductory comments.
19       Why would a woman seek a abortion reversal pill?
20       CHAIRPERSON SENATOR JULIE GONZALES:  Senator Winter?
21       SENATOR FAITH WINTER:  I'm not -- I think one of the
22   things we make a mistake in doing in these conversations
23   is trying to place assumptions on medical decisions that
24   women are making, and I think whether she asserts -- a
25   pregnant person is seeking to have an abortion, get the

Page 13

1    morning-after pill, or decides that they would like to
2    explore not taking the second dose of a medication --
3    medicated abortion, I'm not going to speculate as to why
4    they are making that personal medical choice.
5        CHAIRPERSON SENATOR JULIE GONZALES:  Further
6    questions?
7        Senator Gardner?
8        SENATOR CORY GARDNER:  Thank you, Madam Chair.  And
9    this is either for Senator Winter or Senator Marchman.
10   Your bill is not very long, text-wise.  It's interesting,
11   setting aside the legislative declaration which doesn't
12   seem to be designed to go in the CRS, but contains a lot
13   of conclusions that, you know, are -- go to the core of
14   what's good medical treatment or not medical treatment,
15   and has pejorative terms for things and so forth, but be
16   that as it ...
17                    * * * * *
18   [7:38:40 PM - 8:07:05 PM]
19       VICE CHAIR SENATOR ROBERT RODRIGUEZ:  Thank you.
20   Mitchell Creinin, can you hear us?  There you are.
21       MITCHELL D. CREININ, M.D.:  I can, thank you for
22   allowing me to participate.  I am Dr. Mitchell Creinin.
23   I'm a board certified obstetrician gynecologist and a
24   board certified complex family planning specialist and a
25   tenured professor at the University of California, Davis.

Page 14

```
 1   I am here on my -- speaking on my own behalf.
 2       I am the only investigator who has ever studied
 3   mifepristone reversal.  There are only three studies that
 4   have ever been published and all of the prior testimony
 5   that related to numerous studies and many people in
 6   studies is blatantly false.
 7       There are three studies and that is it.  Two of
 8   those studies or what qualify as studies are simply case
 9   reports with less than 10 patients each.  There is also
10   my study, which a randomized trial which we stopped
11   early after enrolling 12 patients.  And that's the
12   evidence.  Period.
13       There is a report with upwards of 750 people that
14   supposedly received mifepristone and then supposedly
15   received progesterone.  The problem is that doesn't
16   qualify as a study, and the basis for all of the
17   discussion around mifepristone reversal is tethered on
18   this one report.
19       Well, to reach an evidence level of a study at the
20   lowest level, a case study or case series, which is what
21   this report tried to be, needs to report on the outcomes
22   for all of the individuals who were included, not just
23   the individuals had the result that was desired by the
24   investigators.
25       So this larger report of 750 people is not a study
```

Page 15

```
 1   because they only reported the outcomes for those people
 2   that had continuing pregnancies which was about 50% and
 3   not the other half.  Said nothing about what happened to
 4   the other 50% who didn't have the desired outcome.
 5   Therefore, it's not a study.
 6       So, all of this discussion is about a treatment that
 7   is purported by anti-abortion clinics to be proven and
 8   effective, and there are no studies to do so.  So, this
 9   is misleading.  This bill is about medical fraud, and
10   that's all it's about.  It's not about when life begins,
11   it's not about abortion.  It's about the ability of
12   clinics to move forward with medical fraud and that's
13   just not right.
14       VICE CHAIR SENATOR ROBERT RODRIGUEZ:  Thank you.
15       Colleagues, is there any questions?  Senator
16   Roberts?
17       SENATOR DYLAN ROBERTS:  Thank you, Mr. Chair.  Thank
18   you all for your testimony and your time this evening.
19       Ms. Gavin, I wanted to go back to you and get into
20   the legal analysis a little bit more, and I think you
21   were just ending or your time ran up just when you were
22   making your point.
23       Can you walk me through a little bit more of the
24   legal analysis of how this doesn't violate the first
25   amendment as deceptive health information -- is that
```

Page 16

```
 1   deceptive health information -- is that under the
 2   existing deceptive trade practices or is there case law
 3   that leads to that conclusion?  Can you just walk me
 4   through that?
 5       VICE CHAIR SENATOR ROBERT RODRIGUEZ:  Ms. Gavin?
 6       MS. LEANNA GAVIN:  Yes, thank you.
 7       VICE CHAIR SENATOR ROBERT RODRIGUEZ:  It happens.
 8       MS. LEANNA GAVIN:  Thank you.
 9       I was speaking to the Deceptive Trade Practices Act
10   and also just to the common law on first amendment
11   rights, so content-based regulations tend to be a
12   trigger, strict scrutiny.  There has been a split on the
13   US Supreme Court as to whether content -- false
14   content-based statements trigger strict scrutiny or
15   immediate scrutiny.
16       So, strict scrutiny meaning that the law is presumed
17   unconstitutional unless the government can show that the
18   challenged law is the least restrictive means of
19   targeting speech while also serving a compelling
20   government interest.  If we were to apply intermediate
21   scrutiny, which is a lower standard, the law must further
22   an important government interest by means that are
23   substantially related to that interest.
24       My argument is that this law can meet either test.
25   Colorado has already adopted the Uniform Deceptive Trade
```

Page 17

```
 1   Practices Act which states that, in part, it's a
 2   deceptive trade practice to knowingly or recklessly make
 3   a false representation to the characteristics, uses, or
 4   benefits of products or services or to knowingly or
 5   recklessly engage in any unfair, unconscionable,
 6   deceptive, deliberately misleading, false, or fraudulent
 7   act or practice.
 8       So that is already an existing restriction on speech
 9   that exists and the law that is being proposed in this
10   bill is arguably a more compelling government interest
11   because it's not just about commercial trade practices,
12   it's about healthcare.
13       As I said, the consumers that we're talking about
14   are women who are seeking healthcare related to their
15   pregnancy and they are being deceived into thinking that
16   they're receiving healthcare, but they're actually
17   receiving propaganda from anti-choice activists disguised
18   as healthcare.  And so, arguably, there's a more
19   compelling government interest here and this law is more
20   narrowly tailored to address that government interest in
21   that it specifically addresses AACs.
22       VICE CHAIR SENATOR ROBERT RODRIGUEZ:  Senator
23   Roberts?
24       SENATOR DYLAN ROBERTS:  Thank you, Mr. Chair.
25   Thank you for that, and just so one follow-up.  So
```

Page 18

1  that subcategory of healthcare information, is that
2  doesn't currently exist in Colorado law, is that right?
3  And if not, is there anywhere in case law that sort of
4  creates that category or other states maybe or -- have
5  categorized a specific category of healthcare?
6      VICE CHAIR SENATOR ROBERT RODRIGUEZ: Ms. Gavin?
7      MS. LEANNA GAVIN: I am not sure about the answer to
8  that question, so I would defer to another panelist. The
9  law that I reviewed didn't speak specifically to
10  healthcare. I was simply saying that, you know, from my
11  perspective as an attorney, I would think that because
12  it's healthcare, not just commercial information, that
13  that would be a compelling government interest.
14      SENATOR DYLAN ROBERTS: Okay, thank you.
15      VICE CHAIR SENATOR ROBERT RODRIGUEZ: Oh, Senator
16  Gonzalez?
17      CHAIRPERSON SENATOR JULIE GONZALES: Thank you, Mr.
18  Chair.
19      I apologize, Dr... is it Crennan or Creinin?
20      MITCHELL D. CREININ, M.D.: Thank you.
21      CHAIRPERSON SENATOR JULIE GONZALES: I walked in
22  just as you were speaking, and I missed the majority of
23  your testimony, but it's my understanding that you have
24  worked on the study that has been referred to at great
25  length thus far during this hearing, and I wanted to take

Page 19

1  an opportunity to ask you, because we've heard some
2  testimony from previous witnesses that abortion pill
3  reversal is safe and effective.
4      Can you speak to that given the -- your knowledge
5  and expertise?
6      MITCHELL D. CREININ, M.D.: Sure. Thank you for
7  asking.
8      I think one of the important things about looking at
9  all of these questions and a lot of the testimony that's
10  been provided before is that science is not about seeing
11  a patient who experienced outcome A, or saying, I saw one
12  person who reported outcome B. Science is about looking
13  at something systematically. That's why we do studies,
14  to really test if an outcome is due to the intervention
15  or the treatment, or if it occurs by chance.
16      So when you look at the information that was
17  available, even before I started my study, it was two
18  case series, and that's it. A case series is when
19  somebody has a certain condition or -- and somebody gives
20  them a treatment and says, what happened? It doesn't
21  prove any cause and effect. It doesn't show any outcome.
22  It just says, you know, I gave this, and this is what
23  happened. Maybe it might be reasonable. There should be
24  real studies done.
25      There is a 2018 report from -- led by Delgado and

Page 20

1  colleagues that was published in what would be considered
2  an irreputable journal. It's not even a standard medical
3  journal. There was no criteria that were done that would
4  allow any reputable journal to publish anything like this
5  without getting into large amounts of detail, but it
6  didn't meet the minimum criteria even for a case series,
7  which is that when you treat all the people, you report
8  the outcomes on all the people.
9      So, therefore, with those three things in existence,
10  that means the only data that really looks at
11  mifepristone reversal are a couple of case series with
12  less than 10 people each, and then the study I attempted
13  to do, keeping in mind that mifepristone and misoprostol
14  together are very effective, very safe, very well-proven
15  treatment with a death rate that's lower than Tylenol, a
16  death rate that's lower than Viagra. Right? So let's
17  get the safety really clear, what the combination of the
18  two drugs represents.
19      If you give the first drug and then try to do what
20  we did, which is that give women mifepristone with an
21  established pregnancy, and then randomize them to a
22  placebo or progesterone in a blinded fashion so they
23  didn't know what they were getting and we didn't know
24  what they were getting, with the idea of following them
25  for two weeks to see what happens even over two weeks.

