## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

BELLA HEALTH AND WELLNESS et al.,

    *Plaintiffs,*

CHELSEA M. MYNYK,

    *Plaintiff-Intervenor,*

    v.

PHIL WEISER, in his official capacity as Attorney General of Colorado, et al.,

    *Defendants.*

Case No. 1:23-cv-939-DDD-SKC

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Mark L. Rienzi
Rebekah P. Ricketts
Laura W. Slavis
Michael O'Brien
Colten L. Stanberry
Amanda L. Salz
Amy Ren
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
mrienzi@becketfund.org

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

RESPONSE TO ATTORNEY GENERAL'S STATEMENT OF FACTS ...................... 2

RESPONSE TO BOARDS' STATEMENT OF FACTS .............................................. 7

ARGUMENT ........................................................................................................ 17

I. Plaintiffs' claims are justiciable. ....................................................... 17

   A. Plaintiffs have standing to challenge Section 1. ........................ 18

   B. Plaintiffs have standing to challenge Section 2. ........................ 23

   C. Plaintiffs' claims are ripe. .......................................................... 26

II. Plaintiffs have shown actual success on the merits of Counts I-VIII. ............ 28

   A. Colorado's ban on abortion pill reversal violates the
      Free Exercise Clause. ................................................................ 28

      1. The ban burdens Plaintiffs' religious exercise. ..................... 28

      2. The ban is not generally applicable because it treats
         religious activity less favorably than comparable secular
         activity (Count I). ................................................................. 29

      3. The ban is not generally applicable because it contains
         mechanisms for individualized exemptions (Count II). ......................... 34

      4. The ban is not neutral (Count III). ........................................ 37

   B. The Eleventh Amendment does not bar Plaintiffs' claims
      against the Attorney General. ..................................................... 40

   C. SB 23-190 violates the Free Speech Clause by discriminating
      based on content and viewpoint (Count IV). ............................... 43

   D. SB 23-190 violates the First Amendment right to receive
      information (Count V). ................................................................ 49

E.  SB 23-190 violates the Fourteenth Amendment right of
pregnant women not to be forced to undergo or continue
an abortion (Counts VI-VIII)......................................................................... 50

F.  SB 23-190 is void for vagueness (Count VIII). .......................................... 51

G. The government cannot carry its burden under strict scrutiny................. 53

CONCLUSION............................................................................................................... 57

CERTIFICATE OF SERVICE ...................................................................................... 59

CERTIFICATE OF COMPLIANCE ............................................................................ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative v. Elenis,*
    6 F.4th 1160 (10th Cir. 2021) ................................................... 19, 22, 23

*303 Creative v. Elenis,*
    600 U.S. 570 (2023) ........................................................................ 43

*Animal Legal Def. Fund v. Kelly,*
    9 F.4th 1219 (10th Cir. 2021) .......................................................... 44

*Axson-Flynn v. Johnson,*
    356 F.3d 1277 (10th Cir. 2004) ................................................. *passim*

*Black Emergency Response Team v. Drummond,*
    737 F. Supp. 3d 1136 (W.D. Okla. 2024) ...................................... 51-52

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ........................................................................ 55

*Brown v. Herbert,*
    850 F.Supp.2d 1240 (D. Utah. 2012) ............................................... 21

*Burwell v. Hobby Lobby Stores,*
    573 U.S. 682 (2014) ........................................................................ 29

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
    447 U.S. 557 (1980) ........................................................................ 48

*Chamber of Com. of U.S. v. Edmondson,*
    594 F.3d 742 (10th Cir. 2010) ............................................... 40, 41, 42

*Chiles v. Salazar,*
    116 F.4th 1178 (10th Cir. 2024) ......................................... 23, 26, 36, 39

*Church of Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) ......................................................... 37, 39, 55, 56

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ........................................................................ 53

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ........................................................................ 22

*Colo. Christian Univ. v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) .................................................................... 40

*Colo. State Bd. of Med. Exam'rs v. Boyle,*
    924 P.2d 1113 (Colo. App. 1996) ............................................................... 41

*Colo. Union of Taxpayers v. Griswold,*
    No. 22-1122, 2023 WL 5426581 (10th Cir. Aug. 23, 2023) ................ 18, 19, 23, 24

*Crowe v. Tulle,*
    126 P.3d 196 (Colo. 2006) ......................................................................... 19

*Cruzan v. Director,*
    497 U.S. 261 (1990) ................................................................................... 50

*Denver Bible Church v. Azar,*
    494 F. Supp. 3d 816 (D. Colo. 2020) ......................................................... 28

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ................................................................................... 44

*Doe v. City of Albuquerque,*
    667 F.3d 1111 (10th Cir. 2012) .................................................................. 49

*Does 1-11 v. Bd. of Regents of Univ. of Colo.,*
    100 F.4th 1251 (10th Cir. 2024) ................................................................. 29

*Doyle v. Hogan,*
    1 F.4th 249 (4th Cir. 2021) ........................................................................ 42

*Employment Div. v. Smith,*
    494 U.S. 872 (1990) ................................................................................... 34

*FEC v. Cruz,*
    596 U.S. 289 (2002) ................................................................................... 18

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
*Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023) ...............................................................*passim*

*Free Speech Coal. v. Anderson,*
    119 F.4th 732 (10th Cir. 2024) .................................................................. 42

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ...........................................................................*passim*

*Harris v. Quinn,*
573 U.S. 616 (2014) ........................................................................ 48

*Holt v. Hobbs,*
574 U.S. 352 (2015) ........................................................................ 57

*Hynes v. Mayor of Oradell,*
425 U.S. 610 (1976) ........................................................................ 51

*Initiative & Referendum Inst. v. Walker,*
450 F.3d 1082 (10th Cir. 2006) ........................................... 22, 23, 26

*Jordan v. Pugh,*
425 F.3d 820 (10th Cir. 2005) ...................................................... 51, 52

*Kitchen v. Herbert,*
755 F.3d 1193 (10th Cir. 2014) ........................................................ 41

*Masterpiece Cakeshop v. Colo. C.R. Comm'n,*
584 U.S. 617 (2018) .................................................................... 31, 39

*McCullen v. Coakley,*
573 U.S. 464 (2014) ........................................................................ 46

*Murthy v. Missouri,*
603 U.S. 43 (2024) .......................................................................... 24

*National Federation of the Blind of Arkansas v. Pryor,*
258 F.3d 851 (8th Cir. 2001) ........................................................... 52

*NIFLA v. Becerra,*
585 U.S. 755 (2018) ........................................................................ 47

*Peck v. McCann,*
43 F.4th 1116 (10th Cir. 2022)................................................*passim*

*People ex rel. T.B.,*
452 P.3d 36, 43 (Colo. App. 2016) .................................................. 19

*Platt v. Moore,*
15 F.4th 895 (9th Cir. 2021)............................................................. 43

*Prairie Band Potawatomi Nation v. Wagnon,*
476 F.3d 818 (10th Cir. 2007) ......................................................... 40

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ............................................................ 44, 45, 49

*Reynolds v. United States,*
   98 U.S. 145 (1878) ............................................................................ 1

*Robertson v. Tokar,*
   No. 23-cv-2132, 2024 WL 4817265 (D. Colo. Nov. 18, 2024)................................. 54

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) ................................................................ 45, 46, 49

*SBA List v. Driehaus,*
   573 U.S. 149 (2014) ...................................................................*passim*

*Sessions v. Dimaya,*
   584 U.S. 148 (2018) ......................................................................... 53

*SFFA v. Harvard Coll.,*
   600 U.S. 181 (2023) ......................................................................... 54

*Shell Oil Co. v. Noel,*
   608 F.2d 208 (1st Cir. 1979) .......................................................... 41

*Sorrell v. IMS Health,*
   564 U.S. 552 (2011) ................................................................... 47, 48

*Stamp v. Vail Corp.,*
   172 P.3d 437 (Colo. 2007) ............................................................. 20

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ...................................................................... 29, 30

*Teva Pharms., USA v. Weiser,*
   709 F. Supp. 3d 1366 (D. Colo. 2023).....................................26-27, 42

*U.S. West v. FCC,*
   182 F.3d 1224 (10th Cir. 1999) .......................................................... 48

*United States v. Virginia,*
   518 U.S. 515 (1996) ..................................................................33-34

*State ex rel. Weiser v. Ctr. for Excellence in Higher Educ.,*
   499 P.3d 1081 (Colo. Ct. App. 2021) ................................................. 24

*Whole Woman's Health v. Jackson,*
   595 U.S. 30 (2021) ........................................................................ 42

*Yellowbear v. Lampert,*
   741 F.3d 48 (10th Cir. 2014) ........................................................... 55

**Statutes**

Colo. Rev. Stat. §6-1-105 ................................................................ 46

Colo. Rev. Stat. §6-1-113 ................................................................ 16

Colo. Rev. Stat. §6-1-734 ................................................................ 51

Colo. Rev. Stat. §12-240-125 ........................................................ 6, 41

Colo. Rev. Stat. §12-255-119 ........................................................ 6, 41

Colo. Rev. Stat. §25-6-404 ............................................................ 50-51

H.B. 21-1276, 75th Gen. Assemb., Reg. Sess. (Colo. 2021) ........................................ 39

S.B. 23-190, 74th Gen. Assemb., Reg. Sess. (Colo. 2023) ..................................*passim*

**Other Authorities**

U.S. Const. amend. XIV ................................................................ 50

Written Stakeholder Comments, Colorado Department
    of Regulatory Agencies ........................................................ 38-39

Amy G. Bryant, *Why Crisis Pregnancy Centers Are Legal but*
    *Unethical*, AMA J. Ethics (Mar. 2018) ................................................ 38

## INTRODUCTION

To hear the Boards tell it, "[t]his case is about medicine," and SB 23-190 is an ordinary health-and-safety regulation subject to rational-basis review. But that standard—as the Boards' own cases make clear—governs laws that do not burden constitutional rights. It has no application where, as here, Colorado has banned Plaintiffs' religious exercise while allowing comparable secular conduct, selectively targeted their speech as disfavored, and deprived their patients of information and help needed to stop ongoing abortions they no longer want. There is no avoiding the Constitution in this case.

