IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-00939-DDD-SPB


BELLA HEALTH AND WELLNESS, on behalf of itself and its patients, et al,
     Plaintiffs,

CHELSEA M. MYNYK,
     Plaintiff-Intervenor,

     v.

PHIL WEISER, in his official capacity as Attorney General of Colorado, et al.
     Defendants.

---

**COLORADO MEDICAL BOARD'S AND COLORADO BOARD OF
NURSING'S JOINT RESPONSE TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT [DOC. 180] AND COLORADO
BOARD OF NURSING'S RESPONSE TO PLAINTIFF-INTERVENOR'S
MOTION FOR SUMMARY JUDGMENT [DOC. 179]**

---

## INTRODUCTION

Plaintiffs[1] bring a facial challenge to SB23-190 and its implementing

regulations. Their burden in a First Amendment facial challenge is high: they must

show that a substantial number of the law's applications are unconstitutional when

judged against the statute's plainly legitimate sweep. They cannot meet this

rigorous standard, because the law regulates the prescribing and administering of

drugs in the context of abortion care. That is the practice of medicine and nursing—

a form of conduct that is at the core of the state's police powers. The plain legitimate

sweep of the law far outweighs any purportedly unconstitutional ones and the Court

should deny Plaintiffs' motion for summary judgment.

## RESPONSE TO BELLA PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

The Boards object to Plaintiffs' Statement of Undisputed Material Facts

because most of its paragraphs fail to comply with the Court's Civil Practice

Standard III(E)(1)(a) requiring each material fact to be "set forth in simple,

declarative sentences, separately numbered and paragraphed." The Boards'

responses to the noncompliant paragraphs attempt to comply with Civil Practice

---

[1] Bella Health Plaintiffs and Plaintiff-Intervenor brought the same claims in this suit based on the same legal theories and assert similar arguments in support of their Motions for Summary Judgment, thus any references to "Plaintiffs," "claims," etc. refer to both unless individually identified.

Standard III(E)(1)(d), to the extent possible, even though most paragraphs contain

numerous separate allegedly undisputed material facts.

**Bella Health and Wellness.**

      1.     Admitted.

      2.     Admitted.

      3.     Admitted.

      4.     Admitted.

      5.     Admitted.

      6.     Admitted.

      7.     Admitted.

      8.     Admitted

      9.     Admitted.

      10.     Admitted.

      11.     Admitted.

**Progesterone**

      12.     Admitted.

      13.     Admitted.

      14.     Admitted.

      15.     Admitted.

16.     Admitted.

17.     Admitted

18.     Admitted in part. Progesterone can be prescribed for multiple indications in obstetrics and gynecology. However, prescribing progesterone is not always appropriate for all obstetrics and gynecology indications. Ex. 73[2] at 44:23–45:11, 46:23–47:16, 48:16–21.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.[3]

23.     Denied. Plaintiffs cite only to a conclusory, unsupported allegation in their Amended Complaint, lacking any indication it is based on personal knowledge. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002). To assist health care providers in risk-benefit analysis and counseling pregnant women and nursing mothers who need medication, the FDA historically classified drugs that pregnant or lactating women might take, thus allowing them to make informed and

---

[2] Because Ms. Mynyk submitted only a single exhibit, the Boards have consecutively numbered exhibits from the AG's Response to the Bella Plaintiffs' Motion for Summary Judgment. D.C. Colo. L Civ R 56.1(c).

[3] *But see* Defendants' Statement of Additional Disputed Facts ("SADF") ¶2.

educated decisions for themselves and their children. *See* FDA, Pregnancy and

Lactation Labeling (Drugs) Final Rule, https://www.fda.gov/drugs/labeling-

information-drug-products/pregnancy-and-lactation-labeling-drugs-final-rule

(visited Feb. 20, 2025). But the FDA learned that the categories were confusing, did

not accurately and consistently communicate differences in degrees of fetal risk, and

were often misinterpreted and misused. *See id.*; 79 FR 72064 (codified at 21 CFR

201), "Pregnancy and Lactation Labeling Rule," at 1. Revised rules required more

detailed information about risk incidence and continued requiring that clinicians

inform patients whether the clinician's relied-upon data was animal or human

trials. 79 FR 72064 at 23–24, 27–28. And throughout, the rules require that

clinicians discuss the impacts on the fetus or breast-fed baby. *Id.* at 25–27, 30.

24.    Denied. The FDA ceased characterizing medications as Plaintiffs

suggest because providers misused the labels. 79 FR 72064 at 1.

25.    Admitted.[4]

26.    Admitted in part. The 1982 FDA bulletin cited by Plaintiffs does

contain the quoted language on page 6 but continues, "Such 'unapproved' or, more

precisely, 'unlabeled' uses may be appropriate and rational in certain

---

[4] *But see* SADF ¶1.

circumstances, and may, in fact, reflect approaches to drug therapy that have been

extensively reported in medical literature." Doc. 182-11 at 6.

27.    Admitted.[5]

28.    Admitted.

29.    Admitted.

30.    Admitted.

31.    Admitted.

32.    Admitted.[6]

**Mifepristone**

33.    Admitted.

34.    Admitted.

35.    Admitted.

36.    Admitted.

37.    Admitted.

38.    Admitted.

39.    Admitted.

40.    Admitted.

---

[5] *But see* SADF ¶¶1–3.
[6] *But see* SADF ¶¶34-36.

41.    Admitted.[7]

42.    Admitted.[8]

43.    Admitted.[9]

44.    Admitted.

45.    Admitted.

46.    Admitted.[10]

47.    Admitted.

48.    Admitted.[11]

49.    Admitted.

50.    Admitted.

## Abortion Pill Reversal

51.    Admitted.[12]

52.    Admitted.

53.    Admitted.

---

[7] *But see* SADF ¶¶27-28.
[8] *But see* SADF ¶¶27-28.
[9] *But see* SADF ¶¶51-58.
[10] *But see* SADF ¶18.
[11] *But see* SADF ¶¶14-15.
[12] *But see* SADF ¶13.

54.     Admitted.[13]

55.     Admitted.

56.     Admitted.

57.     Admitted.

58.     Admitted.

59.     Admitted.

60.     Admitted.[14]

61.     Admitted.[15]

62.     Admitted.[16]

63.     Admitted.[17]

64.     The Boards object because this fact is unsupported by admissible

evidence. Fed. R. Civ. P. 56(c)(2). The quoted article constitutes at least two levels of

hearsay and contains an expert opinion by an individual that no party has endorsed

or disclosed, and that opinion lacks factual foundation. Subject to this objection, the

---

[13]The Boards refer to this practice as "Progesterone Intervention," because as
Dr. Wubbenhorst acknowledges, it is inaccurate to say progesterone "reverses" the
effects of mifepristone. *See* SADF ¶24.
    [14] *But see* SADF ¶43.
    [15] *But see* SADF ¶40.
    [16] *But see* SADF ¶¶44-50.
    [17] *But see* SADF ¶59.

Boards admit the quote appears in the article, but note the article also says Dr.

Kliman did not advocate for the widespread use of Progesterone Intervention. Doc.

182-24 at 8.

