# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

BELLA HEALTH AND WELLNESS
et al.,

    *Plaintiffs*,

CHELSEA M. MYNYK,

    *Plaintiff-Intervenor*,

    v.

PHIL WEISER, in his official capacity as
Attorney General of Colorado, et al.,

    *Defendants*.

Case No.  1:23-cv-939-DDD-SKC

# REPLY IN SUPPORT OF PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT

Mark L. Rienzi
Rebekah P. Ricketts
Laura W. Slavis
Michael J. O'Brien
Colten L. Stanberry
Amanda L. Salz
Amy Ren
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
mrienzi@becketfund.org

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION .................................................................................................. 1

REPLY TO DEFENDANTS' RESPONSES TO PLAINTIFFS'
    STATEMENT OF UNDISPUTED MATERIAL FACTS.......................................... 2

RESPONSE TO ATTORNEY GENERAL'S STATEMENT
    OF ADDITIONAL FACTS ................................................................................ 3

RESPONSE TO BOARDS' STATEMENT OF ADDITIONAL
    DISPUTED FACTS ......................................................................................... 4

ARGUMENT ...................................................................................................... 12

I.  Plaintiffs have shown actual success on the merits of Counts I-VIII. ................. 12

    A.  Colorado's ban on abortion pill reversal violates the Free
        Exercise Clause. ...................................................................................... 12

        1.  The ban burdens Plaintiffs' religious exercise............................................ 12

        2.  The ban is not generally applicable because it treats religious
            activity less favorably than comparable secular activity (Count I). .......... 12

        3.  The ban is not generally applicable because it contains
            mechanisms for exemptions (Count II)....................................................... 17

        4.  The ban is not neutral (Count III). ............................................................ 19

    B.  The Eleventh Amendment does not bar Plaintiffs' claims
        against the Attorney General. .................................................................... 20

    C.  SB-190 violates the Free Speech Clause by discriminating based
        on content and viewpoint (Count IV). ......................................................... 22

    D.  SB-190 violates the First Amendment right to receive
        information (Count V)................................................................................ 28

    E.  SB 23-190 violates the Fourteenth Amendment right of
        pregnant women not to be forced to undergo or continue an
        abortion (Counts VI-VII)........................................................................... 29

    F.  SB 23-190 is void for vagueness (Count VIII).............................................. 30

G.  The government cannot carry its burden under strict scrutiny......................31

II.  Plaintiffs easily satisfy the remaining injunctive-relief factors. ..........................32

CONCLUSION.......................................................................................................33

CERTIFICATE OF SERVICE....................................................................................35

CERTIFICATE OF COMPLIANCE............................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) ........................................................ 18-19

*Brewer v. City of Albuquerque,*
18 F.4th 1205 (10th Cir. 2021) ............................................................ 32

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) .............................................................................. 31

*Cardtoons v. MLB Players Ass'n,*
95 F.3d 959 (10th Cir. 1996) ............................................................... 24

*Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n,*
447 U.S. 557 (1980) .............................................................................. 23

*Chiles v. Salazar,*
116 F.4th 1178 (10th Cir. 2024) ....................................................... 19-20

*Church of Lukumi Babalu Aye v. City of Hialeah,*
508 U.S. 520 (1993) .............................................................. 17, 19, 20, 32

*Conaway v. Smith,*
853 F.2d 789 (10th Cir. 1988) ............................................................... 2

*Cressman v. Thompson,*
719 F.3d 1139 (10th Cir. 2013) ............................................................ 21

*Crowe v. Tull,*
126 P.3d 196 (Colo. 2006) ............................................................... 28, 31

*Darren Patterson Christian Acad. v. Roy,*
699 F. Supp. 3d 1163 (D. Colo. 2023) .................................................. 18

*Darren Patterson Christian Acad. v. Roy,*
No. 23-cv-1557, --- F. Supp. 3d ---, 2025 WL 700268
(D. Colo. Feb. 24, 2025) ....................................................................... 31

*Denver Bible Church v. Azar,*
494 F. Supp. 3d 816 (D. Colo. 2020) .................................................... 12

*FCA v. San Jose Unified Sch. Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023).................................................................. 17

*First Resort v. Herrera,*
    860 F.3d 1263 (9th Cir. 2017) ............................................................. 28

*Frank v. Lee,*
    84 F.4th 1119 (10th Cir. 2023).............................................................. 21

*Fraternal Order of Police v. City of Newark,*
    170 F.3d 359 (3d Cir. 1999)............................................................. 17-18

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) .............................................................................. 17

*Greater Baltimore Ctr. for Pregnancy Concerns v. Mayor & City*
    *Council of Baltimore,*
    879 F.3d 101 (4th Cir. 2018) ................................................................ 25

*Greater Philadelphia Chamber of Com. v. City of Philadelphia,*
    949 F.3d 116 (3d Cir. 2020).................................................................. 24

*Hampton v. Root9b Techs.,*
    No. 15-cv-2152, 2016 WL 7868823 (D. Colo. Aug. 3, 2016)..................... 3

*Harris v. Quinn,*
    573 U.S. 616 (2014) .............................................................................. 23

*Jordan v. Pugh,*
    425 F.3d 820 (10th Cir. 2005) .............................................................. 30

*Lawrence v. Garland,*
    No. 23-cv-2199, 2024 WL 3022906 (D. Colo. Jan. 17, 2024) ................. 22

*Masterpiece Cakeshop v. Colo. C.R. Comm'n,*
    584 U.S. 617 (2018) ......................................................................... 12-13

*Montgomery v. City of Ardmore,*
    365 F.3d 926 (10th Cir. 2004) .............................................................. 21

*Moody v. NetChoice,*
    603 U.S. 707 (2024) ........................................................................ 20, 25

*N.Y. Times v. Sullivan,*
    376 U.S. 254 (1964) .............................................................................. 24

*National Federation of the Blind of Arkansas v. Pryor,*
258 F.3d 851 (8th Cir. 2001) ................................................................ 30

*Planned Parenthood v. Moser,*
747 F.3d 814 (10th Cir. 2014) .............................................................. 27

*Prairie Band Potawatomi Nation v. Wagnon,*
476 F.3d 818 (10th Cir. 2007) .............................................................. 22

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ............................................................................. 27

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ....................................................................... 26, 27

*Renteria v. N.M. Office of Superintendent of Ins.,*
2025 WL 635754 (10th Cir. Feb. 27, 2025) ......................................... 12

*Riley v. Nat'l Fed'n of the Blind,*
487 U.S. 781 (1988) ............................................................................. 24

*SBA List v. Driehaus,*
573 U.S. 149 (2014) ............................................................................. 29

*Sorrell v. IMS Health,*
564 U.S. 552 (2011) ............................................................................. 25

*Stamp v. Vail Corp.,*
172 P.3d 437 (Colo. 2007) ................................................................... 28

*StreetMediaGroup v. Stockinger,*
79 F.4th 1243 (10th Cir. 2023) ....................................................... 30, 31

*Tandon v. Newsom,*
593 U.S. 61 (2021) ............................................................................... 12

*Thomas v. Collins,*
323 U.S. 516 (1945) ............................................................................. 26

*U.S. West v. FCC,*
182 F.3d 1224 (10th Cir. 1999) ..................................................... 25, 26

