IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico

Civil Action No. 1:23-cv-00939-DDD-SKC

BELLA HEALTH AND WELLNESS et al.,

     Plaintiffs,

v.

PHIL WEISER et al.,

     Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Motivated by what everyone in this case acknowledges is sincere religious belief, Plaintiffs provide medical services to pregnant women through what they consider "crisis pregnancy centers." The Colorado legislature, however, passed a bill in April 2023 targeting what it calls "anti-abortion centers," including Plaintiffs'. *See* Dkt. 94 ¶ 153; SB 23-190. It is not disputed that by effectively prohibiting them from using a particular treatment for pregnant women, this law burdened Plaintiffs' sincerely held religious beliefs and required the Defendants to satisfy the demands of strict scrutiny. Because they could not do so, Plaintiffs' motion for a preliminary injunction was granted in October 2023.

The parties have now completed discovery and submitted cross-motions for summary judgment. The evidence they have produced largely confirms that provided at the preliminary injunction stage: while the clinical efficacy of abortion pill reversal remains debatable, nobody has been injured by the treatment and a number of women have successfully given birth after receiving it. The Defendants have thus failed to show

that they have a compelling interest in regulating this practice, and Plaintiffs' motion must therefore be granted to the extent it seeks a permanent injunction allowing them to continue offering the treatment. But because any threat of prosecution for their advertising practices has dissipated, Defendants' motion is granted on that matter.

## INTRODUCTION

Titled "Deceptive Trade Practice Pregnancy-related Service," the bill known generally as SB 23-190 contained three sections primarily aimed at preventing the provision of a service intended to reverse the effects of a partially-completed medication abortion.

The first section, titled, "Legislative declaration," recites a number of findings and declarations made by the general assembly. These include that:

- "Anti-abortion centers are the ground-level presence of a well-coordinated anti-choice movement"; and
- "Some anti-abortion centers go so far as to advertise medication abortion reversal, a dangerous and deceptive practice that is not supported by science or clinical standards, according to the American College of Obstetricians and Gynecologists, or by the United States food and drug administration."

SB 23-190 § 1(1)(d), (f). Section One is not codified in Colorado Revised Statutes.

Section Two of SB 23-190 modified Colorado's Consumer Protection Act to add a new definition of a "deceptive trade practice":

A person engages in a deceptive trade practice when the person makes or disseminates to the public or causes to be made or disseminated to the public any advertisement that indicates that the person provides abortions or emergency contraceptives, or referrals for abortions or emergency contraceptives, when the person knows or reasonably should have known, at the time of publication or dissemination to

> the public of the advertisement, that the person does not
> provide those specific services.

*Id.* § 2(2) (codified at Colo. Rev. Stat. § 6-1-734(2)). The Attorney General and district attorneys for the State's judicial districts are concurrently responsible for the enforcement of the Colorado Consumer Protection Act, including as amended by SB 23-190.

Section Three provided a new definition of "unprofessional conduct" under the State's medical-licensing laws. Section Three reads:

> A licensee, registrant, or certificant engages in unprofessional conduct or is subject to discipline pursuant to this title 12 if the licensee, registrant, or certificant provides, prescribes, administers, or attempts medication abortion reversal in this state, unless the Colorado medical board created in section 12-240-105(1), the state board of pharmacy created in section 12-280-104(1), and the state board of nursing created in section 12-255-105(1), in consultation with each other, each have in effect rules finding that it is a generally accepted standard of practice to engage in medication abortion reversal.

*Id.* § 3(2)(a) (codified at Colo. Rev. Stat. § 12-30-120(2)(a)). "Medication abortion reversal" is defined as "administering, dispensing, distributing, or delivering a drug with the intent to interfere with, reverse, or halt a medication abortion." *Id.* § 3(1)(c) (codified at Colo. Rev. Stat. § 12-30-120(1)(c)). And a "medication abortion" is defined as an "abortion conducted solely through the use of one or more prescription drugs." *Id.* § 3(1)(b) (codified at Colo. Rev. Stat. § 12-30-120(1)(b)).

## BACKGROUND

The same day that the governor signed SB 23-190 into law, the Plaintiffs filed this suit, along with an emergency motion seeking a temporary restraining order enjoining enforcement of the new law. Dkt. 1; 7. I granted the Plaintiffs' motion for a temporary restraining order in part, and restrained the Defendants from enforcing the bill against the

Plaintiffs pending a hearing at which the propriety of issuing a preliminary injunction could be determined. Dkt. 8.

A preliminary-injunction hearing was held on April 24, 2023. Dkt. 46. At that hearing, the Defendants represented that they would not enforce the new law at least until the rulemaking contemplated by the bill was completed. Given that representation, I found that injunctive relief was not necessary at that time, and I dissolved the temporary restraining order and denied the Plaintiffs' request for a preliminary injunction, but noted that the Plaintiffs could bring a new motion should the circumstances change. Dkt. 48.

The boards subsequently completed the rulemaking process contemplated by SB 23-190. The Medical Board's final rule states that:

> [T]he Board does not consider administering, dispensing, distributing, or delivering progesterone with the intent to interfere with, reverse, or halt a medication abortion undertaken through the use of mifepristone and/or misoprostol to meet generally accepted standards of medical practice . . . . For other conduct that could meet the definition of medication abortion reversal, the Board will investigate such deviation on a case-by-case basis.