Page 21

1  Is there any sense that the pregnancies do continue at a
2  different rate between the groups? Well, to even test
3  that, you need at least 20 women in each group to have
4  any statistical sense, any reasonable outcome that you
5  can say, "I can say statistically this matters."
6      We had to stop the study after 12 women were
7  enrolled because three of the women had such significant
8  bleeding they had to be rushed to the emergency room or
9  they called an ambulance. I can tell you in decades of
10  providing medical abortion care, that's incredibly rare,
11  yet to have 3 out of 12 have that happen, that's more
12  than rare. So we stopped the study, not knowing, again,
13  what women had received because we were all blinded.
14      And once the study was stopped, we could then find
15  out from the pharmacy what they received. It turns out
16  two of the people had received placebo and one had
17  received progesterone. So in a small study, all we could
18  say is that when you give them a first mifepristone by
19  itself and you don't give them misoprostol, bad things
20  can happen.
21      But what that also means is that we have no data,
22  just like if you went to your physician and had a tumor,
23  a lung cancer, for example, your doctor would be able to
24  say, well, based on the biopsy, this type of lung cancer,
25  and based on the CAT scans, you have this much

Page 22

1  advancement of the disease, so, specifically, for you, if
2  we give you this treatment, I can tell you what the
3  outcomes might be rather -- and if you had a slightly
4  different disease process, I can tell you what the
5  outcomes would be.
6      With this, I have no idea, number one, if
7  progesterone works, number two, how likely is it that
8  somebody will hemorrhage. Number three, if it does work,
9  does it work differently at different gestational ages?
10  Does it matter how long it's been since she's taken the
11  mifepristone? These are all the tenents and many more
12  questions that any healthcare provider would want to be
13  able to say to a patient, "I have a proven treatment and
14  I know how well it works and I can provide you with
15  adequate counseling about the pros and cons of the
16  treatment." That doesn't exist.
17      And the FDA allows off-label treatment if you tell
18  the patient it's off-label, and if there's adequate
19  medical evidence to prove it's effective and safe, and
20  none of that exists for this. So any claim that this
21  treatment works, any claim that it's safe or effective is
22  misleading and medical fraud.
23      CHAIRPERSON SENATOR JULIE GONZALES: I want to thank
24  you for that response, Doctor. It is quite helpful and
25  clarifying for me.

Page 23

1      So, just to reiterate, there is -- do you believe
2  that abortion pill reversal is any more effective than
3  not taking the second pill in the medication abortion
4  regimen?
5      MITCHELL D. CREININ, M.D.: We have zero medical
6  evidence that it does, and in fact, if I want to look at
7  the evidence that could exist, that I could try to
8  translate, like using progesterone in somebody having a
9  miscarriage, we have lots of evidence that it does
10  absolutely nothing. In fact, there's a big difference,
11  for example, of a doctor trying to give progesterone to a
12  patient who, maybe, has had multiple miscarriages and
13  saying, maybe I can help you not lose this pregnancy, and
14  giving progesterone after mifepristone.
15      Miscarriage is a process where the majority of cases
16  occur because there's a genetic abnormality of the
17  pregnancy, right, so giving anything is unlikely to help.
18  And in fact, studies have shown that people that have
19  even repetitive miscarriages, giving them high doses of
20  progesterone does nothing to increase the likelihood of
21  them having another continuing pregnancy. It doesn't
22  work.
23      Mifepristone binds, as a prior person had stated in
24  prior testimony, binds incredibly strongly to the
25  progesterone receptor, more strongly than progesterone

Page 24

1  itself. And it has a long half-life, meaning it sticks
2  around in the body for a long time. There is no medical
3  sense that by giving more progesterone, that it's going
4  to reverse the effects.
5      If I have you in a really tight bear hug, and I am
6  able to hold that bear hug for 24 to 48 hours, and you
7  just put more people around me who wanna give you a hug,
8  does that mean I'm gonna let go? No, it doesn't. So,
9  that's the idea of what happens between mifepristone and
10  progesterone. So giving more progesterone doesn't
11  displace mifepristone from the receptors. It doesn't
12  make it come off. It doesn't make any medical sense that
13  it could work.
14      Now, if somebody really thinks it does  then do a
15  large appropriate study to prove that our understanding
16  that we've had for decades of how hormones work doesn't
17  seem to work when it comes to mifepristone and
18  progesterone, and tell me more than "I saw one patient
19  who had this and one patient who had that," because the
20  data doesn't support it. Thank you for your question.
21      CHAIRPERSON SENATOR JULIE GONZALES: Thank you,
22  Doctor, and thank you for explaining it to a Judiciary
23  Committee member in terms of the bear hug issue, because
24  as a non-doctor, I very much appreciate that. So, just
25  thank you.

Page 25

1      Senator Van Winkle?
2      SENATOR KEVIN VAN WINKLE: Thank you, Madam Chair.
3  And thank you, Doctor, for your testimony. I was trying
4  to follow along. It was a pretty quick going through it.
5  Going through the study you did, I think it was 20 women,
6  12 got the APR, the rest got a placebo, and then there
7  were complications.
8      Could you tell me from which group did the
9  complications come from: From both groups, one group,
10  or, please explain that?
11      CHAIRPERSON SENATOR JULIE GONZALES: Dr. Creinin?
12      MITCHELL D. CREININ, M.D.: Sure. There were --
13  Yes, there were 12 women that were recruited before we
14  ended the study.
15      Again, I can give you the results knowing after the
16  fact that we were unblinded at the time, we didn't know
17  what people had received. There were -- it turns out we
18  had six in each group. There was one person in each
19  group that stopped on their own before anything happened
20  because they had side effects. One of them happened to
21  have severe nausea and vomiting of pregnancy and just
22  wanted her planned abortion. The -- another one started
23  to have some light bleeding and said, I don't want to
24  wait; I just want to have my planned abortion. So, the
25  other five people who were waiting, planning to go

Page 26

1    through the two weeks, there were two in the people that
2    received placebo and one in the group that received
3    progesterone that had significant bleeding.
4        So, that's one out of five in the progesterone group
5    and two out of five in the placebo group that had really
6    significant heavy bleeding and had to go emergently to
7    the hospital.
8        When you look at who made it two weeks, there were
9    four out of five in the progesterone group and two out of
10    five in the placebo group that made it for the two weeks.
11    Those numbers are too small to say with any certainty
12    whether something works or doesn't work.  All it means is
13    that in an early study to see if there's any sense of
14    whether this might work in patients who were not at risk
15    for taking the drugs, there was a safety signal that
16    would be -- would indicate it wasn't good for people not
17    at risk to continue.
18        Whenever -- Any drug that you've taken, Senator,
19    any drug you've taken that's gone through FDA approval,
20    the very first studies were first to establish safety.
21    Those are phase-one studies.  You take the range of dose
22    that you're going to -- you're potentially going to use
23    as a treatment and say, is it safe for me to even try to
24    use this range of dose? So safety studies always come
25    first and this study didn't pass.  This treatment didn't

Page 27

1    pass.
2        VICE CHAIR SENATOR ROBERT RODRIGUEZ:  Thank you.
3        MITCHELL D. CREININ, M.D.:  Thank you.
4        CHAIRPERSON SENATOR JULIE GONZALES:  Are there any
5    other questions for this panel of witnesses?
6        Senator Gardner?
7        SENATOR CORY GARDNER:  Thank you, Madam Chair.
8        Doctor, to follow up on that, so, I don't know --
9    I'm a lawyer, not a doctor.  And I don't know, you know,
10    prior to March 2020, I sort of trusted the science, but
11    now I don't know, you know.  One study says one thing and
12    one study says another and one study is terminated
13    because the results...
14        Is your study inconclusive or how would you
15    characterize that?
16        CHAIRPERSON SENATOR JULIE GONZALES:  Dr. Creinin?
17        MITCHELL D. CREININ, M.D.:  Sure.  Thank you.  So,
18    my study was inconclusive as far as showing whether or
19    not the treatment might work.  My study was very
20    conclusive that there was a safety signal that means it's
21    unsafe to provide this treatment unless you're going to
22    do something under a study because there's no proof that
23    it's safe and no proof that it works.
24        CHAIRPERSON SENATOR JULIE GONZALES:  Senator
25    Gardner?

Page 28

1        SENATOR CORY GARDNER:  Thank you.
2        Now, what this bill does with respect to medical
3    practice standards is it -- it declares that someone who
4    holds a medical license has engaged in unprofessional
5    conduct and is subject to discipline if they administer
6    medication abortion reversal.
7        Are you aware whether in Colorado or any of the
8    other states a medical board, board of medical examiners,
9    or whatever board there is -- a governing board, are you
10    aware of any that have made such a holding or finding or
11    even a finding in a case?
12        CHAIRPERSON SENATOR JULIE GONZALES:  Dr. Creinin?
13        MITCHELL D. CREININ, M.D.:  Not in the United
14    States, but I am aware of it in other countries.  So, it
15    does occur.
16        SENATOR CORY GARDNER:  Well, what countries, Doctor?
17        MITCHELL D. CREININ, M.D.:  The United Kingdom.
18        SENATOR CORY GARDNER:  They're the people who
19    brought us thalidomide babies, right?
20        MITCHELL D. CREININ, M.D.:  I don't think that has
21    any relevance for your question.
22        SENATOR CORY GARDNER:  Well, I just -- it might in
23    my view.  I mean, their standards may not be our
24    standards.  Anyway, Doctor, let me continue.
25        There are already in medical practice standards,

Page 29

1    there are already provisions that would permit the
2    discipline of a physician for engaging in unprofessional
3    conduct.  Is that correct?  Is that, in your experience,
4    correct?
5        CHAIRPERSON SENATOR JULIE GONZALES:  Dr. Creinin?
6        MITCHELL D. CREININ, M.D.:  Yes.
7        SENATOR CORY GARDNER:  I mean, might it be possible
8    that advances in science or something might make -- in
9    the future, might make some sort of medication abortion
10    reversal process safe?  Is that, you know, in the realm
11    of possibility?
12        MITCHELL D. CREININ, M.D.:  I think it is very
13    possible that somebody could develop something that could
14    make the action of mifepristone not effective.  It's
15    always possible.  But at this current time, there are
16    people who are touting that a current treatment is
17    effective, is proven safe, and they can provide it in a
18    way that's equal to any other medication.  And I don't
19    think that is true at all right now or potentially in the
20    near future.
21        I, also, have heard testimony that people -- that
22    doctors see hundreds or thousands of people who have
23    received treatment or need a treatment, yet there is no
24    evidence ever published, ever, of these numbers being so
25    large.