Tellingly, the Boards' lead citation is to *Reynolds v. United States*, 98 U.S. 145 (1878), a nearly 150-year-old decision upholding a polygamy conviction. But *Reynolds* "rested primarily on the proposition that the Free Exercise Clause protects beliefs, not conduct"—and "[t]he Court had repudiated that distinction a half century before *Smith* was decided." *Fulton v. City of Philadelphia*, 593 U.S. 522, 596-97 (2021) (Alito, J., concurring). That the Boards are forced to reach back two centuries to find authority for their alternate (and antique) version of the First Amendment speaks volumes about the legal deficiencies of their arguments.

For his part, the Attorney General badly wants to get out of this case without taking any position about abortion pill reversal—but he refuses to follow the district attorneys' lead and disavow enforcement. Instead, the AG recycles his arguments

that Plaintiffs' claims are not justiciable. This Court correctly rejected those arguments before and should do so again.

Defendants (and the rest of Colorado government) have now confirmed by their actions that no compelling interest supports SB 23-190. The General Assembly granted the Boards discretion to flip the statutory "off" switch. The Boards reserved case-by-case decision-making power. And after 21 months of litigation and full discovery, the AG still cannot formulate a position about the safety or efficacy of APR, going so far as to refuse to endorse the opinions of the experts his own lawyers hired. It makes no sense to ask this Court to deem an interest compelling when so much of Colorado's own government finds it wholly unpersuasive.

Because SB 23-190 and its implementing rules violate the First Amendment many times over, Defendants' motions for summary judgment should be denied.

## RESPONSE TO ATTORNEY GENERAL'S STATEMENT OF FACTS

1.  Admit Bella is a faith-based Catholic medical clinic. Deny Bella is located in Lakewood, Colorado. Dkt.94, First Am. Verified Compl. ("Am.Compl.") ¶¶30, 34.

2.  Admit.

3.  N/A.

4.  Admit.

5.  Admit.

6.  Admit.

7.  Admit.

2

8. Admit sponsors did not name the "fake clinics" and "anti-abortion centers." Deny implication that sponsors did not identify the "fake clinics" and "anti-abortion centers." Am.Compl. ¶¶160-174 ("faith-based" and "religious-based" organizations); Pls.Ex.46 at 54 (referring to beliefs of "this particular faith").

9. Admit sponsors did not name the "anti-abortion centers." Deny implication that sponsors did not identify the "anti-abortion centers." Am.Compl. ¶¶160-174; Pls.Ex.46 at 54.

10. Admit.

11. Admit the AG did not take a public position on SB 23-190 during the legislative process. ███████████████████████████████████████████
██████████

12. Admit.

13. Admit.

14. Admit.

15. █████████████████████████████████████████████████
████████████████████████████████

16. Admit.

17. Admit.

18. Admit.

19. Admit the AG is not bound by "viewpoints of individual legislators." ███

████████████████████████████████████████████

███████████████████████████████████████

20. Admit.

21. Admit.

22. Admit.

23. Admit.

24. Admit.

25. Admit.

26. Admit.

27. Admit.

28. Admit.

29. Admit.

30. Admit.

31. Admit Plaintiffs are not aware of any instance in which a Bella patient asked

Plaintiffs for an abortion. AG.Ex.7 at 37.

32. Admit.

33. Admit.

34. Admit.

35. Admit.

36. N/A.

37. Admit.

38. Admit.

39. Deny. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Pls.Ex.63 at 6-7; ████████████

████████████████████████

40. Admit.

41. Admit.

42. Admit.

43. Deny. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

44. Admit.

45. Deny. ████████████████████████

46. Admit.

47. ████████████████████████████████████████████████████

████████████████████████████████

48. ████████████████████████████████████████████████████

████████████████████████████ Pls.Ex.37 at 2; ████████████

49. Admit.

50. Admit.

51. Admit.

52. ██████████████████████████████████████████

████████

53. Admit this is the AG's current position in this federal lawsuit. ████████

████████████████████████████████████████████████

██████████████████████████████

54. Admit the AG has expressed no opinion on whether Plaintiffs' advertisements

violate the CCPA. ████████████████████████████████

████████████████████████████████████████████████

██████████ *cf.* Br. of States of Cal., Colo. et al. as Amici Curiae at 8, *United States*

*v. Skrmetti*, No. 23-477 (U.S. filed Sept. 3, 2024), 2024 WL 4101407.

55. Deny. What the AG "would" do in a future investigation is not a "fact." DDD

Civ. P.S. III(E).

56. Deny implication that the AG does not also have statutory obligations to pros-

ecute complaints referred by the Medical and Nursing Boards. Colo. Rev. Stat. §12-

240-125(4)(c)(V), (5)(d) (Medical Board); *id.* §12-255-119(3)(c)(V), (4)(d) (Nursing

Board).

57. Admit subject to statutory language cited in ¶56.

58. Admit subject to statutory language cited in ¶56.

59. Admit subject to statutory language cited in ¶56.

## RESPONSE TO BOARDS' STATEMENT OF FACTS

1. Admit.

2. Admit.

3. Admit.

4. Admit.

5. Admit.

6. Admit.

7. Admit.

8. Admit.

9. N/A.

10. N/A.

11. N/A.

12. Admit.

13. Admit.

14. Admit the Boards are authorized to determine generally accepted standards.

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Pls.Ex.70 ("Keenan

Tr.") 24:16-24.

15. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

████████████████  ████████████

16. Admit the Boards generally regulate the use of medical treatments and drugs through their authority to discipline licensees. Deny the Boards specifically regulate "off-label" or "experimental use[]" of medical treatments or drugs. Pls.Ex.72 at 9.

17. Admit.

18. Admit professional nurses ("RN") and licensed practical nurses ("LPN") "may not simply refuse to comply with a treatment or medication order." Dkt.99-2 ¶10. Deny implication that RNs and LPNs are not allowed to "advocate for a change" in "an order for patient care" that she believes will "risk patient safety." *Id.*

19. Deny. No evidence exists that can competently establish as a "fact" the universal intent of third-party licensees. DDD Civ. P.S. III(E).

20. Admit.

21. Admit.

22. Deny. Pls.Ex.73 ("Wubbenhorst 2/28/25 Supplement") 7.

23. Admit.

24. Admit.

25. Admit.

26. Admit the body breaks down mifepristone into metabolites. Deny the metabolites necessarily "block progesterone receptors." Pls.Ex.74 ("Wubbenhorst Rebuttal") 8-9; Dkt.184, Pls.Ex.7 ("Cohen Tr.") 167:14-24.

27. Admit.

28. Admit there is "some evidence" that mifepristone is less effective at "inducing pregnancy loss" at higher gestational age. Boards.Ex.10 at 37:6-12.

29. Admit.

30. Admit the Boards' expert, Dr. Cohen, advocates expectant management (or "watchful waiting") as the standard of care. Dkt.99-1 at 17. ██████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Also deny Plaintiffs agree expectant management is the "current standard of care." Pls.Ex.51.

31. Deny medication abortion reversal using progesterone is a "theory." Pls.Ex.6 ("Wubbenhorst Report") 15-16.

32. Deny medication abortion reversal using progesterone is a "hypothesis." Wubbenhorst Report 15-16.

33. Admit.

34. Deny. Plaintiffs cannot testify to what research would be "consider[ed]" by all "[p]hysicians considering whether to use progesterone for an off-label purpose."

35. Deny. Wubbenhorst Report 3-22; Boards.Ex.10 at 32:10-22 (explaining use of term "reverse").

36. Admit "progesterone levels ... in and of themselves, do not appear to predict whether or not a patient will go on to suffer a pregnancy loss after mifepristone." Pls.Ex.80 ("Wubbenhorst Tr.") 34:5-9.

37. Admit.

38. Admit Dr. Keenan testified "[t]here's no exact answer" to "[h]ow much progesterone flooding will overcome mifepristone's receptor bond." Boards.Ex.11 at 40:18-22.

39. Deny. No evidence exists that can competently establish as a "fact" what all "Proponents of Progesterone Intervention" do or "do not know." DDD Civ. P.S. III(E).[1]

40. Deny. Dr. Keenan testified "it would be inappropriate to mention … the safety of progesterone used in antagonizing mifepristone" where "that was not the subject matter at hand in the article." Boards.Ex.11 at 52:4-25.

41. Deny Delgado 2012 study was "based on patient self-reports to a hotline." Pls.Ex.20.

42. Deny Delgado 2018 study is "a summary of patient self-reports" that was "retracted for violations of institutional research standards." *See* Pls.Ex.22; Wubbenhorst Rebuttal 21-22.

43. Deny as to "many institutions." Dkt.99-1 at 13; Dkt.99-2 at 12.

44. Admit Delgado 2018 study did not report mifepristone dose, history of prior miscarriage, or pain or bleeding before taking progesterone. Deny the information is "demographic." Deny study did not report progesterone dose. Pls.Ex.22 at 26-27.

---

[1]   The Boards' newly minted term "Progesterone Intervention" does not appear in any expert report or scientific literature in this case.

45. Admit. Deny implication that a concurrent control group was necessary or appropriate. Wubbenhorst Report 25.

46. Admit.

47. Deny. Wubbenhorst Report 26.

48. Deny. The study included eight progesterone regimens. Pls.Ex.22 at 27.

49. Admit.

50. Admit.

51. Admit Dr. Creinin's study is the only RCT testing "Progesterone Intervention" in humans. *See* Pls.Ex.19.

52. Deny. Defendants fail to define "nationally recognized secular medical organization."

53. Deny implication that ACOG represents the interests of all OB-GYNs. Keenan Tr.121:8-21; ███████████████████████

54. Admit ACOG stated "abortion reversal" "is not a generally accepted standard of practice based on the current evidence base." Boards.Ex.12 at 61. Admit the Colorado Section of ACOG stated "abortion reversal" "is not a recognized contemporary standard of care," after first taking the position that it "should be subjected to the longstanding process of study and testing … to validate its claims." *Compare* Boards.Ex.12 at 100-01 (Aug. 7, 2023 comment), *with id.* at 40-44 (Aug 2, 2023 comment).