65.    Admitted.

66.    Admitted.

67.    Admitted

68.    Admitted.

69.    Admitted.[18]

70.    Admitted.

71.    Admitted.

72.    Admitted.

73.    Admitted.

74.    Admitted.

75.    Admitted.

**Bella's experience with abortion pill reversal**

76.    Admitted.

77.    Admitted.

_____

[18] *But see* SADF ¶¶51-58.

78.    Admitted.

79.    Admitted.[19]

80.    Denied. ███████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████.

81.    The Boards adopt the response of the Attorney General.

82.    The Boards adopt the response of the Attorney General.

83.    Denied. Plaintiffs cite only to a conclusory, unsupported allegation in their Amended Complaint, with no indication it is based on personal knowledge. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002).

84.    Denied. Plaintiffs cite only to a conclusory, unsupported allegation in their Amended Complaint, with no indication it is based on personal knowledge. *See id.*

85.    Denied. Plaintiffs cite only to a conclusory, unsupported allegation in their Amended Complaint, with no indication it is based on personal knowledge. *See id.*

---

[19] *But see* SADF ¶¶60-69.

**Reproductive Health Equity Act**

86.    Admitted.

87.    Admitted.

88.    The Boards adopt the response of the Attorney General.

**Colorado and Nursing Licensing Regimes**

89.    The Boards object because this is a conclusion of law rather than a factual position. *See* Fed. R. Civ. P. 56(c)(1) (requires a party to support *factual* positions).

90.    Objection, conclusion of law. *See id*.

91.    Objection, conclusion of law. *See id*.

92.    Admitted in part. The Boards do not punish licensees, but instead issue "discipline" to protect the public from treatments that do not meet the standard of practice and rehabilitate the licensee's practice. Doc. 182-30 at 40:7–11, 43:7–20; C.R.S. §§ 12-255-119(4)(c)(IV); 12-240-125(5)(c)(III).

93.    Admitted.

94.    Denied. The Boards have document retention policies that do not allow them to conclusively determine whether they have "never" received any complaint about medication abortion reversal prior to the Act. The Boards admit that they are unaware of any complaint about medication abortion reversal within the last five

years, other than the complaint regarding Plaintiff-Intervenor Mynyk. Doc. 182-33

at 15–16.

95.    Denied. 

96.    Denied.

97.    Objection, conclusion of law. *See* Fed. R. Civ. P. 56(c)(1).

98.    The Boards object because this fact is unsupported by admissible

evidence. Fed. R. Civ. P. 56(c)(2). The document is inadmissible hearsay and lacks

adequate factual foundation because the witness testified he did not recognize the document. Doc. 182-30 at 86:1–2. Subject to these objections, the Boards admit the document says, "In 2023, Colorado became the first state in the country to explicitly include gender-affirming care services in its benchmark health insurance plan for essential health benefits (EHBs)."

99.    The Boards object because this fact is unsupported by admissible evidence. Fed. R. Civ. P. 56(c)(2). The document is inadmissible hearsay and lacks adequate factual foundation. Subject to these objections, the Boards admit the exhibit references gender-affirming hormone therapy.

100.   Denied. ███████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████

101.   Denied. ███████████████████████████
████████████████████████████████████████

**Colorado Consumer Protection Act**

102. The Boards adopt the response of the Attorney General.

103. The Boards adopt the response of the Attorney General.

104. The Boards adopt the response of the Attorney General.

**Senate Bill 12-190**

105. Objection, conclusion of law. *See* Fed. R. Civ. P. 56(c)(1).

106. Objection, conclusion of law. *See id*.

107. Objection, conclusion of law. *See id*.

108. Objection, conclusion of law. *See id*.

109. Objection, conclusion of law. *See id*.

110. Objection, conclusion of law. *See id*.

**Legislative Record**

111. Admitted.

112.   Admitted.

113.   Admitted, with the clarification that Plaintiffs' quotations are taken out of context. Senator Marchman was comparing clinics without medical staff to clinics with licensed medical staff and, in describing the difference in services offered, the Senator said, "[A]bout half are considered medical, meaning they have insurance and operate under the license of a physician. These pregnancy medical centers are the only ones that can prescribe abortion pill reversal. . . . The other half are considered pregnancy resource centers. They primarily provide resources for pregnant people like diapers, formula, and clothes. . . . Please hear me: This bill does not shut down these clinics." Doc. 182-44 at 2:21–3:5.

114.   Admitted.

115.   The Boards adopt the response of the Attorney General.

116.   The Boards adopt the response of the Attorney General.

117.   The Boards adopt the response of the Attorney General.

118.   The Boards adopt the response of the Attorney General.

119.   The Boards adopt the response of the Attorney General.

**SB 23-190 Rulemaking**

120.   Admitted.

121.    Admitted, with the clarification that all licensees receive education in
OB/GYN but none of the Board members specialized in that area at the time of
rulemaking. Doc. 182-30 at 42:3–16; 3 C.C.R. 716-1(1.2)(E)(15)(a), (c)(4).

122.    Admitted.

123.    Admitted.

124.    Admitted.[20]

125.    Admitted.[21]

126.    Admitted.[22]

127.    Admitted.[23]

128.    Admitted.[24]

129.    Objection, conclusion of law. *See* Fed. R. Civ. P. 56(c)(1). Subject to this
objection, the Boards deny that the Medical Board "reversed course." ███████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[20] *But see* SADF ¶¶87-90.
[21] *But see* SADF ¶¶87-90.
[22] *But see* SADF ¶¶87-90.
[23] *But see* SADF ¶¶87-90.
[24] *But see* SADF ¶¶87-90.

130.    Objection, conclusion of law. *See* Fed. R. Civ. P. 56(c)(1). To the extent

Plaintiffs assert the factual position that the Nursing Board made a "minor

modification" to the draft rule, the Boards deny. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

**Procedural History**

  131. Admitted.

  132. Admitted.

  133. Admitted.

  134. Admitted.

**Patient Outcomes**

  135. Admitted.

  136. Admitted.

  137. Admitted.[25]

  138. Admitted.

  139. Admitted.[26]

---

[25] *But see* SADF ¶¶70-74.
[26] *But see* SADF ¶¶70-74.

140.   Admitted.[27]

141.   Admitted.[28]

142.   Admitted.[29]

143.   Admitted.

**Harm to Plaintiffs**

144.   Objection, conclusion of law. *See* Fed. R. Civ. P. 56(c)(1).

145.   The Boards object because this is a conclusion of law. *See id.* Subject to this objection, denied. Only the Medical Board rule prohibits Progesterone Intervention. Nursing Board does not. 3 C.C.R. 713-1-1.32; 3 C.C.R. 716-1-1.35.

146.   Objection, conclusion of law. *See* Fed. R. Civ. P. 56(c)(1).

147.   Denied. The statute and rules require Plaintiffs to provide medical services that conform to the applicable standard of practice. *See* C.R.S. § 12-30-120; 3 C.C.R. 713-1-1.32; 3 C.C.R. 716-1-1.35.

148.   Objection, conclusion of law. *See* Fed. R. Civ. P. 56(c)(1).

149.   Objection, conclusion of law. *See id*.

---

[27] *But see* SADF ¶¶70-74.
[28] *But see* SADF ¶¶73-74.
[29] *But see* SADF ¶¶73-74.