*United States v. O'Brien,*
391 U.S. 367 (1968) ............................................................................. 27

*W. Food Plan v. Dist. Ct.,*
598 P.2d 1038 (Colo. 1979) ................................................................. 33

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ............................................................................ 27

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ...................................................................... 22-23

*Webster v. Reprod. Health Servs.*,
    492 U.S. 490 (1989) ...................................................................... 28-29

## Statutes

Colo. Rev. Stat. §12-240-107 ............................................................ 20

Colo. Rev. Stat. §12-240-125 ..................................................... 3, 11, 21

Colo. Rev. Stat. §12-255-119 ..................................................... 3, 11, 21

Colo. Rev. Stat. §12-255-127 ............................................................ 20

Colo. Rev. Stat. §24-31-101 ......................................................... 21, 22

Colo. Rev. Stat. §25-6-404 ................................................................ 29

## Other Authorities

Amy G. Bryant, *Why Crisis Pregnancy Centers Are Legal*
    *but Unethical*, AMA J. Ethics (Mar. 2018) ........................................ 25

## INTRODUCTION

After nearly two years of litigation and full discovery, SB 23-190 and its related rules are just as unconstitutional as they were at the start. That's good news, as Bella's APR patients have given birth to 11 babies (and counting) since this case began. Any government committed to patient wellbeing and women's rights should welcome this result.

Lacking any serious argument that SB 23-190 is either constitutional or beneficial, Defendants keep switching interests in hopes that something sticks. But nothing does. The Boards cycle through a host of claimed interests—a fear of "experimental" therapies, a requirement of "demonstrated benefit," worries about common side effects like nausea, and more. Each belated rationale fails—Colorado lacks general prohibitions for any of them, and doesn't pursue these claimed interests against other treatments. The Attorney General tries to avoid a permanent injunction by insisting he lacks authority to enforce Board statutes that say he "shall prosecute" referrals, and saying a continued injunction will "leave [him] powerless" to protect the public from deception. ██████████████████████████████████████ ████████████████ and refuses to take any position on whether APR is safe or effective or whether Bella's APR ads are deceptive.

Defendants seek a last refuge in the standards for facial challenges—ignoring that SB 23-190 is invalid both on its face and as applied, as Plaintiffs have argued from the outset and easily demonstrate.

New Coloradans are alive because the Constitution worked at the preliminary-injunction stage to protect the safe and effective care sought by their mothers. Discovery has overwhelmingly confirmed that result, and this Court should make its injunction permanent.

### REPLY TO DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants characterize several of Plaintiffs' statements as "conclusion[s] of law." Boards.Resp.Pls.SOF ¶¶89-91, 97, 105-10, 129-30, 144-46, 148-49; AG.Resp.Pls.SOF ¶¶89-91, 97-98, 106-10, 129-30, 144-50. But they offer no authority for the proposition that the text, history, effect, and existence of statutory provisions are not "fact[s]" within the meaning of Federal Rule of Civil Procedure 56(c)(1). *Cf.* AG.SOF ¶¶4-7, 12 (asserting similar statements as undisputed material facts); Boards.SOF ¶¶12-19, 111-112, 115-16 (same).

Defendants assert that several of Plaintiffs' statements cite only to "a conclusory, unsupported allegation." Boards.Resp.Pls.SOF ¶¶23, 83-85; AG.Resp.Pls.SOF ¶¶23, 83-85. But Bella's CEO verified her personal knowledge of the Amended Complaint's assertions under penalty of perjury. Am.Compl.74; *see Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988).

Additionally, and without waiving any other undisputed material facts, Plaintiffs provide specific replies to the following:

64. Plaintiffs cite Dr. Kliman's public statements as evidence of his opinion on APR, not "to prove the truth of the matter asserted." Fed.R.Evid. 801(c)(2); *e.g.*, *Hampton v. Root9b Techs.*, 2016 WL 7868823, at *4 (D. Colo. Aug. 3, 2016).

80. The Boards mischaracterize Plaintiffs' statement, and do not dispute that Bella has treated dozens of APR patients who successfully maintained their pregnancies. Am.Compl. ¶114; Sinnett Decl. ¶5.

98. The cited documents are "official publications," Fed.R.Evid. 902(5), and are offered to show Colorado's public positions, not "to prove the truth of the matter asserted," Fed.R.Evid. 801(c)(2).

99. *Supra* ¶98.

145. The Boards have repeatedly admitted that SB 23-190 "bans" APR. Boards.MSJ.31; Dkt.99 at 14; *see* Dkt.113 at 26.

151. Plaintiffs have presented extensive evidence of APR's effectiveness. Pls.MSJ.11-16, 39.

### RESPONSE TO ATTORNEY GENERAL'S STATEMENT OF ADDITIONAL FACTS

1. Undisputed subject to AG's statutory obligations to prosecute complaints referred by the Boards. Colo. Rev. Stat. §12-240-125(4)(c)(V), (5)(d); *id.* §12-255-119(3)(c)(V), (4)(d).

2. Undisputed subject to ¶1.

3. Undisputed subject to ¶1.

4. Undisputed subject to ¶1.

5. Undisputed. AG.Ex.72 at 162:3-166:24.

6. Undisputed.

7. Undisputed.

## RESPONSE TO BOARDS' STATEMENT OF
## ADDITIONAL DISPUTED FACTS[1]

1. Objection to compound assertions. DDD Civ. P.S. III(E)(1)(a).[2] Undisputed that off-label prescribing is permitted but does not always meet generally accepted stand-ards. Am.Compl. ¶¶71-72. Dispute "because" and what thousands of providers in var-ied circumstances "must consider" or when. Boards.Ex.81 at 42:10-22; Boards.Ex.73 at 60:8-63:19.

2. Disputed. Pls.Ex.82 ("Keenan Rebuttal") 5-7.

3. Objection to compound assertions. DDD Civ. P.S. III(E)(1)(a). Undisputed that providers frequently prescribe off-label drugs during pregnancy. Pls.Ex.6 ("Wubben-horst Report") 6. Dispute "should." *See* Keenan Rebuttal 2-7 ("proven benefit" rule "would jeopardize access to fertility treatment for millions of American women").

4. Undisputed. Am.Compl. ¶50.

5. Disputed. ████████████████████████████████████
████████████████████

---

[1] The Boards' "Statement of Additional Disputed Facts" includes numerous undisputed statements, including many that appear verbatim in the Boards' own "Statement of Undisputed Material Facts." *Compare* Boards.SOF ¶¶15-16, 22-23, 38-41, 44-52, 59-64, 67-68, 86-87, 103-08, 113-14, *with* Boards.SADF ¶¶9, 11, 22, 25, 29-34, 42, 46-52, 59, 67-71, 75-76, 81-88.

[2] The Boards complain about Plaintiffs' compliance with this Court's Civil Practice Standard III(E)(1)(a), Boards.Resp.2, while asserting numerous compound facts.

6.  Undisputed that ERDs do not specifically refer to APR. Dispute implication that Plaintiffs are not religiously obligated to offer APR. ███████████████ ███████████ Am.Compl. ¶¶108-09.[3]

7.  Undisputed that ERDs do not refer to "attempting to reverse abortion care."

8.  Undisputed that ERDs "support" care that meets generally accepted standards. ███████████████. Undisputed that Plaintiffs perceive no tension between ERDs and generally accepted standards. ███████████████.