Dkt. 78. The State's Pharmacy Board and the Nursing Board's final rules state that they "evaluate[] generally accepted standards of . . . practice on a case-by-case basis," and that they "will not treat medication abortion reversal . . . as a *per se* act" of unprofessional conduct and will "investigate all complaints related to medication abortion reversal in the same manner that [they] investigate[] other alleged deviations from generally accepted standards of . . . practice." Dkt. 94-24; 94-26. Thus, medication abortion reversal is considered unprofessional conduct under the provisions of SB 23-190 because none of the three boards has in effect a rule finding that it is a generally accepted standard of practice. *See* Colo. Rev. Stat. § 12-30-120(2)(a).

On October 21, 2023, I granted Plaintiffs' renewed request for a preliminary injunction and enjoined the named defendants from enforcing SB 23-190 against them. I based this decision on the fact that Defendants did not substantively contest the injunction with respect to Section Two and the conclusion that Plaintiffs' constitutional right to freely exercise their religion was likely abridged by Section Three.

Since then, the parties have engaged in discovery and cross-filed motions for summary judgment on all pending claims. The facts elicited in discovery are consistent with those submitted at the preliminary-injunction stage.

The evidence shows that Plaintiff Bella Health and Wellness is an independent, faith-based Catholic medical center offering "life-affirming, dignified health care" to women, men, and children. Dkt. 94 ¶ 30. Bella Health currently operates medical centers in Englewood and Denver, Colorado. *Id.* Prior to and during the early stages of this lawsuit, Bella operated another medical center in Lafayette that has since closed. *Id.*

Plaintiff Denise Chism is the co-founder and chief executive officer of Bella Health. She has worked as a nurse practitioner specializing in high-risk pregnancies for over twenty-eight years. *Id.* ¶ 31. Plaintiff Abby Sinnett also co-founded Bella Health and acts as its chief operating officer. *Id.* ¶ 32. She too is a nurse practitioner and specializes in labor and delivery. *Id.* Plaintiff Kathleen Sander is a medical doctor board-certified in obstetrics and gynecology and has worked at Bella Health for the past five years. *Id.* ¶ 33. Ms. Chism and Ms. Sinnett co-founded Bella Health's predecessor in 2014. Dkt. 94 ¶ 43. Today, Bella Health has twenty-four providers and over 28,000 registered patients. Dkt. 180 ¶ 4.

Bella Health's articles of incorporation list several stated purposes for the organization, including to provide "spiritual, emotional, educational, charitable, and financial support of human dignity" in accordance with Catholic teachings, "to promote and protect life from natural conception to natural death," and "to deliver, and support the delivery of, charitable health services consistent with the teachings of the Catholic Church." Dkt. 94 ¶ 50. Bella's patients and employees must sign forms acknowledging Bella's commitment to "life-affirming health care" and Bella's refusal to provide "contraception, sterilizations, or abortions." *Id.* ¶ 55.

Bella Health regularly prescribes progesterone to pregnant women, including those with prior miscarriage, first-trimester bleeding, prior preterm labor or delivery, and infertility. *Id.* ¶ 106. And pursuant to its religious commitment to "life-affirming" health care, Bella Health provides abortion pill reversal with progesterone. *Id.* ¶ 109. Indeed, Bella Health views offering abortion pill reversal as a "religious obligation." *Id.* Bella Health has treated several women in this way, including during the pendency of this lawsuit. *Id.* ¶¶ 115-17.

Bella Health also advertises these services. On its website, Bella Health describes itself as a "comprehensive, life-affirming OB-GYN practice" and describes itself as providing a "full continuum of care." Dkt. 94 ¶ 123. Bella Health does not expressly advertise that it does not offer abortion services but appears not to expressly advertise that it does, either. Bella Health does, however, expressly advertise abortion pill reversal on its website and in its social-media postings. *See id.* ¶¶ 125-31.

An additional Plaintiff, Chelsea Mynyk, has since intervened in this case. *See, e.g.*, Dkt. 140. She shares similar religious beliefs to her co-Plaintiffs, and it is undisputed that she "considers it a religious

obligation to provide treatment for pregnant mothers and to protect un-
born life if the mother seeks to stop or reverse abortion." *Compare* Dkt.
179 ¶ 9 *with* Dkt. 196 at 20 ¶ 11 ("Admitted."). It is also undisputed that
"[r]efusing to administer supplemental progesterone to a woman who is
medically eligible for the procedure and who desires to continue her
pregnancy would violate her deeply held religious beliefs," *compare id.*
¶ 10 *with* Dkt. 196 at 20 ¶ 10 ("Admitted."), and that she is "religiously
obligated to offer APR so long as she has the means and ability to do so."
*Compare* Dkt. 179 ¶ 11 *with* Dkt. 196 at 20 ¶ 11 ("Admitted.").

Since the preliminary injunction was entered, the parties have en-
gaged in discovery. The evidence they've adduced has largely reinforced
what was already produced, and the efficacy of medication abortion re-
versal (sometimes referred to as "MAR" or "abortion pill reversal") re-
mains hotly contested by the parties and their experts. *Compare, e.g.*,
Dkt. 179 ¶ 26–30 ("Supplemental progesterone works to reverse the ef-
fects of mifepristone by flooding the woman's body with supplemental
progesterone to outcompete the mifepristone for the progesterone recep-
tors.") *with* Dkt. 196 at 21–22 ¶¶ 26–30 ("Supplemental progesterone
does not outcompete mifepristone, and no competent research supports
Progesterone Intervention as effective."). The parties dispute whether
the practice is safe for mother and fetus, whether there is sufficient clin-
ical data to support its effectiveness, and whether it presents peculiar
risks relative to other off-label uses of progesterone. They remain in
agreement, however, about some of the basic factual predicates which
lie behind these disputes.