Page 30

```
 1    In the state of Nebraska, when they passed a law
 2  requiring that patients be informed of medication
 3  abortion reversal, and that it was required in the state
 4  of Nebraska, that doctors who provided this treatment
 5  report it to the state in the same way they report
 6  abortions, before Nebraska outlawed abortions, there had
 7  been zero reported to the state.  All the other states
 8  that passed abortion reversal laws did not have a
 9  reporting mechanism as part of the requirements, so we
10  don't know anything, but in the state of Nebraska, there
11  were zero.
12      CHAIRPERSON SENATOR JULIE GONZALES:  Senator
13  Gardner?
14      SENATOR CORY GARDNER:  Thank you, Madam Chair.
15      Well, to go back to the beginning, I think you said
16  it's within the realm of possibility that in the future,
17  medication abortion reversal might -- there might be some
18  way that it would be safe, and yet, if we pass this bill,
19  we will have placed in law a standard of practice with
20  regard to that broad-based procedure.
21      Why isn't our current medical practice standard
22  sufficient for a board of physicians to determine whether
23  using this procedure is professional conduct or not?  Why
24  is that not okay?  It's okay for every other thing that
25  physicians do with few exceptions.
```

Page 31

```
 1      MITCHELL D. CREININ, M.D.:  Well, in my experience
 2  as an obstetrician/gynecologist, I have lived through
 3  legislative actions which have legislated my practice of
 4  medicine beyond just what goes on by the medical board.
 5      I have practiced in Pennsylvania for 17 years where
 6  the medical board there decided I had to tell patients
 7  that abortion caused breast cancer.  I had to inform
 8  patients seeking abortions of certain things that,
 9  interestingly, I didn't have to tell any of my prenatal
10  patients.
11      So the fact is that state legislatures do legislate
12  how medicine can be practiced and what physicians have to
13  say or not say at certain times.  Also, we live in a
14  world where, as an obstetrician, I am told that I have to
15  allow a patient to stay in the hospital after delivery
16  for a certain period of time, or that, also -- that if I
17  have a patient who is being evaluated for breast cancer,
18  that my mammogram has to report things in a certain way.
19      Keep in mind that during the COVID-19 pandemic, the
20  FTC sometimes sent cease and desist letters to companies
21  that falsely advertised their products treated -- that
22  their products treated or prevented COVID-19.  So, even
23  though this could be under the form of a medical board,
24  there are legislative actions that take place to
25  jurisdict how physicians talk to patients or interact
```

Page 32

```
 1  with patients all the time.
 2      CHAIRPERSON SENATOR JULIE GONZALES:  Senator
 3  Gardner?
 4      SENATOR CORY GARDNER:  Thank you.
 5      Well, I don't -- I guess my point, Doctor, wasn't
 6  that legislatures don't do that.  My point was, as I
 7  think some of your examples show, that the legislature is
 8  maybe not the one -- best position to tell physicians
 9  what the standard of practice is.  Would you agree with
10  that?
11      CHAIRPERSON SENATOR JULIE GONZALES:  Doctor --  Go
12  ahead, please.  Sorry.
13      MITCHELL D. CREININ, M.D.:  I think that
14  legislatures can optimally help ensure that patients get
15  appropriate care, especially since some of the examples
16  are because insurance companies won't cover things.  Some
17  of the examples are because of the inability in certain
18  states to access care without the legislature making sure
19  that it's available, and also in this case, I think a lot
20  of this has to do more with what is -- would be more
21  appropriate for the legal experts here about fraud and
22  the laws around fraud.
23      I think that medical boards -- I would, actually,
24  like it that both the legislature and the medical board
25  were both on board with this. I would like a joint
```

Page 33

```
 1  effort, if you ask my preference, because the bottom line
 2  is lying isn't illegal, except when it is.
 3      SENATOR CORY GARDNER:  Thank you.
 4      Well, Doctor, I heard you said -- say you would
 5  leave fraud to the lawyers, or at least indirectly say
 6  that, whatever "indirectly" means these days.
 7      What is medical fraud?
 8      MITCHELL D. CREININ, M.D.:  No, to correct my
 9  statement, I was answering your thing that the legal
10  specifics of your question would be better left to the
11  attorneys, rather than me as a physician.
12      Medical fraud is when you make a statement regarding
13  medical care or healthcare that is simply a lie and not
14  based in fact.  So, none of you can tell me that there is
15  a fact that medical abortion reversal has been proven to
16  be safe and effective.  There is no fact.
17      So nobody can sit up there or sit behind and provide
18  any testimony to say that that is a proven fact because
19  there is no science to support that at all.  Anything
20  that meets the standard of science does not exist, and
21  that is medical fraud.
22      CHAIRPERSON SENATOR JULIE GONZALES:  Senator
23  Gardner?
24      SENATOR CORY GARDNER:  Thank you.
25      Well, I appreciate your testimony, Doctor.  I don't
```

Page 34

1    think I've heard anybody say what you assert is medical

2    fraud this evening.  Quite to the contrary.  I think I

3    kind of come away from it the same way I came away from

4    COVID:  I don't even know whether I was better off

5    wearing a mask or not, whether or not my grandchild not

6    being in school was better for her or not, so I thank you

7    for your testimony and being here.

8        CHAIRPERSON SENATOR JULIE GONZALES:  Okay.

9        Seeing -- Are there any further questions for this

10    panel of witnesses?

11        Seeing none, I want to thank you all for sharing

12    your testimony with us today as we debate the merits of

13    this policy.

14        I'm gonna shift now to a panel of opponents.  And

15    I'm going to welcome Fallon Whiteley, Diane Serrano,

16    Brittany Vesely, and Dr. Catherine Wheeler.

17            * * * * *

18    (The audio recording excerpt concluded.)

19

20

21

22

23

24

25

Page 35

1  STATE OF FLORIDA   )

2  COUNTY OF GULF    )

3        I, LISA M. SPARLING, Registered Professional Reporter,

4  Florida Professional Reporter, Notary Public in and for the

5  State of Florida at Large, do hereby certify that I have

6  prepared a transcript of an audio recording which was

7  presented to me for transcription, in the cause styled in the

8  caption hereto, on Page 1 hereof; that I was authorized to

9  did transcribe the audio recording fully and accurately, and

10  the foregoing transcription constitutes a correct transcript

11  of my stenographic notes of the audio recording as presented

12  to me.

13        I FURTHER CERTIFY that I am neither an attorney nor

14  counsel for the parties to this cause nor a relative or

15  employee of any attorney or party connected with this

16  litigation and that I have no interest in the outcome of this

17  action.

18        IN WITNESS WHEREOF, I have hereunto subscribed my name

19  and affixed my seal this the 19th day of January, 2025.

20

21

22

23        _____
         Lisa M. Sparling, RPR, FPR, Notary Public
         State of Florida at Large

24

25

## WORD INDEX

**< 1 >**
**1** 35:*8*
**10** 7:*17* 14:*9*
*20*:*12*
**12** 14:*11* 21:*6,*
*11* 25:*6, 13*
**15** 1:*10*
**17** 31:*5*
**18** 7:*16*
**190** 2:*9* 12:*10*
**1990s** 5:*13*
**19th** 35:*19*

**< 2 >**
**20** 21:*3* 25:*5*
**2018** 19:*25*
**2020** 11:*23*
*27*:*10*
**2021** 9:*7*
**2023** 1:*10*
**2025** 35:*19*
**23-190** 3:*6*
**24** 24:*6*

**< 3 >**
**3** 21:*11*
**30** 5:*18*

**< 4 >**
**48** 24:*6*

**< 5 >**
**5:43:13** 1:*18*
*2*:*2*
**5:59:58** 1:*18*
*2*:*2*
**50** 7:*14* 15:*2, 4*

**< 7 >**

**7:38:40** 1:*18*
13:*18*
**750** 14:*13, 25*
**76** 7:*18*
**79** 5:*17*

**< 8 >**
**8:07:05** 1:*18*
13:*18*
**80s** 5:*10*
**85** 9:*7*

**< A >**
**AAC** 8:*7*
**AACs** 7:*25*
17:*21*
**AAC's** 3:*13*
**ability** 15:*11*
**able** 21:*23*
22:*13* 24:*6*
**abnormality**
23:*16*
**abortion** 3:*5, 8,*
*10, 15, 21* 4:*2, 8*
7:*6, 11, 17* 8:*9*
10:*4, 16, 19*
11:*3, 9, 20, 24*
12:*6, 17, 19, 25*
13:*3* 15:*11*
19:*2* 21:*10*
23:*2, 3* 25:*22,*
*24* 28:*6* 29:*9*
30:*3, 8, 17* 31:*7*
33:*15*
**abortions** 30:*6*
31:*8*
**absolutely** 8:*22*
23:*10*
**accepted** 6:*9*
11:*1*

**access** 8:*4, 7*
32:*18*
**accessing** 10:*11*
**accreditation**
6:*7*
**accurate** 1:*10*
2:*16* 4:*22* 8:*10*
10:*1*
**accurately** 35:*9*
**ACOG** 11:*9*
**act** 10:*12* 16:*9*
17:*1, 7*
**action** 5:*1*
29:*14* 35:*17*
**actions** 31:*3, 24*
**activists** 5:*13*
17:*17*
**actual** 5:*5*
**addition** 10:*15*
**Additionally**
3:*24*
**address** 17:*20*
**addresses** 17:*21*
**adequate** 22:*15,*
*18*
**adequately** 4:*23*
**administer** 28:*5*
**adopted** 16:*25*
**adoption** 7:*16*
**advanced** 7:*2*
**advancement**
22:*1*
**advances** 29:*8*
**advantage** 10:*10*
**advent** 5:*14*
**advertised** 31:*21*
**advertising** 2:*19*
3:*7, 8, 14, 22*
4:*8* 8:*25* 10:*16*
12:*4*

**advocates** 7:*9*
**affixed** 35:*19*
**agencies** 7:*16*
**ages** 22:*9*
**agree** 32:*9*
**ahead** 32:*12*
**allow** 7:*5* 20:*4*
31:*15*
**allowing** 13:*22*
**allows** 5:*3*
22:*17*
**ambulance** 21:*9*
**amendment**
15:*25* 16:*10*
**American** 6:*23*
10:*17, 22*
**amounts** 20:*5*
**analysis** 15:*20,*
*24*
**answer** 18:*7*
**answering** 33:*9*
**antiabortion** 3:*6*
9:*4*
**anti-abortion**
3:*1, 7, 24* 5:*13*
8:*24* 9:*9, 24*
10:*5, 12* 15:*7*
**anti-choice**
17:*17*
**anybody** 34:*1*
**Anyway** 28:*24*
**apologize** 18:*19*
**appear** 3:*25*
**appearance** 4:*3*
**apply** 16:*20*
**appreciate**
24:*24* 33:*25*
**appreciation**
2:*5, 7*
**appropriate**
24:*15* 32:*15, 21*

approval 11:*21*
26:*19*
APR 25:*6*
areas 7:*5*
arguably 17:*10,
18*
argument 16:*24*
aside 13:*11*
asking 19:*7*
assert 34:*1*
asserts 12:*24*
assistance 11:*7*
Association
10:*23*
assumptions
12:*23*
attach 5:*5*
attempted 20:*12*
Attorney 8:*23*
18:*11* 35:*13, 15*
attorneys 33:*11*
AUDIO 1:*8, 17,
18* 34:*18* 35:*6,
9, 11*
authorities 4:*16*
authorized 35:*8*
autonomy 8:*3*
9:*16*
available 6:*12*
7:*22* 11:*7*
19:*17* 32:*19*
aware 28:*7, 10,
14*