55. ███████████████████████████████████

56. ████████████████████████████████████████
████████████████████████████████████████
██████████

57. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████ Wubbenhorst Report 3-22.

58. Admit.

59. Admit.

60. Deny as to PRISM study, which found no "significantly higher rate of live
births among women with threatened miscarriage overall," but "did identify a differ-
ential benefit among women with prior miscarriages." Wubbenhorst Rebuttal 4.

61. Deny. PRISM concluded there was a benefit to progesterone therapy for women
with one or more miscarriages, and the "benefit was even greater" for women with
three or more prior miscarriages. Pls.Ex.13 at 5; Pls.Ex.12 at 24.

62. Admit.

63. Admit.

64. ████████████████████████████████████████
██████████████████████████████

65. ████████████████████████████████████████
████████████████████████████████████



66. ████████████████████████████████████

████████████████████████

67. ████████████████████████████████████

████████████████

68. ████████████████████████████████████

████████████████████████████████████████

████████████████████ *cf.* Keenan Tr.42:9-15.

69. Deny Bella "endorses" a case-specific assessment of patient care to "determine" whether a provider meets standard of care in prescribing progesterone. ████████

████████████████████████████████████████

████████████████████████████████████████

████

70. ████████████████████████████████████████

████████████████████████████████████████

████████████████████

71. ████████████████████████████████████████

████████████████████████████████████████

████████████████████

72. Admit.

73. Admit.

74. Admit Bella expects its providers to receive, read, and utilize the Guideline where applicable. 

75.

.

76.

77.

78.

79.

80. Admit.

81.

82. Admit the Guideline does not cite the Creinin study. Deny the Guideline "omits" it. ████████████████████████████████████████

████████████████████████████

83. Deny. ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████

84. Deny. ████████████████████████████████████████

████████████████████████████████████

85. Admit.

86. Deny. ████████████████████████████████████████

████████████████████████████████████████

87. ████████████████████████████████████████████

██████████████████████████████████████████████████

██

88. N/A.

89. N/A.

90. Admit.

91. N/A.

92. N/A.

93. N/A.

94. N/A.

95. N/A.

96. N/A.

97. N/A.

98. N/A.

99. N/A.

100.    N/A.

101.    N/A.

102.    Admit.

103.    Deny. Lawmakers used terms like "faith-based" throughout the legislative process. Pls.Ex.46 at 54:3-15.

104.    Admit.

105.    Deny. There are multiple additional references to a specific religion and faith. *E.g.*, Pls.Ex.46 at 54:3-15 ("this particular faith").

106.    Deny. Representative McCormick stated "[f]aith-based counseling is absolutely fine," but "the voice of this particular faith" is "riddled with guilt-inducing anti-abortion messages." Pls.Ex.46 at 54:5-10.

107.    Deny. Bill sponsors specifically targeted religious services from "this particular faith." Pls.Ex.46 at 54:7, 11.

108.    Deny as to "no ideological affiliation." Dkt.94-10 at 5 (referring to "18 Planned Parenthood Clinics" and "76 state-funded health clinic[s]").

109.    Deny "repeatedly informed." Pls.Ex.43 at 23:1-6 (Dr. Creinin asserting "zero medical evidence").

110.    Admit.

111.    Admit.

112.    Deny "[b]oth Board Defendants," as the Board members are individual Defendants. Am.Compl. 1-2.

113.    Admit.

114.    Admit.

115.    Admit.

116.    Admit.

## ARGUMENT

### I.  Plaintiffs' claims are justiciable.

The AG urges the very same standing arguments this Court previously rejected—but without bothering to cite this Court's prior opinion, much less engage its analysis. And after nearly two years of litigation, he refuses to take any position on the safety or efficacy of APR or whether Plaintiffs' statements are deceptive. Instead, he doggedly claims that Plaintiffs cannot challenge Sections 1 or 2—not because *he* has disavowed enforcement, but because *Plaintiffs* view their own conduct as honest. That is not how Article III works.

**A.  Plaintiffs have standing to challenge Section 1.**

Article III standing requires "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *FEC v. Cruz*, 596 U.S. 289, 296 (2002); Dkt.113 at 14. Plaintiffs easily meet the three requirements here.

The AG disputes only injury in fact. A plaintiff is not required to expose herself to "actual arrest, prosecution or other enforcement action." *SBA List v. Driehaus*, 573 U.S. 149, 158 (2014). Rather, the Supreme Court has established a three-part test for pre-enforcement injuries. The plaintiff must allege (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that the "intended future conduct is 'arguably proscribed by [the] statute'" the plaintiff "wish[es] to challenge"; and (3) that "there exists a credible threat of prosecution thereunder." *Id*. at 159-60, 162, 167. The Tenth Circuit "appl[ies] a low evidentiary bar for pre-enforcement standing on First Amendment claims," including at summary judgment. *Colo. Union of Taxpayers v. Griswold*, No. 22-1122, 2023 WL 5426581, at *2 (10th Cir. Aug. 23, 2023).

Plaintiffs satisfy all three injury-in-fact elements for a pre-enforcement challenge.

*First,* Plaintiffs' intended conduct is arguably affected with a constitutional interest. Plaintiffs "have a religious obligation to offer abortion pill reversal." Dkt.180 ("Pls.SOF") ¶¶78-79. That's why Bella also "describes and promotes the availability of abortion pill reversal on its website [and] social media accounts." Pls.SOF ¶¶81-82;

Pls.Ex.26; Pls.Ex.27. Such "speech" is "certainly 'affected with a constitutional inter-est." *SBA List*, 573 U.S. at 162; *see also 303 Creative v. Elenis*, 6 F.4th 1160, 1170, 1172 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023) (conduct "affected with a constitutional interest" where graphic designer "holds a sincere religious belief that prevents her from creating websites that celebrate same-sex marriage").[2]

*Second,* Plaintiffs intend to "engage in conduct that would arguably violate the law." *Griswold*, 2023 WL 5426581, at *1. Section 1 describes APR as "a dangerous and deceptive practice," §1(1)(f), and then declares that the CCPA "applies" to "ad-vertising for ... medication abortion reversal," §1(3)(b). That *actually* proscribes Plaintiffs' advertising—and not accidentally. Pls.SOF ¶115.

The AG again downgrades Section 1 as "an uncodified legislative declaration." AG.MSJ.16. But "Section One cannot be ignored entirely." Dkt.113 at 22. Colorado courts are free to consider legislative declarations to determine a law's purpose and interpret its provisions, particularly where other provisions are ambiguous. *See, e.g.*, *People ex rel. T.B.*, 452 P.3d 36, 43 (Colo. App. 2016). As the en banc Colorado Su-preme Court put it: "Our goal [in interpreting the CCPA] is to give effect to the intent of the General Assembly." *Crowe v. Tulle*, 126 P.3d 196, 201 (Colo. 2006). The "inten-tion of the legislature prevails over a literal interpretation" of the statute, and Colo-rado courts will "avoid constructions that defeat the legislature's intent." *Id.* Indeed,

---

[2]    The AG does not cite *SBA List* and analyzes only the factors for pre-enforcement standing based on chilled speech. AG.MSJ.15; *but see* Dkt.68 at 6 (citing and applying *SBA List* at motion-to-dismiss stage). For the reasons set forth below, Plaintiffs satisfy those factors too.

a "legislative declaration" is "[o]ften the *best* guide to legislative intent." *Stamp v. Vail Corp.*, 172 P.3d 437 (Colo. 2007) (emphasis added).

Section 1 shouts from the rooftops the legislature's view that APR is a "dangerous and deceptive practice" and then "applies" the CCPA to "advertising" for APR. SB 23-190 §§1(f), 1(3)(b). It also declares "stopping deceptive trade practices relating to … medication abortion reversal" a "matter[] of statewide concern." §1(2)(a). ███

████████████████████████████████████████████████

████████████████████

Faced with these explicit indicia of legislative intent, the AG moves the goalposts: advertising APR is not a "per se" violation of the CCPA. AG.MSJ.18. But Plaintiffs need not show that advertising APR will "*automatically* violate" the law. *See id.* (emphasis added). They need only show that advertising APR is "*arguably* proscribed" by the law." *SBA List*, 573 U.S. at 162 (emphasis added). It plainly is.

The AG next points to the CCPA's mens rea requirements, claiming that Plaintiffs lack standing because they have not "knowingly or recklessly" advertised APR "in a deceptive manner." AG.MSJ.19. The Supreme Court squarely rejected this argument in *SBA List*. There, respondents claimed that SBA List lacked standing to challenge Ohio's false-statement law because it did not "'plan[] to lie.'" 573 U.S. at 163. The Sixth Circuit agreed, reasoning that because SBA List was only liable for "knowing" falsities, its "insistence that its speech is factually true" defeated standing. *Id.* The

Supreme Court unanimously reversed, holding that "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate the law." *Id.*

So too here. Plaintiffs have always made clear that they believe their speech about APR is truthful. Am.Compl.¶¶95, 126. They need not make a pre-confession to challenge a law that openly declares their speech to be "deceptive," SB 23-190 §1(1)(f), and thus "at least arguabl[y]" proscribes their advertisements, Dkt.113 at 22-23.

*Third,* Plaintiffs face a credible threat of enforcement. This prong "is not supposed to be a difficult bar" in the First Amendment context. *Peck v. McCann*, 43 F.4th 1116, 1133 (10th Cir. 2022). The Tenth Circuit considers: "(1) whether the plaintiff showed past enforcement against the same conduct; (2) whether authority to initiate charges was not limited to a prosecutor or an agency and, instead, any person could file a complaint against the plaintiffs; and (3) whether the state disavowed future enforcement." *Id.* at 1132 (internal quotation marks omitted).

There is no past enforcement of SB 23-190—because the law was immediately enjoined. Nor is it surprising that the CCPA was not previously wielded against APR advertising, as the AG had no prior knowledge of any complaints about APR. Dkt.51 at 76:16-19. In any event, SB 23-190 "is recently enacted" and "not moribund," so "its existence alone may create a [credible] threat." *Brown v. Herbert*, 850 F.Supp.2d 1240, 1248 (D. Utah. 2012).