150.    Denied. Section 12-30-120, 3 C.C.R. 713-1-1.32, and 3 C.C.R. 716-1-1.35 prohibit Plaintiffs from providing treatment that does not conform to the generally accepted standard of practice for their professions. The Medical Board determined Progesterone Intervention deviates from standards of care. The Nursing Board did not. The Act and Rules do not regulate patients nor do they prevent licensees from providing information.

151.    Denied. There is no scientific evidence that medication abortion reversal using progesterone is effective in reversing the effects of mifepristone. Ex. 85 at 1–2; Ex. 73 at 122:25–126:15; Doc. 178-3 at 17:24–18:3, 41:22–42:3, 110:7-19; Doc. 178-4 at 84:16–20; Doc. 178-9 at 125:6–126:4, 118:4–7; Doc. 178-10 at 26:17–27:10, 27:25–28:6, 28:19–24, 32:10–22, 71:7–8; Doc. 178-12 at 40–44, 54–80, 100–101; Doc. 99-1 ¶¶17, 18–22, 29–32, 34–35, 38, 40; Doc. 108-1 ¶5.

**RESPONSE TO PLAINTIFF-INTERVENOR'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

**Plaintiff-Intervenor Mynyk**

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted.

Case No. 1:23-cv-00939-DDD-SBP    Document 206    filed 03/13/25    USDC Colorado
pg 20 of 60

6.    Admitted.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Admitted.[30]

11.    Admitted.[31]

12.    Admitted.

13.    Admitted.

14.    Admitted.

15.    Denied. Ms. Mynyk's website, https://crwomenshealth.com/ (visited February 6, 2025), lacks information about her commitment to providing Progesterone Intervention and her Verified Complaint, Doc. 140 ¶117, states that she previously removed that language from her website.

**Mynyk Practices Progesterone Intervention**

16.    Admitted.

17.    Admitted.

18.    Admitted.

---

[30] *But see* SADF ¶¶60-69.
[31] *But see* SADF ¶¶60-69.

19.     Admitted.[32]

20.     Denied. In the cited exhibit, Dr. Cohen stated that mifepristone may be ineffective by itself with or without Progesterone Intervention, and there is insufficient evidence to demonstrate whether Progesterone Intervention impacts the outcome, but it "Could be."

21.     Admitted.

22.     Admitted.

23.     Denied. ████████████████████████████████
████████████████████████████████████████████████████████
██████████

24.     Denied. ████████████████████████████████████████
████████████████████████████████████████████

25.     Admitted.

26.     Denied. Supplemental progesterone does not out-compete mifepristone, and no competent research supports Progesterone Intervention as effective. Doc. 99-1 ¶¶17, 33–36.

_____

[32] *But see* SADF ¶13.

21

27.    Denied. Supplemental progesterone does not out-compete mifepristone, and no competent research supports Progesterone Intervention as effective. Doc. 99-1 ¶¶17, 33–36; Defendants Additional Facts ¶15.

28.    Denied. ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

29.    Denied. No competent research supports Progesterone Intervention as effective. Doc. 99-1 ¶¶17, 33–36; SADF ¶15.

30.    Please see responses to ¶¶12–74 of Bella Plaintiffs' Statement of Facts, above.

**Colorado passes SB23-190**

31.    Objection, conclusion of law. *See* Fed. R. Civ. P. 56(c)(1).

32.    Objection, conclusion of law. *See id*.

33.    Objection, conclusion of law. *See id*. Subject to this objection, the Boards adopt the response of the Attorney General.

34.    Objection, conclusion of law. *See id*.

35.    Objection, conclusion of law. *See id*.

36. Objection, conclusion of law. *See id*. To the extent Plaintiffs assert the factual position that a nurse is prohibited from practicing Progesterone Intervention, the Board denies. The Nursing Board's Rule 1.35 states that it will review any complaints about a nurse's provision of Progesterone Intervention "in the same manner that it investigates other alleged deviations from generally accepted standards of nursing practice." 3 C.C.R. 716-1:1.35; Ex. 75 at 98:10–99:4; 102:10–103:13; 106:7–18.

37. Please see responses to ¶¶88–127, 141–48 of Bella Plaintiffs' Statement of Facts, above.

**Mynyk Intervenes**

38. Admitted.

39. Admitted.

40. Admitted.

41. Admitted.

**THE BOARDS' STATEMENT OF
ADDITIONAL DISPUTED FACTS**

**Generally Accepted Standards of Practice**

1. The FDA permits providers to prescribe drugs for both "on-label uses" and "off-label uses" under certain circumstances, but "off-label use" does not necessarily meet generally accepted standards of care under all circumstances

because physicians and advanced practice nurses with prescriptive authority must

consider the scientific evidence for the best-known therapy-to-date as well as the

nature and strength of the evidence supporting any other therapy prior to

prescribing. Ex. 81 at 42:5–45:13; Ex. 73 at 60:8–63:19.

2.      Even if a medication is safe, it should not be prescribed if it has not

been established to have a clinical benefit for the condition at issue. Doc. 182-10 at

1.

3.      Obstetricians and advanced practice nurses sometimes prescribe drugs

for off-label use during pregnancy but should only do so when there is scientific

evidence to support both safety and effectiveness. Doc. 182-10 at 2; Ex. 73 at 65:1–

13, 92:17–93:17; Ex. 81 at 37:11–25, 42:5–15, 44:3–45:13.

4.      Bella requires that its staff provide care consistent with the Ethical

and Religious Directives for Catholic Health Care Services ("religious directives").

Doc. 94 ¶¶50, 53, 54.

5.      ██████████████████████████████████████████

██████████████████████████████████████████

6.      The religious directives lack any mention of abortion pill reversal,

medication abortion reversal, or Progesterone Intervention. *See generally* Catholic

Health Association of the United States and United States Conference of Catholic

Bishops, Ethical and Religious Directives for Catholic Health Care Services (6th ed.

June 2018), https://www.usccb.org/resources/ethical-religious-directives-catholic-

health-service-sixth-edition-2016-06_3.pdf (visited Feb. 20, 2025).

7.     The religious directives lack any mention of attempting to reverse

abortion care. *See generally id*.

8.     ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

**Medication Abortion Reversal**

9.     A patient who continues their pregnancy following mifepristone use

increases their risk for miscarriage or early delivery. Doc. 99-1 ¶14.

10.     Patients who ingest mifepristone but not misoprostol may be at higher

risk for hemorrhage than women who take both medications. Doc. 182-17 at 2; Ex.

73 at 135:7–11.

11.     The FDA risk evaluation and mitigation strategy requires both patient

and provider to sign a form indicating the patient will complete the regimen once

starting it. Doc. 99-1 ¶14.

12. The current standard of practice for initiating a medication abortion requires rigorous informed consent that includes the importance of being firm in the decision to end the pregnancy before taking mifepristone. Doc. 99-1 ¶40.

13. Research suggests that fewer than 0.3% of all patients who receive abortion care change their mind after ingesting mifepristone, and Dr. Cohen has treated only two patients who have chosen not to complete an abortion in ten years of providing abortion care. Doc. 99-1 ¶11; Doc. 182-17 at 3; Ex. 73 at 122:16–18.

14. While mifepristone's bind to progesterone is not complete or permanent, Dr. Cohen opines that "there's nuance there . . . there's a constant balance between association or binding and dissociation or unbinding . . . not all receptors are going to be occupied at every given moment, but a high proportion, at any given moment, we think are." Ex. 73 at 69:13–70:12.