9.  Disputed. Pls.Ex.73 ("Wubbenhorst 2/28 Supplement") 7-8.

10. Undisputed. Boards.Ex.73 at 135:7-11.

11. Undisputed. Pls.Resp.Boards.SOF ¶23.

12. Dispute "rigorous." Wubbenhorst Report 15 & n.43.

13. Undisputed that cited sources provide this statistic. *But see* Wubbenhorst Report 14-15 (source "disclos[es] that such data are not reported in most clinical trials").

14. Undisputed. Boards.Ex.73 at 69:13-70:12.

15. Disputed. Wubbenhorst Report 3-22; Pls.Ex.74 ("Wubbenhorst Rebuttal") 16-23.

16. Undisputed. ███████████████.

17. Undisputed these are potential "side effects." Boards.Ex.73 at 51:7-14.

18. Undisputed these are potential "side effects." Boards.Ex.73 at 51:7-16.

---

[3]  Plaintiffs object to the Boards' newly-minted term "Progesterone Intervention," which does not appear in any testimony, scientific literature, or expert report. Plaintiffs also dispute the Boards' mischaracterization of Dr. Wubbenhorst's testimony. Pls.Resp.Boards.SOF ¶24.

19. Dispute "negative interactions." Boards.Ex.73 at 51:7-18 ("side effects").

20. Undisputed that side effects may cause some patients to stop taking progesterone. Boards.Ex.73 at 51:23-52:1. Dispute that any side effects are "severe." Pls.Ex.7 ("Cohen Tr.") 51:23-52:13 (corrected at Dkt.184).

21. Undisputed. ███████████████████.

22. Undisputed that Dr. Keenan testified "[t]here's no exact answer" to "[h]ow much progesterone flooding would overcome mifepristone's receptor bond." Boards.Ex.11 at 40:18-22.

23. Disputed. Dr. Cohen did not testify to "almost all," Boards.Ex.73 at 166:17-167:10, and the underlying source does not support it, Pls.Ex.84 at 281-82.

24. Disputed. ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████.

25. Disputed. Pls.Resp.Boards.SOF ¶39.

26. ████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████ *cf.* Pls.Ex.86 ("Keenan Tr.") 42:9-15.

27. Dispute "unqualified." Wubbenhorst Report 12-13.

28. Disputed. Wubbenhorst Rebuttal 14-16.

29. Disputed. Boards.Ex.11 at 52:4-25 ("inappropriate to mention" where "that was not the subject matter at hand").

30. Undisputed. Pls.Resp.Boards.SOF ¶59.

31. Disputed as to PRISM, which "did identify a differential benefit among women with prior miscarriages." Wubbenhorst Rebuttal 4.

32. Disputed. Pls.Ex.13 at 5 ("benefit was even greater"); Pls.Ex.12 at 24.

33. Undisputed. Pls.Resp.Boards.SOF ¶62.

34. Undisputed. Pls.Resp.Boards.SOF ¶63.

35. Undisputed. Boards.Ex.16 at 17; *cf.* ███████████████████ Keenan Tr.42:9-15.

36. Undisputed. Boards.Ex.16 at 32.

37. Undisputed as to thalidomide and estrogen diethylstilbestrol (DES). Pls.Ex.10 ("Cohen Report 1-C") at 1; Dkt.108-1 ¶2; Dkt.102-1 ¶17.

38. Undisputed. Cohen Report 1-C at 1.

39. Undisputed. *Cf.* Cohen Tr.172:4-20 ("[a]nimal studies can be evidence"); Cohen Report 1-C at 4 (citing rat study).

40. Undisputed. Pls.Ex.21 at 4.

41. Dispute "inapplicable." *See* Pls.Ex.19 at 8.

42. Undisputed. Pls.Resp.Boards.SOF ¶41.

43. Objection to compound assertions. DDD Civ. P.S. III(E)(1). Dispute "low quality" and "key" and "lacked sufficient information." Wubbenhorst Report 23-25.

44. Disputed. Wubbenhorst Rebuttal 21-22.

45. Dispute "many institutions." Dkt.99-1 at 13; Dkt.99-2 at 12.

46. Dispute "failed" to report "important" "demographic" information. *See* Pls.Ex.22.

47. Undisputed. Pls.Resp.Boards.SOF ¶45. Dispute implication that a concurrent control group was necessary or appropriate. Wubbenhorst Report 25.

48. Undisputed. Pls.Resp.Boards.SOF ¶46.

49. Disputed. Wubbenhorst Report 26.

50. Dispute ten regimens. Pls.Ex.22 at 27. Dispute "cannot be relied upon." *See* Wubbenhorst Report 25-26.

51. Undisputed. Pls.Resp.Boards.SOF ¶¶49-50.

52. Undisputed that Creinin study is the only RCT testing APR in humans. Pls.Resp.Boards.SOF ¶51.

53. Undisputed. Pls.Ex.17 at 2.

54. Undisputed. Pls.Ex.17 at 2.

55. Undisputed as to "statistically insignificant." Boards.Ex.73 at 138:8-16. Dispute any implication that "could have happened by chance" means could not have been the result of actual differences. Cohen Tr.143:25-151:23 (estimating only a 52% likelihood results were caused by chance, and a 48% likelihood that results are due to "differences between progesterone and placebo").

56. Undisputed. Pls.Ex.17 at 2.

57. Undisputed. Pls.Ex.17 at 8.

58. Undisputed. Pls.Ex.17 at 4.

59. Disputed. Pls.Resp.Boards.SOF ¶52.

60. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ Undisputed that Plain-

tiffs are "religiously compelled to offer" it. ████████████████.

61. Undisputed. ████████████████.

62. ███████████████████████████████████████████

████████████████████████████████████████████████

██████

63. Undisputed. ████████████████.

64. Undisputed. ████████████████.

65. N/A

66. N/A

67. Disputed. ████████████████████████████████████

████████████████████████████

68. ████████████████████████████████████████████

████████████████████████

69. *Supra* ¶26.

70. Disputed. ██████████████████████████████████████

████████████████████████████████.

71. ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

72. N/A

73. Undisputed that Dr. Cohen testified as much. ██████ ████████████████████

██████

74. Disputed. Wubbenhorst Rebuttal 14; Pls.Ex.55 ("Wubbenhorst 12/6 Supple-

ment") 2-3.

75. ██████████████████████████████████████████

████████████████████████████████████. Dispute implication

that Boards routinely establish standards of care through rulemaking. ████████

████████

76. Undisputed that Boards generally regulate use of medical treatments and

drugs through their disciplinary authority. Dispute the Boards specifically regulate

"off-label" or "experimental use[]." Pls.Ex.72 at 9.

77. ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

78. Dispute implication that the AG does not also have statutory obligations to prosecute complaints referred by the Boards. Colo. Rev. Stat. §12-240-125(4)(c)(V), (5)(d); *id.* §12-255-119(3)(c)(V), (4)(d).