The current medication abortion regimen consists of two drugs. Dkt.
178 ¶ 20. The first drug, mifepristone, is a progesterone antagonist,
which means that it binds to the same intracellular receptors as proges-
terone. *Id.* ¶ 24. In so doing, mifepristone interferes with a woman's

absorption of progesterone and, in turn, can block oxygen and nutrition to the developing embryo and eventually result in detachment of the embryo from the uterine lining. *Id*. ¶ 27. Mifepristone's ability to cause a complete abortion without ingesting the second drug in the abortion-pill regimen varies with gestational age. *Id*. ¶ 28. The second drug in the abortion-pill regimen is called misoprostol. *Id*. ¶ 29. This drug completes the medication abortion regimen by binding to smooth muscle cells in the uterine lining, causing contractions that mechanically expel the embryo from a woman's uterus. *Id*.

The FDA risk evaluation and mitigation strategy requires both the patient and provider to sign a patient agreement form indicating the patient agrees to complete the regimen once starting it. *Id*. ¶ 23. But when a woman decides not to complete the medication abortion regimen by refraining from ingesting misoprostol, the current standard of care is that the patient and her provider engage in watchful waiting to determine whether the mifepristone terminated the pregnancy. *Id*. ¶ 30.

Plaintiffs contend, however, that for women who elect not to take misoprostol, ingestion of supplemental progesterone may actually reverse the effects of mifepristone by outcompeting it at progesterone receptor sites, thereby increasing the likelihood that the mother is able to carry her embryo to term. *See, e.g.*, Dkt 180 ¶ 44 ("Mifepristone's binding to the receptor is neither complete nor permanent."), ¶ 45 ("When mifepristone releases from the receptor, it is possible for progesterone to attach to the receptor."), and ¶ 48 ("Mifepristone's metabolites bind to the receptor less strongly than progesterone does."). While the board defendants refer to the effectiveness of supplemental progesterone in this context as a mere "hypothesis," Dkt. 178 ¶ 32, critique the few studies that have been conducted to test the efficacy of this intervention,[1] *id*. at ¶¶

---

[1]    I note that at least one of these studies was paused due to the fact

41–52, and emphasize that "[n]o nationally recognized secular medical organization has declared that Progesterone Intervention meets generally accepted standards of medical care," *Id.* at ¶ 52, Plaintiffs contend that its efficacy has been proven by the fact that 11 babies have been born since the filing of this case after their mothers received the medication abortion reversal treatment.[2] Dkt. 180 ¶ 136; *see also id.* at 137 ("Multiple patients who received abortion pill reversal treatment at Bella are maintaining healthy pregnancies and are expected to give birth later this year."). Plaintiffs also point to the potential effectiveness of other off-label uses of supplemental progesterone—such as to prevent spontaneous miscarriage or pre-term birth—to support their view that it might help resuscitate a pregnancy after the ingestion of mifepristone. *See, e.g.*, Dkt. 178 ¶ 57; Dkt. 180 ¶¶ 19–20.

Bella Health's Progesterone Guide, which it provides to guide providers when administering medication abortion reversal, acknowledges that "there has been conflicting data regarding progesterone supplementation for miscarriage and preterm delivery prevention." Dkt. 178 ¶¶ 72, 73. Bella Health also asks some of their patients to sign an informed consent form specific to progesterone intervention before undergoing treatment. *Id.* ¶ 70; Dkt. 198-3 at 138:11–15 ("So, ideally, we do a written consent, but not always. You know, our consent form is a tool to aid in educating and offering that information, but it's not always used, but

---

that several participants began to experience internal hemorrhaging. Dkt. 178 ¶ 50. The data is not clear, however, whether this was the result of the mere failure to finish the regimen or the supplemental use of progesterone. Dkt. 180 ¶¶ 71, 75. These sort of risks and the dangers they pose to both mother and fetus demonstrate some of the inherent ethical difficulties in achieving clinical certainty through a placebo-controlled, double-blind study in this area.

[2]    Plaintiff Sander does, however, concede that "there's not a way to determine for sure" whether supplemental progesterone caused a pregnancy to continue after exposure to mifepristone. Dkt. 178 ¶ 87.

the information is still always conveyed.").

Beyond its use for abortion pill reversal, progesterone can be prescribed for multiple indications in obstetrics and gynecology. Dkt. 196 at 4 ¶ 18. Researchers have estimated that providers use progesterone in 5–12% of all pregnancies. Dkt. 180 ¶ 21. Of these uses, treatment of endometrial hyperplasia and secondary amenorrhea are the only ones that are not considered "off-label." Dkt. 180 ¶ 28. One common off-label use of progesterone is treatment of luteal phase deficiency, also known as luteal phase defect, a condition characterized by inadequate endometrial maturation during the luteal phase of the menstrual cycle. Dkt. 180 ¶ 19. Progesterone is also routinely used off-label during assisted reproductive technology cycles, during in vitro fertilization, and in frozen embryo transfer treatments, where it supports endometrial function and helps prevent miscarriage. *Id.* ¶ 20. The State of Colorado promotes off-label use of progesterone in the context of gender-affirming care as well. Dkt. 182-40. There is substantial scientific debate on how effective progesterone treatment is for at least some of these off-label uses. *See, e.g.*, Dkt. 113 at 4.