< B >
babies 7:*15*
28:*19*
back 2:*4* 15:*19*
30:*15*
background

9:*20*
bad 21:*19*
based 10:*20*
21:*24, 25* 33:*14*
basic 5:*6* 9:*20*
basis 14:*16*
bear 24:*5, 6, 23*
began 5:*10*
beginning 30:*15*
begins 15:*10*
behalf 14:*1*
believe 23:*1*
belong 6:*8*
beneath 4:*15*
benefits 17:*4*
best 2:*17* 32:*8*
better 33:*10*
34:*4, 6*
beyond 5:*7*
31:*4*
big 23:*10*
Bill 2:*9* 8:*16,
21* 12:*3, 10, 11*
13:*10* 15:*9*
17:*10* 28:*2*
30:*18*
billboards 3:*17*
binds 23:*23, 24*
biopsy 21:*24*
birth 7:*19*
bit 15:*20, 23*
blatantly 14:*6*
bleeding 21:*8*
25:*23* 26:*3, 6*
blinded 20:*22*
21:*13*
board 13:*23, 24*
28:*8, 9* 30:*22*
31:*4, 6, 23*
32:*24, 25*

boardreviewed
11:*24*
boards 11:*13*
32:*23*
boast 4:*12*
bodily 8:*2*
body 24:*2*
bottom 33:*1*
branding 4:*2*
breast 31:*7, 17*
brief 10:*22*
bring 2:*9*
Brittany 34:*16*
broad-based
30:*20*
brought 28:*19*
build 5:*16*

< C >
California 13:*25*
call 3:*17*
called 21:*9*
campuses 3:*18*
cancer 21:*23, 24*
31:*7, 17*
caption 35:*8*
care 2:*21, 24*
3:*4, 5, 12, 16, 21*
4:*1, 12, 21* 6:*10*
7:*25* 8:*1, 4, 6, 8*
9:*1, 6, 25* 10:*4,
6, 11, 14* 21:*10*
32:*15, 18* 33:*13*
case 10:*22*
11:*12, 16, 19*
14:*8, 20* 16:*2*
18:*3* 19:*18*
20:*6, 11* 28:*11*
32:*19*
cases 23:*15*

CAT 21:*25*
categorized 18:*5*
category 18:*4, 5*
Catherine 34:*16*
cause 19:*21*
35:*7, 14*
caused 31:*7*
cease 31:*20*
center 3:*1* 7:*20*
9:*9*
centers 3:*2, 6, 7,
24* 4:*19, 21* 5:*4,
11, 12, 15, 18, 20,
23, 24* 6:*11, 13,
15, 18, 20* 7:*6,
11, 12, 15* 8:*25*
9:*4, 10* 10:*6*
certain 19:*19*
31:*8, 13, 16, 18*
32:*17*
certainty 26:*11*
Certified 1:*23*
3:*12* 9:*19*
13:*23, 24*
certify 35:*5, 13*
Chair 8:*14*
12:*15* 13:*8, 19*
15:*14, 17* 16:*5,
7* 17:*22, 24*
18:*6, 15, 18*
25:*2* 27:*2, 7*
30:*14*

CHAIRPERSON
2:*3* 8:*11* 12:*7,
20* 13:*5* 18:*17,
21* 22:*23* 24:*21*
25:*11* 27:*4, 16,
24* 28:*12* 29:*5*
30:*12* 32:*2, 11*

33:*22*  34:*8*
**challenged**  16:*18*
**chance**  19:*15*
**change**  9:*15*
**characteristics**
  17:*3*
**characterize**
  27:*15*
**check**  6:*21*
**child**  8:*6*
**choice**  8:*17*  9:*3*
  13:*4*
**choices**  9:*13*
**choose**  9:*1*
**claim**  22:*20*, *21*
**clarifying**  22:*25*
**clean**  4:*25*
**clear**  8:*17*
  20:*17*
**clearly**  9:*3*
**clients**  4:*19*, *23*
  5:*1*, *17*
**clinic**  3:*4*  4:*5*
  7:*18*, *20*  9:*11*,
  *22*  10:*5*
**clinical**  7:*2*
**clinics**  2:*22*  3:*2*
  4:*2*  6:*3*, *8*  7:*13*,
  *17*  9:*19*, *24*
  10:*12*  15:*7*, *12*
**coerce**  8:*1*
**Colleagues**
  15:*15*  20:*1*
**collected**  7:*10*
**collectors**  8:*21*
**college**  3:*18*
  10:*17*
**color**  10:*9*
**Colorado**  1:*9*
  7:*6*, *14*, *20*  10:*3*
  16:*25*  18:*2*  28:*7*

**combination**
  20:*17*
**come**  2:*4*  24:*12*
  25:*9*  26:*24*  34:*3*
**comes**  24:*17*
**commercial**
  17:*11*  18:*12*
**Committee**  1:*9*
  8:*15*  11:*14*
  12:*12*  24:*23*
**common**  16:*10*
**communities**
  5:*17*  10:*8*, *9*
**community**  2:*25*
**companies**
  31:*20*  32:*16*
**compares**  7:*16*
**compelling**
  16:*19*  17:*10*, *19*
  18:*13*
**complaints**  5:*21*
**completely**  8:*8*
**complex**  13:*24*
**complications**
  25:*7*, *9*
**comprehensive**
  3:*4*  9:*5*
**concerned**  7:*9*
**concerns**  12:*1*
**concluded**  34:*18*
**conclusion**  16:*3*
**conclusions**
  13:*13*
**conclusive**  27:*20*
**condition**  19:*19*
**conduct**  3:*11*
  28:*5*  29:*3*  30:*23*
**connected**  35:*15*
**cons**  22:*15*
**consent**  12:*4*

**consequences**
  5:*6*
**consideration**
  2:*10*
**considered**  20:*1*
**constitute**  10:*25*
**constitutes**  35:*10*
**consumer**  5:*6*
  8:*15*, *21*  9:*14*
  12:*2*
**consumers**  8:*18*,
  *20*  17:*13*
**contains**  13:*12*
**content**  16:*13*
**content-based**
  16:*11*, *14*
**continue**  2:*15*
  7:*5*  21:*1*  26:*17*
  28:*24*
**continuing**  15:*2*
  23:*21*
**contraception**
  3:*22*  12:*6*
**contrary**  34:*2*
**control**  7:*19*
  11:*17*, *21*
**controlled**  11:*24*
**conversations**
  12:*22*
**cool**  2:*6*
**core**  5:*12*  13:*13*
**correct**  29:*3*, *4*
  33:*8*  35:*10*
**correctly**  9:*8*
**CORY**  13:*8*
  27:*7*  28:*1*, *16*,
  *18*, *22*  29:*7*
  30:*14*  32:*4*
  33:*3*, *24*
**counsel**  35:*14*

**counseling**  9:*1*
  22:*15*
**counteract**  10:*25*
**counties**  7:*19*, *21*
**countries**  28:*14*,
  *16*
**COUNTY**  35:*2*
**couple**  20:*11*
**Court**  16:*13*
**cover**  32:*16*
**COVID**  34:*4*
**COVID-19**
  31:*19*, *22*
**creates**  18:*4*
**credentials**  6:*21*
**credibility**  5:*17*
**credible**  10:*25*
  11:*2*
**Creinin**  13:*20*,
  *21*, *22*  18:*19*, *20*
  19:*6*  23:*5*
  25:*11*, *12*  27:*3*,
  *16*, *17*  28:*12*, *13*,
  *17*, *20*  29:*5*, *6*,
  *12*  31:*1*  32:*13*
  33:*8*
**Crennan**  18:*19*
**crisis**  3:*2*
**criteria**  20:*3*, *6*
**critical**  8:*4*, *7*
**CRS**  13:*12*
**current**  29:*15*,
  *16*  30:*21*
**currently**  18:*2*
**Custer**  7:*22*

**< D >**
**Dakota**  10:*22*
**danger**  9:*23*
**dangerous**  9:*17*

data 11:*22* 20:*10* 21:*21* 24:*20*
Davis 13:*25*
day 2:*6, 9* 35:*19*
days 12:*16* 33:6
dead 5:*3*
death 20:*15, 16*
debate 34:*12*
debt 8:*20*
decades 21:*9* 24:*16*
deceived 2:*20* 5:*2* 17:*15*
deceptive 3:*7, 9, 13, 25* 5:*21* 8:*22* 10:*14* 15:*25* 16:*1, 2, 9, 25* 17:*2, 6*
decided 31:*6*
decides 13:*1*
decision 2:*15*
decision-making 8:*3* 12:*5*
decisions 7:*25* 9:*15* 12:*23*
declaration 13:*11*
declares 28:*3*
defer 18:*8*
define 3:*9*
defraud 5:*9*
delay 2:*23* 9:*24*
delays 8:*7*
Delgado 19:*25*
deliberately 17:*6*
delivery 31:*15*
deserve 2:*16, 25* 7:*24* 8:*3, 9*
design 4:*9*
designed 13:*12*

desired 14:*23* 15:*4*
desist 31:*20*
detail 20:*5*
deter 7:*7*
determine 2:*17* 30:*22*
develop 29:*13*
Diane 34:*15*
difference 23:*10*
different 21:*2* 22:*4, 9*
differently 22:*9*
difficult 6:*20*
director 6:*12, 14, 17*
directors 4:*13* 6:*17*
discipline 28:*5* 29:*2*
disclaimers 3:*20*
disclosure 8:*19*
discussion 14:*17* 15:*6*
disease 22:*1, 4*
disguised 17:*17*
disinformation 2:*22*
displace 24:*11*
doctor 6:*9* 21:*23* 22:*24* 23:*11* 24:*22* 25:*3* 27:*8, 9* 28:*16, 24* 32:*5, 11* 33:*4, 25*
doctors 5:*24* 29:*22* 30:*4*
documents 6:*13*
dodge 5:*4*
doing 12:*22*
donors 5:*17*

dose 13:*2* 26:*21, 24*
doses 23:*19*
doubling 7:*6*
downright 9:*16*
Dozens 4:*14*
Dr 13:*22* 18:*19* 25:*11* 27:*16* 28:*12* 29:*5* 34:*16*
drug 20:*19* 26:*18, 19*
drugs 20:*18* 26:*15*
due 11:*25* 19:*14*
DYLAN 15:*17* 17:*24* 18:*14*