21

The remaining two credible-threat factors decisively favor Plaintiffs. CCPA enforcement is "not limited to a prosecutor or an agency." *Peck*, 43 F.4th at 1132. "[A]ny person" who is an "actual or potential consumer" and is allegedly injured may sue, Colo. Rev. Stat. §6-1-113(1)(a), which "bolster[s]" the "credibility of th[e] threat," *SBA List*, 573 U.S. at 164.

More importantly, the AG makes *no* attempt to "disavow[ ] future enforcement" of SB 23-190. *Peck*, 43 F.4th at 1132. ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

By contrast, the three district attorneys who were dismissed from this case provided "clear disavowals" of enforcement. Dkt.113 at 18, 20. At the beginning of this case, counsel for the AG "unequivocally stated" that he "w[ould] not enforce Senate Bill 23-190 pending the outcome of the rulemaking." Dkt.51 at 12:14-17. But now "[t]here is nothing, not even [his] word," to prevent the AG from bringing charges against Plaintiffs. *Peck*, 43 F.4th at 1133. This case is not *Clapper*, *cf.* AG.MSJ.17 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)), and Plaintiffs' fears "do not 'rest on guesswork' or 'a highly attenuated chain of possibilities,'" *303 Creative*, 6 F.4th at 1173. Those fears are "objectively justifiable." *Peck*, 43 F.4th at 1133. The AG ignores *SBA List* and discusses only the chilled-speech test in *Initiative & Referendum Institute v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc). To

the extent the *Walker* test for injury-in-fact remains distinct from the *SBA List* test,[3] Plaintiffs satisfy *Walker* too. Plaintiffs' speech is "affected by" SB 23-190 because their advertisements for APR are an "apparent violation" of it. *Peck*, 43 F.4th at 1130; *see also Chiles v. Salazar*, 116 F.4th 1178, 1197 (10th Cir. 2024) (first *Walker* prong satisfied where plaintiff "engaged in conduct she believes the [law] proscribes"). Plaintiffs also have a "present desire … to engage in" the restricted speech, *Walker*, 450 F.3d at 1089, as demonstrated by their ongoing speech about APR under this Court's protection. Pls.SOF ¶¶81-82. And the credible threat of enforcement remains. *Griswold*, 2023 WL 5426581, at *3 n.4 ("We have never interpreted a 'credible fear' differently based on the plaintiff's theory of standing.").

### B. Plaintiffs have standing to challenge Section 2.

For similar reasons, Plaintiffs also have standing to challenge Section 2. Once again, the AG contests only injury in fact. And once again, all three elements of injury in fact for a pre-enforcement challenge are readily satisfied.

*First,* Plaintiffs' intended conduct is arguably affected with a constitutional interest. Bella describes itself as a "comprehensive, life-affirming OB-GYN practice" that offers a "full continuum of care." Pls.SOF ¶10. Such "speech"—describing the core of Bella's identity—is "certainly 'affected with a constitutional interest." *SBA List*, 573 U.S. at 162. The AG does not contend otherwise.

---

[3]    *Compare Griswold*, 2023 WL 5426581, at *3 n.4 ("*[SBA] List* did not involve a theory of chilled speech"), *with SBA List*, 573 U.S. at 155 (complaint alleged "SBA's speech … had been chilled"); *see also 303 Creative*, 6 F.4th at 1171-75 (applying *SBA List* where plaintiffs alleged chill).

*Second,* Plaintiffs' intended conduct "arguably violate[s] the law." *Griswold*, 2023
WL 5426581, at *1. Bella uses the same terms to describe itself that sponsors of SB
23-190 denounced as deceptive when used by pro-life providers. Pls.SOF ¶¶117-19.
The AG says comments by legislators are "unrelated to how the [AG], a separate ac-
tor, will enforce the CCPA." AG.MSJ.24. But the relevant question is whether Plain-
tiffs' speech is "arguably … proscribed" by Section 2. *SBA List*, 573 U.S. at 162. Given
that multiple sponsors of SB 23-190 argued that it is deceptive for pro-life providers
to use terms like "comprehensive," it is at the very least "arguable" that Bella's ad-
vertisements using those terms "could run afoul of the laws on the books." Dkt.113 at
22.

Indeed, the AG himself routinely relies on the testimony of bill sponsors in litigat-
ing the meaning of state statutes. *See, e.g.*, Br. of State at *29, *Colo. Prop. Tax Adm'r
v. CO2 Comm., Inc.*, 527 P.3d 371 (Colo. 2023), 2022 WL 19520798; *State ex rel. Weiser
v. Ctr. for Excellence in Higher Educ.*, 499 P.3d 1081, 1092 (Colo. Ct. App. 2021). It is
not treating the government "as a monolith," *Murthy v. Missouri*, 603 U.S. 43, 69
(2024), to fear that the AG, private plaintiffs, and courts will do the same here.

*Third,* Plaintiffs face a credible threat of enforcement under Section 2. There is
more than enough to satisfy the "extremely low" pre-enforcement evidentiary bar.
*Peck*, 43 F.4th at 1133.

███████████████████████████████████████████████████████

█ And the district attorneys have stated that they will refer complaints to him.

Dkt.113 at 23. The AG says he "has not investigated anyone, including Plaintiffs, for any conduct that would come close to the conduct that Section Two prohibits." AG.MSJ.24. But that "does little to diminish a fear of enforcement given how new the law is," Dkt.113 at 23, and given that it was quickly enjoined. Moreover, Section 2 is "recently enacted" and "not moribund," and thus "its existence alone" may create a credible threat. *Brown*, 850 F. Supp. 2d at 1248.

As to third-party enforcement, the AG does not dispute that third parties may bring complaints under the CCPA that could also trigger enforcement action by the AG. Dkt.113 at 24. That "bolster[s]" the "credibility of th[e] threat." *SBA List*, 573 U.S. at 164.

As to disavowal, the AG has provided no sworn disavowal of enforcement. ███ ███████████████ He repeats the stingy concession that "the phrase 'we offer comprehensive, life-affirming care' *on its own* is not deceptive." AG.MSJ.24 (emphasis added). But even that is not a sworn disavowal, and concessions by counsel "do not have the same sort of force as the [AG] forswearing enforcement under penalty of perjury." Dkt.113 at 24. And on its face, it offers no protection for Bella's advertisements using similar but not identical language. Pls.SOF ¶10.

Remarkably, the AG complains that Plaintiffs' Section 2 claims are "devoid of the context that the CCPA, and the [AG], requires." AG.MSJ.25. But Bella's advertisements—which were attached to the pleadings, Am.Compl. ¶¶125-31—provide the exact "context" of its use of the relevant phrases, Pls.Exs.3-5. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████

The AG says he "cannot preemptively exempt" from the CCPA advertisements that use the terms "comprehensive" or "full continuum." AG.MSJ.24. It is more accurate to say that he has deliberately *refused* to disavow enforcement as to the specific Bella advertisements at issue. The AG is certainly entitled to make that choice. But his "staunch refusal to disavow prosecution" carries "heavy weight" in Plaintiffs' favor. *Chiles*, 116 F.4th at 1198-99. The credible-threat standard is amply satisfied.

Just as with Section 1, *supra* p.17, Plaintiffs satisfy *Walker* too. Bella's speech is "affected by" Section 2 because its advertisements using "comprehensive" and similar terms are an "apparent violation" of it. *Peck*, 43 F.4th at 1130; *cf.* Pls.SOF ¶¶117-19. Plaintiffs also have a "present desire … to engage in the restricted speech," *Walker*, 450 F.3d at 1089, as demonstrated by their ongoing use of that language. Pls.' SOF ¶10. And the same credible threat of enforcement persists.

## C. Plaintiffs' claims are ripe.

Finally, the AG claims for the first time—after nearly two years of litigation—that Plaintiffs' claims are unripe. AG.MSJ.25. That argument fails too.

"To the extent there is a difference between constitutional standing and ripeness, it does not alter the analysis here." *Teva Pharms., USA v. Weiser*, 709 F. Supp. 3d

1366 (D. Colo. 2023). In pre-enforcement challenges, standing and ripeness often "boil down to the same question." *SBA List*, 573 U.S. at 157 n.5.

The AG repackages his credible-threat arguments, claiming that Plaintiffs' fear of enforcement "rests entirely on uncertain or contingent future events" because he "has not investigated Plaintiffs" and "has no plans to do so." AG.MSJ.26-27. As explained above, *supra* pp.16, 19, the absence of enforcement history "does little to diminish a fear of enforcement given how new the law is," Dkt.113 at 23, and how quickly it was enjoined. And if an "investigat[ion]" or "plans" to investigate were required to ripen a claim, AG.MSJ.27, that would eviscerate pre-enforcement challenges altogether. *SBA List* holds the opposite. 573 U.S. at 158.

The AG further claims that "Plaintiffs will not face hardship if the Court withholds judgment." AG.MSJ.27. This fails the straight-face test. Because of SB 23-190, Bella faces staggering financial penalties if it continues to publicize APR and describe itself as a "comprehensive" or "full-service" OB-GYN practice. Pls.SOF ¶¶148-49. The hardship to Bella's patients is even more severe, as SB 23-190 will prevent them from receiving time-sensitive information about APR. Pls.SOF ¶¶150-51. Absent this Court's protection, Plaintiffs will "ha[ve] to choose between either following the law under [SB 23-190] and forgoing prohibited speech," or "moving forward by making [their] desired disclosures." *Peck*, 43 F.4th at 1134. This "dilemma" is "directly caused" by SB 23-190. *Id.* Nothing more is required.

**II. Plaintiffs have shown actual success on the merits of Counts I-VIII.**

**A. Colorado's ban on abortion pill reversal violates the Free Exercise Clause.**

SB 23-190 burdens Plaintiffs' religious exercise and violates each of "three bedrock requirements of the Free Exercise Clause." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (*FCA*); *see* Dkt.180 ("Pls.MSJ.") 33-43. Colorado cannot prove otherwise. Thus, SB 23-190 is subject to strict scrutiny, *see Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004), which it fails.