15. Progesterone has not been shown to interfere with or reverse the effects of mifepristone on the body. Doc. 178-9 at 125:6–126:4, 118:4–7; Doc. 178-10 at 26:17–27:10, 27:25–28:6, 28:19–24, 32:10–22, 71:7–8.

16. Common side effects of taking progesterone include fatigue, nausea, and headaches. Ex. 78 at 256:12–17; Ex. 73 at 51:7–14.

17. Vaginally administering progesterone carries complication risks including irritation, infection, and discharge. Ex. 73 at 51:7–14.

18.   Risks of injecting progesterone includes pain at the injection site and abscess. Ex. 73 at 51:7–16; Doc. 178-15 at 3.

19.   Progesterone supplementation may have negative interactions with other hormones the patient may be on. Ex. 73 at 51:16–18.

20.   The side effects from progesterone can be severe enough that a patient will stop taking the medication. Ex. 73 at 51:23–52:1.

21.   ████████████████████████████████████
████████████████████████████████████████
████████████████████████████

22.   When asked how much progesterone would overcome mifepristone, Plaintiffs' expert, Dr. Jeffrey Keenan, stated, "There's no exact answer[.]" Doc. 178-11 at 40:18–22; Doc. 178-10 at 35:6–36:7.

23.   Dr. Cohen explained that, while mifepristone's metabolites' bind to the receptor weaker than progesterone, almost all of the binding is done by mifepristone rather than the metabolites within the first twenty-four hours of ingestion of mifepristone. Ex. 73 at 166:17–167:10.

24.   ████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

25.     Proponents of Progesterone Intervention do not know how much progesterone is required to overcome mifepristone. Doc. 178-11 at 40:18–22; Doc. 178-2 at 238:2–239:4; Doc. 178-2 at 35:6–36:7.

26.     A high dose of progesterone could deviate from generally accepted standards of practice. Doc. 178-5 at 199:16–23.

27.     Mr. DeBeasi, who published what he called a scoping review in The Linacre Quarterly, which is not a journal typically utilized by OB/GYNs for dissemination of clinically relevant data, is an engineer who is unqualified to opine on generally accepted standards of practice in obstetrics and gynecology. Doc. 99-1 ¶31.

28.     Mr. DeBeasi's scoping review relied on flawed and insufficient data. Doc. 99-1 ¶31.

29.     Although Dr. Keenan's expert report cited extensive research regarding the safety of progesterone outside the presence of mifepristone, he repeatedly stated that discussing the safety of Progesterone Intervention in the same context as other progesterone treatments would be "inappropriate." Doc. 178-

11 at 52:4–25, 53:8–22, 57:7–18, 60:18–61:17, 62:6–20, 64:13–25, 71:11–25, 75:3–24, 92:8–93:3, 93:20–94:13, 97:5–22.

30.    The PRISM and PROMISE studies relied on by proponents of Progesterone Intervention did not analyze progesterone's effectiveness in antagonizing mifepristone. Doc. 178-10 at 55:21–25; Doc. 178-11 at 65:1–66:14.

31.    Neither study found a "significant difference" in the rate of live births with the use of progesterone. Doc. 94 ¶¶76–77; Doc. 178-10 at 57:23–58:8.

32.    PRISM concluded only that progesterone could provide a benefit to women with three or more previous miscarriages. Doc. 178-10 at 56:15–18.

33.    Proponents of Progesterone Intervention also rely on the United Kingdom's National Institute of Health and Care Excellence ("NICE") 2021 guidelines. Doc. 94 ¶¶78–79.

34.    The NICE guidelines state, "The committee confirmed that the recommendations for the use of progesterone are only for women with early pregnancy bleeding and a history of miscarriage. The recommendations are not applicable in other circumstances, such as after the use of mifepristone." Doc. 178-16 at 32.

35.    The NICE guidelines only recommend vaginal micronized progesterone for threatened miscarriage if they present with vaginal bleeding and have previously miscarried. Doc. 178-16 at 17.

36.    The NICE guidelines noted, "There was no evidence of harm to the mother or baby from the use of progesterone, although the evidence is insufficient to rule out the possibility of rare events." Doc. 178-16 at 32.

37.    Numerous drugs once thought to be "safe" turned out to pose severe harms to mother or child. Doc. 182-10 at 2; Doc. 108-1 ¶2; *see also* Doc. 102-1 ¶17 (semisynthetic estrogen later found to cause vaginal cancer in women exposed to it *in utero*).

38.    The FDA recently withdrew approval for Makena, a medication used to prevent premature birth in women with a history of preterm labor, based on lack of clinical benefit. Doc. 182-10 at 2.

39.    The author of the 1989 rat study cited by Plaintiffs noted partial fetal demise in the resulting litters and foundational differences in rat and human physiology, stating "as per any pre-clinical study conducted in animal models, cannot be extrapolated directly to the clinical/human level." Doc. 182-19 at 8.

40.    The authors of the 2017 case series (Garratt & Turner) admitted that a "weakness of this study is the small number of women whose cases were reported,"

30

that "[t]he number of cases in the literature does not lend itself to statistical analysis," and that "[t]here is currently no definitive evidence for the success of using progesterone to prevent the abortifacient effect of mifepristone." Doc. 182-21 at 4.

41.     The authors of the 2023 rat study (Camilleri & Sammut) stated that "there are limitations that need to be considered . . . some level of fetal demise was observed in the reversal (mifepristone + progesterone) group[,]" and made clear that the results are inapplicable to human subjects. Doc. 182-19 at 9.

42.     Dr. George Delgado is a family medicine and palliative medicine doctor. Doc. 99-1 ¶15; Doc. 102-1 ¶39 n. 51.

43.     Dr. Delgado's 2012 study was low-quality, contained too few participants to draw statistically significant conclusions, lacked key patient information such as gestational age and dosage of mifepristone, and involved multiple different progesterone protocols. Doc. 99-1 ¶¶18–22. The study also lacked sufficient information to conclude that the babies were all healthy or that there were no adverse impacts related to mifepristone and/or progesterone exposure. Ex. 81 at 211:24–215:21.

44.     Dr. Delgado's 2018 observational case series on Progesterone Intervention was originally retracted for violations of institutional research standards. Doc. 99-1 ¶¶18–30; Doc. 102-1 ¶41 n. 53.

45.     Drs. Cullen and Cohen, professional medical researchers, opined Dr. Delgado's ethical violations were so severe that many institutions would ban researchers who committed these same offenses from conducting future research, or at the very minimum, strictly supervise them going forward. Doc. 99-1 ¶¶3, 24–30; Doc. 99-2 ¶¶1–5, 17–19.

46.     Dr. Delgado's study failed to report multiple important pieces of demographic information. Doc. 99-1 ¶29.

47.     Dr. Delgado's study lacked a concurrent control group. Doc. 99-1 ¶29.

48.     Dr. Delgado's study only included patients with ongoing pregnancy confirmed via ultrasound after mifepristone ingestion. Doc. 99-1 ¶30.

49.     Including patients with an ongoing pregnancy confirmed by ultrasound biased the results towards patients whose pregnancies had already withstood mifepristone's effects. Doc. 99-1 ¶30.