79. Undisputed that Representative McCormick made these statements. Pls.Ex.46 at 4:16-5:4.

80. Undisputed. Pls.Ex.43 at 13-34; Pls.Ex.45 at 8-34.

81. Disputed. Lawmakers used terms like "[f]aith-based" throughout hearings. Pls.Ex.46 at 54:3-15.

82. Undisputed. Pls.Resp.Boards.SOF ¶104.

83. Disputed. *E.g.*, Pls.Ex.46 at 54:3-15 ("this particular faith").

84. Disputed. Pls.Ex.46 at 54:5-6, 7, 9-10 ("[f]aith-based counseling is absolutely fine," but "the voice of this particular faith" is "riddled with guilt-inducing anti-abortion messages").

85. Disputed. Pls.Ex.46 at 54:7, 11 ("this particular faith").

86. Dispute "no ideological affiliation." Pls.Ex.43 at 7:16-18 ("18 Planned Parenthood Clinics" and "76 state-funded health clinic[s]").

87. Undisputed. Pls.Resp.Boards.SOF ¶113.

88. Undisputed. Pls.Resp.Boards.SOF ¶114.

89. Undisputed. Boards.Ex.89.

90. Undisputed. Boards.Ex.90, 91.

## ARGUMENT

I. **Plaintiffs have shown actual success on the merits of Counts I-VIII.**

A. **Colorado's ban on abortion pill reversal violates the Free Exercise Clause.**

1. **The ban burdens Plaintiffs' religious exercise.**

Colorado previously didn't "contest[] that SB 23-190 burdens Bella Health's religious practice." Dkt.113 at 32. Now, the Boards claim APR "is not a religious practice like ingesting peyote or engaging in animal sacrifice." Boards.Resp.53. But "[the government] does not have the power to decide what tasks are a necessary part of an individual's religious [exercise]." *Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 833 (D. Colo. 2020). Plaintiffs have repeatedly explained their sincere religious obligation to offer APR, Pls.SOF ¶¶7, 77-79; Pls.Resp.28-29, and the Boards cannot redefine that obligation.[4]

2. **The ban is not generally applicable because it treats religious activity less favorably than comparable secular activity (Count I).**

The Boards acknowledge that comparability is "judged against the asserted government interest that justifies the regulation at issue." Boards.Resp.44 (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). But they again try to "engineer" the conclusion that there is no comparable secular activity by "adjusting the dials" of generality

---

[4]    The Boards attempt to wield the ERDs against Plaintiffs. Boards.Resp.53. But "[c]ourts should refrain from trolling through a person's or institution's religious beliefs." *Renteria v. N.M. Office of Superintendent of Ins.*, 2025 WL 635754, at *5 (10th Cir. Feb. 27, 2025).

"*just right.*" *See Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 652 (2018)
(Gorsuch, J., concurring). That effort fails.

Gone from the Boards' response is their late-breaking claim that APR is "unique"
because progesterone is used "in conjunction with a progesterone antagonist."
Boards.MSJ.3. Instead, the Boards change the aperture again. With no apparent
sense of irony, the Boards now claim to be regulating off-label and experimental treat-
ments "in the context of ... abortion services" based on the "lack[] [of] scientific evi-
dence of efficacy and safety for the pregnant person *and the child that may result
from the pregnancy*." Boards.Resp.44 (emphasis added). But no statute or rule gener-
ally regulates "off-label and experimental treatment" that "lacks scientific evidence
of efficacy and safety," either "in the context of ... abortion services" or otherwise. And
by the Boards' own admission, SB 23-190 "narrowly regulates only medication abor-
tion reversal." Boards.Resp.44. That is not general applicability.

The Boards next claim that Plaintiffs "use the wrong comparator" because other
uses of progesterone "have a far broader evidence base." Boards.Resp.44-45. They of-
fer no response on progesterone's use for premenstrual syndrome, which Dr. Cohen
derided as "clinically ineffective." Cohen Report 1-C at 1; Pls.MSJ.37. And in an ap-
parent change of heart about PRISM, the Boards now say that "randomized control
trials show benefit of progesterone for women with a history of recurrent miscar-
riage." Boards.Resp.45 (citing PRISM). That's true, as Plaintiffs' experts have ex-
plained. Pls.MSJ.8-9. But it directly contradicts Dr. Cohen's assertions that using

progesterone to treat threatened miscarriage is a "theory" that "rel[ies] on low-quality case series." Dkt.99-1 at 8; *see also* Cohen Report 1-C at 1-2; Pls.Ex.23 ("Cohen Report 1-D") 1; *cf.* Boards.SOF ¶¶59-61. Having embraced Dr. Cohen's opinions in full, *see* Pls.Resp.31, 33, the Boards cannot selectively abandon them now.

The Boards also backpedal on progesterone for luteal phase support, citing its "universal adoption" among "assisted reproductive technology clinics." Boards.Resp.45. But this is so *even though* "the level of evidence is … rather low." Pls.Ex.89 at 4-5. And Dr. Cohen denigrated this use of progesterone too. Cohen Report 1-D at 1.

The Boards claim "demonstrated benefit" is "require[d]" "*before* offering experimental treatments outside of research." Boards.Resp.47. But no statute or rule imposes such a requirement. *Cf.* Keenan Rebuttal 5-6 (any such rule would "jeopardize access to fertility treatment for millions of American women"). The Boards cannot escape the existence of "[s]imilar scientific uncertainty" as to other uses of progesterone that they do not ban. Dkt.113 at 35.[5]

Remarkably, the Boards say "[t]here is not a lower bar for other uses of progesterone." Boards.Resp.45. That was true until SB 23-190 was signed. Post-enactment,

---

[5]     The Boards grossly mischaracterize Dr. Keenan's testimony. Boards.Resp.45. Dr. Keenan testified that "it would be inappropriate to mention the safety" of APR where "*that was not the subject matter at hand in the article.*" Keenan Tr.52:4-14 (emphasis added); *see also id.* at 53:8-22 (similar as to efficacy). He made clear that other progesterone uses are "relevant in determining the reasonableness" of APR. *Id.* at 53:13-16.

only APR is "banned" by statute. Boards.MSJ.40. All other uses of progesterone remain subject to the preexisting "case-by-case" disciplinary process. Pls.MSJ.35-36.

Then there's Colorado's penchant for gender-affirming care. The Boards duck official publications of DORA and UC Health as "irrelevant hearsay unattributable to the Boards." Boards.Resp.46.[6] These are offered to show Colorado's public positions and state of mind—not "to prove the truth of the matter asserted." Fed.R.Evid. 801(c)(2). This Court need not resolve the (hotly disputed) standard of care for gender dysphoria to find that Colorado violates *Tandon* by actively promoting progesterone as a cross-sex hormone, including for minors—and including when doctors at its own medical school profess to have no idea how or whether it will work, *see* Pls.Ex.64— while banning it for pregnant women who seek to counteract the effects of mifepristone. Pls.MSJ.38.