With respect to Section Two of SB 23-190, which prohibits misleading advertising implying that the provider gives abortions or emergency contraceptives when it does not, the relevant facts, legislative history, and roles played in enforcement by the parties are discussed in my prior order granting Plaintiffs' motion for a preliminary injunction. *See* Dkt. 113 at 7–12. I note here only that the Attorney General has still not investigated Plaintiffs for any violation of this section, "has no plans to open any such investigation, and has no anticipated CCPA enforcement action." Dkt. 177 at 3; *see also id.* ¶ 29 ("Plaintiffs do not try to mislead their patients about anything."). He has also averred that "[b]efore and since the passage of SB 23-190, the Attorney General has not

investigated anyone for violating the CCPA based on their advertising," *id*. ¶ 46, and that he "has no plans to investigate anyone under the CCPA based on their advertising, providing, or offering [medication abortion reversal]." *Id*. ¶ 47; *see also id.* ¶ 51 ("The Attorney General has no plans to investigate anyone, including Plaintiffs, under the CCPA based on their advertising abortion, emergency contraceptives, or referrals for abortion or emergency contraceptives."). The Attorney General has discretion to decide whether and how to pursue a particular action under the CCPA. Dkt. 180 ¶ 104.

Because this discovery has largely confirmed the information that was submitted at the preliminary injunction stage, I conclude that Defendants must be permanently enjoined from initiating disciplinary action against Plaintiffs for the provision of abortion pill reversal treatment. Because the intervening time has convinced me that Plaintiffs no longer have standing to challenge Section Two, however, the preliminary injunction respecting Plaintiffs' advertising practices is dissolved, and their motion for a permanent injunction permitting them to advertise their services using certain words is denied.

## LEGAL STANDARD

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id*. If a reasonable juror could not return a verdict for the nonmoving party, summary judgment

is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477
U.S. 317, 323 (1986).

In deciding whether the moving party has carried its burden, courts
do not weigh the evidence, and instead must view it and draw all rea-
sonable inferences from it in the light most favorable to the nonmoving
party. *Adamson*, 514 F.3d at 1145. But a nonmovant's unsupported con-
clusory allegations or mere traces of evidence are not sufficient to
demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*,
654 F. Supp. 2d 1284, 1291 (D. Colo. 2009); *Scott*, 550 U.S. at 380 ("The
mere existence of some alleged factual dispute between the parties will
not defeat an otherwise properly supported motion for summary judg-
ment; the requirement is that there be no genuine issue of material
fact."). And "[i]f a party fails to properly support an assertion of fact or
fails to properly address another party's assertion of fact . . . the court
may . . . consider the fact undisputed for purposes of the motion." Fed.
R. Civ. P. 56(e)(2).

## DISCUSSION

At the outset it is worth noting that the parties sometimes frame the
relief in this case as seeking an injunction against SB 23-290 itself, or
sections thereof. *See, e.g.*, Dkt. 180 at 9 ("This Court enjoined Senate Bill
23-190 and its implementing rules back in October 2023[.]"). But to be
clear, my authority is limited to adjudicating disputes between the par-
ties before me, and I have no freestanding power to enjoin laws beyond
my power to enjoin parties responsible for enforcing them. *See Trump v.
CASA, Inc.*, No. 24A884–6, 2025 WL 1773631, at *7 (2025) (holding that
injunctive relief must be limited to the parties). I therefore emphasize
that any injunction in this case covers enforcement actions against the

Plaintiffs, not the law itself.[3] I also emphasize that while I often refer to "Section Three" for ease of reference, what I am really addressing is the application of Section Three (which is expressly contingent on Medical, Pharmacy, and Nursing Board rulemaking) through the Boards' rules and the Defendants' enforcement powers.

## I.   Section Three of SB 23-1903

As explained above, discovery has only further corroborated the information available earlier in this case and strengthened Plaintiffs' argument that application of Section Three to prohibit them from using an otherwise-approved medication to try to reverse medication abortions violates their constitutional right to freely practice their religion. Defendants[4] are therefore permanently enjoined from taking action against the Plaintiffs in this case for doing so.

### A. Free Exercise Claim

As Defendants note, it is still the case that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Emp't Div., Dept. of Hum. Res. v. Smith*, 494 U.S. 872, 878–82 (1990). Where, however, a law "invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," the Supreme Court has more recently clarified that it is not generally applicable and strict scrutiny applies.

---

[3]   Though Plaintiffs are right, as a general matter, that the legislative declaration in Section One is relevant to understanding the scope and purpose of SB 23-190, I agree with Defendants that because it does not contain any enforcement mechanism, it does not provide for any action that could actually be enjoined by court order.

[4]   Though the Attorney General raises Eleventh Amendment immunity arguments that I address below, I do not distinguish between the named Defendants for the time being, and refer to them collectively either as "the Board" or, simply, "Defendants."

*Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021) (internal quotation marks omitted). Strict scrutiny also applies where a law prohibits conduct that substantially burdens religious activity but permits secular activity that undermines its asserted interests in comparable ways. *See Tandon v. Newsom*, 593 U.S. 61, 62 (2021) ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.").

The parties do not dispute that Plaintiffs' religious beliefs are sincerely held or that they are substantially burdened by application of Section Three and the Boards' rules. *Compare, e.g.*, Dkt 180 ¶ 79 ("Bella and its providers have a religious obligation to offer abortion pill reversal as long as they have the means and ability to do so.") *with* Dkt. 196 at 10 ¶ 79 ("Admitted."). And it is not within the province of this Court to second-guess the truth of Bella Health's religious callings or suggest alternative means of satisfying them. *See Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.¸* 450 U.S. 707, 716 (1981) ("Courts are not arbiters of scriptural interpretation."). The only question, therefore, is whether this section's prohibition against medication abortion reversal is generally applicable to other non-religious uses of progesterone. It is not.

A glance at SB 23-190 shows that it is not generally applicable. It targets one particular, FDA-approved, drug for differential regulation. Even as to that drug, it permits any off-label uses—except the one that is a necessary part of what Defendants concede is Plaintiffs' religious calling. This is not neutral or generally applicable.

Beyond this, the discriminatory effect of Section Three on Plaintiffs' religion is primarily evinced by Colorado's treatment of other off-label uses of progesterone that pose similar risks to medication abortion reversal. Off-label use of progesterone to treat luteal phase deficiency,

- 14 -

for example, is not regulated by law in Colorado. But similar efficacy concerns exist with respect to that use of progesterone as exist with respect to the use at issue here, despite the Board's conclusory assertion that "research supports other progesterone interventions." Dkt. 178 at 32; *see also* Dkt. 113 at 35 ("Similar scientific uncertainty (even if arguably not to the same exact *degree*) remains as to some of those other uses, even according to Defendants."). The Board's own expert, Dr. Camile Cohen, opined that "luteal phase support has not been shown to be beneficial in all methods of assisted reproduction." Dkt. 182-23 at 2. Dr. Cohen similarly opined that use of progesterone to treat premenstrual syndrome is "clinically ineffective," Dkt. 182-10 at 2, and that its effectiveness in treating threatened miscarriage is questionable because "one study did not find any statistically significant increase in live births in patients" with this condition. Dkt. 99-1 at 8. Yet use of progesterone to treat luteal phase deficiency, premenstrual syndrome, and threatened miscarriage are not currently considered outside the generally accepted standards of medical practice in Colorado.

The Board argues that these other uses of progesterone are not comparable because medication abortion reversal is "unique among progesterone treatments," as it "is the only one in which progesterone is used in conjunction with a progesterone antagonist." Dkt. 178 at 3. Even if so, Defendants have not pointed to any compelling evidence that this difference actually sets medication abortion reversal apart from other off-label uses of progesterone. And though this might theoretically be important if it were true that the presence of a progesterone antagonist posed significant medical risks not present in uses of progesterone involving no antagonist, Plaintiffs' expert Monique Wubbenhorst has shown that use of "higher doses of a receptor agonist to counteract the effects of a receptor antagonist is not a new idea." Dkt. 200-7 at 4. In fact, similar agonist-antagonist pairings are frequently used in

"treatment of carbon monoxide poisoning," to name one example. *See id.*
at 3–9 (outlining several common uses of agonist-antagonist pairings not
subject to laws like Section Three). The record is thus not consistent
with the conclusion that comparable secular activities are limited in the
way that Defendants suggest.[5]

It is also worth noting that Colorado supports the use of progesterone
in the context of gender-affirming care. While the Board argues that it
is not "the Division of Insurance or the University of Colorado School of
Medicine," and that "the positions of those entities are irrelevant
hearsay unattributable to the Board," Dkt. 196 at 46, that misses the
point. Whichever arm of the state promotes the use of progesterone in
that circumstance, the point is that the Defendants do not *prohibit* its
use as they do Plaintiffs', even though there is also significant concern
about the safety and efficacy of using supplemental hormones in that
context. *See generally U. S. v. Skrmetti*, 145 S.Ct. 1816 (2025). Whether
one position or the other is correct on that question, Plaintiffs are right
that Colorado's "under-inclusivity of regulation in a closely related
context further undermines the State's asserted interest in protecting
patients from treatments or protocols with uncertain efficacy or safety."
Dkt. 113 at 35.

The Boards' application of Section Three also permits individual ex-
emptions in a way that undermines the purported neutrality of the

---

[5]  Defendants' argument that the universe of comparable activities
only includes those where a receptor antagonist has been administered
prior to progesterone also runs afoul of Justice Gorsuch's admonition
against engineering the conclusion that there is no comparable secular
activity "by adjusting the dials *just right* [and] fine-tuning the level of
generality up or down for each case based solely on the identity of the
parties and the substance of their views." *Masterpiece Cakeshop, Ltd. v.
Colo. Civil Rights Comm'n*, 584 U.S. 617, 652 (2018) (Gorsuch, J., con-
curring). A law discriminating against religion could always escape
strict scrutiny if such "results-driven reasoning" were proper. *Id.*

provision. Most obviously, the Medical and Nursing Board rules state that generally accepted standards of medical and nursing practice are evaluated on a "case-by-case basis," Dkt. 182-53 at 7, Dkt. 182-54 at 2, even though at least the Medical Board rule flatly states that medication abortion reversal using progesterone does not "meet generally accepted standards of medical practice." Dkt. 182-53 at 7.