< E >
early 11:*25* 14:*11* 26:*13*
ectopic 9:*22*
education 9:*20*
effect 19:*21*
effective 11:*2* 15:*8* 19:*3* 20:*14* 22:*19, 21* 23:*2* 29:*14, 17* 33:*16*
effects 24:*4* 25:*20*
efficacy 10:*19*
effort 33:*1*
efforts 7:*7*
either 13:*9* 16:*24*
emergency 3:*21* 12:*6* 21:*8*
emergently 26:*6*
employee 35:*15*
encourage 7:*15*

ended 11:*25* 25:*14*
enforced 8:*23*
engage 17:*5*
engaged 28:*4*
engaging 29:*2*
enrolled 21:*7*
enrolling 14:*11*
ensure 32:*14*
equal 29:*18*
equipment 4:*4, 25*
era 7:*5*
especially 7:*9* 32:*15*
essential 2:*20, 23* 12:*4*
establish 26:*20*
established 20:*21*
ethical 11:*13*
ethic-reviewed 11:*25*
ethics 11:*15, 21*
evaluate 11:*23*
evaluated 31:*17*
evening 15:*18* 34:*2*
evidence 11:*1, 3, 18* 14:*12, 19* 22:*19* 23:*6, 7, 9* 29:*24*
examiners 28:*8*
example 21:*23* 23:*11*
Examples 3:*16* 32:*7, 15, 17*
exceptions 6:*11* 30:*25*
excerpt 34:*18*
excerpts 1:*10*

exist 18:*2*
22:*16* 23:*7*
33:*20*
existence 20:*9*
existing 16:*2*
17:*8*
exists 17:*9*
22:*20*
expand 5:*16*
experience 29:*3*
31:*1*
experienced
19:*11*
experiment 11:*1*
experimenting
10:*24*
expertise 19:*5*
experts 10:*18*
32:*21*
explain 25:*10*
explaining 24:*22*
explore 13:*2*
extend 2:*5, 7*
5:*7*

< F >
face 6:*4*
facilitation 3:*10*
facilities 3:*18*
4:*1, 25*
facility 4:*3*
fact 7:*21* 9:*7*
10:*23* 23:*6, 10,
18* 25:*16* 31:*11*
33:*14, 15, 16, 18*
FAITH 8:*14*
12:*21*
faithbased 9:*2*
faith-based 3:*3*
7:*21*

fake 3:*2*
Fallon 34:*15*
false 14:*6*
16:*13* 17:*3, 6*
falsely 31:*21*
family 13:*24*
far 5:*7* 18:*25*
27:*18*
fashion 20:*22*
FDA 22:*17*
26:*19*
federal 4:*16* 6:*5*
fields 6:*18*
find 6:*20* 8:*6*
10:*4* 21:*14*
finding 28:*10, 11*
first 15:*24*
16:*10* 20:*19*
21:*18* 26:*20, 25*
five 7:*19* 25:*25*
26:*4, 5, 9, 10*
Florida 1:*23*
35:*1, 4, 5, 23*
follow 25:*4*
27:*8*
following 3:*25*
5:*14* 7:*8* 20:*24*
follow-up 17:*25*
food 10:*3*
foregoing 35:*10*
form 31:*23*
forms 4:*4* 11:*17*
forth 13:*15*
forward 15:*12*
found 9:*7*
four 6:*21* 26:*9*
FPR 1:*18* 35:*23*
fraud 15:*9, 12*
22:*22* 32:*21, 22*
33:*5, 7, 12, 21*

34:*2*
fraudulent 17:*6*
free 4:*5, 6* 5:*11,
18* 9:*11*
Fremont 7:*22*
front 5:*7*
FTC 31:*20*
full 9:*25* 10:*13*
fully 35:*9*
Further 13:*5*
16:*21* 34:*9*
35:*13*
future 29:*9, 20*
30:*16*

< G >
Gardner 13:*7*
27:*6, 7, 25* 28:*1,
16, 18, 22* 29:*7*
30:*13, 14* 32:*3,
4* 33:*3, 23, 24*
GARNDER 13:*8*
Gavin 15:*19*
16:*5, 6, 8* 18:*6, 7*
General's 8:*23*
genetic 23:*16*
gestational 22:*9*
getting 20:*5, 23,
24*
give 4:*2* 20:*19,
20* 21:*18, 19*
22:*2* 23:*11*
24:*7* 25:*15*
given 19:*4*
gives 19:*19*
giving 8:*17*
23:*14, 17, 19*
24:*3, 10*
go 13:*12, 13*
15:*19* 24:*8*

25:*25* 26:*6*
30:*15* 32:*11*
goals 10:*7*
goes 31:*4*
going 2:*4, 9*
13:*3* 24:*3* 25:*4,
5* 26:*22* 27:*21*
34:*15*
gonna 24:*8*
34:*14*
GONZALES
2:*3* 8:*11* 12:*7,
20* 13:*5* 18:*17,
21* 22:*23* 24:*21*
25:*11* 27:*4, 16,
24* 28:*12* 29:*5*
30:*12* 32:*2, 11*
33:*22* 34:*8*
Gonzalez 18:*16*
good 13:*14*
26:*16*
goodwill 5:*8*
govern 6:*6*
governing 28:*9*
government
16:*17, 20, 22*
17:*10, 19, 20*
18:*13*
grandchild 34:*5*
gratitude 2:*5, 8*
great 18:*24*
group 11:*22*
21:*3* 25:*8, 9, 18,
19* 26:*2, 4, 5, 9,
10*
groups 6:*23*
11:*17* 21:*2* 25:*9*
guess 32:*5*
GULF 35:*2*
gynecologist
13:*23*

Gynecologists 10:*18*

< H >
half 15:*3*
half-life 24:*1*
happen 21:*11, 20*
happened 15:*3* 19:*20, 23* 25:*19, 20*
happens 16:*7* 20:*25* 24:*9*
hard 10:*11*
health 2:*18, 20, 24* 3:*4, 12, 15* 4:*1* 5:*7* 6:*19* 7:*9, 10, 18, 24* 8:*1, 4* 9:*6, 24* 10:*6, 11, 13* 15:*25* 16:*1*
healthcare 5:*5* 9:*15* 17:*12, 14, 16, 18* 18:*1, 5, 10, 12* 22:*12* 33:*13*
hear 13:*20*
heard 19:*1* 29:*21* 33:*4* 34:*1*
Hearing 1:*9* 18:*25*
heavy 26:*6*
held 5:*5*
help 3:*17* 23:*13, 17* 32:*14*
helpful 22:*24*
hemorrhage 22:*8*
hereof 35:*8*
hereto 35:*8*

hereunto 35:*18*
high 23:*19*
high-quality 4:*21*
HIPAA 6:*6*
hold 24:*6*
holding 28:*10*
holds 28:*4*
honest 8:*17, 19*
hormones 24:*16*
hospital 6:*7* 26:*7* 31:*15*
hours 24:*6*
https://sg001-harmony.sliq.net/00327/Harmony/en/PowerBrowser/P 1:*17*
hug 24:*5, 6, 7, 23*
human 11:*14*
hundreds 4:*19* 29:*22*

< I >
idea 20:*24* 22:*6* 24:*9*
identify 9:*8*
illegal 33:*2*
immediate 16:*15*
important 12:*2* 16:*22* 19:*8*
inability 32:*17*
inaccurate 9:*13*
include 3:*16* 4:*14* 6:*5*
included 14:*22*
including 4:*7* 9:*2* 11:*21*
inconclusive 27:*14, 18*

inconvenient 9:*14*
increase 23:*20*
increasing 4:*9*
incredibly 21:*10* 23:*24*
indicate 26:*16*
indirectly 33:*5, 6*
individuals 14:*22, 23*
industry 4:*16*
infections 4:*11* 5:*19*
inform 31:*7*
information 2:*16* 4:*22, 24* 7:*10* 8:*9, 10, 17* 11:*6* 15:*25* 16:*1* 18:*1, 12* 19:*16*
informed 7:*24* 12:*4* 30:*2*
inspecting 4:*24*
instance 9:*21*
instances 4:*12*
Institute 6:*23*
institutional 11:*13*
insurance 32:*16*
intake 4:*4*
intending 11:*23*
intensified 5:*22*
interact 31:*25*
intercept 3:*5*
interest 16:*20, 22, 23* 17:*10, 19, 20* 18:*13* 35:*16*
interesting 13:*10*
interestingly 31:*9*

intermediate 16:*20*
interpret 7:*2* 9:*21*
intervention 19:*14*
intimidation 2:*22*
introductory 12:*18*
investigator 14:*2*
investigators 14:*24*
invite 2:*10*
irreputable 20:*2*
issue 7:*4* 24:*23*

< J >
JANICE 2:*14*
January 35:*19*
joint 32:*25*
journal 20:*2, 3, 4*
Judiciary 1:*9* 2:*4* 24:*22*
JULIE 2:*3* 8:*11* 12:*7, 20* 13:*5* 18:*17, 21* 22:*23* 24:*21* 25:*11* 27:*4, 16, 24* 28:*12* 29:*5* 30:*12* 32:*2, 11* 33:*22* 34:*8*
jurisdict 31:*25*

< K >
keep 7:*15* 31:*19*
keeping 10:*5* 20:*13*
KEVIN 25:*2*

kind 34:*3*
Kingdom 28:*17*
know 2:*8*
 13:*13* 18:*10*
 19:*22* 20:*23*
 22:*14* 25:*16*
 27:*8, 9, 11*
 29:*10* 30:*10*
 34:*4*
knowing 21:*12*
 25:*15*
knowingly 17:*2,*
*4*
knowledge 19:*4*
known 3:*2* 6:*5*