**1. The ban burdens Plaintiffs' religious exercise.**

There is "no question" whether SB 23-190 burdens Plaintiffs' religious exercise: "It does." Dkt.113 at 32; *see* Pls.MSJ.33-34.

Colorado did "not contest[] that SB 23-190 burdens Bella Health's religious practice" at the preliminary injunction stage. Dkt.113 at 32. Yet the Boards now say that "[p]rescribing and administering a drug is a secular act," and that "[p]rescribing or administering progesterone to a patient during a medical appointment is not a religious practice like peyote in *Smith* or animal sacrifice in *Lukumi*." Boards.MSJ.27.

But the government "does not have the power to decide what tasks are a necessary part of an individual's religious [exercise]." *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 833 (D. Colo. 2020). There is no dispute that Plaintiffs have a sincere religious obligation to offer APR. Pls.SOF ¶¶7, 77-79. In this respect, Plaintiffs are just like the religious parties who wanted to bake a cake in *Masterpiece*, run a foster agency

in *Fulton*, or exclude abortion-inducing drugs from their healthcare plan in *Hobby Lobby*: They are engaged in a religious exercise that the government seeks to punish. And it is the religious party's beliefs—not the government's—that dictate whether the prohibited conduct is a religious exercise.

SB 23-190 does not just "incidentally burden[ ]" Plaintiffs' religious exercise, *contra* Boards.MSJ.25—it "ban[s]" it under threat of lost licenses and crippling penalties. *Id.* at 31. "If these consequences do not amount to a substantial burden, it is hard to see what would." *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 691 (2014).

## 2. The ban is not generally applicable because it treats religious activity less favorably than comparable secular activity (Count I).

Section 23-190 is not generally applicable because it "treats comparable secular activity more favorably" than Plaintiffs' "religious activity." Dkt.113 at 32 (citing *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)); Pls.MSJ.34-39. A law lacks general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S at 62. The comparability of "two activities" is "judged against" the "government interest that justifies the regulation at issue." *Id.* Once a plaintiff shows that any comparable secular activity is treated more favorably, strict scrutiny follows. *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1277-78 (10th Cir. 2024).

Defendants previously asserted interests in prohibiting the off-label use of drugs based on the "lack of scientific evidence" about their "potential risks" and "efficacy."

Dkt.99 at 25; *see* Dkt.113 at 34. As Plaintiffs have explained, *see* Pls.MSJ.35-39, these claims collapsed during discovery.

As to safety, Dr. Cohen admits that "progesterone itself is safe." Pls.Ex.10 ("Cohen Report 1-C") 1; *see also* Cohen Tr.124:12-125:2 ("my concern was not that [APR] is dangerous"); Dkt.99-1 at 17 ("low-risk medication"). This concession makes perfect sense given the essential role of progesterone during pregnancy, Cohen Tr.41:2-10, and the decades-long history of safely using progesterone for numerous indications in obstetrics and gynecology, *id.* 44:25-49:24; Wubbenhorst Report 4-10. Notably, Colorado has not regulated *any* other use of progesterone.

The only safety concerns the Boards can muster relate not to the use of progesterone but to the use of *mifepristone*, particularly in the *absence of misoprostol.* Boards.MSJ.37; Cohen Tr.135:7-20. But those concerns apply equally to "[e]xpectant [m]anagement," which Dr. Cohen says is the relevant standard of care, Dkt.99-1 at 17, and in which patients also refrain from taking misoprostol, Boards.SOF ¶¶73-75. Because the only alleged safety risk applies equally to Defendants' *own* proposed standard of care—and because Colorado has taken no action to regulate that treatment, Pls.Ex.34 at 6-7—SB 23-190 is not generally applicable. *Tandon*, 593 U.S. at 62; Dkt.113 at 34-35.

As to effectiveness, the Boards summarily claim that "research supports other progesterone interventions." Boards.MSJ.32. But Dr. Cohen repeatedly denigrates the evidence for other uses of progesterone. She says the use of progesterone to treat

threatened miscarriage is a "theory" that "reli[es] on low-quality case series." Dkt.99-1 at 8; *see also* Cohen Report 1-C at 2; Pls.Ex.23 ("Cohen Report 1-D") 1; Dkt.113 at 35 (noting "[s]imilar scientific uncertainty" as to "some of those other uses"). She also derides the use of progesterone to treat premenstrual syndrome as "clinically ineffective," Cohen Report 1-C at 1, and says using progesterone for luteal-phase support "has not shown to be beneficial in all methods of assisted reproduction," Cohen Report 1-D at 1. ████████████████████████ ████████████████████ ███████████████ the Boards cannot now rest their theory of general applicability on efficacy arguments she expressly rejected.

For the first time at summary judgment, the Boards unveil a new justification for singling out APR. They now claim—with no citation—that APR is "unique among progesterone treatments" because "[i]t is the only one in which progesterone is used in conjunction with a progesterone antagonist." Boards.MSJ.3. Nothing in the record supports this newfound theory, which is a bald attempt to "adjust[] the dials *just right*" and "fine-tun[e] the level of generality up or down" in order to "engineer" the conclusion that there is no comparable secular activity. *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 652 (2018) (Gorsuch, J., concurring).

The record refutes it anyway. As Dr. Wubbenhorst explains, "[u]sing higher doses of a receptor agonist to counteract the effects of a receptor antagonist is not a new idea." Wubbenhorst 2/28/25 Supplement at 2. The classic example from emergency

medicine is carbon monoxide poisoning. Carbon monoxide is an antagonist of oxygen—but the standard emergency treatment for carbon monoxide poisoning is "high-flow oxygen therapy." *Id.* at 3. Thus, oxygen is routinely administered "in the presence of its antagonist" in order to "counteract carbon monoxide's effects." *Id.*; *see also id.* at 5 (additional examples of unregulated agonist-antagonist pairings).

The same principles apply to the use of the progestin depot medroxyprogesterone acetate (DMPA)—a semisynthetic compound that mimics progesterone and is used as a contraceptive—with mifepristone. *Id.* at 3-5. Because DMPA (like progesterone) "may interfere with the effects of mifepristone," ongoing pregnancy is "significantly more common" when the two drugs are administered on the same day. *Id.* at 3-4. For that reason, ACOG instructs physicians to counsel patients that administering DMPA for contraception on the same day as mifepristone "may increase the risk of ongoing pregnancy." Pls.Ex.25 at 15.

Yet Colorado does nothing to prohibit physicians from administering DMPA after a patient takes mifepristone. Indeed, Dr. Cohen freely admits that she "continue[s] to administer DMPA and mifepristone at the same time"—she "just do[es] so after counseling patients on the slightly elevated risk of ongoing pregnancy during the informed consent process." Cohen Report 1-C at 5. Thus, Colorado allows providers—including Defendants' own expert—to administer a progestin after mifepristone to *prevent* a woman's future pregnancy, while at the same time banning Plaintiffs from administering bioidentical progesterone after mifepristone to *maintain* a woman's

32

current pregnancy. That fatally undermines the Boards' purported interest in regulating hormones in the presence of their antagonists.

Colorado's failure to regulate any of these agonist-antagonist pairings proves that its newfound objection is simply made up. Indeed, the Boards have effectively conceded as much. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ *See, e.g.*, Pls.Ex.77 at 2 ("the Boards endorse the opinions of Dr. Rebecca Cohen and Dr. Patricia Cullen"); ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ Moreover, neither Dr. Cohen nor Ms. Cullen has ever asserted that APR is uniquely dangerous because it is "used in conjunction with a progesterone antagonist." Boards.MSJ.3. This factually unsupported theory, "invented *post hoc* in response to litigation" (and apparently invented by counsel, rather than by the Boards or their experts) cannot now be recast as a legal justification. *United States v. Vir-*

*ginia*, 518 U.S. 515, 533 (1996). Given the "vastly underinclusive" nature of Colorado's regulatory regime, Dkt.113 at 34-35, there is no escaping the conclusion that SB 23-190 lacks general applicability and therefore triggers strict scrutiny.

### 3. The ban is not generally applicable because it contains mechanisms for individualized exemptions (Count II).

SB 23-190 and its implementing rules are also not generally applicable because they "contain multiple mechanisms for exceptions" that "undermine the State's asserted interests." Dkt.113 at 32, 36-37; Pls.MSJ.39-41. Discretion is inconsistent with general applicability: "it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537 (quoting *Employment Div. v. Smith*, 494 U.S. 872, 884 (1990)). And such discretion means that burdens imposed by the government are the opposite of the "incidental" burdens *Smith* envisioned. *See id.* at 878. "[T]he mere existence of government discretion is enough to render a policy not generally applicable." *FCA*, 82 F.4th at 685. And the "greater [the] discretion in the hands of governmental actors," the "more, not less, constitutionally suspect." *Axson-Flynn*, 356 F.3d at 1298-99.

The Boards claim "[t]here are no exceptions to the law or rule, secular or otherwise." Boards.MSJ.31. That is wrong three times over.

*First*, SB 23-190 made "the uniformity of Section Three's application … dependent on the outcome of three boards' rulemaking." Dkt.113 at 36. The fact that the law included this discretionary "off" switch "undermines the [State's] contention that its [regulations] can brook no departures." *Fulton*, 593 U.S. at 542.

*Second*, the Boards' implementing rules have exemptions baked in. The Medical Board rule prohibits the use of progesterone for APR, but allows the Board to evaluate any "other" types of APR "on a case-by-case basis." Pls.Ex.53 at 7. The Nursing and Pharmacy Boards' rules retain even more discretion, allowing them to evaluate *all* APR on a "case-by-case basis." Pls.Ex.54 at 2; Pls.Ex.65 at 2. All three rules thus contain "system[s] of individual exemptions, made … at the 'sole discretion' of the [Boards]." *Fulton*, 593 U.S. at 535.

*Third*, the Boards retain discretion about whether and how to punish any provider for unprofessional conduct or violating generally accepted standards of practice. Pls.Ex.30 ("Delp 11/14 Tr.") 36:9-14, 43:16-20; Pls.Ex.31 ("Shackelford Tr.") 34:4-12, 47:18-48:24; Pls.Ex.32 ("Hills Tr.") 76:9-22, 79:18-21, 124:24-125:6. This discretion impermissibly "invite[s] [Colorado] to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537; *see also Axson-Flynn*, 356 F.3d at 1298 (law contains individualized exemptions when it includes "systems that are designed to make case-by-case determinations"); Delp 12/12 Tr.30:11-14, 33:6-8, 34:13-17 ("case by case"); Shackelford Tr.34:4-12, 48:22-24 (same); Hills Tr.76:14-16, 79:18-21 (same).