50.     Dr. Delgado's study included ten separate progesterone regimens, limiting the ability to draw any conclusions such that the study cannot be relied upon to conclude that Progesterone Intervention is effective. Doc. 99-1 ¶30.

51.     Dr. Creinin, who published the 2020 report on Progesterone Intervention relied on by Plaintiffs, halted his study when three participants sought emergency medical care for hemorrhage. Doc. 99-1 ¶38; Doc. 178-9 at 131:5–7.

52.     To date, Dr. Creinin's halted study is the only randomized control trial testing Progesterone Intervention. Doc. 99-1 ¶¶37–39.

53.     Dr. Creinin calculated that he needed to enroll forty participants to show the statistically significant difference in expected outcomes of progesterone versus placebo. Doc. 108-1 ¶7.

54.     Only ten participants completed the study. Doc. 108-1 ¶7; Doc. 182-17 at 2.

55.     The small number of participants that completed Dr. Creinin's protocol means the results are statistically insignificant and could have happened by chance. Ex. 73 at 138:8–16.

56.     Dr. Creinin could not estimate the efficacy of Progesterone Intervention because the study was terminated early. Doc. 182-17 at 2.

57.     Dr. Creinin noted that Progesterone Intervention "is experimental and should be offered only in institutional review board-approved human clinical trials to ensure proper oversight." Doc. 182-17 at 8.

58.    Dr. Creinin's study estimation that 25% of participants receiving the placebo would have continuing pregnancies was based on a 1988 study involving pregnancies under seven weeks of gestation. Doc. 182-17 at 4 n. 11; Ex. 85 at 10.

59.    No nationally recognized secular medical organization has declared that Progesterone Intervention meets generally accepted standards of medical practice (often referred to as "meeting standard of care"). *See, e.g.*, Doc. 99-1 ¶¶35, 38, 40; Doc. 108-1 ¶5.

**Plaintiffs' experience with Progesterone Intervention.**

60.    ██████████████████████████████

███████████████████ ██ ███████████████████

61.    ████████████████████████████████

████████████████████████████████

██████████████████████████

62.    ██████████████████████

████████████████████████████████

████████████████████████

63.    ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

64. 

65.

66.

67.

68.

69.

70.

71.

72. 

73.

74.

**Colorado Medical and Nursing Licensing Regimes**

75.     The Boards establish standards of care for their respective practices

through the rulemaking process or when investigating complaints by reviewing the

36

care and sometimes obtaining a consulting expert's review of the care. Doc. 178-8 at 20:19–22:9, 29:6–22, 30:11–13.



**Legislative Record**

79.    In hearings on the Act, Representative McCormick explained: "Senate Bill 190 does two things: It states that if one of these centers advertises that they offer or implies that they offer abortion care or emergency contraception and they know that they do not offer these services, then they have engaged in deceptive trade practice and the Attorney General can step in to stop this form of false advertising. The second part of the bill addresses what is being called abortion pill

reversal. This co-called treatment has absolutely no basis in science, has not gone through safety studies, and in fact, has been called out by the American Medical Association and the American College of Obstetricians and Gynecologists as unethical, unproven and false." Doc. 182-46 at 4:16–5:4.

80.    The General Assembly received comments from Dr. Cohen, Dr. Delgado, Dr. Creinin, Heartbeat International's medical director, and others. Doc. 90-12 at 8–17; Doc. 90-14 at 6–13.

81.    At no time during any of the hearings or floor debates did lawmakers reference a specific religion, sect, or religious practice. *See* Doc. 90-12; Doc. 90-13; Doc. 90-14; Doc. 90-15.

82.    ████████████████████████████████████████████████
████████████████████████████████

83.    The closest reference to a specific religion came when Rep. McCormick shared a letter her office received from someone with a "faith-based perspective" who "feels compelled to speak out that weaponizing their particular faith . . . is against a sacred principle that they have at the very heart of their faith." Doc. 94-13 at 14.

84.    When lawmakers acknowledged that many pregnancy centers are religiously affiliated, they also said "that's fine." Doc. 94-13 at 14.

38

85.    Bill sponsors repeatedly supported faith-based counseling for pregnant people and other religious services, so long as they are neither misleading nor coercive. Doc. 94-12 at 4; Doc. 94-13 at 5, 14.

86.    Lawmakers acknowledged that many pregnancy resource centers or clinics in Colorado were affiliated with a religious organization, but they discussed that many others—at least ninety-four—had no ideological affiliation. Doc. 94-10 at 5; Doc. 94-11 at 4.

87.    The Boards received written comments from various stakeholders, including Plaintiffs, physicians, and both pro-choice and anti-abortion interests. Doc. 178-12.

88.    During the Medical Board's rulemaking hearing, Board members stated:

  a.    "[M]ost, if not all, of the written and verbal testimony" discussed using progesterone to reverse the effects of mifepristone and misoprostol. Doc. 94-22 at 4.

  b.    "[I]t would be helpful to have some language added to this rule about the specific example that everyone is talking about." Doc. 94-22 at 5.

c. If "new therapies happen . . . then I think we amend [the] rule, and you can do that." Doc. 94-22 at 10.

d. "[T]he act itself is not a problem. It's the use of this particular [ ] drug in this case." Doc. 94-22 at 12.

e. "[T]hat's kind of my thought . . . the statement really that the board does not and will not treat medication abortion reversal as a per se act of unprofessional conduct." Doc. 94-22 at 27.

89. 

90.

## LEGAL STANDARD

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Nelson v. Geringer*, 295 F.3d 1082, 1086 (10th Cir. 2002). The movant bears the burden of

proof, and courts examine the record in the light most favorable to the nonmoving

party. *Bell v. Dillard Dept. Stores, Inc*., 85 F.3d 145, 1453 (10th Cir. 1996). Where a

plaintiff moves for summary judgment, they "must establish beyond peradventure

*all* of the essential elements of the claim . . . to warrant judgment in [their] favor."

*Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Fontenot v. Upjohn

Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)) (emphasis in original). Plaintiffs' "showing

*must be sufficient for the court to hold that no reasonable trier of fact could find

other than for the moving party*." *Id.* (quoting *Calderone v. United States*, 799 F.2d

254, 259 (6th Cir. 1986)) (emphasis in original).

Plaintiffs raise facial challenges to the Act and Rules. Facial challenges are

disfavored because they "often rest on speculation" and risk "premature

interpretation of statutes on the basis of factually barebones records." *Wash. State

Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (internal

citations omitted); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024)

("Even in the First Amendment context, facial challenges are disfavored[.]"). They

are also disfavored because they "run contrary to the fundamental principle of

judicial restraint." *Wash. State Grange*, 552 U.S. at 450. Finally, they are disfavored

because "facial challenges threaten to short circuit the democratic process by

preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 450–51.

To prevail on a facial challenge based on the First Amendment, plaintiffs must establish that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *NetChoice*, 603 U.S. at 723 (internal citations and quotations omitted). First a court must assess the state laws' scope. *Id.* at 724. Next a court must decide "which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* at 725.