The Boards concede that progesterone is "a safe, low-risk medication," but claim Plaintiffs "overstate" the safety evidence due to progesterone's "[c]ommon side effects." Boards.Resp.46. But no statute or rule regulates (much less bans) medications that can cause "fatigue, nausea, and headaches," or vaginal "irritation," or "pain at the injection site." Boards.Resp.46-47. And the Boards cite no evidence that these side

---

[6]    Pls.Ex.39, https://perma.cc/WV8Q-Q9DR; Pls.Ex.40 (2024), https://perma.cc/5P5H-GRHL (2025); Pls.Ex.41, https://perma.cc/4ZBY-EVDR; Pls.Ex.64, https://perma.cc/S7JN-CZ6X; Pls.Ex.90 ("Delp 11/14 Tr.") 78:15-79:6, 81:14-23, 85:17-87:8; ██████████████████████████; Cohen Tr.210:11-212:2; *cf.* Fed.R.Evid. 902(5).

effects are different when progesterone is administered for APR. As with mifepristone, patients should "be able to choose to bear th[e] side effects [of progesterone]" to get the "benefit" they "seek." *See* Cohen Tr.71:19-72:8.

Grasping further, the Boards now profess to be "[e]ven more concern[ed]" with the "unknown risks" of APR. Boards.Resp.47. But they admit that progesterone "has been used to support female fertility … for more than 50 years." Pls.SOF ¶17; Boards.Resp.Pls.SOF ¶17. And NICE expressly states that "there [is] *no evidence of harms* for women or babies" from progesterone. Pls.SOF ¶32 (emphasis added); Boards.Resp.6. The Boards cannot survive *Tandon* by speculating about future "rare harmful events" that have never occurred. Boards.Resp.47.[7]

Finally, the Boards assert the evidence of APR's efficacy "is little more than theory and anecdote," Boards.Resp.48—but make no attempt to rebut the "multiple lines of scientific evidence" that support it. Wubbenhorst Report 3-22; Pls.Ex.8 ("Keenan Report") 4-11. Dr. Cohen conceded that "animal studies can be evidence" and that "case series" are "evidence." Cohen Tr.61:10-11, 172:19-20. And she ultimately admitted it's "possible" that progesterone could counteract the effects of mifepristone. Cohen Tr.216:9-217:2. As the Boards now admit, Bella's APR patients have given birth to at least 11 babies since this case began. Boards.Resp.Pls.SOF ¶136.

---

[7]    The Boards complain that Plaintiffs "cannot articulate" a universal "progesterone dosage" for APR. Boards.Resp.47. But no generally applicable rule bars using medications that lack a one-size-fits-all dosage. *Cf.* Pls.Ex.64; Cohen Tr.210:12-213:3.

The Boards' aperture adjustments cannot alter reality. Whether "[v]iewed broadly" or "more narrowly," SB 23-190 is "vastly underinclusive" as to comparable "off-label use of hormones or any other drugs prophylactically," and obviously "underinclusive as to comparable secular uses of progesterone." Dkt.113 at 34-35.

### 3. The ban is not generally applicable because it contains mechanisms for exemptions (Count II).

The Boards insist that SB 23-190 is generally applicable because "neither the Act nor Board Rules contain exemptions." Boards.Resp.48. That's wrong.

Laws that contain "a mechanism for individualized exemptions" are not generally applicable. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Categorical exemptions also destroy a law's general applicability. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542 (1993) ("categories of selection are of paramount concern" when law has "incidental effect of burdening religious practice"). What matters is not the exemption's label, but "the mere existence of government discretion." *FCA v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

SB 23-190 *codifies* categorical discretion. By allowing the Boards to flip the statutory "off" switch, it "undermines" the claim the law "can brook no departures." *Fulton*, 593 U.S. at 542; Dkt.113 at 36; Pls.MSJ.40. The Boards say the switch is "not an *individual* exemption." Boards.Resp.50. But legally, categorical exemptions also evince government discretion—and defeat general applicability. *Fraternal Order of*

*Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.) (general applicability is "only further implicated" when government "creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection"); *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1185 (D. Colo. 2023) (similar). The General Assembly made APR unprofessional conduct—"*unless*" the Boards determined it meets "generally accepted standard[s] of practice." §3(2) (emphasis added). It is difficult to conceive of "greater discretion" than freedom to nullify a statute. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004).

Then the Boards exercised their rulemaking authority to create more mechanisms for exemptions. Dkt.113 at 36-37; Pls.MSJ.40-41. The Medical Board prohibits the use of progesterone for APR—but allows the Board to evaluate any "other" types of APR "case-by-case." Pls.Ex.53. And the Nursing Board retains discretion to evaluate *all* APR "case-by-case." Pls.Ex.54. These are quintessential mechanisms for individualized exemptions. *See Axson-Flynn*, 356 F.3d at 1297.

The Boards resist *Axson-Flynn* on the grounds that "the applicable standard of practice is an objective test, not a subjective one." Boards.Resp.50-51. But *Axson-Flynn* says there are no "individualized exemption[s]" where "statutes … contain express exceptions for *objectively defined categories of persons*." 256 F.3d at 1298 (emphasis added). Neither Board rule turns on such objective categories.

What's more, the Boards concede they have discretion about whether and how to discipline providers. Dkt.113 at 37; Pls.MSJ.41; Pls.Resp.35. Given the "subjective"

"individualized governmental assessment[s]" the Boards make at the outset, *Axson-Flynn*, 356 F.3d at 1297, no subsequent procedural requirements, *see* Boards.Resp.52, can cure the clear lack of general applicability.

*Chiles v. Salazar* does not disturb the general-applicability analysis. 116 F.4th 1178 (10th Cir. 2024), *cert. granted*, 2025 WL 746313 (U.S. Mar. 10, 2025) (No. 24-539). There, the law contained "*no* mechanism for the regulatory Boards to consider the particular reasons for a person's conduct." *Id.* at 1225 (cleaned up). This case is the opposite.

### 4. The ban is not neutral (Count III).

Ignoring the evidence that SB 23-190 is discriminatory, the Boards report that it "targets medical practice, not religious conduct." Boards.Resp.53. But what matters is that the "burden" of the law, "in practical terms, falls on [religious parties] but almost no others." *Lukumi,* 508 U.S. at 536; Pls.MSJ.41-43.

The legislative record confirms this. Dkt.113 at 38. To start, at least one legislator did "reference a specific religion, sect, or religious practice." *Contra* Boards.Resp.54. Representative McCormick repeatedly targeted "this particular faith"—both for offering counseling "riddled with guilt-inducing anti-abortion messages" and for "weaponizing their particular faith as justification for … deceptive advertising." Pls.Ex.46 at 54. Particularized and general disdain for religious providers infected the legislative and rulemaking record. Pls.MSJ.23-28, 43. Thus, even if a purely "secular meaning" were "discernible" from the text (though the Boards have identified

none), Boards.Resp.52 (quoting *Chiles*, 116 F.4th at 1222), the legislature's "cho[ice] to ban" a practice "that it knows is undertaken for religious reasons" defeats neutrality. Dkt.113 at 39.

The Boards tout provisions of the Medical and Nurse Practice Acts that "exclude religious *worship* from regulation." Boards.Resp.53 (emphasis added). Those carve-outs, which clarify that a person may "not be required to obtain a license" in order to practice "religious worship" or "Christian Science" or "pray[ ] for healing," Colo. Rev. Stat. §§12-240-107(3)(g)-(h), 12-255-127(1)(m), (2), are irrelevant to whether SB 23-190 "impermissibly target[s]" religious exercise. *Lukumi*, 508 U.S. at 535. It does.