Additionally, if the Medical or Nursing Board finds that generally accepted standards of practice have been violated, they retain "the discretion as to how and what discipline and if they will discipline." Dkt. 182-30 at 43:16–20; *see also id.* at 36:9–14. This is precisely the kind of "subjective test" that the Tenth Circuit has explained triggers heightened scrutiny under *Fulton. See Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004) (holding that a law contains individualized exemptions when it contains "systems that are designed to make case-by-case determinations"); *Fulton*, 593 U.S. 522 ("A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions."). Case-by-case determinations like those involved here invite government officials to "consider the particular reasons for a person's conduct." *Fulton*, 593 U.S. at 533. Such determinations, under binding Tenth Circuit and Supreme Court precedent, are not generally applicable.

Overall, it is impossible to avoid the conclusion that Plaintiffs' use of progesterone is not being regulated neutrally—it is being singled out. Defendants' application of Section Three of SB 23-190 must therefore satisfy strict scrutiny. *Fulton*, 593 U.S. at 541. "[H]istorically, strict scrutiny requires the State to further 'interests of the highest order' by means 'narrowly tailored in pursuit of those interests.'" *Id.* (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546

(1993)). Defendants have not carried their burden to show that its stated interests can survive this exacting inspection.

To begin, Defendants' asserted interests remain overly broad. Dkt. 113 at 40 ("The State's interest in regulating the medical profession, generally, are too broadly formulated."); *see also Fulton*, 593 U.S. at 541 ("The City states these objectives at a high level of generality, but the First Amendment demands a more precise analysis."). Though it may be true that States "have a compelling interest in the practice of professions within their boundaries," and in protecting "the people of this state from unauthorized, unqualified, and improper application of services," Dkt. 196 at 55–56, those broadly formulated interests do not suffice where, as here, religious practice has been singled out for differential treatment. And while I would generally have no trouble giving the state "wide discretion to pass legislation in areas where there is medical and scientific uncertainty," *Skrmetti*, 145 S.Ct. at 1836, such deference is not appropriate where strict scrutiny is required. *Cf. GenBioPro, Inc. v. Raynes*, No. 23-2194, 2025 WL 1932936, at *1 (4th Cir. Jul. 15, 2025) (upholding West Virginia law prohibiting medication abortion in context not necessitating strict scrutiny). The fact that Plaintiffs' religiously compelled practice has been targeted in this case demands a more searching scrutiny.

Section Three is also "not drawn in narrow terms to accomplish" the interests proffered by Defendants. *Lukumi*, 508 U.S. at 546 ("A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will only survive strict scrutiny in rare cases."). Most obviously, even accepting Defendants' rationale that it is necessary to prohibit medical practices that potentially pose safety and efficacy risks, Section Three is vastly underinclusive. Though the Board's own expert, Dr.

Camile Cohen, explained that use of progesterone to treat luteal phase deficiency, for example, "has not been shown to be beneficial in all methods of assisted reproduction," it remains unregulated by Defendants. Dkt. 182-23 at 2. The same is true of supplemental progesterone treatment for premenstrual syndrome and threatened miscarriage, both of which present similar efficacy concerns as abortion pill reversal but are not addressed in Section Three. *See supra* at 14; *see also Lukumi*, 508 U.S. 546 (finding "ordinances are overbroad or underinclusive in substantial respects" because the "proffered objectives are not pursued with respect to analogous non-religious conduct").

To the extent that Defendants claim a compelling interest in regulating agonist-antagonist pairings, Section Three is also underinclusive: though carbon-monoxide treatment and breast cancer therapy both involve such pairings, they have not been deemed to fall outside currently accepted standards of medical practice. Dkt. 200-7 at 4–7. And to the extent that Defendants claim an interest in preventing harm to unborn children and minors, the lack of regulation of progesterone in gender-affirming care demonstrates that this rationale only applies to religiously motivated conduct. In this situation, "there can be no serious claim that those interests justify" Section Three. *Lukumi*, 508 U.S. at 547 (governmental interest not compelling when "it leaves appreciable damage to that supposedly vital interest unprohibited").

Nor can the Defendants show that the purported goals of Section Three could not be accomplished through less restrictive means. To the extent Section Three was intended to prevent patients from undergoing treatments without full knowledge of safety or efficacy concerns, why would that interest not be equally served by an "informed consent law to ensure that women seeking APR are adequately informed of its risks and benefits"? Dkt. 179 at 22. Defendants have not suggested that they

considered any less restrictive alternatives before enacting Section Three. *See McCullen v. Oakley*, 573 U.S. 464, 494 (law not narrowly tailored where defendant has "not shown that it seriously undertook to address the problem with less intrusive tools readily available to it").

For all of these reasons, Defendants have not carried their burden to show that Section Three is narrowly tailored to serve a compelling government interest. Section Three therefore fails strict scrutiny and the Plaintiffs named in this case are entitled to a narrow injunction enjoining its enforcement against them. *See Trump v. CASA*, 2025 WL 1773631, at *7 ("[T]o allow all persons subject to the statute to be treated as parties to a lawsuit would confound the established order of judicial proceedings." (internal quotation marks omitted)).