< L >
lack 4:*18* 11:*12*
language 3:*16*
 4:*4* 9:*10*
Large 1:*23*
 20:*5* 24:*15*
 29:*25* 35:*5, 23*
larger 6:*7*
 14:*25*
law 6:*5* 16:*2,*
*10, 16, 18, 21, 24*
 17:*9, 19* 18:*2, 3,*
*9* 30:*1, 19*
laws 6:*22* 30:*8*
 32:*22*
lawyer 27:*9*
lawyers 33:*5*
leads 16:*3*
LEANNA 16:*6,*
*8* 18:*7*
learning 12:*16*
leave 33:*5*
led 19:*25*
left 33:*10*

legal 5:*4* 15:*20,*
*24* 32:*21* 33:*9*
legally 6:*2*
legislate 31:*11*
legislated 31:*3*
legislative 13:*11*
 31:*3, 24*
legislature 32:*7,*
*18, 24*
legislatures
 31:*11* 32:*6, 14*
legitimate 5:*9*
length 18:*25*
letters 31:*20*
level 14:*19, 20*
levels 6:*4*
license 28:*4*
licensed 3:*11*
 4:*13, 22* 5:*24*
 6:*14, 15, 22*
licenses 6:*2*
lie 33:*13*
life 15:*10*
light 25:*23*
likelihood 23:*20*
limitations 11:*21*
limiting 8:*16*
line 33:*1*
link 7:*15*
Lisa 1:*18* 35:*3,*
*23*
list 6:*12*
litigation 35:*16*
little 5:*22*
 15:*20, 23*
live 31:*13*
lived 31:*2*
loans 8:*19*
locations 7:*18*
lodging 10:*3*

long 9:*2* 13:*10*
 22:*10* 24:*1, 2*
look 4:*9* 19:*16*
 23:*6* 26:*8*
looking 9:*9*
 19:*8, 12*
looks 20:*10*
lose 23:*13*
lot 13:*12* 19:*9*
 32:*19*
lots 23:*9*
low-cost 7:*19*
lower 16:*21*
 20:*15, 16*
lowest 14:*20*
low-income 10:*8*
lung 21:*23, 24*
lure 3:*14* 10:*15*
lying 33:*2*

< M >
M.D 13:*21*
 18:*20* 19:*6*
 23:*5* 25:*12*
 27:*3, 17* 28:*13,*
*17, 20* 29:*6, 12*
 31:*1* 32:*13* 33:*8*
machine 5:*14*
Madam 8:*14*
 12:*15* 13:*8*
 25:*2* 27:*7* 30:*14*
Mainstream
 6:*23*
majority 18:*22*
 23:*15*
making 2:*15*
 9:*3* 12:*24* 13:*4*
 15:*22* 32:*18*
mammogram
 31:*18*
manner 8:*4*

March 1:*10*
 27:*10*
Marchman 2:*11,*
*13, 14* 8:*12* 13:*9*
mask 34:*5*
mass 3:*17*
matter 22:*10*
matters 21:*5*
mean 6:*9* 24:*8*
 28:*23* 29:*7*
meaning 16:*16*
 24:*1*
means 4:*18*
 16:*18, 22* 20:*10*
 21:*21* 26:*12*
 27:*20* 33:*6*
mechanism 30:*9*
Medicaid 6:*6*
medical 4:*3, 4, 5,*
*7, 13, 14, 15* 5:*8,*
*10, 15* 6:*2, 3, 12,*
*14, 17, 23* 7:*13*
 8:*10* 9:*11, 25*
 10:*18, 21, 23*
 11:*18* 12:*4, 23*
 13:*4, 14* 15:*9,*
*12* 20:*2* 21:*10*
 22:*19, 22* 23:*5*
 24:*2, 12* 28:*2, 4,*
*8, 25* 30:*21*
 31:*4, 6, 23*
 32:*23, 24* 33:*7,*
*12, 13, 15, 21*
 34:*1*
medicalization
 5:*12*
medicalized 5:*21*
medically 8:*9*
 10:*1* 11:*1*
medically-based

9:5
**Medicare** 6:6
**medicated**
11:20 13:3
**medication** 11:3,
7, 23 13:2 23:3
28:6 29:9, 18
30:2, 17
**medicine** 5:9
6:24 31:4, 12
**meet** 10:21
16:24 20:6
**meets** 33:20
**member** 24:23
**members** 2:24
8:15 12:12
**mentioned** 12:17
**merits** 34:12
**mesoprostol**
20:13
**mifeprestone**
10:25
**mifepristone**
14:3, 14, 17
20:11, 13, 20
21:18 22:11
23:14, 23 24:9,
11, 17 29:14
**mind** 20:13
31:19
**minds** 9:15
**minimizing** 3:20
**minimum** 20:6
**miscarriage**
23:9, 15
**miscarriages**
23:12, 19
**misinformation**
4:7 9:13 10:15
**mislead** 7:25

**misleading** 9:4
11:4, 8 15:9
17:6 22:22
**misled** 2:20
**misoprostol**
21:19
**missed** 9:22
18:22
**mission** 10:7
**mistake** 12:22
**mistreated** 5:2
**Mitchell** 13:20,
21, 22 18:20
19:6 23:5
25:12 27:3, 17
28:13, 17, 20
29:6, 12 31:1
32:13 33:8
**mobile** 4:5 7:23
**morning-after**
13:1
**move** 5:10
15:12
**muddles** 5:8
**multiple** 23:12

**< N >**
**name** 35:18
**names** 4:1, 14
**narrowly** 17:20
**National** 1:23
**nausea** 25:21
**near** 29:20
**nearby** 4:2
**Nebraska** 30:1,
4, 6, 10
**need** 21:3 29:23
**needs** 14:21
**neither** 35:13
**non-doctor**

24:24
**North** 10:22
**Notary** 1:23
35:4, 23
**notes** 35:11
**number** 4:9
22:6, 7, 8
**numbers** 26:11
29:24
**numerous** 8:20
14:5
**nurses** 5:25
6:25

**< O >**
**OB/GYN** 4:10
**obscuring** 3:20
**obstacles** 8:7
**obstetric** 6:25
**obstetrician**
13:23 31:14
**obstetrician/gyne
cologist** 31:2
**Obstetricians**
10:17
**occur** 23:16
28:15
**occurs** 19:15
**offer** 3:21 5:18
7:17, 19 9:10,
25 10:7, 13
**offered** 9:18
**offering** 3:10
4:7, 10, 21 5:11
9:5, 11 10:16
**office** 8:23
**off-label** 22:17,
18
**Oftentimes** 9:18
**Oh** 18:15

**Okay** 18:14
30:24 34:8
**omitting** 3:19
**once** 21:14
**operate** 4:9
5:23
**opponents** 34:14
**opportunity**
19:1
**optimally** 32:14
**options** 2:17
3:22 9:10
**order** 2:4 10:4
**organizations**
3:3 9:2
**Otero** 7:21
**outcome** 15:4
19:11, 12, 14, 21
21:4 35:16
**outcomes** 11:23
14:21 15:1
20:8 22:3, 5
**outlawed** 30:6
**outside** 6:18
**overcome** 8:6
**oversight** 4:20
6:4
**owerBrowserV2/
20241217/41/1434
3** 1:18

**< P >**
**Page** 35:8
**paid** 10:2
**pandemic** 31:19
**panel** 27:5
34:10, 14
**panelist** 18:8
**Parenthood** 7:17
**part** 5:25 17:1

30:*9*
**participants** 9:*8*
**participate**
13:*22*
**particularly**
12:*5*
**parties** 35:*14*
**party** 35:*15*
**pass** 26:*25*
27:*1* 30:*18*
**passed** 30:*1, 8*
**patient** 6:*5*
9:*23* 10:*2*
19:*11* 22:*13, 18*
23:*12* 24:*18, 19*
31:*15, 17*
**patients** 3:*5*
5:*9* 10:*15* 11:*5,*
*6* 12:*1* 14:*9, 11*
26:*14* 30:*2*
31:*6, 8, 10, 25*
32:*1, 14*
**payday** 8:*18*
**peer-reviewed**
6:*10*
**pejorative** 13:*15*
**Pennsylvania**
31:*5*
**people** 2:*18*
3:*14* 7:*24* 8:*1,*
*3, 5, 8* 9:*14*
10:*8* 14:*5, 13,*
*25* 15:*1* 20:*7, 8,*
*12* 21:*16* 23:*18*
24:*7* 25:*17, 25*
26:*1, 16* 28:*18*
29:*16, 21, 22*
**perform** 7:*1*
9:*20*
**performed** 9:*19*

**Period** 14:*12*
31:*16*
**permit** 29:*1*
**person** 12:*25*
19:*12* 23:*23*
25:*18*
**personal** 4:*24*
8:*2* 13:*4*
**person's** 8:*2*
**perspective**
18:*11*
**persuade** 9:*14*
**pharmacy** 21:*15*
**phase-one** 26:*21*
**physician** 6:*15,*
*16* 7:*1* 21:*22*
29:*2* 33:*11*
**physicians**
10:*24* 11:*4*
30:*22, 25* 31:*12,*
*25* 32:*8*
**piggyback** 6:*1*
**pill** 3:*8, 10* 4:*8*
10:*19* 12:*17, 19*
13:*1* 19:*2* 23:*2,*
*3*
**place** 12:*23*
31:*24*
**placebo** 20:*22*
21:*16* 25:*6*
26:*2, 5, 10*
**placed** 30:*19*
**places** 10:*16*
**plane** 10:*3*
**Planned** 7:*17*
25:*22, 24*
**planning** 13:*24*
25:*25*
**plans** 7:*8*
**playing** 4:*20*

**please** 25:*10*
32:*12*
**PM** 1:*18* 2:*2*
13:*18*
**point** 15:*22*
32:*5, 6*
**policy** 2:*12*
34:*13*
**populations**
10:*10*
**pose** 3:*3*
**position** 32:*8*
**possibility** 29:*11*
30:*16*
**possible** 11:*5*
29:*7, 13, 15*
**posted** 1:*17*
**post-Roe** 7:*5*
**potentially**
26:*22* 29:*19*
**practice** 3:*9*
11:*11, 12* 17:*2,*
*7* 28:*3, 25*
30:*19, 21* 31:*3*
32:*9*
**practiced** 31:*5,*
*12*
**practices** 3:*13*
8:*22* 10:*14*
16:*2, 9* 17:*1, 11*
**predatory** 8:*18*
**preference** 33:*1*
**pregnancies**
3:*19* 7:*8* 15:*2*
21:*1*
**pregnancy** 2:*16*
3:*2* 4:*6, 19* 5:*4,*
*11, 12, 20, 24*
6:*11, 13* 7:*11,*
*14, 20* 9:*12, 23*
17:*15* 20:*21*