The Boards says there is "good reason" for the Nursing Board's case-by-case rule because "[u]nlike the Medical Board, Nursing Board licensees practice at all levels of patient care," and most "lack discretion to ignore treatment orders." Boards.MSJ.35. They further contend that if the Nursing Board had adopted a "categorical ban" on

APR, it would have forced its licensees into an "unsolvable dilemma: either violate the rule or ignore a medication order." *Id.* at 35-36. The Boards offer no record support for these claims—because there is none. Hills Tr.125:21-126:10. And Colorado has no stronger interest in preventing a physician—as opposed to a nurse with prescriptive authority—from using progesterone for APR. ████████████████████████████ ████████████████████ The Boards' "unsolvable dilemma" justification is post hoc and purely invented.

The Boards try to downplay their discretion by saying that their investigations, unlike the "discretionary exceptions described in *Fulton*," are "replete with due process guarantees." Boards.MSJ.32. This is the same "overly narrow" interpretation of *Fulton* that the en banc Ninth Circuit rejected in *FCA*. 82 F.4th at 687. *Fulton* is not "only concerned with 'unfettered' discretion," but instead holds that "the *mere existence* of a discretionary mechanism to grant exemptions can be sufficient to render a policy not generally applicable, regardless of the actual exercise." *Id.* at 687-88 (emphasis added). The Boards' rules contain broad "discretionary mechanism[s]" in spades, with the Medical Board evaluating any "other" types of APR "on a case-by-case basis," Pls.Ex.53, and the Nursing Board evaluating *all* APR "on a case-by-case basis," Pls.Ex.54. *Contra Chiles*, 116 F.4th at 1224-25 (law generally applicable where "there is *no mechanism* for the regulatory Boards to consider the particular reasons for a person's conduct" (cleaned up) (emphasis added)). Any procedural requirements that kick in *after* the Boards decide to initiate an investigation do not eliminate their

initial discretionary mechanisms for "decid[ing] which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537.

The possibility that "Board Rules and the standard of care [c]ould change" in the future cures nothing. Boards.MSJ.34-35. The current statute bans APR—subject to veto by the three Boards. The current rules authorize the Boards to make "case-by-case" determinations about which instances of APR fall below the standard of care and which do not. And the current system of investigation and enforcement is "designed to make case-by-case determinations." *Axson-Flynn*, 356 F.3d at 1298. The "mere existence" of any one of these discretionary mechanisms would be enough to render SB 23-190 not generally applicable. *See FCA*, 82 F.4th at 687-88. Taken together, there is ample evidence that SB 23-190 fails general applicability and is thus subject to strict scrutiny.

### 4. The ban is not neutral (Count III).

SB 23-190 also fails the neutrality standard because its "object" is "to infringe upon or restrict practices because of their religious motivation." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993); *see* Dkt.113 at 37-38; Pls.MSJ.41-43. Because government hostility to religion can be "masked, as well as overt," courts must "survey meticulously" all evidence of a law's purpose, including "the legislative or administrative history." *Lukumi*, 508 U.S. at 534, 540.

On its face, SB 23-190 expressly targets "anti-abortion centers, also known as 'crisis pregnancy centers,'" which it accuses of "us[ing] deceptive advertising tactics" and

"go[ing] so far as to advertise medication abortion reversal." §1(1)(c)-(f). The article quoted in Section 1 recognizes that "[m]ost [crisis pregnancy centers] are religiously affiliated," and claims that "religious ideology … takes priority over the health and well-being of the women seeking care at these centers." Amy G. Bryant, *Why Crisis Pregnancy Centers Are Legal but Unethical*, AMA J. Ethics (Mar. 2018), https://perma.cc/Z8QW-9FFR. The text of Section 1 alone thus confirms that Colorado knew the "anti-abortion centers" targeted by the law were primarily religious providers.

The legislative history is even more explicit. One sponsor explained that the bill's use of "anti-abortion center" referred to "faith-based organizations that pose as a comprehensive reproductive health care clinic." Pls.Ex.43 at 3:1-5; *see also* Pls.Ex.46 at 54:3-4 ("many of these crisis pregnancy centers are religiously affiliated"). She also stated that these "fake clinics" were "the only ones that can prescribe [APR]." Pls.Ex.43 at 3:2; Pls.Ex.44 at 2:21-22. The sponsors did not hide their disdain for these religious providers—accusing them of "sham[ing]" women and engaging in "delay tactics," "disinformation," and "intimidation." Pls.Ex.43 at 2:22-23.

That same religious animus infected the rulemaking. Three bill sponsors—including those who repeatedly targeted "faith-based" organizations—submitted a rulemaking comment expressing their "dismay and disappointment in the proposed draft 'rules,'" which they said "would have the opposite effect" of their legislative intent to

38

"stop" APR. Written Stakeholder Comments at 1239, Colorado Department of Regulatory Agencies, https://perma.cc/53ZP-HBKF. Two of those sponsors then attended a Board stakeholder meeting to urge the Boards to "reconsider your draft rules and carefully reread the instructions" in the statute. Pls.Ex.52 at 14:12-13; *id.* at 22:22-23:2 ("I just want to make it incredibly clear what the legislative intent was").

The record here shows far more than the "subtle departures from neutrality" that violate the Free Exercise Clause. *Masterpiece*, 584 U.S. at 638. It also stands in marked contrast to *Chiles*, where "[n]othing in the record suggest[ed] that the [law's] aim [wa]s to infringe or restrict practices because of their religious motivation," 116 F.4th at 1223. Here, it is the Boards that don't "meaningfully address the legislative history." *Id.* And here, the record is replete with evidence that SB 23-190 and its rules were enacted "*because of,*" not merely "in spite of," their "suppression of … religious practice." *Lukumi*, 508 U.S. at 540 (emphasis added).

The Boards say this is "not the first time" the General Assembly has "prophylactically regulated" healthcare providers. Boards.MSJ.29-30. But the Boards' examples—opioids, benzodiazepines, painkillers, and stimulants—underscore that SB 23-190 is the odd one out. These prior "prophylactic[]" regulations involve well-established public safety risks. *See, e.g.*, H.B. 21-1276 §1(1)(a) ("death" from "opioid epidemic"); *id.* §1(1)(e) ("overdose" from "benzodiazepines"). Here, Defendants have yet to identify a single patient harmed by APR. The Boards' claim that its rules about

39

APR are "no different than these previous examples" is simply not credible. Boards.MSJ.30.

For all these reasons, SB 23-190 fails *Lukumi*'s neutrality standard and is "plainly unconstitutional." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).

**B. The Eleventh Amendment does not bar Plaintiffs' claims against the Attorney General.**

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████     Instead, it's déjà vu all over again with the AG's Eleventh Amendment theory. This Court correctly rejected that argument before, Dkt.113 at 28-30, and should do so again.

The *Ex parte Young* exception to Eleventh Amendment immunity "permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007). The exception applies "so long as the defendant officer has 'some connection with the enforcement of the act.'" *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010). "Some" connection does not mean a "special connection." *Wagnon*, 476 F.3d at 828. The plaintiff need point only to "a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Id*. Both prongs are met here.

The AG's "particular duty" is manifest. As he has repeatedly conceded, AG.MSJ.34; Dkt.68 at 16, "Colorado law specifically *requires* the attorney general to bring charges referred to him by the Medical and Nursing Boards." Dkt.113 at 30; *accord* Colo. Rev. Stat. §§ 12-240-125(5)(b), (d), 12-255-119(3)(c)(V), (4)(d) (AG "*shall* prosecute … charges" referred by Medical and Nursing Boards) (emphasis added). This specific duty more than satisfies the "particular duty" prong. *See, e.g.*, *Kitchen v. Herbert*, 755 F.3d 1193, 1202-03 (10th Cir. 2014) (statutory authority to bring lawsuit and "exercise supervisory powers over the district and county attorneys" sufficient). Nor can the AG seriously contest "demonstrated willingness," since he has exercised these prosecutorial duties in the past. *See, e.g.*, *Colo. State Bd. of Med. Exam'rs v. Boyle*, 924 P.2d 1113, 1115 (Colo. App. 1996); ███████████████

The AG claims these statutory obligations are mere "client-service duties" that "cannot overcome the Eleventh Amendment." AG.MSJ.35. But *Edmondson* says nothing of the sort. There, plaintiffs challenged two provisions of Oklahoma law. Their first challenge identified a statutory duty to enforce and a history of past enforcement, so the court found standing. *Edmondson*, 594 F.3d at 760. But their second challenge "[did] not cite to any Oklahoma law authorizing the [AG] to enforce that provision," so the court found no standing. *Id.* It was in this context that the court said—by way of a parenthetical citation to out-of-circuit dicta—that "a duty to prosecute all actions in which the state is interested" was insufficient. *Id.* (quoting *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)). Here, Plaintiffs have identified

specific statutory duties—far more than a mere "attorney-client relationship," *cf.*
AG.MSJ.36—demonstrating that the AG "may or must take enforcement actions
against the [Plaintiffs] if they violate the terms of" the Medical and Nurse Practice
Acts. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 45-46 (2021). The snippet from
*Edmondson* is thus completely irrelevant.