Plaintiffs cannot establish that the undisputed facts support every element of their claims as a matter of law under this "rigorous standard." *Id.* at 723. The Act and Rules regulate the practice of medicine and the practice of nursing. The plainly legitimate sweep of the Act and Rules is vast: it regulates what types of healthcare thousands of medical professionals can provide without regard to their personal motivations. Because the Act and Rules focus on the conduct of medical professionals offering medical care to the public in every medical setting throughout the state, Plaintiffs cannot meet their lofty legal burden.

42

## ARGUMENT

### I.    The Act does not violate the free exercise clause (Counts I–III).

The Act allows Colorado medical practitioners—including Plaintiffs—to exercise their sincerely held religious beliefs while still maintaining their licensure in good standing. The Act burdens all nursing and medical practitioners in Colorado equally, regardless of religion, by regulating substandard ineffective medical practices. Plaintiffs have conceded that their religious obligations do not include providing ineffective medical treatment. Because the genuine undisputed facts establish that the Act comports with the "bedrock requirements" of the Free Exercise clause and is rationally related to the State's legitimate goals of preserving the integrity of the medical profession and protecting patients, Plaintiffs are not entitled to judgment as a matter of law on their claims under the free exercise clause.

#### A.    The Act does not treat religious activity less favorably than comparable secular activities.

##### 1.    The secular activities identified by Plaintiffs are not comparable.

"A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525

(2022); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021).

"[W]hether two activities are comparable for purposes of the Free Exercise Clause

must be judged against the asserted government interest that justifies the

regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). A law or regulation

is not generally applicable if it "makes a value judgment in favor of secular

motivations, but not religious motivations." *Does 1-11 v. Bd. of Regents of Univ. of

Colo.*, 100 F.4th 1251, 1277 (10th Cir. 2024) (internal quotations and citations

omitted).

Colorado has asserted interests including prohibiting the use of an off-label

and experimental treatment when it lacks scientific evidence of efficacy and safety

for the pregnant person and the child that may result from the pregnancy. *See* Doc.

180 at 43 (*citing* Doc. 99 at 25); Ex. 87 at 3–4. In furtherance of those interests, the

Act is concerned with timely access to medical care supported by "science or clinical

standards" in the context of "the provision of abortion services." S.B. 23-190 §

1(1)(f), (2). To that end, section 12-30-120, C.R.S., narrowly regulates only

medication abortion reversal. It does so with *zero* exceptions, secular or otherwise.

Indeed, the only way to reach the conclusion Plaintiffs urge is to use the

wrong comparator. Plaintiffs point to the use of progesterone for other indications in

obstetrics and gynecology, all of which are irrelevant to the provision of abortion

44

services. *See* Doc. 180 at 43.[33] Moreover, those other uses have a far broader

evidence base—and far broader general acceptance among the medical

community—supporting their use compared to the limited and flawed evidence

supporting the Progesterone Intervention. *See, e.g.,* Doc. 182-12; Doc. 182-14

(randomized control trials show benefit of progesterone for women with a history of

recurrent miscarriage); Doc. 182-8 ¶¶21–22 (universal adoption of progesterone use

for luteal phase support by assisted reproductive technology clinics). Plaintiff's own

expert stated it would be inappropriate to apply the safety and efficacy of those

progesterone treatments to Progesterone Intervention. SADF ¶29. Moreover,

Colorado does regulate the use of progesterone and other off-label drugs in other

contexts. Ex. 83 (responses to RFAs 3 and 6). A licensee can be disciplined for any

use of progesterone that fails to meet generally accepted standards of practice. *See*

C.R.S. §§ 12-240-121(1)(j); 12-255-120(1)(f). There is not a lower bar for other uses of

progesterone. The bar is the same: generally accepted standards of practice. To find

otherwise would vitiate the ability of medical boards to determine medical

standards and regulate medical professionals.

---

[33] As the Boards have previously argued, these other evidence-based uses of
progesterone are also incomparable because each drug must be viewed in the light
of a particular indication. *See* Doc. 178 at 31–32. The Boards incorporate this
argument by reference.

Bella Health Plaintiffs ask this Court to compare regulations of abortion-related care to gender-affirming care. It goes without saying that the Boards are not the Division of Insurance or the University of Colorado School of Medicine, and the positions of those entities are irrelevant hearsay unattributable to the Boards. The Boards regulate gender-affirming care only by setting and enforcing the applicable generally accepted standards of practice. Plaintiffs have not proffered any qualified expert opinions that hormone use in gender-affirming care deviates from generally accepted standards of practice. Indeed, hormone use in gender-affirming care likely *does* meet generally accepted standards of practice. *See L.W. by & through Williams v. Skrmetti*, 83 F.4th 460, 467–68 (6th Cir. 2023) (noting that national and international medical standards for gender-affirming care permitted use of hormones since 2012). Thus, the gender-affirming care Plaintiffs point to is irrelevant to whether the Act and Rules are generally applicable.

### 2. Plaintiffs overstate the evidence regarding the safety and efficacy of Progesterone Intervention.

Plaintiffs claim that the Boards' interest in patient safety is nonexistent because progesterone is a low-risk medication. The Boards do not dispute that progesterone is generally considered to be a safe, low-risk medication. But "low-risk" does not mean "no-risk." *See* Doc. 99-1 ¶36. Common side effects of progesterone include fatigue, nausea, and headaches. SADF ¶17. Vaginally

administering progesterone carries complication risks including irritation, infection, and discharge. SADF ¶18. Risks of injecting progesterone includes pain at the injection site and abscess. SADF ¶19. Some of these side effects can be severe enough that a patient will stop taking progesterone. SADF ¶21. Progesterone supplementation may also have negative interactions with other hormones the patient may be on. SADF ¶20. █████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██

Even more concerning are the unknown risks. Numerous drugs once considered "safe" have caused harm to mother or child. SADF ¶37. The NICE guidelines acknowledge that the current evidence base is insufficient to rule out rare harmful events. SADF ¶36. The studies Plaintiffs rely on to demonstrate Progesterone Intervention's safety examined only short-term risks to the mother and child, and most of those studies lacked analysis of progesterone after ingesting mifepristone. The risk of the unknown is precisely why the standard of practice requires a demonstrated benefit *before* offering experimental treatments outside of research. For example, the FDA recently withdrew approval for Makena based on

47

lack of clinical benefit. SADF ¶38; *see also* https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/makena-hydroxyprogesterone-caproate-injection-information ("FDA determined that given effectiveness has not been shown, no level of risk is justified.").

Finally, as explained in the Boards' motion for summary judgment, Plaintiffs' basis for asserting Progesterone Intervention's efficacy is little more than theory and anecdote. *See* SADF ¶¶13, 25. Plaintiffs proffer research conducted on *other* unrelated fertility interventions in the hope the Court will overlook the dearth of scientific evidence moving Plaintiffs' general biochemical assertions from experimental treatment to standard of practice. The General Assembly and the Boards have a clear interest in ensuring that medical providers are not providing experimental therapies to patients.

### B.    The Act does not contain any mechanisms for individual exemptions.

Plaintiffs claim that the Act is not generally applicable because they argue it includes mechanisms for individualized exemptions. Doc. 180 at 47–49. They are wrong: neither the Act nor Board Rules contain exemptions.