The ban thus has no "plainly legitimate sweep" covering "healthcare" regulation writ large. *Contra* Boards.Resp.42 (citing *Moody v. NetChoice*, 603 U.S. 707, 723 (2024)). The only "sweep" is a bullseye on APR and those who talk about it—and the record shows that most (if not all) APR providers are religious. Pls.Resp.37-38. The "logical conclusion" of the Free Exercise Clause is not that religious providers "avoid regulation of virtually any medical practice," *contra* Boards.Resp.53-54, but that SB 23-190 fails *Lukumi*'s neutrality standard, and woefully so.

## B. The Eleventh Amendment does not bar Plaintiffs' claims against the Attorney General.

The AG declines to defend Section 3 on the merits, instead putting all his chips on the Eleventh Amendment. The Court previously rejected this argument, Dkt.113 at 28-31—a fact the AG ignores—and should do so again. Pls.Resp.40-43.

The AG says he "has no duty to enforce the Medical Practice Act or Nurse Practice Act." AG.Resp.24. But "Colorado law specifically *requires* the attorney general to bring charges referred to him by the Medical and Nursing Boards," Dkt.113 at 30; Colo. Rev. Stat. §12-240-125(4)(c)(V), (5)(d); *id.* §12-255-119(3)(c)(V), (4)(d), as the AG has repeatedly conceded, Dkt.177 at 34; Dkt.68 at 16.

According to the AG, this doesn't count because "he acts solely in the Department of Law's capacity as their counsel." AG.Resp.24. The AG does not cite, and Plaintiffs have not located, any authority supporting this attorney-client-relationship escape hatch. The AG's connection is direct: if the Boards refer unprofessional conduct charges, the AG "shall prosecute those charges." This specific duty more than satisfies the "particular duty" prong. Dkt.113 at 29-30; Pls.Resp.41-43.[8]

The AG further claims he is without "sufficient decision-making authority" to have a "duty to enforce … for purposes of *Ex parte Young*." AG.Resp.24-25. But "statutory duties and obligations" are sufficient to provide "some connection with the enforcement" of the statute irrespective of who "oversee[s]" the "prosecution." *Frank v. Lee*, 84 F.4th 1119, 1132-33 (10th Cir. 2023). And surely the AG—the state's "chief legal representative," Colo. Rev. Stat. §24-31-101(1)(a)—is not akin to a Motor Vehicle Division hearing officer responsible only for "interpreting policies" and lacking enforcement authority. *Cressman v. Thompson*, 719 F.3d 1139, 1146 (10th Cir. 2013).

---

[8]    These facts bear no resemblance to *Montgomery v. City of Ardmore*, 365 F.3d 926, 939-40 (10th Cir. 2004), which held that a plaintiff failed to *plead* a civil conspiracy claim where he "merely alleged many unlawful acts by various defendants."

That the Medical and Nurse Practice Acts do not appear in the (non-exclusive) list of statutes the AG "[m]ay independently initiate and bring … actions to enforce," Colo. Rev. Stat. §24-31-101(1)(i), is irrelevant. *Contra* AG.Resp.25. What matters is that the AG has "some" connection to enforcement of those statutes, *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)—which he does. This Court's decision in *Lawrence v. Garland* proves the point. There, the General Assembly had not "granted [the AG] the authority" to enforce the criminal law at issue. 2024 WL 3022906, at *3 (D. Colo. Jan. 17, 2024) (emphasis added). Here, both Acts command that the AG "shall prosecute" charges.

Finally, the AG suggests that he has not "demonstrated a willingness to *independently* enforce either practice act." AG.Resp.24 (emphasis added). That's not the rule. And the AG's willingness to exercise these prosecutorial duties is well-established. Pls.Resp.41.

### C. SB-190 violates the Free Speech Clause by discriminating based on content and viewpoint (Count IV).

The AG tries to muddy the waters by asserting that Plaintiffs bring only a facial challenge, AG.Resp.25-26—but Plaintiffs have always sought facial and as-applied relief, Am.Compl.70-72. They have argued at length that SB 23-190 is both "facially content-based" and viewpoint discriminatory as to *Bella's* speech. Pls.MSJ.44-47, 52; Pls.SOF. ¶¶6-11; Pls.Resp.47-49, 52-53. And the AG engaged in full discovery *about Bella*—so there is no need to "speculat[e]" on a "factually barebones record[]." *Wash.*

*State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Sections 1 and 2 are invalid both on their face and as applied.

Throughout this litigation, the AG has refused to take any position on the safety or efficacy of APR, Pls.Resp.40, or on the truth of Plaintiffs' advertisements, Pls.Resp.22, 48, 53; Dkt.51 at 73:3-9, 74:5-15, going so far as to argue that Plaintiffs' claims are not justiciable because *they* believe their statements are truthful, AG.MSJ.19, 23. At the eleventh hour, he invokes the General Assembly's purportedly "sufficient reasons," AG.Resp.30—████████████████████████████ ████████████████████████████—and tries to defend Sections 1 and 2 *solely* as "commercial speech" restrictions. That fails too.

***Not commercial speech.*** Commercial speech "relate[s] solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980). Bella's website affirms its commitment to "save mothers and babies through sound medical counseling and [APR]," and to "cover all costs associated with [APR], should finances be an issue." Pls.Ex.26 at 3. Consistent with its mission to "[m]ake people whole—body, mind and soul," Pls.Ex.5, Bella describes itself as a "comprehensive, life-affirming OB-GYN practice" that offers a "full continuum of care and comprehensive health care," Pls.Ex.3.

That's not speech that "does no more than propose a commercial transaction." *Harris v. Quinn*, 573 U.S. 616, 648 (2014). And using "deceptive trade practices" stat-

utes to target this speech, AG.Resp.26-28, does not *ipso facto* transform it into "commercial" speech, *contra* AG.Resp.30. Otherwise, the government "could perform an easy end-run around First Amendment scrutiny by passing a speech restriction in conjunction with a law that made one use of the regulated speech illegal." *Greater Philadelphia Chamber of Com. v. City of Philadelphia*, 949 F.3d 116, 142 (3d Cir. 2020). Nor does the fact that Bella sometimes receives compensation for APR suddenly render its speech commercial. *See Cardtoons v. MLB Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996) (parody trading cards "not transformed into commercial speech merely because they are sold for profit"); *cf. N.Y. Times v. Sullivan*, 376 U.S. 254, 266 (1964) (paid newspaper advertisement "d[id] not forfeit" full First Amendment protection).

The AG grudgingly concedes that Plaintiffs' APR advertisements "might be tangentially related" to "other First Amendment rights," but says those advertisements are still commercial speech. AG.Resp.28. The reverse is true. Even if some of Bella's speech targeted by SB 23-190 is commercial speech, it is "inextricably intertwined with otherwise fully protected speech," subjecting SB 23-190 to strict scrutiny. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 (1988).

The AG says "Plaintiffs have not established that SB 23-190 regulates more non-commercial speech than commercial speech." AG.Resp.27. But the record shows that the crisis pregnancy centers openly targeted by SB 23-190 "do not charge for services."