## B. Eleventh Amendment Immunity

Though the Attorney General's presence in this suit does not practically affect the relief that Plaintiffs might receive with respect to Section Three, he still maintains that the claims against him pertaining to Section Three are barred by Eleventh Amendment immunity. Because this argument is identical to the one that I previously rejected, and no new facts or case law convince me that my earlier ruling was erroneous, I adopt my prior analysis in full here.

The Eleventh Amendment has been held to bar citizens from suing states, including their own, in federal court. *See* U.S. Const. amend. XI; *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 827 (10th Cir. 2007). But this immunity does not extend to state officials sued in their official capacity where the plaintiff seeks only prospective relief based on federal law under what is known as the *Ex parte Young* exception. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)). For this exception to apply, however, the defendant officer must have "some

- 20 -

connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. at 157. But this need not be any "special connection" to the challenged statute; instead, the officer need only "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Edmondson*, 594 F.3d at 760 (internal quotation marks omitted).

The Attorney General argues that he has no "particular duty to enforce Section Three" and that Plaintiffs' arguments "conflate[] his role as head of the Department of Law with his role as Colorado's chief law enforcement officer." Dkt. 177 at 32, 35. He stresses that he has no discretion in deciding whether to initiate an enforcement action based on a referral from the Board[6], and argues that his "client-service duties" to the Nursing Board are too general to overcome the Eleventh Amendment, citing *Edmondson*. *Id*. at 34–36. But the statement from *Edmondson* that an attorney general's "broad duty to prosecute all actions in which the state is interested is not enough to make him a proper defendant in every such action" does not help in this case. 594 F.3d at 760 (citing *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)). Here, the

---

[6]    As Plaintiffs note, the Attorney General is willing to argue the opposite of this position (that the *presence* of discretion defeats Eleventh Amendment immunity) elsewhere. *See Teva Pharms., USA, Inc. v. Weiser*, 709 F.Supp.3d 1366, 1376 (D. Colo. 2023). The fact that the same party can make such conflicting arguments demonstrates some of the issues raised by the puzzling way the Eleventh Amendment has been interpreted by the courts, *see Pennhurst State Sch. & Hosp. v. Halderman*, 495 U.S. 89, 125 (1984) (Brennan, J., dissenting) (stressing "continued belief that the Eleventh Amendment bars federal court suits against States *only by citizens of other States*" (internal quotation marks omitted; emphasis added)), as well as the *Ex Parte Young* doctrine, which has been referred to by the Chief Justice as both a "fiction" and an "empty formalism." *Virginia Off. For. Prot. & Advoc. v. Stewart*, 563 U.S. 247, 266 (2011) (Roberts, J. dissenting).

Attorney General has far more than such a general duty; he has a specific, statutorily enumerated duty to "prosecute those charges that have been referred to [him] by the inquiry panel." Colo. Rev. Stat. §§ 12-240-125(5)(d). Even if this just entails "hiring and supervising the attorneys that represent the boards," as the Attorney General stresses, that is still significant enough to show that he has some connection with the enforcement of Section Three and to easily meet the requirements of *Ex Parte Young*. One who hires and supervises the attorneys responsible for enforcing a law has the power to make important strategic decisions regarding their work and thus necessarily has the requisite connection with enforcement of the law.[7]

The Attorney General also cites *Doyle v. Hogan*, 1 F.4th 249, 256 (4th Cir. 2021) for the same proposition. But in that case, the attorney general only had a duty to "issue advisory opinions" about the law at issue. *Id.* at 256. Here, by contrast, and as noted above, the Attorney General is *required* by Colorado law to bring charges referred to him by the Medical and Nursing Boards. Dkt. 198 at 50; *see also* Dkt. 71 at 24–26. That alone is sufficient to demonstrate he has the required connection to the enforcement of Section Three.

As to his "demonstrated willingness" to enforce Section Three, the Attorney General has not averred that he would refrain from prosecuting a disciplinary action initiated by the Medical or Nursing Boards. I therefore must assume that he is willing to prosecute any charges

---

[7]    It is also worth noting that the Tenth Circuit in *Edmondson* stated that Eleventh Amendment immunity was waived as to Section 7(B) "[f]or the same reasons we concluded that the claimed Section 7(B) injury is redressable," 594 F.3d at 760, which is significant because redressability only requires the relatively insignificant showing that the claimed injury "would be reduced *to some extent* if petitioners received the relief they seek." *Id*. at 757 (quotation marks omitted; emphasis added).

referred to him by the Boards, as required by Colo. Rev. Stat. §§ 12-240-125(5)(d), and that he thus has demonstrated his willingness to enforce Section Three. The Attorney General's motion for summary judgment is thus denied to the extent it claims Eleventh Amendment immunity.

## II. Section Two

With respect to Section Two, both parties renew their arguments regarding standing. The Attorney General, for his part, maintains that "Plaintiffs lack standing" because they "do not advertise that they provide abortions or emergency contraceptives" and because "they are not engaging in the type of conduct that violates the statute." Dkt. 177 at 22–23. Plaintiffs respond that the "AG urges the very same standing arguments this Court previously rejected" and maintain that they credibly fear becoming the targets of an enforcement action brought pursuant to Section Two. Dkt. 198 at 25.