23:*13, 17, 21*
25:*21*
**pregnancy-**
**related** 3:*23*
**pregnant** 9:*2*
12:*25*
**prenatal** 4:*12*
7:*1* 31:*9*
**prepared** 35:*6*
**prescribing** 3:*10*
**presented** 35:*7,*
*11*
**presumed** 16:*16*
**pretty** 25:*4*
**prevented** 31:*22*
**previous** 19:*2*
**prior** 12:*12*
14:*4* 23:*23, 24*
27:*10*
**privacy** 6:*5*
7:*13*
**problem** 14:*15*
**procedure**
30:*20, 23*
**procedures** 3:*16*
11:*10*
**proceeding**
12:*13*
**process** 22:*4*
23:*15* 29:*10*
**products** 17:*4*
31:*21, 22*
**professional** 6:*1*
30:*23* 35:*3, 4*
**professionalism**
4:*15*
**professionals**
3:*12*
**professor** 13:*25*
**progesterone**
10:*24* 14:*15*

20:*22*  21:*17*
22:*7*  23:*8, 11,
14, 20, 25*  24:*3,
10, 18*  26:*3, 4, 9*
**Prohibit**  3:*6, 8*
**promotes**  6:*9*
**proof**  27:*22, 23*
**propaganda**
 17:*17*
**proposed**  17:*9*
**pros**  22:*15*
**protect**  8:*18*
 11:*14*
**protecting**  4:*23*
**protection**  5:*6*
 8:*16, 21*  12:*3*
**protections**  8:*20*
**prove**  19:*21*
 22:*19*  24:*15*
**proven**  15:*7*
 22:*13*  29:*17*
 33:*15, 18*
**provide**  5:*18*
 6:*2, 13*  22:*14*
 27:*21*  29:*17*
 33:*17*
**provided**  19:*10*
 30:*4*
**provider**  7:*2*
 8:*10*  22:*12*
**providers**  4:*10*
 9:*25*
**providing**  21:*10*
**provisions**  29:*1*
**Public**  1:*23*  8:*5*
 35:*4, 23*
**publicly**  6:*12*
**publish**  20:*4*
**published**  14:*4*
 20:*1*  29:*24*

**Pueblo**  7:*23*
**purported**  15:*7*
**purposefully**  9:*4*
**purposely**  10:*8*
**pushes**  8:*8*
**Put**  10:*12*  24:*7*
**putting**  9:*23*

**< Q >**
**qualify**  14:*8, 16*
**question**  18:*8*
 24:*20*  28:*21*
 33:*10*
**questions**  11:*15*
 12:*11*  13:*6*
 15:*15*  19:*9*
 22:*12*  27:*5*  34:*9*
**quick**  25:*4*
**quite**  22:*24*
 34:*2*

**< R >**
**radar**  5:*23*
**raising**  11:*15*
**ramped**  5:*15*
**ran**  15:*21*
**randomize**  20:*21*
**randomized**
 14:*10*
**range**  9:*12, 25*
 10:*13*  26:*21, 24*
**rare**  21:*10, 12*
**rate**  20:*15, 16*
 21:*2*
**rationale**  12:*9*
**reach**  5:*16*  8:*8*
 14:*19*
**real**  19:*24*
**really**  19:*14*
 20:*10, 17*  24:*5,
14*  26:*5*

**realm**  29:*10*
 30:*16*
**reasonable**
 19:*23*  21:*4*
**received**  14:*14,
15*  21:*13, 15, 16,
17*  25:*17*  26:*2*
 29:*23*
**receiving**  17:*16,
17*
**receptor**  23:*25*
**receptors**  24:*11*
**recklessly**  17:*2,
5*
**RECORDING**
 1:*8, 17*  34:*18*
 35:*6, 9, 11*
**recordings**  1:*18*
**recruit**  5:*24*
**recruited**  25:*13*
**refer**  3:*21*
**referred**  18:*24*
**refuted**  10:*18*
**regard**  30:*20*
**regarding**  11:*15*
 33:*12*
**regimen**  23:*4*
**registered**  3:*12*
 35:*3*
**regulate**  3:*6*
 4:*17*
**regulation**  4:*18*
 7:*4*
**regulations**  6:*6*
 16:*11*
**regulatory**  5:*3,
23*
**reiterate**  23:*1*
**related**  12:*5*
 14:*5*  16:*23*

17:*14*
**relative**  35:*14*
**relevance**  28:*21*
**religious-based**
 7:*14*
**remove**  8:*2*
**repetitive**  23:*19*
**report**  14:*13, 18,
21, 25*  19:*25*
 20:*7*  30:*5*  31:*18*
**reported**  11:*22*
 15:*1*  19:*12*  30:*7*
**Reporter**  35:*3, 4*
**reporting**  30:*9*
**reports**  14:*9*
**representation**
 17:*3*
**represents**  20:*18*
**reproductive**
 2:*24*  3:*4, 15, 25*
 5:*7*  6:*18*  10:*13*
**reputable**  20:*4*
**require**  8:*19*
**required**  11:*14*
 30:*3*
**requirements**
 30:*9*
**requiring**  6:*22*
 30:*2*
**research**  11:*14*
**respect**  28:*2*
**response**  22:*24*
**rest**  25:*6*
**restriction**  17:*8*
**restrictive**  16:*18*
**result**  14:*23*
**results**  7:*3*
 11:*16*  25:*15*
 27:*13*
**reversal**  3:*8, 11*
 4:*8*  10:*16, 19*

11:*9*, *24* 12:*17*, *19* 14:*3*, *17* 19:*3* 20:*11* 23:*2* 28:*6* 29:*10* 30:*3, 8, 17* 33:*15*
**reversals** 11:*20*
**reverse** 11:*7* 24:*4*
**reversed** 11:*4*
**review** 11:*13*
**reviewed** 18:*9*
**right** 2:*3, 4, 18* 7:*24, 25* 8:*2, 3* 15:*13* 18:*2* 20:*16* 23:*17* 28:*19* 29:*19*
**rights** 16:*11*
**risk** 26:*14, 17*
**ROBERT** 13:*19* 15:*14* 16:*5, 7* 17:*22* 18:*6, 15* 27:*2*
**Roberts** 15:*16, 17* 17:*23, 24* 18:*14*
**RODRIGUEZ** 13:*19* 15:*14* 16:*5, 7* 17:*22* 18:*6, 15* 27:*2*
**role** 4:*20* 6:*17*
**room** 21:*8*
**RPR** 1:*18* 35:*23*
**rules** 6:*7* 7:*13*
**rural** 7:*19* 10:*9*
**rushed** 21:*8*

**< S >**
**safe** 11:*2* 19:*3* 20:*14* 22:*19, 21* 26:*23* 27:*23*

29:*10, 17* 30:*18* 33:*16*
**safeguards** 5:*4*
**safety** 11:*22, 25* 20:*17* 26:*15, 20, 24* 27:*20*
**saw** 19:*11* 24:*18*
**saying** 18:*10* 19:*11* 23:*13*
**says** 19:*20, 22* 27:*11, 12*
**SB** 3:*5*
**scans** 21:*25*
**school** 34:*6*
**science** 10:*20* 19:*10, 12* 27:*10* 29:*8* 33:*19, 20*
**scientific** 11:*3, 11, 16*
**scrubs** 4:*4*
**scrutiny** 5:*22* 11:*11* 16:*12, 14, 15, 16, 21*
**seal** 35:*19*
**second** 13:*2* 23:*3*
**see** 12:*11* 20:*25* 26:*13* 29:*22*
**seeing** 19:*10* 34:*9, 11*
**seek** 8:*2* 9:*1* 10:*4* 12:*19*
**seekers** 7:*12*
**seeking** 2:*20* 3:*5* 8:*9* 12:*25* 17:*14* 31:*8*
**Senate** 1:*9* 2:*4, 9* 12:*10*
**SENATOR** 2:*3, 11, 13, 14* 8:*11,*

12, 13, 14 12:*7, 8, 14, 15, 20, 21* 13:*5, 7, 8, 9, 19* 15:*14, 15, 17* 16:*5, 7* 17:*22, 24* 18:*6, 14, 15, 17, 21* 22:*23* 24:*21* 25:*1, 2, 11* 26:*18* 27:*2, 4, 6, 7, 16, 24* 28:*1, 12, 16, 18, 22* 29:*5, 7* 30:*12, 14* 32:*2, 4, 11* 33:*3, 22, 24* 34:*8*
**sense** 21:*1, 4* 24:*3, 12* 26:*13*
**sensitive** 7:*10*
**sent** 31:*20*
**series** 11:*19* 14:*20* 19:*18* 20:*6, 11*
**serious** 11:*15*
**Serrano** 34:*15*
**serve** 4:*19*
**services** 2:*21* 3:*23* 5:*10, 16* 6:*2, 14* 7:*18* 8:*1* 12:*6* 17:*4*
**serving** 16:*19*
**setting** 11:*25* 13:*11*
**severe** 25:*21*
**sexually** 4:*11* 5:*19*
**shame** 2:*23*
**Sharing** 4:*6* 34:*11*
**shift** 34:*14*
**show** 16:*17*

19:*21* 32:*7*
**showing** 27:*18*
**shown** 23:*18*
**shutting** 8:*24*
**side** 25:*20*
**signal** 26:*15* 27:*20*
**significant** 4:*18* 21:*7* 26:*3, 6*
**similar** 4:*1* 11:*20*
**simply** 10:*12* 14:*8* 18:*10* 33:*13*
**sit** 33:*17*
**six** 25:*18*
**slightly** 22:*3*
**small** 21:*17* 26:*11*
**so-called** 9:*22* 11:*9*
**somebody** 19:*19* 22:*8* 23:*8* 24:*14* 29:*13*
**someone's** 2:*15*
**sonographers** 5:*25* 6:*22*
**sonography** 6:*25*
**Sorry** 32:*12*
**sort** 12:*9* 18:*3* 27:*10* 29:*9*
**Sparling** 1:*18* 35:*3, 23*
**speak** 18:*9* 19:*4*
**speaking** 14:*1* 16:*9* 18:*22*
**specialist** 13:*24*
**specialize** 6:*18*
**specific** 18:*5*
**specifically**