*Doyle* is similarly unavailing. AG.MSJ.35 (citing *Doyle v. Hogan*, 1 F.4th 249 (4th
Cir. 2021)). *Doyle* straightforwardly held that a state law requiring the AG to "'[g]ive
his opinion in writing ... on any legal matter or subject'" did not give him "control over
*enforcing* the [challenged act]." 1 F.4th at 256. Here the AG's enforcement power is
not only "necessarily encompassed by [his] overall enforcement authority," *Free
Speech Coal. v. Anderson*, 119 F.4th 732, 740 (10th Cir. 2024), its exercise is *required*
by the Medical and Nurse Practice Acts.[4]

The AG fights the comparison to his counterpart in *Ex parte Young*, Dkt.113 at
30, because Young exercised "discretionary enforcement," which the AG says is "quite
different" from his own mandatory role in prosecuting "referrals" from the Boards.
AG.MSJ.34-35. The AG has tried (and failed) the flip side of this argument before.
*Teva Pharms.*, 709 F. Supp. 3d at 1376 (rejecting argument that AG is immune under
Eleventh Amendment because his "enforcement is discretionary"). If anything, the

---

[4]    That the Medical and Nurse Practice Acts do not appear in a list of statutes the AG can "inde-
pendently initiate and bring civil and criminal actions to enforce" is irrelevant. AG.MSJ.36. What
matters is that the AG has "some connection with the enforcement of the act," *Edmondson*, 594 F.3d
at 760, as he plainly does.

AG's mandatory statutory duties here make him *more* closely connected to the enforcement regime, not less.

Finally, for the first time in this litigation, the AG claims that the Eleventh Amendment precludes Plaintiffs' request for nominal damages. AG.MSJ.36-37. But the AG has "waived" "any sovereign immunity defense to the nominal damages claims" through "undu[e] delay[ ] in asserting it," since he "had ample opportunity to raise the issue earlier in this litigation," including in his motion to dismiss. *Platt v. Moore*, 15 F.4th 895, 910 (9th Cir. 2021); *cf.* Dkt.68 (no reference to nominal damages).

### C. SB 23-190 violates the Free Speech Clause by discriminating based on content and viewpoint (Count IV).

The First Amendment prohibits the government from "excis[ing] certain ideas or viewpoints from the public dialogue." *303 Creative v. Elenis*, 600 U.S. 570, 588 (2023). Sections 1 and 2 do exactly this by regulating speech based on its content and viewpoint. Pls.MSJ.44-47.

***Content discrimination.*** SB 23-190 is facially content based because it applies only to speakers who discuss certain topics. Start with Section 1, which creates a targeted "prohibition on deceptive trade practices" that applies to speakers who advertise one particular message by "offering to provide … medication abortion reversal." §1(3)(b). A speaker who advertises abortion is not subject to the law.

The AG does not brief content discrimination. Instead, he pins his hopes on Section 1's "uncodified" status. AG.MSJ.28-29. Although Section 1 is labeled a "legislative declaration," it is "unlikely that Section One has no bearing on how a Colorado court may interpret the CCPA in light of SB 23-190." Dkt.113 at 22. For Colorado courts, legislative intent *is* statutory meaning—with legislative declarations often serving as the Rosetta Stone. *Supra* p.14 (collecting cases). The AG is free to rely on Section 1 in enforcing SB 23-190 and the CCPA. ██████████████████████

███████████████████████ And any casual reader would understand that drawing a bead on advertisements about APR is what Section 1 is all about. Courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Section 2 is content based too. It applies only to speakers whose advertisements "indicate[]" that they provide or refer for abortion or emergency contraceptives. §2(2). Speakers who *do* provide abortion and emergency contraceptives cannot violate Section 2. ████████████████████ It's thus a classic content-based statute that "singles out specific subject matter for differential treatment," *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015), and "requires enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred," *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (cleaned up).

SB 23-190 is also content based because Colorado enacted it out of "disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (cleaned up). That disagreement is plain from Section 1's litany of claims about "anti-abortion centers"— including that they "use deceptive advertising tactics" and "go so far as to advertise medication abortion reversal, a dangerous and deceptive practice that is not supported by science or clinical standards." §1(1)(c)-(f). And the sponsors' floor statements are replete with disapproval. *Supra* at p.33. Because SB 23-190 is "targeted at specific subject matter" and was enacted due to "'disagreement' with its message," it is "content based even if it does not discriminate among viewpoints." *Reed*, 576 U.S. at 167, 169.

***Viewpoint discrimination.*** But SB 23-190 *does* discriminate among viewpoints, making the First Amendment violation here "all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Section 1 explicitly targets the views of "[a]nti-abortion centers" for their role in the "anti-choice movement." §1(1)(d). It effectuates that targeting by prohibiting (on its own and through the CCPA) advertising or counseling patients about APR. §1(3)(b). Section 1 thus plainly discriminates against the viewpoint that progesterone treatment can reverse the effects of mifepristone—while providers remain free to advertise any other form of progesterone treatment, or to claim that "expectant management" is safer or more effective than progesterone, even without proof. Pls.Ex.38 at 11-14; ▮▮▮▮▮▮▮▮

▮▮▮▮ Cohen Tr.48:1-50:7, 127:13-129:9.

45

Section 2 doubles down. It prohibits false advertising by speakers who do not provide abortion or emergency contraceptives, leaving false advertising by speakers who do provide and refer for abortions and emergency contraceptives untouched. §2(2); ██████████████████ This blinkered approach might seem innocent enough if the preexisting CCPA didn't contain at least two provisions that already prohibited the same conduct. Colo. Rev. Stat. §6-1-105(1)(e), (rrr); ███████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████     ██████████████ So the real purpose of Section 2 is to "target[] … particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. Because SB 23-190 "facilitate[s] speech on only one side of the abortion debate," it is "a clear form of viewpoint discrimination." *McCullen v. Coakley*, 573 U.S. 464, 485 (2014).

The AG tries to analogize Section 2 to misrepresentations about radon mitigation. AG.MSJ.30. But those provisions regulate false statements in *either direction* about "the results of a radon test or the need for radon mitigation." Colo. Rev. Stat. §6-1-105(ll). By contrast, the legislature here acted out of disagreement with the message of "anti-abortion centers," §1(1)(c)-(e), and it passed a law that targets only those who fail to provide abortion and contraception, rather than those who fail to provide prenatal care.

The AG says Section 2 does not "exclusively" target the speech of pro-life providers because there are three "independent ways" to violate it. AG.MSJ.30-31. But the fact that Section 2 favors providers who check all three boxes—abortion, emergency contraceptives, and referrals for the same—doesn't make the discrimination any better. Planned Parenthood can rest easy, but Bella is still in danger of future enforcement for a "comprehensive" advertisement that "might be" deceptive. AG.MSJ.24. Indeed, an abortion provider can call her clinic "Comprehensive Women's Health Center" without providing prenatal care, Cohen Tr.22:5-9, 25:11-12—and never lose a wink of sleep over Section 2. That is viewpoint discrimination.

The Supreme Court "has stressed the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'" *NIFLA v. Becerra*, 585 U.S. 755, 756 (2018). Colorado "may not burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell v. IMS Health*, 564 U.S. 552, 578-79 (2011). As a content- and viewpoint-based restriction of speech, SB 23-190 is "presumptively unconstitutional" and subject to strict scrutiny. *NIFLA*, 585 U.S. at 766.

***Not commercial speech.*** The AG makes a fainthearted attempt to dodge strict scrutiny by recasting Section 1 (but not Section 2) as a "commercial" speech regulation. AG.MSJ.28-29. That argument fails too.

Bella's speech about APR is not commercial. The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker

and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980). Bella's website affirms its commitment to "save mothers and babies through sound medical counseling and [APR]," and to "cover all costs associated with [APR], should finances be an issue." Pls.MSJ.Ex.26 at 3. That is not speech that "does no more than propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014).

But even if Bella's speech were commercial, the AG makes no attempt to satisfy the "heightened scrutiny" that applies to content and viewpoint-based restrictions of commercial speech. *Sorrell*, 564 U.S. at 565. "Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment." *Id.* at 571-72. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ Pls.Ex.62; ████████████████████████████ Because the AG fails to come forward with *any* interest—much less a "substantial" one, *U.S. West v. FCC*, 182 F.3d 1224, 1233 (10th Cir. 1999)—in banning speech about APR, he cannot carry his burden to justify Section 1 as a commercial-speech restriction under any legal standard.

**D. SB 23-190 violates the First Amendment right to receive information (Count V).**

"The Supreme Court has repeatedly recognized that the First Amendment includes not just a right of free speech, but also a right to receive information." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1118-19 (10th Cir. 2012) (collecting cases). SB 23-190 violates that right. Pls.MSJ.47-49.

Both Section 1 and Section 3 are content-based on their face, as they "single[] out" for "differential treatment" only one "specific subject": APR. *Reed*, 576 U.S. at 169. As explained, *supra* p.39, they were also enacted out of "disagreement with the message" of APR, *Reed*, 574 U.S. at 164, and they "target … particular views" on the subject, *Rosenberger*, 515 U.S. at 829.

The AG says in passing that the First Amendment does not "guarantee anyone the right to receive deceptive information." AG.MSJ.29. This bluster is mystifying, as the AG has doggedly refused to express any opinion about whether Bella's speech about APR is deceptive. *Supra* p.16. Reams of evidence—and 11 live babies since this case was filed, Pls.SOF ¶136—show it is not. *Infra* pp.24-25. Having retreated from the "central issue in this case," Blake 12/13 Tr.147:2-11, the AG cannot now rescue SB 23-190 with a backhand reference to unspecified "deceptive information."

The Boards argue only that Section 1 "restricts nothing because it was not codified." Boards.MSJ.45. Wrong. *Supra* p.14. And Section 1 plainly *can* be "applied to restrict the activities" of Plaintiffs, Boards.MSJ.45—and thus rob their patients of crucial information—through the CCPA.

### E. SB 23-190 violates the Fourteenth Amendment right of pregnant women not to be forced to undergo or continue an abortion (Counts VI-VIII).

The Fourteenth Amendment protects the right to refuse "unwanted medical treatment," *Cruzan v. Director*, 497 U.S. 261, 278 (1990), and also forbids states from "deny[ing] to any person … the equal protection of the laws." U.S. Const. amend. XIV, § 1. SB 23-190 strips all of these rights. Pls.MSJ.49-50.