The Tenth Circuit's recent opinion in *Chiles* clarifies what sort of "individualized exemptions" run afoul of the First Amendment. The *Chiles* plaintiff argued that Colorado's minor conversion therapy law created individualized

exemptions because the law authorized "secular counselors to 'change' their minor clients' identities from straight or cisgender to LGBT but prohibits religious counselors from 'changing' their minor clients' identities from LGBT to straight or cisgender." *Chiles v. Salazar*, 116 F.4th 1178, 1225 (10th Cir. 2024). The Tenth Circuit rejected that framing, instead noting that the law applies "equally to all licensed mental health professionals, regardless of their religious beliefs or affiliations," and that the regulatory boards had no mechanism "to consider the particular reasons for a person's conduct." *Id.* (internal citations omitted).

The same is true here. Because no board determined medication abortion reversal meets generally accepted standards of practice, medication abortion reversal is unprofessional conduct without exemption. C.R.S. § 12-30-120(2)(a). Nor do the Boards' rules provide such exemptions. The Medical Board's rule prohibits Progesterone Intervention regardless of the licensee's motivation. *See* 3 C.C.R. 713-1-1.32(D)(4). In all other cases, the Medical Board will review all complaints regarding medication abortion reversal using the same procedure as they did for any allegation of substandard care before the Act's passage. *See id.* Rather than create an explicit prohibition, due to many licensees' requirement to follow other providers' orders, the Nursing Board elected instead to review all complaints regarding medication abortion reversal using the same procedure they did for all

allegations of substandard care prior to the Act. *See* 3 C.C.R. 716-1-1.35. Plaintiffs' arguments that the Act and Board Rules somehow allow exceptions based on individual circumstances are incorrect.

First, Bella Health Plaintiffs claim that the Act contains a prohibited exemption because medication abortion reversal would not have been unprofessional conduct if all three boards agreed it met generally accepted standards of practice. Doc. 180 at 48; *see also* C.R.S. § 12-30-120(2)(a). But that is not an *individual* exemption at all. If the boards found Progesterone Intervention met generally accepted standards of practice, then there would be no prohibition in place for any provider who sought to reverse a medication abortion for any reason.

Second, Plaintiffs claim the Boards' case-by-case analysis creates a mechanism for individualized exemptions that runs afoul of *Fulton*. This is not true. "[The Tenth Circuit] has held that a system of individualized exemptions is one that gives rise to the applications of a *subjective test*." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004) (internal citations and quotations omitted) (emphasis added). Thus, the "individualized exemption" exception "does not apply to statutes

that, although otherwise generally applicable, contain express exceptions for

objectively defined categories of persons." *Id.* at 1298.[34]

The Board Rules incorporate the traditional standard of practice analysis

they apply in all cases involving a possible deviation from standards of practice.

And in those cases, the applicable standard of practice is an objective test, not a

subjective one. *State Bd. of Medical Examiners v. McCroskey*, 880 P.2d 1188, 1194–

95 (Colo. 1994) (holding that health care professionals are held to "an objective

standard of reasonable care"); *see also United Blood Servs., Inc. v. Quintana*, 827

P.2d 509, 519 (Colo. 1992) (discussing the standard of objective behavior measured

by the degree of reasonable care exercised by individuals practicing the same

profession). Moreover, the disciplinary process is not analogous to the discretionary

contractual provision at issue in *Fulton*. *See* 593 U.S. at 534–35 (noting the

commissioner had "sole discretion" to grant exceptions to contractual provision

prohibiting discrimination based on sexual orientation); *Darren Patterson Christian

Academy v. Roy,* No. 23-1557, slip op. at 11–12 (D. Colo. February 24, 2025) (finding

system of individual exemptions where state had explicit authority to grant, and

had in fact granted, some individual requestors religious exemptions from

_____

[34] Plaintiff-Intervenor's cite to *Axson-Flynn*, Doc. 179 at 12–13, omits this
context which forms part of the test.

compliance with regulatory scheme, but had denied plaintiff's request). As the

Boards described in their motion for summary judgment, a disciplinary action is a

quasi-judicial proceeding akin to a civil lawsuit, complete with the discovery

afforded by the Colorado Rules of Civil Procedure and judicial review. *See* Doc. 178

at 32–36; C.R.S. §§ 24-4-105; 12-240-125(1)(a)–(d), (2) (Medical); 12-255-119(1)(a)–

(d), (2) (Nursing). Said another way, the Boards have no more discretion than this

Court does in a negligence lawsuit tried before the judge. And to the extent a

licensee claims a board targeted them for discipline based on their religious

motivations, that licensee can assert an as-applied constitutional challenge through

every stage of the proceedings. *See Horrell v. Dep't of Admin.*, 861 P.2d 1194, 1198

n.4 (Colo. 1993) (holding that boards may entertain as-applied constitutional

challenges in administrative proceedings).

### C.    The Act is neutral.

As explained in the Boards' motion for summary judgment, the Act does not

discriminate against religion on its face. *See* Doc. 178 at 27–30. The Boards have

previously prophylactically regulated healthcare providers' conduct and specifically

exclude religious practice from regulated conduct. C.R.S. §§ 12-30-109(6); 12-30-

109.5; 12-240-107(3)(g)–(h); 12-255-127(1)(m), (2); 3 C.C.R. 713-1:1.27(A), 713-

1:1.28(A) (Medical); 3 C.C.R. 716:1:1.26 (Nursing). Neither the Act nor rules "refer

to a religious practice without a secular meaning discernible." *Chiles*, 116 F.4th at

1222 (quoting *Lukumi*, 508 U.S. at 533) (holding that statute banning conversion therapy is facially neutral even though plaintiff alleged it was primarily a religious practice). But Plaintiffs argue that the Act is not neutral because its object was to burden religious practice. This is again incorrect.

The Act targets medical practice, not religious conduct. Prescribing or administering progesterone to a patient in a medical office is a secular act that only licensed healthcare providers can perform. *See* C.R.S. §§ 12-240-107(1)(b); 12-255-104(1), (3.3)–(5), (7)–(12). It is not a religious practice like ingesting peyote or engaging in animal sacrifice. *See Smith,* 494 U.S. at 874; *Lukumi*, 508 U.S. at 524–25. The Boards exclude religious worship from regulation. C.R.S. §§ 12-240-107(3)(g)–(h); 12-255-127(1)(m), (2). And the Act places no limitations on worship practices. *See Tandon*, 593 U.S. at 62 (limitations on worship gatherings during COVID). Even the Ethical and Religious Directives for Catholic Health Care Services that Plaintiffs follow confirm that religious medical professionals should adhere to generally accepted standards of care for their professions. SADF ¶9. Following Plaintiffs' argument to its logical conclusion would allow religiously motivated medical professionals to avoid regulation of virtually any medical

practice simply by claiming that they were religiously compelled to act.[35] In such a world, patient safety would be dictated by an individual practitioner's conscience, not science.