Amy G. Bryant, *Why Crisis Pregnancy Centers Are Legal but Unethical*, AMA J. Ethics (Mar. 2018), https://perma.cc/Z8QW-9FFR; *see also* Pls.Ex.43 at 3:24-4:6, 5:10-19. And "[a] morally and religiously motivated offering of free services cannot be described as a bare 'commercial transaction.'" *Greater Baltimore Ctr. for Pregnancy Concerns v. Mayor & City Council of Baltimore*, 879 F.3d 101, 108 (4th Cir. 2018). Thus, the vast majority of the speech regulated by SB 23-190 is *non*-commercial in nature—and the law's "unconstitutional applications are substantial compared to its constitutional ones," *NetChoice*, 603 U.S. at 718.

In any event, the AG barely tries—and fails—to satisfy the "heightened scrutiny" that applies to content- and viewpoint-based commercial-speech restrictions. *Sorrell v. IMS Health*, 564 U.S. 552, 565 (2011). To apply heightened scrutiny, courts first conduct a "threshold inquiry" about whether the speech "concerns lawful activity and is not misleading." *U.S. West v. FCC*, 182 F.3d 1224, 1233 (10th Cir. 1999) (applying *Central Hudson*). If that requirement is met, "the government may restrict the speech only if it proves: (1) it has a substantial state interest in regulating the speech; (2) the regulation directly and materially advances that interest, and (3) the regulation is no more extensive than necessary to serve the interest." *Id.* (cleaned up).

The AG *recites* that SB 23-190 "regulates only commercial speech that is misleading, false, or deceptive," AG.Resp.27, but that claim requires him to rewrite the statute. He must ignore that Section 1 specifically "prohibit[s]" as a "deceptive trade practice[]" speech "offering to provide … medication abortion reversal." §1(3)(b); *contra*

25

AG.Resp.27 ("could be a deceptive trade practice"). And though he pretends that Section 2 broadly "prohibits a person advertising services that they knowingly do not offer," AG.Resp.28, in reality it applies *only* to speakers who do *not* provide or refer for abortion or emergency contraceptives; it cannot be violated by speakers who *do* provide those services (but lie about providing other pregnancy-related services). §2(2); ██████████████████████. And while the AG parrots the word "misleading," AG.Resp.26-30, he takes no position on whether Bella's speech is deceptive. *Supra* p.23.[9]

The AG next attempts to sanitize the legislative history, claiming "the General Assembly had sufficient reasons" to enact SB 23-190. AG.Resp.30. That's directly at odds with the AG's own testimony, which repeatedly disclaimed any view about the stated interests for SB 23-190. *Supra* p.23. Because the AG—the only Defendant defending Sections 1 and 2—has failed to assert *any* interest, much less a "substantial" one, *U.S. West*, 182 F.3d at 1233, he cannot carry his burden under any legal standard.

**Content discrimination.** "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." *Reed v. Town of Gilbert*, 576 U.S. 155, 165-66 (2015). Sections 1 and 2 facially discriminate by singling out specific subject matter for differential treatment.

---

[9]   The AG makes no argument that Bella's speech concerns unlawful activity. For good reason. *See Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("I do not think [the state] could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.").

Pls.MSJ.44-45. And SB 23-190 was enacted out of disagreement with a specific message. Pls.MSJ.45-46.

The AG ignores all this. He does not deny that the legislative record is replete with animus toward pro-life religious providers. Pls.SOF ¶¶111-19. Instead, he claims that "legislative motive" is "immaterial" in free-speech cases. AG.Resp.32 (citing *Planned Parenthood v. Moser*, 747 F.3d 814, 839-43 (10th Cir. 2014), and *United States v. O'Brien*, 391 U.S. 367 (1968)). But *Moser* says only that courts don't "consider the motives of lawmakers" when a statute "imposes no burden on speech" in the first place. 747 F.3d at 840. In content- and viewpoint-discrimination cases where speech *is* burdened, an improper government motive can be "controlling." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying *O'Brien*). Thus, while "a content-based purpose … is not necessary," it is "sufficient." *Reed*, 576 U.S. at 165.

Nor can the AG justify SB 23-190's line-drawing by saying it merely "targets deceptive commercial speech." AG.Resp.31. Even within a category of "proscribable speech," "the First Amendment imposes … a 'content discrimination' limitation," barring regulation "based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386-87 (1992); *see* Dkt.99 at 34 (similar). The record here is rife with such hostility.

***Viewpoint discrimination.*** The AG opines that the "only viewpoint" implicated by SB 23-190 is that "deceptive commercial speech in the advertisement of medical services is problematic." AG.Resp.32. But SB 23-190 does not regulate all, and only,

"untrue or misleading" commercial speech about "pregnancy-related" medical ser-
vices. *Cf. First Resort v. Herrera*, 860 F.3d 1263, 1270-71 (9th Cir. 2017). Instead,
Section 1 singles out offering APR. §1(3)(b). This plainly discriminates against the
viewpoint that progesterone treatment can counteract the effects of mifepristone—
while providers remain free to advertise any other form of progesterone treatment,
or to claim that "expectant management" is safer or more effective than progesterone,
even without proof. *See* Pls.Ex.38 at 11-14; ███████████████████; Cohen
Tr.48:1-50:7, 127:13-129:9. Section 2 prohibits false advertising by speakers who do
not provide abortion or emergency contraceptives, leaving false advertising by speak-
ers who *do* provide and refer for abortions and emergency contraceptives untouched.

### D. SB 23-190 violates the First Amendment right to receive information (Count V).

Defendants continue to downgrade Section 1 as an "uncodified legislative declara-
tion." AG.Resp.15, 19, 33-34; Boards.Resp.57-58 ("restricts nothing"). But Section 1
"cannot be ignored entirely." Dkt.113 at 22. Colorado courts' "goal[]" when interpret-
ing the CCPA is to "give effect" to legislative "intent," *Crowe v. Tull*, 126 P.3d 196,
201 (Colo. 2006)—and a "legislative declaration" is "[o]ften the *best* guide to legisla-
tive intent," *Stamp v. Vail Corp.*, 172 P.3d 437, 443 (Colo. 2007) (emphasis added).
███████████████████████████████████████████
███████████████████████████. And Section 1 *can* be "applied to restrict the ac-
tivities" of Plaintiffs, Boards.Resp.58—and thus rob their patients of crucial infor-
mation—through the CCPA. *Contra Webster v. Reprod. Health Servs.*, 492 U.S. 490,

501, 505-06 (1989) (preamble "d[id] not by its terms regulate abortion" and "impose[d] no substantive restrictions").

The AG does not contest that Section 1 *can* be enforced through the CCPA, but says "Plaintiffs should wait … [to] fac[e] an enforcement action." AG.Resp.33-34, 34 n.10. Of course, any such rule would eviscerate pre-enforcement standing. Fortunately, the Supreme Court holds the opposite. *SBA List v. Driehaus*, 573 U.S. 149, 158 (2014).

### E. SB 23-190 violates the Fourteenth Amendment right of pregnant women not to be forced to undergo or continue an abortion (Counts VI-VII).

The Boards insist that SB 23-190 complies with the Fourteenth Amendment because it "do[es] not compel a patient to take misoprostol if they change their minds." Boards.Resp.58. That's wholly unresponsive. Depriving a woman of the ability to use a safe medication to counteract a mifepristone-induced miscarriage obviously undermines—not "reinforce[s]," *id.*—her choice to bear a child.