To establish an injury in fact in this context, a plaintiff must show "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and (2) a credible threat of future prosecution." *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007) (internal quotation marks omitted). "To satisfy the injury in fact requirement, the plaintiff must demonstrate that expressive activities will be inhibited by an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement." *Id.* (internal quotation marks omitted). Because these "other consequences" may "chill the exercise of the First Amendment right to speech," they may confer standing even on plaintiffs who do not face a credible threat of future prosecution. *Hill v. Williams*, No. 16-cv-02627-CMA, 2016 WL 8667798, at *5 (D. Colo. Nov. 4, 2016).

Plaintiffs here do not allege that they have been chilled from advertising their services in the way they desire. *See, e.g.*, Dkt. 180 ¶ 10; *see also id.* at 60 (claiming Plaintiffs face a credible fear of enforcement based on advertising with "the same terms that Bella *routinely uses* to describe its core identity") (emphasis added). They simply argue that they are "vulnerable to future enforcement actions" based on "their beliefs, viewpoint, and message." *Id.* at 60. When considering such arguments, courts are to weigh at least three factors:

1. Whether there is evidence of past enforcement against the same conduct;

2. Whether authority to initiate charges is not limited to a prosecutor or an agency and, instead, any person could file a complaint or grievance against the plaintiff; and

3. Whether the state disavowed future enforcement.

*Peck v. McCann*, 43 F.4th 1116, 1132 (10th Cir. 2022).

As to the first factor, it is true that the parties' arguments are largely the same as they were when I found that Plaintiffs did have standing to challenge Section Two. But SB 23-190 was at that time a very young law and the passage of time has changed the impact of those arguments. *See* Dkt. 113 at 23 ("[A]ny lack of enforcement under the CCPA, as amended by SB 23-190, does little to diminish a fear of enforcement given how new the law is."). In the intervening time, it has become clear that Plaintiffs should no longer reasonably fear enforcement of these sections.[8] For one, nearly two years of litigation have elapsed without the Attorney General initiating any investigation of Plaintiffs for a potential violation of Section Two. Dkt. 198 at 25; *cf. Brown v. Herbert*, 850 F.Supp.2d 1240, 1248 (D. Utah 2012) (a new law's "existence alone may create a threat

---

[8]    I still assume that Plaintiffs' advertisements at least arguably violate Sections One and Two for the purposes of this analysis. *See* Dkt. 113 at 21–23.

that is credible enough to create standing"). And even though he has previously brought enforcement actions pursuant to the CCPA, the Attorney General has still "not investigated anyone for violating the CCPA based on their advertising, providing, or offering MAR" since SB 23-190 was passed.[9] Dkt. 177 ¶ 46. This cuts strongly against the Plaintiffs' credible fears of enforcement in this case, even without the certainty that a sworn declaration forswearing enforcement would provide.

As to the second factor, whether the authority to initiate an enforcement action is limited to a prosecutor or an agency, it is significant that third-party complaints do not automatically trigger a prosecution in this context. While it remains true, as I previously emphasized, that "third parties may bring complaints under the CCPA that could also trigger an enforcement action by the attorney general," Dkt. 113 at 24, those complaints do not *automatically* trigger an enforcement action, and the Attorney General has already demonstrated that he will not prosecute every third-party complaint he receives. Dkt. 177 at 20 ("Tellingly, the Attorney General received two complaints about MAR before this lawsuit was filed but took no action based on either complaint."). This too cuts against the existence of a credible fear of enforcement in this case.

Finally, as to the third factor—whether the state has disavowed future enforcement—the Attorney General has consistently represented since the beginning of this case that he "has no plans to investigate anyone under the CCPA for offering, providing, or advertising medication

---

[9]    I acknowledge that this may be due, at least in part, to the fact that enforcement of Section Three as to the Plaintiffs has been preliminarily enjoined as to the Plaintiffs named in this case, and the Attorney General is probably more likely to allow abortion pill reversal clinics to advertise their services where they have also been permitted to perform the underlying service itself. Because I have now permanently enjoined Section Three, however, I see no reason why this should change the analysis.

abortion reversal." Dkt. 177-10 ¶ 9. All three "credible threat" factors therefore point towards this dispute no longer being justiciable, and Plaintiffs have not provided any compelling reason for me to find otherwise.

In light of this, Plaintiffs no longer face a credible fear of enforcement of Section Two from the Attorney General. They thus no longer have standing to pursue this claim and Defendants' motions for summary judgment as to Section Two must be granted. Should it become clear that an investigation of Plaintiffs' speech is underway or that the Attorney General's view of Plaintiffs' conduct has shifted, that might warrant a renewed motion, but until then any substantive opinion on the legal merits of Section Two would be merely advisory.

## CONCLUSION

It is **ORDERED** that:

The Attorney General and Boards' Motions for Summary Judgment, **Dkt. 177** and **178**, are **granted in part**, and Plaintiffs' claims pertaining to Sections One and Two of SB 23-190 are dismissed; and

Plaintiffs and Plaintiff-Intervenor's Motions for Summary Judgment, **Dkt. 179** and **180**, are **granted in part** and Defendants, their officers, agents, servants, employees, attorneys, and any others who are in active concert or participation with them are **permanently enjoined** from—

Taking any enforcement action under Section Three of SB 23-190 or its implementing regulations against Plaintiffs and all those acting in concert with them based on their provision of abortion pill reversal

treatment.

DATED: August 1, 2025                BY THE COURT:

~~Daniel~~ D. Domenico
United States District Judge