17:*21* 18:*9* 22:*1*
**specifics** 33:*10*
**speculate** 13:*3*
**speech** 16:*19*
17:*8*
**split** 16:*12*
**sponsors** 2:*10*
12:*12*
**staff** 4:*13, 22*
5:*25* 6:*16*
**stamps** 1:*18*
**stand** 11:*11*
**standard** 16:*21*
20:*2* 30:*19, 21*
32:*9* 33:*20*
**standards** 5:*6*
10:*21* 28:*3, 23,*
*24, 25*
**started** 5:*11*
19:*17* 25:*22*
**State** 1:*23* 4:*16*
7:*7* 10:*2* 30:*1,*
*3, 5, 7, 10* 31:*11*
35:*1, 5, 23*
**stated** 11:*9*
23:*23*
**state-funded**
7:*18*
**statement** 33:*9,*
*12*
**statements**
12:*18* 16:*14*
**states** 6:*22, 24*
17:*1* 18:*4* 28:*8,*
*14* 30:*7* 32:*18*
**statistical** 21:*4*
**statistically** 21:*5*
**stay** 31:*15*
**steer** 3:*14*
**Stenographer**
1:*23*

**stenographic**
35:*11*
**STI** 9:*12*
**sticks** 24:*1*
**stop** 21:*6*
**stopped** 14:*10*
21:*12, 14* 25:*19*
**strategy** 5:*13*
**strict** 16:*12, 14,*
*16*
**strongly** 23:*24,*
*25*
**student** 8:*19*
**studied** 14:*2*
**studies** 11:*10,*
*12, 16* 14:*3, 5, 6,*
*7, 8* 15:*8* 19:*13,*
*24* 23:*18* 26:*20,*
*21, 24*
**study** 9:*7*
11:*23* 14:*10, 16,*
*19, 20, 25* 15:*5*
18:*24* 19:*17*
20:*12* 21:*6, 12,*
*14, 17* 24:*15*
25:*5, 14* 26:*13,*
*25* 27:*11, 12, 14,*
*18, 19, 22*
**styled** 35:*7*
**subcategory**
18:*1*
**subject** 7:*12*
28:*5*
**subjects** 11:*15*
**subscribed**
35:*18*
**Subsequent**
11:*19*
**substantially**
16:*23*

**substantive** 5:*1*
**sufficient** 30:*22*
**supervision**
11:*12*
**support** 11:*19*
24:*20* 33:*19*
**supposedly**
14:*14*
**Supreme** 16:*13*
**sure** 4:*21* 18:*7*
19:*6* 25:*12*
27:*17* 32:*18*
**system** 6:*3*
**systematically**
19:*13*
**systems** 6:*7*

**< T >**
**tactics** 2:*23*
3:*25* 5:*21*
**tailored** 17:*20*
**take** 8:*5* 18:*25*
26:*21* 31:*24*
**taken** 22:*10*
26:*18, 19*
**talk** 31:*25*
**talking** 17:*13*
**target** 3:*19* 10:*8*
**targeting** 16:*19*
**teams** 5:*25*
**technicians** 6:*24*
**tell** 2:*11* 11:*5,*
*6* 21:*9* 22:*2, 4,*
*17* 24:*18* 25:*8*
31:*6, 9* 32:*8*
33:*14*
**tend** 16:*11*
**tenents** 22:*11*
**tenured** 13:*25*
**terminated**
27:*12*

**terms** 13:*15*
24:*23*
**test** 16:*24*
19:*14* 21:*2*
**testimony** 12:*13*
14:*4* 15:*18*
18:*23* 19:*2, 9*
23:*24* 25:*3*
29:*21* 33:*18, 25*
34:*7, 12*
**testing** 4:*6*
5:*11, 18* 9:*12*
**tests** 4:*11*
**tethered** 14:*17*
**text-wise** 13:*10*
**thalidomide**
28:*19*
**Thank** 2:*7, 14*
8:*11, 14, 15*
12:*7, 15* 13:*8,*
*19, 21* 15:*14, 17*
16:*6, 8* 17:*24,*
*25* 18:*14, 17, 20*
19:*6* 22:*23*
24:*20, 21, 22, 25*
25:*2, 3* 27:*2, 3,*
*7, 17* 28:*1*
30:*14* 32:*4*
33:*3, 24* 34:*6, 11*
**thing** 7:*22*
27:*11* 30:*24*
33:*9*
**things** 12:*22*
13:*15* 19:*8*
20:*9* 21:*19*
31:*8, 18* 32:*16*
**think** 12:*21, 24*
15:*20* 18:*11*
19:*8* 25:*5*
28:*20* 29:*12, 19*

30:*15* 32:*7*, *13*, *19*, *23* 34:*1*, *2*
**thinking** 17:*15*
**thinks** 24:*14*
**thousands** 29:*22*
**three** 7:*21* 14:*3*, 7 20:*9* 21:*7* 22:*8*
**ticket** 10:*3*
**tight** 24:*5*
**time** 1:*18* 8:*5* 10:*11* 15:*18*, *21* 24:*2* 25:*16* 29:*15* 31:*16* 32:*1*
**timely** 8:*4*
**times** 9:*23* 31:*13*
**time-sensitive** 2:*24* 3:*15* 9:*24* 10:*5* 12:*5*
**today** 34:*12*
**told** 31:*14*
**touting** 29:*16*
**trade** 3:*9* 5:*8* 8:*22* 16:*2*, *9*, *25* 17:*2*, *11*
**traditional** 4:*10* 6:*8*
**trained** 4:*23*
**training** 6:*25*
**transcribe** 35:*9*
**transcribed** 1:*18*
**TRANSCRIPT** 1:*8* 35:*6*, *10*
**transcription** 1:*10* 35:*7*, *10*
**transit** 3:*18*
**translate** 23:*8*
**transmitted** 4:*11* 5:*19*

**transparency** 12:*3*
**transportation** 8:*6*
**travel** 10:*3*
**treat** 20:*7*
**treated** 31:*21*, *22*
**treatment** 4:*8* 10:*1* 13:*14* 15:*6* 19:*15*, *20* 20:*15* 22:*2*, *13*, *16*, *17*, *21* 26:*23*, *25* 27:*19*, *21* 29:*16*, *23* 30:*4*
**trial** 14:*10*
**tried** 14:*21*
**trigger** 16:*12*, *14*
**trip** 8:*7*
**true** 1:*10* 29:*19*
**trust** 5:*8*
**trusted** 8:*10* 27:*10*
**truth** 2:*19* 8:*25* 12:*3*
**try** 20:*19* 23:*7* 26:*23*
**Trying** 9:*14* 12:*23* 23:*11* 25:*3*
**tumor** 21:*22*
**turns** 21:*15* 25:*17*
**Two** 14:*7* 19:*17* 20:*18*, *25* 21:*16* 22:*7* 26:*1*, *5*, *8*, *9*, *10*
**Tylenol** 20:*15*
**type** 21:*24*
**types** 6:*3*
**typically** 5:*24*

**< U >**
**ultra-sensitive** 4:*24*
**ultrasound** 5:*14* 6:*13*, *24* 9:*22*
**ultrasounds** 4:*6*, *11* 5:*18* 7:*1* 9:*12*, *18*, *21*
**unbiased** 9:*5*
**unblinded** 25:*16*
**unconscionable** 17:*5*
**unconstitutional** 16:*17*
**under-reporting** 11:*22*
**understanding** 18:*23* 24:*15*
**unethical** 10:*20* 11:*10*
**unfair** 17:*5*
**Unfortunately** 9:*3*
**Uniform** 16:*25*
**unit** 7:*23*
**United** 28:*13*, *17*
**University** 13:*25*
**unplanned** 3:*19*
**unprofessional** 3:*11* 28:*4* 29:*2*
**unproven** 10:*19* 11:*10*
**unsafe** 27:*21*
**untruthful** 10:*6*, *14*
**up-to-date** 5:*1*
**upwards** 14:*13*
**urge** 12:*2*
**urgent** 7:*4*

**use** 2:*22* 3:*7*, *24* 4:*1* 8:*5* 9:*10* 11:*19* 26:*22*, *24*
**uses** 17:*3*

**< V >**
**validity** 11:*16*
**Van** 12:*14*, *15* 25:*1*, *2*
**veneer** 4:*15*
**verify** 4:*25*
**Vesely** 34:*16*
**Viagra** 20:*16*
**VICE** 13:*19* 15:*14* 16:*5*, *7* 17:*22* 18:*6*, *15* 27:*2*
**view** 28:*23*
**violate** 15:*24*
**violation** 9:*16*
**volunteer** 6:*16*
**volunteers** 4:*3* 6:*1*
**vomiting** 25:*21*
**vote** 12:*2*
**vulnerable** 10:*10*

**< W >**
**wait** 2:*6* 25:*24*
**waiting** 25:*25*
**walk** 15:*23* 16:*3*
**walked** 18:*21*
**walking** 12:*8*, *9*
**wanna** 24:*7*
**want** 2:*5*, *7* 22:*12*, *23* 23:*6* 25:*23*, *24* 34:*11*
**wanted** 15:*19* 18:*25* 25:*22*

**way** 5:*16* 29:*18* 30:*5, 18* 31:*18* 34:*3*
**weakest** 11:*17*
**weaponized** 7:*11*
**wearing** 34:*5*
**websites** 3:*18* 9:*9*
**weeks** 20:*25* 26:*1, 8, 10*
**welcome** 34:*15*
**Well** 14:*19* 21:*2, 24* 22:*14* 28:*16, 22* 30:*15* 31:*1* 32:*5* 33:*4, 25*
**well-being** 2:*18*
**well-proven** 20:*14*
**went** 21:*22*
**we're** 17:*13*
**we've** 19:*1* 24:*16*
**Wheeler** 34:*16*
**WHEREOF** 35:*18*
**Whiteley** 34:*15*
**Winkle** 12:*14, 15* 25:*1, 2*
**Winter** 2:*11* 8:*13, 14* 12:*8, 20, 21* 13:*9*
**withhold** 2:*23*
**witness** 12:*13* 35:*18*
**witnesses** 19:*2* 27:*5* 34:*10*
**woman** 12:*19*
**women** 7:*7, 15* 12:*24* 17:*14*

20:*20* 21:*3, 6, 7, 13* 25:*5, 13*
**women's** 4:*5* 7:*9* 9:*11*
**word** 4:*14*
**work** 8:*5* 9:*24* 22:*8, 9* 23:*22* 24:*13, 16, 17* 26:*12, 14* 27:*19*
**worked** 18:*24*
**working** 6:*16*
**works** 6:*3, 21* 22:*7, 14, 21* 26:*12* 27:*23*
**world** 31:*14*
**worry** 2:*19*

**< Y >**
**y'all** 2:*6*
**year** 4:*20*
**years** 31:*5*
**young** 10:*8*

**< Z >**
**zero** 23:*5* 30:*7, 11*
**zone** 5:*3*