The Boards insist that SB 23-190 and their rules pass constitutional muster because they "do not compel a patient to take misoprostol if they change their minds." Boards.MSJ.44. That misses the point. Of course depriving a woman of the ability to use a safe medication to reverse the effects of mifepristone undermines her right to decide to bear a child. It is preposterous and patronizing to claim that depriving her of the progesterone available to all other pregnant women somehow "does nothing but reinforce" her right to keep her child. *Id.*

SB 23-190 also runs roughshod over Colorado's Reproductive Health Equity Act (RHEA). Both the Boards and the AG are "public entities." Delp 11/25 Tr.76:5-10;

████████████████████████████████████████████████████████

████████████    And public entities are specifically prohibited from either "interfer[ing] with" a woman's "fundamental right" to continue her pregnancy in the "regulation or provision of … services[] or information" *or* "[d]epriv[ing]" her of the "right to act … during [her] pregnancy" based on "the potential, actual, or perceived impact on the pregnancy, the pregnancy's outcomes, or on the pregnant individual's health." Colo.

Rev. Stat. §25-6-404(1). But that is exactly what Colorado has done. Depriving only one category of women of the progesterone available to all others is an equal protection violation.

### F. SB 23-190 is void for vagueness (Count VIII).

Separate and apart from its other defects, Section 2 is also unconstitutionally vague. Pls.MSJ.50-52. A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Jordan v. Pugh*, 425 F.3d 820, 824-25 (10th Cir. 2005). The vagueness test "applies with particular force" in reviewing "laws dealing with speech." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976).

Section 2 fails to provide fair notice. Any advertisement that falsely "indicates" that the person "provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives" is prohibited as a deceptive trade practice. §2(2); Colo. Rev. Stat. §6-1-734(2). "Indicates" is not a defined term, and Section 2 offers no standards or guidance on what it means.

The AG insists that the meaning of "indicates" is "unambiguous[]," AG.MSJ.31-32—but he still refuses to say what that meaning is. ███████████████████ ███████████████████████████████████████ ██████████████████████████ Thus, the undefined term "indicates" has a "scope so indefinite" that it leaves "persons of common intelligence

51

[to] necessarily guess at its meaning and differ as to its application." *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1148-49 (W.D. Okla. 2024). Section 2 is vague for that reason alone.

Citing *National Federation of the Blind of Arkansas v. Pryor*, 258 F.3d 851, 857 (8th Cir. 2001), the AG claims that "indicates" is not vague "[w]hen used in a consumer protection statute." AG.MSJ.23; *see id.* at 32. But *Pryor* contains no blanket holding of the kind. In that case, the court rejected a vagueness challenge to a statute regulating telemarketing—where the AG issued an authoritative and "reasonable interpretation" of the challenged provision, thus "provid[ing] relevant assurance that the statute will not be subject to arbitrary and discriminatory enforcement." 258 F.3d at 857. The AG offers no such interpretive guidance here, despite repeated opportunities to do so.

Even if Section 2 did provide fair notice, it still permits arbitrary and discriminatory enforcement. SB 23-190's "purpose"—which courts "often consider[]" in deciding vagueness questions, *Jordan*, 425 F.3d at 825—is to target "anti-abortion centers." §1(1)(c)-(e). Its sponsors repeatedly took aim at the same terms that Bella routinely uses. Pls.MSJ.4-5, 24-25, 32, 43. And the prospect that a future court or enforcement authority will take its cues from the bill sponsors is far from a "marginal fact situation[]." AG.MSJ.32. The "potential chilling effect" on Bella's "protected expression" is "both real and substantial." *Jordan*, 425 F.3d at 828.

 On one

hand, the AG says Plaintiffs "are not engaging in the type of conduct that violates

[Section 2]," AG.MSJ.23—in which case he should have no reason to resist permanent

relief. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████

This equivocation and obfuscation confirm vagueness. Section 2 unconstitution-

ally "leav[es] [Plaintiffs] in the dark about what the law demands," thus "invit[ing]

the exercise of arbitrary power" and allowing future "prosecutors and courts to make

it up." *Sessions v. Dimaya*, 584 U.S. 148, 175 (2018) (Gorsuch, J., concurring in part).

**G. The government cannot carry its burden under strict scrutiny.**

All these roads lead to strict scrutiny—"the most demanding test known to consti-

tutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Defendants must put

forth evidence "establishing that the requirement was narrowly tailored to advance

a compelling governmental interest." *Axson-Flynn*, 356 F.3d at 1294. The Boards fail this "daunting task," *id.*, and the AG does not even try.

Some claims don't escape the gate. No Defendant argues that the speech restrictions in Section 1 and 2 satisfy any level of scrutiny—waiving the issue. *Robertson v. Tokar*, No. 23-cv-2132, 2024 WL 4817265, at *7 (D. Colo. Nov. 18, 2024). And an argument that Colorado had any interest—much less a compelling one—in passing Sections 1 and 2 would be inconsistent with the AG's ongoing claims that these provisions do nothing at all. Blake 12/13 Tr.92:20-24; Dkt.51 at 67-68; AG.MSJ.16.

**No compelling interest.** The Boards claim Colorado has two "compelling interests" in banning the use of progesterone for the sole purpose of counteracting the effects of mifepristone: "regulating licensed medical professionals" and "protecting patients." Boards.MSJ.41. Colorado cannot rely on such "broadly formulated interests." *Fulton*, 593 U.S. at 541. And regardless, the record disproves them.

First, now that Colorado's safety and effectiveness arguments have collapsed, *see supra* pp.24-25, there is no evidence to support either stated interest—much less prove they are "exceedingly persuasive." *SFFA v. Harvard Coll.*, 600 U.S. 181, 217 (2023). There is no reason to believe the Boards have a compelling need to restrict women from receiving what their own expert calls a "low-risk medication" that is "safe." Cohen Report 1-C at 1; Dkt.99-1 at 17. And while Defendants contend that "use of mifepristone without misoprostol may be associated with an increased risk of potentially life-threatening hemorrhage" or "miscarriage later in the pregnancy and

early delivery," Boards.MSJ.37-38, those risks are associated not with the addition of progesterone, but the *absence of misoprostol*. And that concern applies equally to expectant management, *supra* p.25, which Colorado declines to regulate. Pls.Ex.34 at 6-7. Having failed to show an "'actual problem' in need of solving," Colorado's claimed interests fail. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011).

These interests are even less compelling when viewed in light of Colorado's failure to regulate other practices. The Boards variously suggests that their concerns are over treatments that "lack … scientific evidence" about their "potential risks" and "efficacy," Dkt.99 at 25, or that are "experimental procedures in the clinical context, without the benefit of the safeguards of formal research," Boards.MSJ.40, or that involve ingesting a drug after its antagonist, *id.* at 3. But the problem here mirrors the problem for general applicability: If these interests were compelling (or even substantial), Colorado would have laws that prohibit treatments that lack scientific evidence, or experimental treatments without formal research safeguards, or medication regimens that involve ingesting a drug after its antagonist. But they don't.

By declining to regulate comparable medical treatments, Colorado "leaves appreciable damage to [its] supposedly vital interest unprohibited," and therefore cannot show its supposed interests in regulation and safety are compelling. *Lukumi*, 508 U.S. at 547; *see also Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.) (underinclusiveness raises inference that "claimed interest isn't actually so compelling after all").

Finally, Colorado's actions have confirmed that even the State does not view its asserted interest in banning APR as compelling. First, when enacting SB 23-190, the General Assembly did not issue an immediate ban on APR—it declared that APR would be unprofessional conduct "*unless*" all three Boards issued rules finding that APR is generally accepted. §3(2)(a) (emphasis added). If the interests were compelling, why would the legislature grant regulatory discretion to flip the statutory "off" switch? *See Fulton*, 593 U.S. at 535, 537, 542. Second, the Boards don't treat the interest as compelling either—eschewing categorical bans and instead reserving case-by-case decision-making power. Pls.Ex.54; Pls.Ex.65. Third—and most damning at this stage of the case—even the Attorney General does not find the asserted interest compelling. After 21 months of litigation and full discovery, he still cannot formulate a position about the safety or efficacy of APR—going so far as to refuse to endorse the opinions of the experts his own lawyers hired. *Supra* p.43.

**Not narrowly tailored.** Even if Defendants could muster a compelling interest—they cannot—SB 23-190's lack of narrow tailoring is an independent basis for holding the ban is unconstitutional. A law that is "underinclusive in substantial respects" not only undermines the government's interests, *see supra* p.50, but also demonstrates an "absence of narrow tailoring" that "suffices to establish [its] invalidity." *Lukumi*, 508 U.S. at 546. Defendants provide no justification for treating APR different than other unregulated uses of other unregulated uses of progesterone, other uses of drugs with antagonists, or other unregulated off-label drug uses. *See supra* pp.24-28. Nor

56

do Defendants provide any explanation for why Colorado is the *only state in the country* to need a ban on APR in order to regulate its medical professionals and protect patients—many of whom want to provide, and receive, this life-saving treatment. *Holt v. Hobbs*, 574 U.S. 352, 368-69 (2015) (practice in "vast majority of states" suggests available less restrictive means). By "fail[ing] to offer any showing that [Colorado] even considered less restrictive measures than those implemented," Defendants have failed to bear their burden of establishing that SB 23-190 is narrowly tailored. *FCA*, 82 F.4th at 694.

## CONCLUSION

For these reasons, Defendants' motions for summary judgment should be denied.

Dated: February 28, 2025          Respectfully submitted,

                                  /s/ Mark L. Rienzi
                                  Mark L. Rienzi
                                  Rebekah P. Ricketts
                                  Laura W. Slavis
                                  Michael O'Brien
                                  Colten L. Stanberry
                                  Amanda L. Salz
                                  Amy Ren
                                  The Becket Fund for Religious Liberty
                                  1919 Pennsylvania Ave, N.W.
                                  Suite 400
                                  Washington, D.C. 20006
                                  (202) 955-0095
                                  mrienzi@becketfund.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the foregoing Response to Defendants' Motions for Summary Judgment with the Clerk of Court via CM/ECF, which will provide electronic copies to counsel of record.

/s/ Mark L. Rienzi
Mark L. Rienzi

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 12,539 words. I further certify that this brief and the brief filed by Plaintiff-Intervenor do not exceed a combined 17,500 words. Dkt.175. As to all other matters, I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

/s/ Mark L. Rienzi
Mark L. Rienzi