The legislature's acknowledgement that licensees engaging in Progesterone Intervention may be motivated by faith does not demonstrate that its purpose was to burden religious practice. The legislators and Boards heard and referenced testimony that there was "zero medical evidence" supporting the safety or efficacy of medication abortion reversal. Doc. 94-10 at 4–6, 8–17; Doc. 94-11 at 5; Doc. 94-12 at 4–5; Doc. 94-22 at 4–5, 10, 12, 27; Doc. 178-12. At no time during any of the hearings or floor debates on the Act did lawmakers reference a specific religion, sect, or religious practice. SADF ¶81. Bill sponsors repeatedly voiced support for non-misleading faith-based counseling and care, and legislators discussed that the majority of pregnancy resource centers and clinics in Colorado are not religiously affiliated. Doc. 94-10 at 6. In short, Plaintiffs cannot establish that the General Assembly or Boards acted to regulate medication abortion reversal "because of" and

---

[35] Indeed, a group of physicians in South Carolina have made similar arguments claiming that the state's abortion ban infringes on their free exercise of religion because their faith and secular conscientious beliefs compels them to provide abortions to patients in need. *See* Ex. 92.

not merely "in spite of" any burden religious practice. *See Lukumi*, 508 U.S. at 540;

*Chiles*, 116 F.4th at 1223.

**D.    The Act's regulation of medication abortion reversal satisfies strict scrutiny.**

Because the Act is neutral and generally applicable, it must be upheld if it is

rationally related to a legitimate government interest. *See Chiles*, 116 F.4th at

1221–22. Plaintiffs do not argue that the Act fails to satisfy this test. It easily does.

*See* Doc. 178 at 36–41. But even if strict scrutiny applied, the Act does not violate

Plaintiffs' constitutional free exercise rights.

States have a "compelling interest in the practice of professions within their

boundaries," and as part of their police powers, states have "broad power" to

regulate professions. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975);

*accord Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978) ("The state bears a

special responsibility for maintaining standards among members of the licensed

professions."). "From time immemorial, states have enacted regulations to 'secure . .

. against the consequences of ignorance and incapacity' by medical professionals."

*Chiles*, 116 F.4th at 1206 (citations omitted). The Supreme Court has recognized the

compelling interest in regulating licensed medical professionals' conduct in the face

of physicians' assertions of their own First Amendment rights to be free of

compelled speech. *NIFLA v. Becerra,* 585 U.S. 755, 769–70 (2018) (citing *Planned*

*Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S.833, 884 (1992)) ("To be sure, the physician's First Amendment rights not to speak are implicated . . . but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State. . . . We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.") *(*citations omitted) (*overruled on other grounds*). The Boards have a mandate "to protect the people of this state from unauthorized, unqualified, and improper application of services" by licensees. C.R.S. §§ 12-255-102(1); 12-240-102. The Act furthers Colorado's compelling interest in preventing licensees from improperly imposing ineffective or unsafe treatments on its citizens. C.R.S. § 12-30-120(2)(a).

The Act and Board Rules are narrowly tailored to this interest. The Act regulates only the administering, dispensing, distributing, or delivering a drug with the intent to interfere with, reverse, or halt a medication abortion. C.R.S. § 12-30-120(1)(c). That is conduct that only appropriately licensed professionals can engage in, and the prohibition is specific to one indication—medication abortion. The Act is further narrowed in scope to only the practice of a health profession because both the Medical Practice Act and the Nurse Practice Act exclude religious worship from regulation by the respective boards. C.R.S. §§ 12-240-107(3)(g)–(h); 12-255-127(1)(m), (2).

The Board Rules defined the conduct at issue even more narrowly than the
Act to more closely fit the context of their licensees. The Act and Board Rules do not
attempt to regulate licensees' personal motivation or every potential use of
progesterone. Instead, the regulatory framework creates precise and readily
navigable boundaries around Progesterone Intervention because it has not been
established as an effective method of achieving the licensee's or patient's goal of
maintaining a pregnancy in the presence of mifepristone. The Board Rules ensure
that medical professionals only provide treatment that comports with current
medically accepted standards of care while allowing the Boards to assess other
potential future therapies as they arise. Thus, even if strict scrutiny applied, the
Boards' conduct does not violate Plaintiffs' constitutional rights to freely exercise
their religion.

## II.    The Act does not violate the First Amendment right to receive information (Count V).

Plaintiffs argue that the Act's legislative declaration purporting to prohibit
advertising for or offering medication abortion reversal results in the Boards
violating their First Amendment freedom of speech rights because it restricts a
patient's right to receive information. It does not. In reality, the declaration—which
was Section 1 of the bill—restricts nothing because it was not codified in the
Colorado Revised Statutes. While the legislative declaration may provide insight

57

into the legislators' intent and purpose in enacting the Act, it cannot be applied to restrict the activities of any Plaintiffs. *See Webster v. Reprod. Health Servs.*, 492 U.S. 490, 504–06 (1989). Thus, the declaration cannot form the basis of a claim for violation of rights to free speech.

## III.    The Act does not force pregnant women to undergo or continue an abortion (Bella Health Count VI, Plaintiff-Intervenor Count V)

Colorado law protects the right to continue or terminate a pregnancy. C.R.S. § 25-6-403(2). And it is beyond dispute that a competent person has a constitutionally protected interest to refuse unwanted medical treatment. *Cruzan v. Director*, 497 U.S. 261, 278 (1990). Plaintiffs falsely claim the Act and Board Rules "force" abortions on women in violation of the Fourteenth and First Amendments and the Colorado Reproductive Health Equity Act, C.R.S. §§ 25-6-401 *et seq*.

Plaintiffs' claims misrepresent the facts: Neither the Act nor Board Rules force women to undergo abortions. The Act and Rules do not compel a patient to take misoprostol if they change their minds. And the Act does not change the fact that any abortion care provider must obtain robust informed consent prior to prescribing mifepristone or misoprostol. The decision to continue or terminate a pregnancy belongs only to the patient, and the Act does nothing but reinforce that truth.

But the right to continue or terminate a pregnancy does not mean a patient has a constitutional right to determine which medications they receive to treat a particular condition. The medical care offered to Colorado patients deciding whether to terminate a pregnancy must meet generally accepted standards of care for the practice of medicine and nursing. C.R.S. §§ 12-240-102; 12-255-102. The Boards regulate their respective healing arts and that includes prohibiting their licensees from practicing unsafe medicine that fails to meet generally accepted standards of care. *Id.* Consequently, Plaintiffs' claims lack merit.

## CONCLUSION

For the foregoing reasons, the Court should deny Bella Health Plaintiffs' and Plaintiff-Intervenor's motions for summary judgment.

Respectfully submitted this 28th day of February 2025.

PHILIP J. WEISER
Attorney General


/s/ *Brian J. Urankar*
Brian J. Urankar, Senior Assistant Attorney
General
Jennifer H. Hunt, Senior Assistant Attorney
General
Counsel to the Colorado Medical Board
1300 Broadway
Denver, Colorado 80203
Telephone: (720) 508-6407
Email: brian.urankar@coag.gov
Jennifer.hunt@coag.gov


/s/ *Elizabeth V Kenny*
Elizabeth V Kenny, Senior Assistant Attorney
General
Zach Fitzgerald, Assistant Attorney General
Counsel to the Colorado State Board of Nursing
1300 Broadway
Denver, Colorado 80203
Telephone: (720) 508-6407
Email: elizabeth.kenny@coag.gov
Zach.fitzgerald@coag.gov


CERTIFICATION OF WORD COUNT: I hereby certify that the foregoing
pleading complies with the type-volume limitation set forth in Judge Domenico's
Practice Standard III(A)(1), as modified by court order dated 12/24/2024.

/s/ *Brian J. Urankar*
Brian J. Urankar, Assistant Attorney General