Defendants do not contest that, as "public entities" under the Reproductive Health Equity Act, they cannot "interfere with" a woman's "fundamental right" to continue her pregnancy in the regulation of "services[ ] or information" *or* "[d]eprive" her of the "right to act … during [her] pregnancy" based on "the potential, actual, or perceived impact on the pregnancy, the pregnancy's outcomes, or on the pregnant individual's health." Colo. Rev. Stat. §25-6-404(1). That's exactly what Colorado has done.[10]

---

[10]    The AG's sovereign immunity argument, AG.Resp.34-35, fails here too. *Supra* 21-22.

**F. SB 23-190 is void for vagueness (Count VIII).**

The AG insists that Section 2 is not vague—but after nearly two years of litigation and full discovery, he still "cannot" determine whether Plaintiffs' advertisements are deceptive without additional "context." AG.Resp.37. If the AG and his attorneys cannot answer that question, then surely the law does not provide people with "ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Jordan v. Pugh*, 425 F.3d 820, 824-25 (10th Cir. 2005).

The AG says his citations to *National Federation of the Blind of Arkansas v. Pryor*, 258 F.3d 851 (8th Cir. 2001), show the meaning of "indicates" in Section 2. AG.Resp.35. But *Pryor* rejected a vagueness challenge based on the Arkansas AG's "reasonable" and authoritative interpretation of the challenged statute. 258 F.3d at 857. Notably, that interpretation addressed both what "indicates" does and *does not* mean. Br. of Attorney General, *Pryor*, 2000 WL 35543844 (No. 00-2324). These disclaimers provided "relevant assurance" that the statute would not be arbitrarily enforced. *Pryor*, 258 F.3d at 857. The AG refuses to follow suit.

Citing *StreetMediaGroup v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023), the AG says Plaintiffs' "real[]" claim is discriminatory enforcement, which "is not a vagueness challenge." AG.Resp.36. Not so. *StreetMediaGroup* reiterated that a law is impermissibly vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." 79 F.4th at 1253. The signage statute at issue did not—because its accompanying rules "provide[d] limits on [its] enforcement." *Id.* at 1254.

Here, SB 23-190 itself—including its purpose to target "anti-abortion centers," §1(1)(c)-(e)—"authorize[s] [and] encourage[s] arbitrary and discriminatory enforcement." *StreetMediaGroup*, 79 F.4th at 1254. That risk is particularly acute given that legislative sponsors repeatedly took aim at the same terms that Bella routinely uses, Pls.SOF ¶¶10, 116-19, and that Colorado courts "avoid constructions that defeat the legislature's intent" in interpreting the CCPA, *Crowe*, 126 P.3d at 201.

### G. The government cannot carry its burden under strict scrutiny.

SB 23-190 fails both prongs of strict scrutiny's "demanding" standard. *Darren Patterson Christian Acad. v. Roy*, --- F. Supp. 3d ---, 2025 WL 700268, at *5 (D. Colo. Feb. 24, 2025); *see* Pls.Resp.53-57.

***No compelling interest.*** The Boards claim SB 23-190 furthers Colorado's interest in "preventing licensees from improperly imposing ineffective or unsafe treatments on its citizens." Boards.Resp.56. But they still have not established that APR is either ineffective or unsafe. *Supra* pp.13-17. That is, they have not shown an "'actual problem' in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). They can't even convince the AG.

Regardless, the Boards' "'broadly formulated interests' do not suffice." *Darren Patterson*, 2025 WL 700268, at *6. "Defendants must do more than profess a 'compelling interest'"— "they must demonstrate *why* they have a compelling interest in 'denying an exception' to Plaintiff." *Id.* (emphasis added). Yet the Boards offer no valid explanation for granting exemptions for comparable secular activity, *supra* pp.13-17, or for

reserving mechanisms for additional discretionary exemptions, *supra* 17-19, while denying Plaintiffs a religious exemption. Nor can the Boards explain why they have not generally banned ineffective treatments if such an interest exists.

***Not narrowly tailored.*** The Boards assert that SB 23-190's statutory "prohibition … specific to … medication abortion" and the rules' "precise and readily navigable boundaries around [APR]" evidence its narrow tailoring. Boards.Resp.56-57. Just the opposite. SB 23-190's "underinclusiv[ity]" demonstrates the "absence of narrow tailoring." *Lukumi*, 508 U.S. at 546. Colorado does not ban any other use of progesterone (including those its expert rejects as unsupported) and advocates the controversial use of progesterone as a cross-sex hormone (including for minors), *supra* pp.15-16—belying the Boards' broad assertion that their rules "ensure that medical professionals only provide treatment that comports with current medically accepted standards of care," Boards.Resp.57. The Boards' "deficient, largely non-existent less-restrictive-means analysis [further] bespeaks and emphasizes" that SB 23-190 is "not narrowly tailored." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1256 (10th Cir. 2021). That too "suffices to establish [SB 23-190's] invalidity." *Lukumi*, 508 U.S. at 546.

## II. Plaintiffs easily satisfy the remaining injunctive-relief factors.

The Boards do not contest the remaining injunctive-relief factors, and the AG challenges only one: public interest. AG.Resp.37.

As before, the public interest favors Plaintiffs because their claims "implicate[]
matters of life and death." Dkt.113 at 42. The AG ignores this ruling, which has only
grown more correct. Because of the injunction, Plaintiffs' APR patients have given
birth to 11 babies (and counting) since this case began. Pls.SOF ¶136. Withdrawing
that protection subverts the public interest.

The AG's on-again-off-again interest in protecting Coloradans from deception
through Section 2 fares no better. Plaintiffs seek not a "prophylactic license,"
AG.Resp.39—just to continue using the same phrasing protected by this Court's pre-
liminary injunction. Dkt.113 at 40-41, 44-45. Making that injunction permanent por-
tends no harm to the AG's "statutory duty to enforce the CCPA." AG.Resp.38.[11] And
it certainly wouldn't "leave [him] powerless," AG.Resp.39, ██████████████████
███████████████████████████████████████████████████████████
██████████████

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for Plain-
tiffs on all claims and order the declaratory and injunctive relief set forth in the First
Amended Complaint.

---

[11]  *Western Food* stands for the unremarkable (and inapplicable) proposition that an "injunction is
normally sought in a trial court" and rarely issued directly by the Colorado Supreme Court. *W. Food
Plan v. Dist. Ct.*, 598 P.2d 1038, 1040 (Colo. 1979).

Dated: March 21, 2025                    Respectfully submitted,

<u>/s/ Mark L. Rienzi</u>

Mark L. Rienzi
Rebekah P. Ricketts
Laura W. Slavis
Michael J. O'Brien
Colten L. Stanberry
Amanda L. Salz
Amy Ren
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave, N.W.
Suite 400
Washington, D.C. 20006
(202) 955-0095
mrienzi@becketfund.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2025, I electronically filed the foregoing Response to Defendants' Motions for Summary Judgment with the Clerk of Court via CM/ECF, which will provide electronic copies to counsel of record.

/s/ Mark L. Rienzi
Mark L. Rienzi

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 7,284 words. I further certify that this brief and the brief filed by Plaintiff-Intervenor do not exceed a combined 10,000 words. Dkt.175. As to all other matters, I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

/s/ Mark L. Rienzi
Mark L. Rienzi